# 23-1226-cv

## United States Court of Appeals
### *for the*
## Second Circuit

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff-Appellee,*

— v. —

THE DRAMATIC PUBLISHING COMPANY,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR PLAINTIFF-APPELLEE

WOOK HWANG
JONATHAN ZAVIN
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
(212) 407-4000

KEANE BARGER
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, Tennessee 37203
(615) 749-8300

*Attorneys for Plaintiff-Appellee*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Atticus Limited Liability Company, by and through its undersigned counsel, states that it has no parent corporation and no public company owns ten percent or more of its stock.

 March 13, 2024                         LOEB & LOEB LLP

                                         By:  */s/ Jonathan Zavin*
                                             Jonathan Zavin

                                         *Counsel for Plaintiff-Appellee Atticus*
                                         *Limited Liability Company*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ...........................7

COUNTER-STATEMENT OF THE CASE ............................................8

I.    THE 1969 GRANT OF EXCLUSIVE AMATEUR STAGE RIGHTS IN THE NOVEL FROM HARPER LEE TO DRAMATIC AND SUBSEQUENT TERMINATION THEREOF ..............8

II.   THE AARON SORKIN STAGE ADAPTATION OF THE NOVEL PRODUCED BY ATTICUS ............................................................9

III.  DRAMATIC'S 2019 ARBITRATION AGAINST THE LEE ESTATE........................................................................................10

IV.  THE DISTRICT COURT PROCEEDINGS .................................13

V.   THE DISTRICT COURT'S REJECTION OF EACH OF THE ARGUMENTS DRAMATIC RAISES ON APPEAL .................................15

SUMMARY OF ARGUMENT ........................................................18

ARGUMENT ................................................................................21

I.    THE DISTRICT COURT CORRECTLY REJECTED DRAMATIC'S POSITION THAT THE DERIVATIVE RIGHTS EXCEPTION RENDERS GRANTS OF COPYRIGHT EXCLUSIVITY *IN*TERMINABLE............................................21

     A.   The Language and Core Purpose of Copyright Termination Conclusively Refute Dramatic's Position ...........................................21

     B.   The Derivative Works Exception Provides No Support for Dramatic's Position ...............................................................24

II.   DRAMATIC'S REMAINING ARGUMENTS ARE EQUALLY MERITLESS................................................................................31

     A.   The Extent of Atticus's Stage Rights to the Novel Is Irrelevant to this Action........................................................31

B.      Dramatic's Statute-of-Limitations Argument Fails ...........................33

    1.      The One-Time Accrual Rule Does Not Apply to
            Claims that Merely Challenge Another's Claim of
            Copyright Ownership ...............................................................33

    2.      Dramatic Waived this Argument by Failing to Raise It
            In Response to Atticus's Motion for Complete
            Summary Judgment ................................................................38

C.      Atticus and Its Predecessor-in-Interest Did Not "Agree" to
        Be Bound to the Results of Any Arbitration to Which It Was
        Not a Party .........................................................................................43

CONCLUSION .....................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)..................................................................................29

*Application of Royal Bank of Canada*,
33 F.R.D. 296 (S.D.N.Y. 1963) ..........................................................41

*APWU v. Potter*,
343 F.3d 619 (2d Cir. 2003) ....................................................... 29-30

*Baldwin v. EMI Feist Catalog, Inc.*,
805 F.3d 18 (2d Cir. 2015) ...................................................22, 30

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
193 F.3d 415 (6th Cir. 1999) ...............................................................44

*Busher v. Barry*,
No. 20-3587-cv, 2021 U.S. App. LEXIS 32561
(2d Cir. Nov. 2, 2021).........................................................................39

*Cabell v. Zorro Prods.*,
No. 5:15-cv-00771-EJD, 2018 U.S. Dist. LEXIS 80262
(N.D. Cal. May 11, 2018) ..................................................................35

*Case v. Eslinger*,
555 F.3d 1317 (11th Cir. 2009) .........................................................38

*Charles v. Seinfeld*,
803 F. App'x 550 (2d Cir. 2020) .......................................................36

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) ............................................................30

*Compania Maritima Transoceanica, S. A. v. Ocean Freighting & Brokerage Corp.*, 10 F.R.D. 129 (S.D.N.Y. 1950)............................41

*Cuomo v. Clearing House Ass'n, L.L.C.*,
557 U.S. 519 (2009).........................................................................29

*Dramatic Publ'g Co. v. Carter*,
   608 F. Supp. 3d 618 (N.D. Ill. 2022) .....................................................13

*Ferrarini v. Individual*,
   No. 21-597-cv, 2022 U.S. App. LEXIS 14862
   (2d Cir. May 31, 2022), *cert denied*, 143 S. Ct. 570 (2023) .............................36

*FurryRecords, Inc. v. RealNetworks, Inc.*,
   No. 01 Civ. 10998 (JSR), 2002 U.S. Dist. LEXIS 16272
   (S.D.N.Y. Aug. 29, 2002) ...................................................................30

*Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc.*,
   697 F.3d 59 (2d Cir. 2012) ................................................................34

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
   716 F.3d at 317 ......................................................................34, 36

*Garza v. Everly*,
   59 F.4th 876 (6th Cir. 2023) ..............................................................37

*Horror Inc. v. Miller*,
   15 F.4th 232 (2d Cir. 2021) ...........................................................33, 36

*IBEW v. CSX Transp., Inc.*,
   369 F. Supp. 2d 982 (N.D. Ill. 2005),
   *aff'd*, 446 F.3d 714 (7th Cir. 2006)......................................................13

*Johnson v. Bd. of Regents*,
   263 F.3d 1234 (11th Cir. 2001) ...........................................................42

*Knipe v. Skinner*,
   999 F.2d 708 (2d Cir. 1993) ..............................................................12

*Kwan v. Schlein*,
   634 F.3d 224 (2d Cir. 2011) ..........................................................33, 36

*Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*,
   738 F. App'x 722 (2d Cir. 2018) ..........................................................36

*Mahan v. ROC Nation, LLC*,
   634 F. App'x 329 (2d Cir. 2016) ..........................................................36

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) .........................................................21, 29

*Mills Music v. Snyder*,
  469 U.S. 153 (1985)....................................................................*passim*

*Narragansett Elec. Co. v. Am. Home Assur. Co.*,
  999 F. Supp. 2d 511 (S.D.N.Y. 2014) ...............................................41

*Narragansett Elec. Co. v. Am. Home Assurance Co.*,
  921 F. Supp. 2d 166 (S.D.N.Y. 2013) ......................................... 41-42

*O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on
  September 11, 2001 (Saudi Joint Relief Comm.))*,
  714 F.3d 109 (2d Cir. 2013) ...................................................... 37-38

*OXY USA Inc. v. United States DOI*,
  32 F.4th 1032 (10th Cir. 2022) .........................................................13

*Palmieri v. Lynch*,
  392 F.3d 73 (2d Cir. 2004) ...............................................................39

*Penguin Grp. (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008) ....................................... 18, 22, 23, 24

*Petrella v. MGM*,
  572 U.S. 663 (2014)..........................................................................33

*Phx. Light SF, Ltd. v. U.S. Bank Nat'l Ass'n*,
  No. 14-CV-10116 (VSB), 2020 U.S. Dist. LEXIS 144731
  (S.D.N.Y. Aug. 12, 2020), *aff'd*, 2021 U.S. App. LEXIS 29749
  (2d Cir. Oct. 4, 2021) .................................................................. 38-39

*Polk v. Sherwin-Williams Co.*,
  No. 3:16-cv-1491 (MPS), 2017 U.S. Dist. LEXIS 46088
  (D. Conn. Mar. 29, 2017)..................................................................40

*Ray v. Ray*,
  22 F.4th 69 (2nd Cir. 2021) ..............................................................21

*SEC v. Miller*,
  808 F.3d 623 (2d Cir. 2015) .............................................................29

*Simmons v. Stanberry*,
  810 F.3d 114 (2d Cir. 2016) ...............................................................36

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)...............................................................44, 45

*Triodetic Inc. v. Statue of Liberty IV, LLC*,
  582 F. App'x 39 (2d Cir. 2014) .......................................................39

*United States Naval Inst. v. Charter Commc'ns, Inc.*,
  936 F.2d 692 (2d Cir. 1991) .......................................................23-24

*United States v. Drame*,
  No. 18 Civ. 11480 (AKH), 2021 U.S. Dist. LEXIS 64268
  (S.D.N.Y. Apr. 1, 2021)...............................................................38

*Vela v. City of Houston*,
  276 F.3d 659 (5th Cir. 2001) ...............................................................39

*Vineberg v. Bissonnette*,
  529 F. Supp. 2d 300 (D.R.I. 2007), *aff'd*, 548 F.3d 50 (1st Cir.
  2008) ...............................................................39

*W. P. Carey, Inc. v. Bigler*,
  No. 18 Civ. 585 (KPF), 2019 U.S. Dist. LEXIS 51975
  (S.D.N.Y. Mar. 27, 2019) ...............................................................40

