# 23-1226-cv

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

### REPLY BRIEF OF DEFENDANT-APPELLANT

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

April 17, 2024

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

                                                                                    **Page**

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................3

I.      ALLC's Suit Fails Under The Derivative Works Exception. .........................3

      A.      Under the plain text of the Exception and *Mills Music*, Dramatic may continue to use the Sergel Play in non-first-class venues under all the terms of the grant. ...............................4

      B.      ALLC and the government's arguments regarding statutory purpose and absurd results are incorrect and do not negate the statutory text. ...................................................................12

II.     ALLC's Suit Fails Because The Grant To ALLC Came Too Early. ............16

III.    ALLC's Suit Is Untimely. ............................................................................20

      A.      ALLC's arguments for avoiding the time bar lack merit....................20

      B.      Dramatic's limitations defense was not forfeited. ..............................24

IV.    ALLC's Suit Is Barred By Preclusion. .........................................................26

CONCLUSION ...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*118 East 60th Owners, Inc. v. Bonner Properties, Inc.*,
  677 F.2d 200 (2d Cir. 1982) ...............................................................22

*Artists Rts. Enf't Corp. v. Est. of King*,
  224 F. Supp. 3d 231 (S.D.N.Y. 2016) ...............................................17

*Baldwin v. EMI Feist Catalog, Inc.*,
  805 F.3d 18 (2d Cir. 2015) ................................................................17

*Charles v. Seinfeld*,
  803 F. App'x 550 (2d Cir. 2020) .......................................................23

*City of Saint Paul v. Evans*,
  344 F.3d 1029 (9th Cir. 2003) ...........................................................22

*CTS Corp. v. Waldburger*,
  573 U.S. 1 (2014) ...............................................................................13

*Davis v. Shah*,
  821 F.3d 231 (2d Cir. 2016) ..............................................................24

*Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport
  News Shipbuilding & Dry Dock Co.*,
  514 U.S. 122 (1995)............................................................................12

*Dramatic Publ'g Co. v. Carter*,
  608 F. Supp. 3d 618 (N.D. Ill. 2022)..................................................27

*Est. of Hogarth v. Edgar Rice Burroughs, Inc.*,
  342 F.3d 149 (2d Cir. 2003) ..............................................................24

*Gary Friedrich Ente., LLC v. Marvel Characters, Inc.*,
  716 F.3d 302 (2d Cir. 2013) ..............................................................23

*Gibbons v. Bristol-Myers Squibb Co.*,
  919 F.3d 699 (2d Cir. 2019) ..............................................................15

ii

*Gilbert v. City of Cambridge*,
     932 F.2d 51 (1st Cir. 1991)................................................................22

*Kelly v. Robinson*,
     479 U.S. 36 (1986)........................................................................13

*Kidd v. Thomson Reuters Corp.*,
     925 F.3d 99 (2d Cir. 2019) ..............................................................6

*Kwan v. Schlein*,
     634 F.3d 224 (2d Cir. 2011) ..............................................20, 22, 23

*Lamie v. U.S. Tr.*,
     540 U.S. 526 (2004)......................................................................15

*Mills Music v. Snyder*,
     469 U.S. 153 (1985)..............................................4, 5, 6, 9, 12, 13, 14

*Narragansett Elec. Co. v. Am. Home Assur. Co.*,
     921 F. Supp. 2d 166 (S.D.N.Y. 2013) ...........................................25

*Narragansett Elec. Co. v. Am. Home Assur. Co.*,
     999 F. Supp. 2d 511 (S.D.N.Y. 2014) .......................................25, 26

*Pulsifer v. United States*,
     601 U.S. __, 2024 WL 1120879 (U.S. Mar. 15, 2024) ...................12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
     566 U.S. 639 (2012).......................................................................10

*Regan v. Wald*,
     468 U.S. 222 (1984).......................................................................13

*Rose v. AmSouth Bank of Fla.*,
     391 F.3d 63 (2d Cir. 2004) ............................................................25

*Taylor v. Sturgell*,
     553 U.S. 880 (2008).................................................................27, 28

*Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*,
     262 F.3d 559 (6th Cir. 2001) .........................................................28

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) ...............................................................................6, 8

**Statutes:**

17 U.S.C. § 106(2) ............................................................................................8

17 U.S.C. § 203 ...............................................................................................18

17 U.S.C. § 304(c) ...................................................................................9, 10, 11

17 U.S.C. § 304(c)(5) .......................................................................................11

17 U.S.C. § 304(c)(6) .......................................................................................10

17 U.S.C. § 304(c)(6)(A) ...............................................................................4, 9

17 U.S.C. § 304(c)(6)(D) ........................................................................2, 16, 17

17 U.S.C. § 507(b) ...........................................................................................20

**Legislative Materials:**

S. Rep. No. 94-473 (1975) ...............................................................................17

**Other Authority:**

*Restatement (Second) of Judgments* § 40 (1980)..............................................28, 29

# INTRODUCTION

By misreading the Copyright Act, the district court blessed an invalid transfer to ALLC of performance rights that remain Dramatic's under the statute, in a declaratory-judgment action that is both untimely and precluded.[1] ALLC has no convincing response to any of the four independent bases for reversing the judgment.

