# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee*,

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

**SPECIAL APPENDIX**
**(SPA1-59)**


William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*Counsel for Defendant-Appellant*

Wook Hwang
SHEPPARD MULLIN
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Plaintiff-Appellee*


(*For Continuation of Appearances See Inside Cover*)

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

Keane Barger
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203

*Counsel for Plaintiff-Appellee*

## TABLE OF CONTENTS

**Page**

### SPECIAL APPENDIX (SPA1-59)

Opinion and Order, dated April 27, 2023 (ECF No. 65) .................................. SPA-1

Opinion and Order, dated July 24, 2023 (ECF No. 87) .................................. SPA-35

Order, dated July 25, 2023 (ECF No. 88) .................................................... SPA-46

Judgment, dated August 1, 2023 (ECF No. 92) ............................................ SPA-49

Amended Judgment, dated August 28, 2023 (ECF No. 100) ......................... SPA-51

17 U.S.C. § 304 ........................................................................................ SPA-54

### DEFFERED JOINT APPENDIX VOLUME I of V (JA1-173)

U.S. District Court Southern District of New York,
Civil Docket for Case No. 1:22-cv-10147 ........................................................ JA-1

Complaint, dated November 30, 2022 (ECF No. 1) ........................................ JA-17

Notice of Motion, dated January 23, 2023 (ECF No. 28) ................................ JA-31

Defendant Dramatic Publishing Company's Memorandum
in Support of Its Motion to Dismiss Atticus LLC's Complaint,
dated January 23, 2023 (ECF No. 29) ........................................................... JA-33

Declaration of Kevin Tottis, dated January 23, 2023 (ECF No. 30) ............... JA-63

Final Award of Arbitrator in American Arbitration Association
Case No. 01-19-0000-7463, dated January 28, 2022
(ECF No. 30-2) ....................................................................................... JA-66

### DEFFERED JOINT APPENDIX VOLUME II of V (JA174-233)

Agreement between Harper Lee and Dramatic Publishing Co.,
dated June 25, 1969 (ECF No. 30-4) ....................................................... JA-174

Notice of Termination of Transfer Extended Renewal Term,
dated April 28, 2011 (ECF No. 30-7) ....................................................... JA-179

Notice of Cross-Motion for Summary Judgment, dated February 6, 2023 (ECF No. 34) .......... JA-186

Plaintiff's Statement of Undisputed Material Facts, dated February 6, 2003 (ECF No. 35) .......... JA1-88

Plaintiff's Memorandum of Law (1) in Opposition to Defendant's Motion to Dismiss and (2) in Support of Plaintiff's Cross-Motion for Summary Judgment, dated February 6, 2023 (ECF No. 36) .......... JA-191

Declaration of Jonathan Zavin, dated February 6, 2023 (ECF No. 37) .......... JA-222

Agreement between Harper Lee and Rudinplay, Inc., dated June 29, 2015 (ECF No. 37-3) .......... JA-225

Agreement between No Ice, Inc. and Atticus LLC, dated December 12, 2018 (ECF No. 37-5) .......... JA-231

**DEFERRED JOINT APPENDIX VOLUME III of V (JA234-342)**

Motion to Confirm Arbitration Award and Enter Judgment, Case No. 1:21-CV-05541 (N.D. Ill. October 19, 2021) (ECF No. 37-7) .......... JA-234

**DEFERRED JOINT APPENDIX VOLUME IV of V (JA343-531)**

Final Judgment Order, Case No. 1:21-CV-05541 (N.D. Ill. January 13, 2023) (ECF No. 37-8) .......... JA-343

Dramatic Publishing Company's Response to Respondents' Motions to Vacate Arbitration Awards, Reply in Support of Motion to Confirm Awards and Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify, Case No. 1:21-CV-05541 (N.D. Ill., February 16, 2022) (ECF No. 37-9) JA-354

Dramatic Publishing Company's Reply in Support of Its Motion to Dismiss Atticus LLC's Complaint, dated February 15, 2023 (ECF No. 47) .......... JA-390

Dramatic Publishing Company's Response to Motion for Summary Judgment, dated February 21, 2023 (ECF No. 50) .......... JA-405

Declaration of Kevin Tottis, dated February 21, 2023 (ECF No. 52) .......... JA-433

Dramatic Publishing Company's Response to Plaintiff's Statement of Undisputed Material Facts, dated February 22, 2023 (ECF No. 57)..............JA-443

Declaration of Kevin Tottis, dated February 28, 2023 (ECF No. 60)............JA-448

Email from Matthew Lembke to Jonathan Zavin, dated March 7, 2019 (ECF No. 60-27).....................................................JA-458

Dramatic Publishing Company's Statement of Additional Facts, dated February 28, 2023 (ECF No. 61) .........................................................JA-461

Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment, dated March 3, 2023 (ECF No. 63)..........................JA-473

Defendant Dramatic Publishing Company's Answer to Plaintiff Atticus LLC's Complaint, dated May 11, 2023 (ECF No. 72) .......................JA-489

Order, dated May 25, 2023 (ECF No. 75) .....................................................JA-507

Notice of Dramatic Publishing Company's Motion for Summary Judgment, dated June 2, 2023 (ECF No. 76)..................................................JA-509

Memorandum of Law in Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 2, 2023 (ECF No. 77)................JA-511

**DEFERRED JOINT APPENDIX VOLUME V of V (JA532-736)**

Declaration of Kevin Tottis, dated June 2, 2023 (ECF No. 78) .....................JA-532

Email from Scott Rudin to Alvin Deutsch, dated January 23, 2019 (ECF No. 78-1) ..........................................................................JA-535

Arbitration Demand file by Dramatic Publishing Co. against The Estate of Harper Lee, dated March 7, 2019 (ECF No. 78-3) ..............JA-536

Letter from Jonathan Zavin to Matthew Lembke, dated April 24, 2019 (ECF No. 78-6).......................................................JA-563

Declaration of Christopher Sergel III, dated June 2, 2023 (ECF No. 79) ..................................................................JA-565

Letter from Jonathan Zavin to Dramatic Publishing Co., dated January 9, 2019 (ECF No. 79-1)..............................................................JA-568

Letter from Matthew Lembke to Dramatic Publishing Co., dated January 15, 2019 (ECF No. 79-2) .......... JA-572

Defendant Dramatic Publishing Company's Statement of Undisputed Material Facts, dated June 2, 2023 (ECF No. 80) .......... JA-576

Reply in Further Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 14, 2023 (ECF No. 83) .......... JA-584

Transcript of Conference held on May 23, 2023 before Judge Denise L. Cote (ECF No. 84) .......... JA-599

Joint Status Report, dated June 16, 2023 (ECF No. 86) .......... JA-618

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-2) .......... JA-622

Excerpts of Post-Hearing Brief of The Estate of Harper Lee and Harper Lee LLC, American Arbitration Association Case No. 10-19-0000-7463, dated July 28, 2021, and Excerpts of Respondents' Motion to Vacate Corrected Interim Award of Arbitration and Response in Opposition to Petitioner's Motion to Confirm Corrected Interim Award, Case No. 1:21-CV-05541 (N.D. Ill., January 14, 2022) (ECF No. 86-3) .......... JA-631

Email from Jonathan Zavin to Matthew Lembke, dated February 1, 2021 (ECF No. 86-4) .......... JA-648

Wayback Machine captures of February 5, 2021 and March 4, 2021 U.S. Copyright Office webpage (ECF No. 86-5) .......... JA-653

Emails from Jonathan Zavin, dated between March 23, 2019 and July 27, 2021 (ECF No. 86-6) .......... JA-658

Email from Jonathan Zavin to Matthew Lembke, dated September 25, 2020 (ECF No. 86-7) .......... JA-701

Email from Jonathan Zavin to Matthew Lembke, dated April 6, 2021 (ECF No. 86-8) .......... JA-703

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-9) .......... JA-705

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-10) ........ JA-708

Email from Jonathan Zavin to Matthew Lembke, dated May 20, 2021 (ECF No. 86-11) ........ JA-712

Email from Jonathan Zavin to Matthew Lembke, dated May 26, 2021 (ECF No. 86-12) ........ JA-714

Email from Jonathan Zavin to Matthew Lembke, dated June 14, 2021 (ECF No. 86-13) ........ JA-717

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-14) ........ JA-719

Notice of Appeal, dated August 30, 2023 (ECF No. 102) ........ JA-721

Opinion and Order, dated October 31, 2023 (ECF No. 109) ........ JA-723

| | | |
|---|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br>Plaintiff,<br>and<br>AARON SORKIN,<br>Involuntary Plaintiff,<br>-v-<br>THE DRAMATIC PUBLISHING COMPANY,<br>Defendant. | : | 22cv10147 (DLC)<br><br>OPINION AND ORDER |

APPEARANCES:

For plaintiff Atticus Limited Liability Company:
Frank David D'Angelo
Wook J Hwang
Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

Keane A. Barger
Loeb & Loeb, LLP
35 Music Square East
Suite 310
Nashville, TN 37203

For involuntary plaintiff Aaron Sorkin:
Maura Wogan
Nicole Bergstrom
Frankfurt Kurnit Klein & Selz, P.C.
28 Liberty Street
New York, NY 10005

For defendant The Dramatic Publishing Company:
Kevin Tottis
Keith Stolte
Max A. Stein
TottisLaw

401 N. Michigan Avenue
Suite 530
Chicago, IL 60611

Steven J. Hyman
David Blasband
Oliver R. Chernin
Paul Howard Levinson
McLaughlin & Stern, LLP
260 Madison Avenue
New York, New York 10016

DENISE COTE, District Judge:

In 1960, Harper Lee published the American masterpiece To Kill a Mockingbird (the "Novel"). This lawsuit raises the question of whether the defendant has exclusive rights to perform amateur productions of a play derived from that masterpiece. The plaintiff, Atticus Limited Liability Company ("Atticus"), which owns the production rights to the play authored by Aaron Sorkin that arrived on Broadway in 2018 to critical acclaim (the "Sorkin Play"), contends that the defendant has only non-exclusive rights. The defendant -- The Dramatic Publishing Company ("Dramatic") -- disagrees. Dramatic contends that it has exclusive rights to perform in amateur productions a play derived from the Novel. Dramatic's play, written by Dramatic's former-President Christopher Sergel (the "Sergel Play"), has been performed pursuant to a license from Lee for nearly 50 years.

For the reasons explained below, this Opinion finds as a matter of law that Dramatic's rights are no longer exclusive.[1] It remains to be determined, however, whether the plaintiff's right to assert as much is limited by an award entered on January 28, 2022, in the arbitration between the Estate of Harper Lee and Dramatic. Dramatic prevailed in that arbitration and contends that the plaintiff is bound through the doctrine of claim preclusion to abide by that decision.

## Background

The following facts are taken from the evidence submitted in connection with the motion for summary judgment brought by Atticus and a motion to dismiss filed by Dramatic. The facts are undisputed or are taken in the light most favorable to Dramatic, unless otherwise indicated.

