# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

## DEFFERED JOINT APPENDIX
## VOLUME II of V (JA174-233)

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*Counsel for Defendant-Appellant*

Wook Hwang
SHEPPARD MULLIN
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Plaintiff-Appellee*

*(For Continuation of Appearances See Inside Cover)*

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

Keane Barger
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

## SPECIAL APPENDIX (SPA1-59)

Opinion and Order, dated April 27, 2023 (ECF No. 65) .................................. SPA-1

Opinion and Order, dated July 24, 2023 (ECF No. 87) ................................. SPA-35

Order, dated July 25, 2023 (ECF No. 88) ........................................................ SPA-46

Judgment, dated August 1, 2023 (ECF No. 92) ............................................... SPA-49

Amended Judgment, dated August 28, 2023 (ECF No. 100) ......................... SPA-51

17 U.S.C. § 304 ................................................................................................ SPA-54

## DEFFERED JOINT APPENDIX VOLUME I of V (JA1-173)

U.S. District Court Southern District of New York,
Civil Docket for Case No. 1:22-cv-10147 ......................................................... JA-1

Complaint, dated November 30, 2022 (ECF No. 1) ......................................... JA-17

Notice of Motion, dated January 23, 2023 (ECF No. 28) ................................. JA-31

Defendant Dramatic Publishing Company's Memorandum
in Support of Its Motion to Dismiss Atticus LLC's Complaint,
dated January 23, 2023 (ECF No. 29) .............................................................. JA-33

Declaration of Kevin Tottis, dated January 23, 2023 (ECF No. 30) ............... JA-63

    Final Award of Arbitrator in American Arbitration Association
    Case No. 01-19-0000-7463, dated January 28, 2022
    (ECF No. 30-2) ............................................................................................. JA-66

## DEFFERED JOINT APPENDIX VOLUME II of V (JA174-233)

    Agreement between Harper Lee and Dramatic Publishing Co.,
    dated June 25, 1969 (ECF No. 30-4) ......................................................... JA-174

    Notice of Termination of Transfer Extended Renewal Term,
    dated April 28, 2011 (ECF No. 30-7) ........................................................ JA-179

Notice of Cross-Motion for Summary Judgment,
dated February 6, 2023 (ECF No. 34) .............................................................JA-186

Plaintiff's Statement of Undisputed Material Facts,
dated February 6, 2003 (ECF No. 35) .............................................................JA1-88

Plaintiff's Memorandum of Law (1) in Opposition to Defendant's
Motion to Dismiss and (2) in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated February 6, 2023 (ECF No. 36) .....................JA-191

Declaration of Jonathan Zavin, dated February 6, 2023 (ECF No. 37)...........JA-222

    Agreement between Harper Lee and Rudinplay, Inc.,
    dated June 29, 2015 (ECF No. 37-3) .........................................................JA-225

    Agreement between No Ice, Inc. and Atticus LLC,
    dated December 12, 2018 (ECF No. 37-5).................................................JA-231

**DEFERRED JOINT APPENDIX VOLUME III of V (JA234-342)**

    Motion to Confirm Arbitration Award and Enter Judgment, Case
    No. 1:21-CV-05541 (N.D. Ill. October 19, 2021) (ECF No. 37-7)...........JA-234

**DEFERRED JOINT APPENDIX VOLUME IV of V (JA343-531)**

    Final Judgment Order, Case No. 1:21-CV-05541 (N.D. Ill. January
    13, 2023) (ECF No. 37-8)...........................................................................JA-343

    Dramatic Publishing Company's Response to Respondents' Motions to Vacate
    Arbitration Awards, Reply in Support of Motion to Confirm Awards and
    Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify,
    Case No. 1:21-CV-05541 (N.D. Ill., February 16, 2022) (ECF No. 37-9) JA-354

Dramatic Publishing Company's Reply in Support of Its Motion
to Dismiss Atticus LLC's Complaint, dated February 15, 2023
(ECF No. 47)...................................................................................................JA-390

Dramatic Publishing Company's Response to Motion for Summary
Judgment, dated February 21, 2023 (ECF No. 50)..........................................JA-405

Declaration of Kevin Tottis, dated February 21, 2023 (ECF No. 52) .............JA-433

Dramatic Publishing Company's Response to Plaintiff's Statement of Undisputed Material Facts, dated February 22, 2023 (ECF No. 57)..............JA-443

Declaration of Kevin Tottis, dated February 28, 2023 (ECF No. 60) ............JA-448

    Email from Matthew Lembke to Jonathan Zavin,
    dated March 7, 2019 (ECF No. 60-27)........................................................JA-458

Dramatic Publishing Company's Statement of Additional Facts,
dated February 28, 2023 (ECF No. 61) ...........................................................JA-461

Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated March 3, 2023 (ECF No. 63).........................JA-473

Defendant Dramatic Publishing Company's Answer to Plaintiff
Atticus LLC's Complaint, dated May 11, 2023 (ECF No. 72) ......................JA-489

Order, dated May 25, 2023 (ECF No. 75) ........................................................JA-507

Notice of Dramatic Publishing Company's Motion for Summary
Judgment, dated June 2, 2023 (ECF No. 76)...................................................JA-509

Memorandum of Law in Support of Dramatic Publishing Company's
Motion for Summary Judgment, dated June 2, 2023 (ECF No. 77)...............JA-511

**DEFERRED JOINT APPENDIX VOLUME V of V (JA532-736)**

Declaration of Kevin Tottis, dated June 2, 2023 (ECF No. 78) .....................JA-532

    Email from Scott Rudin to Alvin Deutsch, dated January 23, 2019
    (ECF No. 78-1) ............................................................................................JA-535

    Arbitration Demand file by Dramatic Publishing Co. against
    The Estate of Harper Lee, dated March 7, 2019 (ECF No. 78-3) ..............JA-536

    Letter from Jonathan Zavin to Matthew Lembke,
    dated April 24, 2019 (ECF No. 78-6)..........................................................JA-563

Declaration of Christopher Sergel III,
dated June 2, 2023 (ECF No. 79) .....................................................................JA-565

    Letter from Jonathan Zavin to Dramatic Publishing Co., dated
    January 9, 2019 (ECF No. 79-1)..................................................................JA-568

Letter from Matthew Lembke to Dramatic Publishing Co., dated January 15, 2019 (ECF No. 79-2)................................................................JA-572

Defendant Dramatic Publishing Company's Statement of Undisputed Material Facts, dated June 2, 2023 (ECF No. 80).............................................JA-576

Reply in Further Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 14, 2023 (ECF No. 83)..........................JA-584

Transcript of Conference held on May 23, 2023 before Judge Denise L. Cote (ECF No. 84).........................................................................JA-599

Joint Status Report, dated June 16, 2023 (ECF No. 86)..................................JA-618

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-2)....................................................................................JA-622

Excerpts of Post-Hearing Brief of The Estate of Harper Lee and Harper Lee LLC, American Arbitration Association Case No. 10-19-0000-7463, dated July 28, 2021, and Excerpts of Respondents' Motion to Vacate Corrected Interim Award of Arbitration and Response in Opposition to Petitioner's Motion to Confirm Corrected Interim Award, Case No. 1:21-CV-05541 (N.D. Ill., January 14, 2022) (ECF No. 86-3) ............................................................JA-631

Email from Jonathan Zavin to Matthew Lembke, dated February 1, 2021 (ECF No. 86-4) ..................................................................................JA-648

Wayback Machine captures of February 5, 2021 and March 4, 2021 U.S. Copyright Office webpage (ECF No. 86-5) ..............................JA-653

Emails from Jonathan Zavin, dated between March 23, 2019 and July 27, 2021 (ECF No. 86-6) ....................................................................JA-658

Email from Jonathan Zavin to Matthew Lembke, dated September 25, 2020 (ECF No. 86-7) ...........................................................................JA-701

Email from Jonathan Zavin to Matthew Lembke, dated April 6, 2021 (ECF No. 86-8) ..................................................................................JA-703

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-9) ..................................................................................JA-705

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-10) ...................................................................JA-708

Email from Jonathan Zavin to Matthew Lembke, dated May 20, 2021 (ECF No. 86-11) ...................................................................JA-712

Email from Jonathan Zavin to Matthew Lembke, dated May 26, 2021 (ECF No. 86-12) ...................................................................JA-714

Email from Jonathan Zavin to Matthew Lembke, dated June 14, 2021 (ECF No. 86-13) ...................................................................JA-717

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-14) ...................................................................JA-719

Notice of Appeal, dated August 30, 2023 (ECF No. 102)..............................JA-721

Opinion and Order, dated October 31, 2023 (ECF No. 109)..........................JA-723

# EXHIBIT 4

*AGREEMENT* entered into this **25th**              day of **June**

18 60 , between **HARPER LEE**

(herein sometimes called "Owner") and **THE DRAMATIC PUBLISHING COMPANY**, an Illinois corporation (herein sometimes called "Publisher")

### Witnesseth, That:

In consideration of the mutual covenants and conditions herein contained, the parties hereto hereby mutually agree with each other with respect to the property written by **HARPER LEE**

entitled **TO KILL A MOCKINGBIRD**

(herein sometimes called "Property") and a dramatization (herein sometimes called "Play") to be based upon and/or adapted from the Property, as follows:

1. The Owner hereby represents, warrants and agrees that:

(a) Neither the Property nor the exercise of the rights granted and/or purported to be granted herein will infringe upon or violate any copyright or any other right of any person, firm or corporation, and that the Property contains nothing libelous, slanderous or unlawful, and that he alone has the power and authority to grant the rights herein granted and/or purported to be granted and that there is not now and there will not be during the term of this agreement any valid or outstanding right, title, interest, claim, encumbrance, or agreement in connection with the Property or the rights herein granted which would prevent or hinder the Publisher from the full exercise of all rights granted herein, and that he will do nothing, either by omission or commission, to prevent or hinder the Publisher from the full exercise of all rights granted and/or purported to be granted herein;

(b) He will defend, indemnify and hold harmless the Publisher from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by the Owner; provided, however, that the provisions of this paragraph shall not apply to any material in the Play not also contained in the Property.

2. The Owner hereby grants to the Publisher the complete right throughout the world:

(a) To write or cause to be written a dramatization based upon and/or adapted from the Property, but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;

(b) To lease the amateur acting rights in and to the Property and/or the Play and/or parts thereof;

(c) To publish the Play and/or parts thereof in such form and style as the Publisher may determine;

(d) To publish portions of the Play up to 1,500 words in collections of readings.

3. The Publisher covenants and agrees to:

(a) Cause the Play to be written and published within eighteen (18) months from the date hereof;

(b) Sell copies and license amateur performances of the Play and/or parts thereof at such prices and on such terms as it determines;

(c) Publish the Play with the following notice of copyright, and to register the claim to copyright in the Copyright Office of the United States of America;

© (Year Play is published)    By  **Harper Lee**
The Dramatic Publishing Company

Based upon the work,
**TO KILL A MOCKINGBIRD**
(Title) © 1960 by Harper Lee
All Rights Reserved
Printed in the United States of America

(d) Deliver to the Owner a copy of Exhibit A signed by the dramatizer of the Property;

(e) Pay to the Owner twenty-five per cent (25%) of all monies actually collected and retained from the leasing and licensing of the amateur acting rights in and to the Play and/or parts thereof;

(f) Pay to the Owner a royalty of five per cent (5%) of the retail price on every copy of the Play published and sold by it, but not on free copies or on copies destroyed, damaged or returned;

DPC000386 CONFIDENTIAL

C013-001

(g) Semi-annually send to the Owner statements of account and pay any sums due.

