# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

## DEFERRED JOINT APPENDIX
## VOLUME III of V (JA234-342)

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*Counsel for Defendant-Appellant*

Wook Hwang
SHEPPARD MULLIN
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Plaintiff-Appellee*

*(For Continuation of Appearances See Inside Cover)*

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Keane Barger
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203

*Counsel for Plaintiff-Appellee*

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

### SPECIAL APPENDIX (SPA1-59)

Opinion and Order, dated April 27, 2023 (ECF No. 65) ...................................SPA-1

Opinion and Order, dated July 24, 2023 (ECF No. 87) ..................................SPA-35

Order, dated July 25, 2023 (ECF No. 88) ........................................................SPA-46

Judgment, dated August 1, 2023 (ECF No. 92) .............................................SPA-49

Amended Judgment, dated August 28, 2023 (ECF No. 100) ........................SPA-51

17 U.S.C. § 304 ...............................................................................................SPA-54

### DEFFERED JOINT APPENDIX VOLUME I of V (JA1-173)

U.S. District Court Southern District of New York,
Civil Docket for Case No. 1:22-cv-10147 .........................................................JA-1

Complaint, dated November 30, 2022 (ECF No. 1) .........................................JA-17

Notice of Motion, dated January 23, 2023 (ECF No. 28)..................................JA-31

Defendant Dramatic Publishing Company's Memorandum
in Support of Its Motion to Dismiss Atticus LLC's Complaint,
dated January 23, 2023 (ECF No. 29) ...............................................................JA-33

Declaration of Kevin Tottis, dated January 23, 2023 (ECF No. 30) ................JA-63

   Final Award of Arbitrator in American Arbitration Association
   Case No. 01-19-0000-7463, dated January 28, 2022
   (ECF No. 30-2) ...............................................................................................JA-66

### DEFFERED JOINT APPENDIX VOLUME II of V (JA174-233)

   Agreement between Harper Lee and Dramatic Publishing Co.,
   dated June 25, 1969 (ECF No. 30-4) ...........................................................JA-174

   Notice of Termination of Transfer Extended Renewal Term,
   dated April 28, 2011 (ECF No. 30-7) ..........................................................JA-179

Notice of Cross-Motion for Summary Judgment,
dated February 6, 2023 (ECF No. 34) ............................................JA-186

Plaintiff's Statement of Undisputed Material Facts,
dated February 6, 2003 (ECF No. 35) ............................................JA1-88

Plaintiff's Memorandum of Law (1) in Opposition to Defendant's
Motion to Dismiss and (2) in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated February 6, 2023 (ECF No. 36) ....................JA-191

Declaration of Jonathan Zavin, dated February 6, 2023 (ECF No. 37)...........JA-222

    Agreement between Harper Lee and Rudinplay, Inc.,
    dated June 29, 2015 (ECF No. 37-3) ........................................JA-225

    Agreement between No Ice, Inc. and Atticus LLC,
    dated December 12, 2018 (ECF No. 37-5) ................................JA-231

**DEFERRED JOINT APPENDIX VOLUME III of V (JA234-342)**

Motion to Confirm Arbitration Award and Enter Judgment, Case
No. 1:21-CV-05541 (N.D. Ill. October 19, 2021) (ECF No. 37-7)...........JA-234

**DEFERRED JOINT APPENDIX VOLUME IV of V (JA343-531)**

Final Judgment Order, Case No. 1:21-CV-05541 (N.D. Ill. January
13, 2023) (ECF No. 37-8)........................................................JA-343

Dramatic Publishing Company's Response to Respondents' Motions to Vacate
Arbitration Awards, Reply in Support of Motion to Confirm Awards and
Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify,
Case No. 1:21-CV-05541 (N.D. Ill., February 16, 2022) (ECF No. 37-9) JA-354

Dramatic Publishing Company's Reply in Support of Its Motion
to Dismiss Atticus LLC's Complaint, dated February 15, 2023
(ECF No. 47)....................................................................JA-390

Dramatic Publishing Company's Response to Motion for Summary
Judgment, dated February 21, 2023 (ECF No. 50)..........................JA-405

Declaration of Kevin Tottis, dated February 21, 2023 (ECF No. 52) .............JA-433

Dramatic Publishing Company's Response to Plaintiff's Statement of Undisputed Material Facts, dated February 22, 2023 (ECF No. 57)..............JA-443

Declaration of Kevin Tottis, dated February 28, 2023 (ECF No. 60) ............JA-448

    Email from Matthew Lembke to Jonathan Zavin,
    dated March 7, 2019 (ECF No. 60-27) ......................................................JA-458

Dramatic Publishing Company's Statement of Additional Facts,
dated February 28, 2023 (ECF No. 61) ...........................................................JA-461

Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated March 3, 2023 (ECF No. 63).........................JA-473

Defendant Dramatic Publishing Company's Answer to Plaintiff
Atticus LLC's Complaint, dated May 11, 2023 (ECF No. 72) ......................JA-489

Order, dated May 25, 2023 (ECF No. 75) .......................................................JA-507

Notice of Dramatic Publishing Company's Motion for Summary
Judgment, dated June 2, 2023 (ECF No. 76)...................................................JA-509

Memorandum of Law in Support of Dramatic Publishing Company's
Motion for Summary Judgment, dated June 2, 2023 (ECF No. 77)...............JA-511

**DEFERRED JOINT APPENDIX VOLUME V of V (JA532-736)**

Declaration of Kevin Tottis, dated June 2, 2023 (ECF No. 78) ....................JA-532

    Email from Scott Rudin to Alvin Deutsch, dated January 23, 2019
    (ECF No. 78-1) ...........................................................................................JA-535

    Arbitration Demand file by Dramatic Publishing Co. against
    The Estate of Harper Lee, dated March 7, 2019 (ECF No. 78-3) .............JA-536

    Letter from Jonathan Zavin to Matthew Lembke,
    dated April 24, 2019 (ECF No. 78-6).........................................................JA-563

Declaration of Christopher Sergel III,
dated June 2, 2023 (ECF No. 79) ....................................................................JA-565

    Letter from Jonathan Zavin to Dramatic Publishing Co., dated
    January 9, 2019 (ECF No. 79-1)..................................................................JA-568

Letter from Matthew Lembke to Dramatic Publishing Co., dated January 15, 2019 (ECF No. 79-2)................................................................JA-572

Defendant Dramatic Publishing Company's Statement of Undisputed Material Facts, dated June 2, 2023 (ECF No. 80).............................................JA-576

Reply in Further Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 14, 2023 (ECF No. 83)..........................JA-584

Transcript of Conference held on May 23, 2023 before Judge Denise L. Cote (ECF No. 84).........................................................................................JA-599