*Waite v. UMG Recordings, Inc.*,
  477 F. Supp. 3d 265 (S.D.N.Y. 2020) ...............................................................32

*Waldman v. PLO*,
  82 F.4th 64 (2d Cir. 2023) ...............................................................32

*Williams v. Univ. Med. Ctr. of S. Nev.*,
  No. 2:09-CV-00554-PMP-PAL, 2010 U.S. Dist. LEXIS 76995
  (D. Nev. July 28, 2010)...............................................................39

*Wilson v. Dynatone Publ'g Co.*,
  892 F.3d 112 (2d Cir. 2018) ...............................................................36

**Statutes**

17 U.S.C. § 101 ...................................................................................23

17 U.S.C. § 203(b)(1)..............................................................................3

17 U.S.C. § 304(c) ........................................................................*passim*

17 U.S.C. § 501(b) ..............................................................................24

17 U.S.C. § 507(b) ......................................................................7, 19, 33

**Court Rules and Other Authorities**

Fed. R. Civ. P. 8(b)(1)...........................................................................40

Fed. R. Civ. P. 12(b) .............................................................................40

Fed. R. Civ. P. 56(b) .............................................................................40

Fed. R. Civ. P. 56(d) .............................................................................42

3 Nimmer on Copyright § 11.01 (2023) ...............................................22

3 Nimmer on Copyright § 12.05 (2022) ...............................................35

15 Nimmer on Copyright – COPYRIGHT LAW REVISION, FURTHER DISCUSSIONS AND COMMENTS ON PRELIMINARY DRAFT FOR REVISED U.S. COPYRIGHT LAW, Transcript of Meetings, August 15-16, 1963...........................................................................................27

15 Nimmer on Copyright – COPYRIGHT LAW REVISION, PRELIMINARY DRAFT FOR REVISED U.S. COPYRIGHT LAW AND DISCUSSIONS AND COMMENTS OF THE DRAFT, Transcript of Meeting, June 11, 1963 ..................27

Restatement (Second) of Judgments § 40 Comment b ...........................44

**INTRODUCTION**

The core of this appeal turns on a straightforward issue of copyright law: whether a grant of exclusive rights to a copyrighted work is subject to termination pursuant to the Copyright Act's termination provision, 17 U.S.C. § 304(c). The plain language of the relevant statutory provisions resolves this inquiry. *See* 17 U.S.C. § 304(c) ("the exclusive or nonexclusive grant" of a copyright interest "is subject to termination") (emphasis added); 17 U.S.C. 304(c)(6) ("all rights under this title that were covered by the terminated grant revert, upon the effective date of termination"). But, improperly seeking to perpetuate the copyright monopoly it enjoyed for nearly half a century, Appellant The Dramatic Publishing Company ("Dramatic")— without a shred of legal support, and with *all* legal authority refuting its thesis—asks this Court to erase these provisions from the Copyright Act. The District Court "readily" rejected Dramatic's position with its thorough and well-reasoned decision, and it should be rejected again.

Dramatic is the recipient of a 1969 grant (the "1969 Grant") by which author Harper Lee granted Dramatic an exclusive license to stage amateur productions of her novel *To Kill a Mockingbird* (the "Novel"), among the most highly regarded and widely read works in the history of American literature. Pursuant to the 1969 Grant, Dramatic's then-President, Christopher Sergel, prepared a stage adaptation of the Novel (the "Sergel Play") that Dramatic has licensed and otherwise exploited over

the ensuing decades.  In 2011, Lee served Dramatic with a notice to terminate the 1969 Grant pursuant to Section 304(c) of the Copyright Act.  This provision confers authors of pre-1978 works with the inalienable right to terminate grants of copyright interests after a prescribed time period, a right Congress specifically created so that authors and their heirs could benefit from the extended term of copyright that was codified at the same time.  Dramatic has never contested the validity of this termination, and does not contest it on this appeal.

In Dramatic's words, "[t]he issue is whether Dramatic retained **exclusive ownership rights** in the rights granted to it by Ms. Lee under … the 1969 Agreement" following termination.  ECF 77 at 14 (emphasis added).[1]  Settled law— including the single decision upon which Dramatic places virtually exclusive reliance—is unambiguous and uniform that the termination "caused the ownership of the copyright to revert" to Harper Lee's heirs.  *Mills Music v. Snyder*, 469 U.S. 153, 167 (1985).  But Dramatic claims that it somehow retains the same "exclusive ownership rights"—to the exclusion of Harper Lee's estate, the recipient of the reverted rights; to the exclusion of Atticus, the company responsible for the production of another stage adaptation written by playwright Aaron Sorkin (the

---

[1] All citations to "ECF" refer to the filings on the docket in the District Court action, with corresponding docket entry numbers.  Citations to "AOB" are made to Appellant Dramatic's opening brief (Dkt. No. 55) on this appeal.

"Sorkin Play"); and to the exclusion of every school, community theater or anyone else looking to present an amateur stage production of the Novel other than Dramatic's own.  In other words, Dramatic's thesis is that a concededly valid termination accomplished *nothing at all*—a result the District Court correctly observed would render any and all grants of exclusive licenses *in*terminable, and thereby "eviscerate the statutory termination right" altogether.  ECF 65 at 18.

Dramatic rests its argument on the so-called "derivative rights exception" (*see* 17 U.S.C. § 304(c)(6)(A); *see also* 17 U.S.C. § 203(b)(1)), a carve-out to statutory termination that does nothing more than permit a licensee, after termination, to continue to "utilize" derivative works prepared under the grant prior to termination.  But no one including Atticus has ever contested Dramatic's right to continue to "utilize" the Sergel Play subject to the terms of the 1969 Grant.  Instead, the result Dramatic seeks is to transform its uncontested right to "utilize" the Sergel Play into an interminable copyright monopoly over rights in the Novel, and thereby have the derivative works "exception" swallow the termination rule in its entirety.

That of course is not the law.  The plain language of the Copyright Act, applicable decisional authority, the legislative history, the treatises, the most basic canons of statutory construction and, indeed, the very purpose of copyright termination *all* refute Dramatic's remarkable overreach.  Accordingly, in the 40-plus years since authors' termination rights were enshrined in the Copyright Act of 1976,

no court has ever held or even implied that a grant of copyright exclusivity can never be terminated. Dramatic's appeal that this Court be the first to do so lacks all merit, and should be rejected.

The remainder of Dramatic's arguments are equally meritless, and mere sideshow in an attempt to foist its distortion of the Copyright Act on Atticus through alternative legal theories so unreasonable they warranted the imposition of a fee award against it.[2]

*First*, Dramatic's argument that Atticus itself did not acquire any amateur stage rights from Ms. Lee is not only wrong, but also misses the point entirely. Atticus has not sued for a declaration of *Atticus's* ownership rights, but rather sought (and secured) a declaration (i) that it has the right "in relation to Dramatic" to present the Sorkin Play, and (ii) that any such presentations "have not infringed and do not infringe any copyright interest Dramatic holds in and to the Novel." ECF 100 at 3. The only issue on which this inquiry hinges is whether *Dramatic* continues to hold exclusive rights in the Novel post-termination and thus has standing to sue *anyone* for copyright infringement (it does not)—a reality Dramatic itself repeatedly

---

[2] For the reasons set forth herein, and as will be further addressed in Atticus's cross-appeal of the District Court's fee award, Dramatic's legal position on termination is just as objectively unreasonable, and Atticus should be awarded the fees incurred in defending that argument as well.

acknowledged, and emphasized, in the proceedings below. *See, e.g.,* ECF 77 at 15 ("This is a case about the extent of Dramatic's ownership rights.").

*Second*, Dramatic's argument that Atticus's claim is time-barred misses the mark just as widely, and for much the same reason. While Dramatic is correct that a one-time-accrual rule applies to a party *asserting* copyright ownership—in this case, Dramatic—it has never been held to apply to a party (like Atticus) *contesting* another's claim of copyright ownership. If Dramatic's interpretation of the statute of limitations were correct, it could claim "exclusive" ownership to any work via public pronouncement—including, for example, the entire Shakespearean corpus, or the Bible—and later assert a time-bar against any challenge to its claimed "exclusivity" by anyone who had heard it. This comedy of errors of course has no support in the law. The District Court also rightly applied clear Second Circuit authority to hold that Dramatic waived this argument in any event by failing to raise it in response to Atticus's motion for complete summary judgment—a procedure that would be rendered futile if a party could assert a defense or any other position *after* a summary judgment ruling against it and thereby escape its impact.

*Third*, and finally, Dramatic's argument that Atticus contractually "agreed" to be bound by the results of any potential future third-party arbitration seeks to rewrite the plain language of the very agreement on which Dramatic relies. That agreement, between Ms. Lee and Atticus's predecessor, does not mention arbitration at all and

merely acknowledged that Dramatic continues to have the post-termination right to exploit the Sergel Play "**on a non-exclusive basis**"—dispositive contractual language Dramatic fails even to mention, much less address, in its principal brief. Dramatic's contention that Atticus agreed to be bound by an arbitration to which it was never a party, and erroneously reaching the *opposite* conclusion, is wrong.