Application of the Derivative Works Exception is straightforward here. Under the Exception's text and *Mills Music*, Dramatic may "continue to utilize[]" the Sergel Play "under" *all* the relevant "terms of the grant" governing use of that derivative work. The terms provide that Dramatic may use the Sergel Play in non-first-class venues, and that in exchange for the resulting royalties, Lee will not license competing adaptations of the Novel in those venues. Neither ALLC nor the government can explain why the Exception preserves the *other* agreed-upon terms for the scope of Dramatic's rights for using the Sergel Play (such as royalty arrangements and the exclusion of first-class venues) but *not* the terms defining the scope of Dramatic's public performance rights. Indeed, ALLC and the government appear to disagree with each other on which terms survive, and they make little attempt to ground their proposed distinctions in the Exception's text.

---

[1] Capitalized terms have the same meaning as in Dramatic's opening brief. "Blue Br." refers to that brief; "Red Br." refers to ALLC's brief.

1

Both rely instead on atextual, policy-driven warnings that unless the exclusive-use term in *this* grant is overridden, somehow *all* grants involving derivative works will be interminable and authors will be blocked from licensing new derivative works. Those overwrought predictions are wrong. Exclusive licenses will remain generally terminable, and authors (including Lee's Estate) can license all manner of *new* derivative works. The legal issue here arises only in the narrow set of cases in which exclusivity is *already* one of the "terms of the grant" of rights to use a derivative work that exists before termination. ALLC's and the government's rhetoric about extreme consequences is as unconvincing as it is irrelevant, given the text and structure of the Exception.

Nonetheless, the Court need not address the merits of the Derivative Works Exception, because it can reverse on any of the three other grounds Dramatic has identified (none of which the government addresses).

Lee's grant to ALLC is plainly invalid under Section 304(c)(6)(D)'s express prohibition on agreeing to transfer rights before termination. ALLC's only response on the merits is that Lee gave it an option, which it did not exercise until after the termination of Dramatic's grant. But § 304(c)(6)(D) expressly invalidates an "agreement to make a further grant" if made before termination takes effect; ALLC's option is exactly that type of agreement. ALLC tries to shield the invalidity of the grant from review by arguing its rights are irrelevant to this suit. That is wrong:

ALLC's own asserted performance rights are the predicate of its suit, and the declaration ALLC secured from the district court recognizes them.

ALLC's argument that it can avoid the statute of limitations by styling its suit as one for a "defensive declaration" is similarly flawed. The suit may be immediately trained on Dramatic's rights, but its purpose has been to vindicate ALLC's ownership claim. Ownership claims accrue only once, and on undisputed facts, ALLC's claim accrued more than three years before this suit was filed.

Finally, the suit is barred by preclusion. ALLC's 2015 Agreement provides that ALLC's performance rights "shall be subject" to Dramatic's. Under the law of judgments, that agreement makes ALLC subject to the arbitrator's determination of the scope of Dramatic's rights.

## ARGUMENT

## I.    ALLC's Suit Fails Under The Derivative Works Exception.

Nothing in ALLC's or the government's briefs refutes the plain text of the Derivative Works Exception: the Sergel Play is a derivative work and may be used "under the terms of the grant." That means *all* the terms, including the limitation to particular venues and Lee's agreement not to license a competing adaptation in those venues.

**A.**     **Under the plain text of the Exception and *Mills Music*, Dramatic may continue to use the Sergel Play in non-first-class venues under all the terms of the grant.**

1.     The text of the Derivative Works Exception is clear.  The Exception is an express "limitation[]" that applies to "all cases" of termination, and it provides: "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." 17 U.S.C. § 304(c)(6)(A).  As the Supreme Court has explained, the plain meaning of the Exception is to "preserve the total contractual relationship" related to use of a derivative work, so that Dramatic's continued ability to utilize the Sergel Play is "defined by reference to the scope of the privilege … under" its 1969 Agreement with Lee. *Mills Music v. Snyder*, 469 U.S. 153, 164, 169 (1985); *see also* Blue Br. 29-33.

The scope of that privilege is clear, too.  In the 1969 Agreement, Harper Lee "agree[d] that [the Sergel Play] is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed." A175.  There could not be a more explicit "term[] of the grant that w[as] applicable to the use of [the] derivative work[] at the time of termination." *Mills Music*, 469 U.S. at 177.  "Under the terms of the grant in effect at the time of termination," therefore, Dramatic "is entitled" to

4

use the Sergel Play with exclusivity in non-first-class productions after termination. *Id.* at 178. *See* Blue Br. 33-39.

2. Neither ALLC nor the government has an answer to the plain text of the Exception or *Mills Music*. They cannot even agree between themselves *which* "terms of the grant" their statutory interpretation would preserve. The statute provides no support for such a pick-and-choose approach. *All* of "the terms of the grant" governing use of a derivative work operate together; continuing some terms but not others upsets the balance of the original bargain.

ALLC insists (at 24-26) that the only "terms of the grant" that survive under the Exception are "financial benefits" like the royalty right in *Mills Music*. Nothing in the text of the statute justifies this cramped reading; the Exception says that derivative works may continue to be "utilized under the terms of the grant," without qualification. The limits on *where* Dramatic may perform the Sergel Play are not "financial" in the sense ALLC uses the term, but ALLC plainly does not think that the termination of the 1969 Agreement liberated Dramatic to perform the Sergel Play on Broadway. The "terms of the grant" continue to govern the use of the Sergel Play, and both Dramatic and Lee are bound by them.