I. Factual Background

A. Lee's 1969 Agreement with Dramatic

In 1969, Lee entered into an agreement with Dramatic, granting Dramatic "the complete right throughout the world" to create a dramaztization of the Novel which "is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed" (the "1969 Agreement"). The phrase

[1] This Opinion will not address stock rights, a topic of some importance to the arbitrator's analysis. Whatever rights Dramatic obtained, they are no longer exclusive.

"amateur acting rights" was defined under the contract to include:

> [A]ll performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

Lee "reserve[d] all rights not expressly granted to [Dramatic], including but not limited to the professional acting . . . rights."

Lee agreed to "do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and/or purported to be granted herein." For its part, Dramatic agreed that during the run of any "first class" production in New York or a related touring engagement, Dramatic "shall not permit amateur performances [of the Sergel Play], as provided herein, within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000."

The 1969 Agreement also contained an arbitration clause. It stated that: "[a]ny controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the

American Arbitration Association." Pursuant to the 1969 Agreement, Dramatic's then-President, Christopher Sergel, wrote a stage adaptation of the Novel, the Sergel Play.

B. 2011 Termination Letter

In April 2011, Dramatic was notified that Lee was terminating the 1969 Agreement (the "2011 Termination Letter"). The 2011 Termination Letter states, in relevant part,

> Pursuant to Section 304(c) of the Copyright Act of 1976 (as amended) (17 U.S.C. § 304(c)) and the regulations issued thereunder by the Register of Copyrights, 37 CFR § 201.10, Nelle Harper Lee hereby terminates the grant of transfer of copyright(s) made in that certain Agreement dated June 26, 1969 between Nelle Harper Lee on the one hand and The Dramatic Publishing Company on the other hand . . . . The effective date of termination shall be April 26, 2016.

C. Atticus and Sorkin's Acquisition of Rights in the Novel

On June 29, 2015, Lee entered into an agreement with Rudinplay, Inc.[2] (the "2015 Agreement"). The 2015 Agreement designated Rudinplay as Lee's exclusive agent to select a playwright for a new dramatic adaption of the Novel. Upon the written approval by Lee of the selected playwright, Lee granted Rupinplay:

> [T]he sole and exclusive option (the "Option") to acquire, on an exclusive (subject to Paragraph 2(b) below), worldwide basis, all live stage rights in and

[2] Rudinplay (n/k/a No Ice, Inc.) and Atticus are entities owned, controlled, or operated by Scott Rudin ("Rudin").

> to the Novel and all subsidiary and ancillary rights related to such live stage rights.

That option would "be deemed exercised" upon the "initial commercial first class production" of the play on Broadway or London's West End. Section 2(b) states:

> [Rudinplay] acknowledges that, notwithstanding [the 2011] termination, the amateur acting rights to the [Sergel Play] <u>can continue to be exploited following such termination under the terms of the [1969] Agreement on a non-exclusive basis in the United States</u>, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

(emphasis added).

Rudinplay subsequently contracted with Aaron Sorkin to serve as the playwright for the new stage adaptation of the Novel, and Rudinplay assigned to Atticus its production rights to the Sorkin Play. Sorkin is a well known and successful theater, film, and television writer. Lee died on February 19, 2016. The Sorkin Play debuted on Broadway on December 13, 2018.

### D. The Arbitration Proceedings Between Dramatic and the Lee Estate

On March 7, 2019, Dramatic filed an arbitration demand against the Estate of Harper Lee, and later added Harper Lee, LLC as a party (collectively, the "Lee Estate"). In the arbitration proceeding, Dramatic asserted that the Lee Estate had breached the 1969 Agreement by hindering the full exercise

of Dramatic's rights and had tortiously interfered with its related licensing contracts. Specifically, Dramatic alleged that Rudin and the Lee Estate had interfered with Dramatic's license to Jonathan Church Productions ("Church") for a non-first-class tour of the Sergel Play in the United Kingdom and Ireland. Dramatic alleged that "Dramatic and Church received a letter from lawyers representing Mr. Rudin and endorsed by the Lee Estate, threatening lawsuits if any presentations of the Sergel version were made[,]" and Church cancelled the tour "as a result of those threats of litigation." On another occasion, Dramatic had sought permission from the Lee Estate for nine amateur theaters to produce the Sergel Play within 25 miles of certain major cities while the Sorkin Play ran on Broadway. The Lee Estate initially authorized eight of the nine productions, but revoked that permission months later "as many or most of the Licensed Productions were preparing to open." Dramatic alleged that "[o]ver the next month, in concert with Mr. Rudin, the Lee Estate proceeded to threaten a number of the productions," and those theaters "shut down their productions because of fears of reprisal."

In its arbitration demand, Dramatic alleged "multiple breaches" of the 1969 Agreement, sought a declaration regarding the scope of "Dramatic's exclusive rights to the Sergel Version

of the play," and requested an injuction against the Lee Estate "from purporting to own, be authorized to exploit or to exploit [the amateur] worldwide rights in any stage version of the novel To Kill a Mockingbird."

The Lee Estate claimed that it had "no advanced approval" of Atticus' letters regarding the Church tour, and that it "did not sign those letters and never made any demand on anyone that the planned tour be cancelled." The Lee Estate maintained, however, that "licenses for productions [of the Sergel Play] involving professional actors are not permitted under the [1969 Agreement]."

The Lee Estate asserted that it had revoked "any purported waiver" of the 25-mile restriction upon discovering that "several" of the theaters were "professional theaters." The Lee Estate further asserted that Atticus, not the Lee Estate, "sent letters to the theaters that had been issued licenses by Dramatic that were not consistent with the geographic limitiation," and that the Lee Estate "never asked any of these theaters to cancel their scheduled perfomrances." Accordingly, the Lee Estate filed counterclaims against Dramatic, in which it asserted (1) a claim for breach of contract of "the express surviving terms of the [1969 Agreement]," (2) a claim of copyright infringement of the "exclusive live stage rights in

and to the Novel," and (3) a claim of copyright infringement of the Novel.

The arbitrator entered an interim award on October 21, 2021, and a final award on January 28, 2022 (collectively, the "Arbitration Award"). The Arbitration Award rejected the Lee Estate's counterclaims and largely found it liable on Dramatic's claims.

The arbitrator first interpreted the scope of Dramatic's rights under the 1969 Agreement. The Arbitration Award concluded that the 1969 grant to Dramatic consisted of all "non-first-class rights," including not just amateur productions but also rights to productions in regional and community theaters where paid professionals would perform the Sergel Play.

The arbitrator next analyzed the legal effect of Lee's 2011 Termination Letter. The arbitrator analyzed §§ 304(c) and 304(c)(6)(A) of the Copyright Act and concluded that Dramatic's non-first-class rights survived the 2011 Termination Letter and remained exclusive. The arbitrator thus determined that "Dramatic continues to have the right to exclude the Estate from granting any third party the 'amateur acting rights' for an adaptation of [To Kill a Mockingbird]." These findings resolved the parties' respective breach of contract claims, and Atticus' copyright infringement claims, in favor of Dramatic. Lastly,

the Arbitration Award found that the Lee Estate had "tortiously interfered with contracts between Dramatic and several of its licensees" because the Lee Estate had worked "in concert with" Rudin "to help him engage in a campaign against Dramatic's licensees."

On November 11, 2021, Dramatic moved to confirm the interim award in the United States District Court for the Northern District of Illinois. The Civil Cover Sheet identified the basis for jurisdiction as "federal question" jurisdiction. The motion to confirm the Arbitration Award asserted that there was federal question jurisdiction in federal court "because the underlying arbitration involved claims under the Copyright Act, 17 U.S.C. § 101, et seq."[3]

On January 14, 2022, the Lee Estate cross-moved to vacate the award. On January 13, 2023, the Northern District of Illinois entered a Final Judgment Order (the "Illinois Judgment") confirming the Arbitration Award. The Lee Estate has appealed the Illinois Judgment. That appeal remains pending. Neither Atticus nor Sorkin were parties to the arbitration or confirmation proceedings in the Northern District of Illinois.

[3] The motion added that there was "also" subject matter jurisdiction on the ground of diversity.

II. Procedural History of the Instant Action

Atticus filed this federal lawsuit on November 30, 2022, seeking a declaration that (1) "Atticus and Sorkin have the right, in relation to [Dramatic], to present any and all Second-Class, Stock, Amateur and Ancillary Performances [] of the Sorkin Play in the United States;" and (2) "any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to the Novel."[4] In the complaint, Atticus named Sorkin as an involuntary party/nominal defendant by virtue of Sorkin's copyright ownership of the Sorkin Play. By an Order dated January 2, 2023, Sorkin was realigned as an involuntary plaintiff.

Dramatic moved to dismiss the complaint on January 23, 2023. On February 6, Atticus cross-moved for summary judgment. The motions became fully submitted on March 3. Discovery has not yet begun.

[4] The parties do not dispute that Atticus has the exclusive right to produce the Sorkin Play on Broadway and in other first-class venues. This dispute centers only on non-first-class rights, which this Opinion refers to as rights for amateur productions. Thus, in this Opinion, the reference to amateur productions includes stock rights.

## Discussion

Although Dramatic has moved to dismiss Atticus' claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., a court may convert a motion to dismiss into a motion for summary judgment under Rule 56, Fed. R. Civ. P., when "matters outside the pleading are presented to and not excluded by the court." Fed. R. Civ. P. 12(d). A district court may not so convert a motion under Rule 12(d), however, unless "[a]ll parties [were] given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment is governed by principles of substance rather than form." Palin v. N.Y. Times Co., 940 F.3d 804, 811 (2d Cir. 2019). "[T]he essential inquiry is whether the [nonmovant] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment." Id. at 811-12.

In support of its motion to dismiss, Dramatic presented the declaration of Kevin Tottis, counsel for defendant, which included seven exhibits of evidentiary material. In opposition to Dramatic's motion, plaintiff cross-moved for summary judgment, offering its own evidentiary material and a Rule 56.1 statement. Dramatic submitted additional evidence with its opposition to Atticus' summary judgment motion and filed a Rule

56.1 counter-statement. Accordingly, all parties have had a reasonable opportunity to present supporting material. In these circumstances, it is appropriate to convert Dramatic's motion to dismiss to a motion for summary judgment.

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are those facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).

The Second Circuit has cautioned that "[o]nly in the rarest of cases may summary judgment be granted against a party who has not been afforded the opportunity to conduct discovery" because

"the nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment." Ass'n of Car Wash Owners Inc. v. City of New York, 911 F.3d 74, 83 (2d Cir. 2018) (citation omitted). Still,

> A party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit [or declaration] showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (citation omitted); see also Ass'n of Car Wash Owners, 911 F.3d at 83-84; Fed. R. Civ. P. 56(d) (formerly Fed. R. Civ. P. 56(f) (2009)).

I. Section 304(c) of the Copyright Act

The core of this dispute turns on a straightforward question of statutory interpretation: whether, under 17 U.S.C. § 304(c), Dramatic retains exclusive rights to produce amateur performances of the Novel. Dramatic in its motion to dismiss and Atticus in its motion for summary judgment each acknowledge that this is a legal issue that can and should be decided on the basis of their respective motions, and that no discovery is needed to resolve it.