4. It is further agreed between the parties hereto that:

(a) Without in any way limiting any of the other provisions of this agreement, the Publisher shall have the absolute and unlimited right, for the purpose of the dramatization to be produced, to make such changes, alterations, adaptations, additions to or eliminations from the Property as in its sole judgment and discretion the Publisher shall deem advisable;

(b) Publisher is hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the said Property and Play and any renewals thereof, or concerning any infringement of or interference with the rights hereby granted, in its own name or in the name of the copyright proprietor, but at the expense of the Publisher and, at its option, the Publisher may join the Owner and/or copyright proprietor as party plaintiff or defendant in any such action or proceeding. Any recovery from the infringement of the copyright in the said Property or Play, in so far as it arises from a violation of the rights hereunto granted to the Publisher, is assigned to and shall be paid to the Publisher;

(c) The Publisher shall have the right to use and permit others to use the Owner's name, photograph and likeness in connection with exploiting and publicizing the Play and the rights herein granted;

(d) This agreement shall be governed by and interpreted in accordance with the laws of the State of Illinois, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. This agreement contains the entire understanding between the parties hereto and shall not be construed as a joint venture or partnership;

(e) The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

(f) The Owner shall renew and/or extend the copyright in the Property during that period when it may be renewed and/or extended, and the term of this agreement unless terminated earlier as provided elsewhere herein, shall be for the term of the original copyright of the Property and the renewals and/or extensions thereof;

(g) One year after publication, if the Publisher finds the Play unprofitable and wishes to terminate this agreement, it may do so. If the Play is allowed to remain out of print more than six months after written demand by the Owner to reprint, the Owner may terminate this agreement. These terminations shall take effect on mailing of notice by registered mail to the last known address of the other party;

(h) If the Publisher shall fail to send the Owner a certified public accountant's statement as to the correctness of all reports sent to the Owner by the Publisher for the preceding year, a Certified Public Accountant appointed by any mutually agreed upon third party shall have the right to examine the books of the Publisher insofar as they relate to the Play and make a report to the Owner as to the correctness of the Publisher's statements. Such examination shall be at the cost of the Owner unless errors shall be found requiring an adjustment in the Owner's favor of five per cent (5%) or more of the total sums theretofore paid the Owner, in which case the cost shall be paid by the Publisher;

(i) The parties hereto shall execute such other and further documents as may be necessary or desirable to effectuate the purposes hereof;

(j) This agreement may not be terminated nor the Publisher held liable because of failure of performance for causes outside the Publisher's control, unless continued unreasonably after abatement of the said cause;

(k) Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association;

(l) All notices hereunder shall be in writing and except for notices of termination, which shall be sent by registered mail, all other notices, statements and payments shall be sent by regular mail to the parties hereto at their last known addresses.

**In Witness Whereof,** the parties hereto have executed this agreement the day and year first above written.

In addition to the foregoing, Paragraphs 5, 6 and 7 on Page Four of this agreement are hereby made a part of this agreement.

_Harper Lee_ ......................(SEAL)
(Owner's signature)

THE DRAMATIC PUBLISHING COMPANY

ATTEST: _____     By _____
Secretary or Assistant Secretary                        President or Vice President

DPC000387 CONFIDENTIAL

C013-002

**RIDER TO CONTRACT DATED JUNE 25, 1960 BY AND BETWEEN HARPER LEE AS OWNER AND THE DRAMATIC PUBLISHING COMPANY AS PUBLISHER RE. "TO KILL A MOCKINGBIRD"**

1.   The following shall be deemed added to Paragraph 1 (b):

   The Publisher will similarly indemnify and hold harmless
   the Owner with respect to any new material in the Play not
   contained in the Property.

2.   The following shall be deemed added to Paragraph 2:

   In the event the Owner shall lease professional acting rights to a third party
   for the purpose of producing a first class dramatic play or dramatico-musical
   play based on the Property, during the run of the said play in New York or
   during a first class touring engagement thereof, the Publisher shall not permit
   amateur performances, as provided herein, within a distance of twenty-five (25)
   miles of the city limits of any city which had a 1960 U.S. census population in
   excess of 150,000.  After the close of the final first class road company, the
   Publisher may release amateur rights without restriction.

3.   The following shall be deemed added to Paragraph 4 (c):

   Any biographical material, photograph and/or likeness of the Owner used by
   the Publisher shall be subject to the Owner's approval.

DPC000388 CONFIDENTIAL

C013-003

Page Four

5.    The Publisher agrees to pay to the Owner, promptly upon receipt of a properly executed copy of this agreement, the sum of Two Thousand Five Hundred Dollars ($2,500.00) as a non-returnable advance against royalties to accrue under the terms hereof.  Before any amount due to the Owner under Paragraphs 3 (e) and 3 (f) hereof is paid to the Owner, the Publisher shall take all such amounts as its own property until the sum so taken shall equal the total of the advance herein provided for.

6.    All notices, monies, and statements due to the Owner hereunder shall be sent and/or paid to Annie Laurie Williams, Inc., 18 East 41st Street, New York, New York 10017, as her agent, and the Publisher shall not be required to look to the application of any payments made to Annie Laurie Williams, Inc., but the receipt by Annie Laurie Williams, Inc. shall be a full and complete discharge of the Publisher's obligation to the Owner to the extent of any such payments.

7.    Before publication of the dramatization and before the leasing and/or licensing of the amateur acting rights to the dramatization, the Publisher agrees to submit a copy of the dramatization to the Owner.  The Owner agrees that upon receipt of such copy of the dramatization she will examine the same and within thirty (30) days from the receipt thereof, either give her written objections to the Publisher or submit her written approval thereto.  If within such thirty (30) day period the Owner has not given her written approval or submitted her written objections to the Publisher, the drama-tization shall be deemed to have been approved by the Owner and the Publisher may publish the dramatization as submitted to the Owner, and lease and/or license the amateur acting rights therein as herein elsewhere provided.  If the Owner within the said thirty (30) day period submits written objections to the dramatization, the Publisher agrees to use its reasonably best efforts to have the dramatization revised to meet the said objections, provided however that it is understood and agreed that the Publisher shall not be required to materially alter the basic structure and/or nature of the dramatization or make extensive revisions therein.  The Owner shall also have the right to make such line changes and/or revisions in the said dramatization as the Owner deems necessary and proper.  After the said dramatization has been approved by any of the means hereinabove provided or after written objections have been submitted to the Publisher and the Publisher has used its reasonably best efforts to revise the dramatization to meet the Owner's objections as hereinabove provided, the Publisher shall have the right to publish the dramatization including any changes made therein by the Owner and to lease and/or license the amateur acting rights therein as herein elsewhere provided.

DPC000389 CONFIDENTIAL

C013-004

# EXHIBIT 7

**Notice of Termination of Transfer**
**Extended Renewal Term**

<u>To Kill A Mockingbird</u>

DPC000915 CONFIDNETIAL

## NOTICE OF TERMINATION OF TRANSFER
### EXTENDED RENEWAL TERM

The Dramatic Publishing Company
311 Washington Street
Woodstock, Illinois 60098-3308
Attn: CEO

DPC000916 CONFIDNETIAL

Pursuant to Section 304(c) of the Copyright Act of 1976 (as amended) (17 U.S.C. § 304(c)) and the regulations issued thereunder by the Register of Copyrights, 37 C.F.R. § 201.10, Nelle Harper Lee hereby terminates the grant of transfer of copyright(s) made in that certain Agreement dated June 26, 1969 between Nelle Harper Lee on the one hand and The Dramatic Publishing Company on the other hand by and through the undersigned authorized agent, and sets forth in connection therewith the following:

1.     The name and address of the grantee and/or successor in title whose rights are being terminated are as follows: The Dramatic Publishing Company, 311 Washington Street, Woodstock, Illinois 60098-3308, and any other successor in title to the grant terminated hereby.

2.     This Notice of Termination applies to the following work: To Kill A Mockingbird, for which statutory copyright was originally secured on April 25, 1960, under Copyright Registration A 448971, and for which renewal was secured in the name of Nelle Harper Lee on June 13, 1988, under Copyright Registration RE 387-164, and to any other work that is the subject of any grant by Nelle Harper Lee, including but not limited to, any derivative works based upon To Kill A Mockingbird.

3.     The grant to which this Notice of Termination applies is made in that certain agreement dated June 26, 1969 between Nelle Harper Lee on the one hand and The Dramatic Publishing Company on the other hand, and any other grants of rights in the works identified in paragraph 2 of this Notice.

DPC000917 CONFIDNETIAL

4.   The effective date of termination shall be April 26, 2016.

Dated: April 28, 2011

Nelle Harper Lee
c/o Philologus Procurator, Inc
1521 Alton Road
Miami Beach, FL 33139
(917) 365-4435

DPC000918 CONFIDNETIAL

**CERTIFICATE OF INVESTIGATION**

I hereby certify that before serving the foregoing document described as FIRST
AMENDED NOTICE OF TERMINATION OF TRANSFER EXTENDED RENEWAL
TERM, and pursuant to 37 C.F.R. § 201.10(d), I caused a reasonable investigation to be
made as to the current ownership of the rights being terminated by, *inter alia*,
commissioning a search of the records in the U.S. Copyright Office.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of April, 2011, at Monroeville, Alabama

Nelle Harper Lee
c/o Philologus Procurator, Inc
1521 Alton Road
Miami Beach, FL 33139
(917) 365-4435

DPC000919 CONFIDNETIAL

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document described as

NOTICE OF TERMINATION OF TRANSFER EXTENDED RENEWAL TERM to be

served this 5th day of August, 2011, by First Class Mail, postage prepaid, upon the

following:

The Dramatic Publishing Company
311 Washington Street
Woodstock, Illinois 60098-3308

Patrick T. Perkins
Perkins Law Office, P.C.
1711 Route 9D
Cold Spring, NY 10516
(845) 265-2820
Authorized Agent of Nelle Harper Lee

DPC000920 CONFIDNETIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

          *Plaintiff*,

   and

AARON SORKIN,

          *Involuntary Plaintiff*,

   -against-

THE DRAMATIC PUBLISHING COMPANY,

          *Defendant.*

Case No.: 1:22-cv-10147-DLC

**<u>NOTICE OF CROSS-MOTION</u>**
**<u>FOR SUMMARY JUDGMENT</u>**

     PLEASE TAKE NOTICE that, upon the accompanying Declaration of Jonathan Zavin, memorandum of law in support, and statement of undisputed material facts, Plaintiff Atticus Limited Liability Company ("Atticus"), by their undersigned counsel, will cross-move this Court, before the Hon. Denise L. Cote, United States District Court of the Southern District of New York, 500 Pearl St., New York, NY 1007, for an Order, pursuant to Fed. R. C. P. 56(a), granting summary judgment in favor of Atticus and declaring that (1) Atticus and Aaron Sorkin have the right, in relation to Defendant The Dramatic Publishing Company ("DPC"), to present any and all Second-Class, Stock, Amateur and Ancillary Performances of the Sorkin Play (as each of those terms are defined in the Complaint) in the United States; and (2) any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest DPC claims to hold to the Novel.  Atticus further seeks an award of its costs and reasonable attorneys' fees incurred in this matter pursuant to 17 U.S.C. § 505.

23472091

PLEASE TAKE FURTHER NOTICE that, pursuant to L. Civ. R. 6.1(b), opposition papers,

if any, shall be served within fourteen (14) days hereof.

Dated: February 6, 2023
New York, New York

LOEB & LOEB LLP

By:     */s/ Jonathan Zavin*
Jonathan Zavin
Wook Hwang
Frank D. D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

*Attorneys for Plaintiff Atticus Limited Liability
Company*

2

**JA-187**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | |
| *Plaintiff*, | Case No.: 1:22-cv-10147-DLC |
| and | |
| AARON SORKIN, | **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |
| *Involuntary Plaintiff*, | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant.* | |

Pursuant to Local Civil Rule 56.1, Plaintiff Atticus Limited Liability Company ("Atticus") submits the following statement of undisputed materials facts in support of Atticus's motion for summary judgment.

1.     Harper Lee authored and, in 1960, published *To Kill a Mockingbird* (the "Novel") in 1960. (Doc. 1 ¶ 12; Zavin Decl., Ex. 1 at 1; Zavin Decl., Ex. 2 at 3 ¶ 2.)

2.     In 1969, Lee entered into an agreement (the "DPC Grant") with The Dramatic Publishing Company ("DPC"). (Zavin Decl., Ex. 1.)

3.     DPC's President, Christopher Sergel, wrote a stage adaptation of the Novel (the "Sergel Play") pursuant to the DPC Grant. (Doc. 1 ¶ 2.)

4.     In April 2011, Lee terminated the DPC Grant pursuant to Section 304(c) of the Copyright Act, 17 U.S.C. § 304(c). (Doc. 1 ¶ 14; Zavin Decl., Ex. 2.)

5.     Lee entered into an agreement with No Ice, Inc. (f/k/a Rudinplay, Inc.) dated June 29, 2015 (the "No Ice Grant"). (Zavin Decl., Ex. 3.)

6.      No Ice and Aaron Sorkin entered an agreement dated January 19, 2017 (the "Sorkin Agreement"). (Zavin Decl., Ex. 4.)

7.      No Ice and Atticus entered into an agreement dated December 12, 2018 (the "Atticus Assignment"). (Zavin Decl., Ex. 5.)

8.      The stage adaptation of the Novel produced by Atticus and written by Aaron Sorkin (the "Sorkin Play") premiered at the Shubert Theatre on Broadway on December 13, 2018. (Zavin Decl. ¶ 11.)