Joint Status Report, dated June 16, 2023 (ECF No. 86)..................................JA-618

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-2) ....................................................................................JA-622

Excerpts of Post-Hearing Brief of The Estate of Harper Lee and Harper Lee LLC, American Arbitration Association Case No. 10-19-0000-7463, dated July 28, 2021, and Excerpts of Respondents' Motion to Vacate Corrected Interim Award of Arbitration and Response in Opposition to Petitioner's Motion to Confirm Corrected Interim Award, Case No. 1:21-CV-05541 (N.D. Ill., January 14, 2022) (ECF No. 86-3) ............................................................JA-631

Email from Jonathan Zavin to Matthew Lembke, dated February 1, 2021 (ECF No. 86-4) ....................................................................................JA-648

Wayback Machine captures of February 5, 2021 and March 4, 2021 U.S. Copyright Office webpage (ECF No. 86-5) ..............................JA-653

Emails from Jonathan Zavin, dated between March 23, 2019 and July 27, 2021 (ECF No. 86-6) .......................................................................JA-658

Email from Jonathan Zavin to Matthew Lembke, dated September 25, 2020 (ECF No. 86-7) ..............................................................................JA-701

Email from Jonathan Zavin to Matthew Lembke, dated April 6, 2021 (ECF No. 86-8) ....................................................................................JA-703

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-9) ....................................................................................JA-705

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-10) .................................................................JA-708

Email from Jonathan Zavin to Matthew Lembke, dated May 20, 2021 (ECF No. 86-11) .................................................................JA-712

Email from Jonathan Zavin to Matthew Lembke, dated May 26, 2021 (ECF No. 86-12) .................................................................JA-714

Email from Jonathan Zavin to Matthew Lembke, dated June 14, 2021 (ECF No. 86-13) .................................................................JA-717

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-14) .................................................................JA-719

Notice of Appeal, dated August 30, 2023 (ECF No. 102)..............................JA-721

Opinion and Order, dated October 31, 2023 (ECF No. 109)..........................JA-723

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) ) ) | |
| Petitioner, | ) ) | Case No. 1:21-cv-5541 |
| v. | ) ) | |
| THE ESTATE OF NELLE HARPER LEE, BY AND THROUGH ITS PERSONAL REPRESENTATIVE TONJA CARTER & HARPER LEE, LLC, | ) ) ) ) ) ) | |
| Respondents. | ) | |

## MOTION TO CONFIRM ARBITRATION AWARD AND ENTER JUDGMENT

Petitioner, the Dramatic Publishing Company ("Dramatic"), pursuant to Federal Arbitration Act (FAA), 9 U.S.C. § 9, moves this Court to confirm an arbitration award issued in AAA Case No.: 01-19-0000-7463 on October 18, 2021 in its favor and against Respondents, The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter, and Harper Lee, LLC ("collectively, "the Respondents"). Dramatic is concurrently seeking leave to file the Arbitration Award under seal for a limited period. Although Dramatic believes that little to none of the award ultimately should be placed under seal consistent with prevailing Seventh Circuit authority, under the terms of the parties' protective order and out of an abundance of caution, Dramatic has attached a highly-redacted version of the arbitration award as Exhibit A.

In support of its Motion, Dramatic states as follows:

## PARTIES

1.       Dramatic, established in 1885, is a small family-owned company located in Woodstock, Illinois, engaged in the business of licensing stock and amateur theatrical rights and in publishing plays.

2.       Nelle Harper Lee ("Harper Lee" or "Ms. Lee") was a resident of Monroe County, Alabama until her death on or around February 19, 2016.

3.       Upon information and belief, Respondent Tonja B. Carter is a citizen of Monroe County, Alabama. Ms. Carter has appeared in the underlying arbitration as the Personal Representative of the Estate of Nelle Harper Lee (the "Estate").

4.       Respondent Harper Lee, LLC is an Alabama Limited Liability Company, with offices located at 44 East Claiborne Street, Monroeville, AL 36460.

## JURISDICTION AND VENUE

3.       This motion seeks to confirm a final arbitration award entered in AAA Case No.: 01-19-0000-7463 on October 18, 2021 under the FAA, 9 U.S.C. §§ 6 and 9. Section 9 of the FAA authorizes suits in federal district court to enforce arbitration awards in cases arising out of contracts directed to transactions involving interstate or foreign commerce, 9 U.S.C. §§ 1, 2.  The agreement at issue in the underlying arbitration proceeding is a contract involving interstate and foreign commerce. This motion has been brought within one year after the arbitration award was made as provided under § 9 of the FAA.

4.       This Court has subject matter jurisdiction over this motion under 28 U.S.C. § 1331 because it involves a federal question arising under the civil laws of the United States and under 28 U.S.C. § 1338 because the underlying arbitration involved claims under the Copyright Act, 17 U.S.C. § 101, *et seq.*  The Court also has jurisdiction under 28 U.S.C. § 1332 (c)(1), as complete diversity of citizenship exists between Dramatic, which is a citizen of Illinois on the one hand, and Harper Lee

(deceased), her Estate, Tonja Carter and Harper Lee, LLC, which are (or in the case of Ms. Lee, had been) citizens of Monroe County, Alabama. The amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Personal jurisdiction and venue are proper in this district under 9 U.S.C. § 9. The Agreement entered into by Dramatic and Harper Lee, dated June 25, 1969 ("the Agreement") required the parties to arbitrate their dispute in Chicago, Illinois, under the rules of the American Arbitration Association. *See* Agreement, attached as Exhibit B, ¶ 4(k). Because of the Covid Pandemic, the parties agreed to conduct proceedings over Zoom. /s/The arbitrator, William T. McGrath, was located in Chicago. Claimant is located in Woodstock, Illinois and its lead counsel are located in Chicago. Because the arbitration was conducted in Chicago, the arbitration award was entered in Chicago and the underlying agreement foresees Chicago as venue, it satisfies the venue requirement of § 9 of the FAA.

## STATEMENT OF FACTS

6.      In 1969, Dramatic entered into the Agreement with Harper Lee under which she agreed that Dramatic would create a play based upon her novel *To Kill a Mockingbird*.

7.      Pursuant to the terms of the Agreement, then-president of Dramatic, Christopher Sergel, Sr. (now deceased), authored an adaptation of *To Kill a Mockingbird* for the stage.

8.      Ms. Lee died in February 2016.

9.      On March 7, 2019, Dramatic filed a Demand for Arbitration with the American Arbitration Association seeking to provide for the administration of a controversy between Dramatic and the Estate arising out of the Agreement.

10.     Specifically, Dramatic alleged the Estate breached several provisions of the Agreement, including the right to license the Sergel version for professional productions, with the

exception of Broadway and "first class" productions, and sought declaratory relief, injunctive relief, damages and an award of reasonable attorneys' fees and costs.