For each of these reasons, Atticus respectfully submits that the District Court's judgment should be affirmed in all respects.

## COUNTER-STATEMENT OF ISSUES PRESENTED

1.    Did the District Court correctly rule that Dramatic cannot claim exclusive rights in the Novel, in relation to Atticus, following the uncontested termination of the 1969 Grant pursuant to 17 U.S.C. § 304(c)?

2.    Did the District Court correctly conclude that the scope of Atticus's rights in the Novel does not bear on the question of whether Dramatic can assert exclusive rights in the Novel against Atticus?

3.    Did the District Court correctly rule that the Copyright Act's statute of limitations, 17 U.S.C. § 507(b), does not time-bar Atticus's challenge to Dramatic's claimed copyright ownership?

4.    Did the District Court correctly rule that Dramatic waived its statute of limitations argument by failing to raise it in opposition to Atticus's motion for complete summary judgment?

5.    Did the District Court correctly rule that Atticus did not agree to be bound by the results of a future private arbitration to which Atticus was not a party, and reaching a result contradicting the plain language of the agreement by which Dramatic claims Atticus agreed to be so bound?

## COUNTER-STATEMENT OF THE CASE

## I. THE 1969 GRANT OF EXCLUSIVE AMATEUR STAGE RIGHTS IN THE NOVEL FROM HARPER LEE TO DRAMATIC AND SUBSEQUENT TERMINATION THEREOF

Harper Lee ("Lee") and Dramatic are parties to the 1969 Grant pursuant to which Lee granted Dramatic the right to "write or cause to be written a dramatization based upon and/or adapted from the [Novel.]" ECF 30-4 § 2(a). Conferring Dramatic with exclusive amateur stage rights to the Novel, the 1969 Grant provided that "said dramatization (hereinafter called the 'Play') is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed[.]" *Id.*

The scope of Dramatic's exclusive rights to present "amateur stage productions" were defined as follows (*id.* § 4(e)):

> The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

Pursuant to the 1969 Grant, Dramatic's then-President, Christopher Sergel, wrote the Sergel Play. ECF 30-2 at 22. Dramatic has for decades since licensed the Sergel Play to third parties. *Id.* at 35-36.

In April 2011, Lee served a notice terminating the 1969 Grant pursuant to Section 304(c) of the Copyright Act, with an effective date of termination of April 26, 2016. ECF 30-7.

## II. THE AARON SORKIN STAGE ADAPTATION OF THE NOVEL PRODUCED BY ATTICUS

Following service of her termination notice, Lee entered into an agreement with Atticus's predecessor-in-interest, No Ice, Inc. ("No Ice") f/k/a Rudinplay, Inc., to create a new stage adaptation of the Novel (the "Option Agreement"). ECF 37-3. Lee designated No Ice as agent to select a playwright. *Id.* § 1. Upon Lee's written approval of the selected playwright, No Ice would have the option to acquire the right to "create, develop, produce and present a live stage play" based on the Novel. *Id.* §§ 2(a) & 3(a). That option would be "exercised" upon the "initial commercial first class production" of the play on Broadway or London's West End. *Id.* § 4.

Recognizing the import of the Copyright Act's derivative works exception, the Option Agreement acknowledged that Dramatic would remain free to continue exploiting the Sergel Play in amateur productions following the exercise of No Ice's option, but only on a "non-exclusive basis":

> [No Ice] acknowledges that pursuant to an agreement (the "Prior Agreement") dated June 26, 1969 between [Lee] and [Dramatic], [Lee] granted [Dramatic] the right to create a play (the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (as defined in the [1969 Grant]) in the Prior Adaptation. Author represents that it has terminated the [1969 Grant] effective April 26, 2016. [No Ice] acknowledges that, notwithstanding such termination, the amateur

acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement **on a non-exclusive basis in the United States**, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, **as limited by such termination**.

*Id.* § 2(b) (emphasis added).

No Ice thereafter contracted with famed playwright and screenwriter Aaron Sorkin ("Sorkin") to write the new stage adaptation of the Novel. By agreement dated December 12, 2018, No Ice assigned its rights under the Option Agreement to Atticus. ECF 37-5 § 1.

The Sorkin Play premiered at the Shubert Theatre on Broadway on December 13, 2018. ECF 37 ¶ 11. Pursuant to the Option Agreement's terms, the December 2018 Broadway opening exercised the option and thus effectuated the grant of amateur stage rights to Atticus.

## III.   DRAMATIC'S 2019 ARBITRATION AGAINST THE LEE ESTATE

On March 7, 2019, Dramatic filed an arbitration demand against the Estate of Harper Lee and Harper Lee, LLC (together, the "Estate"). ECF 78-3. Atticus was not a party to the arbitration. *Id.*

Dramatic broadly claims in its principal brief that Atticus "litigated" the arbitration "via the Estate," and "worked in lockstep with the Estate to defend against Dramatic's claims." *See* AOB at 3, 23. The evidentiary record conclusively refutes this narrative. Over the two-and-half year span from the commencement of the

arbitration to its conclusion, Atticus and its counsel had little involvement in the arbitration beyond intermittent requests to be kept apprised.[3]   ECF 86 at 2-4. Accordingly, upon its review of the evidence, the District Court rejected Dramatic's "unsubstantiated speculation" that Atticus exercised "control" over the Estate in the arbitration (ECF 88 at 2 (citation omitted))—a factual theory the District Court found so "far-fetched" and "untethered to any reliable evidence" (ECF 109 at 11) as to warrant an award of attorney's fees against Dramatic.  Not surprisingly, Dramatic makes no mention or even suggestion that Atticus "controlled" the Estate in its principal brief, declining to raise it in its Statement of Issues.  AOB at 5.  To the

---

[3] The sparse communications between Atticus and the Estate's representative (ECF 86-7 – 86-14) reflect this reality, showing Atticus's counsel asking: "What is the current status/schedule of the arbitration?"; "What is the status of the arbitration. Have you testified yet, so that you can talk to me about it?"; "How many days has it [the hearing] gone so far?"; "I look forward to you telling me about this when it's over."; "What is the status of the arbitration?"; "Any word on whether you can talk to me.  Both my client and I are, to say the least, curious as to what's going on."; "What is the status of the arbitration?  Any end in sight?" *Id.*

Dramatic's blithe assertion (AOB at 23) that Atticus "worked in lockstep with the Estate to defend against Dramatic's claims" is obviously false.  And the emphasis it places on comments Atticus's counsel provided to a single brief the Estate submitted in the arbitration ignores that this was a post-hearing brief spanning scores of pages, submitted after more than two years of proceedings in which Atticus was not involved.  Atticus's counsel suggested only a few short paragraphs with additional legal cites, and those were sent by a cover email in which Atticus's counsel noted: "Obviously you will adopt or not adopt this as you will."  ECF 86 at 3; ECF 86-14.  As the District Court rightly found, this provided no support for Dramatic's theory that Atticus "controlled" the Estate in the arbitration, and it provides no support for its contention now that Atticus "worked in lockstep with the Estate" in that two-and-a-half year proceeding.

extent Dramatic seeks to resuscitate its unfounded theory of "control" in reply, it has been waived. *See, e.g., Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

On October 21, 2021, the private attorney serving as sole arbitrator in the proceeding entered an Interim Award of Arbitration (the "Award"; ECF 30-2, at 21-108). In the Award, the arbitrator stated: "I have determined that, by virtue of the Exception, Dramatic continues to hold after termination of the original grant all the exclusive rights granted to it in the 1969 Agreement." ECF 30-2 at 81. Accordingly, the arbitrator ruled, *inter alia*:

> The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights') and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

*Id.* at 26 ¶ 10. In so ruling, the arbitrator purported to rely on "the absence of any clear statement in the [copyright] statute divesting derivative authors of the exclusive rights granted in the original contract" (*id.* at 88-89), disregarding the Copyright Act's plain language that "the exclusive or nonexclusive grant" of a copyright interest "is subject to termination." 17 U.S.C. § 304(c).

On October 19, 2021, Dramatic moved to confirm the Award in the United States District Court for the Northern District of Illinois. ECF 37-7. Atticus was not a party to that proceeding either. *See id.* On January 13, 2023, the district court

in that proceeding entered judgment confirming the Award (ECF 37-8), constrained by the principle that "arbitration awards are largely immune from . . . . scrutiny in court." *Dramatic Publ'g Co. v. Carter*, 608 F. Supp. 3d 618, 621-22 (N.D. Ill. 2022) (quoting *Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021)).[4]  The court thus could not analyze whether the arbitrator erred in determining that exclusive licenses remain exclusive following termination—a constraint that does not apply here.  *See, e.g., OXY USA Inc. v. United States DOI*, 32 F.4th 1032, 1048 (10th Cir. 2022) ("arbitration awards and decisions have no precedential effect in other cases"); *IBEW v. CSX Transp., Inc.*, 369 F. Supp. 2d 982, 987 n.2 (N.D. Ill. 2005) ("arbitration awards are of no precedential value in a district court"), *aff'd*, 446 F.3d 714 (7th Cir. 2006).[5]

## IV.   THE DISTRICT COURT PROCEEDINGS

Atticus commenced this action on November 30, 2022, seeking a declaratory judgment that: (1) "Atticus and Aaron Sorkin have the right, in relation to DPC [i.e., Dramatic], to present any and all … [p]erformances … of the Sorkin Play in the United States" and (2) "any such productions of the Sorkin Play have not infringed

---

[4] As Dramatic itself explained in its briefing to the Northern District of Illinois, in a confirmation proceeding the "arbitrator's decision is binding and unreviewable as to the parties to the arbitration."  ECF 37-9 at 7-8, 16-17 (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d. 829, 832 (7th Cir. 2003)).