Nor is there any basis for ALLC's financial-benefits-only construction in *Mills Music*. That opinion sweeps far more broadly: the Court announced that "the consequences of a termination that § 304 authorizes simply do not apply to

derivative works that are protected by the Exception defined in § 304(c)(6)(A)," and that "the terms of the grant that were applicable to the use of derivative works at the time of termination should remain in effect." 469 U.S. at 164, 177; *accord Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) (reiterating that the Exception preserves "the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners or their licensees").

"Congress could have achieved the result suggested by [ALLC] by drafting" an express financial-terms limitation in the Exception. *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.9 (2d Cir. 2019). "But the statute does not include this language, and [this Court] may not 'add words to the law to produce what is thought to be a desirable result.'" *Id.* (quoting *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015)).

For its part, the government admits (at 15) that the "terms of the grant" has a broader reach than what ALLC argues, and includes the terms "for 'utiliz[ing]' the derivative work." But the government then indulges in its own non sequitur, and arbitrarily contends this construction only includes terms like "royalty provisions or *limits* on use (for example, the terms in Lee's grant to Dramatic that limit use to 'non-first-class' productions with certain geographical restrictions)." Gov't Br. 15 (emphasis added).

The government has no coherent explanation for how the statutory phrase "under the terms of the grant," or the holding of *Mills Music*, encompass only contractual *limits* on use of a derivative work, and not also the other terms entwined with those limits as part of the bargain. But the terms of the grant bind both parties—Dramatic to license the Sergel Play, pay a higher 25% royalty for limited performance rights in non-first-class venues, and keep a wide berth away from any first-class production when one is staged; Lee to refrain from competing with the Sergel Play in the specified venues. JA175-176. But under the government's reading (like ALLC's), Dramatic must continue to pay the *same* 25% royalty rate to Lee's Estate, with the *same* geographic and non-first-class restrictions, in exchange for performance rights that are significantly *diminished* because the corresponding restrictions on Lee would be lifted. At the same time, ALLC is free to license in any non-first class venue without the same geographical embargo imposed on Dramatic.

The government (at 25) dismisses any concern about unwinding the parties' bargain on the theory that "Dramatic has already received more than the full benefit of its original bargain" because Congress has extended the copyright term for the Novel. But as this Court has observed, "at the time the rights at issue were originally established, neither [Lee nor Dramatic] expected to get royalties for more than 56

years,"[2] so the rights "will be a windfall to either," and "[t]he question, therefore, is: Who is the beneficiary of this windfall?" *Woods*, 60 F.3d at 986. The answer is "found in the phrase 'under the terms of the grant.'" *Id*. The government cannot rationalize excising *some* of those terms, and rewriting the bargain, by claiming that nobody expected *any* part of the bargain to survive more than 56 years.

The government also suggests (at 24) that the exclusive-use term is not really about utilizing the derivative work, because Dramatic could block non-first-class productions of other adaptations "without ever utilizing its existing play." The restriction on Lee applies even if the Sergel Play is not always on stage. And setting aside the fact that the 1969 Agreement *obliges* Dramatic to license performances of the Sergel Play, JA175, the government gives no reason why Dramatic would keep its own play under wraps forever just to spite other adaptations.

At other moments (*e.g.*, at 8, 14), the government tries to justify exclusion of the exclusive-use term from the Exception by arguing it is a "copyright right[]," which supposedly *must* revert to the author upon termination. But that rationale does not hold up—the author's control over derivative works is *also* a "copyright right," 17 U.S.C. § 106(2), but as no one disputes, a portion of that right does not revert to the author where the Exception applies. The only question here is what

---

[2] The parties did, however, provide that their agreement would continue in the event of any extension. *See* JA176.

portion. The answer is in *Mills Music*: the "terms of the grant" are "excluded from the bundle of rights that the author may seek to resell unimpeded by any ill-advised prior commitment." 469 U.S. at 174.

The government also points to the second clause of the Exception, which reads: "this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." 17 U.S.C. § 304(c)(6)(A). The government suggests (at 16) this clause shows the exclusive-use term cannot survive, because otherwise Dramatic would "retain[] a right to exclude others from making derivative works but could not make new works itself, [so that] *no one* could make or authorize new derivative works." Once again, the conclusion does not follow. Lee's Estate is free to authorize new derivative works, as the Sorkin Play's existence demonstrates. The *only* limitation the "terms of the grant" impose is that Lee cannot license these new works to be performed in the limited set of venues where Dramatic's rights are exclusive.

3.  ALLC and the government also try to create conflicts between the plain text of the Exception and other parts of the termination provision. These attempts fail.