Section 304(c) of the Copyright Act confers upon authors and their statutory successors the right to terminate "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978[.]" 17 U.S.C. § 304(c) (emphasis added). That termination right is subject to certain "limitations." 17 U.S.C. § 304(c)(6). Among those limitations is the "derivative works exception," which provides:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

Id. § 304(c)(6)(A) (emphasis added) (the "Derivative Works Exception"). The question here is whether an exclusive license to perform a derivative work remains exclusive following a valid termination of a license. This Opinion readily concludes that it does not.

"Statutory interpretation always begins with the plain language of the statute." Grajales v. Comm'r of Internal Revenue, 47 F.4th 58, 62 (2d Cir. 2022) (citation omitted). Plain meaning "draws on the specific context in which that language is used." Williams v. MTA Bus Co., 44 F.4th 115, 127 (2d Cir. 2022) (citation omitted). When the statute's language

is plain, "the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." In re Fogarty, 39 F.4th 62, 73 (2d Cir. 2022) (citation omitted).

The statutory language at issue here is unambiguous. Section 304(c) provides that the "exclusive" grant of copyright "is subject to termination." As the U.S. Supreme Court noted in Mills Music, Inc. v. Snyder,

> [T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product. That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

469 U.S. 153, 172 (1985). As the Nimmer treatise on copyright law explains, "[i]n general, the termination provisions apply to any 'transfer' of copyright," which includes "exclusive licenses and any other conveyance of copyright or of any exclusive right comprised in a copyright." Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright § 11.02[A] (2022).

Thus, nothing in the Derivative Works Exception prevents an author from exercising its termination right. Rather, the Derivative Works Exception permits a grantee to continue to "utilize" derivative works created during the term of the license without the threat of litigation from the author of the

original work or the author's heirs following such a termination. "Without such an exception, authors might use their reversion rights to extract prohibitive fees from owners of successful derivative works or to bring infringement actions against them." Woods v. Bourne Co., 60 F.3d 978, 986 (2d Cir. 1995).

The Nimmer treatise furnishes an illustrative example:

> Suppose that publication rights previously granted to a book publisher are terminated. . . . [S]uppose the publisher, prior to publication, made a number of editorial changes in the manuscript and claims to have thereby published a "derivative work" for further "utilization" purposes. In most cases, such editorial revisions probably would be regarded as too minimal to warrant characterizing the result as a derivative work. But if such characterization were found to be appropriate, would the publisher merely have the right to continue to sell those copies of the book printed prior to termination, or would it have the further right to print new copies of the book? As with new prints of old movies, new copies probably may be printed because this would not constitute "the preparation after the termination of other derivative works," but only of other copies of the same derivative work.

3 Nimmer on Copyright § 11.02[C][1] (2022). In line with this example, the publisher of the derivative work retains, at most, the right to print new copies of that work, but does not retain the right to prevent the author from licensing others to create new derivative works.

This same reasoning applies with equal force if the underlying work enters the public domain. The playright who

created the derivative work continues to have rights in her creation, but cannot bar others from creating derivative works from an original work that has entered the public domain. Again, as the Nimmer treatise explains,

> [T]he effect [on the derivative work from the underlying work entering the public domain] is adverse. Thus, suppose an author of a novel grants to a playwright the exclusive dramatic rights in the novel, and the playwright accordingly writes and copyrights a play based upon the novel. While the novel remains in copyright, no one may write a second play based either upon the first play or upon the novel. However, once the novel enters the public domain, then although the first play remains protected by copyright, anyone may write a new play based upon the same novel, as long as they do not copy the original material that appeared in the first play, but not in the novel.

3 Nimmer on Copyright § 3.07 (2022)(emphasis added).

Dramatic argues that because § 304(c)(6)(A) allows a derivative work to "continue to be utilized under the terms of the grant after its termination" (emphasis added), an exclusive license remains exclusive even following its termination. This interpretation fails. Such a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable. The Derivative Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c).

Dramatic's argument relies primarily on Mills Music, 469 U.S. 153 (1985). Mills Music addressed the question of "whether an author's termination of a publisher's interest in a copyright

also terminates the publisher's contractual right to share in the royalties on such derivative works." Id. at 156. The Court held that the "contractual obligation to pay royalties survives the termination." Id. at 169. Music Mills did not address the question of whether an exclusive license remains exclusive following a valid termination, and, accordingly, does not help Dramatic.

## II. Claim Preclusion

Dramatic contends that, even if it does not retain exclusive rights over amateur productions of plays derived from the Novel, Atticus is nonetheless bound by the arbitrator's decision to the contrary under the doctrine of claim preclusion. Dramatic asserts that Atticus, although not a party to the arbitration, is bound because it was in privity with the Lee Estate during the arbitration.

It is necessary, as a first step, to select the jurisdiction whose law will provide the claim preclusion principles that will be applied to this dispute. The instant action is brought for a declaration of rights under U.S. copyright law, and is therefore premised on federal question jurisdiction.

In federal question cases, a court looks to federal choice of law principles. Wells Fargo Asia Ltd. v. Citibank, N.A., 936

F.2d 723, 726 (2d Cir. 1991). The preclusive effect of a federal court judgment depends on the basis for jurisdiction in the action. For federal judgments in federal question cases, courts apply "uniform federal rules of res judicata." Taylor v. Sturgell, 553 U.S. 880, 891 (2008) (citation omitted). For federal judgments in diversity cases, "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." Id. at 891 n.4.

The Illinois Judgment does not state the basis of its jurisdiction. To confirm or vacate arbitral awards under the Federal Arbitration Act's §§ 9 and 10, however, a federal court must have an independent jurisdictional basis -- as determined from the "face of the application" submitted to the court. Badgerow v. Walters, 142 S. Ct. 1310, 1316 (2022).

Dramatic's Civil Cover Sheet, which it completed when it filed its action in the Northern District of Illinois to confirm the Arbitration Award, identified the basis for jurisdiction as federal question jurisdiction. Dramatic's motion to confirm the Arbitration Award asserted that there was federal question jurisdiction "because the underlying arbitration involved claims under the Copyright Act, 17 U.S.C. § 101, et seq." Accordingly, this Court concludes that the Illinois Judgment was premised on federal question jurisdiction, and it is appropriate to apply

federal common law in assessing the preclusive effect of the Illinois Judgment.

"The term res judicata . . . encompasses two significantly different doctrines: claim preclusion and issue preclusion." Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc., 779 F.3d 102, 107 (2d Cir. 2015). Dramatic asserts only claim preclusion. Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." In re Motors Liquidation Co., 943 F.3d 125, 130 (2d Cir. 2019) (citation omitted). Under federal law, "a judgment's preclusive effect is generally immediate, notwithstanding any appeal." Coleman v. Tollefson, 575 U.S. 532, 539 (2015). To establish claim preclusion, a party must show that:

> (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.

Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 55 (2d Cir. 2018).

It is undisputed that, under federal common law, the arbitration involved a final adjudication on the merits.[5] It

[5] The parties do not dispute that the judgment is final for purposes of applying the federal law of claim preclusion. The

addressed and resolved the issues of (1) what theatrical rights Dramatic owned under its 1969 Agreement with Lee, and (2) what legal effect Lee's 2011 Termination Letter had on those rights. It is also undisputed that the claim in this action -- whether Dramatic retains the exclusive right to produce amateur theatrical performances of the Novel in the U.S. -- was asserted in the prior action. Accordingly, the issue in dispute is whether Atticus was in 'privity' with the Lee Estate such that Atticus is bound by the Illinois Judgment.

The "rule against nonparty preclusion" recognizes that "[a] person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." Taylor, 553 U.S. at 892 (citation omitted). Therefore, a person cannot typically be bound by a judgment "in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Id. at 893 (citation omitted).

The Supreme Court has, however, enumerated six exceptions to the rule against nonparty preclusion. Id. "When any of these circumstances is present, the parties are said to be in

---

parties contend that if Illinois law were to be applied, however, then the judgment may not be final until the Seventh Circuit decides the pending appeal from the decision by the District Court for the Northern District of Illinois confirming the Arbitration Award.

privity" for purposes of claim preclusion. Sacerdote v. Cammack Larhette Advisors, LLC, 939 F.3d 498, 506 (2d Cir. 2019).

Dramatic asserts that any of four of the six Taylor exceptions should apply: (1) Atticus agreed to be bound; (2) Atticus was in a qualified pre-existing substantive legal relationship with the Lee Estate; (3) the interests of Atticus were adequately represented by a party with the same interests; or (4) Atticus assumed control over the litigation.[6] 553 U.S. at 893–95. Each exclusion will be discussed in turn.

A. Agreement to be Bound

Dramatic argues that the 2015 Agreement between Rudinplay and Lee, which recognized the existence of the 1969 Agreement, incorporated the arbitration provision from the 1969 Agreement, and thereby contractually binds Atticus to the terms of the Arbitration Award. This argument fails.

In general, any agreement to be bound by an arbitration should be explicit. "A person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." Taylor, 553 U.S. at 893 (quoting Restatement (Second) of Judgments § 40 (1980)

---

[6] The other two Taylor exceptions are: (5) a nonparty is acting as a proxy, agent, or designated representative of a party bound by a judgment; and (6) a statutory scheme expressly forecloses successive litigation by nonlitigants, so long as the scheme comports with due process. 553 U.S. at 895.

("Restatement")). As the Supreme Court noted in Taylor, this exception applies where, for example, "separate actions involving the same transaction are brought by different plaintiffs against the same defendant, [and] all the parties to all the actions [] agree that the question of the defendant's liability will be definitely determined, one way or the other, in a 'test case.'" Id. (citation omitted).

Dramatic has not identified any express agreement by Atticus or its affiliates to be bound by the arbitration between Dramatic and the Lee Estate or the Arbitration Award. Instead, it argues that § 2(b) of the 2015 Agreement should be read as expressing the intention to be bound by any arbitration proceedings between Dramatic and the Lee Estate.[7]

Section 2(b) of the 2015 Agreement refers to Lee's termination of the 1969 Agreement with Dramatic, but adds the acknowledgment that "[t]he rights granted hereunder shall be subject to the rights granted under the [1969] Agreement, as limited by such termination." Section 2(b) cannot be read as an agreement by Rudinplay to become a party to the terminated 1969

[7] Dramatic argues as well, however, that the 2015 Agreement was without force and effect since it preceded the effective date of the termination of Dramatic's exclusive license. Nonetheless, for purposes of its claim preclusion argument Dramatic recognizes the validity of the 2015 Agreement.

Agreement and thereby to be bound by the arbitration provision in that agreement, or to otherwise adopt the arbitration provision in that earlier agreement.[8] Section 2(b) simply acknowledges that Lee had previously given Dramatic a license to create a derivative work, and that the license given to Rudinplay to create another derivative work from the Novel would not preclude Dramatic from performing the Sergel Play. That is, Rudinplay's rights were "subject to" the rights Lee had granted to another in the 1969 Agreement.

Dramatic also argues that Atticus impliedly agreed to be bound, by virtue of its actions, to respect the Arbitration Award. Dramatic argues that an agreement should be implied here because

> [T]he Rudinplay Affiliates worked "in concert" with the Lee Estate and directly collaborated. They don't deny they could have intervened in the arbitration. Had the Arbitrator ruled against Dramatic, can anyone seriously dispute that the Rudinplay Affiliates wouldn't have used the ruling to their own benefit? Finally, the Lee Estate claimed that the Rudinplay Affiliates were necessary parties to the Arbitration.