9.      On March 7, 2019, DPC filed with the American Arbitration Association ("AAA") a demand for arbitration (the "Arbitration") against the Estate of Harper Lee and Harper Lee, LLC (collectively, the "Estate") (Zavin Decl., Ex. 6, Appendix A thereto at 1.)

10.     Neither Atticus nor Sorkin were parties to the Arbitration. (*Id.*)

11.     A private attorney serving as sole arbitrator, William T. McGrath (the "Arbitrator"), entered an Interim Award of Arbitration (Corrected) on October 21, 2021, Final Award of Arbitrator on January 28, 2022, and Disposition for Application of Modification of Award (collectively, the "Award") in the Arbitration. (Zavin Decl., Ex. 6.)

12.     On January 13, 2023, the United States District Court for the Northern District of Illinois entered a Final Judgment Order (the "Judgment") confirming the Award. (Zavin Decl., Ex. 8.)

13.     Neither Atticus nor Sorkin were parties to the confirmation proceeding in the United States District Court for the Northern District of Illinois. (Zavin Decl., Ex. 7.)

Dated: February 6, 2023
       New York, New York

LOEB & LOEB LLP


By:     */s/ Jonathan Zavin*
     Jonathan Zavin
     Wook Hwang
     Frank D. D'Angelo
     345 Park Avenue
     New York, New York 10154
     Tel: (212) 407-4000
     Fax: (212) 407-4990

*Attorneys for Plaintiff Atticus Limited Liability Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATTICUS LIMITED LIABILITY COMPANY,

        *Plaintiff*,

   and

AARON SORKIN,

        *Involuntary Plaintiff*,

   -against-

THE DRAMATIC PUBLISHING COMPANY,

        *Defendant.*

---

Case No.: 1:22-cv-10147-DLC

---

**PLAINTIFF'S MEMORANDUM OF LAW (1) IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND (2) IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

LOEB & LOEB LLP
Jonathan Zavin
Wook Hwang
Frank D.  D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

*Attorneys for Plaintiff*
*Atticus Limited Liability Company*

23518449

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 4

I.      MS. LEE'S 1969 GRANT OF STAGE RIGHTS IN THE NOVEL TO DPC,
        AND SUBSEQUENT TERMINATION THEREOF ............................................. 4

II.     ATTICUS AND SORKIN'S ACQUISITION OF STAGE RIGHTS IN THE
        NOVEL ................................................................................................................. 4

III.    DPC'S 2019 ARBITRATION AGAINST THE LEE ESTATE AND 2022
        AWARD THEREIN .............................................................................................. 6

ARGUMENT ..................................................................................................................... 8

I.      THE DERIVATIVE WORKS EXCEPTION DOES NOT CONFER DPC
        WITH ANY EXCLUSIVE RIGHTS IN THE NOVEL ...................................... 8

        A.      DPC's Position Defies the Plain Language and Purposes of the
                Copyright Act's Termination Provisions ................................................ 9

        B.      *Mills Music* Does Not Remotely Support DPC's Interpretation .......... 12

II.     THE ARBITRAL AWARD AND CONFIRMATION JUDGMENT
        AGAINST THE LEE ESTATE HAVE NO PRECLUSIVE EFFECT ON
        ATTICUS OR SORKIN ...................................................................................... 14

        A.      Choice of Law ...................................................................................... 14

        B.      The Judgment Does Not Satisfy Two Essential Elements Necessary for
                Preclusion ............................................................................................. 15

                1.      Atticus Was Not a Party to the Arbitration Nor in Privity with
                        the Estate ................................................................................... 15

                        a)      Atticus Did Not Agree to Be Bound by the Arbitration ............... 16

                        b)      Atticus Is Not Bound by the Judgment Because its
                                Copyright Interest Accrued Prior to DPC's Initiation of
                                the Arbitration ............................................................................. 18

                        c)      Atticus Is Not Bound Based on "Adequate
                                Representation" ............................................................................ 20

        2.     The Judgment Is Not Final for the Purpose of Preclusion .........................21

III.    DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO
       RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT ......................22

CONCLUSION.........................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Janitorial v. Pepper Constr. Co.*,
    124 N.E.3d 962 (Ill. 2018) ...................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................8

*Badgerow v. Walters*,
    142 S. Ct. 1310 (2022) ..........................................................................14

*Baldwin v. EMI Feist Catalog, Inc.*,
    805 F.3d 18 (2d Cir. 2015) ....................................................................11

*Baxter Int'l, Inc. v. Abbott Labs.*,
    315 F.3d. 829 (7th Cir. 2003) ................................................................17

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    193 F.3d 415 (6th Cir. 1999) .................................................................16

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998) .............................................................. 14-15

*Bourne Co. v. MPL Commc'ns, Inc.*,
    675 F. Supp. 859 (S.D.N.Y. 1987), *modified and amended by*,
    678 F. Supp. 70 (S.D.N.Y. 1988) ..........................................................23

*Brumley v. Albert E. Brumley & Sons, Inc.*,
    822 F.3d 926 (6th Cir. 2016) .................................................................11

*Chase Nat'l Bank v. Norwalk*,
    291 U.S. 431 (1934) ...............................................................................18

*Classic Media, Inc. v. Mewborn*,
    532 F.3d 978 (9th Cir. 2008) .................................................................11

*Clugston v. Moore*,
    655 P.2d 29 (Ariz. Ct. App. 1982) ........................................................19

*Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*,
    10 F.4th 814 (7th Cir. 2021) .................................................................7

*Diversified Fin. Sys. v. Boyd*,
    678 N.E.2d 308 (Ill. Ct. App. 1997) .....................................................19

*Gerrity Bakken, LLC v. Oasis Petro. N. Am., LLC,*
   915 N.W.2d 677 (N.D. 2018) ...............................................................19

*Guan v. City of New York,*
   37 F.4th 797 (2d Cir. 2022) ...................................................................8

*Indus. Credit Co. v. Berg,*
   388 F.2d 835 (8th Cir. 1968) ................................................................19

*John Wiley & Sons, Inc. v. DRK Photo,*
   882 F.3d 394 (2d Cir. 2018)..................................................................22

*Larry Spier, Inc. v. Bourne Co.,*
   953 F.2d 774 (2d Cir. 1992)..................................................................10

*Luckett v. Human Rights Comm'n,*
   569 N.E.2d 6 (Ill. Ct. App. 1989) ........................................................21

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.,*
   779 F.3d 102 (2d Cir. 2015)..................................................................15

*Marvel Characters, Inc. v. Simon,*
   310 F.3d 280 (2d Cir. 2002)............................................................ 9-10

*Mills Music, Inc. v. Snyder,*
   469 U.S. 153 (1985).........................................................8, 9, 12, 13

*Mitchell v. Austin,*
   94 So. 2d 391 (Ala. 1957) ....................................................................19

*Noriega v. US Bank, Nat'l Ass'n,*
   2017 U.S. Dist. LEXIS 116089 (E.D.N.Y. July 25, 2017)....................18

*Pelon v. Wall,*
   634 N.E.2d 385 (Ill. Ct. App. 1994) .....................................................22

*People v. Hopkins,*
   922 N.E.2d 1042 (Ill. 2009) ..................................................................21

*Polk v. Sherwin-Williams Co.,*
   2017 U.S. Dist. LEXIS 46088 (D. Conn. Mar. 29, 2017)........................8

*Sacerdote v. Cammack Larhette Advisors, LLC,*
   939 F.3d 498 (2d Cir. 2019)..................................................................21

*In re Salas,*
   2018 Bankr. LEXIS 2906 (Bankr. D.D.C. Sept. 24, 2018) ...................19

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
    531 U.S. 497 (2001) ................................................................................14

*Show-World Ctr., Inc. v. Walsh*,
    438 F. Supp. 642 (S.D.N.Y. 1977) ........................................................21

*Siegel v. Warner Bros. Entm't*,
    690 F. Supp. 2d 1048 (C.D. Cal. 2009) ................................................10

*Siegel v. Warner Bros. Entm't, Inc.*,
    542 F. Supp. 2d 1098 (C.D. Cal. 2008) ................................................11

*Smith v. Estate of Womack*,
    149 N.E.2d 778 (Ill. 1958) ....................................................................19

*Spoleto Corp. v. Ethiopian Airlines Grp.*,
    2022 U.S. App. LEXIS 34070 (2d Cir. Dec. 12, 2022) ........................18

*State Bldg. Venture v. O'Donnell*,
    940 N.E.2d 1122 (Ill. 2010) ..................................................................21

*State Farm Fire & Cas. Co. v. John J. Rickhoff Sheet Metal Co.*,
    914 N.E.2d 577 (Ill. App. Ct. 2009) ....................................................16

*Stewart v. Abend*,
    495 U.S. 207 (1990) ................................................................................9

*Sweeting v. Campbell*,
    119 N.E.2d 237 (Ill. 1954) ........................................................19, 20, 21

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ...................................................................... *passim*

*In re Tyson*,
    433 B.R. 68 (S.D.N.Y. 2010) ................................................................16

*United States v. Int'l Bhd. of Teamsters*,
    905 F.2d 610 (2d Cir. 1990) ..................................................................21

*W. P. Carey, Inc. v. Bigler*,
    2019 U.S. Dist. LEXIS 51975 (S.D.N.Y. Mar. 27, 2019) ......................8

*W. Union Tel. Co. v. Foster*,
    247 U.S. 105 (1918) ..............................................................................21

*Waite v. UMG Recordings, Inc.*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020) ..................................................10

*Wendt v. The BondFactor Co.*,
  2017 U.S. Dist. LEXIS 121706 (S.D.N.Y. Aug. 2, 2017) (Cote, J.) ................................14, 21

*Wight v. Chandler*,
  264 F.2d 249 (10th Cir. 1959) ....................................................................................19


**Statutes and Rules**

Copyright Act of 1976 ............................................................................................ *passim*

17 U.S.C. § 101 ............................................................................................................10, 13

17 U.S.C. § 304(c) ................................................................................................... *passim*

17 U.S.C. § 505 ..............................................................................................................4, 24

Federal Arbitration Act ..............................................................................................14

Fed. R. App. P. 4(1)(A) ...............................................................................................22

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 8

Fed. R. Civ. P. 56 ........................................................................................................1, 8


**Other Authorities**

47 Am Jur 2d Judgments § 566 (2022) ....................................................... 19-20

47 Am. Jur. 2d Judgments § 569 (2022) ...........................................................20

3 Nimmer on Copyright § 10.03[A][7] (2022) ..................................................23

Restatement (Second) of Judgments, § 40 (1982) .........................................16

Restatement (Second) of Judgments, § 44 (1982) .........................................18

Plaintiff Atticus Limited Liability Company ("Atticus") respectfully submits this memorandum of law (1) in opposition to the motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), of Defendant The Dramatic Publishing Company ("DPC"); and (2) in support of Atticus's cross-motion, pursuant to Fed. R. Civ. P. 56, for summary judgment granting the declaratory relief sought by this action.

## PRELIMINARY STATEMENT

This action centers on whether the Copyright Act permits DPC to preclude others, including Atticus and Aaron Sorkin ("Sorkin"), from staging so-called "stock" and "amateur" stage productions of Harper Lee's *To Kill a Mockingbird* (the "Novel"), widely regarded as one of the most cherished works of American literature.  Atticus and Sorkin are, respectively, the production company and playwright responsible for the critically-acclaimed Broadway adaptation of the Novel (the "Sorkin Play").  DPC is the owner of a prior stage adaptation of the Novel written by its former President Christopher Sergel (the "Sergel Play").  DPC claims to have the perpetual right to prevent stock and amateur productions of any other stage version of the Novel, pursuant to a now-terminated 1969 grant by Harper Lee (the "1969 Grant") that conferred DPC with the then-exclusive right to stage stock and amateur adaptations of the Novel.  In other words, DPC claims that, despite the *uncontested* termination of its 1969 Grant, the Sergel Play is the *only* stage version of the Novel that may ever be produced and performed by regional theaters, schools, community theaters and other amateur groups.  That is wrong.

The legal issues are two-fold, and straightforward: (1) whether, pursuant to U.S. copyright law, DPC can continue to claim *exclusive* stock and amateur stage rights to the Novel, notwithstanding Ms. Lee's uncontested termination of the 1969 Grant; and (2) whether the decision of a single arbitrator (a private attorney serving as sole arbitrator in a private arbitration

between DPC and the Estate of Harper Lee)—and incorrectly concluding that, as a matter of federal copyright law, exclusive licenses are *interminable*—binds Atticus, Sorkin or anyone else who was not a party (or in privity with a party) to the arbitration.  As the pending motions reflect, the parties agree that these pure issues of law can be resolved as a matter of law, but disagree as to the governing law.  DPC is wrong on both issues.