11.     Later, Dramatic filed an Amended Arbitration Demand, adding a claim of Intentional Interference with Contract and sought declaratory relief, injunctive relief, damages, punitive damages and an award of reasonable attorneys' fees and costs.

12.     The Estate and Harper Lee, LLC, in turn, asserted claims against Dramatic, alleging that (1) Dramatic breached the Agreement and (2) Dramatic infringed the copyright to the novel *To Kill a Mockingbird* for doing precisely what it had been doing for decades.

13.     Beginning in mid-March 2021 and during the next four months, the parties engaged in five weeks of arbitration hearings before Mr. McGrath where he received several hundred exhibits and heard live testimony via Zoom from over a dozen witnesses. (The parties originally agreed to a panel of three arbitrators, but later agreed upon a single arbitrator, *i.e.*, Mr. McGrath, prior to the hearing.)

14.     In August, during closing arguments, Mr. McGrath said that if he decided to award attorneys' fees, he would deem his substantive award an "interim award" and would conduct further proceedings on the issue of attorneys' fees.[1]  Neither party objected to the proposal so, accordingly,

---

[1] MR. TOTTIS: Mr. McGrath, just in terms of scheduling, and this is kind of a procedural question, will the -- AAA rules say after you close the evidence, you have 30 days to give us an order. I know there are requests for attorneys' fees, so I don't know how that impacts on the order. I am just trying to figure out timing here

 MR. MCGRATH: Yes, I think the best way to do that is once I close the evidence, I will have 30 days to issue a ruling on the merits, and the best way to do this is I will identify my ruling as an interim ruling. I will have decided in that whether there is to be attorneys' fees one way or the other, and that will enable me by not -- if any, I mean, so if there is no attorneys' fees, then I will issue a final ruling. If there is to be attorneys' fees, I will issue an interim ruling, and we will take up the question of attorneys' fees in subsequent submissions.

Exhibit C, Aug. 5, 2021 Tr. 5064:14-5065:9.

under Rules 41 & 45 of the AAA rules,[2] the procedure has been adopted by agreement.

**15.**     On October 18, 2021, Mr. McGrath issued an arbitration award (Award), finding (i) that the Estate and its agents beached the Agreement, (ii) Harper Lee LLC and its agents intentionally interfered with Dramatic's contractual relations with its licensees in the United States and in the United Kingdom, and awarding declaratory, injunctive and monetary relief. The relevant portions of the award that follow are set forth exactly as expressly set forth by Mr. McGrath:

### A. Monetary Relief

1.     The Estate shall pay to Dramatic actual damages in the amount of $172,500 for the breach of contract resulting in the cancellation of the Jonathan Church Productions licensed performances in the United Kingdom. See, Section III.J., *infra.*

2.     The Estate shall pay to Dramatic actual damages in the amount of $12,727 for the breach of contract resulting from the forced cancellations of stock and amateur licensee's performances in the United States. See, Section III.J., *infra.*

3.     The Estate is liable to Dramatic for tortious interference with contract. The monetary damages resulting from the tortious interference are the same as the damages resulting from the Estate's breach of contract. As a result, the Estate shall pay a single damage award to Dramatic in the amount of $185,227, as damages for breach of contract and tortious interference. See, Section III.J., *infra.*

4.     The LLC is not jointly and severally liable for the breach of contract or for the tortious interference with contract.

5.     No punitive damages are awarded to Dramatic. See, Section III.J., *infra.*

6.     Dramatic is awarded its reasonable attorneys' fees in an amount to be determined and set forth in the Final Award. The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of attorneys' fees.

7.     Dramatic is awarded its reasonable costs incurred, including but not limited to all court reporter fees, all fees paid to Arbitration Place, and such other reasonable costs in the Arbitrator's discretion. The arbitrator's discretion in awarding costs will be guided by, but not controlled by, 28 U.S.C. §1920. The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of reasonable costs.

---

[2] With respect to the timing of a final award, AAA Rule 45 states, in part, "[t]he award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing . . ." Rule 41 states, "[a]ny party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object. Under these rules, the parties agreed to alter the timing of a final award and permit Mr. McGrath to issue an award directed to the merits and to address the quantification of attorneys' fees in later proceedings or, alternatively, they waived any objection to Mr. McGrath's bifurcation of his resolution on the merits and later the quantification of attorneys' fees.

8.  The hearings are reopened to allow Claimant to submit its Petition for attorneys' fees and costs by **November 1, 2021**, and for the Respondents to submit their Response by **November 15, 2021**. After the petition and response are received, the hearings will be declared closed and the Final Award will be issued within 30 days.

9.  The administrative fees and expenses of the AAA and the compensation and expenses of the Arbitrators shall be paid by the Respondents. The amount will be set forth in the Final Award.

**B. Other Findings and Relief**

As part of this Award, I also make the following findings and award the following declaratory and injunctive relief:

10.  The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights") and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

11.  Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird*.

12.  Dramatic may continue to license both versions of *To Kill a Mockingbird*.

13.  The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird*; (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

14.  The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird*.

15.  The Estate shall:

a.   defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees, caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the Church Tour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that

cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate.

b.  defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus, LLC, or any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic's exercise of its exclusive worldwide rights to license all non-first-class rights in the Sergel Play;

c.  defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC.

16.  The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

17.  *   *   *

18.  I have considered all of the evidence and arguments raised by the parties. I set forth below some of the most significant evidence that supports my ruling, but the evidence cited is intended to be illustrative rather than exhaustive. To the extent not specifically addressed, any additional arguments raised by the parties are either moot or without merit. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied. This Award shall remain in full force and effect until such time as the Final Award is rendered.

Ex. A, Award at pp. 4–8.

16.  Pursuant to Section 9 of the FAA, "*at any time* within one year after the award is made any party to the arbitration may apply to the court . . . for an order confirming the award." 9 U.S.C. § 9. (emphasis added)  If such a petition is made, the court must grant an order confirming the Arbitration Award unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of the FAA. *Id.; Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) ("Under the terms of § 9, a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11"). An application for any of these orders is intended to obtain "streamlined treatment as a motion, obviating the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." *Id.*, citing 9 U.S.C. § 6.