[5] As Dramatic notes (AOB at 17), the Estate has appealed from the confirmation judgment.  That appeal remains pending but has been stayed.  *Id.*

and could not infringe any purported copyright interest DPC claims to holds to the Novel." ECF 1 at 13-14.

On January 23, 2023, Dramatic filed a motion to dismiss (ECF 28) the complaint, arguing, *inter alia*, that Atticus was bound to the results of the arbitration and, separately, that it retained post-termination copyright ownership under the derivative works exception, 17 U.S.C. § 304(c)(6)(A), as a matter of copyright law. *See generally* ECF 29. On February 6, 2023, Atticus cross-moved for summary judgment seeking complete relief on its declaratory judgment claim. *See* ECF 34, 35, 36. Dramatic opposed the motion, but nowhere in its voluminous filings (on either motion) did it raise the argument that Atticus's claim was barred by the Copyright Act's statute of limitations. *See* ECF 29, 47, 50, 57, 60, 61.

By Opinion and Order dated April 27, 2023 (ECF 65), the District Court denied Dramatic's motion to dismiss and granted Atticus's motion for summary judgment, except leaving open one issue for potential fact discovery: "whether Dramatic is entitled to discovery on the issue of whether Atticus controlled the Lee Estate in its arbitration with Dramatic" such that Atticus could be deemed to be precluded by the arbitration Award. *Id*. at 34.

On May 11, 2023, two weeks after the summary judgment ruling, Dramatic raised its statute of limitations argument for the first time as an affirmative defense in a purported answer. ECF 72 ¶¶ 61-67. On June 2, 2023, after receiving the

District Court's leave (*see* ECF 75), Dramatic filed a motion for summary judgment based on this newly raised statute of limitations defense, seeking an order, *inter alia*, "dismissing, with prejudice, the complaint in this action" (ECF 76).

Following a May 25, 2023 conference to resolve the open discovery issue (*see* DE 84), Atticus, in accordance with the District Court's directive, produced the emails sent from its counsel to an Estate representative over the two-and-a-half-year lifespan of the arbitration, conclusively refuting Dramatic's speculation that Atticus had somehow "controlled" the Estate in the arbitration in which Dramatic itself was the claimant. *See* ECF 86 at 2-4.

## V. THE DISTRICT COURT'S REJECTION OF EACH OF THE ARGUMENTS DRAMATIC RAISES ON APPEAL

By Opinion and Order dated July 24, 2023 (ECF 87), the District Court denied Dramatic's statute-of-limitations motion. By Order dated July 25, 2023 (ECF 88), the District Court resolving the open issue of "control" in Atticus's favor and thus granted Atticus's motion for summary judgment in full. Together with the prior April 27, 2023 Opinion and Order (ECF 65), the District Court rejected each of the arguments Dramatic raises in this appeal:

1.     The District Court rejected (ECF 65 at 18) Dramatic's argument that it can claim to hold exclusive rights in the Novel following termination, explaining that Dramatic's "interpretation fails. Such a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable. The Derivative

Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c)." *Id.*

2.      The District Court rejected (*id.* at 32) Dramatic's argument that this action is barred because the Option Agreement purportedly did not validly convey exclusive rights to Atticus.  That issue, the District Court explained, is "irrelevant to the issues to be decided in this litigation": whether "*Dramatic* has exclusive rights" in the Novel and therefore the "power to bar anyone from performing derivative works based on the Novel."  *Id.* (emphasis added).

3.      The District Court rejected (ECF 87 at 7-11) Dramatic's argument that Atticus's claim for declaratory relief was time-barred, explaining once again that Atticus's "ownership interest in the Sorkin Play is not being litigated here" (*id.* at 10); that Dramatic's position on this issue "invites serious error" and "makes little sense" (*id.*); and, independently, that Dramatic's motion was "untimely" because "Dramatic waived its right to bring that argument" (*id.* at 11) after having failed to raise it in opposition to Atticus's cross-motion for summary judgment.

4.      The District Court rejected (ECF 65 at 23-27) Dramatic's argument that Atticus had "agreed" to be bound to the results in the arbitration to which it was not party, because, in accordance with the derivative works exception, the language of the Option Agreement "simply acknowledges that Lee had previously given Dramatic a license to create a derivative work, and that the license given to [Atticus]

to create another derivative work from the Novel would not preclude Dramatic from performing the Sergel Play." *Id.* at 24-25.

On August 1, 2023, the District Court entered Judgment granting Atticus complete declaratory relief. ECF 92. Pursuant to Stipulation and Order, the final Amended Judgment was entered on August 28, 2023, declaring that (1) "Atticus and Aaron Sorkin have the right, in relation to Dramatic, to present any and all performances of the Sorkin Play in the United States"; and (2) "Any such productions of the Sorkin Play in the United States have not infringed and do not infringe any copyright interest Dramatic holds in and to the Novel." ECF 100.[6]

---

[6] By Opinion and Order dated October 31, 2023 (ECF 109), the District Court granted a partial award of attorneys' fees to Atticus. Both Dramatic and Atticus have appealed from the Court's ruling on attorney's fees, which appeals have been consolidated with the instant appeal and are pending before this Panel.

# SUMMARY OF ARGUMENT

The District Court's Judgment should be affirmed in all respects. Each of the arguments Dramatic advances on this appeal provide no basis for reversal.

Dramatic's principal argument that it retains "exclusive ownership" of the amateur stage rights in the Novel, despite the valid and uncontested termination of the 1969 Grant by which it originally acquired those rights in 1969, is refuted by all applicable authority. That includes the plain language of the Copyright Act, the legislative history, the treatises, all canons of statutory construction and, indeed, the very purpose of the statutory termination right to "cause[] the ownership of the underlying copyright to revert" to authors and their statutory heirs (*Mills Music*, 469 U.S. at 163) and thereby permit them to "recapture" the value of the rights so reverted. *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197-98 (2d Cir. 2008).

The derivative works "exception" on which Dramatic relies provides no support for its position, as that provision (17 U.S.C. § 304(c)(6)(A)) merely permits a prior licensee to continue to "utilize" derivative works created before termination under authority of the grant on a non-exclusive basis post-termination. Dramatic's interpretation is one so absurd that it would not only prevent copyright ownership from reverting to authors and their heirs, but would subject them to *liability* for exploiting the very rights reverting to them pursuant to the inalienable statutory

termination right.  The District Court correctly concluded that Dramatic's "interpretation fails," among other reasons, because its "reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable. The Derivative Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c)."  ECF 65 at 18.

Each of Dramatic's remaining arguments are equally meritless, and just as easily disposed:

*First*, Dramatic's argument that Atticus did not validly acquire amateur stage rights from Harper Lee is entirely irrelevant.  As Dramatic has repeatedly characterized it, Atticus brought this action for the purpose of "challenging Dramatic's exclusive ownership claim."  ECF 77 at 4.  The declaratory relief Atticus sought and obtained confirms this, and that Atticus's own rights are irrelevant to the determination of whether *Dramatic* retains "exclusive ownership" so as to have standing to sue *anyone*, including Atticus, over any amateur stage presentation based on the Novel.  This inquiry, in Dramatic's own words, turns solely on "the extent of *Dramatic's* ownership rights" (ECF 77 at 15 (emphasis added)) after termination.  It has none.

*Second*, Dramatic's contention that Atticus's claim is time-barred under the Copyright Act's statute of limitations, 17 U.S.C. § 507(b), fails for the same reason—because the declaratory relief Atticus sought turns solely on the scope of

*Dramatic's* ownership rights in the Novel. As Dramatic itself has explained, in raising this very argument in the proceedings below, Atticus brought this action for the purpose of "challenging Dramatic's exclusive ownership claim" (ECF 77 at 4). No court, in any jurisdiction, has ever held that a party can be time-barred from *challenging* an adverse party's claim of copyright ownership—a proposition that would allow anyone claiming "ownership" over *any* work, however erroneous, to time-bar anyone else from challenging that claim. There is no law supporting this nonsensical result. Additionally, under settled law in this Circuit, Dramatic waived this argument by failing to raise it in opposition to Atticus's motion for complete summary judgment.