Both ALLC and the government emphasize that the statute provides that "the exclusive or nonexclusive grant of a transfer or license" of copyright "is subject to termination," 17 U.S.C. § 304(c), and argue from this that the Derivative Works

9

Exception cannot limit the termination right. *See* Red Br. 21-2; Gov't Br. 12-15. That gets the architecture of the termination provision backwards. The provision states that "[i]n *all cases* the reversion of rights" through termination "is subject to the following limitations," of which the Derivative Works Exception is the very first. 17 U.S.C. § 304(c)(6) (emphasis added). "[T]he specific governs the general," and the "specific provision" acts as "an exception to the general one" where both apply. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Under that basic rule of construction, the termination right yields to the Exception's carve-out for continued use of the Sergel Play with the exclusive-use term. ALLC argues that the specific-general canon discussed in *RadLAX* "applies only where there exists a 'contradiction' between the general and specific provisions," and that there is no contradiction between the termination right and the privilege granted in the Exception. Red Br. 29 (citation omitted). That is a plain misreading of what *RadLAX* explicitly says—the Court stressed that the canon "avoids not [just] contradiction" but applies *whenever* specific and general authorizations exist together. 566 U.S. at 645. It is also an obvious misreading of the termination provision, which makes the Exception—as the name signals—a "*limitation*" on the right to terminate. 17 U.S.C. § 304(c) (emphasis added).

The government also argues (at 20) that following the Exception's plain meaning would render it indistinguishable from "complete carveout[s]" from

termination "like the exemption for 'work[s] made for hire.'"  Gov't Br. 20 (quoting 17 U.S.C. § 304(c)).  Not so.  Dramatic retains exclusive non-first-class rights not because the Exception categorically immunizes grants with derivative works from termination, but instead because a specific term of Dramatic's grant authorizes use of the Sergel Play with exclusivity in non-first-class productions.  Survival of exclusivity here is a result of that unique contractual term, not some categorical effect of the Exception on exclusive licenses.

Without the exclusivity term, the outcome would be different—if, for example, Lee had simply assigned her copyright to Dramatic in full, without any term making Dramatic's performance rights in any derivative work exclusive.  If Lee had terminated *that* grant, Dramatic would have been allowed under the Exception to continue utilizing any derivative works prepared before termination— but without any guarantee of exclusivity anywhere.  Lee would have been free to authorize other derivative works to compete with Dramatic, because exclusivity would not have been a "term of the grant."

Finally, the government (at 24) contends that Dramatic's plain-text reading of the Derivative Works Exception would create a "loophole" subverting 17 U.S.C. § 304(c)(5), which provides that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary."  Dramatic is not arguing that the 1969 Agreement alone limits Lee's statutory right to terminate, so § 304(c)(5) does

not come into play. What is at work here is an express *statutory* "limitation" on termination—*Congress's* decision that "the consequences of a termination … simply do not apply to derivative works that are protected by the Exception." *Mills Music*, 469 U.S. at 164. A statutory exception cannot be dismissed as a loophole. And the Exception preserves "terms of the grant."

### B. ALLC and the government's arguments regarding statutory purpose and absurd results are incorrect and do not negate the statutory text.

Because their position contradicts the plain meaning of the Exception, ALLC and the government argue extensively that following plain meaning would frustrate Congressional intent and lead to counterintuitive results. "If th[ese] policy argument[s] sounds familiar, it is because [courts] have time and again rejected ones just like [them]." *Pulsifer v. United States*, 601 U.S. __, 2024 WL 1120879, at *27 (U.S. Mar. 15, 2024). This Court should do so here as well. In addition to being contrary to the fundamentals of statutory construction, these arguments about purpose and consequences are unpersuasive on their own terms.

1. ALLC asserts (at 26-27) that enforcing the plain language of the Exception to preserve the exclusive-use term contradicts "the legislative history" of the termination provision and Congress's goal to allow authors to recapture copyright. An argument that the actual language of a statute should be cast aside in favor of a broadly phrased legislative goal is the "last redoubt of losing causes," *Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport News Shipbuilding &*

*Dry Dock Co.*, 514 U.S. 122, 135-36 (1995), because the reality is that "no legislation pursues its purposes at all costs," *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014).  The termination provision is no exception.

As an initial matter, the kind of materials ALLC musters barely even count as legislative history, and none reflects congressional intent.  For example, ALLC (at 27 & n.8) quotes statements to Congress from "commentators and movie producers" to suggest that advocates of the Exception were asking for no more than a non-exclusive right to use their derivative works after termination.  Lobbying is not legislation, however, and courts "decline to give significance" to "comments in [Congressional] hearings" when "none of th[e] statements was made by a Member of Congress." *Kelly v. Robinson*, 479 U.S. 36, 51 n.13 (1986); *see also Regan v. Wald*, 468 U.S. 222, 237 (1984) (similar).

More fundamentally, the Supreme Court has already exhaustively reviewed the legislative history for the Exception and rejected ALLC's view of it.  As the Court explained in *Mills Music*, the termination provision "produce[s] an accommodation and a balancing among various interests."  469 U.S. at 174 n.41.  Its "general purpose" was, as ALLC notes, "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."  *Id.* at 172-73.  "The Exception in § 304(c)(6)(A) was designed, however, to exclude a specific

13

category of grants—even if they were manifestly unfair to the author—from that broad objective." *Id.* at 173.

2.     ALLC and the government fall back on the contention that honoring the Exception's text here will work absurd results.  They repeatedly resort to straw-man mischaracterizations; accepting the construction Dramatic is *actually* offering produces no absurd result.

The government (at 11) asserts that on Dramatic's reasoning, "an author cannot terminate *any* rights in a previous grant if a former grantee has created a derivative work," and even that "no one could create a new derivative work following a termination if the prior grantee had previously created a derivative work."  In a similar vein, ALLC warns (at 30) that a plain-text reading of the Exception "would render even wholesale copyright assignments interminable."