None of the actions to which Dramatic refers implies an agreement by Rudinplay or its affiliates to be bound by the arbitration provision in the 1969 Agreement. As discussed

[8] Dramatic does not explain how Rudinplay could have joined the 1969 Agreement without its consent and a more formal acknowledgment by all parties. Nor does it explain how Rudinplay could be bound by a provision in a terminated contract.

further below, the situations in which Atticus allegedly worked in concert with the Lee Estate do not include the arbitration itself. And, as Dramatic acknowledges, Atticus was not a party to the arbitration.

In making its argument, Dramatic refers as well to comment (b) to § 40 of the Restatement. That comment does not support Dramatic's argument. The comment provides that an agreement to be bound may be implied in the following circumstances:

> In ascertaining whether such an agreement is to be inferred, however, it is relevant to consider the closeness of the interests of the persons involved, whether they were represented by the same or collaborating counsel, whether opportunity existed for the person to participate as a party in the first action, whether the person asserted to have made the agreement could invoke benefits of the judgment in the other action should its outcome favor his position, and what representations were made to the court concerning the relation between the actions.

Restatement § 40 cmt. b. The Restatement warns that no such agreement "should be inferred except upon the plainest circumstances." Restatement § 40 cmt. b; Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 193 F.3d 415, 423 (6th Cir. 1999) (same). The example cited in comment (b) is illustrative:

> A brings an action to restrain B, a common carrier, from putting a rate increase into effect. C, who appeared with A in a prior administrative hearing challenging the rate, brings a similar action, employing the same attorney, and asserting substantially identical claims. C requests deferral

> of his suit until the trial of A against B, stating that the two actions involve identical issues and that the deferral will prevent duplication of trial proceedings. It may be inferred that C consented to be bound by the determinations made in the action between A and B.

Id. No such plain circumstances are present here.

B. Pre-Existing Legal Relationship

Dramatic next argues that Atticus is in privity with the Lee Estate for purposes of claim preclusion because the 2015 Agreement created a successor in interest relationship between them. This argument misconstrues the law of privity.[9]

It is true that certain legal relationships between two entities may create privity for purposes of claim preclusion, but not a license agreement executed before the inauguration of the arbitration. Nonparty preclusion may be justified based on "a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment," including succeeding owners of property. Taylor, 553 U.S. at 894 (citation omitted). The successor in interest exception, however, "has no application to a successor who acquires his interest before the action was commenced concerning the property." Restatement § 44 cmt. f.

[9] Again, Dramatic contends that the 2015 Agreement was invalid, but relies on it to support its claim that Atticus is in privity with the Lee Estate.

Atticus was granted rights to the Novel pursuant to the 2015 Agreement. This occurred before the commencement of the arbitration action on March 7, 2019. Accordingly, the successor in interest exception does not apply.

Dramatic argues that the Second Circuit's decision in Matter of Emergency Beacon Corp., 665 F.2d 36 (2d Cir. 1981), supports its reliance on this arm of the privity doctrine. Dramatic is incorrect. In Emergency Beacon, the Court of Appeals held that, where a corporation had sold two vehicles to its former president, the corporation had no further rights in the vehicles and could not later convey a security interest in the vehicles to a third-party. Id. at 40. There is no principle established by Emergency Beacon that assists Dramatic.

C. Adequate Representation

Dramatic next contends that the Lee Estate sufficiently represented Atticus' interests during the arbitration such that Atticus should be considered as being in privity with the Lee Estate. Privity requires a far closer relationship than Dramatic argues existed here. Therefore, this attempt at establishing privity fails as well.

Privity based on adequate representation exists in "certain limited circumstances" when the nonparty was "adequately represented by someone with the same interests who was a party

to the [prior] suit," such as in class actions and in suits brought by trustees, guardians, and other fiduciaries. Taylor, 553 U.S. at 894-95. A party's representation of a nonparty is considered "adequate" for preclusion purposes "only if, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party in the first suit understood herself to be acting in a representative capacity of the nonparty or the original court took care to protect the interests of the nonparty." Sacerdote, 939 F.3d at 510 (citation omitted). Adequate representation often also requires "notice of the original suit to the persons alleged to have been represented." Id. (citation omitted).

Atticus was not "adequately represented" by the Lee Estate in the arbitration proceeding. This exception applies only in "limited circumstances" where more formally defined legal relationships are present than existed here between Atticus and the Lee Estate. Taylor, 553 U.S. at 894.

In making its "adequate representation" argument, Dramatic relies on a theory of virtual representation. Virtual representation has been recognized by Illinois courts as creating privity under Illinois law. See, e.g., City of Chicago v. St. John's United Church of Christ, 404 Ill. App. 3d 505, 513 (2010); City of Rockford v. Unit Six of Policemen's Benevolent &

Protective Ass'n of Illinois, 362 Ill. App. 3d 556, 563 (2005). "The contours of a proposed virtual representation category have differed from circuit to circuit." Sacerdote, 939 F.3d at 509. Under one formulation considered by the Court in Taylor, virtual representation requires that the nonparty: had the same interests as the party, was adequately represented by the party, and that at least one of the following conditions was present: (a) a close relationship between the nonparty and party; (b) substantial participation by the nonparty in the other action; or (c) tactical maneuvering by the nonparty to avoid preclusion. Id.

It is highly unlikely that Dramatic could establish privity under any theory of virtual representation, but it is unnecessary to explore that issue. The theory of virtual representation was squarely rejected by the Supreme Court in Taylor, 553 U.S. at 898, and cannot be relied upon here. See also, Sacerdote, 939 F.3d at 509. Federal common law, not Illinois law, applies here.

D. Assumed Control

Finally, Dramatic argues that Atticus and the Lee Estate were in privity because Atticus was "kept fully up to speed on the arbitration" and "prior to the Arbitration the Lee Estate and its agents were doing [Atticus'] bidding to hinder

Dramatic's licensing rights." Dramatic argues as well that it is entitled to discovery to establish the existence and extent of Atticus's "influence" during the arbitration. Dramatic has not accurately described its burden of establishing privity under this last pathway.

A nonparty is not bound by a judgment because it has influenced another's litigation strategy. Privity exists if the nonparty "assumed control over the litigation in which that judgment was rendered." Taylor, 553 U.S. at 895 (citation omitted). As the Court explained, it is just to bind the controlling party to the judgment in these circumstances. "Because such a person has had the opportunity to present proofs and argument, he has already had his day in court even though he was not a formal party to the litigation." Id. (citation omitted); see also Restatement § 39 cmt. a. A finding of assumed control "requires that a person have effective choice as to the legal theories and proofs to be advanced in [sic] behalf of the party to the action and have control over the opportunity to obtain review." Students for Fair Admissions, Inc. v. Univ. of Texas at Austin, 37 F.4th 1078, 1087 (5th Cir. 2022) (citation omitted). See Restatement § 39 cmt. c.

In opposition to the motion for summary judgment, Dramatic contends that it is premature to grant summary judgment on the

issue of claim preclusion since it has had no opportunity to take discovery of Atticus. Most of the topics for discovery that Dramatic identifies in its Rule 56(d) declaration, however, are irrelevant to the issues to be decided in this litigation. Many of them seek to explore and undermine any grant of rights that Atticus obtained from the Lee Estate. But, while both Dramatic and Atticus agree that it is essential to this litigation to determine whether Dramatic retains the exclusive right to perform in amateur theatrical settings a work derived from the Novel, it is unnecessary to resolve through this lawsuit the extent to which the Lee Estate granted Atticus rights through the 2015 Agreement to perform a derivative work. That latter issue is irrelevant to Dramatic: if Dramatic has exclusive rights, then Atticus cannot produce the Sorkin Play in amateur settings; if Dramatic's rights are not exclusive, then it has no power to bar anyone from performing derivative works based on the Novel, other than of course the Sergel Play.

Dramatic does attempt to identify one issue, however, that may be relevant to the question of privity and to this declaratory judgment action. Dramatic seeks evidence of communications between the Lee Estate and Atticus, as well as those associated with Sorkin, in order to ascertain "the ability of the Rudinplay Affiliates to influence the Lee Estate's

actions in the arbitration." But again, the test for privity is not one of influence but of control.

To support its request for discovery, Dramatic points to the arbitrator's rejection, as "unconvincing," of the Lee Estate's denial that it had worked in concert with Rudinplay to stop productions of the Sergel Play that used professional actors.[10] That comment by the arbitrator, however, does not reflect a conclusion that Atticus controlled the Lee Estate's conduct of the arbitration. The arbitrator's comment related to historical events and his finding that the Lee Estate had violated the "prevent-hinder provision" of the 1969 Agreement and had tortiously intereferred with Dramatic's licensing agreements. Regardless, as already noted, Dramatic has not invoked the correct standard for establishing privity under the control test. Establishing privity between the Lee Estate and Atticus will require more than a showing of "influence."

For its part, Atticus asserts that it had "no control over the Estate" in the arbitration proceedings. It points out that Atticus's predecessor, Rudinplay, and the Lee Estate were

---

[10] The arbitrator concluded that Lee had granted Dramatic not only rights to perform amateur productions of the Sergel Play but also "stock" productions employing professional actors. As noted <u>supra</u> note 1, this Opinion does not address stock rights.

litigating against each other as recently as 2018. Dramatic began the arbitration in early 2019.

The parties will have an opportunity to address these issues in a conference with the Court. In that conference, it will be determined whether Dramatic is entitled to discovery and the scope of any such discovery.

## Conclusion

Dramatic's January 23 motion to dismiss is denied. As a matter of copyright law, specifically § 304(c) of the Copyright Act of 1976, Dramatic does not currently possess exclusive rights to perform amateur theatrical productions of Harper Lee's novel To Kill a Mockingbird. Atticus' February 6 motion for summary judgment is granted in part for that same reason.

A conference with the parties will be held to determine whether Dramatic is entitled to discovery on the issue of whether Atticus controlled the Lee Estate in its arbitration with Dramatic. A finding of privity may bind Atticus to the Arbitration Award issued against the Lee Estate.

Dated: New York, New York
April 27, 2023

DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, Plaintiff, | : | 22cv10147 (DLC) |
| and | : | OPINION AND ORDER |
| AARON SORKIN, Involuntary Plaintiff, | : | |
| -v- | : | |
| THE DRAMATIC PUBLISHING COMPANY, Defendant. | : | |

APPEARANCES:

For plaintiff Atticus Limited Liability Company:
Frank David D'Angelo
Wook J Hwang
Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

Keane A. Barger
Loeb & Loeb, LLP
35 Music Square East
Suite 310
Nashville, TN 37203

For defendant The Dramatic Publishing Company:
Kevin Tottis
Keith Stolte
Max A. Stein
TottisLaw
401 N. Michigan Avenue
Suite 530
Chicago, IL 60611

Steven J. Hyman
David Blasband

Oliver R. Chernin
Paul Howard Levinson
McLaughlin & Stern, LLP
260 Madison Avenue
New York, New York 10016

Alexander Talel
Stefan M Mentzer
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

DENISE COTE, District Judge:

This lawsuit concerns rights to perform amateur productions of a play derived from Harper Lee's novel, To Kill a Mockingbird. In an Opinion of April 27, 2023 (the "Opinion"), this Court found as a matter of law that the defendant, The Dramatic Publishing Company ("Dramatic"), no longer has exclusive rights to such performances. Having lost that motion, Dramatic has identified a new defense and argues that plaintiff's right to litigate the issue of exclusivity was in fact time-barred. Dramatic's motion is denied on the merits and as untimely.