First, there is no question that exclusive licenses are terminable pursuant to the Copyright Act's termination provisions.  As DPC itself acknowledges, as it must, the plain language of the Copyright Act's applicable termination provision is unambiguous that both "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . **is subject to termination**[.]"  17 U.S.C. § 304(c) (emphasis added). DPC's position would render this provision entirely meaningless, by eliminating exclusive grants from the purview of copyright termination altogether—an overreach that plainly has no basis in the statute or the case law.  Indeed, in the 40-plus years since authors' termination rights were enshrined in the Copyright Act of 1976, no court has ever held or even implied that an exclusive license cannot be terminated.  *All* law is to the contrary.  DPC's reliance on the so-called "derivative works exception," 17 U.S.C. § 304(c)(6)(A), is a red herring, as this provision merely permits DPC to continue to exploit the Sergel Play (*i.e.*, the derivative work) following termination—*not* to preclude the performance of any and every other stage adaptation of the Novel.

Second, the arbitrator's decision purporting to rewrite the Copyright Act's termination provision is not only shockingly wrong, but entirely irrelevant to this action.  DPC would have a private attorney's obviously incorrect decision regarding a matter of U.S. copyright law, issued in a private arbitration, determine the rights under copyright law for everyone in the country. Whatever preclusive effect that decision may have as between DPC and the Lee Estate, it has no

preclusive effect on Atticus, which was not a party to, nor in privity with, any of the parties to the arbitration. Nor does it have any preclusive effect on Sorkin, or the untold number of regional, local and community theaters, colleges, high schools, churches, clubs and other amateur acting group in the United States seeking to stage or perform stage adaptations of the Novel who were not parties to, nor in privity with, any of the parties to the arbitration. DPC is wrong that Atticus and Sorkin are in privity with the Lee Estate merely because they acquired rights to the Novel from Ms. Lee. Critically, Atticus's predecessor acquired those rights from Ms. Lee *before* DPC commenced its arbitration against the Lee Estate. The law is clear that, for preclusion purposes, grantee-grantor privity exists only where the grant is made *after* the commencement of the prior proceeding, such that the grantee had actual or constructive notice thereof. DPC's preclusion argument fails for this reason alone. It fails for the additional and independent reason that neither the arbitral award nor the ensuing confirmation judgment are "final" under applicable preclusion principles, as they remain subject to appeal.

The resolution of these two issues ends the inquiry and mandates the conclusion that DPC has *no* right to prohibit Atticus, Sorkin or anyone else from performing the Sorkin Play—or *any* stage adaptations of the Novel other than the Sergel Play. DPC attempts to distract from this case-dispositive conclusion by arguing that the 2015 grant from Ms. Lee to Atticus's predecessor was invalid. That is not only wrong, but an entirely irrelevant sideshow. This case does not turn on what rights Atticus has vis-à-vis the Lee Estate, but whether *DPC* retains exclusive stage rights to the Novel and thus can seek to preclude Atticus—or anyone else—from performing all dramatic adaptations of the Novel. Copyright law is unambiguous that it does not.

Atticus therefore respectfully requests that the Court (1) deny DPC's motion to dismiss, (2) declare that Atticus and Sorkin have the right, in relation to DPC, to present stock and amateur

performances of the Sorkin Play in the United States; (3) declare that any such productions of the

Sorkin Play have not infringed and could not infringe any purported copyright interest DPC claims

to hold to the Novel; and (4) award Atticus its costs and reasonable attorneys' fees incurred in

connection with this lawsuit pursuant to 17 U.S.C. § 505.

## FACTUAL BACKGROUND

I.   **MS. LEE'S 1969 GRANT OF STAGE RIGHTS IN THE NOVEL TO DPC, AND SUBSEQUENT TERMINATION THEREOF**

Ms. Lee authored and, in 1960, published the Novel.  (Doc. 1 ¶ 12; Zavin Decl., Ex. 1 at

1.)  In 1969, Ms. Lee entered into the DPC Grant.  (Zavin Decl., Ex. 1)  Pursuant thereto, Ms. Lee

granted to DPC the right to "write or cause to be written a dramatization based upon and/or adapted

from the [Novel][.]"  (*Id.* § 2(a).)  Ms. Lee agreed that DPC's dramatization "is to be the only one

the amateur acting rights of which [Ms. Lee] will permit to be leased and/or licensed[.]"  (*Id.*)  In

sum, Ms. Lee granted DPC the exclusive right to stage Stock and Amateur Productions (as defined

in § 4(e) of the 1969 Grant) of the Novel.  DPC's then-President, Christopher Sergel, subsequently

wrote the Sergel Play, which DPC has since licensed to third parties.

In April 2011, Ms. Lee served a notice terminating the DPC Grant pursuant 17 U.S.C. §

304(c).  (Zavin Decl., Ex. 2.)  That termination became effective on April 26, 2016.  (*Id.*)[1]

II.   **ATTICUS AND SORKIN'S ACQUISITION OF STAGE RIGHTS IN THE NOVEL**

Following service of her notice of termination, Ms. Lee entered into an agreement with No

Ice, Inc. (f/k/a Rudinplay, Inc.)  ("No Ice") dated June 29, 2015 (the "No Ice Grant").  (Zavin

---

[1] DPC claims Ms. Lee "br[oke] her promises" and launches into a series of salacious allegations against her purported "handlers."  (Doc. 29 at 8-11.)  One might alternatively describe Ms. Lee's conduct as the proper exercise of her congressionally authorized statutory right of termination.  In any event, none of DPC's caustic allegations are relevant to the legal issues on which the parties' motions turn.

Decl., Ex. 3.)  Ms. Lee designated No Ice as her exclusive agent to select a playwright.  (*Id.* § 1.)

Upon Ms. Lee's written approval of the selected playwright, Ms. Lee granted No Ice an option to

acquire the right to "create develop, produce and present a live stage play" based on the Novel.

(*Id.* §§ 2(a) & 3(a).)  That option would "be deemed exercised" upon the "initial commercial first

class production" of the play on Broadway or London's West End.  (*Id.* § 4.)

Recognizing the import of the Copyright Act's derivative works exception, the No Ice

Grant acknowledged that DPC was free to continue exploiting the Serkel Play in Stock and

Amateur Productions on a "non-exclusive basis":

> [No Ice] acknowledges that pursuant to an agreement (the "Prior Agreement")
> dated June 26, 1969 between [Ms. Lee] and [DPC], [Ms. Lee] granted DPC the
> right to create a play (the "Prior Adaptation") based on the Novel, and to exploit
> the amateur acting rights (as defined in the Prior Agreement) in the Prior
> Adaptation.  Author represents that it has terminated the Prior Agreement effective
> April 26, 2016.  Producer acknowledges that, notwithstanding such termination, the
> amateur acting rights to the Prior Adaptation can continue to be exploited following
> such termination under the terms of the Prior Agreement **on a non-exclusive basis**
> **in the United States**, and on an exclusive basis elsewhere.  The rights granted
> hereunder shall be subject to the rights granted under the Prior Agreement, as
> limited by such termination.

(*Id.* § 2(b) (emphasis added).)

No Ice and Aaron Sorkin—one of the leading theater, film, and television writers in

America—thereafter entered an agreement dated January 19, 2017 (the "Sorkin Agreement")

(Zavin Decl., Ex. 4), by which No Ice engaged Sorkin to create a new stage adaptation of the Novel

(the "Sorkin Play").  As a result of the Sorkin Agreement, Sorkin is the "sole and exclusive Author,

owner and the copyright proprietor of the [Sorkin] Play and of all rights of every kind or nature

therein."  (Doc. 1 ¶ 25.)  No Ice, in its capacity as producer, retained the exclusive right to produce

certain categories of productions and to financially participate in other categories of productions.

(*Id.* ¶¶ 26-27.)  By agreement dated December 12, 2018, No Ice assigned the foregoing rights to

Atticus, including all relevant rights previously held by No Ice pursuant to the No Ice Grant and the Sorkin Agreement.  (Zavin Decl., Ex. 5 § 1.)

The Sorkin Play premiered at the Shubert Theatre on Broadway on December 13, 2018, to great acclaim.  (Zavin Decl. ¶ 11; Doc. 1 ¶¶ 29-31.)  Pursuant to the terms of the No Ice Grant, the December 2018 Broadway premiere exercised the option and thus effectuated the grant of the stage rights to Atticus.  (Zavin Decl., Ex. 3 § 4.)

## III.   DPC'S 2019 ARBITRATION AGAINST THE LEE ESTATE AND 2022 AWARD THEREIN

On March 7, 2019, DPC initiated arbitration against the Estate of Harper Lee and Harper Lee, LLC (together, the "Estate").  (Zavin Decl., Ex. 6, App. A thereto at 1.)  DPC and the Estate were the only parties to the Arbitration.  (*Id.*)  On October 21, 2021, a private attorney serving as sole arbitrator in the proceeding entered an Interim Award of Arbitration (the "Award").[2]  In the Award, the arbitrator ruled, *inter alia*, that "[t]he terms of the original grant in the 1969 Agreement [*i.e.*, the DPC Grant] survive termination.  Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights') and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights."  (*Id.* at 6 ¶ 10).

In so ruling, the arbitrator astonishingly relied on "the absence of any clear statement in the [copyright] statute divesting derivative authors of the exclusive rights granted in the original contract."  (*Id.* at 68-69)  Thus ignoring the unambiguous language of the Copyright Act that both "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right

---

[2] On February 16, 2022, the Arbitrator further entered a "Disposition for Application of Modification of Award" that resolved all of the issues, including fee issues, at issue in the arbitration.  (Zavin Decl., Ex. 6.)

under it, executed before January 1, 1978, . . . **is subject to termination**," 17 U.S.C. § 304(c) (emphasis added), the arbitrator concluded that authors like Ms. Lee have *no* right to terminate grants of exclusive rights under the Copyright Act.

The Arbitrator also purported to adjudicate the rights of Atticus—*which was not a party of the arbitration*—concluding that Atticus "has no stock and amateur rights for live theatrical productions of [*To Kill a Mockingbird*]." (Zavin Decl., Ex. 6, App. A thereto at 72.)  This is directly at odds with the No Ice Grant, in which Ms. Lee, years before the issuance of this arbitral award, represented that DPC's rights to exploit the Sergel Play for Stock and Amateur Productions was on a "non-exclusive basis" only, and expressly granted No Ice all other stage rights to exploit a dramatic adaptation of the Novel (*i.e.*, the Sorkin Play)—including for Stock and Amateur Productions. (Zavin Decl., Ex. 3.)

On October 19, 2021, DPC moved to confirm the Award in the United States District Court for the Northern District of Illinois ("Northern District of Illinois").  (Zavin Decl., Ex. 7.)  DPC and the Estate were the only parties to that confirmation proceeding as well.  (*Id.*)  On January 13, 2023, the Northern District of Illinois entered a Final Judgment Order (the "Judgment") confirming the Award (Zavin Decl., Ex. 8), constrained by the principle that, on motions to confirm or vacate, "arbitration awards are largely immune from . . . scrutiny in court."  *Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021)  The district court thus could not analyze whether the arbitrator erred in determining that exclusive licenses are interminable. No such constraint applies here.

**ARGUMENT**[3]

As a result of Ms. Lee's termination of the DPC Grant, DPC does not hold any exclusive rights in the Novel in relation Atticus or Sorkin.  DPC's distortion of the Copyright Act's termination provision is as meritless as it is unprecedented. DPC's effort to immunize the weakness of its position from judicial review, based on a private arbitration to which neither Atticus nor Sorkin were party, is equally unfounded.

## I.   THE DERIVATIVE WORKS EXCEPTION DOES NOT CONFER DPC WITH ANY EXCLUSIVE RIGHTS IN THE NOVEL

17 U.S.C.  § 304(c) confers upon authors and their statutorily designated heirs the right to terminate "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978[.]"  17 U.S.C. § 304(c).  The "principal purpose of the amendments in § 304 was to provide added benefits to authors."  *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985).  The "termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."  *Id.*  Section 304(c), in other words, affords the author a second bite at the apple to receive the financial benefits of her work.