17.     The Seventh Circuit has repeatedly recognized that where, as here, an arbitrator retains jurisdiction over remedial portions of an award, the award is not "non-final" for the purpose of enforcement. "[T]here is an abundance of case law in both this circuit and other circuits that recognizes the propriety of an arbitrator retaining jurisdiction over the remedy portion of an award." *Cuna Mut. Ins. Soc. v. Office and Professional Employees Int'l Union Local 39*, 443 F.3d 556, 565 (7th Cir. 2006), citing *Dreis & Krump Mfg. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist.* No. 8, 802 F.2d 247, 250-51 (7th Cir.1986) and *Engis Corp. v. Engis Ltd.*, 800 F.Supp. 627 (N.D.Ill.1992). See also *Day & Zimmerman, Inc. v. SOC-SMG, Inc.*, 2012 WL 5232180, *607 (E.D. Pa. Oct. 22, 2012) (where arbitrator retained jurisdiction to determine amount of attorneys' fees, doctrine of *functus officio* [ending arbitrator's jurisdiction] did not apply); *SBC Advanced Solutions, Inc. v. Communications Workers of America*, 44 F.Supp.3d 914, 952 (2014) ( "arbitrators frequently retain limited jurisdiction to resolve issues related to the implementation of a remedy ordered by the arbitrator, both at the request of the parties and *sua sponte*" without affecting the finality of the award).

18.     Moreover, even though the arbitrator styled the award an "Interim Award" and he still hasn't calculated the amount of attorneys' fees, this Court has jurisdiction to confirm the Arbitration Award. The Seventh Circuit has explained that "courts go beyond a document's heading and delve into its substance and impact to determine whether the decision is final." *Publicis Communication v. True North Communications, Inc.*, 206 F.3d 725, 729 (2000); *Olson v. Wexford Clearing Servs. Corp.*, 397 F.3d 488, 492 (7th Cir.2005) (explaining that the finality of an arbitration award "should be judged by substance and effect, not by superficial technicalities").

19.     An "interim award" is deemed final where an arbitrator has bifurcated the proceedings to address discrete claims and then issues an award on the merits of those claims, while leaving others to be addressed in later proceedings. *Standard Security Life Insurance Company of New York v. FCE Benefit Administrators, Inc.*, 967 F.3d 667, 672 (7th Cir. 2020) ("the record here indicates

that the arbitral panel deliberately bifurcated the arbitration to decide discrete claims in each phase. The panel plainly intended the Phase I Award to be final for all of the Phase I claims."). See also *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 234-35 (1st Cir. 2001) (interim award on liability deemed final where issues of liability and damages were bifurcated)

**20.** Indeed, time and again courts enforce (or vacate or modify) arbitration awards or deem them "final" even though the issue of attorneys' fees remains outstanding. *See, e.g., Wholesalecars.com v. Hutcherson*, 2017 WL 840546, * 2 (N.D. Ala. March 3, 2017 *Goldman v. Architectural Iron Co.*, 2001 WL 1705117, * 4 (S.D.N.Y. Jan. 15, 2001); *Matter of Arbitration Between Advest, Inc. and Asseoff*, 1993 WL 119690, * 6 (S.D.N.Y. April 14, 1993); *Bridgeview Aerosol, LLC v. Black Flag Brands, LLC*, 2009 WL 10678555, *4 (D. Minn. Sept. 18, 2009; *Continental Cas. Co. v. Staffing Concepts, Inc.*, 2011 WL 7459781, *4 (M.D. Fla. Dec. 20. 2011)(same); *Crawford Group, Inc. v. Holekamp*, 2007 WL 844819, **3, 5 (E.D. Mo. March 19, 2007); *Cf., Matter of Arbitration Household Mfg., Inc. and Kowin Dev. Corp.*, 1993 WL 303132, *1 *N.D. Ill. Aug. 9, 1993) (Moran, J.), (confirming initial arbitration award on the merits and confirming a later final arbitration award on quantification of attorneys' fees)

**21.** Accordingly, the Arbitrator's October 18, 2021 Award is final for purposes of section 9 of the FAA, 9 U.S.C. § 9, and Dramatic's Motion to Confirm the Arbitration Award is both timely and ripe and should be granted with dispatch.

**22.** Judicial review of arbitration awards is "tightly limited," and confirmation is "usually routine or summary." *Hasbro, Inc. v. Catalyst USA, Inc.*, 367 F.3d 689, 691-92 (7th Cir. 2004). Indeed, the scope of review of an arbitrator's decision is "among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188 (4th Cir. 1998); *Flexible Mfg. Systems Pty. Ltd. v.*

*Super Products Corp.*, 86 F.3d 96, 100 (7ᵗʰ Cir. 1996) (explaining that the primary goal of arbitration is to provide a quick and cheap decision, and a searching review of arbitral awards would defeat that goal).

23.     In this case, that goal has been ill-served. Not only was the commencement of the arbitration hearing delayed by over a year because of Covid and other issues, the discovery that Ms. Carter, the Estate and the LLC had wrongfully and knowingly withheld the existence of a separate arbitration against the Estate of Gregory Peck addressing some of the same issues and containing highly probative evidence in the middle of Ms. Carter's testimony delayed the final resolution by several weeks and resulted in additional, unnecessary expense. Dramatic—a theatrical publisher devastating by the effects of Covid—should not be forced to await further enforcement of the award. This provides an additional basis for enforcing the Award right now.  Even if other issues remained, as the Seventh Circuit has found, "[a] ruling on a discrete, time-sensitive issue may be final and ripe for confirmation even though other claims remain to be addressed by arbitrators." *Publicis Communication*, 206 F.3d at 729.  See also *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007); M*etallgesell-schaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 283 (2d Cir.1986).

24.     Finally, Dramatic requests that the Court also enter an order awarding Dramatic its reasonable attorney's fees and costs incurred in preparing and filing its petition to confirm and litigating this District Court action to confirm the arbitration award.

25.     In an action to vacate or confirm an arbitration award, the determination of whether a party is entitled to attorneys' fees is grounded on whether there is statutory authority for fee shifting or a contractual agreement between the parties on an award of fees. *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 558 (7th Cir. 2000).  Here, Section 1(b) of the Agreement requires the Estate, as successor to Ms. Lee, to indemnify Dramatic and hold it harmless from any monetary losses, including its reasonable attorneys' fees for any breach of the Agreement by the Estate.  (Exhibit A,

1(b)).  Moreover, the Copyright Act provides that "the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. 505. Accordingly, Dramatic is entitled to an award of its reasonable attorney's fees and expenses incurred in confirming the Arbitration Award.

## CONCLUSION

Dramatic respectfully requests that the Court confirm the Arbitrator's Award and adopt the factual findings contained in it and enter an order and judgment confirming and enforcing the relief granted in the arbitration award and referenced in paragraph 15 of this motion. In addition, consistent with the express dictates of Fed. R. Civ. P.65(d), Dramatic requests that the Court's judgement extend to all person who are "in active concert or participation" with Respondents.