*Third*, Dramatic's final argument that Atticus somehow agreed to be bound by the results of a third-party arbitration between Dramatic and the Estate, to which Atticus was never a party, is refuted by the very agreement by which Dramatic claims Atticus so "agreed." That agreement makes no mention of arbitration (or any third-party dispute) at all, and merely acknowledged that Dramatic would continue to have the right to utilize and exploit its own stage adaptation of the Novel (the Sergel Play) "*on a non-exclusive basis*[.]" ECF 37-3 at § 2(b) (emphasis added). Atticus *never* "agreed" to be bound to the results of any third-party arbitration to which it was not a party, reaching the opposite conclusion that Dramatic retains any exclusive ownership rights in contravention of the Copyright Act's plain terms.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY REJECTED DRAMATIC'S POSITION THAT THE DERIVATIVE RIGHTS EXCEPTION RENDERS GRANTS OF COPYRIGHT EXCLUSIVITY *IN*TERMINABLE

The applicable standards for resolving the core statutory dispute on this appeal are familiar, and have been explicated by this Court in reference to Section 304(c) of the Copyright Act specifically:

> In order to determine the meaning of § 304(c), [the Court] appl[ies] the well established canons of statutory construction. In interpreting a statute, we look first to the language of the statute itself. When the language of a statute is unambiguous, judicial inquiry is complete. When the terms of a statute are ambiguous, however, we may seek guidance in the legislative history and purpose of the statute. In so doing, we must construct an interpretation that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results.

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289-90 (2d Cir. 2002) (internal citations, quotations marks and alteration omitted); *see also, e.g., Ray v. Ray*, 22 F.4th 69, 73 (2nd Cir. 2021) (explicating standards). Dramatic's claim to having retained "exclusive ownership rights" (ECF 77 at 14) after termination of the 1969 Grant fails utterly on each of these fronts.

### A. The Language and Core Purpose of Copyright Termination Conclusively Refute Dramatic's Position

Section 304(c) of the Copyright Act confers upon authors and their statutory heirs the right to terminate "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1,

1978[.]" 17 U.S.C. § 304(c) (emphasis added).  Enacted as part of the 1976 revisions to the federal copyright statute, this statutory termination right was designed "to revitalize the ability of authors to revisit the terms of earlier grants of rights," by providing authors and their heirs "an inalienable right to terminate the grant of a transfer or license."  *Penguin*, 537 F.3d at 198.

The purpose of the termination right is to provide "authors or their statutory heirs with an opportunity to recapture some of the additional value produced by the lengthened copyright term."  *Id.* at 198; *see also, e.g., Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 21 (2d Cir. 2015) (purpose of Section 304(c) termination right is for "authors and their families, as opposed to publishers who had come to own the renewal term rights, an opportunity to benefit from the extended term"); 3 Nimmer on Copyright § 11.01 (2023) ("This new statutory scheme is intended to provide added benefits to authors at a time when the work's true value can be appreciated.").  As the very case on which Dramatic so heavily relies explains:

> [T]he concept of a termination right … [was] obviously intended to make the rewards for the creativity of authors more substantial.  More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product.  That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985).

The effect of termination is clear: it "**cause[s] the ownership of the underlying copyright to revert**" to the author or statutory heirs. *Mills Music*, 469 U.S. at 163 (emphasis added). The unambiguous text of the Copyright Act, as with its "obvious[]" purpose (*id.* at 172), makes clear that reversion of ownership necessarily requires that any grant of exclusivity ends upon termination. Not only are "exclusive" grants expressly made "subject to termination," 17 U.S.C. § 304(c), but as Dramatic affirmatively argues, "**an exclusive license is effectively a transfer of ownership over the rights licensed**." AOB at 47-48 (citation and quotation marks omitted; emphasis added) (quoting *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016)); 17 U.S.C. § 101 (defining "transfer of copyright ownership" to include "exclusive license … or any other conveyance …. of any of the exclusive rights comprised in a copyright, … but not including a nonexclusive license").

The consequences of the interminable exclusivity Dramatic argues for are anything but technical, implicating the core benefits of copyright ownership. Not only would authors and their heirs be deprived of any ability to "recapture" the financial benefits of copyright ownership (*Penguin*, 537 F.3d at 198), but an exclusive licensee would retain standing post-termination to sue anyone for copyright infringement over the exercise of the reverted rights, *including* the individual authors and heirs who recaptured them. *See, e.g., United States Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("Once the

copyright owner grants an exclusive license of particular rights, only the exclusive licensee and not his grantor may sue for later occurring infringements of such rights. Indeed, the licensor may be liable to the exclusive licensee for copyright infringement if the licensor exercises rights which have theretofore been exclusively licensed") (citation omitted); 17 U.S.C. § 501(b). In other words, Dramatic's reading is that a statutory regime that "cause[s] the ownership of the underlying copyright to revert" to the author or her heirs (*Mills Music*, 469 U.S. at 163)—and designed to "relieve authors of the consequences" of unfavorable financial terms (*id.* at 172), to "make the rewards for the creativity of authors more substantial" for them (*id.*), and to "recapture" the financial benefits of copyright ownership (*Penguin*, 537 F.3d at 198)—subjects authors to *liability* for exploiting the very rights so reverted.

**B.     The Derivative Works Exception Provides No Support for Dramatic's Position**

The derivative works "exception" to termination provides no support for Dramatic's nonsensical premise. That exception merely permits a grantee to continue to "utilize" derivative works created during the term of the grant, and does not provide, or even imply, that a grantee continues to retain the very same exclusive copyright ownership rights in the original work that revert upon termination. 17 U.S.C. § 304(c)(6)(A) ("A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination….").

The Supreme Court's explication of the derivative works exception in *Mills Music*, the decision upon which Dramatic places virtually exclusive reliance, provides no support for its position either. In that case, the Supreme Court framed the issue as "whether an author's termination of a publisher's interest in a copyright also terminates the publishers' contractual right to share in the royalties on such derivative works." 469 U.S. at 156. In the context of this dispute, the question would be whether Dramatic is entitled to the same financial benefits provided for in the 1969 Grant from its post-termination efforts to "utilize" the Sergel Play under the same terms.[7] *Id.* at 177 ("the Exception protects the utilizer of a derivative work from being required to pay an increased royalty to the author" following termination). Atticus has never contended otherwise.

But nothing in *Mills Music* supports the proposition that the continuing right to "utilize" pre-termination derivative works remains *exclusive* so as to preserve a licensee's "exclusive copyright ownership" following termination. Beginning with

_____

[7] Dramatic's hubris is reflected in its contention (AOB at 38) that "Dramatic would not have agreed to these terms without receiving exclusive non-first-class rights…. Why, for example, should Dramatic continue paying a 25% royalty—a royalty premised on exclusive rights for non-first-class productions—if Dramatic no longer has exclusivity?" Its rhetorical question is thus the opposite of the one addressed in *Mills*—whether the grantee was entitled to any financial benefits of continued exploitation post-termination. And its rhetorical point that it "would not have agreed" to the 1969 Grant without interminable exclusivity misses the fact that Congress did require Dramatic's approval when incorporating a termination right in the 1976 Copyright Act.

the only premise relevant to this appeal—that termination "cause[s] the ownership of the underlying copyright to revert" to the author or statutory heirs (469 U.S. at 163)—the Supreme Court explained that "[t]he purpose of the Exception was to preserve the right of the owner of a derivative work to **exploit** it, notwithstanding the reversion." *Id.* at 173 (emphasis added; citation and quotation marks omitted). This purpose of permitting continued exploitation is repeatedly emphasized in *Mills*, with reference to extensive legislative history. *See, e.g., id.* at 176 (derivative works exception designed "to enable derivative works to **continue to be accessible to the public** after the exercise of an author's termination rights") (emphasis added).

As the Supreme Court further explained, "[t]he word 'utilized' as written in the Exception cannot be separated from its context and read in isolation," concluding that "[i]t is expressly *confined* by 'the terms of the grant.'" *Id.* at 169 (emphasis added). That confinement does not *expand* Dramatic's post-termination right to "utilize" the Sergel Play into interminable ownership over any piece of the Novel.

That the continuing right to "utilize" is not—and, consistent with the text, purpose and context of the termination provision, *cannot* be—exclusive is made clear in the legislative history. "The Exception was drafted in response to protests from commentators and movie producers whose goal was to allow the continued distribution of movies despite termination of the grant in the underlying play or novel." *Id.* at 183-84. These advocates for the exception explained that "the

26

intention and the spirit of the extension" that accompanied introduction of the termination right "can be accomplished by leaving the purchaser in the position he would have been in—namely, with a *non-exclusive* right to continue to exploit his property during the extended term" following termination. 15 Nimmer on Copyright – COPYRIGHT LAW REVISION, FURTHER DISCUSSIONS AND COMMENTS ON PRELIMINARY DRAFT FOR REVISED U.S. COPYRIGHT LAW, Transcript of Meetings, August 15-16, 1963 (statement of Saul N. Rittenberg, Metro-Goldwyn-Mayer) at 29 (emphasis added).[8] The Copyright Office also agrees that exclusivity is necessarily terminated. *See* https://www.copyright.gov/recordation/termination.html ("A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights . . . to prepare new derivative works revert to the authors or their heirs.").