These arguments attack a straw man.  Again, nothing about the Exception makes grants involving derivative works categorically interminable.  Exclusive licenses and wholesale transfers of copyright can continue to be terminated, and authors will continue to recapture their copyrights.  Where the original grantee has prepared a derivative work before termination, the Exception authorizes continued utilization of the derivative work, but only under the precise terms of the particular grant at issue directed to use of the derivative work.  In many cases, there may be no terms of the grant that resemble the one here, where a specific form of exclusivity is

expressly tied to use of a specific derivative work; and in those cases, there will be no basis for the original grantee to use the derivative work with exclusivity post-termination. And even in this case, where there is an exclusive-use term for the derivative work, Lee's Estate retains full power to authorize any number of new derivative works—the relevant limitation imposed by the Exception here does not concern authorization of new derivative works, but rather involves where those new works may be used. *See also* p. 9, *supra*.

For similar reasons, ALLC's invocation (at 28-29) of the canon against superfluity and the canon against exceptions swallowing the rule "overstate[s] the effect of" the Exception's plain terms. *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (rejecting similar absurd-results arguments). Because it is simply not the case that the Exception will render grants with derivative works interminable across the board, a plain-text reading of the Exception does not swallow the termination right or render it superfluous.

The bar for the kind of absurd-results argument on which ALLC and the government rely is high: the plain text should be followed unless "it is quite impossible that Congress could have intended the result and ... the alleged absurdity is so clear as to be obvious to most anyone." *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705-06 (2d Cir. 2019) (citation and quotation marks omitted). ALLC and the government have not met that high bar here. Not only have they not

explained why permitting continued exclusivity for the Sergel Play is unworkable in this case, they have failed to identify a *single* other terminated grant with an exclusive-use term for a derivative work like the one at issue here.

*　　*　　*

Faithful application of the Exception's plain meaning yields a clear result here: all the terms of the grant governing use of the Sergel Play survive, including the exclusive-use term. But even if that were not so, the three separate issues identified in Dramatic's opening brief preclude affirming the judgment. The government (at 2) conspicuously declines to defend the district court's judgment on these issues, including a straightforward reading of another subsection of Section 304; and, as explained further below, ALLC's arguments on them are unpersuasive.

## II. ALLC's Suit Fails Because The Grant To ALLC Came Too Early.

Section 304's timing provision requires that that any "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of termination," unless the grant is made to "the original grantee." 17 U.S.C. § 304(c)(6)(D). Lee agreed to grant ALLC "right[s] covered by [Dramatic's] terminated grant" in 2015, well before the April 26, 2016, effective date for termination of Dramatic's grant. So the portion of the grant to ALLC covering non-first-class rights is invalid on its face, and ALLC cannot

be entitled to a declaration recognizing those rights. The district court wrongly rejected this argument in an unreasoned footnote. *See* Blue Br. 40-41.

1.    ALLC makes no attempt to defend the district court's cursory reasoning. ALLC's only response on the merits of the timing issue is to argue (at 32) that there was "no grant of rights" until ALLC exercised its option for performance rights when the Sorkin Play premiered on Broadway in 2018. That is wrong, because Section 304(c)(6)(D) forbids both "[a] further grant" *and* an "agreement to make a further grant" until termination is effective, unless the new grant is being made to the original grantee. ALLC's option is an "agreement to make a further grant." As this Court has explained, "[b]etween service of the [termination] notice and the date of termination, [an author] c[an] reach an agreement for a further grant of the terminated rights with [the original grantee] or its successor in title, *but no one else*." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015) (emphasis added).

Congress wrote the prohibition against agreements for future grants "to avoid the situation that ha[d] arisen under" the prior statute, where "third parties ha[d] bought up contingent future interests as a form of speculation." S. Rep. No. 94-473, at 111 (1975). That is why courts in this Circuit have held that a pre-termination "promise of future rights" to anyone other than the original grantee "contravenes the terms of the Copyright Act and is thus invalid on its face." *Artists Rts. Enf't Corp.*

17

*v. Est. of King*, 224 F. Supp. 3d 231, 235-36 (S.D.N.Y. 2016) (citation and quotation marks omitted). This Court should hold the same here.

For the same reason, ALLC's citation to authority regarding when a grant is "executed" for purposes of a related termination provision, 17 U.S.C. § 203, is unavailing. *See* Red Br. 32 (citing *Waite v. UMG Recordings, Inc.*, 477 F. Supp. 3d 265, 274 (S.D.N.Y. 2020)). The question here is not when the grant was *executed*, but rather when the *agreement* to make the grant was entered. Finally, to the extent ALLC means to suggest that it did not even have an agreement with Lee until the Sorkin Play premiered in 2018, that is clearly incorrect. Without an agreement with Lee already in place, ALLC and Sorkin could not even have *created* a derivative work based on the Novel, much less stage it on Broadway. That agreement was made in 2015, it agreed to grant ALLC rights being reclaimed from Dramatic in 2016, and it is invalid under § 304(c)(6)(D)'s plain terms.