## **Background**

I. Factual Background

Familiarity with the Opinion is presumed. See Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co., 22cv10147 (DLC), 2023 WL 3135745 (S.D.N.Y. Apr. 27, 2023). Only those facts relevant to Dramatic's statute of limitations defense are summarized below;

these facts are undisputed or taken in the light most favorable to the plaintiff, Atticus Limited Liability Company ("Atticus"), unless otherwise noted.

In 1960, Harper Lee published the American masterpiece To Kill a Mockingbird (the "Novel"). In 1969, Lee entered into an agreement with Dramatic, licensing Dramatic "the complete right throughout the world" to create a dramatization of the Novel which "is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed" (the "1969 Agreement"). Lee reserved "all rights not expressly granted to [Dramatic]" including but not limited to the "professional acting" rights. The 1969 Agreement further stated that during the run of any "first class" production in New York or a related touring engagement, Dramatic "shall not permit amateur performances [of Dramatic's adaptation], as provided herein, within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000." Pursuant to the 1969 Agreement, Dramatic's then-President, Christopher Sergel, wrote a stage adaptation of the Novel (the "Sergel Play").

In April 2011, Dramatic was notified that Lee was terminating the 1969 Agreement pursuant to § 304(c) of the Copyright Act. Four years later, Lee entered into an agreement

with Rudinplay, Inc.[1] to create a new dramatic adaption of the Novel. The 2015 agreement granted Rudinplay "all live stage rights in and to the Novel," but noted that "the amateur acting rights to the [Sergel Play] can continue to be exploited following [the 2011] termination . . . on a non-exclusive basis in the United States[.]" Rudinplay subsequently contracted with Aaron Sorkin to serve as the playwright for the new stage adaptation of the Novel (the "Sorkin Play"). Lee died on February 19, 2016. The Sorkin Play debuted on Broadway on December 13, 2018.

Beginning in January of 2019, Atticus and the Lee Estate separately sent letters to Dramatic regarding productions of the Sergel Play. The letters asserted that certain of Dramatic's planned productions of the Sergel Play violated the 1969 licensing agreement between Dramatic and Lee because the productions involved "professional acting rights." Several U.K. and U.S. productions of the Sergel Play were subsequently cancelled.

On March 7, 2019, Dramatic filed an arbitration demand against the Lee Estate. In its demand, Dramatic asserted that the Lee Estate had breached the 1969 Agreement by hindering the

[1] Rudinplay and Atticus are entities owned, controlled, or operated by Scott Rudin ("Rudin").

full exercise of Dramatic's rights and interfering with its related licensing contracts. Dramatic sought, inter alia, a declaration that it maintained exclusive amateur stage rights for any adaptation of To Kill a Mockingbird. Atticus stipulates that it received a copy of the arbitration demand at or about the time that it was filed. The arbitrator entered an interim award on October 21, 2021, and a final award on January 28, 2022 (collectively, the "Arbitration Award"). The Arbitration Award found that Dramatic's exclusive rights survived Lee's 2011 termination letter. The Arbitration Award is currently on appeal to the U.S. Court of Appeals for the Seventh Circuit.

## II. Procedural History

Atticus filed this federal lawsuit on November 30, 2022, seeking a declaration that (1) "Atticus and Sorkin have the right, in relation to [Dramatic], to present any and all Second-Class, Stock, Amateur and Ancillary Performances [] of the Sorkin Play in the United States;" and (2) "any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to the Novel." Dramatic moved to dismiss the complaint on January 23, 2023. On February 6, Atticus cross-moved for summary judgment.

The Court denied Dramatic's motion to dismiss and granted in part Atticus' cross-motion in its April 27 Opinion. See

Atticus, 2023 WL 3135745. The Court held that as a matter of copyright law, specifically § 304(c) of the Copyright Act, Dramatic does not currently possess exclusive rights to perform in the U.S. amateur theatrical productions of works derived from the Novel. Id. at *5. The Opinion, however, left open the question of whether Atticus' right to assert as much is limited by the doctrine of claim preclusion based on the ruling in the Arbitration Award. Id. at *13. Dramatic contends that Atticus and the Lee Estate are in privity because Atticus "controlled" the Lee Estate in its arbitration with Dramatic. Id. at *11-12.

On May 11, 2023, Dramatic filed its answer, raising for the first time a statute of limitations defense.[2] In a conference held on May 25, Dramatic informed the Court that it planned to move for summary judgment on the ground that the statute of limitations bars this action. On June 2, Dramatic filed the instant motion for summary judgment asserting its statute of limitations defense. The motion became fully submitted on June 14.

---

[2] In a footnote in Dramatic's response to Atticus' motion for summary judgment, Dramatic noted that it had not "had an opportunity to raise affirmative defenses," but did not specifically mention a statute of limitations defense. Dramatic also did not raise this defense in its January 23 motion to dismiss.

**Discussion**

The standard governing summary judgment motions was set forth in the Opinion and is incorporated by reference. Dramatic seeks through this summary judgment motion to dismiss Atticus' declaratory judgment action. Dramatic argues that the action, which was filed in November 2022, is barred by the three-year statute of limitations under the Copyright Act. Dramatic asserts that Atticus knew no later than March 7, 2019, when Atticus received a copy of Dramatic's arbitration demand, that Dramatic was asserting exclusive rights pursuant to the 1969 Agreement. According to Dramatic, at that point a reasonably diligent plaintiff would have been put on inquiry notice as to the existence of "a right" and the statute of limitations began to run.

This argument fails. The "right" which Dramatic sought to resolve in the arbitration with the Lee Estate was not Atticus' right to perform the Sorkin Play and therefore the three-year statute of limitations on which Dramatic relies has not begun to run against Atticus.

The Copyright Act provides that all "civil actions" under its provisions must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). A copyright claim ordinarily accrues "when a plaintiff has a complete and present

cause of action," which typically accrues when an infringing act occurs. Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 670 (2014) (citation omitted). For claims of copyright infringement, each new infringing act causes a new claim to accrue. Kwan v. Schlein, 634 F.3d 224, 228 (2d Cir. 2011) (citation omitted).

There is an exception to this accrual rule, however, for a claim of copyright ownership. Claims of ownership, as distinct from claims of infringement, accrue only once, when "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." Id. (citation omitted). Such a claim accrues where there is a "plain and express repudiation of [the claimant's ownership] communicated to the claimant." Horror Inc. v. Miller, 15 F.4th 232, 257 (2d Cir. 2021) (citation omitted); see also Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc., 716 F.3d 302, 317 (2d Cir. 2013). Before applying these principles, it is necessary to define the claims that are raised in this action.

Atticus' action is brought pursuant to the Declaratory Judgment Act. A declaratory judgment action is time-barred "only if relief on a direct claim based on such rights would also be barred." Stone v. Williams, 970 F.2d 1043, 1048 (2d Cir. 1992). In its complaint, Atticus seeks a declaration that

Atticus and Sorkin are the sole owners of the copyright of the Sorkin Play, and that productions of the Sorkin Play do not infringe on Dramatic's copyright in the Sergel Play.[3] Atticus' ownership rights in the Sorkin Play, however, are not in dispute here. Dramatic never claimed and does not now claim any ownership interest in the Sorkin Play.

In declaratory judgment actions addressed to copyright claims, it is often necessary to realign the parties to properly assess the claims. Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 67 (2d Cir. 2012); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.05 (2023). That is true here. In this litigation, the issue in dispute is the extent of Dramatic's copyright interest in the Novel and whether Dramatic has the exclusive right to perform in amateur productions a derivative work based on the Novel. If Dramatic has such exclusive rights, then it may seek to bar amateur performances of the Sorkin Play. Thus, this litigation, as the parties agree, turns on a determination of Dramatic's rights. As Dramatic admits in its motion, "[t]his is a case about the extent of Dramatic's ownership rights." This action

[3] Atticus and Sorkin are, respectively, the production and copyright owners of the Sorkin Play.

therefore anticipates claims that Dramatic may seek to assert one day against amateur productions of the Sorkin Play.

Applying these principles, Atticus' claim in this declaratory judgment action is not time-barred. Its ownership interest in the Sorkin Play is not being litigated here and therefore the three-year statute of limitations under the Copyright Act for claims about its ownership interest has not been triggered, much less run.

Dramatic's assertion of a statute of limitations bar invites serious error. Carried to its logical conclusion, Atticus would forever be barred from challenging Dramatic's assertion of exclusive rights to perform amateur productions derived from the Novel. Should Dramatic sue Atticus in the future for a performance of the Sorkin Play in amateur productions, Atticus would be foreclosed from challenging Dramatic's assertion of exclusive rights. This cannot be. Similarly, Dramatic's assertion that the time for Atticus to bring this action began when it learned of the claims made in Dramatic's arbitration demand against the Lee Estate makes little sense. Atticus could not have known in March of 2019 that the arbitrator would issue an award premised on a fundamental error of copyright law. See Atticus, 2023 WL 3135745, at *5-7. Moreover, Atticus had no right to join the

arbitration proceeding between the Lee Estate and Dramatic and has no ability to appeal from the Arbitration Award.

The novelty of Dramatic's statute of limitations claim is reinforced by the fact that it is untimely. Dramatic has identified the statute of limitations as a defense only after the Court ruled it does not have exclusive rights in amateur productions. Having failed to raise this affirmative defense in its opposition to the motion for summary judgment, Dramatic waived its right to bring that argument. See, e.g., Davis v. Shah, 821 F.3d 231, 246 (2d Cir. 2016).

The sole remaining issue is Atticus' request for monetary sanctions. Courts have the inherent power to "sanction a party . . . to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court." Yukos Capital S.A.R.L. v. Feldman, 977 F.3d 216, 235 (2d Cir. 2020). Atticus' request for sanctions is denied.

**Conclusion**

Dramatic's June 2, 2023, motion for summary judgment is denied. Atticus' request for monetary sanctions is denied.

Dated: New York, New York
July 24, 2023

DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br>Plaintiff,<br>and<br>AARON SORKIN,<br>Involuntary Plaintiff,<br>-v-<br>THE DRAMATIC PUBLISHING COMPANY,<br>Defendant. | 22cv10147 (DLC)<br><br>ORDER |

DENISE COTE, District Judge:

In an Opinion of April 27, 2023, the Court denied Dramatic's motion to dismiss and granted in part Atticus' cross-motion for summary judgment. The Opinion left open the question of whether the plaintiff's claim is limited by the doctrine of claim preclusion. A conference was held on May 25 to determine whether Dramatic was entitled to discovery and the scope of any such discovery.