---

[3] The applicable procedural standards are straightforward in this dispute.  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Entry of summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Guan v.  City of New York*, 37 F.4th 797, 804 (2d Cir. 2022).  Pursuant to Fed. R. Civ. P. 56, summary judgment motions may be filed at the pleading stage.  *See, e.g., W. P. Carey, Inc. v. Bigler*, 2019 U.S. Dist. LEXIS 51975, at *31 (S.D.N.Y. Mar. 27, 2019) (explaining that "[c]ourts in this Circuit have granted pre-answer motions for summary judgment in certain circumstances," and collecting cases); *Polk v. Sherwin-Williams Co*., 2017 U.S. Dist. LEXIS 46088, at *3 (D. Conn. Mar. 29, 2017) ("Under Federal Rule of Civil Procedure 56(b), a party may file a motion for summary judgment at any time until 30 days after the close of all discovery, including before filing an answer.") (internal quotations and citation omitted)).

The termination right is subject to certain "limitations."  17 U.S.C. § 304(c)(6).  Among those limitations is the so-called "derivative works exception," which provides as follows:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

*See id.* § 304(c)(6)(A).  The effect of the exception is "to enable derivative works to continue to be accessible to the public after the exercise of an author's termination rights."  *Mills Music,* 469 U.S. 153 at 176; *Stewart v. Abend*, 495 U.S. 207, 226 (1990).

Simply put, an author who terminates a license cannot state a claim for copyright infringement against the licensee over the continued exploitation of a derivative work prepared during the term of the license.  *See Mills*, 469 U.S. 153 at 178.  According to DPC, however, Section 304(c)(6)(A) not only *permits* the continued utilization of a derivative work created by the licensee, but affords an exclusive licensee the post-termination right to *prevent* others from exploiting any new derivatives based on the underlying work.  In other words, DPC contends that exclusive licenses remain exclusive following a valid termination, and thus cannot be terminated. The unprecedented and dramatic extension of the derivative works exception that DPC proposes has no merit or basis in the law.

### A.   DPC's Position Defies the Plain Language and Purposes of the Copyright Act's Termination Provisions

The absurd interpretation advanced by DPC is contradicted by the plain language of the Copyright Act's termination provision, which provides that *both* "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . **is subject to termination**[.]"  17 U.S.C. § 304(c). (emphasis added).  This provision—applicable by its plain terms to exclusive licenses—"grants authors (or if deceased, their statutory heirs) an inalienable right to terminate a grant in a copyright fifty-six years after the original grant '**notwithstanding**

**any agreement to the contrary**.'" *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 282 (2d Cir. 2002) (emphasis added; quoting 17 U.S.C. § 304(c)(5)).

The "unequivocal purpose" of termination is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable." *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020); *see also, e.g.*, *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 778 (2d Cir. 1992) ("[T]he purpose of the statute is to protect . . . . the rights of these persons to terminate assignments of copyrights made by the spouse and parent, and to recapture the copyrights for themselves"); *Siegel v. Warner Bros. Entm't*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded . . . by the 1976 Act[.]").

Nothing in the derivative works exception prevents an author from exercising this "inalienable" termination right, contrary to DPC's contention otherwise. *See, e.g.*, https://www.copyright.gov/recordation/termination.html ("A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights . . . to prepare new derivative works revert to the authors or their heirs."). Dramatic's absurd insistence that, pursuant to the derivative works exception, *all* "terms" of any copyright grant remain in full force following termination would mean that a wholesale copyright assignment would, like an exclusive license,[4] be *in*terminable for purposes of recapturing the originally granted rights. Not surprisingly, courts have squarely and

---

[4] Pursuant to the Copyright Act, both assignments and exclusive licenses are deemed to constitute a "transfer of copyright ownership" with respect to the rights conveyed. 17 U.S.C. § 101. Under DPC's reading, any such transfer of ownership by assignment or exclusive license could *never* be recaptured based on its proposition that all "terms" of the grant survive termination.

repeatedly rejected DPC's core premise, and held that both exclusive licenses and wholesale assignments are, as the statute provides, subject to termination.  *See, e.g., Siegel v. Warner Bros. Entm't, Inc.*, 542 F. Supp. 2d 1098, 1107, 1113-14 (C.D. Cal. 2008) (heirs recaptured rights following termination of 1938 grant that had conveyed to comic book publisher "all . . . exclusive right[s]' to *Superman* 'to have and hold forever';" explaining that "the 1976 Act gave artists and their heirs the ability to *terminate* any prior grants . . . regardless of the terms contained in [the grant], *e.g.*, a contractual provision that all the rights (the initial and renewal) belonged exclusively to the [grantee]"); *Baldwin v. EMI Feist Catalog, Inc*., 805 F.3d 18, 22 (2d Cir. 2015) (Copyright Act permitted author's heirs to terminate unfettered grant by which "Grantor hereby sells, assigns, grants, transfers and sets over to Grantee . . . all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works]"); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 929 (6th Cir. 2016) (same, with respect to grants "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" and "all rights to obtain renewals or copyrights in the future upon Works written or composed by [the author]").

Ignoring this authority, DPC insists that exclusive grants persist following termination because "[n]othing in the language [of the derivative rights exception] even hints that it is not applicable to exclusive grants."  (Doc. 29 at 20-21.)  DPC misses the point entirely, as there is no dispute that the derivative works exception applies to any manner of grant.  But, per its plain

language, the exception merely permits a grantee to continue to "**utilize**" derivative works created during the term of the license.  *See* 17 U.S.C. § 304(c)(6)(A) ("A derivative work prepared under authority of the grant before its **termination** may continue to be **utilized** under the terms of the grant after its **termination**, but this privilege does not extend to the preparation after the **termination** of other derivative works based upon the copyrighted work covered by the **terminated** grant.") (emphasis added).  Nothing in the derivative works exception, however, confers the licensee or assignee with the right to **prevent** any other exploitation of the underlying work, or other derivative works based on the same underlying work.  Nor can the repeated references to "termination" be read out from this provision.  Under DPC's interpretation, however, "termination" of an exclusive license is impossible—thus rendering these references meaningless, contrary to the most basic canons of statutory interpretation.  And, as DPC would have it, despite termination of the grant, DPC would continue not only to have the right to *utilize* its derivative work, but would continue to have rights in the Novel itself (*i.e.*, the right to create derivative works)—further rendering the very concept of termination meaningless.

Notably, DPC is unable to cite to a *single* judicial decision, treatise or Copyright Office opinion stating, or remotely suggesting, that exclusive licenses are interminable as it claims.  No such authority exists.

### B.   *Mills Music* Does Not Remotely Support DPC's Interpretation

DPC relies nearly exclusively on the Supreme Court's decision in *Mills Music* to contend that, pursuant to the derivative works exception, exclusive licenses remain exclusive following termination.  This reliance is misplaced, as that decision does not remotely support DPC's position.

In *Mills Music*, the Supreme Court considered the narrow and, here, irrelevant question of "whether an author's termination of a publisher's interest in a copyright also terminates the publishers' contractual right to share in the royalties on such derivative works."  469 U.S. at 156.

The Court held that the "contractual obligation to pay royalties survives the termination," reasoning that the word "utilized" is "expressly confined by the 'terms of the grant." *Id.* at 169. Because the right to share in royalties was a contractual term that governed the music publisher's *utilization* of the derivative works, that contract provision survived termination. *Mills Music* did *not* hold, or even suggest, that Section 304(c)(6)(A) grants an exclusive licensee interminable exclusivity and a corresponding right to *prevent others* from utilizing the underlying work after termination.

*Mills Music* instead exposes the fallacy of the DPC's reasoning. As the Court observed, the termination at issue in that case "caused the ownership of the copyright to revert to the [authors' heirs[.]" *Id.* at 163. Copyright ownership is defined in the Copyright Act to encompass any exclusive rights. *See* 17 U.S.C. § 101 ("'Copyright owner,' with respect to any of one of the **exclusive** rights comprised in a copyright, refers to the owner of that particular right") (emphasis added); *id.* ("A 'transfer of copyright ownership' is an assignment, mortgage, **exclusive** license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the **exclusive** rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.") (emphasis added). DPC's insistence that exclusivity cannot be terminated is directly at odds with the *Mills Music* Court's holding that termination caused "ownership" to "revert."

*Mills Music* further recognized that the "principal purpose" of the Copyright Act's termination provisions were "to provide added benefits to authors" and that "the concept of a termination right itself [was] obviously intended to make the rewards for the creativity of authors more substantial"—purposes that are "plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself," but that DPC claims do not exist. *Id.* at 172-73.

II.     **THE ARBITRAL AWARD AND CONFIRMATION JUDGMENT AGAINST THE LEE ESTATE HAVE NO PRECLUSIVE EFFECT ON ATTICUS OR SORKIN**

Even though Atticus and Sorkin were not parties to the arbitration, DPC argues that the Award against the Estate precludes Atticus's claim for a declaratory judgment.  (Doc. 29 at 13-19.)  DPC claims Atticus (1) "consent[ed] to be bound" by the arbitration clause in the 1969 Grant (*id.* at 13-16) and (2) is in "privity" with the Estate (*id.* at 16-19).  DPC is wrong on both counts.

A.     <u>Choice of Law</u>

"[I]t is an open question whether federal or state law governs a federal court's determination of the preclusive effect of an arbitral award[.]"  *Wendt v. The BondFactor Co.*, 2017 U.S. Dist. LEXIS 121706, at \*10 (S.D.N.Y. Aug. 2, 2017) (Cote, J.) (citation omitted).  On the one hand, Supreme Court precedent holds that the preclusive effect of a judgment issued by a federal court sitting in diversity should be determined according to the laws of the state in which the court sits—in this case, Illinois, the state in which the Northern District of Illinois entered the Judgment.[5]  On the other, Second Circuit precedent suggests federal common law may govern the preclusive effect of the Judgment because the Arbitrator decided a federal question arising under the Copyright Act.[6]  The Court need not resolve this choice-of-law issue.  As explained below, Atticus prevails whether one applies federal or Illinois preclusion principles.

---

[5] The Supreme Court has held that a federal court must apply "the law that would be applied by state courts in the State in which the federal diversity court sits."  *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).  Here, the Northern District of Illinois exercised only diversity jurisdiction when entering the Judgment.  Because the Federal Arbitration Act "does not itself create jurisdiction," an application to confirm an arbitration award typically does not raise a federal issue because the relief sought is "no more than a contractual resolution of the parties' dispute" that "involve[s] only state law[.]"  *Badgerow v. Walters*, 142 S. Ct. 1310, 1314, 1316-17 (2022).  Here, DPC's motion before the Northern District of Illinois sought to enforce the arbitration award pursuant to the arbitration clause contained in the 1969 Grant.  (Zavin Decl., Ex. 7.)  Enforcing a parties' contractual arbitration provision, under *Badgerow*, "involve[s] only state law."  *Badgerow*, 142 S. Ct. at 1317.

[6] *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 n.4 (2d Cir. 1998) (applying federal

**B.**   **The Judgment Does Not Satisfy Two Essential Elements Necessary for Preclusion**

Res judicata, or claim preclusion, bars later litigation when "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [same adverse parties] or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (citation omitted)); *see also, e.g., A&R Janitorial v. Pepper Constr. Co.*, 124 N.E.3d 962, 966 (Ill. 2018) (requiring "(1) a final judgment on the merits rendered by a court of competent jurisdiction, (2) an identity of cause of action, and (3) an identity of parties or their privies").

DPC's attempt to bind Atticus and Sorkin to decisions rendered in its dispute with the Estate fails on two grounds. First, Atticus and Sorkin were not parties to the arbitration nor in privity with the Estate. Second, under Illinois law, the Judgment is a not a final adjudication on the merits.

**1.**   **Atticus Was Not a Party to the Arbitration Nor in Privity with the Estate**

The Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008) establishes the framework for considering whether a party is bound by a judgment in another proceeding. "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation marks and citation omitted). The "rule against nonparty preclusion" is subject only to the "enumerated six exceptions" set forth in the Restatement (Second) of Judgments ("Restatement").

---

preclusion principles to an unconfirmed arbitration award because "Federal law governs the preclusive effect of a prior federal question judgment" and the arbitration "concerned a federal question").

*In re Tyson*, 433 B.R. 68, 99-100 (S.D.N.Y.  2010) (quoting *Taylor*, 553 U.S. at 893) (Cote, J.).[7]
Though its briefing is not a model of clarity, DPC appears to claim three exceptions apply.  (Doc.
29 at 13-19.)  None do.