Dated:  October 19, 2021

Respectfully submitted,

Dramatic Publishing Company

By: /s/ Kevin Tottis

One of its Attorneys

Kevin Tottis
ktottis@tottislaw.com
Keith Stolte
kstolte@tottislaw.com
Monica L. Thompson
mthompson@tottislaw.com
One East Wacker Drive
Suite 1205
Chicago, IL 60601
Tel: (312) 527-1400
Fax: (312) 589-7192

Of Counsel:

David Blasband
dblasband@mclaughlinstern.com
McLaughlin & Stern LLP
260 Madison Avenue
New York, NY 10016
Tel: (212) 448-1100
Fax: (212) 448-0066

# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-19-0000-7463 |
| | ) | |
| THE ESTATE OF NELLE HARPER LEE, | ) | |
| HARPER LEE, LLC | ) | |
| | ) | |
| Respondents | ) | |

## INTERIM AWARD OF ARBITRATOR

I, William T. McGrath, the undersigned arbitrator, having been designated in accordance with the arbitration provision in the Agreement entered by the parties on June 25, 1969, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby issue the following Interim Award.

## I.    INTRODUCTION

Claimant, Dramatic Publishing Company ("Dramatic"), filed a demand for arbitration on March 7, 2019, against the Estate of Nelle Harper Lee ("the Estate"). The Estate filed an Answering Statement on April 8, 2019. On April 24, 2019, the Estate filed a Counterclaim against Dramatic, and Harper Lee LLC ("the LLC") submitted a claim against Dramatic. Dramatic filed an Answer and Reply to the Counterclaim on May 30, 2019. On October 3, 2019, Dramatic filed an Amended Demand. The Respondents collectively filed an Answering Statement to the Amended Demand on October 17, 2019.

The contract between the parties (C013,¶4(k))[1] contains the following arbitration clause: "Any controversy arising out of this agreement is to be arbitrated in Chicago  by and under the rules of the American Arbitration Association."

The parties had originally selected a three-arbitrator panel, of which the undersigned was Chair.  On February 19, 2021, on an administrative conference call, the parties notified the American Arbitration Association that they had agreed to have the arbitration heard exclusively by the undersigned. Counsel provided written notice of this to AAA.  AAA then removed the other two arbitrators.

This case revolves mainly around an agreement dated June 25, 1969, between Nelle Harper Lee and Dramatic ("the 1969 Agreement") granting Dramatic certain rights to create a dramatization adapting Miss Lee's famous novel *To Kill a Mockingbird* ("TKAM" or "the Novel") and to license others to perform the play.   Then-president of Dramatic, Christopher Sergel Sr. (now deceased), wrote an adaptation of TKAM.  Dramatic is now operated by the playwright's grandson, Christopher Sergel III.  Miss Lee died in February 2016.

Briefly, Dramatic claims in this arbitration that the Estate and the LLC have breached the 1969 Agreement in various ways, as described more fully below.  It also asserts that the Estate and the LLC have tortiously interfered with contracts Dramatic entered with various licensees.  It seeks actual damages for breach of contract and tortious interference, and punitive damages for tortious interference.  It also seeks various declaratory and injunctive relief against the Estate and the LLC.  The Estate and the LLC deny any liability.

---

[1] Each Exhibit at the Hearing was marked with a letter designation followed by three digits. For example, a Claimant's Exhibit 13 would be marked C013, Respondents' Exhibit 123 would be R123, and a Joint Exhibit 125 would be J125.  A pinpoint cite in an exhibit would be the Exhibit number followed by a three-digit number.  Thus, J125-003 is page three of the exhibit.

The Estate counterclaims that Dramatic has breached the 1969 Agreement in various ways, as described more fully below. It also claims that it is beneficial owner of the copyright in TKAM and that Dramatic has infringed the copyright in the Novel. It also claims that Miss Lee terminated the copyright grant effective on April 26, 2016 pursuant to 17 U.S.C. § 304(c). The LLC alleges that it is the legal owner of the copyright in the Novel by way of assignment from the Estate and that Dramatic has infringed the copyright. The Estate and LLC seek actual damages and any additional profits and statutory damages for copyright infringement. They also seek various declaratory relief against Dramatic. Dramatic denies any liability.

One partially dispositive motion was filed. On December 17, 2019, the Estate filed a motion for partial summary judgment with regard to Dramatic's request for declaratory relief concerning certain rights granted to it in the 1969 Agreement. The Estate asserted that the grant of copyright rights to Dramatic was terminated effective April 26, 2016, pursuant to 17 U.S.C. § 304(c). After briefing by the parties, the panel heard oral arguments on the motion. On February 13, 2020, the panel issued an order denying the Estate's motion.[2]

---

[2] To be clear, the order did not grant summary judgment on the issue to Dramatic. It simply denied the motion so that the issue could be more fully explored with the benefit of a full hearing. Nevertheless, Dramatic asserted in its Post-Hearing Brief (p.41) that the Panel found as a matter of law that §304(c)(6)(A) did not eliminate affirmative exclusionary rights that were transferred in the original grant. After Dramatic made a similar assertion in a colloquy during the hearing, I explained in an email to the parties, dated March 19, 2021, that:

> . . . the Panel's order (which I wrote on behalf of the Panel) was intended only to deny the Respondents' motion for summary judgment, as the Panel deemed it necessary to have a fuller presentation of the facts as to the terms of the original grant in the hearing.
>
> Denying a motion for summary judgment filed by one party does not amount to granting a motion for summary judgment to the opposing party. To state that 'We do not find that as a matter of law §304(c)(6)(A) eliminates any and all affirmative exclusionary rights that were transferred in the original grant' is not the same as saying that 'We find that as a matter of law §304(c)(6)(A) does not eliminates any and all affirmative exclusionary rights that were transferred in the original grant.' We made no such finding.

After some postponements relating to scheduling difficulties, Covid, and discovery, the evidentiary hearing commenced with opening statements by counsel on March 18, 2021. There were 25 days of evidentiary hearing via remote video transmission from March 18 through June 16, 2021. There are over 1,000 exhibits and over 5,000 pages of transcript.[3]

## II. INTERIM AWARD

For the reasons set forth in detail below, I make the following Interim Award:

### A. Monetary Relief

1. The Estate shall pay to Dramatic actual damages in the amount of $172,500 for the breach of contract resulting in the cancellation of the Jonathan Church Productions licensed performances in the United Kingdom. *See*, Section III.J., *infra*.

2. The Estate shall pay to Dramatic actual damages in the amount of $12,727 for the breach of contract resulting from the forced cancellations of stock and amateur licensee's performances in the United States. *See*, Section III.J., *infra*.