---

[8] The legislative history is replete with statements that the Derivative Works Exception, rather than making grants of exclusivity interminable, merely permits the grantee to continue using the derivative work. *See, e.g.,* 15 Nimmer on Copyright COPYRIGHT LAW REVISION, PRELIMINARY DRAFT FOR REVISED U.S. COPYRIGHT LAW AND DISCUSSIONS AND COMMENTS OF THE DRAFT, Transcript of Meeting, June 11, 1963 ("[W]e added a provision, which I think is probably quite important here, that would permit the owner of a derivative work, such as a motion picture, **to continue using it**.") (statement of Barbara Ringer, Assistant Register of Copyrights, at 157) (emphasis added); *id.* ("any derivative work, such as a motion picture, if made prior to the end of the 25-year period **can continue to be "utilized," that is, distributed**, despite subsection (a)") (statement of Richard Colby, Representative of the Motion Picture Association of America) *id*. at 159 (emphasis added).

In the final analysis, Dramatic's position requires a drastic rewriting of the Copyright Act itself, such that the proviso that "all rights … covered by the terminated grant revert, upon the effective date of termination," 17 U.S.C. 304(c)(6), is transformed into its opposite, such that *no* rights revert. This outcome is underscored by Dramatic's struggle to explain what rights, if any, actually reverted to Lee upon termination, which, according to Dramatic, encompass only the right "to block the creation of new derivative works" (AOB 26), "rights over copying, adaptation, distribution, and performance in a range of other media" *except* amateur stage performances (*id.* 35), and "the power to authorize the preparation of new derivative works based on the Novel" (*id.*) in those "other media." But Lee retained and enjoyed *all* of these rights *before* termination, when Dramatic's rights to stage amateur productions were in fact exclusive.

This led the District Court to rightly conclude (ECF 65 at 18) that Dramatic's "interpretation fails. Such a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable. The Derivative Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c)." *Id.* That conclusion of course follows from the most basic canons of statutory construction: that statutes are to be interpreted "so that no part will be inoperative or superfluous, void or insignificant," *APWU v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003); that "one section will not destroy another," *id.*; and that statutes

cannot be read so "the exception would swallow the rule." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 530 (2009); *see also SEC v. Miller*, 808 F.3d 623, 632 (2d Cir. 2015) ("We decline to adopt the interpretation of the exception urged by Relief Defendants, which would effectively swallow the rule.").  And it comports with the holding in *Mills Music* that "[t]he word 'utilized' as written in the Exception cannot be separated from its context and read in isolation" (469 U.S. at 169), as well as this Court's own that "we must 'construct an interpretation [of Section 304(c)] that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results.'" *Marvel Characters*, 310 F.3d at 289-90 (citation omitted and alteration omitted).

Dramatic's contention (AOB at 34) that "the specific governs the general" is inapt.  That canon applies only where there exists a "contradiction" between the general and specific provisions.  *A RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  No such contradiction exists here, between permitting licensees to "utilize" a preexisting derivative work on a non-exclusive basis "under the terms of the grant" (17 U.S.C. § 304(c)(6)(A)), and the core purpose of termination to "cause[] the ownership of the underlying copyright to revert" to authors and their statutory heirs.  *Mills Music*, 469 U.S. at 163.

Indeed, Dramatic's insistence that, pursuant to the derivative works exception, "*all* 'the terms of the grant'" (AOB 38) remain in full force following termination—

including those granting the "exclusive ownership rights" Dramatic claims to retain (ECF 77 at 14)—would render even wholesale copyright assignments interminable, including those expressly lasting through the full duration of the renewal term. Courts have squarely and repeatedly rejected that core premise. *See, e.g., Baldwin v. EMI Feist Catalog, Inc*., 805 F.3d 18, 22 (2d Cir. 2015) (Copyright Act permitted author's heirs to terminate unfettered grant by which "Grantor hereby sells, assigns, grants, transfers and sets over to Grantee . . . all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works]"); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *cf. FurryRecords, Inc. v. RealNetworks, Inc*., No. 01 Civ. 10998 (JSR), 2002 U.S. Dist. LEXIS 16272, at *5 (S.D.N.Y. Aug. 29, 2002) ("notwithstanding the 'in perpetuity' language, plaintiffs have a federally-protected statutory right to terminate the contract after 35 years") (citing 17 U.S.C. § 203(a)(3)).

Dramatic's appeal that this Court nullify the statutory termination right should be rejected again.

## II. DRAMATIC'S REMAINING ARGUMENTS ARE EQUALLY MERITLESS

Each of Dramatic's remaining arguments are equally meritless, and easily disposed.

### A. The Extent of Atticus's Stage Rights to the Novel Is Irrelevant to this Action

Dramatic's argument that Atticus does not have valid amateur stage rights pursuant to the Option Agreement is irrelevant, and wrong.

As a threshold matter, Dramatic provides no explanation as to why the scope and extent of Atticus's rights bear any relevance to this action or appeal, or supports reversal of the Judgment. It does not. The final Amended Judgment declared that (1) "Atticus and Aaron Sorkin have the right, *in relation to Dramatic*, to present any and all performances of the Sorkin Play in the United States"; and (2) "Any such productions of the Sorkin Play in the United States have not infringed and do not infringe any copyright interest *Dramatic holds* in and to the Novel." ECF 100 (emphasis added). As Dramatic itself characterized it, "Atticus sought affirmative relief challenging Dramatic's claim of exclusive rights[.]" ECF 83 at 9. The District Court agreed, correctly concluding that the declaration sought and obtained by Atticus required (and, on appeal, continues to require) only a resolution of whether *Dramatic* continues to hold exclusive copyright ownership of the amateur stage rights to the Novel.

This is reflected in Dramatic's *own* repeated characterizations of this action in the proceedings below that this dispute turns on the extent of Dramatic's claims ownership and exclusivity. *See, e.g.,* ECF 77 at 14 ("The issue is whether Dramatic retained exclusive ownership rights in the rights granted to it by Ms. Lee . . . ."); *id.* at 15 ("This is a case about the extent of Dramatic's ownership rights."); ECF 83 at 9 ("The issue has always been about whether Dramatic could claim it held exclusive rights."); DE 86 at 1 ("Here, the issue is whether an exclusivity term survives termination under § 304(a) of the Copyright Act."). In short, the scope and extent of Atticus's rights is irrelevant to this appeal and need not be addressed. *See, e.g., Waldman v. PLO*, 82 F.4th 64, 73 n.7 (2d Cir. 2023) ("The district court found that it was unnecessary to resolve this issue, and we need not resolve it on appeal.").

Independently, Dramatic's position is also wrong. Pursuant to the No Ice Grant's express terms, no grant of rights was made until the option was deemed exercised in December 2018, when the Sorkin Play premiered at the Shubert Theatre. This, of course, was *after* the effective date of termination. *See* 17 U.S.C. § 304(c)(6)(D) (permitting agreements "made after the effective date of the termination"); *Waite v. UMG Recordings, Inc.*, 477 F. Supp. 3d 265, 274 (S.D.N.Y. 2020) (explaining that to "execute" an agreement in context of termination provisions means "to perform or complete" and to "put completely in[t]o effect," rather than when it is signed) (citations omitted).

## B. Dramatic's Statute-of-Limitations Argument Fails

Dramatic's argument that Atticus's claim was time-barred fails on the merits, and in any event has been waived.

### 1. The One-Time Accrual Rule Does Not Apply to Claims that Merely Challenge Another's Claim of Copyright Ownership

Dramatic's statute-of-limitations argument relies on a host of misstatements of the law. Its position was not only correctly rejected by the District Court, but aptly characterized as "nearly unintelligible" and one that "invites serious error" and "makes little sense." ECF 87 at 10; ECF 109 at 11.

Under the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b), a copyright claim accrues when an infringing act occurs, and "each infringing act starts a new limitations period." *Petrella v. MGM*, 572 U.S. 663, 670-71 (2014). The one exception to this "separate-accrual" rule is that copyright claims brought by a party *claiming* copyright ownership are subject to one-time accrual—*i.e.*, "[a]n ownership claim accrues only once," *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011), "when plain and express repudiation of [the claimant's ownership] is communicated to the claimant[.]"[9] *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021) (citation omitted).

_____

[9] Dramatic's statute of limitations argument is based on Atticus's knowledge that Dramatic filed an arbitration demand against the *Estate*, not Atticus. Even were Atticus sought a declaration of ownership in this case (it did not), Dramatic's claim of ownership against the Estate, in a private arbitration against the Estate, does not

But Atticus never sought a declaration—or even resolution—of any ownership interest in this action other than *Dramatic's*. As noted above, Dramatic's own filings confirm this, explaining that Atticus brought this action for the purpose of "*challenging Dramatic's exclusive ownership claim*" (ECF 77 at 4 (emphasis added)); that "Atticus sought affirmative relief challenging Dramatic's claim of exclusive rights" (ECF 83 at 9); that "[t]he issue is whether Dramatic retained exclusive ownership rights in the rights granted to it by Ms. Lee" (ECF 77 at 14); that "[t]his is a case about the extent of Dramatic's ownership rights" (*id.* at 15); and that "[t]he issue has always been about whether Dramatic could claim it held exclusive rights" (ECF 83 at 9). Accordingly, the District Court rightly observed that "it is unnecessary to resolve through this lawsuit the extent to which the Lee Estate granted Atticus rights" (ECF 65 at 32). In short, Atticus's ownership rights are not at issue.