2.      ALLC argues (at 31) that the Court should ignore the plain invalidity of the grant because "the scope and extent of [ALLC's] rights" supposedly do not "bear any relevance to this action or appeal." ALLC's pleadings show otherwise.

In the Complaint, ALLC alleged that Dramatic's "reliance on th[e] arbitral award, and its publicly stated intent to exploit and enforce these purportedly 'exclusive' rights, has threatened and jeopardized [ALLC's] ability to exploit *its production rights* to the Sorkin Play." JA28 (¶37) (emphasis added). As a result,

ALLC claimed there is a "substantial controversy" regarding its and Dramatic's "*respective rights* to derivative stage adaptations of the Novel," and it therefore sought declaratory relief that would "clarify[] and settl[e] the *respective rights and obligations* of the parties and would finalize the controversy by according [ALLC] relief from uncertainty and insecurity with respect to *non-first class productions of the Sorkin Play*." JA29(¶43) (emphasis added). Specifically, ALLC "request[ed a] declaratory judgment that: (1) [ALLC] and Sorkin *have the right*, in relation to [Dramatic], to present any and all [non-first-class] Performances ... of the Sorkin Play in the United States; and (2) *any such productions of the Sorkin Play* have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to the Novel." JA29(¶45) (emphasis added). That is essentially the declaration it received from the district court. *See* SPA52.

From the beginning, then, ALLC has framed this suit as one to vindicate its non-first-class performance rights: they are the cornerstone of the declaration ALLC sought and obtained. Without these asserted rights, ALLC would not have a claim to injury from the arbitrator's decision; nor would ALLC be entitled to a declaration that it has performance rights in relation to Dramatic or *anyone*. That is why

§ 304(c)(6)(D)'s timing provision is squarely before the Court: it shows that ALLC lacks the rights it persuaded the district court to declare it possessed.[3]

## III. ALLC's Suit Is Untimely.

The Court can also reverse on the statute-of-limitations provision, 17 U.S.C. § 507(b). ALLC admits it knew Dramatic asserted exclusive performance rights in non-first-class venues by early 2019—an assertion that necessarily repudiated ALLC's claim to performance rights in those venues. Under the one-time accrual rule for ownership claims, that started the three-year clock. *See Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011). But ALLC did not sue until more than three years later, in November 2022. The district court's contrary holding made numerous logical errors, and its conclusion that the defense was waived contradicts the very case law it cited. Blue Br. 45-55.

### A. ALLC's arguments for avoiding the time bar lack merit.

ALLC makes several arguments for why its suit did not accrue in early 2019. None is persuasive.

1. ALLC's primary contention (at 36-38) is that the ownership accrual rule does not apply because this suit is one for a defensive declaration clarifying the

---

[3] ALLC (at 32) suggests Dramatic somehow agreed in its briefing below that ALLC's rights are irrelevant to the action. Dramatic made clear, in the same paper ALLC cites, that "[t]his case is about *competing claims of exclusive rights* in *To Kill a Mockingbird*." JA523 (emphasis added).

limits of Dramatic's performance rights, not the scope of ALLC's rights. For a number of reasons, ALLC is incorrect.

As an initial matter, ALLC once again mischaracterizes its suit. Neither the Complaint nor the declaratory judgment issued by the district court is limited to a determination of Dramatic's rights. Rather, ALLC sued to clarify *both* parties' "*respective rights* to derivative stage adaptations of the Novel." JA29(¶43) (emphasis added). And ALLC sought, and secured, a declaration expressly recognizing that it has the right to mount non-first-class productions of the Sorkin Play. JA29(¶45); SPA52; *see also* pp. 18-19, *supra*. ALLC emphasizes (at 34) that the parties focused their arguments on the scope of Dramatic's claimed exclusivity. But that issue is inextricably linked with ALLC's asserted ownership rights: because the parties' claimed performance rights are irreconcilable, determining one party's rights necessarily determines the other's. That is why the clock began running on this action in March 2019—by then, ALLC knew Dramatic was asserting a claim of exclusivity irreconcilable with its own.

More fundamentally, ALLC is simply wrong that styling an action as one for a defensive declaration immunizes the suit against the statute of limitations. To the contrary, courts around the country, including this Court, have held that "a temporal bar cannot be sidestepped merely by asserting that the [party's] declaratory judgment suit was brought to establish defenses against the rainy day, in the future, when [a

claim] might be [asserted] against [it]." *Gilbert v. City of Cambridge*, 932 F.2d 51, 58 (1st Cir. 1991); *see 118 East 60th Owners, Inc. v. Bonner Properties, Inc.*, 677 F.2d 200, 203-04 (2d Cir. 1982) (applying New York law) (plaintiff was time-barred from seeking affirmative relief in a declaratory-judgment action, even if it could raise the same argument as a defense if it were ever sued); *cf. City of Saint Paul v. Evans*, 344 F.3d 1029, 1035-36 (9th Cir. 2003) (collecting authority for proposition that a "plaintiff cannot engage in a subterfuge to characterize a claim as a defense in order to avoid a temporal bar"). The same principle applies here and bars ALLC from dodging the statute of limitations by repackaging its ownership claim as a defensive declaration.