The parties submitted a letter on June 16, 2023, regarding the status of fact discovery on the issue of claim preclusion -- specifically concerning privity through "assumed control" exercised by Atticus over the Lee Estate in connection with the Estate's arbitration with Dramatic. The standard governing

privity through control was set forth in the April 27 Opinion and is incorporated by reference.

In the June 16 submission, Dramatic identified two possible areas for further discovery, but stated it does not require additional discovery "[i]f the Court does not view full disclosure of Atticus' role in preparing and advising on the exclusivity briefing sufficient to constitute 'control' as a matter of law." Having reviewed the June 16 submission and its attachments, it is hereby

ORDERED that Atticus has produced the relevant discovery materials sought by Dramatic and the further discovery sought by Dramatic is unnecessary.

IT IS FURTHER ORDERED that Dramatic's argument -- that Atticus and the Lee Estate are in privity for purposes of claim preclusion because Atticus "assumed control" over the Lee Estate's arbitration with Dramatic -- is denied. Dramatic has failed to put forth any evidence suggesting that Atticus controlled the Lee Estate's conduct in the arbitration. Dramatic cannot rely on "unsubstantiated speculation." Bermudez v. City of New York, 790 F.3d 368, 374 (2d Cir. 2015) (citation omitted). Accordingly, Atticus' February 6, 2023, cross-motion

for summary judgment is granted in full.

Dated: New York, New York
July 25, 2023

DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff*,

and

AARON SORKIN,

*Involuntary Plaintiff*,

-against-

THE DRAMATIC PUBLISHING COMPANY,

*Defendant.*

Case No.: 1:22-cv-10147-DLC

Hon. Denise L. Cote

**~~[PROPOSED]~~ JUDGMENT**

**WHEREAS**, on November 30, 2022, Plaintiff Atticus Limited Liability Company ("Atticus") commenced this action against Defendant The Dramatic Publishing Company ("Dramatic") and Nominal Defendant Aaron Sorkin ("Sorkin"), seeking declaratory judgment that: (1) Atticus and Sorkin have the right, in relation to Dramatic, to present performances of the Aaron Sorkin stage adaptation (the "Sorkin Play") of the Harper Lee novel *To Kill a Mockingbird* (the "Novel"); and (2) any such productions of the Sorkin Play have not infringed and could not infringe any copyright interest Dramatic claims to hold to the Novel;

**WHEREAS**, pursuant to Stipulation and Order entered on January 3, 2023, Sorkin was realigned as an Involuntary Plaintiff to this action;

**WHEREAS**, on January 23, 2023, Dramatic filed a motion to dismiss, later converted to a motion for summary judgment (the "First Dramatic Motion"), on the grounds, *inter alia*, that Dramatic continues to hold the exclusive right to present non-first-class productions of the Novel,

notwithstanding Harper Lee's termination (the "Termination") of the 1969 grant by which Dramatic claims to have acquired such exclusive rights (the "1969 Grant");

**WHEREAS**, on February 6, 2023, Atticus filed a motion for summary judgment (the "Atticus Motion") in its favor on the grounds, *inter alia*, that Dramatic does not hold any exclusive rights to the Novel following the effective date of the Termination;

**WHEREAS**, on June 2, 2023, Dramatic filed a second motion for summary judgment (the "Second Dramatic Motion") on the grounds that Atticus's claim for declaratory judgment was barred by the Copyright Act's statute of limitations, 17 U.S.C. § 507(b);

**WHEREAS**, pursuant to the Opinion and Order entered on April 27, 2023 (DE 65), the Opinion and Order entered on July 24, 2023 (DE 87), and the Order entered on July 25, 2023 (DE 88) (collectively, the "Prior Rulings"), the First Dramatic Motion and Second Dramatic Motion were denied and the Atticus Motion was granted in full, based, *inter alia,* on the Court's holding that, "[a]s a matter of copyright law, specifically § 304(c) of the Copyright Act of 1976, Dramatic does not currently possess exclusive rights to perform amateur [i.e. non-first-class] theatrical productions of Harper Lee's novel To Kill a Mockingbird" (DE 65 at 34; *id.* at 11 n.4) and that any rights Dramatic acquired pursuant to the 1969 Grant "are no longer exclusive" (*id.* at 3);

**NOW**, therefore, for the reasons stated in the Prior Rulings, it is hereby **DECLARED, ADJUDGED AND DECREED** that:

1. Atticus and Aaron Sorkin have the right, in relation to Dramatic, to present any and all performances of the Sorkin Play; and

2. Any such productions of the Sorkin Play have not infringed and do not infringe any copyright interest Dramatic holds in and to the Novel.

Accordingly, this case is closed.

So ordered, Denise Cote 8/1/23

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff*,

and

AARON SORKIN,

*Involuntary Plaintiff*,

-against-

THE DRAMATIC PUBLISHING COMPANY,

*Defendant*.

Case No.: 1:22-cv-10147-DLC

Hon. Denise L. Cote

**AMENDED JUDGMENT**

**WHEREAS**, on November 30, 2022, Plaintiff Atticus Limited Liability Company ("Atticus") commenced this action against Defendant The Dramatic Publishing Company ("Dramatic") and Nominal Defendant Aaron Sorkin ("Sorkin"), seeking declaratory judgment that: (1) Atticus and Sorkin have the right, in relation to Dramatic, to present performances of the Aaron Sorkin stage adaptation (the "Sorkin Play") of the Harper Lee novel *To Kill a Mockingbird* (the "Novel"); and (2) any such productions of the Sorkin Play have not infringed and could not infringe any copyright interest Dramatic claims to hold to the Novel;

**WHEREAS**, pursuant to Stipulation and Order entered on January 3, 2023, Sorkin was realigned as an Involuntary Plaintiff to this action;

**WHEREAS**, on January 23, 2023, Dramatic filed a motion to dismiss, later converted to a motion for summary judgment (the "First Dramatic Motion"), on the grounds, *inter alia*, that Dramatic continues to hold the exclusive right to present non-first-class productions of the Novel,

notwithstanding Harper Lee's termination (the "Termination") of the 1969 grant by which Dramatic claims to have acquired such exclusive rights (the "1969 Grant");

**WHEREAS**, on February 6, 2023, Atticus filed a motion for summary judgment (the "Atticus Motion") in its favor on the grounds, *inter alia*, that Dramatic does not hold any exclusive rights to the Novel following the effective date of the Termination;

**WHEREAS**, on June 2, 2023, Dramatic filed a second motion for summary judgment (the "Second Dramatic Motion") on the grounds that Atticus's claim for declaratory judgment was barred by the Copyright Act's statute of limitations, 17 U.S.C. § 507(b);

**WHEREAS**, pursuant to the Opinion and Order entered on April 27, 2023 (DE 65), the Opinion and Order entered on July 24, 2023 (DE 87), and the Order entered on July 25, 2023 (DE 88) (collectively, the "Prior Rulings"), the First Dramatic Motion and Second Dramatic Motion were denied and the Atticus Motion was granted in full, based, *inter alia,* on the Court's holding that, "[a]s a matter of copyright law, specifically § 304(c) of the Copyright Act of 1976, Dramatic does not currently possess exclusive rights to perform amateur [i.e. non-first-class] theatrical productions of Harper Lee's novel To Kill a Mockingbird" (DE 65 at 34; *id.* at 11 n.4) and that any rights Dramatic acquired pursuant to the 1969 Grant "are no longer exclusive" (*id.* at 3);

**WHEREAS**, the Court entered judgment consistent with the Prior Rulings on August 1, 2023 (DE 92), which the parties have stipulated should now be clarified pursuant to Federal Rule of Civil Procedure 60(a);

**NOW**, therefore, for the reasons stated in the Prior Rulings, it is hereby **DECLARED, ADJUDGED AND DECREED** that:

1. Atticus and Aaron Sorkin have the right, in relation to Dramatic, to present any and all performances of the Sorkin Play in the United States; and

2. Any such productions of the Sorkin Play in the United States have not infringed and do not infringe any copyright interest Dramatic holds in and to the Novel.

Accordingly, this case is closed.

Dated: New York, New York
August 28, 2023

DENISE COTE
United States District Judge





to substitute statutory for common law copyright for everything now protected at common law, and to substitute reasonable time limits for the perpetual protection now available. In general, the substituted time limits are those applicable to works created after the effective date of the law [Jan. 1, 1978]; for example, an unpublished work written in 1945 whose author dies in 1980 would be protected under the statute from the effective date [Jan. 1, 1978] through 2030 (50 years after the author's death).

A special problem under this provision is what to do with works whose ordinary statutory terms will have expired or will be nearing expiration on the effective date [Jan. 1, 1978]. The committee believes that a provision taking away subsisting common law rights and substituting statutory rights for a reasonable period is fully in harmony with the constitutional requirements of due process, but it is necessary to fix a ''reasonable period'' for this purpose. Section 303 provides that under no circumstances would copyright protection expire before December 31, 2002, and also attempts to encourage publication by providing 25 years more protection (through 2027) if the work were published before the end of 2002.

**Editorial Notes**

AMENDMENTS

2010—Subsec. (b). Pub. L. 111–295 substituted ''any musical work, dramatic work, or literary work'' for ''the musical work''.

1998—Subsec. (a). Pub. L. 105–298 substituted ''December 31, 2047'' for ''December 31, 2027'' in second sentence.

1997—Pub. L. 105–80 designated existing provisions as subsec. (a) and added subsec. (b).

### § 304. Duration of copyright: Subsisting copyrights

(a) COPYRIGHTS IN THEIR FIRST TERM ON JANUARY 1, 1978.—(1)(A) Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for 28 years from the date it was originally secured.

(B) In the case of—

(i) any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or

(ii) any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire,

the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of 67 years.

(C) In the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work—

(i) the author of such work, if the author is still living,

(ii) the widow, widower, or children of the author, if the author is not living,

(iii) the author's executors, if such author, widow, widower, or children are not living, or

(iv) the author's next of kin, in the absence of a will of the author,

shall be entitled to a renewal and extension of the copyright in such work for a further term of 67 years.

(2)(A) At the expiration of the original term of copyright in a work specified in paragraph (1)(B) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in the proprietor of the copyright who is entitled to claim the renewal of copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in the person or entity that was the proprietor of the copyright as of the last day of the original term of copyright.

(B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

(3)(A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

(i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

(B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

(4)(A) If an application to register a claim to the renewed and extended term of copyright in a work is not made within 1 year before the expiration of the original term of copyright in a work, or if the claim pursuant to such application is not registered, then a derivative work prepared under authority of a grant of a transfer or license of the copyright that is made before the expiration of the original term of copyright may continue to be used under the terms of the grant during the renewed and extended term of copyright without infringing the copyright, except that such use does not extend to the preparation during such renewed and extended term of other derivative works based upon the copyrighted work covered by such grant.

(B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1-year period shall be within the discretion of the court.

(b) COPYRIGHTS IN THEIR RENEWAL TERM AT THE TIME OF THE EFFECTIVE DATE OF THE SONNY BONO COPYRIGHT TERM EXTENSION ACT.—Any copyright still in its renewal term at the time that the Sonny Bono Copyright Term Extension Act becomes effective shall have a copyright term of 95 years from the date copyright was originally secured.