### a)        Atticus Did Not Agree to Be Bound by the Arbitration

First, DPC argues that Atticus gave its "explicit consent to be bound" by the Arbitration
because § 2(b) of the No Ice Grant states that the "rights granted hereunder shall be subject to the
rights granted under the [1969 Grant], as limited by such termination."  (Doc. 29 at 13-16.)  DPC
reasons that because the 1969 Grant contained an arbitration provision, Atticus agreed to be bound
by arbitration between DPC and the Estate.  (*Id.*)  DPC's argument is nonsense.

To be sure, "[a] person who agrees to be bound by the determination of issues in an action
between others is bound in accordance with the terms of his agreement."  *Taylor*, 553 U.S. at 893
(quoting RESTATEMENT § 40).  However, "no such agreement should be inferred except upon the
plainest circumstances."  RESTATEMENT § 40 cmt. b; *Becherer v. Merrill Lynch, Pierce, Fenner &
Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999) (same).

Here, Atticus did not agree, let alone expressly, to be bound by the 1969 Grant's arbitration
clause.   Section 2(b) of the No Ice Grant was, by its plain terms, just a disclaimer—an
acknowledgement that DPC could continue utilizing the Serkel Play nonexclusively after
termination.  (*See* Zavin Decl. ¶ 4, Ex. 3 § 2(b) (stating play "can continue to be exploited following
such termination under the terms of the Prior Agreement on a ***non-exclusive basis***" (emphasis
added)).   Section 2(b) does *not* say that Atticus' rights are "limited by such termination *as
determined by the arbitration provision in the 1969 Grant*."  It does not mention arbitration at all.

---

[7] *See also State Farm Fire & Cas. Co. v. John J.  Rickhoff Sheet Metal Co.*, 914 N.E.2d
577, 589 (Ill. App. Ct. 2009) (listing enumerated exceptions in Restatement).

Section 2(b) bears no resemblance to type of "agreement to be bound" contemplated by the Restatement.  As explained in *Taylor*, the exception applies where the parties to separate actions against the same defendant "agree that the question of the defendant's liability will be definitively determined, one way or the other, in a 'test case,'" or via a court-filed "stipulation" to be bound by a separate actions.  553 U.S. at 893-94 (quotations omitted).  Atticus never agreed to have the scope of the Copyright Act's termination provision, a question of U.S. copyright law, decided by a single private attorney in a private arbitration to which it was not a party.

Contrary to DPC's argument (Doc. 29 at 13-14), the Northern District of Illinois did *not* hold, or even analyze, whether Atticus is bound by the Judgment.  (Nor could it, given that Atticus was not a party to the confirmation proceeding.)  The Northern District of Illinois also did *not* agree with, or even analyze, the validity of DPC's absurd interpretation of the derivative work exception. (It could not, given the severe limitations imposed when reviewing whether to confirm an arbitration award.)  As DPC itself explained in its briefing to the court, when conducting that narrow inquiry, the "arbitrator's decision is binding and unreviewable as to the parties to the arbitration."  (Zavin Decl., Ex. 9 at 2-3, 11-12 (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d. 829, 832 (7th Cir. 2003).)  Thus, in adjudicating the rights between DPC and the Estate, the court did not review the merits of the arbitrator's (plainly erroneous) interpretation of § 304(c)(6)(A).

That determination—a matter solely between DPC and the Estate—has no preclusive effect as to Atticus or Sorkin.  *See Baxter*, 315 F.3d at 832 (noting that, despite enforceability of award, any non-party affected by the Award "is free to sue and obtain relief" and "[n]one of them would be bound the award").

> **b)**   **Atticus Is Not Bound by the Judgment Because its Copyright Interest Accrued Prior to DPC's Initiation of the Arbitration**

Second, DPC argues Atticus is a successor in interest to the Estate's property interest in the Novel and is therefore in "privity" with the Estate.  (Doc. 29 at 18.)  DPC's argument fails because Atticus acquired its copyright interest in the Novel (Zavin Decl., Ex. 3) *before* DPC's initiation of the arbitration on March 7, 2019 (Zavin Decl., Ex. 6, Ex. A thereto at 1).  Atticus therefore is not in "privity" with the Estate for preclusion purposes.

As explained in the Restatement, the successor-in-interest privity exception "has *no* application to a successor who acquires his interest *before* the action was commenced concerning the property." RESTATEMENT § 44 cmt. f (emphasis added).  Federal courts across the country, including in this Circuit, have repeatedly and overwhelmingly adhered to this fundamental rule. *See, e.g.*, *Spoleto Corp. v. Ethiopian Airlines Grp.*, 2022 U.S. App. LEXIS 34070, at *4 (2d Cir. Dec. 12, 2022) ("For purposes of res judicata, an assignee is deemed to be in privity with the assignor where the prior action is commenced *before* there has been an assignment.") (emphasis added; internal quotation, citation and alterations omitted); *Noriega v. US Bank, Nat'l Ass'n*, 2017 U.S. Dist. LEXIS 116089, at *14 n.7 (E.D.N.Y. July 25, 2017) ("As the Mortgage was assigned by ASC to USBNA on November 7, 2011, (see Third Assignment)—*prior* to the commencement of the Foreclosure Action on December 5, 2011 (see Foreclosure J.)—ASC was a predecessor in interest to USBNA and is not in privity with USBNA for res judicata purposes.") (emphasis added).[8]

---

[8] *See, also, e.g., Chase Nat'l Bank v. Norwalk*, 291 U.S. 431, 438 (1934) ("[A] decree against a mortgagor with respect to property does not bind a mortgagee whose interest was acquired *before* the commencement of the suit, unless he was made a party to the proceedings.  For in every case where a mortgage was given before the litigation against the mortgagor was instituted, the mortgagee is entitled to have a decision determining his rights rendered on the basis of the facts and considerations adduced by him.") (internal citation omitted; emphasis added);

Illinois courts likewise adhere to this rule.  *See, e.g., Diversified Fin. Sys. v. Boyd*, 678 N.E.2d 308, 311 (Ill. Ct. App. 1997) ("[O]nce the transfer is made, the actions of the transferor no longer bind the transferee.  Where the transferor becomes a party to an action concerning property, after it has been transferred, his becoming a party "does not make him in any sense a representative of his successor in estate.") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 44, cmt. f (1982)); *Smith v. Estate of Womack*, 149 N.E.2d 778, 781 (Ill. 1958) ("A privy to a judgment or decree is one whose succession to the rights of property thereby affected occurred *after* the institution of the particular suit, and from a party thereto.") (emphasis added); *Sweeting v. Campbell*, 119 N.E.2d 237, 240 (Ill. 1954) ("Since she acquired her interest in the property prior to the commencement of the action in McLean County, appellant was not in privity with any of the parties to that action.").  Other state courts and leading commentators agree.[9]

---

*Indus. Credit Co. v. Berg*, 388 F.2d 835, 841-42 (8th Cir. 1968) ("[A] person in privity with a party to a lawsuit, in the sense that he will be bound by a judgment for or against that party under principles of res judicata or collateral estoppel, must acquire his interest in the transaction *after* commencement of the action or rendition of the judgment."  (emphasis added)); *Wight v. Chandler*, 264 F.2d 249, 253 (10th Cir. 1959) (holding that because the plaintiff "acquired the interest now in controversy *prior* to the institution of the action and having owned it ever since, he was not in privity with the defendant Drew," the "default judgment against the defendant Drew did not operate either as res judicata or estoppel by judgment" (emphasis added)); *In re Salas*, 2018 Bankr. LEXIS 2906, at *35 (Bankr. D.D.C. Sept. 24, 2018) ("[T]he facts do not show that collateral estoppel applies on the basis that Max is 'a successor to a party's property interest.' That latter exception applies to successors who acquired their interest in property *after* the commencement of the litigation leading to the judgment declaring ownership of property.") (emphasis added)).

[9] *See, e.g., Gerrity Bakken, LLC v. Oasis Petro. N. Am., LLC*, 915 N.W.2d 677, 684 (N.D. 2018) ("[T]he privity doctrine cannot be applied if the rights to property were acquired by the person sought to be bound before the adjudication."); *Clugston v. Moore*, 655 P.2d 29, 31 (Ariz. Ct. App. 1982) ("The Restatement (Second) of Judgments, §§ 43, 44 (1980), makes it clear that whereas a judgment determining interests in real or personal property has preclusive effect upon a person who succeeds to the interest of a party to the action, the rule has no application to a successor who acquired her interest before the action was commenced concerning the property."); *Mitchell v. Austin*, 94 So. 2d 391, 392-93 (Ala. 1957) (collecting authorities and holding "no one is in privy to a judgment whose succession to the rights of property thereby affected, occurred previously to the institution of the suit"); *see also* 47 AM JUR 2D JUDGMENTS § 566 (2022) ("[A] privy is one who, *after the commencement of the action*, has acquired an interest in the subject

The reason for this timing rule makes good sense.  One who, like Atticus, acquires a property interest in good faith—without any possibility of knowing that a legal proceeding has been instituted affecting the property—is entitled to have a full and fair opportunity to defend its rights.  Simply put, good-faith purchasers deserve legal protection.  As the Supreme Court of Illinois aptly explained, "there is of course the possibility" that the second tribunal "may reach a result inconsistent with, or contrary to, the result which was reached" in the first tribunal. *Sweeting*, 119 N.E.2d at 241.  But potential inconsistency yields to "the importance which our legal system attaches to the overriding principe that every litigant shall have his day in court." *Id.*

c)  **Atticus Is Not Bound Based on "Adequate Representation"**

Third, DPC argues Atticus is bound based on purportedly having been "adequately represented" by the Estate in the prior (and ongoing) litigation.  (Doc. 29 at 18.)  But adequate representation applies only "in certain limited circumstances." *Taylor*, 553 U.S. 880 at 894 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 894 (1996)).  In *Taylor*, the court disclaimed the amorphous concept of "virtual representation" alleged by DPC. *Id.* at 896.  Instead, the concept of adequate representation is confined only to certain formally defined legal relationships, including "properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Id.* at 894 (internal citation omitted).  DPC identifies no such formal legal

---

matter affected by the judgment through or under one of the parties, as by inheritance, succession, purchase, or assignment." (emphasis added)); 47 AM. JUR. 2D JUDGMENTS § 569 (2022) ("[A] person to whom a party to an action has made an assignment or has granted property or an interest therein *before* the commencement of the action is not regarded as in privity with the assignor or grantor so as to be affected by a judgment rendered against the assignor or grantor in the action, unless that person is made a party to the action." (emphasis added)).

relationship, because none exists.  *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 510 (2d Cir. 2019) (rejecting similar "adequate representation" argument). [10]

DPC also complains that Atticus "could have sought to join" the arbitration or "moved to intervene in the Illinois federal action[.]" (Doc. 29 at 19 n.20.) Even if true, DPC's argument is legally irrelevant. "The right to intervene in an action does not, in the absence of its exercise, subject one possessing it to the risk of being bound by the result of the litigation, under the doctrine of res judicata." *Sweeting*, 119 N.E.2d at 240 (quoting 30 AM. JUR. JUDGMENTS § 220); *Show-World Ctr., Inc. v. Walsh*, 438 F. Supp. 642, 648 (S.D.N.Y. 1977) ("The fact that a party has a right to intervene, which it chooses not to exercise, is not enough to make it bound by a judgment in the proceeding in which it possessed such a right." (citing *Brown v. Wright*, 137 F.2d 484, 487 (4th Cir. 1943)); *W. Union Tel. Co. v. Foster*, 247 U.S. 105, 115 (1918)).  Atticus was under no obligation to intervene in a private arbitration in Chicago before a private arbitrator, and does not lose any rights under U.S. copyright law because it chose not to do so.

### 2.    The Judgment Is Not Final for the Purpose of Preclusion

Under Illinois law,[11] preclusion does not apply for an additional reason: the Judgment is not final because the Estate's avenues for appellate review have not been exhausted.[12] The

---

[10] DPC's citation (Doc. 29 at 18) to this Court's decision in *Wendt*, 2017 U.S. Dist. LEXIS 121706, is inapt.  In that case, the Court applied New York law—which does not apply here—and the virtual representation theory that the Supreme Court expressly disclaimed in *Taylor*. *Id.* at *13.

[11] Under federal law, the pendency of an appeal does not deprive a judgment of its preclusive effect.  *See United States v. Int'l Bhd. of Teamsters*, 905 F.2d 610, 621 (2d Cir. 1990).