3. The Estate is liable to Dramatic for tortious interference with contract. The monetary damages resulting from the tortious interference are the same as the damages resulting from the Estate's breach of contract. As a result, the Estate shall pay a single damage award to

---

[3] An almost two-week delay during the course of the hearing occurred when Dramatic's counsel discovered that the Estate has been involved in another arbitration relating to a different grant of rights made by Miss Lee relating to TKAM (the "Peck arbitration"). This arbitration had not been disclosed to Dramatic at any time prior to the hearing. Dramatic asserted that the Peck arbitration was likely to have documents responsive to its prior document requests. The Estate disagreed, but agreed to consult with the counsel in the Peck arbitration and conduct a document review. A complete discussion of the matter is at Tr. 1016-19; 1049-52; 1413-27; 1538-57. A substantial number of documents were eventually produced, which required the hiatus in the hearing to allow Dramatic time to review the documents produced. Among the documents produced was a highly relevant handwritten note from Miss Lee in which she comments on the scope of her rights and Dramatic's rights.

Dramatic in the amount of $185,227, as damages for breach of contract and tortious interference. *See*, Section III.J., *infra*.

4.    The LLC is not jointly and severally liable for the breach of contract or for the tortious interference with contract.

5.    No punitive damages are awarded to Dramatic. *See*, Section III.J., *infra*.

6.    Dramatic is awarded its reasonable attorneys' fees in an amount to be determined and set forth in the Final Award. The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of attorneys' fees.

7.    Dramatic is awarded its reasonable costs incurred, including but not limited to all court reporter fees, all fees paid to Arbitration Place, and such other reasonable costs in the Arbitrator's discretion. The arbitrator's discretion in awarding costs will be guided by, but not controlled by, 28 U.S.C. §1920. The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of reasonable costs.

8.    The hearings are reopened to allow Claimant to submit its Petition for attorneys' fees and costs by **November 1, 2021**, and for the Respondents to submit their Response by **November 15, 2021**. After the petition and response are received, the hearings will be declared closed and the Final Award will be issued within 30 days.

9.    The administrative fees and expenses of the AAA and the compensation and expenses of the Arbitrators shall be paid by the Respondents. The amount will be set forth in the Final Award.

   **B.  Other Findings and Relief**

   As part of this Award, I also make the following findings and award the following declaratory and injunctive relief:

10.    The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights") and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

11.    Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird.*

12.    Dramatic may continue to license both versions of *To Kill a Mockingbird.*

13.    The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird;* (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

14.    The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird.*

15.     The Estate shall:

a.      defend, indemnify and hold harmless Dramatic from and against any and all

monetary losses or other losses whatsoever, including attorneys' fees, caused

by any legal or administrative action brought against Dramatic by any of the

following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other

licensee theater that had scheduled a production of the Play on the Church

Tour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan

University; (iv) DeSoto Family Theater performing at Landers Theater Center;

(v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii)

Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely

amateur theater that was consented to by Mr. O'Donnell that cancelled a

production of TKAM after receiving a cease and desist letter from Rudin or

the Estate.

b.      defend, indemnify and hold harmless Dramatic from or against any and all

losses arising from any legal or administrative action brought against Dramatic

by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus,

LLC, or any of their licensees or assignees, or anyone on their

behalf connected in any way with Dramatic's exercise of its exclusive

worldwide rights to license all non-first-class rights in the Sergel Play;

c.      defend, indemnify and hold harmless Dramatic from or against any and all

losses arising from any legal or administrative action brought against Dramatic

by any third party as a result of the transfer of any non-first-class rights by the

Estate or LLC.

16. The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

17. The parties were allowed to make post-hearing submissions pursuant to Commercial Arbitration Rule 35(c). The Estate points out that certain additional documents submitted by Dramatic are documents that had not been produced in discovery. (Estate's Supplemental Response, dated August 31, 2019). The documents identified in footnote 2 of the Estate's Supplemental Response will not be admitted. Dramatic objected to the Estate's submission of the original and supplemental expert witness reports of Katherine Mendelsohn. Those reports will be admitted. The fact that Ms. Mendelsohn did not testify at the hearing and could not be cross-examined has been taken into consideration and goes to the weight given to those reports. All other post-hearing submissions are allowed, unless specifically excluded.

18. I have considered all of the evidence and arguments raised by the parties. I set forth below some of the most significant evidence that supports my ruling, but the evidence cited is intended to be illustrative rather than exhaustive. To the extent not specifically addressed, any additional arguments raised by the parties are either moot or without merit. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied. This Award shall remain in full force and effect until such time as the Final Award is rendered.

████ ████████████

████████████████████████████████████

████████

█ ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████

████████████████████████

████████████████████████████████
████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████
████████████████████████████████████
████████
████████████████████████████████████
████████



████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████

     ███████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████

     ███████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████

  ████

       █  ██████████████████████
     ███████████████████████████████████████████
██████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████
    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

25
JA-271

28

█ ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████     ████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

█████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████

33
JA-279

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████

██████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████



█████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

■ ███████████████████████████████████████████████
███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

■ ██████████████████████████████
████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

█████████████████████████████████

███████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████



███████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████     ████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████

　██   ███████████████████████
　████████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
　██████████████████████████████████████████████
██████████████████████████████
　██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████

60
JA-306

██████████████████████████████████████████████████████████

█████████

     ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████

  ■  ████████████████████████████████████████

     ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



█████████████████████████████████

██████████████████████████████████

████████████████████████████████

█████████████████████

█████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████

█████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████

████████████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

    ██████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████

    ███████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████



████████████████████████████████

███████████████████████████████

████████████████████████████████

█████████████████████████████████

███████████

        ███████████████████████████

        █████████████████████████████

█████████████████████████████████

█████████████████████████████████

██████████████████████████████████

████████████████████████████████

█████████████████████████████████

████████████████████████████

For all the foregoing reasons, I enter the Interim Award set forth above.

Dated:  October 18, 2021

_William T. McGrath_

William T. McGrath,
Arbitrator

# EXHIBIT B

*AGREEMENT* entered into this **25th** day of **June**

19**60** , between  **HARPER LEE**

(herein sometimes called "Owner") and THE DRAMATIC PUBLISHING COMPANY, an Illinois corporation (herein sometimes called "Publisher")

## Witnesseth, That:

In consideration of the mutual covenants and conditions herein contained, the parties hereto hereby mutually agree with each other with respect to the property written by **HARPER LEE**

entitled  **TO KILL A MOCKINGBIRD**

(herein sometimes called "Property") and a dramatization (herein sometimes called "Play") to be based upon and/or adapted from the Property, as follows:

1. The Owner hereby represents, warrants and agrees that:

(a) Neither the Property nor the exercise of the rights granted and/or purported to be granted herein will infringe upon or violate any copyright or any other right of any person, firm or corporation, and that the Property contains nothing libelous, slanderous or unlawful, and that he alone has the power and authority to grant the rights herein granted and/or purported to be granted and that there is not now and there will not be during the term of this agreement any valid or outstanding right, title, interest, claim, encumbrance, or agreement in connection with the Property or the rights herein granted which would prevent or hinder the Publisher from the full exercise of all rights granted herein, and that he will do nothing, either by omission or commission, to prevent or hinder the Publisher from the full exercise of all rights granted and/or purported to be granted herein;

(b) He will defend, indemnify and hold harmless the Publisher from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by the Owner; provided, however, that the provisions of this paragraph shall not apply to any material in the Play not also contained in the Property.