As this Court has explained, in declaratory judgment actions, "we must conceptually realign the declaratory judgment parties and claims and analyze them as they would appear in a coercive suit." *Garanti Finansal Kiralama A.S. v. Aqua*

---

constitute "plain and express repudiation" to Atticus and thus could not have triggered the accrual of any claims Atticus may have had against Dramatic. *See, e.g., Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d at 317 (explaining that a party claiming ownership "does not need to bring suit until there has been an 'express repudiation' of that claim") (citation omitted). Dramatic's statute of limitations argument fails for this reason alone.

*Marine & Trading, Inc.*, 697 F.3d 59, 67 (2d Cir. 2012); 3 Nimmer on Copyright § 12.05 (2022) ("Sometimes, the roles are reversed—the erstwhile claimant sits back, while the erstwhile responding party initiates suit. That posture marks declaratory relief, in which the potential defendant is the nominal plaintiff."); *Cabell v. Zorro Prods.*, No. 5:15-cv-00771-EJD, 2018 U.S. Dist. LEXIS 80262, at *47 (N.D. Cal. May 11, 2018) ("the analysis must focus on the substance of the underlying claim").

And, in this procedural posture, the District Court correctly held that the "one-time accrual" rule does not apply to Atticus's claim of non-infringement: "[T]his litigation, as the parties agree, turns on a determination of *Dramatic's* rights. As Dramatic admits in its motion, 'this is a case about the extent of Dramatic's ownership rights.' This action therefore anticipates claims that Dramatic may seek to assert one day against amateur productions of the Sorkin Play." ECF 87 at 9-10 (emphasis added; alteration omitted). This same scenario was addressed in *Cabell*, in which the court rejected the application of the "one-time accrual" to a claim of non-infringement:

> [T]he declaratory relief that Plaintiff seeks is a declaration that 'his musical does not infringe upon any copyright or trademark interest of ZPI'—i.e., if Plaintiff were to produce his musical tomorrow, it would not infringe Defendants' intellectual property. If Plaintiff were to produce his musical tomorrow, the statute of limitations would not bar an infringement claim by Defendants. Accordingly, the statute of limitations also cannot bar the declaration that Plaintiff seeks.

2018 U.S. Dist. LEXIS 80262, at *48.

The procedural posture in this action—and the fact that Atticus has not sought (nor obtained) declaratory relief relating to *its* ownership—distinguishes each and every case upon which Dramatic relies in its principal brief. AOB at 46-50. In each of these decisions, the one-time-accrual rule was deemed to apply precisely because, unlike here, proof of ownership was required for the plaintiff to prevail. *See Kwan*, 634 F.3d at 227-28 (plaintiff required to establish ownership to prevail on copyright infringement claim); *Simmons v. Stanberry*, 810 F.3d 114, 115 (2d Cir. 2016) (plaintiff required to establish claimed status as exclusive licensee to prevail on copyright infringement claim). The same is true of *every* instance in which this Court has applied the one-accrual rule.[10] By contrast, Dramatic cannot cite a single decision for the proposition it advances: that an erroneous pronouncement of

---

[10] *See Ferrarini v. Individual*, No. 21-597-cv, 2022 U.S. App. LEXIS 14862, at *1-2 (2d Cir. May 31, 2022) (applying rule where plaintiff sued for copyright infringement based on her alleged authorship), *cert denied*, 143 S. Ct. 570 (2023); *Horror Inc. v. Miller*, 15 F.4th at 257 (applying rule where counterclaimant sued for declaratory judgment that he owned screenplay); *Charles v. Seinfeld*, 803 F. App'x 550, 551 (2d Cir. 2020) (applying rule where plaintiff sued for copyright infringement based on his alleged authorship of television show); *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 118 (2d Cir. 2018) (applying rule where plaintiffs sued for copyright infringement based on their alleged ownership of song); *Latin Am. Music Co. v. Spanish Broad. Sys., Inc.*, 738 F. App'x 722, 723 (2d Cir. 2018) (applying rule where plaintiffs sued for copyright infringement based on their alleged ownership of musical works); *Mahan v. ROC Nation, LLC*, 634 F. App'x 329, 330 (2d Cir. 2016) (applying rule where plaintiff sued for declaratory judgment of his alleged co-ownership of song); *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d at 317 (applying rule where plaintiff sued for copyright infringement based on his alleged ownership of renewal copyright).

copyright ownership over any work time-bars a *challenge* to such claimed ownership. No such authority exists for this obviously incorrect premise, as it would have triggered an entire industry of enterprising individuals who could wrest copyright ownership from true owners and from the public domain simply by propagating false ownership claims.

To the extent the statute of limitations bars any assertion of ownership, it is Dramatic's. Atticus expressly and directly repudiated *Dramatic's* claim of ownership by letter on January 9, 2019, more than three years prior to the commencement of this action. *See* ECF 80 ¶¶ 1-5, 12). Yet Dramatic never took any legal action against Atticus at any time in the three years that ensued. This scenario too has been squarely addressed in the decisional authority, and bars Dramatic's assertion of ownership as a defense in this case. *See Garza v. Everly*, 59 F.4th 876, 884 (6th Cir. 2023) (Copyright Act's statute of limitations barred declaratory judgment defendant from asserting defense of co-ownership and co-authorship, where defendant "would not be able to bring suit over authorship as an affirmative claim" pursuant to one-time accrual rule). The Judgment can be affirmed on this basis as well. *See, e.g., O'Neill v. Saudi Joint Relief Comm. (In re Terrorist Attacks on September 11, 2001 (Saudi Joint Relief Comm.))*, 714 F.3d 109, 114 (2d Cir. 2013) ("We are free to affirm a decision on any grounds supported in the record,

even if it is not one on which the trial court relied.") (citation, quotation marks and alteration omitted).

> ### 2. Dramatic Waived this Argument by Failing to Raise It In Response to Atticus's Motion for Complete Summary Judgment

Second Circuit law is clear and unequivocal that, "[i]f a party moves for final summary judgment, the responding party *must* raise in its opposition to the motion *any* defense that would preclude final summary judgment." *United States v. Drame*, No. 18 Civ. 11480 (AKH), 2021 U.S. Dist. LEXIS 64268, at *8 (S.D.N.Y. Apr. 1, 2021) (emphasis added); *see also, e.g., Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (on summary judgment, "it becomes incumbent upon the nonmovant to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in the moving party's favor") (citation and alterations omitted). To hold otherwise would allow parties, like Dramatic does here, to "complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." *Id.* (citation omitted).

The consequences of failing to raise an argument in opposition to summary judgment are equally clear: "In the Second Circuit, a party that fails to raise an argument in its opposition papers on a motion for summary judgment has waived that argument." *Phx. Light SF, Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-CV-10116

(VSB), 2020 U.S. Dist. LEXIS 144731, at *10 (S.D.N.Y. Aug. 12, 2020) (emphasis

added), *aff'd*, 2021 U.S. App. LEXIS 29749 (2d Cir. Oct. 4, 2021)*; see also, e.g.,

Busher v. Barry*, No. 20-3587-cv, 2021 U.S. App. LEXIS 32561, at *8-9 (2d Cir.

Nov. 2, 2021) ("Because the plaintiffs failed to 'raise this argument in [their]

opposition to summary judgment,' the 'argument has been waived.'") (citation

omitted); *Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir.

2014) ("[P]laintiff never raised these arguments in its opposition to defendants'

motion for summary judgment.  Accordingly, these arguments were waived.");

*Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) ("Palmieri failed to . . . raise this

argument in his opposition to summary judgement. Thus, this argument has been

waived."). Federal law is uniform on this point, including with respect to the statute

of limitations defense that Dramatic has waived here.[11]

---

[11] *See, e.g.*, *Vela v. City of Houston*, 276 F.3d 659, 678 (5th Cir. 2001)
(defendant waived "statute of limitations defense" because "a party in his opposition
to a motion for summary judgment cannot abandon an issue and then . . . by drawing
on the pleadings resurrect the abandoned issue") (citation and quotation marks
omitted); *Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 305-06 (D.R.I. 2007) ("This
Court finds that because Defendant failed to adequately develop and argue the
affirmative defense of statute of limitations in her opposition to the motion for
summary judgment, the statute of limitations defense is waived."), *aff'd*, 548 F.3d
50 (1st Cir. 2008); *Williams v. Univ. Med. Ctr. of S. Nev.*, No. 2:09-CV-00554-PMP-
PAL, 2010 U.S. Dist. LEXIS 76995, at *6 (D. Nev. July 28, 2010) ("Defendants
have waived the statute of limitations defense . . . . When a party moves for final
summary judgment on an issue, the nonmoving party must raise in their opposition
all arguments or defenses which would preclude judgment in the moving party's
favor or else the nonmoving party abandons the argument or defense.").