2. ALLC's related contention (at 35) that its suit is advancing a "claim of non-infringement" and so is not governed by the ownership accrual rule is similarly flawed. ALLC does not even attempt to suggest that the dispute here "involve[s] the nature, extent or scope, of copying." *Kwan*, 810 F.3d at 229. Nor could it—the dispositive issue for the blanket declaration of non-infringement ALLC received is the scope of the parties' "respective rights to derivative stage adaptations of the Novel," JA29(¶43), not the infringement factors. So, as in *Kwan*, even though this suit facially concerns infringement, "ownership [still] forms the backbone of the 'infringement' claim," and so the one-time accrual rule applies. 634 F.3d at 229.

3. ALLC's only argument for avoiding the time bar if the ownership-accrual rule *does* apply is a cursory assertion that Dramatic's arbitration demand was not a "plain and express repudiation" of ALLC's rights. Red Br. 33 n.9. It was. Repudiation triggering an ownership dispute does not require a personal letter containing magic words; it can occur through actions that amount to a "public repudiation" of the plaintiff's ownership claim. *Gary Friedrich Ente., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 317-18 (2d Cir. 2013); *see, e.g., Charles v. Seinfeld*, 803 F. App'x 550, 552 (2d Cir. 2020).

Dramatic's arbitration demand fits that standard. The demand took direct aim at Rudin and ALLC's attempts to interfere with non-first-class productions of the Sergel Play, JA536-543(¶¶1-31), and it asked for a declaration that Dramatic has "the exclusive right to license" non-first-class performances "and that no other person or entity has such rights in any other stage version of the novel," JA543. ALLC does not dispute it knew of this claim when it was first made, in March 2019. JA616. And contemporaneous correspondence shows that ALLC understood Dramatic's position to reject ALLC's asserted performance rights. JA563-564. Under *Kwan*, the clock began running on ALLC's claim then. 634 F.3d at 229.

4. Finally, ALLC (at 37) cites out-of-circuit law to argue that *Dramatic* is time-barred from asserting an ownership-based defense in this suit. For two reasons, that is incorrect. First, even if the time bar could apply to Dramatic's defenses,

Dramatic already vindicated its ownership rights in a timely suit—the arbitration initiated in March 2019, from which Dramatic obtained a declaration, confirmed by a federal court, that its non-first-class performance rights remain exclusive. Second, this Court has made clear in the copyright context that "[a] defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." *Est. of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163-64 (2d Cir. 2003) (collecting authority).

## B. Dramatic's limitations defense was not forfeited.

On waiver, ALLC (at 38-39) repeats the district court's conclusion that a defendant *automatically* forfeits a defense if it is not raised in response to the plaintiff's summary-judgment motion—even if the motion is filed before the time to answer, the district court does not grant the motion in full, and the defendant then raises the defense in its answer. But no such *per se* forfeiture rule exists, and neither ALLC nor the district court has cited any rule or case applying one.

As Dramatic explained, the only case the district court cited (at SPA45) *rejected* forfeiture, even of an argument that the defendant had failed to raise in opposition to a (post-answer) motion for summary judgment that was granted in full. *See Davis v. Shah*, 821 F.3d 231, 246 (2d Cir. 2016). This Court found that the argument was fairly presented, because it had been raised in the answer and earlier motion practice, and "plaintiffs suffered no unfair surprise or prejudice." *Id.*

24

ALLC cites no case from this Court applying the supposed *per se* waiver rule at summary judgment. ALLC does not even address *Davis*, its refusal to find waiver, or the district court's erroneous reliance on it. Nor does ALLC attempt to argue that the normal prudential factors this Court examines—"undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings," *Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004)— support waiver here.

Rather, ALLC (at 38) grounds its argument in a slew of cases that do not involve pre-answer summary judgment at all. Some do not even involve affirmative defenses, but arguments directly responsive to the plaintiff's arguments, which (unlike defenses) naturally must be raised in the response to the plaintiff's motion.

The only court in this Circuit to have considered this same forfeiture question has persuasively explained that "it would be unfair not to consider" the affirmative defense. *Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 516 (S.D.N.Y. 2014). ALLC attempts to sidestep *Narragansett* by noting (at 41-42) that the plaintiff's pre-answer motion sought only partial summary judgment. That is no distinction. In *Narragansett*, the plaintiff sought *and won* summary judgment on the *same claim* that the defendant then alleged in its answer was untimely. *Compare id.* at 515-16 *with Narragansett Elec. Co. v. Am. Home Assur. Co.*, 921 F. Supp. 2d 166, 169, 190-91 (S.D.N.Y. 2013). Despite this, the district court held that "there is no

case law or rule" that barred raising the limitations defense in the answer, and that "[j]ustice require[d] consideration" of that defense. 999 F. Supp. 2d at 516. The Court should come to the same conclusion here.

ALLC also claims (at 41) that, unless waiver is found here, "the possibility of case disposition via a pre-answer motion for summary judgment would be negated entirely." Not so. A district court can sometimes grant a motion for summary judgment in full before any answer is filed. But here, the pre-answer motion was *not* granted in full, and the district court kept the case open, which permitted Dramatic to answer. Dramatic cannot be faulted for raising its affirmative defenses in that answer.

## IV.    ALLC's Suit Is Barred By Preclusion.

Last, the district court was wrong to reject application of claim preclusion. ALLC's 2015 Agreement expressly states that its rights "shall be subject to" Dramatic's; given the arbitrator determined Dramatic's non-first-class rights continue to be exclusive, ALLC is bound by that judgment. Blue Br. 56-60.