(c) TERMINATION OF TRANSFERS AND LICENSES COVERING EXTENDED RENEWAL TERM.—In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

(d) TERMINATION RIGHTS PROVIDED IN SUBSECTION (c) WHICH HAVE EXPIRED ON OR BEFORE THE EFFECTIVE DATE OF THE SONNY BONO COPYRIGHT TERM EXTENSION ACT.—In the case of any copyright other than a work made for hire, subsisting in its renewal term on the effective date of the Sonny Bono Copyright Term Extension Act for which the termination right provided in subsection (c) has expired by such date, where the author or owner of the termination right has not previously exercised such termination right, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated in subsection (a)(1)(C) of this section, other than by will, is subject to termination under the following conditions:

(1) The conditions specified in subsections (c)(1), (2), (4), (5), and (6) of this section apply to terminations of the last 20 years of copyright term as provided by the amendments made by the Sonny Bono Copyright Term Extension Act.

(2) Termination of the grant may be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured.

(Pub. L. 94–553, title I, §101, Oct. 19, 1976, 90 Stat. 2573; Pub. L. 102–307, title I, §102(a), (d), June 26, 1992, 106 Stat. 264, 266; Pub. L. 105–80, §12(a)(9), Nov. 13, 1997, 111 Stat. 1535; Pub. L. 105–298, title I, §§102(d)(1), 103, Oct. 27, 1998, 112 Stat. 2827, 2829; Pub. L. 107–273, div. C, title III, §13210(10), Nov. 2, 2002, 116 Stat. 1910.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

The arguments in favor of lengthening the duration of copyright apply to subsisting as well as future copyrights. The bill's basic approach is to increase the present 56-year term to 75 years in the case of copyrights subsisting in both their first and their renewal terms.

**Copyrights in Their First Term.** Subsection (a) of section 304 reenacts and preserves the renewal provision, now in Section 24 of the statute [section 24 of former title 17], for all of the works presently in their first 28-year term. A great many of the present expectancies in these cases are the subject of existing contracts, and it would be unfair and immensely confusing to cut off or alter these interests. Renewal registration will be required during the 28th year of the copyright but the length of the renewal term will be increased from 28 to 47 years.

Although the bill preserves the language of the present renewal provision without any change in substance, the Committee intends that the reference to a ''posthumous work'' in this section has the meaning given to it in *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941 (2d Cir. 1975)—one as to which no copyright assignment or other contract for exploitation of the work has occurred during an author's lifetime, rather than one which is simply first published after the author's death.

**Copyrights in Their Renewal Term.** Renewed copyrights that are subsisting in their second term at any time during the period between December 31, 1976, and December 31, 1977, inclusive, would be extended under section 304(b) to run for a total of 75 years. This provision would add another 19 years to the duration of any renewed copyright whose second term started during the 28 years immediately preceding the effective date of the act (January 1, 1978). In addition, it would extend by varying lesser amounts the duration of renewal copyrights already extended under Public Laws 87–668, 89–142, 90–141, 90–416, 91–147, 91–555, 92–170, 92–566, and 93–573, all of which would otherwise expire on December 31, 1976. The subsection would also extend the duration of renewal copyrights whose second 28-year term is scheduled to expire during 1977. In none of these cases, however, would the total terms of copyright for the work be longer than 75 years.

Subsection (b) also covers the special situation of a subsisting first-term copyright that becomes eligible for renewal registration during the year before the act comes into effect. If a renewal registration is not made before the effective date [Jan. 1, 1978], the case is governed by the provisions of section 304(a) [subsec. (a) of this section]. If a renewal registration is made during the year before the new law takes effect, however, the copyright would be treated as if it were already subsisting in its second term and would be extended to the full period of 75 years without the need for further renewal.

**Termination of Grants Covering Extended Term.** An issue underlying the 19-year extension of renewal terms

under both subsections (a) and (b) of section 304 [subsecs. (a) and (b) of this section] is whether, in a case where their rights have already been transferred, the author or the dependents of the author should be given a chance to benefit from the extended term. The arguments for granting rights of termination are even more persuasive under section 304 than they are under section 203; the extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it.

Subsection (c) of section 304 is a close but not exact counterpart of section 203. In the case of either a first-term or renewal copyright already subsisting when the new statute becomes effective [Jan. 1, 1978], any grant of rights covering the renewal copyright in the work, executed before the effective date [Jan. 1, 1978], may be terminated under conditions and limitations similar to those provided in section 203. Except for transfers and licenses covering renewal copyrights already extended under Public Laws 87–668, 89–142, 90–141, 90–416, 91–147, 91–555, 92–170, 92–566, and 93–573, which would become subject to termination immediately upon the coming into effect of the revised law, the 5-year period during which termination could be made effective would start 56 years after copyright was originally secured.

The bill distinguishes between the persons who can terminate a grant under section 203 and those entitled to terminate a grant covering an extended term under section 304. Instead of being limited to transfers and licenses executed by the author, the right of termination under section 304(c) also extends to grants executed by those beneficiaries of the author who can claim renewal under the present law: his or her widow or widower, children, executors, or next of kin.

There is good reason for this difference. Under section 203, an author's widow or widower and children are given rights of termination if the author is dead, but these rights apply only to grants by the author, and any effort by a widow, widower, or child to transfer contingent future interests under a termination would be ineffective. In contrast, under the present renewal provisions, any statutory beneficiary of the author can make a valid transfer or license of future renewal rights, which is completely binding if the author is dead and the person who executed the grant turns out to be the proper renewal claimant. Because of this, a great many contingent transfers of future renewal rights have been obtained from widows, widowers, children, and next of kin, and a substantial number of these will be binding. After the present 28-year renewal period has ended, a statutory beneficiary who has signed a disadvantageous grant of this sort should have the opportunity to reclaim the extended term.

As explained above in connection with section 203, the bill adopts the principle that, where a transfer or license by the author is involved, termination may be effected by a per stirpes majority of those entitled to terminate, and this principle also applies to the ownership of rights under a termination and to the making of further grants of reverted rights. In general, this principle has also been adopted with respect to the termination of rights under an extended renewal copyright in section 304, but with several differences made necessary by the differences between the legal status of transfers and licenses made after the effective date of the new law [Jan. 1, 1978] (governed by section 203) and that of grants of renewal rights made earlier and governed by section 304(c). The following are the most important distinctions between the termination rights under the two sections:

1. *Joint Authorship*.—Under section 304, a grant of renewal rights executed by joint authors during the first term of copyright would be effective only as to those who were living at the time of renewal; where any of them are dead, their statutory beneficiaries are entitled to claim the renewal independently as a new estate. It would therefore be inappropriate to impose a requirement of majority action with respect to transfers executed by two or more joint authors.

2. *Grants Not Executed by Author*.—Section 304(c) adopts the majority principle underlying the amendments of section 203 [section 203 of this title] with respect to the termination rights of a dead author's widow or widower and children. There is much less reason, as a matter of policy, to apply this principle in the case of transfers and licenses of renewal rights executed under the present law by the author's widow, widower, children, executors, or next of kin, and the practical arguments against doing so are conclusive. It is not clear how the shares of a class of renewal beneficiaries are to be divided under the existing law, and greater difficulties would be presented if any attempt were made to apply the majority principle to further beneficiaries in cases where one or more of the renewal beneficiaries are dead. Therefore, where the grant was executed by a person or persons other than the author, termination can be effected only by the unanimous action of the survivors of those who executed it.

3. *Further Grants*.—The reason against adopting a principle of majority action with respect to the right to terminate grants by joint authors and grants not executed by the author apply equally with respect to the right to make further grants under section 304(c). The requirement for majority action in clause (6)(C) is therefore confined to cases where the rights under a grant by the author have reverted to his or her widow or widower, or children, or both. Where the extended term reverts to joint authors or to a class of renewal beneficiaries who have joined in executing a grant, their rights would be governed by the general rules of tenancy in common; each coowner would have an independent right to sell his share, or to use or license the work subject to an accounting.

Nothing contained in this section or elsewhere in this legislation is intended to extend the duration of any license, transfer, or assignment made for a period of less than fifty-six years. If, for example, an agreement provides an earlier termination date or lesser duration, or if it allows the author the right of cancelling or terminating the agreement under certain circumstances, the duration is governed by the agreement. Likewise, nothing in this section or legislation is intended to change the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment.

Section 304(c)(6)(E) provides that, unless and until termination is effected under this section, the grant, ''if it does not provide otherwise,'' continues for the term of copyright. This section means that, if the agreement does not contain provisions specifying its term or duration, and the author has not terminated the agreement under this section, the agreement continues for the term of the copyright, subject to any right of termination under circumstances which may be specified therein. If, however, an agreement does contain provisions governing its duration—for example, a term of sixty years—and the author has not exercised his or her right of termination under the statute, the agreement will continue according to its terms—in this example, for only sixty years. The quoted language is not to be construed as requiring agreements to reserve the right of termination.

**Editorial Notes**

REFERENCES IN TEXT

The Sonny Bono Copyright Term Extension Act, referred to in subsecs. (b) and (d), is title I of Pub. L. 105–298, Oct. 27, 1998, 112 Stat. 2827. The effective date of the Act is the date of enactment of Pub. L. 105–298, which was approved Oct. 27, 1998. For complete classification of this Act to the Code, see Short Title of 1998 Amendment note set out under section 101 of this title and Tables.

AMENDMENTS

2002—Subsec. (c)(2)(A) to (C). Pub. L. 107–273, in subpars. (A) to (C), substituted ''The'' for ''the'' and, in

subpars. (A) and (B), substituted period for semicolon at end.

1998—Subsec. (a)(1)(B), (C). Pub. L. 105–298, § 102(d)(1)(A)(i), substituted ''67'' for ''47'' in concluding provisions.

Subsec. (a)(2)(A), (B). Pub. L. 105–298, § 102(d)(1)(A)(ii), substituted ''67'' for ''47'' in introductory provisions.

Subsec. (a)(3)(A)(i), (B). Pub. L. 105–298, § 102(d)(1)(A)(iii), substituted ''67'' for ''47''.

Subsec. (b). Pub. L. 105–298, § 102(d)(1)(B), amended heading and text of subsec. (b) generally. Prior to amendment, text read as follows: ''The duration of any copyright, the renewal term of which is subsisting at any time between December 31, 1976, and December 31, 1977, inclusive, or for which renewal registration is made between December 31, 1976, and December 31, 1977, inclusive, is extended to endure for a term of seventy-five years from the date copyright was originally secured.''

Subsec. (c)(2). Pub. L. 105–298, § 103(1), struck out ''by his widow or her widower and his or her children or grandchildren'' after ''exercised,'' in introductory provisions.

Subsec. (c)(2)(D). Pub. L. 105–298, § 103(2), added subpar. (D).

Subsec. (c)(4)(A). Pub. L. 105–298, § 102(d)(1)(C), inserted ''or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2),'' before ''and the notice''.

Subsec. (d). Pub. L. 105–298, § 102(d)(1)(D), added subsec. (d).