[12] *See State Bldg. Venture v. O'Donnell*, 940 N.E.2d 1122, 1127 (Ill. 2010) ("[F]inality requires that the potential for appellate review must have been exhausted." (citation omitted)); *People v. Hopkins*, 922 N.E.2d 1042, 1050 (Ill. 2009) ("This court has repeatedly held that for purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted." (internal alterations, quotation marks, and citation omitted)); *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10 (Ill. Ct. App. 1989) (applying rule;

Northern District of Illinois entered the Judgment on January 13, 2023 (Zavin Decl., Ex. 8), so the Estate has the right to appeal to the Seventh Circuit within 30 days, *see* Fed. R. App. P.  4(1)(A). Giving preclusive effect would therefore be premature given the possibility of reversal on appeal.

## III.   DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT

Apparently recognizing the utter lack of merit to its own claim of perpetual exclusive rights, DPC takes aim at the validity of Atticus's stage rights to the Novel, arguing that "the Copyright Act's express terms bar this action" because Ms. Lee allegedly transferred her rights in the Novel to Atticus before "the effective date of termination, April 26, 2016."  (Doc. 29 at 12.) DPC's argument again misses the point.

Atticus is *not* suing DPC for copyright infringement, a scenario in which the hypothetical existence and scope of Atticus's rights would be relevant.  *See, e.g.*, *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (holding only owners of exclusive rights may bring claim for copyright infringement).  Rather, Atticus seeks only a declaration that DPC cannot sue Atticus for copyright infringement.  The *only* issue that matters for purposes of this action, therefore, is whether *DPC* can maintain a claim of holding exclusive rights in the Novel so as to confer it with standing to sue Atticus, Sorkin or anyone else for copyright infringement.  For the reasons explained herein, that claim cannot be maintained against anyone other than the Estate. For purposes of *this* action, whether Atticus has exclusive, nonexclusive, or no rights in the Novel is irrelevant.

Moreover, DPC's claim that Atticus has no rights in the Novel is flat wrong, for at least three reasons.

_____

*Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. Ct. App. 1994) (applying rule).

First, as explained above, pursuant to the No Ice Grant, no grant of rights was made until the option was deemed exercised in December 2018, when the Sorkin Play premiered at the Shubert Theatre.  (*See* Zavin Decl., ¶¶ 4, 11; Ex. 3 § 4; Doc. 1 ¶¶ 29-31.)  This, of course, was *after* the effective date of termination.  *See* 17 U.S.C. § 304(c)(6)(D) (emphasis added).

Second, even if the No Ice Grant were invalid, Atticus, at minimum, has a nonexclusive license to the stock and amateur rights at issue.  Unlike an exclusive license, a nonexclusive license need not be in writing.  3 NIMMER ON COPYRIGHT § 10.03[A][7] (2022) ("[N]onexclusive licenses may therefore be granted orally, or may even be implied from conduct.").  Thus, when "the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license."  *Id.*  Here, following the effective date of termination, Atticus has indisputably exploited the Sorkin Play for years with the permission of the Estate, in exchange for the valuable consideration paid to Ms. Lee and, thereafter, her Estate.  (Doc. 1 ¶¶ 29-31; Doc. 29 at 8-11) (describing efforts by the Estate to exploit the Sorkin Play).)

Third, DPC has no standing to challenge the validity of the No Ice Grant.  As courts have made clear, the derivative rights exception on which DPC exclusively relies "confers no right upon the current grantee [here, DPC,] to have the property offered to him first or upon any given terms as a contractual right of first refusal" *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 866 (S.D.N.Y. 1987), *modified and amended by,* 678 F. Supp. 70 (S.D.N.Y. 1988).  In other words, while an *author* may contest the validity of an agreement subject to § 304(c)(6)(D), the statute confers no such right on the original grantee.[13]

---

[13] Tellingly, DPC does not even suggest that it ever even tried to negotiate a new license with Ms. Lee prior to the effective date of termination.

23

<u>**CONCLUSION**</u>

For the foregoing reasons, Atticus respectfully requests that the Court (1) deny DPC's motion to dismiss, (2) grant summary judgment in Atticus' favor granting the declaratory relief sought in this action, and (3) award Atticus its costs and reasonable attorneys' fees incurred in connection with this lawsuit pursuant to 17 U.S.C. § 505.

Dated: February 6, 2023
       New York, New York

<div style="margin-left: 3em;">

LOEB & LOEB LLP


By:____*/s/ Jonathan Zavin*_____
       Jonathan Zavin
       Wook Hwang
       Frank D. D'Angelo
       345 Park Avenue
       New York, New York 10154
       Tel: (212) 407-4000
       Fax: (212) 407-4990

*Attorneys for Plaintiff Atticus Limited Liability Company*

</div>

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATTICUS LIMITED LIABILITY COMPANY,

       *Plaintiff*,

  and

AARON SORKIN,

       *Involuntary Plaintiff*,

   -against-

THE DRAMATIC PUBLISHING COMPANY,

       *Defendant*.

---

Case No.: 1:22-cv-10147-DLC

**<u>DECLARATION OF</u>**
**<u>JONATHAN ZAVIN</u>**

I, JONATHAN ZAVIN, declare as follows:

1.     I am a member of Loeb & Loeb LLP, attorneys for Plaintiff Atticus Limited Liability Company ("Atticus") in this action.  I respectfully submit this declaration in opposition to the motion to dismiss of Defendant The Dramatic Publishing Company ("DPC") and in support of Atticus's cross-motion for summary judgment.

2.     Attached hereto as **Exhibit 1** is a true and correct copy of an agreement between Harper Lee and DPC dated June 25, 1969 (the "DPC Grant").

3.     Attached hereto as **Exhibit 2** is a notice of termination dated April 28, 2011 that Harper Lee served on DPC pursuant to 17 U.S.C. § 304(c).

4.     Attached hereto as **Exhibit 3** is a true and correct copy of an agreement between Harper Lee and No Ice, Inc. (f/k/a Rudinplay, Inc.) ("No Ice") dated June 29, 2015 (the "No Ice Grant").

23472280

5.      Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of an agreement between No Ice and Aaron Sorkin dated January 19, 2017, consisting of the Approved Production Contract for Plays (a form agreement promulgated by the Dramatists Guild of America) and a rider amending and supplementing its standard terms (collectively, the "Sorkin Agreement").  Certain financial terms of the Sorkin Agreement that are not relevant to the parties' motions have been redacted, but will be provided to the Court upon request.

6.      Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of an agreement between No Ice and Atticus dated December 12, 2018 (the "Atticus Assignment").

7.      Attached hereto as **<u>Exhibit 6</u>** is a true and correct copy of a Disposition for Application of Modification Award entered by the American Arbitration Association and dated February 16, 2022 (the "Award").

8.      Attached hereto as **<u>Exhibit 7</u>** is a true and correct copy of the Motion to Confirm Arbitration Award and Enter Judgment filed by DPC on October 19, 2021, in the United States District Court of the Northern District of Illinois.

9.      Attached hereto as **<u>Exhibit 8</u>** is a true and correct copy of the Final Judgment Order entered by the United States District Court for the Northern District of Illinois on January 13, 2023 (the "Judgment").

10.      Attached hereto as **<u>Exhibit 9</u>** as a true and correct copy of DPC's Response to Respondent's Motions to Vacate Arbitration Awards, Reply in Support of Motion to Confirm Awards and Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify, which was filed in the United States District Court for the Northern District of Illinois on February 16, 2022.

11.    The stage adaptation of Harper Lee's *To Kill a Mockingbird* produced by Atticus and written by Aaron Sorkin premiered at the Shubert Theatre on Broadway on December 13, 2018.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 6, 2023.

*/s/ Jonathan Zavin*
JONATHAN ZAVIN

# EXHIBIT 3

**RUDINPLAY, INC.**
120 West 45th Street, 10th Floor
New York, New York  10036

As of  29 June, 2015

Ms. Harper Lee
c/o Andrew Nurnberg Associates International
20-23 Greville Street, London EC 1N 8SS
United Kingdom;

Re:    "To Kill a Mockingbird" Live Stage Rights

Dear Ms. Lee:

This letter agreement (**"Agreement"**) sets forth the material deal terms that have been agreed upon between Rudinplay, Inc. (**"Producer"**) and you (**"Author"**) in connection with the live stage and ancillary rights in and to the novel entitled "To Kill a Mockingbird" written by you (the **"Novel"**).

1.       Agency.

Commencing with the date of this Agreement and continuing for a period of twelve months thereafter, Author designates Producer as her sole and exclusive agent (the "Agency") to procure a playwright (the "Playwright") to create a dramatic adaptation of the Novel for presentation as a live stage play (the "Play").  The choice of the Playwright shall be subject to the written approval of Author in her sole and absolutely unfettered discretion.  Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof during the term of the Agency.  In the event the Producer fails to procure a Playwright acceptable to the Author during the term of the Agency, then upon the expiration of the Term the Agency shall terminate absolutely without further notice.  For the avoidance of any doubt, the written approval of the Playwright by the Author is a condition precedent to any grant of rights to the Producer in the Novel pursuant to this agreement.

2.       Grant of Rights.

(a)       Upon having obtained the written approval of the Author to the Playwright, Author shall thereby grant to Producer and its licensees and assignees the sole and exclusive option (the "Option") to acquire, on an exclusive (subject to Paragraph 2 (b) below), worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights, including without limitation: (i) the right to create, develop, produce and present a live stage play (the "Play") based on and using the Work and any and all elements thereof (including without limitation the right to present the Play in first and non-first class touring and sit-down productions), (ii) the right to use the title "To Kill a Mockingbird" in connection with the Play, and (iii) the right to exploit all customary advertising rights in all media, merchandising rights and stock and amateur licensing rights (subject to Paragraph 1(b) below).  It shall be a condition precedent to the approval of the Playwright that the Playwright shall agree in writing that any grant of stock and amateur licensing rights is to be contingent on: (i) an annual professional performance of the Play in Monroeville, AL,  (ii) a prohibition against any license for performance of the Play by or under the auspices of the Monroe County Museum or to any successor or affiliated entity, organization or individual, and (iii) a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL.

(b)       Producer acknowledges that pursuant to an agreement (the **"Prior Agreement"**) dated June 26, 1969 between Author and The Dramatic Publishing company (**"DPC"**), Author granted DPC the right to create a play (the **"Prior Adaptation"**) based on the Novel, and to exploit the amateur acting rights (as defined in the

NY1301454.6_076169-10002

Prior Agreement) in the Prior Adaptation.  Author represents that it has terminated the Prior Agreement effective April 26, 2016.  Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere.  The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

3.      Option Periods and Payments.

(a)      In consideration for Author's grant of the Option, Producer shall pay to Author the sum of $100,000, payable upon the Author's written approval of the Playwright.  The initial term of the Option shall commence upon payment of the $100,000.00 and shall continue for twenty-four (24) months thereafter.  Producer may extend the Option term for an additional twelve (12) months by paying to Author $50,000.  Producer shall have the right to further extend the Option term for up to an additional consecutive six (6) months solely to accommodate the availability of a star, director or theater.  The foregoing Option extension payment shall be due prior to the expiration of the initial Option period.  The initial Option period or then-current extension period (as applicable) will be extended by the number of days of performances of any workshop, regional theater or other developmental production ("**Developmental Production**") that occurs during such period, plus sixty (60) days. The initial Option period and any extensions thereof as set forth above shall be referred to herein collectively as the "**Option Period**".

The initial Option payment shall be non-returnable, and shall be recoupable from Author's royalties.  The Option extension payment shall be nonreturnable, and shall be recoupable from half of Author's royalties after recoupment

4.      Exercise of Option.  The initial commercial first class production of the Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright (the "**Playwright Agreement**") shall be referred to herein as the "**Initial Production**".  The Option will be deemed exercised if the first paid public performance of the Initial Production is presented within the Option Period. Producer shall have the right to present a pre-Broadway or pre-West End developmental production, either at a not-for-profit theater or as a commercial engagement.

5.      Royalties.

(b)      On a company-by-company basis, with respect to each production of the Play that is presented by or under license from Producer prior to the expiration of Producer's production rights under the Playwright Agreement in the applicable territory (each, a "**Production**") and for which royalties are based on gross weekly box office receipts, less customary deductions ("**GWBOR**"), or Company Share (as customarily defined), Author shall be entitled to receive a royalty equal to an amount not less than two-thirds (2/3) of 6% of GWBOR or company share, increasing to 12% upon 110% of recoupment (as customarily defined in the theatrical industry). Any requirement hereunder that Author receive no less than a certain share of any amounts (e.g., royalties, Subsidiary Rights revenues) payable to the Playwright shall be understood to apply to the amounts payable to the original Playwright, it being understood that in the event Producer subsequently engages any additional or replacement writer and is required to pay amounts to such party in excess of (i.e., not deducted from) the amounts payable to the original Playwright, Author shall not be entitled to its minimum share of such excess.  Furthermore, in no event will Author be entitled to share in, or receive additional compensation as a result of, any compensation payable to the Playwright for services rendered by such party in connection with the Play in a capacity other than as an author of the Play, provided that such compensation is not designed to reduce Author's compensation hereunder.