2. The Owner hereby grants to the Publisher the complete right throughout the world:

(a) To write or cause to be written a dramatization based upon and/or adapted from the Property, but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;

(b) To lease the amateur acting rights in and to the Property and/or the Play and/or parts thereof;

(c) To publish the Play and/or parts thereof in such form and style as the Publisher may determine;

(d) To publish portions of the Play up to 1,500 words in collections of readings.

3. The Publisher covenants and agrees to:

(a) Cause the Play to be written and published within eighteen (18) months from the date hereof;

(b) Sell copies and license amateur performances of the Play and/or parts thereof at such prices and on such terms as it determines;

(c) Publish the Play with the following notice of copyright, and to register the claim to copyright in the Copyright Office of the United States of America;

© **(Year Play is published)** By  **Harper Lee**

~~The Dramatic Publishing Company~~

Based upon the work,

**TO KILL A MOCKINGBIRD**

(Title) © **1960** by **Harper Lee**

All Rights Reserved

Printed in the United States of America

(d) Deliver to the Owner a copy of Exhibit A signed by the dramatizer of the Property;

(e) Pay to the Owner ██████████ ████ of all monies actually collected and retained from

(g) Semi-annually send to the Owner statements of account and pay any sums due.

4. It is further agreed between the parties hereto that:

(a) Without in any way limiting any of the other provisions of this agreement, the Publisher shall have the absolute and unlimited right, for the purpose of the dramatization to be produced, to make such changes, alterations, adaptations, additions to or eliminations from the Property as in its sole judgment and discretion the Publisher shall deem advisable;

(b) Publisher is hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the said Property and Play and any renewals thereof, or concerning any infringement of or interference with the rights hereby granted, in its own name or in the name of the copyright proprietor, but at the expense of the Publisher and, at its option, the Publisher may join the Owner and/or copyright proprietor as party plaintiff or defendant in any such action or proceeding. Any recovery from the infringement of the copyright in the said Property or Play, in so far as it arises from a violation of the rights hereunto granted to the Publisher, is assigned to and shall be paid to the Publisher;

(c) The Publisher shall have the right to use and permit others to use the Owner's name, photograph and likeness in connection with exploiting and publicizing the Play and the rights herein granted;

(d) This agreement shall be governed by and interpreted in accordance with the laws of the State of Illinois, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. This agreement contains the entire understanding between the parties hereto and shall not be construed as a joint venture or partnership;

(e) The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/ or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, (together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

(f) The Owner shall renew and/or extend the copyright in the Property during that period when it may be renewed and/or extended, and the term of this agreement unless terminated earlier as provided elsewhere herein, shall be for the term of the original copyright of the Property and the renewals and/or extensions thereof;

(g) One year after publication, if the Publisher finds the Play unprofitable and wishes to terminate this agreement, it may do so. If the Play is allowed to remain out of print more than six months after written demand by the Owner to reprint, the Owner may terminate this agreement. These terminations shall take effect on mailing of notice by registered mail to the last known address of the other party;

(h) If the Publisher shall fail to send the Owner a certified public accountant's statement as to the correctness of all reports sent to the Owner by the Publisher for the preceding year, a Certified Public Accountant appointed by any mutually agreed upon third party shall have the right to examine the books of the Publisher insofar as they relate to the Play and make a report to the Owner as to the correctness of the Publisher's statements. Such examination shall be at the cost of the Owner unless errors shall be found requiring an adjustment in the Owner's favor of five per cent (5%) or more of the total sums theretofore paid the Owner, in which case the cost shall be paid by the Publisher;

(i) The parties hereto shall execute such other and further documents as may be necessary or desirable to effectuate the purposes hereof;

(j) This agreement may not be terminated nor the Publisher held liable because of failure of performance for causes outside the Publisher's control, unless continued unreasonably after abatement of the said cause;

(k) Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association;

(l) All notices hereunder shall be in writing and except for notices of termination, which shall be sent by registered mail, all other notices, statements and payments shall be sent by regular mail to the parties hereto at their last known addresses.

**In Witness Whereof,** the parties hereto have executed this agreement the day and year first above written.

In addition to the foregoing, Paragraphs 5, 6 and 7 on Page Four of this agreement are hereby made a part of this agreement.

_____      _____ (SEAL)
(Owner's signature)

RIDER TO CONTRACT DATED JUNE 25, 1960 BY AND BETWEEN HARPER LEE
AS OWNER AND THE DRAMATIC PUBLISHING COMPANY AS PUBLISHER RE.
"TO KILL A MOCKINGBIRD"

1.   The following shall be deemed added to Paragraph 1 (b):

The Publisher will similarly indemnify and hold harmless
the Owner with respect to any new material in the Play not
contained in the Property.

2.   The following shall be deemed added to Paragraph 2:

In the event the Owner shall lease professional acting rights to a third party
for the purpose of producing a first class dramatic play or dramatico-musical
play based on the Property, during the run of the said play in New York or
during a first class touring engagement thereof, the Publisher shall not permit
amateur performances, as provided herein, within a distance of twenty-five (25)
miles of the city limits of any city which had a 1960 U.S. census population in
excess of 150,000. After the close of the final first class road company, the
Publisher may release amateur rights without restriction.

3.   The following shall be deemed added to Paragraph 4 (c):

Any biographical material, photograph and/or likeness of the Owner used by
the Publisher shall be subject to the Owner's approval.

Case 2:12-cv-05514-Document Filed 07/19/21 Page 06/23 of Page 113:05

## Page Four

5.     The Publisher agrees to pay to the Owner, promptly upon receipt of a properly executed copy of this agreement, the sum of ▓▓▓▓▓▓▓ as a non-returnable advance against royalties to accrue under the terms hereof. Before any amount due to the Owner under Paragraphs 3 (e) and 3 (f) hereof is paid to the Owner, the Publisher shall take all such amounts as its own property until the sum so taken shall equal the total of the advance herein provided for.

6.     All notices, monies, and statements due to the Owner hereunder shall be sent and/or paid to Annie Laurie Williams, Inc., 18 East 41st Street, New York, New York 10017, as her agent, and the Publisher shall not be required to look to the application of any payments made to Annie Laurie Williams, Inc., but the receipt by Annie Laurie Williams, Inc. shall be a full and complete discharge of the Publisher's obligation to the Owner to the extent of any such payments.