Each of Dramatic's arguments to avoid this result fails.

*First*, Dramatic's appeal (AOB 51-52) to Fed. R. Civ. P. 12(b) and 8(b)(1) provide no support for its position. While these provisions require that a party "must" assert all affirmative defenses in its responsive pleading, neither even hints at the result Dramatic seeks: that a party is *not* required to do so in opposition to a pre-answer motion for summary judgment. A pre-answer motion for summary judgment is expressly permitted under the Federal Rules. *See* Fed. R. Civ. P. 56(b) ("[A] party may file a motion for summary judgment **at any time** until 30 days after the close of all discovery.") (emphasis added).[12] If a party could—as Dramatic did here—withhold its arguments in opposition to a pre-answer motion for summary judgment only to assert them later, the possibility of case disposition via a pre-answer motion for summary judgment would be negated entirely, and result in a colossal waste of judicial resources spent in ruling on motions for summary judgment that could be mooted entirely by the stratagem Dramatic employed here. The utility of pre-answer motions for summary judgment cannot be written out of

---

[12] *See, e.g., W. P. Carey, Inc. v. Bigler*, No. 18 Civ. 585 (KPF), 2019 U.S. Dist. LEXIS 51975, at *31 (S.D.N.Y. Mar. 27, 2019) ("Courts in this Circuit have granted pre-answer motions for summary judgment in certain circumstances," and collecting cases); *Polk v. Sherwin-Williams Co*., No. 3:16-cv-1491 (MPS), 2017 U.S. Dist. LEXIS 46088, at *3 (D. Conn. Mar. 29, 2017) ("Under Federal Rule of Civil Procedure 56(b), a party may file a motion for summary judgment at any time until 30 days after the close of all discovery, including before filing an answer.") (internal quotations and citation omitted)).

existence in this manner. *See Application of Royal Bank of Canada*, 33 F.R.D. 296, 300 (S.D.N.Y. 1963) ("[T]he Federal Rules of Civil Procedure in general. . . are to be given a harmonious and symmetrical reading to prevent their circumvention and abuse through the employment of convenient stratagems."); *Compania Maritima Transoceanica, S. A. v. Ocean Freighting & Brokerage Corp.*, 10 F.R.D. 129, 131 (S.D.N.Y. 1950) (with respect to the Federal Rules of Civil Procedure, "emphasis therefore may not be prudently accorded to one rule in disregard of another which comes into operation").

*Second*, Dramatic broadly argues that affirmative defenses "need not be raised in a pre-answer motion" (AOB at 52), quoting *Santos v. District Council of New York City & Vicinity of United Brotherhood of Carpenters & Joiners*, 619 F.2d 963, 967 (2d Cir. 1980). That decision is inapposite, as it addressed a defendant's failure to raise a limitations defense on its *own* pre-answer motion to dismiss on jurisdictional grounds, not a failure to raise a defense in opposition to the other party's motion for summary judgment. Dramatic's reliance on *Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511 (S.D.N.Y. 2014), is also unavailing, as that decision is not "on point" (AOB at 53) either. There, the district court permitted the defendant to raise its affirmative defense after responding to the plaintiff's motion for *partial* summary judgment. *See Narragansett Elec. Co. v. Am. Home Assurance Co.*, 921 F. Supp. 2d 166, 169 (S.D.N.Y. 2013) (explaining that

plaintiff filed a "motion for partial summary judgment, pursuant to Rule 56(a), Fed. R. Civ. P., as to Count I of the First Amended Complaint"). Here, by contrast, the law provides that a party opposing a motion for complete summary judgment, like Dramatic, must raise—or waive—any defense it claims precludes entry of judgment. *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001) ("Plaintiffs moved for final summary judgment, not merely partial summary judgment…. Accordingly, it became incumbent upon the Intervenors to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in Plaintiffs' favor.").

*Third*, Dramatic vaguely contends that Atticus's summary judgment motion was "premature." AOB at 51. That is wrong. All of the materials Dramatic submitted in connection with its statute-of-limitations motion were available to Dramatic at the time it opposed Atticus's motion for summary judgment. And nowhere in Dramatic's own Rule 56(d) declaration (ECF 60) requesting additional discovery did it even mention a statute-of-limitations defense, much less claim that it needed discovery to assert this defense.

Though Dramatic implies that it was unaware at the time of Atticus's motion when Atticus "knew of Dramatic's assertion of exclusivity" (AOB 52 n.5), that implication is refuted by Dramatic's *own* filings in opposition to Atticus's summary judgment motion. These include numerous emails between the Estate and Atticus's

counsel showing Atticus's (uncontested) knowledge of Dramatic's claims in the arbitration more than three years prior to commencement of this action, including one (ECF 60-27) in which an Estate representative forwarded Dramatic's arbitration demand to Atticus's counsel the very day the arbitration was commenced. All of these were "produced [to Dramatic] in the arbitration" well before the commencement of this action, and obviously within Dramatic's possession and knowledge at the time it opposed Atticus's motion for summary judgment. *See* ECF 60 ¶¶ 43-50 (attaching emails "produced in the arbitration"); ECF 61 ("Dramatic Publishing Company's Statement of Additional Facts" on Atticus's summary judgment motion) ¶ 66 (explaining that an Estate Representative provided Atticus's counsel "with Dramatic's initial arbitration demand shortly after it was filed").

The District Court did not abuse its discretion, and should be affirmed on this issue as well.

### C. <u>Atticus and Its Predecessor-in-Interest Did Not "Agree" to Be Bound to the Results of Any Arbitration to Which It Was Not a Party</u>

Finally, Dramatic's argument that Atticus entered into an "agreement to be bound in the arbitration" (AOB at 59) fails, and is once again based on a distortion of the record—in this instance, the very agreement by which Dramatic claims Atticus so agreed.

Dramatic relies (AOB at 57) on the unremarkable proposition that "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) (quoting Restatement (Second) of Judgments § 40). But "no such agreement should be inferred except upon the plainest circumstances." Restatement (Second) of Judgments § 40 cmt. b; *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999) (same).

No such agreement exists here. Dramatic relies on section 2(b) of the Option Agreement (to which Dramatic is not a party). By that provision, Atticus agreed in relevant part only that the Sergel Play "can continue to be exploited following such termination under the terms of the Prior Agreement **on a non-exclusive basis in the United States**…" ECF 37-3 § 2(b) (emphasis added). Dramatic fails to mention, much less address, this critical qualifier. But, as the District Court explained, this provision was, by its plain terms, merely an "acknowledg[ment] that Lee had previously given Dramatic a license to create a derivative work, and that the license given to [Atticus] to create another derivative work from the Novel would not preclude Dramatic from performing the Sergel Play." ECF 65 at 25. And this provision makes no mention of arbitration or litigation at all.

Section 2(b) of the Option Agreement thus bears no resemblance to the type of "agreement to be bound" contemplated by the Restatement. As explained in

*Taylor*, the "agreement to be bound" exception applies where the parties to separate actions against the same defendant "agree that the question of the defendant's liability will be definitively determined, one way or the other, in a 'test case,'" or via a court-filed "stipulation" to be bound by a separate actions. 553 U.S. at 893-94 (citation omitted). In stark contrast, Atticus never agreed to have the scope of the Copyright Act's termination provision, a question of federal copyright law, decided by a single private practice attorney in a future private arbitration to which Atticus was not a party.

## **CONCLUSION**

For all of the foregoing reasons, Atticus respectfully requests that the District

Court's Judgment be affirmed in all respects.

Dated: March 13, 2024
      New York, New York

                    LOEB & LOEB LLP

                    By:   */s/ Jonathan Zavin*
                        LOEB & LOEB LLP
                        Jonathan Zavin
                        Wook Hwang
                        345 Park Avenue
                        New York, New York 10154
                        Tel: (212) 407-4000
                        Fax: (212) 407-4990

                        Keane Barger
                        35 Music Square East, Suite 310
                        Nashville, Tennessee 37203
                        Tel: (615) 749-8300
                        Fax: (615) 749-8308

                        *Counsel for Appellee Atticus Limited*
                        *Liability Company*

## **CERTIFICATE OF COMPLIANCE**

I, Jonathan Zavin, a member of Loeb & Loeb LLP, counsel for Appellee Atticus Limited Liability Company, hereby certify that the foregoing brief complies with the requirements of Fed. R. App. P. 32(a)(7) and Local Rule 32.1(a). Excluding the items identified in Fed. R. App. P. 32(f), the foregoing brief contains 11,075 words and 941 lines, including footnotes, according to the word count of the word processing software used to prepare it.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) as well as type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point Times New Roman font.

*/s/ Jonathan Zavin*
Jonathan Zavin