1.    ALLC argues that it merely confirmed in the 2015 Agreement that Dramatic can continue to use the Sergel Play "on a non-exclusive basis in the United States." Red Br. 44 (emphasis removed) (quoting JA227). That ignores key language from the 2015 Agreement. True, ALLC (through its predecessor-in-interest, Rudinplay) first "acknowledge[d]" its belief that termination would leave

Dramatic with a non-exclusive license. JA227. But ALLC then went beyond this to agree, without qualification, that "[t]he rights granted [under the 2015 Agreement] shall be subject to the rights granted under the [1969] Agreement, as limited by [Lee's] termination." JA227. As the Northern District of Illinois explained, this "means that if Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then [ALLC] did not acquire that right." *Dramatic Publ'g Co. v. Carter*, 608 F. Supp. 3d 618, 624 (N.D. Ill. 2022). "That is exactly what transpired" by virtue of the arbitrator's decision. *Id.*

ALLC has no response to this analysis, except to complain elsewhere (at, *e.g.*, 14) that the Northern District of Illinois reviewed the merits of the arbitral award under the usual deferential standard. That is inaccurate. The district court considered the Estate's argument that the award should be vacated because it affected third parties, and it found no effect on Rudinplay because Rudinplay agreed to subject its rights to Dramatic's. 608 F. Supp. 3d at 623-25. And Dramatic's rights have been determined in a decision confirmed by a federal court. The Northern District of Illinois correctly concluded that, under the plain language of the 2015 Agreement, ALLC's rights were necessarily determined when Dramatic's were, and this Court should do the same.

2. ALLC next argues that *Taylor v. Sturgell*, 553 U.S. 880 (2008), limits agreements to be bound to specific situations: "a test case," or "a court-filed

stipulation to be bound by a separate action[]."  Red Br. 45 (quoting *Taylor*, 553 U.S. at 893-94).  That is a misreading of *Taylor*.  The Court discussed those scenarios as "*example[s]*" of a broader principle: "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement."  *Taylor*, 553 U.S. at 893-94 (emphasis added) (quoting *Restatement (Second) of Judgments* § 40, at 390 (1980) ("Restatement")).

The section of the Restatement upon which *Taylor* relies makes this clear.  It cites cases holding that an agreement to be bound by another's rights or obligations translates into an agreement to be bound by a determination of those rights or obligations—even if the agreement makes no mention of having these rights determined in litigation.  *E.g.*, *Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001) (cited in Restatement § 40) (party's agreement that another's "appeal process [and] grievance guidelines or rules ... shall be followed" bound the party to later court order determining the scope of those guidelines and rules).  Although Dramatic cited this authority in its opening brief (at 57), ALLC offers no response to it.

3.    Beyond its express commitments in the 2015 Agreement, ALLC's "conduct and manifestations of intention" during the arbitration support "impl[ying]" an agreement to be bound.  Restatement § 40; Blue Br. 58-59.  Discovery revealed that ALLC had drafted the core of the Estate's briefing on the

exclusivity issue in the arbitration and lobbied the Copyright Office to change its own public statements about the Derivative Works Exception.  *See* JA623-627; JA649-652; Blue Br. 13, 23.  ALLC worked arm-in-arm with the Estate for a reason: it understood the arbitrator's decision about Dramatic's rights would determine its rights as well.  *See* JA563.

ALLC responds only indirectly to the evidence regarding its involvement in the arbitration, arguing it relates only to a different theory of preclusion (based on ALLC's control of the Estate).  Red Br. 11-12 & n.3.  That is incorrect.  An agreement to be bound can be "implied" based on evidence showing, among other things, "the closeness or interests of the persons involved" and "whether they were represented by the same or collaborating counsel."  Restatement § 40.  That is what Dramatic is arguing in this Court.

ALLC's cursory attempts to minimize its involvement in the arbitration are unconvincing.  ALLC points out (at 11 n.3) that it did not ghostwrite *all* of the Estate's briefing on *every* issue in the arbitration.  But the point is that ALLC took the pen on the decisive issue here—the Derivative Works Exception—because it knew that its own rights were at stake.

## CONCLUSION

The district court's judgment should be reversed.

April 17, 2024                              Respectfully submitted,


                                            /s/ William M. Jay
William E. Evans                            William M. Jay
GOODWIN PROCTER LLP                         GOODWIN PROCTER LLP
100 Northern Avenue                         1900 N Street, NW
Boston, MA 02210                            Washington, DC 20036
(617) 570-1000                              (202) 346-4000

Stefan Mentzer                             Kevin Tottis
GOODWIN PROCTER LLP                         TOTTISLAW
The New York Times Building                 401 N. Michigan Avenue
620 Eighth Avenue                           Suite 530
New York, NY 10018                          Chicago, IL 60611
(212) 813-8800                              (312) 527-1400

                                            *Counsel for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Local Rule 32.1(a)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,949 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Version 2008 in 14-point Times New Roman, a proportionally spaced typeface.

April 17, 2024

*/s/ William M. Jay*
William M. Jay

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system.  I certify that all counsel of record are registered as ECF filers and will be served by the CM/ECF system.


April 17, 2024                            */s/ William M. Jay*
                                          William M. Jay