1997—Subsec. (c). Pub. L. 105–80 substituted ''subsection (a)(1)(C)'' for ''the subsection (a)(1)(C)'' in introductory provisions.

1992—Subsec. (a). Pub. L. 102–307, § 102(a), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: ''COPYRIGHTS IN THEIR FIRST TERM ON JANUARY 1, 1978.—Any copyright, the first term of which is subsisting on January 1, 1978, shall endure for twenty-eight years from the date it was originally secured: *Provided*, That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of forty-seven years when application for such renewal and extension shall have been made to the Copyright Office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his or her next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of forty-seven years when application for such renewal and extension shall have been made to the Copyright Office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in default of the registration of such application for renewal and extension, the copyright in any work shall terminate at the expiration of twenty-eight years from the date copyright was originally secured.''

Subsec. (c). Pub. L. 102–307, § 102(d), substituted ''subsection (a)(1)(C)'' for ''second proviso of subsection (a)'' in introductory provisions.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 1992 AMENDMENT

Amendment by Pub. L. 102–307 effective June 26, 1992, but applicable only to copyrights secured between January 1, 1964, and December 31, 1977, and not affecting court proceedings pending on June 26, 1992, with copyrights secured before January 1, 1964, governed by section 304(a) of this title as in effect on the day before June 26, 1992, except each reference to forty-seven years in such provisions deemed to be 67 years, see section 102(g) of Pub. L. 102–307, as amended, set out as a note under section 101 of this title.

### EFFECTIVE DATE

Subsec. (b) of this section effective Oct. 19, 1976, see section 102 of Pub. L. 94–553, set out as a note preceding section 101 of this title.

### LEGAL EFFECT OF RENEWAL OF COPYRIGHT UNCHANGED

Pub. L. 102–307, title I, § 102(c), June 26, 1992, 106 Stat. 266, as amended by Pub. L. 105–298, title I, § 102(d)(2)(A), Oct. 27, 1998, 112 Stat. 2828, provided that: ''The renewal and extension of a copyright for a further term of 67 years provided for under paragraphs (1) and (2) of section 304(a) of title 17, United States Code[,] shall have the same effect with respect to any grant, before the effective date of the Sonny Bono Copyright Term Extension Act [Oct. 27, 1998], of a transfer or license of the further term as did the renewal of a copyright before the effective date of the Sonny Bono Copyright Term Extension Act under the law in effect at the time of such grant.''

### AD INTERIM COPYRIGHTS SUBSISTING OR CAPABLE OF BEING SECURED UNDER PREDECESSOR PROVISIONS

Pub. L. 94–553, title I, § 107, Oct. 19, 1976, 90 Stat. 2600, provided that: ''In the case of any work in which an ad interim copyright is subsisting or is capable of being secured on December 31, 1977, under section 22 of title 17 as it existed on that date, copyright protection is hereby extended to endure for the term or terms provided by section 304 of title 17 as amended by the first section of this Act [this section].''

### COPYRIGHT GRANTED TO ''SCIENCE AND HEALTH WITH KEY TO THE SCRIPTURES'' FOR TERM OF 75 YEARS

Private Law 92–60, Dec. 15, 1971, 85 Stat. 857, provided: ''That, any provision of law to the contrary notwithstanding, copyright is hereby granted to the trustees under the will of Mary Baker Eddy, their successors, and assigns, in the work 'Science and Health with Key to the Scriptures' (entitled also in some editions 'Science and Health' or 'Science and Health; with a Key to the Scriptures'), by Mary Baker Eddy, including all editions thereof in English and translation heretofore published, or hereafter published by or on behalf of said trustees, their successors or assigns, for a term of seventy-five years from the effective date of this Act [Dec. 15, 1971] or from the date of first publication, whichever is later. All copies of the protected work hereafter published are to bear notice of copyright, and all new editions hereafter published are to be registered in the Copyright Office, in accordance with the provisions of title 17 of the United States Code or any revision or recodification thereof. The copyright owner shall be entitled to all rights and remedies provided to copyright owners generally by law: *Provided, however*, That no liability shall attach under this Act for lawful uses made or acts done prior to the effective date of this Act in connection with said work, or in respect to the continuance for one year subsequent to such date of any business undertaking or enterprise lawfully undertaken prior to such date involving expenditure or contractual obligation in connection with the exploitation, production, reproduction or circulation of said work. This Act shall be effective upon enactment.''

### EXTENSION OF RENEWAL TERMS UNDER PRIOR LAW

Pub. L. 93–573, title I, § 104, Dec. 31, 1974, 88 Stat. 1873, provided that in any case in which the renewal term of a copyright subsisting in any work on Dec. 31, 1974, or the term thereof as extended by Public Law 87–668, by Public Law 89–142, by Public Law 90–141, by Public Law

90–416, by Public Law 91–417, by Public Law 91–555, by Public Law 92–170, or by Public Law 92–556 (or by all or certain of said laws) [set out below], would expire prior to Dec. 31, 1976, such term was continued until Dec. 31, 1976.

Pub. L. 92–566, Oct. 25, 1972, 86 Stat. 1181, provided that in any case in which the renewal term of a copyright subsisting in any work on Oct. 25, 1972, or the term thereof as extended by Public Law 87–668, by Public Law 89–142, by Public Law 90–141, by Public Law 90–416, by Public Law 91–147, by Public Law 91–555, or by Public Law 92–170 (or by all or certain of said laws) [set out below], would expire prior to Dec. 31, 1974, such term was continued until Dec. 31, 1974.

Pub. L. 92–170, Nov. 24, 1971, 85 Stat. 490, provided that in any case in which the renewal term of a copyright subsisting in any work on Nov. 24, 1971, or the term thereof as extended by Public Law 87–668, by Public Law 89–142, by Public Law 90–141, by Public Law 90–416, by Public Law 91–147, or by Public Law 91–555 (or by all or certain of said laws), would expire prior to Dec. 31, 1972, such term was continued until Dec. 31, 1972.

Pub. L. 91–555, Dec. 17, 1970, 84 Stat. 1441, provided that in any case in which the renewal term of a copyright subsisting in any work on Dec. 17, 1970, or the term thereof as extended by Public Law 87–668, by Public Law 89–442 [89–142], by Public Law 90–141, by Public Law 90–416, or by Public Law 91–147 (or by all or certain of said laws) [set out below], would expire prior to Dec. 31, 1971, such term was continued until Dec. 31, 1971.

Pub. L. 91–147, Dec. 16, 1969, 83 Stat. 360, provided that in any case in which the renewal term of a copyright subsisting in any work on Dec. 16, 1969, or the term thereof as extended by Public Law 87–668, by Public Law 89–142, by Public Law 90–141, or by Public Law 90–416 (or by all or certain of said laws) [set out below], would expire prior to Dec. 31, 1970, such term was continued until Dec. 31, 1970.

Pub. L. 90–416, July 23, 1968, 82 Stat. 397, provided that in any case in which the renewal term of a copyright subsisting in any work on July 23, 1968, or the term thereof as extended by Public Law 87–668, by Public Law 89–142, or by Public Law 90–141 (or by all or certain of said laws) [set out below], would expire prior to Dec. 31, 1969, such term was continued until Dec. 31, 1969.

Pub. L. 90–141, Nov. 16, 1967, 81 Stat. 464, provided that in any case in which the renewal term of a copyright subsisting in any work on Nov. 16, 1967, or the term thereof as extended by Public Law 87–668, or by Public Law 89–142 (or by either or both of said laws) [set out below], would expire prior to Dec. 31, 1968, such term was continued until Dec. 31, 1968.

Pub. L. 89–142, Aug. 28, 1965, 79 Stat. 581, provided that in any case in which the renewal term of a copyright subsisting in any work on Aug. 28, 1965, or the term thereof as extended by Public Law 87–668 [set out below], would expire prior to Dec. 31, 1967, such term was continued until Dec. 31, 1967.

Pub. L. 87–668, Sept. 19, 1962, 76 Stat. 555, provided that in any case in which the renewal term of a copyright subsisting in any work on Sept. 19, 1962, would expire prior to Dec. 31, 1965, such term was continued until Dec. 31, 1965.

### § 305. Duration of copyright: Terminal date

All terms of copyright provided by sections 302 through 304 run to the end of the calendar year in which they would otherwise expire.

(Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2576.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

Under section 305, which has its counterpart in the laws of most foreign countries, the term of copyright protection for a work extends through December 31 of the year in which the term would otherwise have expired. This will make the duration of copyright much easier to compute, since it will be enough to determine the year, rather than the exact date, of the event from which the term is based.

Section 305 applies only to ''terms of copyright provided by sections 302 through 304,'' which are the sections dealing with duration of copyright. It therefore has no effect on the other time periods specified in the bill; and, since they do not involve ''terms of copyright,'' the periods provided in section 304(c) with respect to termination of grants are not affected by section 305.

The terminal date section would change the duration of subsisting copyrights under section 304 by extending the total terms of protection under subsections (a) and (b) to the end of the 75th year from the date copyright was secured. A copyright subsisting in its first term on the effective date of the act [Jan. 1, 1978] would run through December 31 of the 28th year and would then expire unless renewed. Since all copyright terms under the bill expire on December 31, and since section 304(a) requires that renewal be made ''within one year prior to the expiration of the original term of copyright,'' the period for renewal registration in all cases will run from December 31 through December 31.

A special situation arises with respect to subsisting copyrights whose first 28-year term expires during the first year after the act comes into effect. As already explained in connection with section 304(b), if a renewal registration for a copyright of this sort is made before the effective date [Jan. 1, 1978], the total term is extended to 75 years without the need for a further renewal registration. But, if renewal has not yet been made when the act becomes effective [Jan. 1, 1978], the period for renewal registration may in some cases be extended. If, as the bill provides, the act becomes effective on January 1, 1978, a copyright that was originally secured on September 1, 1950, could have been renewed by virtue of the present statute between September 1, 1977, and December 31, 1977; if not, it can still be renewed under section 304(a) of the new act between January 1, 1978, and December 31, 1978.

## CHAPTER 4—COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

Sec.
401. Notice of copyright: Visually perceptible copies.
402. Notice of copyright: Phonorecords of sound recordings.
403. Notice of copyright: Publications incorporating United States Government works.
404. Notice of copyright: Contributions to collective works.
405. Notice of copyright: Omission of notice on certain copies and phonorecords.
406. Notice of copyright: Error in name or date on certain copies and phonorecords.
407. Deposit of copies or phonorecords for Library of Congress.
408. Copyright registration in general.
409. Application for copyright registration.
410. Registration of claim and issuance of certificate.
411. Registration and civil infringement actions.
412. Registration as prerequisite to certain remedies for infringement.

**Editorial Notes**

AMENDMENTS

2008—Pub. L. 110–403, title I, § 101(b)(2), Oct. 13, 2008, 122 Stat. 4258, inserted ''civil'' before ''infringement'' in item 411.

1988—Pub. L. 100–568, §§ 7(g), 9(b)(2), Oct. 31, 1988, 102 Stat. 2859, inserted in items 405 and 406 ''on certain copies and phonorecords'' and substituted in item 411 ''Registration and infringement actions'' for ''Registration as prerequisite to infringement suit''.