(c)      Notwithstanding the foregoing, with respect to any Developmental Production from which Playwright is entitled to receive a royalty, Author's royalty shall be paid out of, and not in addition to, Author's royalty, and Author shall receive not less than two-thirds (2/3) of the Playwright's royalty from such Developmental Production, it being understood and agreed that Author shall not be entitled to receive a royalty from any Developmental Production from which Playwright is not entitled to receive a royalty.

(d)     Notwithstanding anything to the contrary contained in this Paragraph 5, Author agrees that if Playwright agrees to any alternative royalty calculation (including royalties based on weekly operating profits) and/or any adjustment, deferral, waiver, amortization and/or reduction of percentage royalties and/or minimum weekly guarantees with respect to any Production, Author shall in good faith also consider agreeing to such calculation, adjustment, deferral, waiver, amortization or reduction with respect to Author's royalties under this Paragraph 4 on the same proportionate basis and to the same extent. For the avoidance of doubt, Author shall not receive both a royalty and a share of Subsidiary Rights revenues from the same production of the Play.

6.     Subsidiary Rights. Author shall be entitled to two-thirds (2/3) of 100% of the Playwright's Net Compensation from the sale or other disposition of Subsidiary Rights (as customarily defined) in and to the Play. For purposes hereof, "**Playwright's Net Compensation**" shall be defined as all gross receipts actually received by Playwright from the sale or other disposition of all Subsidiary Rights in and to the Play, less customary commissions payable to a stock and/or amateur licensing agent or any other agent or representative (not to exceed 10% of such gross receipts in the aggregate, except with regard to amateur licenses, for which such commissions shall not exceed 20% of such gross receipts in the aggregate), any participations therein payable to Producer (which shall be as set forth in the Minimum Basic Production Contract, or the Approved Production Contract, of the Dramatists Guild), and any share that Author grants to a director and/or choreographer of the Play, Actors Equity, a theater that presents a Developmental Production or any other third party.

7 .     Net Profits. In addition to the royalty set forth above, Producer shall pay (or cause to be paid) to Author 2.5% of 100% of the net profits of the company ("Original Company") which finances and presents the Initial Production. "Net profits" shall be computed, defined and paid in the same manner as for investors in the Original Company.

8.     Merger. If Producer presents at least twenty-one (21) paid public performances (including an official press opening but not including previews) of the Play on Broadway or the West End of London, then the Novel and the Play shall "merge" (as such term is customarily understood in the live stage theatrical industry) and the rights granted by Author under this agreement shall become exclusively granted to Producer and Playwright (as their respective interests may appear) for a period of seven (7) years after there has been a hiatus of 90 days in which no productions of the Play have been presented in the United States and Canada or the United Kingdom under the auspices of Producer (the "Exclusive Period"), and thereafter on a non-exclusive basis for the duration of the original and all renewal and extended terms of all copyrights in the Novel. Producer hereby agrees that, in the event merger occurs as set forth in this paragraph 6, Producer shall be deemed to have assigned to Playwright all rights in the Novel granted to Producer hereunder, subject, however, to Producer's production and/or other rights in and to the Play as set forth in this agreement and in Producer's agreement with the Playwright. Producer agrees that the rights granted to Producer under this agreement will terminate unless merger occurs within 12 months from the exercise of the Option.

9.     Holdback. Except as provided below, commencing with the date of this Agreement and continuing the earliest of (i) the termination of the Agency for failure to have obtained the written approval of the Author to a Playwright during the term of the Agency, (ii) Producer's failure to exercise the Option prior to the expiration thereof or failure to achieve merger as set forth above prior to the expiration of Producer's production rights hereunder, and (iii) if the Option is timely exercised and merger occurs, for the duration of the Exclusive Period, Author agrees that she will not authorize the development, marketing and/or production of any live stage production or other live show or audiovisual production that is based on the Novel or any portion thereof (subject to Paragraph 2(b) above).

10.     Billing. Author will receive billing credit wherever and whenever Playwright is afforded billing credit, except for radio, television, mobile and internet banner and pop-up advertising, vehicular advertising and print advertisements of one-quarter page or less (unless any party receives billing credit in such excluded advertising other than Playwright, director, producers, stars and theater), and subject to customary exclusions for award and congratulatory ads, use of critics' quotes and the customary right to use a billing box or movie-style run-on billing. Such credit will appear immediately following Author's credit, in a type size no less than 100% of the

size of Playwright's credit, in substantially the following form: "Based on the novel 'To Kill a Mockingbird' written by Harper Lee". All other billing terms not expressly provided herein shall be in Producer's sole discretion.

  11. <u>Representations, Warranties and Indemnities</u>.

    (e) Author hereby represents and warrants that: (i) Author has not assigned or licensed to any person and/or entity, and has not entered into any agreements to place any lien or encumbrance upon, the rights in the Novel that would derogate from or conflict with the rights granted hereunder (subject to the provisions of Paragraph 2(b) above); (ii) there are no claims, litigation or other proceedings pending or threatened which could in any way conflict with the rights granted hereunder; (iii) the Novel, except to the extent that it is based upon or taken from material in the public domain, is wholly original with Author; (iv) Author has the sole and full right and authority to enter into this Agreement and to grant the rights granted hereunder; and (v) there are no third parties from whom any clearances, releases, consents and/or permissions may be necessary for Producer to obtain to exploit any rights to the Work granted hereunder, and the exercise of such rights will not violate any personal, contractual, proprietary or other rights of any third party.

    (f) Author agrees to indemnify and hold harmless Producer and Playwright, and their respective affiliates, officers, directors, employees, agents, successors, assignees, licensees and any other parties claiming by or through Producer and/or Playwright, from and against any and all third party claims (including any amounts paid in settlement, subject to the indemnitor's prior written consent, not to be unreasonably withheld), liability, demands, suits, losses, costs, expenses (including reasonable attorneys' fees and disbursements), damages, judgments or recoveries (collectively, **"Claims"**) which may be made against or suffered or incurred by Producer, Playwright and such others arising out of or in connection with any breach of any representations, warranties or agreements made by Author hereunder

    (g) Producer shall indemnify and hold harmless Author (or require in writing any assignee(s) and/or licensee(s) of Producer's rights hereunder to indemnify and hold harmless Author), from and against any and all Claims which may be made against or suffered or incurred by Author arising out of or in connection with the development, production and exploitation of the Play and which do not arise from or in connection with a breach of Author's representations, warranties or agreements contained herein.

  12. <u>Approvals</u>.  Author shall have the absolute and unconditional right to approve the Playwright for the Play.  Such right of approval of Author hereunder shall be a right of prior, written approval, and Author's exercise of such right shall be within her sole and unfettered discretion..  Author shall also have the right to review the script of the Play and to make comments which shall be considered in good faith by the Playwright, and the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters.  If the Author believes that the Play does so derogate or depart, or alter characters, Producer will be given notice thereof as soon as possible, and will be afforded an opportunity to discuss with Owner resolutions of any such concerns.

  13. <u>Breach</u>.  Anything herein to the contrary notwithstanding, in the event of any default in the payment of any sum of money or other default by Producer or Playwright, as their respective interests may appear, under this Agreement, if Author has provided reasonable notice of such default and a reasonable opportunity to cure such default, Author shall be entitled to an award of reasonable legal fees incurred in the enforcement of her rights hereunder in addition to her remedies at law and in equity.

  14. <u>House Seats; Travel</u>.  For the official press opening performance of each of the initial Broadway and West End Productions, Author shall be entitled to receive two (2) complimentary tickets to such performance along with accompanying complimentary passes to any opening night party.  If such performance occurs more than 100 miles from the current residence of either Author or her designees who will use such tickets, Producer will provide each such person  with (i) one (1) business class roundtrip airfare, (ii) ground transportation to and from airports, (iii) first class hotel accommodations for 2 nights, and (iv) a per diem of $125.

15.     Long-Form Agreement.  The parties hereto intend to enter into a long-form agreement containing the foregoing terms at such time as the parties so elect, which agreement will also contain all other terms and conditions customarily included in agreements of this nature, subject to good faith negotiations.

16.     Miscellaneous.  All matters concerning this Agreement and its validity, performance or breach shall be governed by the law of the State of New York applicable to contracts made and performed entirely therein.  This Agreement may be executed in several counterparts, all of which when signed shall constitute a single agreement.  Facsimile and PDF copies of this Agreement and signatures thereon shall be valid and binding on the parties.

Please confirm your agreement to the foregoing by signing your name where indicated below.

Very truly yours,

RUDINPLAY, INC.

By: _____
    An Authorized Officer

ACCEPTED AND AGREED:

By: _____
    HARPER LEE

# EXHIBIT 5

Assignment from **NO ICE, INC.**, formerly known as **RUDINPLAY, INC.** ("Assignor"), c/o Joey Parnes Productions LLC, 234 West 44th Street, Suite 800, New York, NY 10036 to **ATTICUS LIMITED LIABILITY COMPANY** ("Assignee"), c/o Joey Parnes Productions LLC, 234 West 44th Street, Suite 800, New York, NY 10036.

WHEREAS, Assignor, pursuant to an agreement with Harper Lee dated as of June 29, 2015 and an agreement with Aaron Sorkin dated as of January 19, 2017 and amended by an amendment dated as of May 7, 2018 (collectively, the "Rights Agreement"), acquired certain rights to produce the play written by Aaron Sorkin based on the novel by Harper Lee entitled "To Kill a Mockingbird" (the "Play") and exploit customary rights in connection therewith;

WHEREAS, except as otherwise expressly set forth herein, Assignor desires to assign all of its rights and obligations solely in its capacity as producer pursuant to the Rights Agreement and any and all of Assignor's other rights and obligations in its capacity as producer which it may have duly acquired by assignment or which have been granted to it under all agreements relating to the Play (collectively, the "Contracts") to Assignee, and Assignee desires to acquire all such rights and obligations from Assignor.

NOW, THEREFORE, the parties hereto agree as follows:

1.  Except as otherwise expressly set forth herein, Assignor hereby assigns to Assignee all of Assignor's rights and obligations solely in Assignor's capacity as producer (as set forth in Article IV of Assignee's operating agreement (the "Operating Agreement") and, for clarity, excluding Assignor's rights and obligations derived from services in other capacities as set forth in Section 15.1.9 of the Operating Agreement) pursuant to the Contracts.  Notwithstanding the foregoing, any rights to produce and/or exploit any audiovisual versions of the Play (other than customary advertising, promotional and archival rights in connection with the Play) are excluded from the foregoing assignment.

2.  Assignee hereby accepts such assignment and assumes, covenants and agrees to fully and faithfully perform and discharge each and every covenant, duty, obligation, liability and term on the part of Assignor to be performed in and under or pursuant to the Contracts relating to periods from and after the date hereof.

3.  Each party hereto represents and warrants to the other party that such representing party: (a) has full power and authority to enter into this Assignment, deliver and perform its obligations hereunder; and (b) the execution of this instrument will not violate any provision of any agreement or instrument to which it is a party or by whose terms it is bound.  Notwithstanding the preceding clause (b), if any Contract contains a provision which prohibits assignment, the existence of such provision shall not constitute a breach hereof.  In such event, Assignor shall afford Assignee all of the benefits of such Contract and Assignee shall assume all of the obligations pertaining thereto.

4.  Assignee hereby indemnifies Assignor and agrees to hold Assignor harmless from any and all claims, losses, expenses, liabilities and/or damages arising out of the Contracts.

5.  This Assignment constitutes the entire agreement between the parties with respect to the subject matter hereof, and may be amended only be a written agreement signed by each party.

1

484886.1A
011419

**JA-232**

6. This Assignment and the rights and liabilities contained herein, shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7. This Assignment may be executed in counterparts, with electronically forwarded signatures, each of which shall be deemed an original, and which shall constitute one and the same instrument.

8. This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the parties have agreed as of December 12, 2018.

**ASSIGNOR:**                                                        **ASSIGNEE:**

**NO ICE, INC.**                                                     **ATTICUS LIMITED LIABILITY COMPANY**

By: _____          By: _____
       Authorized Signatory                                     Authorized Signatory