7.     Before publication of the dramatization and before the leasing and/or licensing of the amateur acting rights to the dramatization, the Publisher agrees to submit a copy of the dramatization to the Owner. The Owner agrees that upon receipt of such copy of the dramatization she will examine the same and within thirty (30) days from the receipt thereof, either give her written objections to the Publisher or submit her written approval thereto. If within such thirty (30) day period the Owner has not given her written approval or submitted her written objections to the Publisher, the dramatization shall be deemed to have been approved by the Owner and the Publisher may publish the dramatization as submitted to the Owner, and lease and/or license the amateur acting rights therein as herein elsewhere provided. If the Owner within the said thirty (30) day period submits written objections to the dramatization, the Publisher agrees to use its reasonably best efforts to have the dramatization revised to meet the said objections, provided however that it is understood and agreed that the Publisher shall not be required to materially alter the basic structure and/or nature of the dramatization or make extensive revisions therein. The Owner shall also have the right to make such line changes and/or revisions in the said dramatization as the Owner deems necessary and proper. After the said dramatization has been approved by any of the means hereinabove provided or after written objections have been submitted to the Publisher and the Publisher has used its reasonably best efforts to revise the dramatization to meet the Owner's objections as hereinabove provided, the Publisher shall have the right to publish the dramatization including any changes made therein by the Owner and to lease and/or license the amateur acting rights therein as herein elsewhere provided. _____

# EXHIBIT C

IN THE MATTER OF AN ARBITRATION

BETWEEN:

DRAMATIC PUBLISHING INC.

Claimant

- and -

HARPER LEE ESTATE

Respondent

TRANSCRIPT OF PROCEEDINGS
HEARD BEFORE HONOURABLE WILLIAM MCGRATH
held via Arbitration Place Virtual
on Thursday, August 5, 2021, at 11:00 a.m. EDT

VOLUME 26

CONDENSED TRANSCRIPT WITH INDEX


APPEARANCES:

Mr. Kevin Tottis                on behalf of the Claimant
Mr. Keith Stolte

Mr. David Hymer                 on behalf of the Respondent
Mr. Dylan Black

ALSO PRESENT:

Mr. Michael Tasevski                    Tech specialist
Ms. Amy Harkness                        Court Reporter


Arbitration Place © 2021
940-100 Queen Street          900-333 Bay Street
Ottawa, Ontario K1P 1J9       Toronto, Ontario M5H 2R2
(613) 564-2727                (416) 861-8720

Page 5062

1  Well, you know what?  The basis for that whole
2  complaint is that there are two versions on the
3  web site.  So it was enough to put Mr. Lembke on
4  notice when he filed his lawsuit or he filed his,
5  I'm sorry, claim in arbitration.  But now they
6  want to say but it wasn't enough for Ms. Carter.
7  Okay.  Thank you, Mr. McGrath.
8        MR. MCGRATH:  Okay.  Thank
9  you all.  Okay.  So the only thing, then, let me
10 ask this question:  Does either party have any
11 more evidence or documents to introduce into the
12 record?  At a certain point, we have to close the
13 record.  Normally I would do it now, but I do want
14 to look at the transcript of the argument today,
15 and so it will be a few more days.  This is -- you
16 have -- first of all, there is a huge amount of
17 documentation here.  You have been very thorough
18 with that.  Your briefs have been very thorough.
19 But within the next few days, if there is some
20 document, oh my god, I forgot to put this into the
21 record, now is your chance to do that.  Okay?
22       MR. TOTTIS:  Mr. McGrath, can
23 I give it to you now or do you want us to send it
24 to you?
25       MR. MCGRATH:  The document?

Page 5063

1  An additional document?
2        MR. TOTTIS:  It is already
3  marked.  It is one of their exhibits.  But if you
4  want us to send it through an email, we can do
5  that, too.
6        MR. MCGRATH:  Just put it
7  in an email.  That's fine.  Or actually, better,
8  if you have the document number, just tell us
9  [inaudible].
10       MR. TOTTIS:  It is R030, and
11 it is an article from the Decatur Daily where
12 Harper Lee attends a performance, a high school
13 performance in 2007 of To Kill a Mockingbird, and
14 she meets with the adult Scout, the girl who plays
15 the adult Scout, which is a pretty clear
16 indication that Dramatic was marketing both
17 productions and she knew it, so, because the adult
18 Scout is the only one in the original version, so
19 --
20       MR. MCGRATH:  All right.
21 Mr. Hymer, anything further?
22       MR. HYMER:  Would you mind if
23 we let you know by tomorrow sometime?
24       MR. MCGRATH:  Yes, tomorrow
25 would be fine.

Page 5064

1        MR. HYMER:  Okay.  I believe,
2  as Mr. Clarida said, it is not necessary, one
3  thing off the top of my head, it is not necessary
4  for us to actually put the novel into the record
5  because you can take judicial notice of that, but
6  we would want to include that as one item.
7        MR. MCGRATH:  All right.
8  Okay.
9        MR. HYMER:  I am not sure I
10 will send you my autographed copy of the novel,
11 but we will get you a copy.
12       MR. MCGRATH:  Okay.  I can
13 go to the library, too, for that matter.
14       MR. TOTTIS:  Mr. McGrath, just
15 in terms of scheduling, and this is kind of a
16 procedural question, will the -- AAA rules say
17 after you close the evidence, you have 30 days to
18 give us an order.  I know there are requests for
19 attorneys' fees, so I don't know how that impacts
20 on the order.  I am just trying to figure out
21 timing here.
22       MR. MCGRATH:  Yes, I think
23 the best way to do that is once I close the
24 evidence, I will have 30 days to issue a ruling on
25 the merits, and the best way to do this is I will

Page 5065

1  identify my ruling as an interim ruling.  I will
2  have decided in that whether there is to be
3  attorneys' fees one way or the other, and that
4  will enable me by not -- if any, I mean, so if
5  there is no attorneys' fees, then I will issue a
6  final ruling.  If there is to be attorneys' fees,
7  I will issue an interim ruling, and we will take
8  up the question of attorneys' fees in subsequent
9  submissions.
10       MR. TOTTIS:  The other
11 question, this is really selfish, but is it safe
12 to say that Mr. Hymer and I can at least sleep
13 soundly for two weeks, not expecting an opinion
14 from you?
15       MR. MCGRATH:  I can
16 guarantee that.  I will most likely take the
17 entire 30 days.  Yes, you can go on a two-week
18 vacation.
19       MR. TOTTIS:  Okay.  Thank you.
20 Thank you, Mr. McGrath.
21       MR. MCGRATH:  All right.
22 Thank you, everyone, and we will be back in touch
23 as things develop.
24       MR. HYMER:  Thank you.
25 --- Whereupon the proceedings adjourned at 1:47 p.m.