# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

## DEFERRED JOINT APPENDIX
## VOLUME IV of V (JA343-531)

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*Counsel for Defendant-Appellant*

Wook Hwang
SHEPPARD MULLIN
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Plaintiff-Appellee*

*(For Continuation of Appearances See Inside Cover)*

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

Keane Barger
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**Page**

## SPECIAL APPENDIX (SPA1-59)

Opinion and Order, dated April 27, 2023 (ECF No. 65) ................................... SPA-1

Opinion and Order, dated July 24, 2023 (ECF No. 87) ................................. SPA-35

Order, dated July 25, 2023 (ECF No. 88) ........................................................ SPA-46

Judgment, dated August 1, 2023 (ECF No. 92) ............................................... SPA-49

Amended Judgment, dated August 28, 2023 (ECF No. 100) ......................... SPA-51

17 U.S.C. § 304 ................................................................................................ SPA-54

## DEFFERED JOINT APPENDIX VOLUME I of V (JA1-173)

U.S. District Court Southern District of New York,
Civil Docket for Case No. 1:22-cv-10147 ........................................................ JA-1

Complaint, dated November 30, 2022 (ECF No. 1) ......................................... JA-17

Notice of Motion, dated January 23, 2023 (ECF No. 28) ................................. JA-31

Defendant Dramatic Publishing Company's Memorandum
in Support of Its Motion to Dismiss Atticus LLC's Complaint,
dated January 23, 2023 (ECF No. 29) .............................................................. JA-33

Declaration of Kevin Tottis, dated January 23, 2023 (ECF No. 30) ................ JA-63

  Final Award of Arbitrator in American Arbitration Association
  Case No. 01-19-0000-7463, dated January 28, 2022
  (ECF No. 30-2) ............................................................................................. JA-66

## DEFFERED JOINT APPENDIX VOLUME II of V (JA174-233)

  Agreement between Harper Lee and Dramatic Publishing Co.,
  dated June 25, 1969 (ECF No. 30-4) ............................................................ JA-174

  Notice of Termination of Transfer Extended Renewal Term,
  dated April 28, 2011 (ECF No. 30-7) ............................................................ JA-179

Notice of Cross-Motion for Summary Judgment,
dated February 6, 2023 (ECF No. 34) ...........................................JA-186

Plaintiff's Statement of Undisputed Material Facts,
dated February 6, 2003 (ECF No. 35) ...........................................JA1-88

Plaintiff's Memorandum of Law (1) in Opposition to Defendant's
Motion to Dismiss and (2) in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated February 6, 2023 (ECF No. 36) ....................JA-191

Declaration of Jonathan Zavin, dated February 6, 2023 (ECF No. 37)...........JA-222

    Agreement between Harper Lee and Rudinplay, Inc.,
    dated June 29, 2015 (ECF No. 37-3) ........................................JA-225

    Agreement between No Ice, Inc. and Atticus LLC,
    dated December 12, 2018 (ECF No. 37-5) ...................................JA-231

**DEFERRED JOINT APPENDIX VOLUME III of V (JA234-342)**

    Motion to Confirm Arbitration Award and Enter Judgment, Case
    No. 1:21-CV-05541 (N.D. Ill. October 19, 2021) (ECF No. 37-7)...........JA-234

**DEFERRED JOINT APPENDIX VOLUME IV of V (JA343-531)**

    Final Judgment Order, Case No. 1:21-CV-05541 (N.D. Ill. January
    13, 2023) (ECF No. 37-8)..................................................JA-343

    Dramatic Publishing Company's Response to Respondents' Motions to Vacate
    Arbitration Awards, Reply in Support of Motion to Confirm Awards and
    Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify,
    Case No. 1:21-CV-05541 (N.D. Ill., February 16, 2022) (ECF No. 37-9) JA-354

Dramatic Publishing Company's Reply in Support of Its Motion
to Dismiss Atticus LLC's Complaint, dated February 15, 2023
(ECF No. 47)...................................................................JA-390

Dramatic Publishing Company's Response to Motion for Summary
Judgment, dated February 21, 2023 (ECF No. 50).........................JA-405

Declaration of Kevin Tottis, dated February 21, 2023 (ECF No. 52).............JA-433

Dramatic Publishing Company's Response to Plaintiff's Statement of Undisputed Material Facts, dated February 22, 2023 (ECF No. 57)..............JA-443

Declaration of Kevin Tottis, dated February 28, 2023 (ECF No. 60) ............JA-448

    Email from Matthew Lembke to Jonathan Zavin,
    dated March 7, 2019 (ECF No. 60-27)........................................................JA-458

Dramatic Publishing Company's Statement of Additional Facts,
dated February 28, 2023 (ECF No. 61) ...........................................................JA-461

Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated March 3, 2023 (ECF No. 63)..........................JA-473

Defendant Dramatic Publishing Company's Answer to Plaintiff
Atticus LLC's Complaint, dated May 11, 2023 (ECF No. 72) .......................JA-489

Order, dated May 25, 2023 (ECF No. 75) ........................................................JA-507

Notice of Dramatic Publishing Company's Motion for Summary
Judgment, dated June 2, 2023 (ECF No. 76)....................................................JA-509

Memorandum of Law in Support of Dramatic Publishing Company's
Motion for Summary Judgment, dated June 2, 2023 (ECF No. 77)................JA-511

**DEFERRED JOINT APPENDIX VOLUME V of V (JA532-736)**

Declaration of Kevin Tottis, dated June 2, 2023 (ECF No. 78) .....................JA-532

    Email from Scott Rudin to Alvin Deutsch, dated January 23, 2019
    (ECF No. 78-1) ..........................................................................................JA-535

    Arbitration Demand file by Dramatic Publishing Co. against
    The Estate of Harper Lee, dated March 7, 2019 (ECF No. 78-3) ..............JA-536

    Letter from Jonathan Zavin to Matthew Lembke,
    dated April 24, 2019 (ECF No. 78-6)........................................................JA-563

Declaration of Christopher Sergel III,
dated June 2, 2023 (ECF No. 79) ....................................................................JA-565

    Letter from Jonathan Zavin to Dramatic Publishing Co., dated
    January 9, 2019 (ECF No. 79-1).................................................................JA-568

Letter from Matthew Lembke to Dramatic Publishing Co., dated January 15, 2019 (ECF No. 79-2)...............................................................JA-572

Defendant Dramatic Publishing Company's Statement of Undisputed Material Facts, dated June 2, 2023 (ECF No. 80)............................................JA-576

Reply in Further Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 14, 2023 (ECF No. 83).........................JA-584

Transcript of Conference held on May 23, 2023 before Judge Denise L. Cote (ECF No. 84)........................................................................................JA-599

Joint Status Report, dated June 16, 2023 (ECF No. 86)...................................JA-618

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-2) ...................................................................................JA-622

Excerpts of Post-Hearing Brief of The Estate of Harper Lee and Harper Lee LLC, American Arbitration Association Case No. 10-19-0000-7463, dated July 28, 2021, and Excerpts of Respondents' Motion to Vacate Corrected Interim Award of Arbitration and Response in Opposition to Petitioner's Motion to Confirm Corrected Interim Award, Case No. 1:21-CV-05541 (N.D. Ill., January 14, 2022) (ECF No. 86-3) .............................................................JA-631

Email from Jonathan Zavin to Matthew Lembke, dated February 1, 2021 (ECF No. 86-4) ...................................................................................JA-648

Wayback Machine captures of February 5, 2021 and March 4, 2021 U.S. Copyright Office webpage (ECF No. 86-5) .............................JA-653

Emails from Jonathan Zavin, dated between March 23, 2019 and July 27, 2021 (ECF No. 86-6) ....................................................................JA-658

Email from Jonathan Zavin to Matthew Lembke, dated September 25, 2020 (ECF No. 86-7) ...........................................................................JA-701

Email from Jonathan Zavin to Matthew Lembke, dated April 6, 2021 (ECF No. 86-8) .....................................................................................JA-703

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-9) .................................................................................JA-705

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-10) ...............................................................JA-708

Email from Jonathan Zavin to Matthew Lembke, dated May 20, 2021 (ECF No. 86-11) ...............................................................JA-712

Email from Jonathan Zavin to Matthew Lembke, dated May 26, 2021 (ECF No. 86-12) ...............................................................JA-714

Email from Jonathan Zavin to Matthew Lembke, dated June 14, 2021 (ECF No. 86-13) ...............................................................JA-717

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-14) ...............................................................JA-719

Notice of Appeal, dated August 30, 2023 (ECF No. 102).............................JA-721

Opinion and Order, dated October 31, 2023 (ECF No. 109)..........................JA-723

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No.: 1:21-CV-05541-MFK |
| v. | ) | |
| | ) | |
| TONJA CARTER, et al., | ) | |
| | ) | |
| Respondents. | ) | |

**FINAL JUDGMENT ORDER**

This case was initiated by Petitioner Dramatic Publishing Company ("Dramatic") on October 19, 2021, following arbitration proceedings against Respondents The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter (the "Estate"), and Harper Lee, LLC ("LLC"). This case involved motions to confirm and cross-motions to vacate several awards entered in the arbitration proceedings.

In accordance with the Court's previous Memoranda and Orders, Judgment is hereby entered in favor of Petitioner Dramatic and against Respondents, and it is hereby **ORDERED AND ADJUDGED** as follows, and the Clerk is directed to enter judgment accordingly:

1.    The Corrected Final Award is **CONFIRMED** ([Doc. 35.1]);

2.    Pursuant to the Corrected Final Award, the Estate and LLC are joint and severally liable for $2,577,204.00 in attorneys' fees and costs. (The Estate and LLC already have satisfied this sum.) [1]

---

[1] On September 28, 2022, the Estate transferred to Dramatic $2,580,417.42, which represented the fees and costs in the Corrected Final Award plus the 9% interest that accrued after the Court confirmed that award. Pursuant to the Court's December 29, 2022 Order (Doc. 72), the Estate is

3. Consistent with the Corrected Final Award, the Estate is **ORDERED** to pay Dramatic **$151,730.89 in interest;**

4. The Estate and LLC are ORDERED to pay, jointly and severally, additional attorneys' fees and costs stemming from the remand of the arbitration totaling $56,090.00. (The Estate and LLC already have satisfied this sum.)

5. The Court **CONFIRMS** the arbitrator's September 2, 2021 Agreed Order ([Doc.51, Exhibit A]), and declares:

    a. The Estate will not enter into any settlement in the Peck Arbitration or with any of the parties in the Peck Arbitration (Case No. 01 15 0004 7377) involving live stage rights in the presence of an audience that conflicts in any way with any of Dramatic's rights under the 1969 Agreement as such rights are determined in this Arbitration (Case No. 01-19-0000-7463). Any settlement agreement entered into by the Estate in connection with the Peck Arbitration that addresses the issue of stage rights will include a statement that the agreement is subject to Dramatic's stage rights as such rights are determined in this Arbitration or in any appeal thereof.

    b. In the event the Estate seeks a declaration in the Peck Arbitration regarding live stage rights in the presence of an audience it will make clear that any such declaration is subject to Dramatic's stage rights as determined in this Arbitration or in any appeal thereof. In the event the arbitrator in the Peck Arbitration is asked to resolve any issues relating to live stage rights, the Estate will inform the Peck Arbitration arbitrator of the existence of this Arbitration and will provide the Peck Arbitration arbitrator with a copy of all awards and judgments entered in connection with this Arbitration. In no event, will the Estate seek any relief in the Peck Arbitration that would infringe on any stage rights held by Dramatic as such rights are determined in this Arbitration or in any appeal thereof.

    c. The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in Atticus Corp. et al v. Carter et al, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof.

---

required to pay 9% interest from the date on which the arbitrator entered his awards. As a result, the Estate is ordered to pay the difference between its September 28, 2022 payment ($2,580,417.42) and the Corrected Final Award amount final award plus 9% interest from the date the award was entered and September 28, 2022 ($2,732,148.31). That difference is **$151,730.89**

2

6. The Court **CONFIRMS** the Corrected Interim Award, as clarified by the arbitrator ([Doc. 21, 59.1]), and declares:

a. The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights" as defined below) and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

b. Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird*.

c. Dramatic may continue to license both versions of *To Kill a Mockingbird*.

d. The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird*.

e. The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird*; (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

f. The term "first-class rights" is comprised of the theatrical or stage rights for the following categories of dramatic productions of *To Kill a Mockingbird*:

    i. **Broadway Productions**.
    (a) Broadway Productions are For-Profit Commercial Productions (as defined in section i (b), below) that take place in venues of 500 or more seats located in Manhattan, New York City ("Broadway Theaters"). The production must be governed by the Actors Equity "Production Agreement" or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

3

(b) "For-Profit Commercial Productions" consist only of productions that are wholly financed by for-profit entities whose purpose is to provide their investors with a positive return on their investment. The fact that a production may engage for-profit enterprises as part of their production (*e.g.*, a for-profit tour promoter) or otherwise rely on entities that operate for profit, shall not, by itself, render it a "For-Profit Commercial Production."

(c) At present the following Broadway Theatres whose productions constitute "Broadway Productions" are:

Ambassador, 215 West 49th Street;
American Airlines, 227 West 42nd Street;
Brooks Atkinson, 256 West 47th Street;
Ethel Barrymore, 243 West 47th Street;
Vivian Beaumont,150 West 65th Street;
Belasco,111 West 44th Street; Booth, 222 West 45th Street;
Broadhurst, 235 West 44th Street;
Broadway,1681 Broadway;
Circle in the Square,1633 Broadway;
Cort,138 West 48th Street;
Samuel J. Friedman,261 West 47th Street;
Gershwin,1633 Broadway;
John Golden, 252 West 45th Street;
Helen Hayes, 240 West 44th Street;
Al Hirschfeld, 302 West 45th Street;
Hudson, 139-141 West 44th Street;
Imperial, 249 West 45th Street;
Bernard B. Jacobs, 242 West 45th Street;
Walter Kerr, 219 West 48th Street;
Longacre, 220 West 48th Street;
Lunt-Fontanne, 205 West 46th Street;
Lyceum,149 West 45th Street;
Lyric, 213 West 42nd Street;
Majestic, 245 West 44th Street;
Marquis,1535 Broadway;
Minskoff, 200 West 45th Street;
Music Box, 239 West 45th Street;
Nederlander,208 West 41st Street;
New Amsterdam, 214 West 42nd Street;
Eugene O'Neill, 230 West 49th Street;
Palace,1564 Broadway;
Richard Rodgers,226 West 46th Street;
St. James,246 West 44th Street;
Gerald Schoenfeld, 236 West 45th Street;
Shubert,225 West 44th Street;

4

Neil Simon, 250 West 52nd Street;
Stephen Sondheim,124 W. 43rd Street;
Studio54, 254 West 54th Street;
August Wilson, 245 West 52nd Street;
Winter Garden,1634 Broadway.

(d) The theaters listed above are presumed to be the only Broadway Theaters as of the date of this clarification. However, because the 1969 Agreement could remain in force for a significant amount of time into the future, and new Broadway theaters might be opened or existing theaters might be closed or repurposed into a different type of venue, more flexibility is required. While the theaters listed above are presumed in this clarification to be the only theaters housing. Broadway Productions, that presumption is rebuttable. A venue that in the future meets the criteria for a Broadway Production stated herein shall be treated as a Broadway Production. Likewise, a venue that in the future no longer meets the criteria stated herein will no longer be treated as a Broadway Production.

ii. **For-Profit Commercial Productions outside New York City**.
(a) "For-Profit Commercial Productions outside New York City" as used in this clarification are tours and sit-downs ("sit-downs" are non-touring production) outside of New York City that take place in venues of 500 or more seats and are For-Profit Commercial Productions as defined in section i.(b), above. The production must be governed by the Actors Equity Production Agreement or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

(b) By way of example, the Dorothy Chandler Pavilion in Los Angeles and the Kennedy Center in Washington D.C. were identified in testimony as theaters having first-class productions that would meet the criteria for this category. The reference to these two theaters is for purposes of illustration only and is not intended as an exhaustive list of theaters that now, or in the future, may qualify as For-Profit Commercial Productions.

iii. **Off-Broadway Productions**.
(a) Off-Broadway productions do not meet the criteria of a Broadway Production because they take place in venues of 100 to 499 seats. Thus, they do not come within the category of "first class" productions. Under the Interim Award, Off-Broadway Productions, in general, fall into the middle-tier category of "stock rights." As such, they are non-first-class rights.

5

(b) However, "first-class rights" are clarified to encompass Off-Broadway Productions that are For-Profit Commercial Productions (as defined in section i (b), above) with an open-ended run and which are governed by an Equity Off Broadway contract or an Equity Production contract. Off-Broadway productions that do not meet these criteria are non-first-class productions. For avoidance of doubt, Off-Off-Broadway productions (productions in theaters in New York City having less than 100 seats) are non-first-class productions.

iv. **West End Productions**.

(a) Like Broadway Productions, "West End" productions are uniformly considered first-class. West End Theaters are theaters that present For-Profit Commercial Productions (as defined in section i.(b), above) that take place in or near the West End area of London. The production must be governed by British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters.

(b) At present, the following West End Theaters whose productions constitute "West End Productions" are:

Adelphi;
Aldwych;
Ambassadors (New Ambassadors);
Apollo;
Apollo Victoria;
Cambridge;
Coliseum;
Comedy Covent Garden;
Criterion; Drury Lane;
Duchess;
Duke of York's;
Fortune;
Garrick;
Gielgud;
Haymarket;
Her Majesty's;
London Palladium;
Lyric;
Mayfair;
New London;
Noel Coward;
Novello Palace;
Phoenix;
Piccadilly;

6

Playhouse;
Prince Edward;
Prince of Wales;
Queen's;
St Martin's;
Savoy;
Shaftesbury;
Trafalgar Studio 1;
Vaudeville;
Victoria Palace;
Westminster;
Wyndham's.

v. **Commercial For-Profit Tours in the United Kingdom**. Commercial For-Profit Tours in the U.K., either emanating from or travelling to a West End Theater, that operate under British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters, are first-class productions. To qualify as a "Commercial For-Profit Tour in the U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vi. **Commercial For-Profit Tours or Productions outside the U.S. or U.K**. In any countries other than the United States or United Kingdom, Commercial For-Profit Tours or Productions are tours or productions that operate under a contract with the country's professional theatrical acting union (*e.g.* Canadian Actors' Equity Association) whose pay scale reflects the highest-level pay for any theatrical acting union in that country, or an analogous agreement whose substantive terms and pay scale are substantially the same as such a union contract, are first-class productions. To qualify as a "Commercial For-Profit Tour outside the U.S. or U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vii. **Non-First-Class Theaters and Productions**. Any theater or production that does not meet the criteria to qualify for one of the categories in sections 1 through 6, above, is not a first-class theater or production. For avoidance of doubt, the following are presumed to be non-first-class productions and theaters:
   (a) Any production at the Stratford Festival in Canada, the Regent's Park Open Air Theatre in London, the League of Resident Theaters (LORT), regional professional theaters, COST theaters, and CORST theaters.

7

(b) Any production operating under any of the following Actors Equity Association contracts:
> Bay Area Project Policy (BAPP);
> Bay Area Theatre;
> Business Theatre and Events;
> Business Theatre & Events Memorandum of Understanding;
> Cabaret;
> Casino;
> Chicago Area Theatre;
> Development;
> Dinner Theatre;
> Disney World;
> Guest Artist;
> Hollywood Area Theatre;
> Letters of Agreement;
> LA 50-Seat Showcase;
> LA 99-Seat Theatre;
> LA Self-Produced Project;
> Midsize Theatres;
> Mini Agreement;
> Musical Stock and Unit Attractions (MSUA);
> New England Area Theatres Agreement (NEAT);
> New Orleans (NOLA);
> NY Showcase;
> Orlando Area Theatre (OAT);
> Off Broadway, except as provided in Section 3;
> Outdoor Drama;
> Short Engagement Touring Agreement (SETA);
> Small Professional Theatre (SPT);
> Special Agreement; Special Appearance;
> Staged Reading Code;
> Theatre for Young Audiences (TYA);
> Transition;
> University/Resident Theatres Association (URTA);
> Western Civic Light Opera (WCLO).

(c) While the theaters listed in subsection vii.(b), above, are presumed in this clarification to be the non-first-class theaters and productions, that presumption is rebuttable. If in the future a theater or production identified in this section meets the criteria for being a first-class production as set forth in any of the sections i through vi, above, that production shall be treated as a first-class production.

g. The Estate Shall:
   i. defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees,

8

**JA-351**

caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the ChurchTour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate;

   ii.   defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus, LLC, or any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic's exercise of its exclusive worldwide rights to license all non-first-class rights in the Sergel Play;

   iii.  defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC.

   h.   The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

7.     Consistent with the Corrected Interim Award, the Estate is ORDERED to pay Dramatic $185,277 plus 9 percent interest for a total of $205,740.96. (The Estate already has satisfied this sum.);

   8.   Pursuant to the Court's order of June 17, 2022 (Doc. No. 42), the Estate and LLC are ORDERED to pay, jointly or severally, Dramatic's attorneys fees and costs in an amount to be determined by the Court.

DONE this 13th day of January., 2023.

9

MATTHEW F. KENNELLY
UNITED STATES DISTRICT JUDGE

10

EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) ) ) | |
| Petitioner, | ) | Case No.   21-cv-05541 |
| v. | ) ) | Honorable Matthew F. Kennelly |
| THE ESTATE OF NELLE HARPER LEE, BY AND THROUGH ITS PERSONAL REPRESENTATIVE TONJA CARTER & HARPER LEE, LLC, | ) ) ) ) ) ) | |
| Respondents. | ) | |

**DRAMATIC PUBLISHING COMPANY'S RESPONSE TO
RESPONDENTS' MOTIONS TO VACATE ARBITRATION AWARDS,
REPLY IN SUPPORT OF MOTION TO CONFIRM AWARDS AND
MEMORANDUM IN SUPPORT OF DRAMATIC'S
MOTION TO VACATE, CORRECT OR MODIFY**

## Table of Contents

Table of Authorities ............................................................................................. iii

Argument ............................................................................................................... 3

    I.    The Section 304(c) Findings Are Not Properly before This Court. ............. 3

        A.    Harper Lee agreed to the arbitrator's review. ....................................... 3

        B.    The Estate misstates the standard of review. ...................................... 7

        C.    Rudin has no overlapping rights as a matter of law. .......................... 12

    II.    The Estate/LLC Are Wrong on the Substance. ........................................ 13

        A.    The plain language of the statue applies to "exclusive" grants. .......... 13

        B.    The Estate/LLC misread the language of the exception. ..................... 15

        C.    The Estate/LLC's reference to the broad purpose of the statute is misleading. .............. 16

        D.    The Estate/LLC's "ownership/exclusive license" argument fails ........... 17

    III.    The Court Should Enforce the Declaratory and Injunctive Relief. ............ 20

        A.    The term "non-first-class" is sufficiently definite to be enforced. ......... 21

        B.    The Estate/LLC's indemnity argument is based on a false premise. ...... 26

    IV.    Dramatic's Requests Are Appropriate. ...................................................... 28

CONCLUSION ................................................................................................... 30

# Table of Authorities

**Cases**

*Affymax, Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 660 F.3d 281, 284 (7th Cir. 2011) .......................................................................................................... 2, 5, 8, 24, 26

*Artist Rights Enforcement Corp. v. Estate of Benjamin E. King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) .................................................................................................................... 12

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ................................................ 5

*Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 706 (7th Cir.1994) ............................ 1, 27

*Baxter Int'l, Inc. v. Abbott Laboratories*, 315 F3d. 829, 832 (7th Cir. 2003) .................... 2, 11, 12

*Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir.2010) ................................................... 30

*Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373-74 (1986) ..... 17

*Catalina Holdings (Bermuda) Limited v. Muriel*, 2020 WL 1675464, *9 (N.D. Ill. April 6, 2020) ................. 8

*Certco, Inc. v. International Broth. of Teamsters, Local Union No. 695*, 722 F.3d 1097, 1100 (7th Cir. 2013) .................................................................................................................... 29

*Chameleon Dental Products, Inc. v. Jackson*, 925 F.2d 223, 225 (7th Cir. 1991) ....................... 27

*Continental Can Co. v. Chicago Truck Drivers Pension Fund*, 921 F.2d 126, 128 (7th Cir.1990) ................. 29

*Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) .......................................................................... 18

*DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588, *10 (C.D. Cal. 2012) ........................... 13

*Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006) ......................................................... 14

*Donen v. Paramount Pictures Corp.*, 2008 WL 5054340, *4 (C.D. Cal. Nov. 20, 2008) .............. 18

*Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 65 (2000) ................... 8, 9, 26

*Eli Lilly and Co. v. Arla foods, Inc.* 893 F.3d 375, 384-85 (7th Cir. 2018) ................................ 25

*First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298 (1968) .......... 18

*Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 280-81 (7th Cir. 1992) .............................. 21

*Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) .................. 11

*George Watts & Son, Inc. v. Tiffany and Co.*, 248 F.3d 577, 580 (7th Cir. 2001) ............... 2, 8, 9, 26

*Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) ........................................ 4

*Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008) ................... 1

*Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–89, (2008) ........................... 3

*Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of the U.S. of Am., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010) .................................................................................................................... 30

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999)........................................................13

*Hyatt Franchising, LLC v. Shen Zhen New World I, LLC*, 876 F.3d 900, 902 (7th Cir. 2017) ........ 8, 26, 29

*LaScola v. U.S. Sprint Communications*, 946 F.2d 559, 565 (1991) .........................................9

*Lippert Tile Co. v. Int'l Union of Bricklayers*, 724 F.3d at 945 (7th Cir. 2013)...............................18

*Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir.1994) ...................................................28

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172- 73 (1985)..................................... 15, 16, 17, 18, 19

*Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F.Supp.2d 375, 380–81 (S.D.N.Y. 1999) ............................12

*Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985)................................ 24, 25

*Stern v. Lavender*, 319 F.Supp.3d 650, 667 (2018) ...........................................................18

*Washington Metropolitan Area Transit Com'n v. Reliable Limousine Service*, 776 F.3d 1, 10 (2015) ..............30

*Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) ...................................... 4, 26

*Widell v. Wolf*, 43 F.3d 1150, 1151-52 (7th Cir. 1994) ........................................................29

*Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006) ...................................... 1, 4, 11

*Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) ......................................................16

*Yasuda*, 37 F.3d 345, 351 (7th Cir. 1994) .................................................................27

*Young v. I.R.S.*, 596 F.Supp.141, 143 (N.D. Ind. 1984) ....................................................8

**Statutes**

17 U.S.C. § 304(c) ......................................................................10, 12, 13, 14, 15, 17

9 U.S.C. § 10 ..............................................................................................12

9 U.S.C. § 11 ..............................................................................................12

**Rules**

Fed.R.Civ.P. 65......................................................................................... 24, 29

Fed.R.Civ.P. 81............................................................................................29

**Treatises**

11A WRIGHT & MILLER § 2956 (3d ed. 2014)...............................................................30

3 Nimmer § 10.01[C] ......................................................................................18

There's a reason the Federal Arbitration Act says that a court should "confirm" rather than "affirm" an arbitration award. The Act doesn't give courts the right to review a decision for legal or factual error; rather, the sole question before a court is whether the arbitrators did their job properly and stayed in their lane. As the Seventh Circuit has explained:

> It is tempting to think that courts are engaged in judicial review of arbitration awards under the Federal Arbitration Act, but **they are not**. *Baravati v. Josephthal, Lyon & Ross, Inc.,* 28 F.3d 704, 706 (7th Cir.1994). **When parties agree to arbitrate their disputes they opt out of the court system**, and when one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated the agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc.— **conduct to which the parties did not consent when they included an arbitration clause in their contract.**

*Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006) (emphasis added) (citations in original). *See also, Baravati,* 28 F.3d at 706. (Judicial review of arbitration tightly limited, "perhaps it ought not be called 'review' at all.") That's why the Seventh Circuit has emphasized that a "factual or legal error, no matter how gross, is insufficient to support overturning an arbitration award." *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008)(citation omitted). Indeed, the issue for the court is not whether a contract interpretation "is incorrect or even wacky," but simply whether the arbitrators interpreted the contract at all. *Wise*, 430 F.3d at 269.

Of course, here, the Arbitrator's reasoned and reasonable 88-page Award is neither wacky nor incorrect. It reflects his thorough consideration of the issues properly before him, which, as a matter of law, ends any inquiry by this Court. That, however, doesn't stop the Estate/LLC[1] from asking for a mulligan, longstanding authority be damned. To get around the express dictates of the Court of Appeals, the Estate/LLC couches its first two do-over requests as fixes for "ambiguities," and then argues contract interpretation or asks the Court to weigh evidence, all the while omitting any discussion of legal standards that would possibly permit vacatur of "ambiguous" awards.

---

[1] The Estate of Nelle Harper Lee by and through it personal representative Tonja Carter (the "Estate") and Harper Lee, LLC (the "LLC").

Far, far worse, however, is the Estate/LLC's request that this Court review and vacate the arbitrator's findings regarding Section 304(c) of the Copyright Act, claiming erroneously that under Seventh Circuit law an arbitration award is subject to review anytime it allegedly affects a third party's contract or other rights. That's nonsense. Arbitration awards impact third parties' rights all the time, whether it's a patent infringement award that bars the infringer from supplying infringing products to third parties with whom the infringer contracted or an award cutting off a supply of goods to a distributor who breached its supply agreement. The actual Seventh Circuit standard permits judicial review only in the rare circumstance where an arbitrator issues an award which causes a party "…to violate…[a] rule of positive law…" like the Sherman Act, "…designed for the *protection of third parties.*" *Affymax, Inc. v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.*, 660 F.3d 281, 284 (7th Cir. 2011) (emphasis added). *See also, George Watts & Son, Inc. v. Tiffany and Co.*, 248 F.3d 577, 580 (7th Cir. 2001) (arbitrator may not direct parties to violate the law).

Even then, under controlling Seventh Circuit authority flat-out ignored by the Estate/LLC, an arbitrator's decision is binding and unreviewable as to the parties to the arbitration. *Baxter Int'l, Inc. v. Abbott Laboratories*, 315 F.3d. 829, 832 (7th Cir. 2003). There, Abbot sought to enforce a license provision which prohibited Baxter from selling a particular product in the United States. Baxter claimed that enforcing the provision would violate the Sherman Act, thus causing injury to third parties. The arbitration panel rejected Baxter's argument and the district court affirmed the award. When Baxter appealed, the Seventh Circuit shot Baxter down, finding that even if third parties could assert a Sherman Act claim, because the arbitrators had considered and resolved Baxter's antitrust argument, "…as between Baxter and Abbott their answer is conclusive." *Id.* at 832. There, like here, the arbitrator was asked to interpret the terms of a license. There, like here, the arbitrator was asked to interpret the effect of federal law on the terms of the license (in addition to contract law issues). There, like here, when the respondent didn't like the result, it complained that the decision would

affect third parties. There, unlike here, the alleged injury to third parties was an actual alleged violation of federal law (violation of the Sherman Act) as opposed to a vague, inaccurate statement of public policy (e.g., the public is entitled to view Aaron Sorkin's work any time he wants them to). Nevertheless, the Seventh Circuit still found judicial review was inappropriate.

What is so deeply disturbing here is that this binding precedent is nowhere to be found in the Estate/LLC's brief, even though Dramatic discussed it at length in its post-hearing arbitration brief. *See* Exhibit A at 14-15. The Estate/LLC's failure to even try to distinguish controlling authority of which they are fully aware speaks volumes about their attempt at skirting the very clear limits of review under Section 10(a) of the FAA. There are only four bases for vacatur and claiming the arbitrator got the law wrong isn't one of them. Indeed, citing the Supreme Court, the Seventh Circuit has made it abundantly clear that the list under Section 10(a) "… is exclusive; neither judges nor contracting parties can expand it… Disregard of the law is not on the statutory list." *Affymax,* 660 F.3d at 284 *citing Hall Street Associates, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 584–89 (2008). For this reason, and many, many others discussed below, this Court should grant Dramatic's motion to confirm the Arbitration Awards and deny the Estate/LLC's motion to vacate.

Argument

Because the Estate/LLC spends the bulk of their brief on Section 304(c) issues, Dramatic will address the issues in their brief reverse order.

### I.     The Section 304(c) Findings Are Not Properly before This Court.

#### A.     Harper Lee agreed to the arbitrator's review.

When Harper Lee agreed to license to Dramatic all non-first class theatrical rights in *To Kill a Mockingbird* 50 years ago, she made another deal. She promised that if any disputes arose with Dramatic about anything related to the 1969 Agreement, an arbitrator rather than a court would handle them: "Any controversy arising out of this agreement is to be arbitrated in Chicago by and

under the rules of the American Arbitration Association." Ex. B, ¶ (k). She also agreed that the promises she made to Dramatic in that Agreement "shall be binding upon…[her] heirs, executors, administrators, successor and assigns." Ex. B, ¶ (d). Dramatic did the same. Given the broad arbitration language by which the parties promised to be bound, as a matter of law, they agreed that an arbitrator would decide "…all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts involving both contract and performance." *Welborn Clinic v. MedQuist, Inc.,* 301 F.3d 634, 639 (7th Cir. 2002). Put another way, by using the language "any controversy arising out of this agreement," the parties agreed that "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se" were the province of the arbitrator and not the court. *Gore v. Alltel Commc'ns, LLC,* 666 F.3d 1027, 1033 (7th Cir. 2012). And, of course, as a matter of law, that also meant the arbitrator could interpret and apply federal law to the terms of the Agreement. *Baxter,* 315 F.3d at 831-32. (Arbitrators "regularly handle" federal statutes, including antitrust disputes.)

Nothing happened in the parties' relationship over the past 50 years that would allow Ms. Lee (or her heirs and assigns) to welch on that deal. Ms. Lee confirmed that the parties had consented to arbitration and, therefore, "opt[ed] out of the court system" (*Wise,* 450 F.3d at 269) in 1991, when her agent, Evva Pryor, threatened arbitration over a production of *TKAM* at the Papermill Playhouse and then backed off when Dramatic's lawyers shot down her agent's erroneous threats (Ex. C). She remained bound by the provision some years later when she emphasized to her dear friend Veronique Peck (wife of the actor Gregory Peck) that she never would agree to a Broadway version of *TKAM* and, as the arbitrator described it, expressed "seller's remorse" about her deal with Dramatic, writing, "The Class A (Broadway) play rights are in me. (Dramatic

Publishing Co. has amateur & stock co. rights, much to my disgust.)" (Ex. D)[2] And she remained bound by her promise to abide by the results of an arbitration when she sent Dramatic a notice of termination back in 2011. (Dkt. No. 22-5).

Ms. Lee also remained bound by her arbitration promise when, in 2015, seven months before her death, her agents gave her an agreement to sign with Scott Rudin's company, Rudinplay, Inc. ("Rudin") giving him those Broadway stage rights she'd said she'd never grant.[3] The fact that Ms. Lee, or her agents, decided to cut a separate deal with Rudin, as a matter of law didn't modify her decades-long contractual commitment to Dramatic to "opt out of the court system" and accept an arbitrator's decision with respect to the meaning of the 1969 Agreement. Arbitration is a creature of contract and the Supreme Court has mandated that "…courts must place arbitration agreements on an equal footing with contracts…and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted). A party can't unilaterally change her obligations under a contract just by entering into a side deal with somebody else.

By agreeing that an arbitrator—and not a court—would determine the effect of the law on the terms of the 1969 Agreement, Ms. Lee promised to be stuck with whatever an arbitrator said those terms are, even if she, her heirs or a court might believe the arbitrator "disregard[ed]…the law." *Affymax*, 660 F.3d at 284. By definition, then, Ms. Lee's rights and Dramatic's rights under the contract are whatever the Arbitrator says they are. After reviewing five weeks of testimony and hundreds of exhibits, he says that Dramatic has and always had exclusive non-first-class rights. The fact that Ms. Lee and her handlers foolishly may have sold those rights without first checking with Dramatic or seeking a determination from an arbitrator is their problem, not Dramatic's. This is no

---

[2] Exhibit D was produced without a confidentiality designation. Dramatic inadvertently labelled it "confidential."

[3] For the purposes of this motion, Dramatic takes no position on whether Ms. Lee was aware of the rights she was transferring to Mr. Rudin.

different than when an arbitrator decides a lightbulb distributor's lightbulbs infringe a patent. The fact that the lightbulb distributor went out and agreed to sell infringing lightbulbs isn't the innocent patentee's problem; it's the infringing distributor's—*i.e.,* the wrongdoer's—problem. If Rudin or Aaron Sorkin or anybody else has a gripe about what rights they bought or thought they bought, their gripe is with Ms. Lee and her Estate who sold them rights she didn't own, not with Dramatic, who was a complete stranger to their transactions. Put another way, it's up to the Lee Estate to clean up the mess it created.

Of course, here, Rudin is no innocent. He expressly agreed to be bound by any of the Arbitrator's decisions.[4] Under Paragraph 2(b) of his Agreement with Ms. Lee, he agreed that his rights were subordinate to all rights in the 1969 Agreement, which include Ms. Lee's promise to resolve all disputes about the Agreement by arbitration:

> Producer acknowledges that pursuant to an agreement (the "**Prior Agreement**") dated June 26, 1969 between Author and The Dramatic Publishing company ("**DPC**"), Author granted DPC the right to create a play ( the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (*as defined in the Prior Agreement*) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation continue to be exploited following such termination on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. *The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.*

Ex. E, Paragraph 2(b) (bold in original) (italics added).

Rudin and his lawyers went into his deal with Ms. Lee with their eyes open. They knew that when it came to the 1969 Agreement and Dramatic's rights, the parties to that agreement had opted out of the court system and agreed that an arbitrator would have the final word on their respective rights, the same rights to which Rudin agreed to subordinate his interests. While that might mean the Estate/LLC possibly may have a defense to some future claim by Rudin or Sorkin, it doesn't

---

[4] If Mr. Sorkin didn't read Rudin's agreement with Ms. Lee, then shame on Mr. Sorkin. That's an issue he can address with Rudin.

mean the Estate/LLC, Rudin or Sorkin can drag Dramatic into their drama. They created their own mess and it's up to all of them to clean it up between themselves.

Moreover, it's not like the Arbitrator's decision on exclusivity came as a surprise to the Estate/LLC. Not only did Dramatic raise its right to exclusivity in its initial claim, the Estate/LLC filed a motion for partial summary judgment on that issue. (Ex. F) And lost. (Ex. G). Moreover, over Dramatic's objection, the Arbitrator even gave the Estate/LLC a second chance and let them reargue the issue in briefs both before and after the hearing. (Ex. H, Ex. I, and Ex. J). And they lost again.[5] (Dkt. No. 21, at 60–71). At no point during their multiple at bats on the exclusivity issue did the Estate/LLC ever suggest or bemoan the fact that a decision by the arbitration tribunal was inappropriate or could not bind the parties because they'd cut a deal with third parties.

The law is clear. Ms. Lee and Dramatic agreed an arbitrator would have the final say on everything relating to their relationship and the Estate/LLC has no right to renege on that promise.

## B. The Estate misstates the standard of review.

Having lost twice on the exclusivity issue, the Estate/LLC tries to cobble together some means of getting this Court to take a third look at it by ignoring the dispositive *Baxter* case, then selectively misreading snippets of caselaw which, it erroneously claims, permits *de novo* review by this Court. As both the panel and individual arbitrator found, the Estate/LLC is substantively wrong on the law, which is discussed below in Section II. More importantly, here, under the express teachings of the Supreme Court and the Seventh Circuit, that is not an analysis in which this Court may engage under the FAA. The Estate/LLC has no legitimate legal basis for seeking review.

Arbitrators have extraordinary latitude in the scope of their decision-making and substantial

---

[5] The Estate/LLC's first loss was before a panel of three arbitrators. The parties ultimately agreed to proceed in the hearing before a single arbitrator, William T. McGrath, the chair of the original panel. Notably, all of the arbitrators were experienced practitioners with years of copyright experience jointly chosen by the parties to the Arbitration under AAA rules.

insulation from district court review. Where, as here, an arbitration clause is broad ("… "any controversy arising out of [the 1969 Agreement]…" Ex. B, ¶ 4(k)) the arbitrator pretty much has unfettered discretion to award any remedy he deems appropriate, so long as it does not exceed the power granted under the contract. *Catalina Holdings (Bermuda) Limited v. Muriel*, 2020 WL 1675464, *9 (N.D. Ill. April 6, 2020) (citations omitted). Arbitrators' vast remedial powers derive from the fact that they act as the parties' agent and, therefore, are empowered to grant *any* relief the parties themselves have the power to agree upon, provided the award doesn't cause the parties to actively violate the law. *George Watts*, 248 F.3d at 580. ("In the main, an arbitrator acts as the parties' agent, and as their delegate, may do anything the parties may do directly") *citing Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 65 (2000). *See also, Hyatt Franchising, LLC v. Shen Zhen New World I, LLC,* 876 F.3d 900, 902 (7th Cir. 2017); *Affymax,* 660 F.3d at 284.

Importantly, "violating the law" doesn't simply mean misinterpreting the contract or otherwise misapplying the law; rather, the judiciary may step in and vacate an arbitrator's decision only when an arbitrator actually commands parties to violate clear "legal norms" which principally means "those in positive law."[6] *George Watts,* 248 F.3d at 580. Indeed, any so-called public policy claimed to be violated must be "explicit," "well defined" and "dominant." *Eastern*, 531 U.S. at 62. As the *Hyatt* court explained, just labelling an alleged violation of a law an issue of "public policy" isn't sufficient to limit an arbitrator's remedial power. All law, of course, "…reflects public policy… but the sort of 'public policy' that judges may use to annul an award is policy designed to protect the public *against* the parties to the arbitration." *Hyatt,* 876 F.3d at 903. The court then reemphasized that as long as the arbitrator reaches a decision the parties could agree to themselves, the award is fully appropriate: "…[W]hen the *parties are free under the law to agree on some outcome*, the arbitrator's decision as their agent does not violate public policy." *Id.* (emphasis added).

---

[6] "Positive law" generally  is "a law passed by Congress." *Young v. I.R.S.*, 596 F.Supp.141, 143 (N.D. Ind. 1984).

Both *Hyatt* and *George Watts* used the same hypothetical (ignored by the Estate/LLC) to illustrate the type of public policy designed to protect the general public against the parties to the arbitration. In *Eastern,* an arbitrator reinstated a truck driver who'd been fired after testing positive twice for marijuana use. While it may not be a good idea to put a serial drug user behind the wheel of a truck and, broadly speaking, it is arguably inconsistent with public policy, the Supreme Court held it was reversible error for a court to vacate the arbitrator's decision absent an express law or statute barring such reinstatement. 531 U.S. at 66-67. In both *Hyatt* and *George Watts*, the Seventh Circuit built on the facts of *Eastern* to provide an example of the type of public policy violation that would permit vacatur of an arbitrator's award: if the driver's license actually had been revoked under the law and the arbitrator enabled an unlicensed truck driver to operate a motor vehicle. That would constitute an obvious threat to the public and would reflect the rare instance when a court could invade an arbitrator's decision. *George Watts*, 248 F.3d at 580-81; *Hyatt,* 876 F.3d at 903.

Despite citing the foregoing Seventh Circuit cases (they don't discuss the Supreme Court's *Eastern* decision), the Estate/LLC unaccountably ignore the Seventh Circuit's examples as well as the discussions in the cases requiring violations of "positive law" or any identification of the "**explicit**," "**well defined**" and "**dominant**" policy against which the public should be protected as required by the Supreme Court in *Eastern*, 531 U.S. at 62. Instead, they tell this Court that it should take the extraordinary step of reviewing the arbitrator's decision because the "law" they claim the Estate/LLC might violate is the *implied* duty of good faith and fair dealing in a contract which doesn't even constitute an independent basis for breach of contract under Illinois law. [7] *LaScola v. U.S. Sprint Communications*, 946 F.2d 559, 565 (1991).

---

[7] Even though the 1969 Agreement is clear that Illinois law governs disputes between the parties (Ex. B, at ¶ 4(d)), to get around Illinois law, the Estate/LLC tries to argue that the choice of law provision in the Estate/LLC-Rudin contract should govern. In any case, competing state laws on this issue hardly rise to the level of "explicit," "well defined" and "dominant."

Even if adhering to the decision by which Ms. Lee promised to be bound did somehow result in a breach of contract on her part with Rudin, that is a far cry from an arbitrator ordering an unlicensed driver to take to the roads and endanger the public. Indeed, had Harper Lee never entered into the contract with Rudin the Estate/LLC's whole premise would fail. The fact that she (or her handlers) and Rudin decided it would be a good idea to enter into an agreement without thoroughly considering Ms. Lee's contractual obligations to Dramatic (including its ongoing exclusivity as determined by the contractually-mandated arbitrator), that is a risk they created for themselves. The fact that the law may give them contract claims against one another doesn't mean an arbitration decision they don't like somehow violates the law—let alone "positive law"—created to protect the public. The Estate/LLC haven't pointed to a single piece of authority—nor can they—even suggesting that causing a wrongdoer (and, in this case, a tortfeasor) to possibly breach a contract with third parties reflects the type of public policy designed to protect the public "against" the parties to arbitration, especially when the prevailing party in the arbitration had no input whatsoever on that agreement. Moreover, agreeing that Dramatic would have exclusive rights to the non-first-class market is exactly the type of decision an arbitrator may enter into as an agent of the parties. *Hyatt*, 876 F.3d at 903. In fact, that's exactly what the parties agreed to back in 1969. Whatever the effect of 17 U.S.C. § 304(c), there is no reason an arbitrator couldn't extend that exclusivity all on his own as an agent of the parties, especially where, as here, Rudin agreed to abide by the arbitrator's decisions.

If that weren't enough, the Arbitrator made an express finding that granting Dramatic exclusive non-professional rights wouldn't lead to a breach of contract by the Lee Estate because those rights were never contractually transferred to Rudin. At page 71 of the Interim Award, he explained that the Estate admitted in its post-hearing brief that the "…rights conveyed to Rudin in the June 29, 2015 letter agreement 'are not 'covered by' the terminated grant from Ms. Lee to

Dramatic." (Dkt. No 21, Interim Award at 71.) As the Arbitrator found, Dramatic has non-first-class rights and, according to the Estate/LLC, none of those rights were transferred to Rudin. If none of those rights were transferred to Rudin, a determination that they're exclusive to Dramatic could never constitute a breach of contract since, by the Estate/LLC's own admission, they aren't part of their agreement with Rudin. That factual determination was not challenged by the Estate/LLC, but even if they tried, it's final and unreviewable. *Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) ("[f]actual or legal errors by arbitrators—even clear or gross errors—do not authorize courts to annul awards"). On this basis alone, the whole third-party-breach-of-contract argument crumbles.

The Estate/LLC's argument that the general public is harmed by enforcing the terms of Dramatic's exclusive license is even more far-fetched. They actually argue that refusing to vacate the Arbitrator's decision here fails to protect the public because it will be "prevented from seeing the Sorkin Play outside of Broadway and the major cities where first-class productions of the Sorkin Play will tour." (Dkt. No. 22, Motion to Vacate at 27) This is hardly akin to putting an unlicensed driver behind the wheel of a truck or subjecting the public to an anti-competitive monopoly in violation of the Sherman Act. Indeed, to be subject to vacatur, the arbitrator's decision must actually result in the violation of a law. *Wise*, 450 F.3d at 268. Copyright policy was codified by Congress in a big, giant statute under Title 17. Other than vague statements of the general policy underlying copyright law, the Estate/LLC hasn't pointed to a single section of the Copyright Act (or any other law) that will be violated simply because members of the public won't see a production of the Sorkin version of TKAM outside of Broadway or other first-class theaters elsewhere. [8]

Of course, none of this gets the Estate/LLC past their *Baxter* problem, 315 F3d. 829. As discussed above, in that case, *Baxter* tried to argue that because an arbitrator turned down its claim

---

[8] If enforcing copyright licenses violated public policy, every contract discussed above would be void.

that the arbitrator's interpretation would result in a Sherman Act violation, that decision was subject to review and vacatur. The Seventh Circuit rejected that argument, finding that because the arbitrator had addressed the Sherman Act issue, as between the parties to arbitration the decision was unreviewable. 315 F.3d at 832. Here, not only did the arbitrator rule on the Section 304(c) issue, he also ruled that based on the Estate/LLC's binding admission, no non-first-class rights were transferred to Rudin under his agreement with Ms. Lee, so there's no breach of contract. None of this is properly before the Court.

<h3 style="text-align:center">C. Rudin has no overlapping rights as a matter of law.</h3>

Leaving aside the Arbitrator's unreviewable factual finding that no non-first-class rights were transferred to Rudin, as a matter of statutory law, Ms. Lee had no legal basis for transferring any such rights in the June 29, 2015 letter agreement with Rudin because her termination of Dramatic's rights wasn't effective until April 26, 2016.[9] (Dkt. No. 22-5, J043-004).

17 U.S.C. § 304(c)(6)(D) is crystal clear: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant **is valid only if it is made after the effective date of the termination**." (emphasis added) This is pretty straightforward. Grantors can't transfer rights they don't have. Courts facing this issue repeatedly have read the plain language of the statute and applied it as written. *Artist Rights Enforcement Corp. v. Estate of Benjamin E. King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) ( promise of future rights contained in sale agreement invalid when agreement predated termination notice) *Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F.Supp.2d 375, 380–81 (S.D.N.Y. 1999) (transfer of interest "conveyed nothing" because it was executed before the

---

[9] Because the Arbitrator found Dramatic's exclusive rights under the 1969 Agreement to license non-first-class performances survived termination under 17 U.S.C. § 304(c), he concluded it was unnecessary to address this argument. (Dkt. No. 21, Interim Award at 71). To the extent this Court considers the Estate/LLC's vacatur request regarding § 304(c), as previously requested, Dramatic respectfully asks that the Court vacate, correct and modify the Arbitrator's failure to address this § 304(c)(6)(D) law under 9 U.S.C. §§ 10 and 11.

effective date of termination); *DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588, *10 (C.D. Cal. 2012) (same).

The Estate, of course, knows this. It repeatedly made the identical argument in a concurrent arbitration between the Estate and the heirs of Gregory Peck and others. (Dkt. No. 21, p. 4, fn 3; Dkt. No. 24, Ex. A, at p. 9). In the Estate's own words: "[a]ny actual grant of those rights . . . is valid 'only if it is made after the effective date of the termination.' § 304(c)(6)(D). An author cannot regrant rights which have not yet returned to her possession." (*Id.*) So, here the Estate and Dramatic are in agreement. Ms. Lee couldn't regrant rights that hadn't been returned to her. Accordingly, for yet another reason, the Estate/LLC's entire damage-to-third-party contract conceit fails, because, as a matter of black letter law, those rights were never legally transferred to Rudin.

## II.    The Estate/LLC Are Wrong on the Substance.

While review of neither the Arbitration Panel's unanimous decision nor the Arbitrator's decision that Dramatic's exclusive rights survive termination are the proper subject of review, there's no question that their decisions are correct. As the Arbitrator found, the plain language of the derivative works exceptions supports Dramatic's exclusivity. "As in any case of statutory construction, our analysis begins with "the language of the statute." …. And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999). The Estate/LLC's unsupported musings about the broad policies between Section 304(c) notwithstanding, the language of the derivative works exception is clear and direct and the Court's analysis should end with those words.

### A.    The plain language of the statue applies to "exclusive" grants.

Congress was clear that subsection (c) of Section 304 of the Copyright Act applies to both exclusive and nonexclusive licenses. It states right up front: "…[T]he **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . is subject to

termination under the following conditions…". 17 U.S.C. § 304(c) (emphasis added). Further down in subsection 304(c)(6)(A), Congress sets forth a list of exceptions or limitations, but never once distinguishes between "exclusive" or "nonexclusive" grants. Subsection 6 provides in relevant part, "In all cases the reversion of rights is subject to the following **limitations**" (emphasis added) and the very first exception, for derivative works, is the one at issue in the arbitration:

> (A) A derivative work prepared under authority of the grant before its termination may continue to be **utilized under the terms of the grant after its termination**, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (emphasis added).

In sum, then, the statute provides for: 1) termination of an exclusive grant, but 2) if that exclusive grant is for a derivative work, then that exclusive grant "may continue to be utilized" under the terms of the original exclusive grant without any limitation. When the word "exclusive" is plugged into the subsection, it becomes abundantly clear (to the extent it wasn't already):

> A derivative work prepared under the authority of the **[exclusive] grant** before its termination may continue to be **utilized under the terms of the [exclusive]grant** after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated **[exclusive] grant**.

17 U.S.C. § 304(c)(6)(A) (emphasis added).

Nothing in the language even hints that it is not applicable to exclusive grants. Congress didn't say "some of the terms of the grant" nor did it say "this doesn't apply to exclusive grants." And it certainly didn't limit the language to "nonexclusive" grants after making clear just a few lines up that Section 304(c) applies to "exclusive and nonexclusive grants." It is error to read words in a statute in isolation. *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006). This is exactly why the Arbitrator concluded that Dramatic's right to exclusivity "is required by the plain language of the §304(c) of the Act." (Dkt. No. 21, Interim Award at 63). Section304(c)(6)(A) is the "limitation" to

the termination section; it is the exception. And the words in the exception say that all of the terms of an exclusive grant survive termination.

## B. The Estate/LLC misread the language of the exception.

Despite the clear language of Section304(c)(6)(A), the Estate/LLC try to argue that the Court should exclude exclusive grants from a statute directed to "exclusive and nonexclusive grants" because Section 304(c)(6)(A) goes on to say that the right to "utilize" the derivative work "under all the terms of the [exclusive or nonexclusive] grant" also limits the "*preparation* after the termination of *other derivative works* based upon the copyrighted work…". (emphasis added) In other words, they're saying that because original derivative rights holders are statutorily barred from *making* any *new* derivative works, that means that when they "utilize" their old derivative works "under the *terms* of the original grant," those "terms" as a matter of law, cannot include exclusivity. Their basis? The unsupported claim that the sole purpose of that language is so "the author…can license new derivative works." (Dkt. No. 22 at 16) But that's not what the language says. And that's not what the Supreme Court says that language says. Or means.

According to the Supreme Court, Congress adopted the derivative works "exception" to specifically carve out grants directed to derivative works from the consequences of Section 304(c), which focuses on the rights of authors to terminate grants and "relieve [them] of the consequence of ill-advised and unremunerative grants" made before the author knew the value of her work. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172- 73 (1985). While much of the Copyright Act and Section 304(c) protects the rights of authors, Congress added Section 304(c)(6)(A) as an **"Exception,"** not to protect the rights of authors, but to "preserve" the rights of the owner of a derivative work:

> The **Exception** in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—**even if they were manifestly unfair to the author**—from that broad objective. The purpose of the **Exception** was to "**preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion.**" Therefore, even if a person acquired the right to exploit **an already prepared derivative work by means of an unfavorable bargain with an author**, that right was to be excluded from the bundle of rights that would

revert to the author when he exercised his termination right.

*Mills Music*, 469 U.S. at 173. (emphasis added).

No matter how unfair, no matter how unfavorable the bargain to Harper Lee,[10] by the express terms of the exception, owners of derivative works were given this particular protection to ensure they could continue to fully exploit their work. The Court reinforced that the exception means what it clearly says: "we believe the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Mills Music*, 469 U.S. at 164. *See also Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) ("The effect of *Mills Music*, then, is to preserve during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works . . . ").

### C.   The Estate/LLC's reference to the broad purpose of the statute is misleading.

In trying to persuade this Court to ignore the actual language in the statute, time and again, the Estate/LLC commits the cardinal sin of relying on sweeping pronouncements about the overall purpose of a statute, while ignoring the express language in the exception (*e.g.* Dkt. No. 23 at 14; 17-18; 23), which, as the Supreme Court has made clear "prevents the effectuation of congressional intent:"

> Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, **the final language of the legislation may reflect hard-fought compromises**. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

---

[10] Of course, by 1969, Harper Lee was no babe in the woods when she negotiated her agreement with Dramatic. By then, she'd already won the Pulitzer Prize for *To Kill a Mockingbird*, authorized her work to be made into an Academy Award winning film, and she was represented by Annie Laurie Williams, one of the top literary agents in New York.

*Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373-74 (1986). (emphasis added). In fact, as the Supreme Court makes abundantly clear in *Mills Music*, the derivative works exception in Section 304(c) reflects exactly the same sort of "hard-fought compromises"[11] it would later identify in *Dimension Financial*. Nobody disputes that, generally, Section 304(c) was adopted to give authors a shot at recapturing some of the original rights they'd granted soon after creation of their works, but in so doing, Congress sought to balance the interests of authors with the interests of creators of derivative works,[12] even if it meant the original author got stung in the transaction. The Estate/LLC's utter failure to discuss the history of the exception should tell the Court all it needs to know.

The Estate/LLC also has come up with no authority to support their exclusivity argument. Although they seem to request *Chevron* deference[13] for an anonymous Copyright Office post, it's not even entitled to *Skidmore* deference.[14] They provide no basis for why the statement on the Copyright Office website has any persuasive power to make it worthy of something closer to "great respect" as opposed to "near indifference." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). [15]

**D.     The Estate/LLC's "ownership/exclusive license" argument fails.**

The Estate/LLC trots out a brand, spanking new argument never raised in the arbitration claiming that *Mills* doesn't apply because if ownership reverts upon termination, so, too, must an

---

[11] "[T]he termination provisions reflect[s] a practical compromise that will further the objectives of the copyright law while recognizing the problems and needs of all interests involved." *Mills Music*, 469 U.S. at 173 quoting H.R. Rep. No. 94-1476, at 124.

[12] According to the Supreme Court, "Congress intended the termination provisions to produce an accommodation and a balancing among various interests." *Mills Music*, 469 U.S. at 173, n. 40.

[13] *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984)( When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute).

[14] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (agency interpretations are entitled to persuasive deference, though the weight of such deference in any particular case will depend on the circumstances.).

[15] The Copyright Office Compendium, a more authoritative reference guide created by the Office, does not contain the statement referenced by the Estate/LLC.

exclusive license because they're the same thing under copyright law. Not only is this issue not properly before the Court, it is wrong as a matter of law. The Seventh Circuit has made clear that federal courts shouldn't "…indulge[] late arguments that were not brought to the attention of the arbitrator below." *Lippert Tile Co. v. Int'l Union of Bricklayers,* 724 F.3d at 945 (7th Cir. 2013). To the extent this Court deems lack of indulgence permissive rather than mandatory, in this case, the exclusive license v. ownership premise still doesn't fly because the copyrights and license at issue arose under the 1909 Copyright Act. Under the earlier version of the Act, an exclusive grant of part of a copyright's rights operated "…merely as a license, not an assignment of ownership of a copyright." *First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298 (1968) *citations omitted. See also Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) ("individual rights comprising the bundle of copyright property rights could not be separately assigned, and exclusive licenses granted more limited rights… .") citing, 3 Nimmer § 10.01[C]. [16]

Of course, the whole too-cute-by-half nature of the Estate/LLC's exclusive license/ownership argument becomes evident when the *Mills* case is viewed in context. In *Mills Music,* Snyder assigned Mills the rights to the song "Who's Sorry Now" in exchange for a cash payment and Mills' agreement to give Snyder 50 percent of the royalties out of any licenses issued by Mills. Mills, in turn, issued nearly 400 non-exclusive licenses to recording companies which were the derivative works in question. *Mills Music,* 469 U.S. at 157. When Snyder's heirs terminated the original assignment to Mills, they claimed that Mills no longer could get its share of the royalties. The question that arose was simply whether, when the Snyder heirs terminated the assignment to Mills, Mills could continue to receive royalties that were part of the original assignment. It is

---

[16] The law is also clear that "[f]or disputes as to ownership of copyright, a court applies the 1909 Act to works created and actions taken before 1978 (the effective date of the 1976 Act) and the 1976 Act to works created and actions taken after 1978." *Stern v. Lavender,* 319 F.Supp.3d 650, 667 (2018) (citations omitted) See also *Donen v. Paramount Pictures Corp.,* 2008 WL 5054340, *4 (C.D. Cal. Nov. 20, 2008).

important to emphasize that the original transfer from Snyder to Mills was a complete assignment of rights that didn't trigger the derivative works exception on its own; rather, the subsequent licenses issued to all of the recording companies (to make derivative works) were subject to the derivative works exception. The Snyder heirs claimed that because they could terminate the original grant which contained the 50 percent deal (the transaction not subject on its own to the derivative works exception), Mills no longer was entitled to its 50 percent cut.

The Supreme Court rejected the Snyder's heirs' attempts at cutting Mills out of the deal, not because the grant to it was an assignment or because it was exclusive or nonexclusive, but rather because the royalty payment part of that original grant was directly tied to the licenses held by all of the derivative rights holders. *Id.* at 166. The court noted that if the underlying assignment grant hadn't authorized separate licenses, "they would have been nullities." *Id.* But because the recording companies' rights were derivative of the rights granted to Mills which also were subject to Mills' agreement to pay Snyder half the royalties it got from those specific terms, they were included in the "terms of the grant:"

> If the scope of the entire set of documents that created and defined each licensee's right to prepare and distribute derivative works is used to define the relevant "terms of the grant" for purposes of the Exception, those terms include Mills' right to obtain 100 percent of the net royalty income in the first instance and Mills' obligation thereafter to remit 50 percent of those revenues to the Snyders.

*Id.* at 167. Again, the court wasn't concerned with the fact that the original transfer was part of an assignment or an exclusive license or a nonexclusive license. For the purposes of the derivative works exception, the Court was clear the "terms of the grant" meant just that:

> It should be noted that Justice WHITE's dissent does not adopt the Court of Appeals' reading of the Exception. He reads the "terms of the grant" to include only those terms defining the amount of the royalty payments and to exclude the terms identifying the parties to whom the royalty is payable. The statute itself, however, refers to "the terms of the grant"—not to some of the terms of the grant.

*Id.* at fn 35.

While it is true that the Supreme Court did say that the statutory transfer of ownership was not the same as the "statutory ownership of contractual rights," it was in the context of the focus of the contracts held by the derivative rights holders. As the court explained, the derivative rights holders had no "direct contractual obligation" to Snyder's heirs just because the transfer of ownership of the underlying copyright, but rather because of the contract that included Mills. *Id.* at 168. That is why the court goes on to explain that the purpose of the derivative rights exception is to "preserve the total contractual relationship." *Id.* at 169. It explained that the right in the derivative works exception to "utilize" the work in the future is "confined by 'the terms of the grant,'" which means that the obligation to pay royalties survives termination and without it, the derivative rights holders would have no obligation to pay the Snyders." *Id.*

After reviewing the legislative history, the *Mills* court went on to explain that the exception not only preserved the obligations to pay royalties, but also that it protects the author of a derivative work "from being required to pay an increased royalty to the author." *Id.* at 177. But that is exactly what the Estate/LLC is proposing here. The royalty set forth in the 1969 Agreement was based on Dramatic retaining exclusive rights. Eliminating Dramatic's exclusivity, but requiring it to pay the same royalty to the Lee Estate is essentially a price increase.[17] In any case, simply operating under those terms doesn't make Dramatic an owner. If, however, nomenclature is a problem, simply call the language in 2(a) stating that the dramatization "is to be the only one the amateur acting rights of which [Harper Lee] will permit to be leased and/or licensed" a covenant not to sue or a prohibition against her and her Estate. Under the plain language of the statute, the legislative history and the detailed analysis of the Supreme Court, these rights remains exclusive.

### III.    The Court Should Enforce the Declaratory and Injunctive Relief.

---

[17] Nobody disputes that the termination provision does not apply outside the United States. Under the Estate/LLC's reading, Dramatic will pay the same royalty in the United States as it would in the United Kingdom, where it has exclusive rights. That simply doesn't make sense.

The Estate/LLC open their brief by arguing that certain relief granted by the Arbitrator is so vague and so ambiguous that this Court can't possibly fashion an order based on it. Conspicuously absent from this discussion is any controlling authority addressing "ambiguity" in orders, particularly in the context of injunctions. Those cases make clear that the Arbitrator's order is sufficiently specific for this Court to enforce. As a preliminary matter, however, remanding a case for clarification to an arbitrator is generally disfavored because it is inconsistent with "the interest in prompt and final arbitration" and when possible, a court should avoid remanding a decision to an arbitrator. *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 280-81 (7th Cir. 1992) (citations omitted). A court may, however, interpret and enforce an ambiguous award "if the ambiguity can be resolved from the record." *Id.* Where, for instance, an arbitrator resolved all claims before him, but a court was left to engage in a "ministerial computation" that could be figured out from the documents, the arbitrator's award was deemed "final and definite." *Id.* Dramatic agrees that given the weeks of testimony over which the Arbitrator presided, he is in a far better position than the Court to clear up a true ambiguity, but as discussed below, in context, his order is sufficiently definite for this Court to enforce. As will become apparent, the Estate/LLC aren't interested in cleaning up ambiguities; they're just interested in rearguing issues that already have been decided.

### A.     The term "non-first-class" is sufficiently definite to be enforced.

As the Estate/LLC correctly notes, the Arbitrator in this case found that in the industry there generally are three broad classes of theater: 1) Broadway/first-class, 2) regional/resident/repertory theatres [like the Goodman, Guthrie or Alabama Shakespeare Festival] and 3) community theaters. (Dkt. No. 21, Interim Award at 12). What they leave out, however, is that these three categories came directly from the Estate's expert, Robert Marx, and that pretty much every witness who testified about theater talked about the three "buckets" or groups of theatre as well. (Ex. K, Tr. 166:8-168:20; 2684:15-2685:13; 3121:9-18; 3338:6-3339:13; 3381:23-

3382:6; 4515:11-4516:20; 4805:10-4807:25). Contrary to the Estate/LLC's characterization, and as should be clear from reading the Interim Award from pages 9-36, the issue in the case wasn't simply whether "stock" theaters could hire professional actors, but whether the term "stock" (or "stock" and "repertoire") as used in the 1969 Agreement referred to that middle group of theater. The Arbitrator determined that it did.

So, for the avoidance of doubt, the Arbitrator made clear that Dramatic has everything but first-class rights, *i.e.* "non-first-class rights." As is evident from his specific findings, this characterization was based on evidence in the case. Not only did Dramatic's expert testify that "stock includes all professional productions except Broadway and first-class."(Dkt. No. 21, Interim Award at 12) that's almost exactly what Harper Lee's lawyer Tim O'Donnell said in 2015. ("Nope, [Dramatic has] everything but first-class production rights." (*Id.*, Interim Award at 23-24)).

Stuck with a ruling they don't like, the Estate/LLC try to claim the term is too ambiguous to enforce because of allegedly conflicting statements in the Interim Award. Leaving aside the issue of whether an allegedly inconsistent statement in the reasoning from an award can render the award "ambiguous" as a matter of law (the Estate/LLC cites to no authority), the Estate/LLC's entire "ambiguity" premise is based on a blatant misrepresentation of the evidence.

The Interim Award provides that "Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* (non-first-class rights")." (Dkt. No. 21, Interim Award at 6.) The term is then used throughout the balance of the award. And, as the Estate/LLC correctly states, "So, from that statement, it would appear that Dramatic can license the Sergel Play for all professional productions other than first-class productions." (Dkt. No. 22 at 10). But then the Estate/LLC try to claim that a statement in the reasoning of the award conflicts with that characterization. They point to the Arbitrator's discussion in the context of his contract construction about the professional acting rights Ms. Lee reserved under the 1969 Agreement. The Arbitrator

notes, "…other non-stock professional acting rights are reserved to Ms. Lee. An example would be rights to Off-Broadway productions." *Id.* Then, to create the "ambiguity" the Estate/LLC tell this Court that the "undisputed evidence at the hearing established that Off-Broadway productions are not first-class." (Dkt. No. 22 at 10-11). Accordingly, they conclude, if Off-Broadway isn't part of first class, but Ms. Lee reserved off-Broadway rights, then, obviously, the term "non-first-class" is ambiguous. The problem with their syllogism, however, is that the claim that "the undisputed evidence at the hearing" showed that Off-Broadway productions are not first class is objectively false. The Court need go no further than the testimony cited by the Arbitrator regarding the rights Ms. Lee reserved. (Dkt. No. 21, Interim Award, p. 27, citing Tr. at 3235-36).

During that testimony, Dramatic's president, Christopher Sergel III, was asked by the Estate/LLC's counsel that if off-Broadway productions weren't listed in the 1969 Agreement, "…those rights belong to Harper Lee. Correct?" Mr. Sergel explains that the analysis is much more nuanced and that, depending on the circumstances, off-Broadway rights could be stock or could be reserved to Ms. Lee:

15 Q All right. So that is a
16 category of theater that is not listed in the 1969
17 agreement. Another category of theater not listed
18 in the 1969 agreement is the right to license
19 off-Broadway productions**.** Correct?
20 A. That is correct.
21 Q. **Because they aren't**
22 **expressly granted in the agreement, those rights**
23 **belong to Harper Lee. Correct?**
24 **A. It would depend on the**
25 **contract with Equity**.
1 Q. What would it depend on?
2 A. If it was a commercial
3 first-class open-ended run on an off-Broadway
4 contract, it would fall to Ms. Lee**. If it were an**
5 **Equity mini-contract or showcase code production**
6 **off-Broadway, that would fall to stock licensing.**

Ex. K, Tr. at 3235-36 (emphasis added).

Clearly, the Arbitrator adopted Mr. Sergel's testimony that in some cases an off-Broadway production could constitute a first-class production, but in others, an off-Broadway production would be a stock right, which also explains his statement regarding what Ms. Lee reserved. That one piece of evidence pretty much destroys the Estate/LLC's premise that there was no evidence that off-Broadway could ever be first class which, in turn, tanks its entire "ambiguity" argument. Dramatic will leave it to the Estate/LLC to explain to this Court how it could represent to the Court that the evidence was "uncontroverted" that off-Broadway is never first class when the citation to Mr. Sergel's testimony was staring them in the face, but the fact remains that no matter how many other references they seek to support their "off-Broadway is always non-first-class" claim, the Arbitrator disagreed and, frankly whether he had evidence or not on this issue, his word is final. Asking this Court to conclude otherwise is asking this Court to weigh the evidence, which is beyond the scope of review. The same is true for the examples the Estate/LLC cite in footnote 3 on p. 11 of their motion. Even if they think there was other evidence to support their belief that there are other "non-stock" professional theaters, the Arbitrator found Dramatic has all non-first-class rights and that's the end of the inquiry.[18]

Nor does the fact that a determination of "first-class" may, on rare occasions, involve weighing various factors render the term inappropriate for an injunction order. The Seventh Circuit has made clear that while a certain level of certainty is required for an injunction under Fed.R.Civ.P. 65, laser-like precision is unnecessary: "But the Rule does not require the impossible. There is a limit to what words can convey. The more specific the order, the more opportunities for evasion ('Loopholes')." *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985).

---

[18] It is truly striking that the Estate/LLC would actually complain that "the Arbitrator undertook no analysis" regarding second-class tours. Whether he did or he didn't, one of the central holdings of *Affymax* is that "no rule of law requires arbitrators to render opinions—or, having chosen to write an opinion, to discuss every issue…". 660 F.3d at 285. Moreover, the Arbitrator made clear the evidence in his Award was meant to be "illustrative rather than exhaustive." (Dkt. No. 21, Interim Award at 8, ¶ 18).

As shown above, "first-class" or "first-class rights" is a commonly used term in the theater industry, which generally means Broadway and West End theatres along with certain other tours generally emanating from or related to those productions. It was used repeatedly in correspondence between the parties over the years when disputes arose between Dramatic and Ms. Lee about whether Dramatic exceeded the professional stock rights in the 1969 Agreement by licensing a "first-class" theater." (Exs. C, L, M; J018; C021; J31). Not only does a search of the term in the hearing transcript reflect literally hundreds of uses by witnesses at the hearing, the Estate/LLC's counsel used the term at least 15 times during his opening statement.[19] While it's true that around the edges the exact boundary of first-class may be gray, (e.g. Dkt. No. 21, Interim Award at 32), as the *Scandia* court explained, when the "difficulty stems from the inability of words to describe the variousness of experience, the court may prefer brief imprecise standards to prolix imprecise standards." 772 F.2d at 1432. *See also, Eli Lilly and Co. v. Arla foods, Inc.* 893 F.3d 375, 384-85 (7th Cir. 2018).

The Estate/LLC's authority on this point? None. And that's part of the problem. It's not like they've offered any alternative definition or characterization that would be consistent with the findings of the Arbitrator and the well-recognized "first-class" industry standard. Not that Dramatic hasn't tried to find out. On more than one occasion its counsel has proposed having precisely that conversation. Most recently, on January 28, 2022, the Estate/LLC's counsel said he needed to "get up to speed" before responding. (Ex. N). Dramatic is still waiting. All this suggests that the Estate/LLC isn't truly interested in "getting certainty," but, rather, trying to relitigate already-long-resolved issues and further delay the inevitable. Their request should be denied.

---

[19] See, e.g., Ex. K, Tr. 83, 84, 95, 100, 101, 102, 103, 104, 119, 123, 124 & 128. Indeed, a cornerstone (albeit unsuccessful) of the Estate/LLC's defense during the hearing was their claim that the Arbitrator didn't need to even address the issue of the meaning of stock because Dramatic materially breached the 1969 Agreement by licensing "first-class" theaters. (*See, e.g.*, Ex. K, Tr. at 83:5-7 "the second issue that doesn't rely on an understanding of the meaning of stock is the licensing of commercial and first-class productions in the UK.")

**B.     The Estate/LLC's indemnity argument is based on a false premise.**

The Estate/LLC spills a lot of ink arguing about whether the indemnity provisions in the Award line up with the indemnity provision in the 1969 Agreement. So what? As the Supreme Court and the Seventh Circuit have hammered home again and again and again, "…[A]n arbitrator acts as the parties' agent and, as their delegate, may do anything the parties may do directly." *George Watts,* 248 F.3d at 580, *citing Eastern Assoc. Coal,* 531 U.S. 57, 65; *Hyatt,* 876 at 902; *Affymax,* 660 F.3d at 284. The only appropriate question is whether the arbitrator's power to decide issues was within the arbitration clause. As discussed above at 4-5, under the broad language in the arbitration clause here, the parties agreed that the arbitrator would resolve "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se," *Gore,* 666 F.3d at 1033. And, indeed, this wasn't simply an action for breach of contract. Rather this case specifically involved claims for tortious interference with contract and, perhaps most importantly, a declaration of the scope of Dramatic's rights under the contract. Not only did the parties agree to litigate these issues, as a matter of law, they, too, were necessarily brought under the arbitration clause which encompasses all claims "tangentially" related to the agreement, including claims of fraud and misrepresentation. *Welborn,* 301 F.3d at 639.[20] And, of course, the Estate/LLC arbitrated all of these issues without objection.

Once the parties are in arbitration, the arbitrator has even broader power to fashion whatever remedy he deems necessary. If the issues are before an arbitrator and he finds a violation then he is "required to formulate an appropriate remedy" even if it wasn't originally anticipated by

---

[20] So the Court is clear, contrary to the Estate/LLC's misstatement at the opening section of their brief, Dramatic didn't "add" the LLC as a party, (Dkt. No. 22 at 23) The LLC demanded that it be part of the arbitration, claiming, "As the legal owner of the copyright to the Novel, **Harper Lee LLC claims an interest relating to the property that is the subject of Dramatic's claims** against the Estate. The conduct of Dramatic alleged herein is grounded in or intertwined with the Original Grant containing the arbitration agreement, such that Dramatic cannot object to arbitration of this claims. Ex. O, at 14. (emphasis added)

the parties. *Chameleon Dental Products, Inc. v. Jackson*, 925 F.2d 223, 225 (7th Cir. 1991) (termination of license agreement appropriate even though it contained no termination provision). The Seventh Circuit repeatedly has emphasized the great remedial breadth inherent in arbitration. *See, e.g. Yasuda*, 37 F.3d 345, 351 (7th Cir. 1994) ("…we would be remiss if we did not emphasize how important a wide range of remedies is to successful arbitration.")*; Baravati*, 28 F.3d at 710.

As the Final Award makes clear, the Estate didn't just breach the contract here, it committed a tort when it interfered with Dramatic's licensees and that conduct was so bad, it was just this side of punitive damages territory. (Dkt. No. 21, Interim Award at 88). Moreover, the entire hearing ground to a screeching halt when Dramatic discovered the Estate/LLC had failed to discuss a parallel arbitration proceeding Harper Lee had filed against the Estate of Gregory Peck which was chock full of important documents directly relevant to the proceedings before him. (Id., Interim Award at 4, fn. 3).[21] To the extent the Court has any further doubt about just how concerned the Arbitrator was with the Estate/LLC's egregious and duplicitous conduct or that they would repeat the conduct in the future, the Court need look no further than the explanation given by the Arbitrator for his substantial fee award contained in the Final Award recently entered against the Estate/LLC: "The award should also serve as a deterrent to similar conduct by Respondents in the future with respect to violations of Dramatic's rights by the Estate and LLC." (Ex. P, at 5-6)

So, in sum: 1) the Dramatic-Estate/LLC relationship was properly before the Arbitrator; 2) the Arbitrator has nearly unlimited discretion to fashion any award he wishes, especially when new issues arise the arbitration; 3) the Arbitrator acts as the parties' agent and can fashion any agreement on their behalf they would fashion as long as it doesn't violate the law; 4) the Estate/LLC hid a highly relevant dispute with highly relevant documents; 5) the Arbitrator found that the Estate breached the contract and engaged in tortious behavior; and 6) the Arbitrator is concerned that both

---

[21] The transcripts referenced in the footnote are attached as Exhibit K.

the Estate and the LLC will act badly in the future with respect to Dramatic's rights.

Under those circumstances, the entire indemnity was within the Arbitrator's power to fashion and the Estate/LLC have pointed to no authority that would permit the Court to scale it back. Indeed, the Estate/LLC's duplicity regarding the Peck arbitration should raise real concerns for this Court about how any proposed limitation might harm Dramatic in the future should it discover other activity that should have been put on the Arbitrator's radar. Obviously, an indemnification demand from Dramatic wholly unrelated to *To Kill a Mockingbird* would result in a swift rebuke from any court should Dramatic seek it, but this Court should not give the wrongdoers here the opportunity to engage in "evasion" or create "loopholes." *Scandia*, 772 F.2d at 1431. The Estate/LLC's request for remand should be denied.

## IV.  Dramatic's Requests Are Appropriate.

Citing *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir.1994), the Estate/LLC argue that nothing in the FAA itself authorizes a district court to award attorney's fees. That may be true as far as the FAA goes, but, as *Menke* recognized, the limitation on fee awards may be imposed "[a]bsent statutory authorization or **contractual agreement between the parties***…" Menke* 17 F.3d 1007, 1009 (7th Cir.1994)(emphasis added). There is a contract here and it provides for fees. The 1969 Agreement, binding on Ms. Lee and her heirs and assigns, requires them to "…defend, indemnify and hold harmless [Dramatic] from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by [Lee]"  Ex. B, ¶1(b). All of the issues raised by Respondents arise out of their multiple breaches under the Agreement, including their current efforts to "prevent" and "hinder" Dramatic from fully exercising its exclusive rights to all non-first-class theatrical rights. Their failure to accept an arbitrator's award despite Ms. Lee's promise to be bound it also constitutes a breach.

It is that same insistence to keep on litigating that has caused the Seventh Circuit to break from the American Rule and award fees to losing parties who refuse to accept arbitration awards. "More than 25 years ago, this court held that commercial parties that have agreed to final resolution by an arbitrator, yet go right on litigating, must pay their adversaries' attorneys' fees." *Hyatt,* 876 F.3d at 903. If the foregoing case cite sounds familiar, it should, since the Estate/LLC repeatedly cited *Hyatt* in their papers. Yet, once again, they failed to mention controlling authority to the Court. Of course, even if they missed the discussion in their case, the Seventh Circuit has articulated this principle multiple times, if they'd only bothered to look. "We have remarked before that awards of attorneys' fees are readily available when one side refuses to accept an arbitrator's award and loses." *Continental Can Co. v. Chicago Truck Drivers Pension Fund*, 921 F.2d 126, 128 (7th Cir.1990). *See also Widell v. Wolf,* 43 F.3d 1150, 1151-52 (7th Cir. 1994) ("…American Rule requires each side to pay its fees in the first round of litigation but does not compel it to pay for a second round attacking the outcome of the first"); *Certco, Inc. v. International Broth. of Teamsters, Local Union No. 695*, 722 F.3d 1097, 1100 (7th Cir. 2013) (costs of moving dispute to a second forum should be borne by the person who initiates the new round.) If not now, when? This Court can and should award Dramatic its reasonable attorneys' fees incurred in this motion.

The Estate/LLC also object to Dramatic's *pro forma* request that the Court's judgment extend to all persons who are in active concert or participation with the Respondents as an improper modification of the Arbitrator's award. That argument ignores that under Fed.R.Civ.P. 65(d)(2), an injunctive order automatically binds the parties, the parties' officers, agents, servants, employees, and attorneys, and other persons in active concert or participation.[22] This is not a substantive request, it

---

[22] The rule applies to district court proceedings relating to the enforcement of arbitration awards. Fed.R.Civ.P. 81(a)(6) states that "[t]hese rules, to the extent applicable, govern proceedings under the following laws, except as these laws provide other procedures: . . . (B) 9 U.S.C., relating to arbitration." The FAA does not contain any rule governing the form or effect of injunctive relief granted in arbitration awards.

is asking the Court to enter judgment consistent with procedure. A person is in "active concert or participation" if they "aid and abet" the enjoined party or if they are in "privity" with the joined party. *Blockowicz v. Williams*, 630 F.3d 563, 567 (7th Cir.2010) citing *Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is of the U.S. of Am., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010). The purpose of Rule 65(d)(2) is to "ensure that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Blockowicz*, 630 F.3d at 567 (citations and quotes omitted). Accordingly, a person is in "active concert or participation" with an enjoined party, and thus bound by the injunction, if he "aids or abets an enjoined party in violating the injunction." *Id.* "An injunction covers these persons/entities **even if they are not expressly mentioned in the text of the order**." *Washington Metropolitan Area Transit Com'n v. Reliable Limousine Service*, 776 F.3d 1, 10 (2015) (emphasis added) citing 11A WRIGHT & MILLER § 2956 (3d ed. 2014).

## CONCLUSION

For the reasons set forth above, this Court should deny Respondents' Motion and confirm the Interim Award subject to the modifications requested by Dramatic.

Dated: February 16, 2022

Respectfully submitted,

The Dramatic Publishing Company

By: /s/ Kevin Tottis
    One of its Attorneys

Kevin Tottis
ktottis@tottislaw.com
Keith Stolte
kstolte@tottislaw.com
Monica L. Thompson
mthompson@tottislaw.com
TottisLaw
One East Wacker Drive
Suite 1205

Chicago, IL 60601
Tel: (312) 527-1400
Fax: (312) 589-7192

Of Counsel:

David Blasband
dblasband@mclaughlinstern.com
McLaughlin & Stern LLP
260 Madison Avenue
New York, NY 10016
Tel: (212) 448-1100
Fax: (212) 448-0066

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATTICUS LIMITED LIABILITY COMPANY,

      *Plaintiff,*

    and

AARON SORKIN,

      *Involuntary Plaintiff,*

    -against-

THE DRAMATIC PUBLISHING COMPANY,

      *Defendant.*

Case No. 1:22-cv-10147-DLC

---

**DRAMATIC PUBLISHING COMPANY'S REPLY IN**
**SUPPORT OF ITS MOTION TO DISMISS ATTICUS LLC'S COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

Key Mischaracterizations...................................................................................................2

    A.    The "private attorney serving as sole arbitrator."...........................................2

    B.    The Illinois decision was more than a rubber stamp. ....................................2

    C.    The Rudinplay Affiliates acted "in concert" with the Lee Estate. ...............3

Argument ...........................................................................................................................3

    A.    The Rudinplay Affiliates never acquired non-first-class rights.....................3

        1.    The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D)..............3

        2.    Ms. Lee had no right to transfer non-first-class rights. .........................5

    B.    The Rudinplay Affiliates' claims and issues are precluded..........................6

        1.    The Rudinplay Affiliates agreed to be bound. ......................................6

        2.    The Rudinplay Affiliates were adequately represented..........................7

        3.    The Rudinplay Affiliates "first-in-time" cases don't apply here..............8

        4.    The Court should not ignore the Illinois judgment. ...............................8

    C.    The Rudinplay Affiliates all but ignore the derivative works exception. ....9

CONCLUSION..................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986) ........................................9

*Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 866 (S.D.N.Y. 1987) ........................5

*Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir. 2011 ..............8

*City of Chicago v. St. John's United Church of Christ,* 935 N.E.2d 1158, 1168 (Ill. App. 2010) ....................7

*Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ...................................................... 1, 6

*Dramatic Publishing Company v. Carter*, --- F.Supp.3d ----,
   2022 WL 2194586, *4 (N.D. Ill. 2022) ...............................................................3

*Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976) .................................. 1, 5

*Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436, 440 (Ill. Ct. App. 1993) .....................9

*Julien J. Studley, Inc. v. N.Y. News, Inc.*, 512 N.E.2d 300, 301 (N.Y.1987) .........................4

*Matter of Emergency Beacon Corp.*, 665 F.2d 36, 39-40, n. 4 (2d Cir. 1981) .........................8

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 167, n.35 (1985) ....................................2, 9, 10

*Mitchell v. Hawley*, 83 U.S. 544, 550 (1872) .........................................................5

*People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020) ...................................9

*People v. Harris* 922 N.E.2d 1042 (Ill. 2009) .......................................................9

*Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995) ..............................................8

*Roy Export Co. Establishment v. Columbia Broad. Sys., Inc.*,
   503 F.Supp. 1137, 1153 (S.D.N.Y.1980) ............................................................6

*Southland Corp. v. Keating*, 465.S. 1, 10 (1984) ...................................................2

*State Bldg. Venture v. O'Donnell,* 940 N.E.2d 1122 (Ill. 2010) .......................................9

*State Life Ins. Co. v. Bd. of Education*, 81 N.E.2d 877, 880 (Ill. 1948) ..............................8

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ............................................................7

*Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) ...............................................9

**Statutes**

17 U.S.C. § 304.................................................................................2, 4, 5, 9

9 U.S.C. § 13 .....................................................................................3, 5

**Other Authorities**

*Reed v. Delta Airlines, Inc.,* 2011 WL 1085338, *4 (S.D.N.Y. March 23, 2011) ...........................................5

Restatement (Second) of Judgments, § 40 ................................................................................................7

The Rudinplay Affiliates' Complaint claims they got the rights to create and produce their version of *To Kill a Mockingbird* from Harper Lee in 2015. Conspicuously absent from the Complaint and their Response, however, is any explanation of how Ms. Lee had the right to sell them anything but first-class rights. As Dramatic has explained, Ms. Lee granted Dramatic all non-first-class rights in 1969 and she never got them back. This not only was confirmed by the district court in Illinois, but, in the first instance, decided by the Arbitrator, who Ms. Lee promised in 1969 would have the final word on the meaning and extent of all her rights under the 1969 Agreement. The Rudinplay Affiliates haven't offered this Court any basis to conclude that under "the terms of the original grant," anybody other than the Arbitrator had the right to decide the scope of Dramatic's and Ms. Lee's rights. Nor do they offer a lick of authority that would permit this Court to step in and undo what either the Arbitrator or the Illinois court have already done. Nor does any such authority exist.

Before the Rudinplay Affiliates can ask this Court to declare anything regarding non-first-class rights, they have the burden of showing they legitimately got them from Ms. Lee. This wasn't lost on the Arbitrator. Nor was it lost on the district court in Illinois. And it shouldn't be lost on this Court. Importantly, none of this analysis turns on application of res judicata, although that doctrine provides an independent basis for dismissal. As Dramatic has established, a licensor can't transfer rights she doesn't own.[1] The Rudinplay Affiliates refuse to address this authority. Instead, they continue pretending that what happened in Illinois is little more than an intramural squabble between Ms. Lee's Estate and Dramatic with no bearing on what Ms. Lee could sell them, longstanding licensing principles be damned.

As far as the remaining issues go, the Rudinplay Affiliates continue to ignore or mischaracterize principles they find inconvenient. Dramatic will address these infelicities below, but one glaring omission begs mention at the outset. In their Complaint and Response, the Rudinplay

---

[1] *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976).

Affiliates promise this Court oodles of law holding that the derivative works exception to § 304(c) of the Copyright Act permits a court to ignore "terms of the grant" governing exclusivity, despite the Supreme Court's express admonition that the exception applies to all and not just "…some of the terms of the grant." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 167, n.35 (1985) Apart from *Mills Music*, not a single case cited by the Rudinplay Affiliates deals directly with the derivative works exception, let alone suggests a court may ignore an exclusivity provision. Consistent with their penchant for ignoring inconvenient controlling authority, the Rudinplay Affiliates also fail to acknowledge—let alone distinguish—any of the Supreme Court's exhaustive analysis of the derivative works exception in *Mills Music*, including its express finding that "…the consequence of a termination that § 304 authorizes **simply do not apply to derivative works that are protected by the Exception…**" defined in § 304(c)(6)(A). *Id.* at 164 (emphasis added). The Court need not wade into the merits of the Rudinplay Affiliates' § 304 analysis, but if it does, it will find that analysis, too, is meritless.

**Key Mischaracterizations**

Dramatic will briefly address a number of relevant misstatements by the Rudinplay Affiliates.

**A.  The "private attorney serving as sole arbitrator."**

The Rudinplay Affiliates' Response is rife with references to what they term a "private attorney serving as a sole arbitrator," suggesting that the Arbitration Award here is somehow illegitimate. Congress and the Supreme Court beg to differ. Congress enacted the FAA nearly a century ago and declared a national policy favoring arbitration. *See, e.g.*, *Southland Corp. v. Keating*, 465. U.S. 1, 10 (1984). Moreover, Congress has made clear that a judgment confirming an arbitration award has the "same force and effect" as any other judgment.[2]

**B.  The Illinois decision was more than a rubber stamp.**

---

[2] "The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13(c).

In their fact discussion, the Rudinplay Affiliates suggest the Illinois decision involved no substantive determinations by the district court. That is not correct. The Lee Estate knew it had no legal basis to simply vacate the Arbitrator's decision on exclusivity, so it argued the Arbitrator's decision exceeded his powers because it injured third parties, specifically Rudin and Sorkin. *Dramatic Publishing Company v. Carter*, --- F.Supp.3d ----, 2022 WL 2194586, *4 (N.D. Ill. 2022). While the Illinois court did defer to the Arbitrator's Section 304(c) analysis, it expressly found that the non-reviewable finding meant Ms. Lee had no further rights to transfer to Rudin. *Id.*

**C.  The Rudinplay Affiliates acted "in concert" with the Lee Estate.**

At footnote 1 of its memorandum, the Rudinplay Affiliates try to dismiss a "series of salacious allegations against" Ms. Lee's handlers. The statements aren't "salacious allegations;" they reflect specific fact-based findings by the Arbitrator. The Rudinplay Affiliates also wrongly attempt to limit those findings to just Ms. Lee's handlers, when, in reality, the Arbitrator's findings also address the Rudinplay Affiliates themselves. Their collaboration with the Lee Estate is directly relevant to privity discussed below, which is why the Arbitrator specifically found the parties acted "in concert" to expand Rudin's rights at the expense of Dramatic.

Argument

**A.  The Rudinplay Affiliates never acquired non-first-class rights.**

For at least two reasons, the Rudinplay Affiliates have no basis to claim the underlying rights upon which they base this action. This failure is fatal to their complaint.

**1.  The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D).**

As Dramatic explained, under the plain language of 17 U.S.C. § 304(c)(6)(D), the Rudinplay Affiliates obtained their grant or "agreement to make a further grant," before the effective date of termination and, thus, any claim they have for non-first-class rights fails. (Doc. 29, pp. 12-13.) The

3

end of the Rudinplay Affiliates' Response belatedly throws in arguments regarding this dispositive

threshold issue, none of which provide a basis for straying from the statute's plain language.

First, they claim that because Dramatic isn't suing them for copyright infringement, the

scope of the Rudinplay Affiliates' rights isn't relevant. That's a headscratcher. They filed this lawsuit.

If they don't have the rights on which they base the lawsuit, they have no lawsuit. The actual words

in their Complaint contradict this pretense, including their representation to the Court that an actual

controversy exists with Dramatic over the Rudinplay Affiliates' "rights" and their request for a

declaration regarding those same "rights." (*See, e.g.,* Doc. No. 1, ¶¶ , 42-45.)

Their arguments don't improve after that. They argue "no grant of rights was made" until

December 2018, when "the option was deemed exercised." But their rights don't exist without the

2015 Letter Agreement and even, if, somehow, the Court concluded the agreement isn't a grant, an

"option" is, in the express words of the statute, "an agreement to make a further grant." Next the

Rudinplay Affiliates claim they might have a license "implied from conduct." They don't, as their

Complaint makes clear. They based this lawsuit on the 2015 Letter Agreement (Doc. No. 1, ¶¶ 2, 20-

23) and they have not pled any conduct that would give rise to an implied license, especially one with

non-first-class rights.[3] More importantly, this newfound claim fails as a matter of law. It is axiomatic

that a contract may not be implied where an express contract covers the same subject matter. *Reed v.

Delta Airlines, Inc.,* 2011 WL 1085338, *4 (S.D.N.Y. March 23, 2011) (citing *Julien J. Studley, Inc. v.

N.Y. News, Inc.*, 512 N.E.2d 300, 301 (N.Y.1987)). Finally, their own exhibits belie that conceit. As

of December 2020, the 2015 Letter Agreement was part of the Agreement between No Ice and

Sorkin, and no mention is made whatsoever of some implied license. (Doc. 37-4, p. 3.)

---

[3] The conduct described in paragraphs 29-30 of the Complaint involved only first-class productions. The
references to Dramatic's opening memorandum (Doc. 29 at 8-11) only show that the Lee Estate and Rudin
conspired to falsely tell Dramatic's licensees that Dramatic didn't have non-first-class rights, a fact Plaintiffs
now do not dispute.

Their final attempt to rely on *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 866 (S.D.N.Y. 1987) goes nowhere. *Bourne* simply held that a grantee was not entitled to claim a right of first refusal following termination, despite legislative history suggesting that Section 304(c)(6)(D) was intended to provide that right. It certainly provides nothing to bar Dramatic from challenging the legitimacy of the Rudinplay Affiliates' rights under the 2015 Letter Agreement, which they themselves put at issue in this case to invoke the Court's jurisdiction. (Doc. 1, ¶¶ 2-3, 40-43.)

### 2. Ms. Lee had no right to transfer non-first-class rights.

As noted at the outset of this Reply, the Rudinplay Affiliates have provided this Court with no basis to conclude they obtained their rights legitimately from Ms. Lee. The fact that the 2015 Letter Agreement predates the Arbitrator's decision is of no moment.[4] Court decisions divest third parties of rights they thought they had all of the time. Purchasers who buy goods from patent infringers don't get to hold on to those infringing goods; restaurants who contract with distributors to buy wine don't get to buy any more wine (and their customers are denied the opportunity to drink it) if a court decides the distributor didn't have the right to sell it; purported holders in due course never get good title from a thief. If Ms. Lee didn't have rights to transfer to the Rudinplay Affiliates, she didn't have rights to transfer to the Rudinplay Affiliates, no matter what their agreement says. This principle is so fundamental to contract law, there's even a Latin phrase for it: "*dat quod non habet*" (one cannot give what one does not have). *Mitchell v. Hawley*, 83 U.S. 544, 550 (1872).

A review of the cases cited by Dramatic—and flat-out ignored by the Rudinplay Affiliates—underscores the futility of the Rudinplay Affiliates' claim. In *Gilliam,* 538 F.2d at 17, the BBC got rights in a Monty Python script from the authors with no right to alter it after production. Time-Life, in turn, got U.S. distribution rights from the BBC and gave ABC the right to make certain cuts

---

[4] The Rudinplay Affiliate can't seriously argue that the result is any different if the decision regarding Ms. Lee's rights was made by a court in the first instance rather than an arbitrator. *See* 9 U.S.C. § 13(c).

in the product, even though the Monty Python authors had never granted those rights to BBC. *Id.* at

17-18. When ABC broadcast the film and cut 24 minutes, the authors sued for copyright

infringement. The Second Circuit held that even if ABC took the rights in good faith, since a

"grantor may not convey greater rights than it owns," the BBC couldn't give Time-Life and,

eventually, ABC, the right to edit the work. The fact that ABC got its license before the court found

the BBC couldn't grant ABC those rights was irrelevant. *See also, Davis* at 103-04 (same, *citing Roy*

*Export Co. Establishment v. Columbia Broad. Sys., Inc.*, 503 F.Supp. 1137, 1153 (S.D.N.Y.1980)

(axiomatic "that no one can convey more than his own interest in a work.").

The Rudinplay Affiliates, of course, knew they couldn't get rights Ms. Lee didn't own and

they protected themselves should it turn out she didn't own them. That is why in the 2015 Letter

Agreement they required that she represent and warrant she had "…the sole and full right and

authority . . . to grant the rights granted hereunder." (Doc. No. 30-3 at ¶ 11(e)(iv).) But they knew

their rights were subordinate to Dramatic's, which is why that same paragraph begins with a specific

reference to Dramatic's preexisting and superseding rights, when Ms. Lee expressly represents that

she hadn't entered into any agreement "…that would derogate or conflict with the rights granted' to

the Rudinplay Affiliates **"subject to the provisions of Paragraph 2(b) above."** *Id.* at ¶ 11(e)(i)

(emphasis added).[5] Not only did the Rudinplay Affiliates know they couldn't get rights from Ms. Lee

she didn't own, they knew Dramatic's rights—including the right to have an arbitrator resolve any

disputes with Ms. Lee—"derogated and conflicted" with theirs. Their claim is meritless.

**B.  The Rudinplay Affiliates' claims and issues are precluded.**

**1.   The Rudinplay Affiliates agreed to be bound.**

Despite the foregoing, the Rudinplay Affiliates begin their substantive application of res

judicata claiming that they did not agree in the 2015 Letter Agreement to be bound to the terms of

---

[5] Of course, ¶2(b) says that the Rudinplay Affiliates rights are subject to Dramatic's rights.

the 1969 Agreement. In support, they cite § 40 of the Restatement and a Sixth Circuit case that merely states the rule, but is otherwise inapplicable. As comment (b) to Section 40, provides, even if the express language in the 2015 Letter Agreement were not clear enough, an agreement to be bound can also be implied:

> …In ascertaining whether such an agreement is to be inferred, however, it is relevant to consider the closeness of the interests of the persons involved, whether they were represented by the same or collaborating counsel, whether opportunity existed for the person to participate as a party in the first action, whether the person asserted to have made the agreement could invoke benefits of the judgment in the other action should its outcome favor his position, and what representations were made to the court concerning the relation between the actions.

This case satisfies each of these considerations. As the Arbitrator found, the Rudinplay Affiliates worked "in concert" with the Lee Estate and directly collaborated. They don't deny they could have intervened in the arbitration. Had the Arbitrator ruled against Dramatic, can anyone seriously dispute that the Rudinplay Affiliates wouldn't have used the ruling to their own benefit? Finally, the Lee Estate claimed that the Rudinplay Affiliates were necessary parties to the Arbitration.[6]

### 2. The Rudinplay Affiliates were adequately represented.

When it comes to the factor of adequate representation as a separate basis for res judicata, the Rudinplay Affiliates make much of the Supreme Court decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008). They ignore the fact, however, that Illinois law is much broader and, when it comes to the issue of "virtual representation," Illinois courts have found "…*Taylor* in no way addressed, let alone overruled, this state's common law regarding privity." *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1168 (Ill. App. 2010). And, yet again, they ignore authority cited by Dramatic showing that under Illinois law, privity arises between parties "who adequately represent the same legal interests." *Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir.

---

[6] The Arbitrator concluded that under Seventh Circuit law a non-party could not be compelled to join an arbitration, but didn't dispute the close relationship between the Rudinplay Affiliates and the Lee Estate.

2011). There is no question that when it came to the issue of exclusivity, both the Lee Estate and its licensee, the Rudinplay Affiliates, had identical interests. Not only were the interests "adequately represented," the Rudinplay Affiliates were involved with and fully apprised of those litigation decisions.

### 3. The Rudinplay Affiliates "first-in-time" cases don't apply here.

The bulk of the Rudinplay Affiliates' res judicata discussion focuses on one type of first-in-time "successor in interest" cases. (Doc. 36, pp. 18-20.) Without a doubt, they cite several cases. Unfortunately, they're all irrelevant. Not one of those cases involves the threshold issue of a transfer of rights the transferring party did not own. Instead, they involve, for instance, whether a successor in interest can be bound by a judgment on a tort or breach of contract action obtained after obtaining the rights. Long ago, the Second Circuit rejected any suggestion that a third party's property interest survived a subsequent determination that the party from whom it received that interest hadn't first gotten the rights. *Matter of Emergency Beacon Corp.*, 665 F.2d 36, 39-40, n. 4 (2d Cir. 1981). The Rudinplay Affiliates' cases simply do not apply here nor does the fact that they got Ms. Lee to transfer some of Dramatic's rights to them before Dramatic had a chance to turn to the Arbitrator change anything.

### 4. The Court should not ignore the Illinois judgment.

Finally, the Rudinplay Affiliates argue that under Illinois law, res judicata does not apply until a judgment is final and non-appealable, although they acknowledge that federal law does not impose the same restriction. (Doc. 36, pp. 21-22.) Their statement of Illinois law is misleading. As the Seventh Circuit has explained, Illinois law is far from settled on the question. "We have no idea what the law of Illinois is on the question whether a pending appeal destroys the claim preclusive effect of a judgment." *Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995) (identifying conflict between *State Life Ins. Co. v. Bd. of Education*, 81 N.E.2d 877, 880 (Ill. 1948) and *Ballweg v. City of Springfield*, 499

N.E.2d 1373, 1375 (Ill. 1986)).[7] In the meantime, some Illinois appellate courts, like the Seventh Circuit, recommend staying the second case pending appeal of the first, relying on an earlier appellate case citing *State Life*. See *e.g., People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020); *Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436, 440 (Ill. Ct. App. 1993) None of these cases suggest the Court should ignore the earlier decision, which appears to remain good law.

### C.  The Rudinplay Affiliates all but ignore the derivative works exception.

17 U.S.C. § 304(c)(6) provides that post-termination, a derivative work "…may continue to be utilized under the terms of the grant after its termination." Notably, the Rudinplay Affiliates never dispute that the exclusivity term is "a term of the grant." Instead, they spend a lot of time talking about the "utilize" portion of the exception and pretty much ignore the "under the terms of the grant" part. They claim the exception allows a grantee to continue to "utilize" the work, but does not allow the grantee to "prevent" the exploitation of the underlying work. (Doc. 36, p. 12.) This cramped reading ignores the balance of the sentence containing the words "under the terms of the grant…". It also was specifically rejected by the Supreme Court in *Mills Music*: "The word "utilized" as written in the Exception cannot be separated from its context and read in isolation. It is expressly confined by "the terms of the grant." 469 U.S. at 169. And "under the terms of the grant," Dramatic is entitled to enforce the term that says its Play "is to be the only one the amateur acting rights of which [the Lee Estate] will permit to be leased and/or licensed." (Doc. 30-4, p. 1.)[8]

Indeed, to read this term out of the grant amounts to increasing Dramatic's royalty payments to the Lee Estate. As the *Mills Music* court went on to explain, the exception not only preserved the

---

[7] Plaintiff cites *State Bldg. Venture v. O'Donnell*, 940 N.E.2d 1122 (Ill. 2010) and *People v. Harris* 922 N.E.2d 1042 (Ill. 2009), both of which rely on *Ballweg*, but like *Ballweg*, neither mentions or overrules S*tate Life*. Nor do they resolve the conflict discussed in *Rogers*.

[8] The Rudinplay Affiliates ignore binding authority actually involving the derivative works exception cited in Dramatic's brief. *Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) says the derivative works exception "preserve[s] during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners…" (citing *Mills Music*, 469 U.S. at 167).

obligations to pay royalties, but also to protect the author of a derivative work "from being required to pay an increased royalty to the author." *Id*. at 177. But that is just what the Rudinplay Affiliates propose here. The 1969 Agreement's royalty was based on Dramatic retaining exclusive rights. Eliminating Dramatic's right to exclusivity, but requiring it to pay the same royalty to the Lee Estate, means Dramatic is paying the same amount but getting fewer rights, essentially a price increase.[9]

As discussed above, the balance of the Rudinplay Affiliate's arguments are based on cases and principles unrelated to the operative derivate works exception here. The Arbitrator was right. There is no basis for the Rudinplay Affiliates' reading and their case should be dismissed.

## Conclusion

For the foregoing reasons, this Court should dismiss the Rudinplay Affiliates' Complaint with prejudice, award costs, attorneys' fees and any other relief the Court deems appropriate.

Dated:  February 15, 2023

Respectfully submitted,

TottisLaw

By:      /s/ Kevin Tottis
         Kevin Tottis (admitted *pro hac vice*)
         Keith Stolte (admitted *pro hac vice*)
         Max A. Stein (admitted *pro hac vice*)
         401 N. Michigan Avenue
         Suite 530
         Chicago, IL 60611
         Tel: (312) 527-1400
         ktottis@tottislaw.com
         kstolte@tottislaw.com
         mstein@tottislaw.com

         McLaughlin & Stern, LLP
         Steven J. Hyman
         David Blasband
         Oliver R. Chernin
         260 Madison Avenue
         New York, NY 10016

---

[9] Nobody disputes that the termination provision does not apply outside the United States. Under the Rudinplay Affiliates' reading, Dramatic will pay the same royalty in the United States as it would in the United Kingdom, where it has exclusive rights. That simply doesn't make sense.

Tel: (212) 447-1100
shyman@mclaughlinstern.com
dblasband@mclaughlinstern.com
ochernin@mclaughlinstern.com

*Attorneys for The Dramatic Publishing Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

       *Plaintiff,*

  and

AARON SORKIN,

       *Involuntary Plaintiff,*

   -against-

THE DRAMATIC PUBLISHING COMPANY,

       *Defendant.*

Case No. 1:22-cv-10147-DLC

**DRAMATIC PUBLISHING COMPANY'S**
**RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

Table of Authorities.................................................................................................................iii

Examples Of Dramatic's Necessary Discovery...................................................................2

BACKGROUND FACTS .........................................................................................................5

ARGUMENT.............................................................................................................................5

    A.    The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D)...............................7

    B.    The Rudinplay Affiliates are bound by all terms of the 1969 Agreement. .................7

    C.    This entire action is barred by the doctrine of res judicata...................................12

        1.    The Rudinplay Affiliates are in privity with the Lee Estate. ..........................12

            a)    The Rudinplay Affiliates agreed to be bound by the arbitrator's decision............14

            b)    The Lee Estate adequately represented the Rudinplay Affiliates' legal interests..15

            c)    The Rudinplay Affiliates have controlled the Lee Estate from the Outset..........17

        2.    The Court should not ignore the Illinois decision. .........................................18

    D.    Dramatic's exclusivity survives termination. ...............................................20

CONCLUSION........................................................................................................................23

# Table of Authorities

## Cases

*Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011)..........................17

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009) ...................................................................................1

*Association of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 81 (2d Cir. 2018) ..................... 1, 2

*Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986) ........................................................18

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  193 F.3d 415, 423 (6th Cir. 1999) .......................................................................................................14

*Chevron Corp. v. Donziger*, 886 F. Supp.2d 235, 270 (S.D.N.Y. 2012)...............................................12

*City of Chicago v. St. John's United Church of Christ*,
  935 N.E.2d 1158, 1167 (Ill. Appl. Ct. 2010).....................................................................................13

*Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) ...................................................................................23

*Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ....................................................................................6

*Duane Reade, Inc. v. St. Paul Fire & Marine Uns. Co.*,
  600 F.3d 190, 195 (2d Cir. 2010) .......................................................................................................12

*Dwyer v. Evoy*, 12 F.Supp.2d 832, 834-35 (N.D. Ill. 1998) ...............................................................19

*First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*,
  286 F.Supp. 295, 298 (1968) ..............................................................................................................23

*Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022).................................................................11

*Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976) ......................................................6

*Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ......................................1

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999).............................................................23

*Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436, 440 (Ill. Ct. App. 1993) ...........................19

*In Holzer v. Motorola Lighting, Inc.*, 693 N.E.2d 446, 455 (Ill. Appl. Ct. 1998) ............................14

*Lai Ling Cheng v. Modansky Leasing Co.*,
  73 N.Y.2d 454, 460, 539 N.E.2d 570, 573 (1989)...........................................................................10

*Lawrence v. Board of Election Com'rs of City of Chicago*,
  524 F.Supp.2d 1011, 1019 (N.D. Ill. 2007)......................................................................................19

*Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10-11 (Ill. App. Ct. 1989) ...................................18

*Lutkauskas v. Ricker*, 28 N.E.3d 727, 738 (2015) ......................................................................... 12, 15

*Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) ................................................3

*Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir. 2003) ......................................5

*Mills Music, Inc. v. Snyder*, 469 U.S. 153,164 (1985)................................................ 20, 21, 22, 23

*Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. Ct. 1994) ................................................................18

*People ex rel. Burris v. Progressive Land Developers, Inc,*
   602 N.E.2d 820, 825 (Ill. App. 1992) ......................................................................... 16, 17

*People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020) .............................................19

*People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 177 (7th Cir 1995) ............................13

*Rogers v. Desiderio,* 58 F.3d 299, 302 (7th Cir. 1995) ..................................................................19

*Ronan Associates, Inc. v. Local 94-94A-94B, Intern. Union of Operating Engineers,*
   24 F.3d 447, 449 (2d Cir. 1994) ........................................................................................9

*Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct. App. 1989) ...............19

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) .............................................8

*St. John's United Church of Christ*, 935 N.E.2d at 1168 ......................................................... 16, 17

*Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) .....................................................11

*State Life Insurance Co. v. Board of Education*, 81 N.E.2d 877, 880 (Ill. 1948)............................18

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ........................................................................................16

*U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007) ....................................... 3, 15

*Wilder v. World of Boxing LLC,*
   310 F. Supp.3d 426, 441 (S.D.N.Y 2018), *aff'd* 777 Fed.Appx. 531 (2d Cir. 2019)...............9, 10, 11

*Wilson v. City of Chicago*, 900 F.Supp. 1015, 1026 (N.D. Ill. 1995) .............................................19

*Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) ................. 9, 11

**Statutes**

17 U.S.C. § 304 ...................................................................................... 1, 2, 4, 7, 13, 22, 23, 25

**Other Authorities**

Fed. R. Civ. P. 56 .......................................................................................................................... 2, 5

Restatement (Second) of Judgments § 40 ......................................................................................14

*Clark & Leland Condominium, L.L.C v. Northside Comm. Bank,* 14-cv-3928, 2016 WL 302102, * 3 (N.D.
   Ill Jan. 25, 2016) ............................................................................................................19

*Hicks v. Midwest Transit, Inc.*, 02-cv-4028, 2006 WL 8455841, *6 (S.D. Ill. May 8, 2006).......................19

*Mandelstein v. Rukin*, Case No. 17-cv-9216,  2018 WL 4384383, *4-5 (N.D. Ill. Sept. 14, 2018)..........19

*Walden*, 2015 WL 1433353 at *5 ...................................................................................................................5

Motions to dismiss and motions for summary judgment are not two sides of the same coin. Motions to dismiss test the sufficiency of the pleadings and decide whether a plaintiff has stated a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). Summary judgment considers whether the parties can establish the essential elements of their cases and should only be granted if the non-moving party cannot make a "sufficient showing" on one of those essential elements. *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). Just because a party claims one issue constitutes a "pure issue of law" is not a sufficient basis for a court to jettison an entire case in that party's favor without discovery. Summary judgment motions are a "'drastic device'" and should not be granted in the face of major factual contentions, especially where, as here, the nonmoving party has not had an opportunity to take discovery. *Association of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 81 (2d Cir. 2018) (citation omitted).

As the now completed briefing on its motion to dismiss demonstrates, Dramatic has provided the Court with multiple bases for dismissing the Rudinplay Affiliates' Complaint. Should the Court, however, find that the pleadings are not facially deficient and—despite the plain language of Section 304(c)'s derivative work exception expressly providing that a derivative work's ' owner's right to "utilize" the work "under the terms of the grant" and the express directive of the Supreme Court that the phrase "terms of the grant" means "all the terms of the grant"—that the Rudinplay Affiliates may pick and choose the terms of the grant under which Dramatic may operate, the Rudinplay Affiliates still must overcome several obstacles before the Court can even consider entering judgment in their favor. These obstacles include:

- Proving that Ms. Lee actually owned the non-first-class rights in the first instance when she purportedly transferred them to the Rudinplay Affiliates;

- Proving that the Rudinplay Affiliates' express agreement that any rights they claim in the 2015 Letter Agreement are "subject to the rights granted under the 1969 Agreement" coupled with their decision to exclude those rights from the express warranties they

drafted for Ms. Lee to grant them in that agreement allows them to ignore the terms of the 1969 Agreement;

• Proving that any rights were properly transferred to them under Section 304(c)(6)(D) of the Copyright Act;

• Proving that they were not in privity with the Lee Estate or otherwise bound by the Arbitration decision and Northern District of Illinois judgment under claim and issue preclusion doctrines; and

• Ultimately, under the derivative works exception in Section 304(c)(6)(A), identifying which "terms of the grant" survived Ms. Lee's termination and the basis for their picks.

On these bases alone, the Court should deny the summary judgment motion.

### Examples Of Dramatic's Necessary Discovery

These numerous issues require discovery and certainly make entertaining summary judgment inappropriate until that discovery can be completed, let alone before Dramatic has even answered.[1] Accordingly, pursuant to Fed. R. Civ. P. 56(d), Dramatic requests discovery on a variety of topics.

To ensure that parties like Dramatic have the opportunity to discover that information, Rule 56(d) "authorizes district courts to defer ruling on a motion for summary judgment—or to deny the motion altogether—'[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Association of Car Wash Owners*, 911 F.3d at 83-84. The Second Circuit assesses requests for discovery made pursuant to Rule 56(d) to determine if the requesting party has provided an affidavit or declaration describing: (1) what facts are sought

---

[1] Not only has there been no opportunity for discovery, Dramatic has not had an opportunity to raise affirmative defenses or assert any counterclaims, be they voluntary or compulsory counterclaims. This last point could mean that entry of summary judgment at this early juncture would give the Rudinplay Affiliates the opportunity to claim Dramatic is bound by a judgment far beyond the limited issue before this Court regarding exclusivity. This is especially problematic given that the Lee Estate and Rudinplay Affiliates have previously advanced the materially false claim that Dramatic had *no* professional acting rights, despite the express grant of "stock and repertoire" rights in the 1969 Agreement that led to the underlying arbitration in the first place. If this Court were to accept the Rudinplay Affiliates' claim that, essentially, the Arbitrator was not the boss of them, it could lead them to subsequently claim that nothing in the arbitration relating to the parties' rights has any effect on them. Also, whether the Lee Estate is a necessary party to this action should be resolved.

and how they are to be obtained, (2) how such facts are reasonably expected to raise a genuine issue of material fact, (3) what efforts the affiant has made to obtain them, and (4) why the affiant's efforts were unsuccessful. *See, e.g., Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (vacating judgment where plaintiff was not given adequate opportunity for discovery).

To comply, with Rule 56(d), Dramatic provides the Declaration of Kevin Tottis.[2] The Tottis Declaration explains that while, to date, no discovery has occurred in this case, Dramatic has provided the Rudinplay Affiliates with a list of initial topics about which it seeks discovery and the Rudinplay Affiliates have failed to even respond. (Tottis Decl., ¶15, Ex. 8.) The Tottis Declaration also identifies the following topics of discovery, most of which were included in the request sent to the Rudinplay Affiliates counsel on February 16, 2023. This material raises both factual issues and potential factual issues central to Dramatic's defense:

1. **The communications among the Lee Estate (including its lawyers), Sorkin (and his lawyers) and the Rudinplay Affiliates (and their lawyers) regarding the Arbitration.** This material is directly related to issues of res judicata, including the ability of the Rudinplay Affiliates to influence the Lee Estate's actions in the arbitration, including any recommendations of legal theories and strategies they may have offered and the Lee Estate's efforts to keep them apprised of the progress of the Arbitration, the confirmation proceedings and the appeal. (Tottis Decl., ¶ 17(b).) In the Arbitration, the Lee Estate actually asserted a "common interest privilege" as to many of these documents, citing authority which describes that relationship as one "where the parties undertake a joint effort with respect to a common legal interest…" *U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007). If the Rudinplay Affiliates share this view, Dramatic is entitled to a privilege log. If they don't, Dramatic is entitled to the material.

2. **Communications and other material relating to the Rudinplay Affiliates' understanding of the 1969 Agreement.** Dramatic is entitled to determine the Rudinplay Affiliates' knowledge and understanding of the exclusivity provisions, the meaning and effect of the 1969 Agreement on the rights they were acquiring, including the need for representations and warranties from Ms. Lee that the Rudinplay Affiliates drafted for her and the effect it might have on her successors and assigns as well as the arbitration provision. Dramatic is also entitled to discovery that might show any changes in those understandings over time. This material relates directly to understanding the

---

[2] Mr. Tottis also provided a Declaration in connection with Dramatic's Motion to Dismiss. (Doc. 30.) Hoping to limit any potential confusion, the Declaration being submitted with this Opposition starts with Paragraph 11 and the Exhibits are numbered starting with Exhibit 8, each picking up where the first Declaration ended.

rights to which the Rudinplay Affiliates believed the 2015 Letter Agreement it prepared were "subject to." (Tottis Decl., ¶17(c).)

3. **Complete copies of any agreements modifying the 2015 Letter Agreement or transferring any of the rights as well as all drafts relating to the negotiation of the agreement.** In support of their Motion, the Rudinplay Affiliates have provided copies of some, but not all of the agreements impacting whatever rights were granted in the 2015 Letter Agreement. Some of the documents are heavily redacted. (*See, e.g.*, Doc. 37-4.) In addition, Doc. 37-4 says that the 2015 Letter Agreement was modified in 2018 by a settlement between the Lee Estate and the Rudinplay Affiliates arising out of litigation. (*See, e.g.*, Doc. 37-4, § 22.27(b).) Dramatic is entitled to all documents relating to the Rudinplay Affiliates' and Sorkin's alleged rights which they claim form the basis for this lawsuit. (Tottis Decl., ¶17(d).)

4. **The basis, nature and extent of the alleged implied contract between Ms. Lee and/or the Estate and the Rudinplay Affiliates**. In their Memorandum, the Rudinplay Affiliates argued without any factual basis that even if their 2015 Letter Agreement was invalid under Section 304(c)(6)(D), they had an implied license. (Doc. 36, p. 23.) To allow it to defend against this assertion, Dramatic is entitled to know how the alleged implied license was formed and the details of any such license. (Tottis Decl., ¶17(a).)

5. **All information reflecting Ms. Lee's understanding that she was licensing rights for a new play**. The evidence shows that, for years, Ms. Lee was adamant she never would agree to license another version of *TKAM*, whether it was for Broadway or the stock and amateur market. (Tottis Decl., ¶17(e), Doc. 30-6(evidencing Ms. Lee's position and uncovered in the Arbitration only after multiple attempts by the Lee Estate to suppress disclosure).) (Dramatic is not claiming rights to first-class theater. Nevertheless, the document upon which the Rudinplay Affiliates base their claim for non-exclusive non-first-class rights is the 2015 Letter Agreement.) In sworn testimony, Mr. Rudin has said that neither he nor anyone on the Rudinplay Affiliates' behalf had any direct contact with Ms. Lee. Ms. Lee survived a stroke in 2007, but suffered from both macular degeneration and profound hearing loss. (Tottis Decl., ¶17(e).) A serious question exists as to whether she understood what rights she owned or knowingly executed the 2015 Letter Agreement. As her sister wrote in 2011, "Poor Nelle can't see and can't hear and will sign anything put before her by anyone in whom she has confidence." (Tottis Decl, ¶17(e); Ex.14.)

6. **Contention interrogatories and other discovery regarding the 1969 Agreement.** Dramatic is entitled to have a clear understanding of those terms of the 1969 Agreement the Rudinplay Affiliates believe do or do not survive the termination, the overall effect of the termination and the basis for those beliefs. (Tottis Decl., ¶17(f).)

7. **Authentication of a number of documents**. Either the Rudinplay Affiliates need to stipulate to the authenticity of a number of documents or Dramatic should be given the opportunity to authenticate them through third parties. (Tottis Decl., ¶17(g).)

8. **Unredacted documents**. If the Estate plans to rely on any document, Dramatic is entitled to review the entire document, under the terms of a protective order. (Tottis Decl., ¶17(h).)

As this non-exhaustive list makes clear, there is much Dramatic needs to discover before the issues in this case can properly resolved on summary judgment.[3] Accordingly, pursuant to Rule 56(d), the Court should now either defer considering the Rudinplay Affiliates' motion or simply deny it.

## BACKGROUND FACTS

Relevant facts are summarized in the motion to dismiss memoranda as well as the Statement of Additional Facts.

## ARGUMENT

The basis for the Rudinplay Affiliates' argument is truly extraordinary. They have sued Dramatic claiming that Dramatic may not exercise the rights it got from Harper Lee under the terms of their 1969 Agreement, even though under the terms of the 1969 Agreement, Dramatic and Ms. Lee agreed an arbitrator would determine those rights. In particular, the Rudinplay Affiliates claim Dramatic may not exercise its exclusive rights which the contractually required arbitrator undeniably decided remained exclusive to Dramatic. Throughout their complaint and supporting memorandum, they have steadfastly refused to even address as a matter of basic contract law just how they could have an interest in rights Ms. Lee had no right to transfer to them in the first place. The Rudinplay Affiliates didn't just find these rights lying on the sidewalk or otherwise generate them themselves; their only claim to these rights derives from Ms. Lee's rights and Ms. Lee's rights were expressly

---

[3] In assessing similar submissions, courts have noted that where no discovery has occurred, a declaration will suffice even if it does not specify the facts that counsel anticipates learning through discovery, since a submission made before discovery has even begun allows for the inference that "such facts will be further developed through discovery." *Walden*, 2015 WL 1433353 at *5 (citing *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003)).

limited by her obligations to Dramatic, a fact the Rudinplay Affiliates expressly acknowledged in the 2015 Letter Agreement.

Dramatic incorporates the arguments made in its motion to dismiss papers into this brief (Docs. 28-30, 47), so it will not repeat all of them here. Notably, however, the Rudinplay Affiliates never once explain how Ms. Lee could transfer rights she didn't own or address the cases cited by Dramatic stating this elementary principle. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976). Perhaps more fundamentally, as a matter of basic contract law, they provide no reason for the Court to ignore clear obligations from the 1969 Agreement which the Rudinplay Affiliates expressly incorporated into their 2015 Letter Agreement. Likewise, in light of these obligations, they fail to explain to the Court how those contractual obligations change simply because they have Ms. Lee's signature on a document that predates the arbitration.

Finally, even if the Court were to find that Ms. Lee's lack of ownership somehow did not constrain her ability to transfer rights she didn't own and even if the Court could find that eight years later, the Rudinplay Affiliates may pick and choose the rights under the 1969 Agreement they now want to incorporate into their 2015 Letter Agreement, the Rudinplay Affiliates still have provided no legitimate basis for the Court to permit them to ignore the plain language of Section 304 of the Copyright Act. This is true whether it applies to the timing of the transfer under 17 U.S.C. § 304(c)(6)(D) or, as they seek in the fundamental question they pose to this Court, the derivative works exception that unambiguously provides (without further exception) that, post-termination, a derivative work owner may continue to utilize its work "under the terms of the grant." Nor, under the appropriate principles of res judicata, do they explain how the Arbitration Award and judgment in the Northern District of Illinois addressing the identical issue before this

Court do not bind them as privies. Given these fundamental failings, as well as the multiple discovery topics identified above, the Court should now reject the Rudinplay Affiliates' motion.

### A. The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D).

Dramatic will not repeat the arguments it made in its initial memorandum and reply in its motion to dismiss. (Doc. 29, pp. 12-13; Doc. 47, pp. 3-5.) As explained, as a matter of law, under 17 U.S.C. § 304(c)(6)(D), the Rudinplay Affiliates simply do not have any non-first-class rights and their motion (and entire case) should fail. Should the court, however, consider the Rudinplay Affiliates' argument claiming an unidentified implied license compelling, Dramatic is entitled to full discovery on the matter.

### B. The Rudinplay Affiliates are bound by all terms of the 1969 Agreement.

In the 1969 Agreement, Ms. Lee granted Dramatic the exclusive right to non-first class productions and Ms. Lee had the right to receive an exclusive license royalty of 25 percent for the right to stage those productions worldwide. (Dramatic's Statement of Additional Facts ("SOAF") ¶1; Doc. 30-4, ¶¶ 2-3.) Ms. Lee and Dramatic also agreed that in resolving their disputes, the parties had the right to alternative dispute resolution through arbitration in Chicago under the rules of the American Arbitration Association. SOAF, ¶5, Doc. 30-4, ¶ 4(k) for "any controversy arising out of [the 1969 Agreement]." (The parties also agreed that each had the right to enforce the terms of the 1969 Agreement against the other's "heirs, executors, administrators, successors and assigns." (SOAF, ¶4; Doc. 30-4, ¶ 4(d).[4]) All of these agreements are included in the parties' "rights" under the 1969 Agreement.

---

[4] "This agreement …shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns."

In the 2015 Letter Agreement, sent to Ms. Lee's handlers on Rudinplay's letterhead and drafted by the Rudinplay Affiliates,[5] the Rudinplay Affiliates first demonstrated full knowledge of the 1969 Agreement and all of the rights and obligations contained in it, specifically identifying the 1969 Agreement and defining it as the "Prior Agreement." (SOAF, ¶19; Doc. 37-3, ¶ 2(b).) Then, to leave no doubt as to the impact of that Prior Agreement, the Rudinplay Affiliates expressly promised in the very words they drafted that the rights they obtained in the 2015 Letter Agreement were limited by the rights in the Prior Agreement: "The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination." (SOAF, ¶24; Doc. 37-3, ¶ 2(b).) So, based on the "rights" as described by the Rudinplay Affiliates' own letter, they acknowledged Dramatic's existing production rights, they accepted that they were on the hook for anything Ms. Lee agreed to with Dramatic back in 1969 (binding on "successors and assigns") and they also agreed that any disputes about the meaning or legal effect of the term providing that Dramatic's play "…is to be the only one the amateur [non-first-class] rights of which [Ms. Lee] will permit to be leased and/or licensed" would be resolved by an arbitrator. (SOAF, ¶¶1-5; Doc. 37-3.)[6]

Other than claiming res judicata does not apply to this language (apparently because the 2015 Letter Agreement referenced but didn't repeat every word from the 1969 Agreement), the

---

[5] Because, to date, Dramatic has not had the chance to conduct discovery, it cannot state with absolute certainty that words included in a letter on Rudinplay letterhead that simply ask Ms. Lee to "agree and accept" were drafted by the Rudinplay Affiliates. If, though, that is contested, then Dramatic is entitled to discover the basis for that assertion, including reviewing all drafts and correspondence relating to it.

Further, Dramatic cannot be certain that the terms set forth in the 2015 Letter Agreement remain the terms of the agreement between Ms. Lee and her Estate and the Rudinplay Affiliates. This is because, as noted above, the 2015 Letter Agreement was modified by the terms of a settlement between the Estate and the Rudinplay Affiliates dated as of May 9, 2018. (SOAF, ¶17(d); Doc. 37-4, § 22.27(b).) The Rudinplay Affiliates haven't provided a copy of the agreement and the copy provided to Dramatic in the Arbitration redacted almost everything.

[6] *See, e.g.*, Doc. 29, pp. 14-16 (discussing an arbitrator's powers, including to apply federal law and citing, among others *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (upholding arbitrator's determination of claims under federal securities laws and RICO)).

Rudinplay Affiliates don't address this central point. As Dramatic has made clear, this is an issue of contract law. Ignoring this language does not mean, as the Rudinplay Affiliates' now apparently contend, they were free to contract with Ms. Lee as though the 1969 Agreement did not exist. "Under New York law, it is well established that contract terms and other agreements may be incorporated by cross-reference," just as the Rudinplay Affiliates did here. *Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022); *see also, Ronan Associates, Inc. v. Local 94-94A-94B, Intern. Union of Operating Engineers*, 24 F.3d 447, 449 (2d Cir. 1994). In *Ronan Associates*, for example, an employee accepted a job subject to the benefits contained in a collective bargaining agreement. Finding that agreement bound the employer to arbitrate, even though the employer hadn't entered into the actual collective barging agreement, the Second Circuit explained: "Parties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to which they are not party." 24 F.3d at 449.

This basic principle applies with equal force to parties binding themselves not just to arbitrate, meaning the **method** for resolving disputes, but also to the actual **resolution** of issues that might impact their own contracts. This is because where a contract references extraneous dispute regulation rules, "…the content of those rules or regulations is incorporated into the contract's terms." *Wilder v. World of Boxing LLC,* 310 F. Supp.3d 426, 441 (S.D.N.Y 2018), *aff'd* 777 Fed.Appx. 531 (2d Cir. 2019) (summary order). There, a boxer and promoter claimed another boxer breached their contract when he tested positive for performance enhancing drugs. Despite an earlier jury verdict to the contrary, the court found that because the parties' agreement referenced the WBC's anti-doping testing program the WBC had full discretion to determine whether the boxer's doping violated the agreement as a result of the parties' binding agreement to abide by the WBC's anti-doping testing program. *Id.* at 441-442.

Here, the 2015 Letter Agreement not only states expressly that the Rudinplay Affiliates' rights are subject to the rights in the 1969 Agreement, the Rudinplay Affiliates drafted it. Thus, to the extent the Rudinplay Affiliates chose not to include qualifications in their references to the 1969 Agreement when they drafted the 2015 Letter Agreement, any ambiguities they may now claim as a result of that decision should be construed against the Rudinplay Affiliates. *See, e.g.*, *Lai Ling Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 460, 539 N.E.2d 570, 573 (1989). There is no dispute that the referenced agreement is the 1969 Agreement; in fact, the Rudinplay Affiliates attached it to their motion and admitted that fact. (Doc. 36, p. 5; Doc. 37-1; Doc. 1, ¶ 21 (quoting Doc. 37-1).) Nor for the purposes of contract construction does the timing of the Arbitrator's decision have any bearing on the Rudinplay Affiliates' rights. Just as the parties' reference to the WBC's anti-doping program meant the WBC's post-jury verdict decision that there was not a violation of the WBC's rules was binding on the parties in *Wilder*, the Rudinplay Affiliates agreed to be bound to ***all*** of the terms of the 1969 Agreement, including the Arbitrator's interpretation and determination of those terms.[7]

What's more, the Rudinplay Affiliates included a second reference in the 2015 Letter Agreement to their obligation to subject their rights to the rights in the 1969 Agreement. In Paragraph 11(e), the Rudinplay Affiliates themselves specifically carved out the rights contained in the 1969 Agreement from Ms. Lee's warranty, stating that she represents and warrants she "has not assigned or licensed to any person and/or entity, and has not entered into any agreements" that would "derogate from or conflict with" the rights in the Novel granted to the Rudinplay Affiliates ***except for the rights contained in the 1969 Agreement*** by noting that Ms. Lee's representation

---

[7] In the 2015 Letter Agreement, the Rudinplay Affiliates offer up their opinion that "…notwithstanding such termination, the amateur acting rights to the [1969 Agreement] can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere." (Doc. 37-3, ¶ 2(b).) But the "rights granted" under the 1969 Agreement are not subject to the ruminations of the Rudinplay Affiliates; they are subject to the rights set forth in the agreement, and those rights have now been determined by the Arbitrator and confirmed by the Northern District of Illinois.

and warranty is "subject to the provision of Paragraph 2(b) above." (Doc. 37-3, ¶ 11(e).) As with the original reference to the 1969 Agreement, this provision contains no other limitation on the rights being represented or warranted.

The 2015 Letter Agreement is clear on its face that the Rudinplay Affiliates were aware of and agreed that their rights would, at a minimum, be limited by the rights of Lee and Dramatic as set forth in the 1969 Agreement. *See, e.g.*, *Wilder*, 310 F. Supp. at 442 (because the parties agreed in their contract to the WBC's anti-doping program, "they are thus now bound by it"). Even if this were not the case, there can be no doubt but that the Rudinplay Affiliates were aware of the 1969 Agreement, and thus were on inquiry notice regarding the terms of that agreement, and their potential impact on their own agreement with Ms. Lee. *See, e.g.*, *Zachman*, 49 F.4th at 102; *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022). As the Second Circuit explained in *Fisher*, "'[w]here an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent.'" *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019)) (emphasis in original). Here, the Rudinplay Affiliates clearly were aware of the 1969 Agreement, its terms were obvious to them and it was called to their attention since they referenced it themselves in drafting the 2015 Letter Agreement. Moreover, the Rudinplay Affiliates then indicated their assent to its terms by, among other things, explicitly making their agreement with Ms. Lee subject to it at multiple points in the 2015 Letter Agreement. To the extent that the Rudinplay Affiliates now attempt to walk away from their own acknowledgement of the 1969 Agreement in their drafting of the 2015 Letter Agreement, that attempt in and of itself creates fact issues about which Dramatic is entitled to seek discovery pursuant to Rule 56(d).

**C.  This entire action is barred by the doctrine of res judicata.**

Whether this action is precluded under the doctrine of res judicata is a question of Illinois law. *Duane Reade, Inc. v. St. Paul Fire & Marine Uns. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) ("The law governing the doctrine of res judicata in a diversity action is 'the law that would be applied by state courts in the state in which the federal diversity court sits.'") (citations omitted). Here, the Arbitration Award was rendered in Illinois and the final judgment was rendered by an Illinois district court in a diversity action. (Doc. 30-2; Doc. 30-5.) Thus, where Illinois and federal law differ, Illinois controls.

A prior action bars a subsequent action under the doctrine of res judicata when three elements exist: 1) a final judgment on the merits rendered by a court of competent jurisdiction; 2) an identity of cause of action; and 3) an identity of parties *or their privies*. *Lutkauskas v. Ricker*, 28 N.E.3d 727, 738 (2015).[8] In their Response, the Rudinplay Affiliates claim no difference between Illinois and federal common law, but that is only partially right. Although the primary elements are the same, as discussed below, under federal law a judgment is "final" even if it is on appeal, *Chevron Corp. v. Donziger*, 886 F. Supp.2d 235, 270 (S.D.N.Y. 2012). Illinois law is inconsistent on the matter, leading many courts to stay the action before them during the pendency of the appeal. Of particular importance, though, Illinois law differs significantly from federal common law on the issue of "privity" and whether the Lee Estate could adequately represent the Rudinplay Affiliates' interests.

**1.  The Rudinplay Affiliates are in privity with the Lee Estate.**

Obviously, the Lee Estate and Rudinplay Affiliates are not identical parties. But identity is not required in the presence of "privity." As courts have noted, for the purposes of res judicata,

---

[8] Because the Rudinplay Affiliates don't appear to dispute the identity of the issues—central to the Arbitration and the present case is whether, following termination under 17 U.S.C. § 304(c)(6)(A), Dramatic continues to own exclusive rights to stage non-first-class productions of *To Kill a Mockingbird*—there is no need to address it further.

privity is an elusive concept, but any analysis depends primarily on the mutuality of interests and the relationship of the parties. *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1167 (Ill. Appl. Ct. 2010); *People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 177 (7th Cir 1995). Even with the few facts now before it, the Court can see the close relationship between the Rudinplay Affiliates and the Lee Estate. Their mutuality of interests bar this action under the doctrine of res judicata. At a minimum, it creates significant fact issues and requires additional discovery. Moreover, the Rudinplay Affiliates failure to respond to an email request in this regard or even start a dialogue on the issue strongly suggests the evidence would not help their cause.

Dramatic has previously identified a number of bases for res judicata to apply, but will focus here on at least three grounds upon which privity exists between the Rudinplay Affiliates and the Lee Estate. First, by agreeing their stage rights as granted in the 2015 Letter Agreement were subject to the 1969 Agreement, the Rudinplay Affiliates effectively agreed to be bound by the arbitrator's decision relating to the Dramatic's and Ms. Lee's respective rights under the 1969 Agreement. Second, privity arises because the Rudinplay Affiliates' and the Lee Estates' legal interests are closely aligned—indeed they are identical—and the Lee Estate adequately represented those interests in the Arbitration and district court action. Third, the Rudinplay Affiliates' control over the Lee Estate and its conduct of the arbitration and Illinois district court action is sufficient to demonstrate privity.[9]

---

[9] In addition, the Rudinplay Affiliates appear to have ratified the terms of the 2015 Letter Agreement in December 2020 (Doc. 37-4, pp. 3 of 96 and 29 of 96) nearly two years after Dramatic filed its Arbitration and nine months *after* a three-arbitrator panel denied the Lee Estate's motion for partial summary judgment on the issue of exclusivity. (Doc. 30-2, Appendix, p. 3) As Dramatic has explained (Doc. 47, p. 8), where original rights ownership is concerned, a subsequent decision does not bar application of privity as successor-in-interest. The fact that the Rudinplay Affiliates contracted *after* knowing of the decision pretty much eliminates their whole first-in-time argument. It also underscores the extraordinary prejudice Dramatic will suffer if it is barred further discover about the transfer of rights between the Rudinplay Affiliates.

> a)   **The Rudinplay Affiliates agreed to be bound by the arbitrator's decision.**

In their memorandum, the Rudinplay Affiliates rely almost exclusively on Section 40 of the Restatement (Second) of Judgments for their argument that they can't be bound by the 1969 Agreement. (Doc. 36, pp. 16-17.) (The case they cite is *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999), which found no express agreement to be bound but did not analyze whether an implied agreement to be bound existed.) In so doing, they focus exclusively on privity based on an "express" agreement to be bound and ignore the test for privity based on an implied agreement. Dramatic, however, prevails in either case. As detailed above, the Rudinplay Affiliates expressly agreed to be bound.[10] If, however, the Court believes this was anything but clear, Dramatic is entitled to conduct discovery on the Rudinplay Affiliates' understanding of the 1969 Agreement.

Moreover, as the Restatement makes clear, privity can arise where an implied agreement to be bound exists. The factors to consider whether an implied agreement exists include:

> the closeness of the interests of the persons involved, whether they were represented by the same or collaborating counsel, whether opportunity existed for the person to participate as a party in the first action, whether the person asserted to have made the agreement could invoke benefits of the judgment in the other action should its outcome favor his position, and what representations were made to the court concerning the relation between the actions.

Restatement (Second) of Judgments § 40, comment b.

As the Arbitrator expressly found, the Lee Estate and the Rudinplay Affiliates and their respective counsel worked in concert to shut down the productions of Dramatic's licensees, giving rise to the arbitration. (SOAF, ¶¶30-50; Doc. 30-2, Appendix A, pp. 73-80, 84-85.) The Lee Estate's

---

[10] *In Holzer v. Motorola Lighting, Inc.*, 693 N.E.2d 446, 455 (Ill. Appl. Ct. 1998), the court found a patent licensor's agreement to accept reduced royalties in the event that the licensee ever had to pay damages to a third party was in a sense an agreement to be bound by a later ruling, and thus privity between the licensor and licensee existed, even though the agreement did not explicitly include the language.

lawyers kept the Rudinplay Affiliates' lawyers fully apprised of the progress of the arbitration, furnishing them with pleadings, orders and other information. (SOAF ¶¶65-73; Doc 30-2n App, A, p. 87) These communications reflect only what was turned over to Dramatic during the Arbitration. Other oral and written communications were withheld on the basis of the Lee Estate's assertion of common interest agreement with the Rudinplay Affiliates. (SOAF, ¶17(b); Tottis Decl, Ex. 33.)

Furthermore, the Rudinplay Affiliates don't deny they could have intervened in the Arbitration and it is obvious they would have invoked the benefits of the rulings of the arbitrator and district court had either ruled in favor of the Lee Estate. Finally, as already noted, during the Arbitration, the Lee Estate represented that they and the Rudinplay Affiliates were subject to a common interest agreement, which means they must be part of a "joint effort with respect to a common legal interest." *BDO Seidman*, 492 F.3d. at 815-16.

In sum, the conduct of the Lee Estate and the Rudinplay Affiliates identified above is sufficient to warrant a finding that the latter implicitly (if not expressly) agreed to be bound by the arbitrator's decision. To the extent this evidence is not sufficiently compelling to the Court, Dramatic should be provided the opportunity to discover the full extent of the "collaboration" between counsel on the Arbitration and district court action and the bases the Rudinplay Affiliates had for not joining either.

**b)  The Lee Estate adequately represented the Rudinplay Affiliates' legal interests.**

As Dramatic explained in its motion to dismiss, under Illinois law privity also arises "between parties who adequately represent the same legal interests." *Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. App. 2015), quoting *People ex rel. Burris v. Progressive Land Developers, Inc*, 602 N.E.2d 820,

825 (Ill. App. 1992).[11] "It is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Lutkauskas,* 28 N.E.3d at 739. Ultimately, a nonparty to a prior suit may be bound pursuant to privity if its interests "are so closely aligned to those of a party" in that prior suit that the party was, essentially, a virtual representative of the nonparty. *St. John's United Church of Christ*, 935 N.E.2d at 1168 (citations omitted).

Citing *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Rudinplay Affiliates claim that the U. S. Supreme Court disclaimed the concept of "virtual representation." They ignore the fact that *Taylor* was discussing federal common law of res judicata. Illinois law is much broader and, when it comes to the issue of "virtual representation," Illinois courts have found "…*Taylor* in no way addressed, let alone overruled, this state's common law regarding privity." *St. John's United Church of Christ*, 935 N.E.2d at 1168.

In *St. John's United Church of Christ*, among the factors the court found compelled finding privity between a church and one of its parishioners in a prior suit and intervenor parishioners in a subsequent suit was their shared religious beliefs and their mutual interest in property rights in the graves of ancestors buried in a cemetery. Specifically, the court found:

> All of the living relatives in this case shared the same core religious beliefs and property interests that they sought to protect by intervening or seeking injunctive relief. They also shared those same core religious beliefs with St. John's. The living relatives' interests are not only closely aligned to those of Runge [the parishioner party in the first action], they are, in the words of the living relatives' own filings, exactly the same as Runge's."

---

[11] When considering the adequacy of the representation in a prior action, the Illinois Supreme Court has focused on whether the same legal position was "vigorously urge[d]" in the prior action, such as through extensive briefing and argument by competent counsel. *Burris,* 151 Ill. 2d at 297 (finding privity between the Illinois Attorney General and members of the Nation of Islam because their interests were identical and the Attorney General extensively briefed and argued the matter). Whether Dramatic's non-first-class rights remained exclusive following the termination was a central issue in the arbitration (and the district court) and subject to extensive briefing and oral argument on summary judgment, oral argument during the hearing, briefing in post-hearing submissions and briefing on the Lee Estate's motion to vacate in the district court. (SOAF, ¶¶53-55; Tottis Decl. ¶39).

*Id.* at 1169.

In *Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011), a fitness club tenant of a shopping plaza sued the city of Arlington Heights over the implementation of a TIF district as part of a redevelopment project. The fitness club lost, appealed and lost again. The owner of the shopping center filed suit against the city urging the same arguments. The court granted summary judgment holding that the claim was precluded based on the prior action filed by the owner's fitness club tenant. In affirming, the court of appeals found privity between the owner and its fitness club tenant:

> First, Capital Fitness and plaintiff shared the same legal interest in their respective lawsuits against defendant. Capital Fitness sought injunctive relief and a declaratory judgment to prevent defendant from incorporating the Plaza in its TIF district and redevelopment plan. This was the exact same relief plaintiff sought in its suit against defendant. Next, it is clear to us that Capital Fitness adequately represented this shared legal interest.

*Id.* at 1132.

Here, the relationship between the Rudinplay Affiliates and the Lee Estate is much closer than they relationship between the parishioners in *St. Johns*, the landlord and tenant in *Agolf* and the Attorney General and members of the Nation of Islam in *Burris*. And like those cases, their legal interests are identical and were extensively briefed and argued by competent counsel in the prior actions. That is more than enough for privity to exist. To the extent the Court is not convinced that the relationship between the Rudinplay Affiliates and the Lee Estate (who, recall, asserted the common interest privilege when it came to communications with the Rudinplay Affiliates) and their mutuality of interests warrant a finding of privity, Dramatic is entitled to full discovery in this regard.

### c) The Rudinplay Affiliates have controlled the Lee Estate from the Outset.

It was not lost on the Arbitrator that prior to the Arbitration the Lee Estate and its agents were doing the Rudinplay Affiliates' bidding to hinder Dramatic's licensing rights. (*See, e.g.*, Doc. 30-2, Appendix, p. 75.) As noted above, from what little Dramatic knows, it is clear the Lee Estate

supplied the Rudinplay Affiliates with salient materials in the arbitration (SOAF, ¶¶65-73) The Lee Estate refused to produce other communications based on a common interest agreement with the Rudinplay Affiliates (nor did it produce a privilege log in this regard), so there is no telling how extensive the control or influence that latter had over the arbitration or the district court litigation. Given the level of control the Rudinplay Affiliates and their counsel had over the Lee Estate and its legal team prior to the Arbitration, it is highly likely their control continued after the Arbitration was filed. Dramatic is entitled to discover the extent the Rudinplay Affiliates influenced the Lee Estate's conduct in the arbitration and district court action.

### 2. The Court should not ignore the Illinois decision.

The Rudinplay Affiliates argue that res judicata cannot apply because the Illinois district court's judgment is not final since it is subject to a notice of appeal. As Dramatic explained in its Reply, Illinois law is not a model of clarity in this area. The confusion arises from two conflicting Illinois Supreme Court decisions. In *State Life Insurance Co. v. Board of Education*, 81 N.E.2d 877, 880 (Ill. 1948), the court held that the decision of the court of first instance retains its preclusive effect, regardless of whether or not the losing party appeals the decision. Decades later, the court held that, for the purposes of collateral estoppel, "finality required that the potential for appellate review must have been exhausted." *Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986).[12] *Ballweg*, however, did not mention, let alone, overrule *State Life*. While *Ballweg* (and two cases cited by the Rudinplay Affiliates, *State Bldg. Venture v. O'Donnell* and *People v. Harris*) are limited to collateral estoppel, some Illinois appellate courts have, without any analysis, extended *Ballweg* to claim preclusion.[13] Other Illinois appellate courts and federal district courts, however, continue to follow

---

[12] This case, of course, includes both res judicata (claim preclusion) and collateral estoppel (issue preclusion).

[13] *See, e.g., Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10-11 (Ill. App. Ct. 1989); *Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. Ct. 1994).

the rule in *State Life*,[14] which, as a result, has created an "intra-court conflict." *See Rogers v. Desiderio,*
58 F.3d 299, 302 (7th Cir. 1995).

This confused state of affairs has led the Seventh Circuit and several district courts to
conclude they have "no idea what the law of Illinois is on the question of whether a pending appeal
destroys the claim preclusive effect of a judgment." *Id.; Wilson v. City of Chicago,* 900 F.Supp. 1015,
1026 (N.D. Ill. 1995) (stating "since *Ballweg* was decided, the state's intermediate appellate courts
have been all over the board, some following *State Life Insurance Co.*, and others following *Ballweg,*"
and agreeing with the Seventh Circuit that the law in Illinois is unsettled.); *see also Mandelstein v. Rukin*,
Case No. 17-cv-9216,  2018 WL 4384383, *4-5 (N.D. Ill. Sept. 14, 2018); *Clark & Leland*
*Condominium, L.L.C v. Northside Comm. Bank,* 14-cv-3928, 2016 WL 302102, * 3 (N.D. Ill Jan. 25,
2016); *Dwyer v. Evoy,* 12 F.Supp.2d 832, 834-35 (N.D. Ill. 1998).

Because the Illinois Supreme Court has never explicitly or implicitly overruled its decision in
*State Life*, the decision in that case remains good law for purposes determining finality in cases
involving res judicata. *Rogers*, 58 F.3d at 301-02 (treating *State Life* as current law) At the least, the
Court should stay this case pending disposition of the Lee Estate's appeal in the Illinois action
consistent with the express admonition of the Seventh Circuit, and several federal district and
Illinois appellate courts. *Rogers*, 58 F.3d at 302; *Dwyer*, 12 F.Supp.2d at 835; *Wilson*, 900 F. Supp. at
1026 & 1029; *Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct. App. 1989).[15]

---

[14] *See e.g.,  People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020); *Illinois Founders Ins. Co. v. Guidish*,
618 N.E.2d 436, 440 (Ill. Ct. App. 1993); *Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct.
App. 1989);  *Lawrence v. Board of Election Com'rs of City of Chicago*, 524 F.Supp.2d 1011, 1019 (N.D. Ill. 2007);
*Hicks v. Midwest Transit, Inc.*, 02-cv-4028, 2006 WL 8455841, *6 (S.D. Ill. May 8, 2006).

[15] The Lee Estate's appellate brief is due March 29, 2023. (SOAF, ¶80; Tottis Decl.  Ex. 46.) Under the
Seventh Circuit's rules, Dramatic's response brief is due April 28, 2023 and the Lee Estate's reply brief is due
May 9, 2023.

**D. Dramatic's exclusivity survives termination.**

As Dramatic discussed extensively in its motion to dismiss submissions (which it incorporates by reference), Section 304 of the Copyright Act provides an author the right to terminate a license or "grant" after a certain period of time. Generally speaking, it allows authors the opportunity to recapture certain rights they previously transferred. That right, however, is subject to an express exception which allows another group of authors—creators of derivative works—to continue to exploit their previously-prepared creations "under the terms of the original grant":

> A derivative work prepared under authority of the grant **before its termination** may continue to be *utilized under the terms of the grant after its termination*, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (emphasis added). As the Supreme Court has explained, "[w]e believe the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Mills Music, Inc. v. Snyder*, 469 U.S. 153,164 (1985).

The 1969 Agreement between Ms. Lee and Dramatic contains a number of terms. One of the terms of that grant is the term in Paragraph 2(a) providing that the Sergel Play "…is to be the only one the [non-first-class] acting rights of which [Ms. Lee] will permit to be leased and /or licensed." (SOAF ¶1.) At no point do the Rudinplay Affiliates suggest that the foregoing term of the grant is not a term of the grant. Instead, they tell the Court that this particular term of the grant doesn't count and the Court should ignore it. They also tell the Court that it should ignore the plain language of the statute, but offer no legitimate basis for their instruction claiming, instead, that because the statute's exception employs the word "utilized" it renders impotent any enforcement power Dramatic may have under the grant.

Thus, under the Rudinplay Affiliates' interpretation of the term "utilized," Dramatic would be unable to "prevent" others from trampling on any of its rights, including the Lee Estate who,

"under the terms of the grant" is specifically prohibited from doing anything that "…would prevent or hinder [Dramatic] from the full exercise of all rights granted" in the 1969 Agreement.  (Doc. 30-4, ¶ 1(a).) Likewise, under the Rudinplay Affiliates' facile reading of "utilize," it is unclear just how Dramatic could seek indemnification under ¶ 1(b) for any violations by the Lee Estate of its ongoing obligations under the terms of the grant. Indeed, Dramatic's inability to affirmatively enforce its rights under the 1969 Agreement would mean it had no remedy when the Lee Estate and the Rudinplay Affiliates teamed up to falsely and maliciously interfere with Dramatic's rights to license non-first-class theaters both in and outside the United States.

This is why, should the Court accept the Rudinplay Affiliates invitation to stray from the plain, unambiguous language of the statute, Dramatic is entitled to conduct discovery testing the basis of the Rudinplay Affiliates' conceit, including allowing Dramatic the opportunity to depose a representative who can identify and explain every term of the grant they believe should be included and every term of the grant they believe should be excluded post-termination. At a minimum, as an initial matter, Dramatic should be permitted to serve contention interrogatories on the issue.

Of course, the Court can avoid all of this by taking the approach specifically endorsed by the Supreme Court in *Mills Music* and read the term "utilized" as written "…in the 'Exception' and not separate it 'from its context' or 'read [it] in isolation.'" 469 U.S. at 169. The Court could also consider the Supreme Court's express admonitions, ignored by the Rudinplay Affiliates, that the word "utilized" is "confined by 'the terms of the grant," *id.*, and that in applying the statute, a court may not pick and choose terms to enforce, recognizing that "[t]he statute itself, however, refers to '*the* terms of the grant'—not to *some* of the terms of the grant." *Id.* at 167, n.35 (emphasis in original). Taking the Supreme Court at its word, then, means that Dramatic's work "is to be the only one the [non-first-class] acting rights of which [Ms. Lee] will permit to be leased and /or licensed" when it is "utilized the terms of grant."

Dramatic acknowledges that the issue of exclusivity was not addressed in *Mills Music*. *Mills Music* also didn't discuss theater. That doesn't mean that the basic principles of statutory construction applied by the Supreme Court or its exhaustive analysis of the Congressional intent behind and meaning of the specific statutory exception here can be ignored. This is especially true given that the Rudinplay Affiliates have failed to point to any authority refusing to apply the exception to a grant of exclusive rights.[16] Moreover, as Dramatic previously discussed at length, Subsection (c) of Section 304 starts out stating that it applies to "exclusive or nonexclusive grant[s]" repeatedly references the term "grant" and never once qualifies the term grant to apply only to nonexclusive grants. The fact that in this particular case the Rudinplay Affiliates may not like the result is of no moment because, as the Supreme Court said:

> The ***Exception*** in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—***even if they were manifestly unfair to the author***—from that broad objective. The purpose of the ***Exception*** was to "***preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion.***" Therefore, even if a person acquired the right to exploit ***an already prepared derivative work by means of an unfavorable bargain with an author***, that right was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right.

*Mills Music*, 469 U.S. at 173. (emphasis added).

The Rudinplay Affiliates have given this Court no basis to unread the express terms of the statute. As in any case of statutory construction, the Court's analysis begins with "the language of the statute.… And where the statutory language provides a clear answer, it ends there as well."

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999). Their motion should be denied.[17]

---

[16] For multiple reasons set forth in Dramatic's initial motion to dismiss memorandum, the Rudinplay Affiliates selective misquoting of something from the Copyright Office website would not properly constitute proper authority even if it weren't misquoted. (Doc. 20, pp. 22-23.)

[17] The Rudinplay Affiliates misread *Mills Music* when they suggest application of exclusivity turns on the issue of ownership. Under the particular facts of the case, the initial grant included an assignment or rights. The derivative works at issue reflected the second leg of the transaction when hundreds of derivative works were created. The Second Circuit found that when the original assignment reverted back to the author's heirs it

**CONCLUSION**

For the reasons set forth above this Court should deny the Rudinplay Affiliates' Motion for Summary Judgment. Alternatively, this Court should stay the motion to permit Dramatic sufficient time to conduct appropriate discovery.

Dated: February 21, 2023                     Respectfully submitted,

                                             TottisLaw

                                             By:    /s/ Kevin Tottis
                                             _____

                                                    Kevin Tottis
                                                    Keith Stolte
                                                    Max A. Stein
                                                    401 N. Michigan Avenue
                                                    Suite 530
                                                    Chicago, IL 60611
                                                    Tel: (312) 527-1400
                                                    ktottis@tottislaw.com
                                                    kstolte@tottislaw.com
                                                    mstein@tottislaw.com


                                                    McLaughlin & Stern, LLP

                                                    Steven J. Hyman
                                                    David Blasband
                                                    Oliver R. Chernin
                                                    260 Madison Avenue
                                                    New York, New York  10016
                                                    Tel: (212) 447-1100
                                                    shyman@mclaughlinstern.com
                                                    dblasband@mclaughlinstern.com
                                                    ochernin@mclaughlinstern.com

                                             *Attorneys for The Dramatic Publishing Company*

---

also transferred the right to them to collect the royalties from the second leg, *i.e.*, the derivative works part of the transaction. The Supreme Court reversed. The quoted language reflects the Supreme Court's description of the Second Circuit's analysis and the misguided view that the reversion of the first leg meant the right to collect royalties from the derivative works went with it. 469 U.S. at 163. In any case, since the transfer arose under the 1909 Copyright Act, their entire false premise crumbles since an exclusive grant of part of a copyright's rights operated "…merely as a license, not an assignment of ownership of a copyright." *First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298 (1968) *citations omitted. See also Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) ("individual rights comprising the bundle of copyright property rights could not be separately assigned, and exclusive licenses granted more limited rights… .")

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

     *Plaintiff,*

  and

AARON SORKIN,

     *Involuntary Plaintiff,*

  -against-

THE DRAMATIC PUBLISHING COMPANY,

     *Defendant.*

Case No. 1:22-cv-10147-DLC

## DECLARATION OF KEVIN TOTTIS

I, Kevin Tottis, declare as follows:

11.     I am an attorney at TottisLaw, which, along with McLaughlin & Stern, is counsel of record for defendant The Dramatic Publishing Company ("Dramatic"). I make this declaration in opposition to the motion for summary judgment filed by Plaintiff Atticus Limited Liability Company, including to provide information in support of Dramatic's request for discovery pursuant to Federal Rule of Civil Procedure 56(d), and to provide the Court with true and correct copies of the documents attached.[1]

### A.    Rule 56(d) Discovery.

12.     At this point in the litigation, Dramatic has not answered the Complaint, nor has it had the opportunity to raise any affirmative defenses or bring any counterclaims or third-party claims it may have. If the Court were to grant the Rudinplay Affiliates' motion now, the resulting

---

[1] I previously submitted a Declaration in support of Dramatic's motion to dismiss. In hopes of avoiding any confusion, this Declaration starts with Paragraph 11 and the Exhibits are numbered starting with Exhibit 8, each picking up where the first Declaration ended.

judgment could operate as a bar to any claims that Dramatic might otherwise have against the Rudinplay Affiliates and any other parties.

13.     Such claims are not simply hypothetical. During the parties' January 30, 2023 Rule 26 conference, I advised counsel for the Rudinplay Affiliates that, if its motion to dismiss were denied, Dramatic would likely bring counterclaims against at least the Rudinplay Affiliates for tortious interference, inducing copyright infringement and potential declarations and noted the likely need for discovery related to them.

14.     Discovery has not begun at this point.

15.     On February 16, 2023, I sent an email to counsel for the Rudinplay Affiliates identifying some of the topics of discovery that Dramatic believes it is entitled to related to the Rudinplay Affiliates' motion for summary judgment and asked Mr. Zavin to respond at his earliest convenience or to contact me if he had any questions. A true and correct copy of that email is attached as Exhibit 8.  That email included almost all of the topics addressed in this declaration. To the extent any were not specifically identified, their subsequent identification only further demonstrates the need for discovery generally in this matter.

16.     To date, I have received neither an acknowledgment nor a response to my email.

17.     Since sending that email, Dramatic has identified a few additional discovery topics related to the Rudinplay Affiliates' Motion. Combined, the topics for which Dramatic seeks discovery to fully justify its opposition to the motion consist of the following:

a.      **The basis, nature and extent of the alleged implied contract between Ms. Lee and/or the Estate and the Rudinplay Affiliates**. In their Memorandum, the Rudinplay Affiliates argue without any factual basis that even if their 2015 Letter Agreement was invalid under Section 304(c)(6)(D), they had an implied license. (Doc. 36, p. 23.) To allow it to defend against this assertion, Dramatic is entitled to know how the alleged implied

license was formed and the details of any such license. Among other things this would include, the terms of that agreement, the specific conduct they claim gave rise to the agreement, the parties to that agreement and identification of people with knowledge of that agreement.

        b.     **The communications among the Lee Estate (including its lawyers), Sorkin (and his lawyers) and the Rudinplay Affiliates (and their lawyers) regarding the Arbitration.** This material is directly related to issues of res judicata, including the ability of the Rudinplay Affiliates to influence the Lee Estate's actions in the arbitration, including any recommendations of legal theories and strategies they may have offered, and the Lee Estate's efforts to keep them apprised of the progress of the Arbitration, the confirmation proceedings and the appeal. In the Arbitration, the Lee Estate actually asserted a "common interest privilege" as to many of these documents, citing authority which describes that relationship as one "where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007). Although the Rudinplay Affiliates are not bound by the Lee Estate's assertion, if they are going to assert the privilege, Dramatic is entitled to know the basis for it as well as obtain a privilege log. Properly done, the log's descriptions could lend valuable insight into the extent of the Rudinplay Affiliates' and the Lee Estate's cooperation with respect to the Arbitration, the Illinois district court action and the appeal—an issue central to privity. If they disagree with the Lee Estate's characterization of their communications, Dramatic is entitled to review them.

        c.     **Communications and other material relating to the Rudinplay Affiliates' understanding of the 1969 Agreement.** Dramatic is entitled to determine the

Rudinplay Affiliates' knowledge and understanding of the exclusivity provisions, the meaning and effect of the 1969 Agreement on the rights being acquired by them, including the need for representations and warranties from Ms. Lee that the Rudinplay Affiliates drafted for her, and the effect it might have on her successors and assigns as well as the arbitration provision. Dramatic is also entitled to discovery that might show any changes in those understandings over time. This material relates directly to understanding the rights to which the Rudinplay Affiliates believed the 2015 Letter Agreement it was preparing was "subject to."

d.  **Complete copies of any agreements modifying the 2015 Letter Agreement or transferring any of the rights as well as all drafts relating to the negotiation of the agreement.** In support of their Motion, the Rudinplay Affiliates have provided copies of some, but not all, of the agreements impacting whatever rights were granted in the 2015 Letter Agreement. Some of the documents are heavily redacted. (*See, e.g.*, Doc. 37-4.) In addition, it is clear that the 2015 Letter Agreement was modified by a settlement between the Lee Estate and the Rudinplay Affiliates arising out of litigation in 2018. (*See, e.g.*, Doc. 37-4, § 22.27(b).) Dramatic is entitled to all documents relating to the Rudinplay Affiliates' and Sorkin's alleged rights which they claim form the basis for this lawsuit. By way of example, Rudinplay Affiliates' Exhibit 4 is a heavily redacted copy of an agreement that modifies an earlier version of the agreement that has not been provided to the Court or Dramatic. (Doc. 37-4, pp. 2-3, 29 of 96.) Similarly, the 2018 settlement agreement produced to Dramatic in the Arbitration was almost entirely redacted.

e.  **All information reflecting Ms. Lee's understanding that she was licensing rights for a new play**. The evidence shows that, for years, Ms. Lee was adamant that she never would agree to license another version of *To Kill A Mockingbird*, whether it was

4

for Broadway or the stock and amateur market. Dramatic is not claiming rights to first-class theater. Nevertheless, the document upon which the Rudinplay Affiliates bases their claim for non-exclusive non-first-class rights is the 2015 Letter Agreement. It is also clear that neither Mr. Rudin nor anybody on behalf of Mr. Rudin had any contact with Ms. Lee. In sworn declarations, both Mr. Rudin and a Loeb and Loeb partner testified that the 2015 Letter Agreement was negotiated between Mr. Rudin and attorney Seth Gelblum on behalf of Rudinplay and Tim O'Donnell, Ms. Lee's New York-based attorney and that they did not negotiate with anyone in Alabama. (See attached Exhibit 11, ¶ 11 and Exhibit 12, ¶¶ 4-5). In a complaint Ms. Lee filed against her former literary agent 2013, Ms. Lee alleged that she suffered a stroke in 2007. (See attached Exhibit 13, ¶ 17.) She suffered from both macular degeneration and profound hearing loss. (*Id.*) Indeed, her sister and long-time lawyer commented to an author of a book on Ms., Lee and herself in 2011 that "Poor Nelle can't see and can't hear and will sign anything put before her by anyone in whom she has confidence." (See attached Exhibit 14.)

Despite all of this, in 2015, Ms. Lee executed the 2015 Letter Agreement, licensing another version of *TKAM*. Dramatic is entitled to discovery of these facts, from both the Estate and the Rudinplay Affiliates, including the Rudinplay Affiliates' knowledge of Ms. Lee's position regarding its proposed production. All of this goes to the legitimate question of whether Ms. Lee knowingly transferred those rights. As Dramatic's counsel explained to the Rudinplay Affiliates' counsel, if there was a subsequent conveyance by Ms. Lee's Estate following her death that could end the inquiry into this area (*e.g.,* the Estate executed a new license after her death) Dramatic is entitled to see that. Notably, however, since the Arbitration Award was issued in 2021, the Estate has been permanently enjoined from transferring any non-first-class rights. (Doc. 30-5, ¶ 6(e).)

      f.      **Contention interrogatories regarding the 1969 Agreement.** Dramatic is entitled to have a clear understanding of those terms of the 1969 Agreement the Rudinplay Affiliates believe do or do not survive the termination, the overall effect of the termination and the basis for those beliefs.

      g.      **Authentication of a number of documents**. Either the Rudinplay Affiliates need to stipulate to the authenticity of a number of documents or Dramatic should be given the opportunity to authenticate them through third parties.

      h.      **Unredacted documents**. If the Estate is going to rely on any document, Dramatic is entitled to review the entire document, under the terms of a protective order if necessary.

**B.     Documents Submitted in Support of Dramatic's Opposition.**

18.     Attached as Group Exhibit 9 are true and correct copies of documents generated by Dramatic and used in the arbitration that list the non-first-class performances of Dramatic's version of To Kill a Mockingbird from 1970 through 2020.

19.     Attached as Exhibit 10 is a true and correct copy of a declaration of Cecilia Peck filed in an arbitration between the Lee estate and the heirs of Gregory Peck and others.

20.     Attached as Exhibit 11 is a true and correct copy of a declaration of Scott Rudin filed in a 2018 between Rudinplay and the Lee Estate.

21.     Attached as Exhibit 12 is a true and correct copy of a declaration of Stefan Schick filed in a 2018 between Rudinplay and the Lee Estate.

22.     Attached as Exhibit 13 is a true and correct copy of a complaint filed by Harper Lee against Samuel Pinkus, her former literary agent, and related entities in a 2013 lawsuit.

23.     Attached as Exhibit 14 is a true and correct copy of a July 14, 2014 Entertainment Weekly article quoting a 2011 letter from Alice Lee to Marja Mills.

24.     Attached as Exhibit 15 is a true and correct copy of an October 2015 email exchange between Scott Rudin, Seth Gelblum, Tim O'Donnell and Andrew Nurnberg produced in the arbitration, which is being filed under seal.

25.     Attached as Exhibit 16 is a true and correct copy of November 2015 email exchange between Julia Ede, Scott Rudin, Seth Gelblum, and Tim O'Donnell produced in the arbitration, which is being filed under seal.

26.     Attached as Exhibit 17 is a true and correct copy of an October 2015 email exchange between Scott Rudin, Seth Gelblum, Tim O'Donnell and Andrew Nurnberg produced in the arbitration, which is being filed under seal.

27.     Attached as Exhibit 18 is a true and correct copy of a November 18, 2015 email exchange between Seth Gelblum and Tim O'Donnell forwarding an email from O'Donnell to Chris Sergel produced in the arbitration, being filed under seal.

28.     Attached as Exhibit 19 is a true and correct copy of a January 2016 email exchange between Tim O'Donnell and Andrew Nurnberg produced in the arbitration, being filed under seal.

29.     Attached as Group Exhibit 20 are true and correct copies of January 2016 email exchanges between Scott Rudin, Tim O'Donnell and Andrew Nurnberg produced in the arbitration, being filed under seal.

30.     Attached as Exhibit 21 is a true and correct copy of a September 2016 email exchange between Tonya Carter, Julia Ede, Tim O'Donnell and Andrew Nurnberg forwarding emails to and from Rudinplay attorneys produced in the arbitration, being filed under seal.

31.     Attached as Group Exhibit 22 are true and correct copies of sample communications from Rudinplay's attorneys and Dramatic and its licensees produced in the arbitration, being filed under seal.

32.     Attached as Exhibit 23 is a true and correct copy of a January 15, 2019 email from Jonathan Zavin to Matt Lembke forwarding a letter January 15, 2019 letter from Harbottle and Lewis produced in the arbitration, being filed under seal.

33.     Attached as Exhibit 24 is a true and correct copy of January 17, 2019 letter from Herbert Smith Freehills to Harbottle & Lewis produced in the arbitration, being filed under seal.

34.     Attached as Exhibit 25 is a true and correct copy of Dramatic's Arbitration Demand filed in the arbitration.

35.     Attached as Group Exhibit 26 are a true and correct copies of the Notices of Appoint of the three arbitrators.

36.     Attached as Group Exhibit 27 are true and correct copies of the three arbitrator's professional webpages discussing their experience and credentials.

37.     Attached as Exhibit 28 is a true and correct copy of the Lee Estates' Motion for Partial Summary Judgment filed in the Arbitration.

38.     Attached as Exhibit 29 is a true and correct copy of Dramatic's Memorandum in Opposition to the Lee Estate's Motion for Partial Summary Judgment.

39.     Attached as Exhibit 30 is a true and correct copy of the arbitration panel's order denying the Lee Estate's Motion for Partial Summary Judgment.  This order was issued after the briefing reference here and oral argument. The issue regarding Section 304(c)(6)(A) of the Copyright Act was then further argued during the Arbitration hearing, post-hearing briefing and in briefing before the Northern District of Illinois.

40.     Attached as Group Exhibit 31 are true and correct copies of a February email exchange between Jonathan Zavin and Matt Lembke, produced in the arbitration, being filed under seal.

41.     Attached as Exhibit 32 is a true and correct copy of a February 19, 2021 email from AAA's Matt Lacy to the Lee Estate's and Dramatic's counsel acknowledging that the parties agreed to have the arbitration heard by a single arbitrator.

42.     Attached as Group Exhibit 33 are true and correct copies (with redactions) of the Lee Estate's Objections and Responses to Dramatic's Second Requests for Production of Documents and Second Set of Requests of Interrogatories.

43.     Attached as Exhibit 34 is a true and correct copy of a March 7, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration, being filed under seal.

44.     Attached as Exhibit 35 is a true and correct copy of a March 8, 2019 from Jonathan Zavin to Matt Lembke, produced in the arbitration, being filed under seal.

45.     Attached as Group Exhibit 36 are true and correct copies of several emailed communications between Matt Lembke and Jonathan Zavin, produced in the arbitration, being filed under seal.

46.     Attached as Exhibit 37 is a true and correct copy of a May 7, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration, being filed under seal.

47.     Attached as Exhibit 38 is a true and correct copy of a September 26, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration, being filed under seal.

48.     Attached as Exhibit 39 is a true and correct copy of September 30, 2019 letter from Keith Stolte to Loeb & Loeb's Chicago offices attaching a subpoena duces tecum.

49.     Attached as Group Exhibit 40 are true and correct copies of October 14, 2019 email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration, being filed under seal.

50.     Attached as Group Exhibit 41 are true and correct copies of November 2, 2020 email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration, being filed under seal.

51.     Attached as Group Exhibit 42 true and correct copies of a series email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration, being filed under seal.

52.     Attached as Exhibit 43 is a true and correct copy of a July 22, 2022 email from M. Graham Coleman to Kevin Tottis.

53.     Attached as Exhibit 44 is a true and correct copy of the arbitrator's September 27, 2022 Clarification of Interim Award.

54.     Attached as Exhibit 45 is a true and correct copy of the Lee Estates' Notice of Appeal dated February 10, 2023.

55.     Attached as Exhibit 46 is a true and correct copy of the Seventh Circuit's Notice of Case Opening, setting the deadline for the Lee Estate's opening appeal brief. Under the 7th Circuit Rules, Dramatic's response is due April 28, 2023 and the Lee Estate's reply is due May 9, 2023.

56.     Attached as Exhibit 47 is a true and correct copy of the Confidentiality Agreement filed in the arbitration.

57.     Attached as Exhibit 48 is a true and correct copy of the Counterclaim of the Estate of Nelle Harper Lee and Claim of Harper Lee LLC filed in the Arbitration on April 24, 2019.


I declare under penalty of perjury that the foregoing is true and correct.


Executed:     February 21, 2023


                            _____
                            /s/ Kevin Tottis
                            Kevin Tottis

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATTICUS LIMITED LIABILITY COMPANY,

　　　　　*Plaintiff,*

　　and

AARON SORKIN,

　　　　　*Involuntary Plaintiff,*

　　-against-

THE DRAMATIC PUBLISHING COMPANY,

　　　　　*Defendant.*

---

Case No. 1:22-cv-10147-DLC

## DRAMATIC PUBLISHING COMPANY'S RESPONSE
## TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendant The

Dramatic Publishing Company ("Dramatic") submits the following statement in response to the

statement of undisputed materials facts submitted by Plaintiff Atticus Limited Liability Company

("Atticus" and, collectively with No Ice Inc. f/k/a Rudinplay, Inc. and Scott Rudin, the "Rudinplay

Affiliates") in support of its motion for summary judgment (the "Summary Judgment Motion").

　　　　　1.　　　　Harper Lee authored and, in 1960, published To Kill a Mockingbird
(the "Novel") in 1960. (Doc. 1 ¶ 12; Zavin Decl., Ex. 1 at 1; Zavin Decl., Ex. 2 at 3 ¶
2.)

**RESPONSE:** Not disputed.

　　　　　2.　　　　In 1969, Lee entered into an agreement (the "DPC Grant") with The
Dramatic Publishing Company ("DPC"). (Zavin Decl., Ex. 1.)

**RESPONSE:** Not disputed and reference is made to the 1969 Agreement (referred to as

the DPC Grant by the Rudinplay Affiliates) for its terms and conditions.

　　　　　3.　　　　DPC's President, Christopher Sergel, wrote a stage adaptation of the
Novel (the "Sergel Play") pursuant to the DPC Grant. (Doc. 1 ¶ 2.)

1

**JA-443**

**RESPONSE:** Not disputed.

4.      In April 2011, Lee terminated the DPC Grant pursuant to Section 304(c) of the Copyright Act, 17 U.S.C. § 304(c). (Doc. 1 ¶ 14; Zavin Decl., Ex. 2.)

**RESPONSE:** For purposes of this motion, Dramatic does not dispute that persons claiming to be authorized agents acting on behalf of Ms. Lee delivered a document titled Notice of Termination of Transfer Extended Renewal Term to Dramatic (the "Notice of Termination") in April 2011 and that a copy of that document is attached as Exhibit 2 to the Zavin Declaration.

5.      Lee entered into an agreement with No Ice, Inc. (f/k/a Rudinplay, Inc.) dated June 29, 2015 (the "No Ice Grant"). (Zavin Decl., Ex. 3.)

**RESPONSE:** The referenced materials do not support the conclusion that Ms. Lee entered into the agreement. Indeed, as the sworn testimony of Mr. Rudin makes clear, he has no firsthand knowledge as to whether Ms. Lee knowingly executed the document because neither he nor any of his lawyers had any contact with Ms. Lee. (Dramatic's Statement of Additional Facts ("SOAF"), ¶¶ 13-15.) In addition, Zavin Declaration Exhibit 4 states that the agreement presented in Exhibit 4 "is limited by and subject to the terms and provisions of the [2015 Letter Agreement] as modified by the settlement agreement between the Producer and Lee as of May 9, 2018 (the 'Settlement Agreement') (jointly, the 'Underlying Rights Agreement')." (Zavin Decl., Ex. 4, § 22.27(b).) Dramatic is unaware of the terms of the Settlement Agreement, with the exception of a single provision that was provided by the Estate during the course of the Arbitration (SOAF, ¶ 26), and therefore is not currently aware of the terms of the Underlying Rights Agreement between the Estate and the Rudinplay Affiliates.

6.      No Ice and Aaron Sorkin entered an agreement dated January 19, 2017 (the "Sorkin Agreement"). (Zavin Decl., Ex. 4.)

**RESPONSE:** The attached documents do not support this assertion. Exhibit 4 is an agreement between No Ice and Sorkin. While the text of the agreement indicates that it is "made and entered into as of the 19th day of January 2017, the signatures included in Exhibit 4, however,

are undated for No Ice and dated December 10, 2020 for Mr. Sorkin, meaning Exhibit 4 fails to

establish when the Sorkin Agreement was made or is effective. Further, Exhibit 4 references other

documents, including a "deal terms memo" dated as of January 19, 2017 and "amended by written

amendment" dated as of May 7, 2018, neither of which is included in Exhibit 4 or otherwise

provided. (Zavin Decl., Ex. 4, p. 2 of 96.) Finally, Exhibit 4 is heavily redacted and so Dramatic

cannot currently know the full scope of that agreement, though reference is made to the unredacted

portions of the Sorkin Agreement for those terms and conditions that have been disclosed thus far.

       7.     No Ice and Atticus entered into an agreement dated December 12, 2018 (the "Atticus Assignment"). (Zavin Decl., Ex. 5.)

**RESPONSE:** Not disputed for purposes of this motion and reference is made to the

Atticus Assignment for its terms and conditions.

       8.     The stage adaptation of the Novel produced by Atticus and written by Aaron Sorkin (the "Sorkin Play") premiered at the Shubert Theatre on Broadway on December 13, 2018. (Zavin Decl. ¶ 11.)

**RESPONSE:** Not disputed.

       9.     On March 7, 2019, DPC filed with the American Arbitration Association ("AAA") a demand for arbitration (the "Arbitration") against the Estate of Harper Lee and Harper Lee, LLC (collectively, the "Estate") (Zavin Decl., Ex. 6, Appendix A thereto at 1.)

**RESPONSE:**  Not disputed as to the Estate of Harper Lee. Harper Lee, LLC was not

named in the demand for arbitration that Dramatic filed on March 7, 2019; rather, Harper Lee LLC

sought to intervene and filed a counterclaim on April 24, 2019 claim "an interest relating to the

property that is the subject of Dramatic's claims against the Estate. The conduct of Dramatic alleged

herein is grounded in or intertwined with the Original Grant containing the arbitration agreement,

such that Dramatic cannot object to arbitration of this claims." (Tottis Decl., ¶ 57 and Exhibit 48.)

       10.     Neither Atticus nor Sorkin were parties to the Arbitration. (*Id.*)

**RESPONSE:** Not disputed.

11.     A private attorney serving as sole arbitrator, William T. McGrath (the "Arbitrator"), entered an Interim Award of Arbitration (Corrected) on October 21, 2021, Final Award of Arbitrator on January 28, 2022, and Disposition for Application of Modification of Award (collectively, the "Award") in the Arbitration. (Zavin Decl., Ex. 6.)

**RESPONSE:** Not disputed.

12.     On January 13, 2023, the United States District Court for the Northern District of Illinois entered a Final Judgment Order (the "Judgment") confirming the Award. (Zavin Decl., Ex. 8.)

**RESPONSE:** Not disputed.

13.     Neither Atticus nor Sorkin were parties to the confirmation proceeding in the United States District Court for the Northern District of Illinois. (Zavin Decl., Ex. 7.)

**RESPONSE:** Not disputed.

Dated: February 21, 2023    Respectfully submitted,

              TottisLaw

              By:  /s/ Kevin Tottis

                 Kevin Tottis
                 Keith Stolte
                 Max A. Stein
                 401 N. Michigan Avenue
                 Suite 530
                 Chicago, IL 60611
                 Tel: (312) 527-1400
                 ktottis@tottislaw.com
                 kstolte@tottislaw.com
                 mstein@tottislaw.com

                 McLaughlin & Stern, LLP

                 Steven J. Hyman
                 David Blasband
                 Oliver R. Chernin
                 260 Madison Avenue
                 New York, New York  10016
                 Tel: (212) 447-1100

shyman@mclaughlinstern.com
dblasband@mclaughlinstern.com
ochernin@mclaughlinstern.com

*Attorneys for The Dramatic Publishing Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | |
| *Plaintiff,* | |
| and | Case No. 1:22-cv-10147-DLC |
| AARON SORKIN, | |
| *Involuntary Plaintiff,* | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant.* | |

### DECLARATION OF KEVIN TOTTIS

I, Kevin Tottis, declare as follows:

11.     I am an attorney at TottisLaw, which, along with McLaughlin & Stern, is counsel of record for defendant The Dramatic Publishing Company ("Dramatic"). I make this declaration in opposition to the motion for summary judgment filed by Plaintiff Atticus Limited Liability Company, including to provide information in support of Dramatic's request for discovery pursuant to Federal Rule of Civil Procedure 56(d), and to provide the Court with true and correct copies of the documents attached.[1]

### A.     Rule 56(d) Discovery.

12.     At this point in the litigation, Dramatic has not answered the Complaint, nor has it had the opportunity to raise any affirmative defenses or bring any counterclaims or third-party claims it may have. If the Court were to grant the Rudinplay Affiliates' motion now, the resulting

---

[1] I previously submitted a Declaration in support of Dramatic's motion to dismiss. In hopes of avoiding any confusion, this Declaration starts with Paragraph 11 and the Exhibits are numbered starting with Exhibit 8, each picking up where the first Declaration ended.

judgment could operate as a bar to any claims that Dramatic might otherwise have against the Rudinplay Affiliates and any other parties.

13.      Such claims are not simply hypothetical. During the parties' January 30, 2023 Rule 26 conference, I advised counsel for the Rudinplay Affiliates that, if its motion to dismiss were denied, Dramatic would likely bring counterclaims against at least the Rudinplay Affiliates for tortious interference, inducing copyright infringement and potential declarations and noted the likely need for discovery related to them.

14.      Discovery has not begun at this point.

15.      On February 16, 2023, I sent an email to counsel for the Rudinplay Affiliates identifying some of the topics of discovery that Dramatic believes it is entitled to related to the Rudinplay Affiliates' motion for summary judgment and asked Mr. Zavin to respond at his earliest convenience or to contact me if he had any questions. A true and correct copy of that email is attached as Exhibit 8.  That email included almost all of the topics addressed in this declaration. To the extent any were not specifically identified, their subsequent identification only further demonstrates the need for discovery generally in this matter.

16.      To date, I have received neither an acknowledgment nor a response to my email.

17.      Since sending that email, Dramatic has identified a few additional discovery topics related to the Rudinplay Affiliates' Motion. Combined, the topics for which Dramatic seeks discovery to fully justify its opposition to the motion consist of the following:

      a.      **The basis, nature and extent of the alleged implied contract between Ms. Lee and/or the Estate and the Rudinplay Affiliates**. In their Memorandum, the Rudinplay Affiliates argue without any factual basis that even if their 2015 Letter Agreement was invalid under Section 304(c)(6)(D), they had an implied license. (Doc. 36, p. 23.) To allow it to defend against this assertion, Dramatic is entitled to know how the alleged implied

license was formed and the details of any such license. Among other things this would include, the terms of that agreement, the specific conduct they claim gave rise to the agreement, the parties to that agreement and identification of people with knowledge of that agreement.

b.      **The communications among the Lee Estate (including its lawyers), Sorkin (and his lawyers) and the Rudinplay Affiliates (and their lawyers) regarding the Arbitration.** This material is directly related to issues of res judicata, including the ability of the Rudinplay Affiliates to influence the Lee Estate's actions in the arbitration, including any recommendations of legal theories and strategies they may have offered, and the Lee Estate's efforts to keep them apprised of the progress of the Arbitration, the confirmation proceedings and the appeal. In the Arbitration, the Lee Estate actually asserted a "common interest privilege" as to many of these documents, citing authority which describes that relationship as one "where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise." *U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007). Although the Rudinplay Affiliates are not bound by the Lee Estate's assertion, if they are going to assert the privilege, Dramatic is entitled to know the basis for it as well as obtain a privilege log. Properly done, the log's descriptions could lend valuable insight into the extent of the Rudinplay Affiliates' and the Lee Estate's cooperation with respect to the Arbitration, the Illinois district court action and the appeal—an issue central to privity. If they disagree with the Lee Estate's characterization of their communications, Dramatic is entitled to review them.

c.      **Communications and other material relating to the Rudinplay Affiliates' understanding of the 1969 Agreement.** Dramatic is entitled to determine the

Rudinplay Affiliates' knowledge and understanding of the exclusivity provisions, the meaning and effect of the 1969 Agreement on the rights being acquired by them, including the need for representations and warranties from Ms. Lee that the Rudinplay Affiliates drafted for her, and the effect it might have on her successors and assigns as well as the arbitration provision. Dramatic is also entitled to discovery that might show any changes in those understandings over time. This material relates directly to understanding the rights to which the Rudinplay Affiliates believed the 2015 Letter Agreement it was preparing was "subject to."

d. **Complete copies of any agreements modifying the 2015 Letter Agreement or transferring any of the rights as well as all drafts relating to the negotiation of the agreement.** In support of their Motion, the Rudinplay Affiliates have provided copies of some, but not all, of the agreements impacting whatever rights were granted in the 2015 Letter Agreement. Some of the documents are heavily redacted. (*See, e.g.,* Doc. 37-4.) In addition, it is clear that the 2015 Letter Agreement was modified by a settlement between the Lee Estate and the Rudinplay Affiliates arising out of litigation in 2018. (*See, e.g.,* Doc. 37-4, § 22.27(b).) Dramatic is entitled to all documents relating to the Rudinplay Affiliates' and Sorkin's alleged rights which they claim form the basis for this lawsuit. By way of example, Rudinplay Affiliates' Exhibit 4 is a heavily redacted copy of an agreement that modifies an earlier version of the agreement that has not been provided to the Court or Dramatic. (Doc. 37-4, pp. 2-3, 29 of 96.) Similarly, the 2018 settlement agreement produced to Dramatic in the Arbitration was almost entirely redacted.

e. **All information reflecting Ms. Lee's understanding that she was licensing rights for a new play**. The evidence shows that, for years, Ms. Lee was adamant that she never would agree to license another version of *To Kill A Mockingbird*, whether it was

4

**JA-451**

for Broadway or the stock and amateur market. Dramatic is not claiming rights to first-class theater. Nevertheless, the document upon which the Rudinplay Affiliates bases their claim for non-exclusive non-first-class rights is the 2015 Letter Agreement. It is also clear that neither Mr. Rudin nor anybody on behalf of Mr. Rudin had any contact with Ms. Lee. In sworn declarations, both Mr. Rudin and a Loeb and Loeb partner testified that the 2015 Letter Agreement was negotiated between Mr. Rudin and attorney Seth Gelblum on behalf of Rudinplay and Tim O'Donnell, Ms. Lee's New York-based attorney and that they did not negotiate with anyone in Alabama. (See attached Exhibit 11, ¶ 11 and Exhibit 12, ¶¶ 4-5). In a complaint Ms. Lee filed against her former literary agent 2013, Ms. Lee alleged that she suffered a stroke in 2007. (See attached Exhibit 13, ¶ 17.) She suffered from both macular degeneration and profound hearing loss. (*Id.*) Indeed, her sister and long-time lawyer commented to an author of a book on Ms., Lee and herself in 2011 that "Poor Nelle can't see and can't hear and will sign anything put before her by anyone in whom she has confidence." (See attached Exhibit 14.)

Despite all of this, in 2015, Ms. Lee executed the 2015 Letter Agreement, licensing another version of *TKAM*. Dramatic is entitled to discovery of these facts, from both the Estate and the Rudinplay Affiliates, including the Rudinplay Affiliates' knowledge of Ms. Lee's position regarding its proposed production. All of this goes to the legitimate question of whether Ms. Lee knowingly transferred those rights. As Dramatic's counsel explained to the Rudinplay Affiliates' counsel, if there was a subsequent conveyance by Ms. Lee's Estate following her death that could end the inquiry into this area (*e.g.,* the Estate executed a new license after her death) Dramatic is entitled to see that. Notably, however, since the Arbitration Award was issued in 2021, the Estate has been permanently enjoined from transferring any non-first-class rights. (Doc. 30-5, ¶ 6(e).)

   f.  **Contention interrogatories regarding the 1969 Agreement.** Dramatic is entitled to have a clear understanding of those terms of the 1969 Agreement the Rudinplay Affiliates believe do or do not survive the termination, the overall effect of the termination and the basis for those beliefs.

   g.  **Authentication of a number of documents**. Either the Rudinplay Affiliates need to stipulate to the authenticity of a number of documents or Dramatic should be given the opportunity to authenticate them through third parties.

   h.  **Unredacted documents**. If the Estate is going to rely on any document, Dramatic is entitled to review the entire document, under the terms of a protective order if necessary.

**B.  Documents Submitted in Support of Dramatic's Opposition.**

18.  Attached as Group Exhibit 9 are true and correct copies of documents generated by Dramatic and used in the arbitration that list the non-first-class performances of Dramatic's version of To Kill a Mockingbird from 1970 through 2020.

19.  Attached as Exhibit 10 is a true and correct copy of a declaration of Cecilia Peck filed in an arbitration between the Lee estate and the heirs of Gregory Peck and others.

20.  Attached as Exhibit 11 is a true and correct copy of a declaration of Scott Rudin filed in a 2018 between Rudinplay and the Lee Estate.

21.  Attached as Exhibit 12 is a true and correct copy of a declaration of Stefan Schick filed in a 2018 between Rudinplay and the Lee Estate.

22.  Attached as Exhibit 13 is a true and correct copy of a complaint filed by Harper Lee against Samuel Pinkus, her former literary agent, and related entities in a 2013 lawsuit.

23.  Attached as Exhibit 14 is a true and correct copy of a July 14, 2014 Entertainment Weekly article quoting a 2011 letter from Alice Lee to Marja Mills.

24.     Attached as Exhibit 15 is a true and correct copy of an October 2015 email exchange between Scott Rudin, Seth Gelblum, Tim O'Donnell and Andrew Nurnberg produced in the arbitration.

25.     Attached as Exhibit 16 is a true and correct copy of November 2015 email exchange between Julia Ede, Scott Rudin, Seth Gelblum, and Tim O'Donnell produced in the arbitration.

26.     Attached as Exhibit 17 is a true and correct copy of an October 2015 email exchange between Scott Rudin, Seth Gelblum, Tim O'Donnell and Andrew Nurnberg produced in the arbitration.

27.     Attached as Exhibit 18 is a true and correct copy of a November 18, 2015 email exchange between Seth Gelblum and Tim O'Donnell forwarding an email from O'Donnell to Chris Sergel produced in the arbitration.

28.     Attached as Exhibit 19 is a true and correct copy of a January 2016 email exchange between Tim O'Donnell and Andrew Nurnberg produced in the arbitration.

29.     Attached as Group Exhibit 20 are true and correct copies of January 2016 email exchanges between Scott Rudin, Tim O'Donnell and Andrew Nurnberg produced in the arbitration.

30.     Attached as Exhibit 21 is a true and correct copy of a September 2016 email exchange between Tonya Carter, Julia Ede, Tim O'Donnell and Andrew Nurnberg forwarding emails to and from Rudinplay attorneys produced in the arbitration.

31.     Attached as Group Exhibit 22 are true and correct copies of sample communications from Rudinplay's attorneys and Dramatic and its licensees produced in the arbitration.

32.     Attached as Exhibit 23 is a true and correct copy of a January 15, 2019 email from Jonathan Zavin to Matt Lembke forwarding a letter January 15, 2019 letter from Harbottle and Lewis produced in the arbitration.

33.     Attached as Exhibit 24 is a true and correct copy of January 17, 2019 letter from Herbert Smith Freehills to Harbottle & Lewis produced in the arbitration.

34.     Attached as Exhibit 25 is a true and correct copy of Dramatic's Arbitration Demand filed in the arbitration.

35.     Attached as Group Exhibit 26 are a true and correct copies of the Notices of Appoint of the three arbitrators.

36.     Attached as Group Exhibit 27 are true and correct copies of the three arbitrator's professional webpages discussing their experience and credentials.

37.     Attached as Exhibit 28 is a true and correct copy of the Lee Estates' Motion for Partial Summary Judgment filed in the Arbitration.

38.     Attached as Exhibit 29 is a true and correct copy of Dramatic's Memorandum in Opposition to the Lee Estate's Motion for Partial Summary Judgment.

39.     Attached as Exhibit 30 is a true and correct copy of the arbitration panel's order denying the Lee Estate's Motion for Partial Summary Judgment.  This order was issued after the briefing reference here and oral argument. The issue regarding Section 304(c)(6)(A) of the Copyright Act was then further argued during the Arbitration hearing, post-hearing briefing and in briefing before the Northern District of Illinois.

40.     Attached as Group Exhibit 31 are true and correct copies of a February email exchange between Jonathan Zavin and Matt Lembke, produced in the arbitration.

41.     Attached as Exhibit 32 is a true and correct copy of a February 19, 2021 email from AAA's Matt Lacy to the Lee Estate's and Dramatic's counsel acknowledging that the parties agreed to have the arbitration heard by a single arbitrator.

42.     Attached as Group Exhibit 33 are true and correct copies (with redactions) of the Lee Estate's Objections and Responses to Dramatic's Second Requests for Production of Documents and Second Set of Requests of Interrogatories.

43.     Attached as Exhibit 34 is a true and correct copy of a March 7, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration.

44.     Attached as Exhibit 35 is a true and correct copy of a March 8, 2019 from Jonathan Zavin to Matt Lembke, produced in the arbitration.

45.     Attached as Group Exhibit 36 are true and correct copies of several emailed communications between Matt Lembke and Jonathan Zavin, produced in the arbitration.

46.     Attached as Exhibit 37 is a true and correct copy of a May 7, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration.

47.     Attached as Exhibit 38 is a true and correct copy of a September 26, 2019 email from Matt Lembke to Jonathan Zavin, produced in the arbitration.

48.     Attached as Exhibit 39 is a true and correct copy of September 30, 2019 letter from Keith Stolte to Loeb & Loeb's Chicago offices attaching a subpoena duces tecum.

49.     Attached as Group Exhibit 40 are true and correct copies of October 14, 2019 email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration.

50.     Attached as Group Exhibit 41 are true and correct copies of November 2, 2020 email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration.

51.     Attached as Group Exhibit 42 true and correct copies of a series email exchanges between Matt Lembke and Jonathan Zavin, produced in the arbitration.

52.     Attached as Exhibit 43 is a true and correct copy of a July 22, 2022 email from M. Graham Coleman to Kevin Tottis.

53.     Attached as Exhibit 44 is a true and correct copy of the arbitrator's September 27, 2022 Clarification of Interim Award.

54.     Attached as Exhibit 45 is a true and correct copy of the Lee Estates' Notice of Appeal dated February 10, 2023.

55.     Attached as Exhibit 46 is a true and correct copy of the Seventh Circuit's Notice of Case Opening, setting the deadline for the Lee Estate's opening appeal brief. Under the 7th Circuit Rules, Dramatic's response is due April 28, 2023 and the Lee Estate's reply is due May 9, 2023.

56.     Attached as Exhibit 47 is a true and correct copy of the Confidentiality Agreement filed in the arbitration.

57.     Attached as Exhibit 48 is a true and correct copy of the Counterclaim of the Estate of Nelle Harper Lee and Claim of Harper Lee LLC filed in the Arbitration on April 24, 2019.


I declare under penalty of perjury that the foregoing is true and correct.


Executed:     February 28, 2023


_____/s/ Kevin Tottis_____

Kevin Tottis

# EXHIBIT 34
# (Filed Under Seal)

**Lembke, Matt**

| | |
|---|---|
| **From:** | Lembke, Matt |
| **Sent:** | Thursday, March 7, 2019 5:49 PM |
| **To:** | Jonathan Zavin |
| **Subject:** | FW: Dramatic Publishing Arbitration Demand |
| **Attachments:** | Arbitration Demand.pdf |

Jonathan:

The Estate received the attached arbitration demand today from Dramatic Publishing.  We can discuss at your convenience.

Also, I believe that Dramatic gave a copy to the New York Times, so I expect a story is imminent.

Best regards,

Matt

**Matthew H. Lembke**
Partner | Bradley
mlembke@bradley.com
205.521.8560

**From:** Kevin Tottis [mailto:ktottis@tottislaw.com]
**Sent:** Thursday, March 07, 2019 11:27 AM
**To:** Lembke, Matt <mlembke@bradley.com>
**Subject:** Dramatic Publishing Arbitration Demand

**[External Email]**

Mr. Lembke,
        Attached is a copy of the Demand in Arbitration we filed today on behalf of the Dramatic Publishing Company with the American Arbitration Association.  My understanding is that you represent the Lee Estate and so I am emailing this directly to you instead of mailing it directly to your client.  If, however, you do not represent the Estate or would like us to send a copy of the Demand directly to the Estate's representative, please let me know.

        Thank you very much.

Kevin Tottis

Kevin Tottis
TottisLaw
One East Wacker Drive
Suite 1205
Chicago, IL  60601
312-527-1400
312-527-1450 (direct)

1

C315-001
HL_00005366

312-589-7192 (fax)
www.tottislaw.com

To comply with U.S. Treasury Regulations: This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication (and any attachment).

Confidentiality Statement:

This message (including any attachments) is intended only for the individual or entity to which it is addressed. It may contain privileged or confidential information that is exempt from disclosure under applicable laws. If you are not the intended recipient, please note that you are strictly prohibited from disseminating or distributing this information (other than to the intended recipient) or copying this information. If you have received this communication in error, please notify us immediately by e-mail or by telephone at 312-527-1400.

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

2

C315-002
HL_00005367

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ATTICUS LIMITED LIABILITY COMPANY, |
| *Plaintiff,* |
| and |
| AARON SORKIN, |
| *Involuntary Plaintiff,* |
| -against- |
| THE DRAMATIC PUBLISHING COMPANY, |
| *Defendant.* |

Case No. 1:22-cv-10147-DLC

## DRAMATIC PUBLISHING COMPANY'S
## <u>STATEMENT OF ADDITIONAL FACTS</u>

Pursuant to Defendant Dramatic Publishing Company ("Dramatic") submits this Statement of Additional Facts in opposition to the motion for summary judgment filed by Atticus Limited Liability Company ("Rudinplay Affiliates").

1.      In 1969, about eight years after she published *To Kill a Mockingbird*, Harper Lee agreed to grant Dramatic the exclusive non-first-class stage rights in her novel, stating that it would be the "…only one the amateur acting rights of which [Ms. Lee] will permit to be leased and/or licensed." (Doc. 30-4, ¶ 2(a).)

2.      "Amateur acting rights" was defined to include "stock, repertoire, lyceum and Chautauqua performances", but specifically excepted "…Broadway production rights … first-class professional road and/or first class touring productions rights." (*Id.*, ¶ 4(e).) As the Arbitrator would

later conclude, these stock and amateur rights amounted to "non-first-class rights."[1] (Doc. 30-2, App. A, pp. 9-17.)

3.      Ms. Lee also pledged she would never do anything to interfere with Dramatic's rights, agreeing to "…do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and /or purported to be granted" in the 1969 Agreement. (Doc. 30-4, ¶ 1(a).)

4.      Ms. Lee further promised that anybody she transferred any rights to would be bound by her word, stating that the Agreement would "be binding upon…" her "heirs, executors, successors and assigns." (*Id.* at ¶ 4(d).)

5.      Finally, Ms. Lee agreed that an arbitrator, and not a court, would decide any disputes about what the Agreement meant: "Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association." (*Id.* at ¶4(k).)

6.      For almost half a century, Dramatic licensed its play, authored by Christopher Sergel, Sr., Dramatic's then-president, to non-first-class theaters across the country, including many leading regional theaters like the Guthrie, Steppenwolf and Huntington Theaters. (Doc. 30-2, App. A, pp. 2, 16; Tottis Decl., Group Ex. 8.)

7.      Dramatic paid Ms. Lee royalties and she accepted them. (Doc. 30-2, App. A, p. 16)

8.      Some 30 years after executing the 1969 Agreement, Ms. Lee expressed "seller's remorse," saying she regretted ever giving Dramatic non-first-class rights because she felt the play was "over-produced" in "for profit" regional productions. (Doc. 30-2, App. A, pp. 22-23; Tottis Decl., Ex. 10, ¶11.)

---

[1] The non-first-class rights are delineated in exacting detail in the Judgment. (Doc. 30-5, ¶ 6(f).)

9.      In a letter Ms. Lee wrote to her friend, Veronique Peck, wife of actor Gregory Peck, she stated that she controlled Broadway and first-class rights, but not stock productions, which include regional productions. (Doc. 30-2, App. A, p. 21; Doc. 30-6.)

10.     In the letter, Ms. Lee referred to the scope of her theatrical rights, stating, "All I know is that my agent has been saying, 'No remakes, no Broadway play, no musical (!), no nothing,' for 35 years to all and sundry. As far as I'm concerned, he will keep on saying it for the rest of my life." (Doc. 30-6.)

11.     Ms. Lee also made clear that she understood the difference between Broadway rights and non-first-class rights, even though she was unhappy about having transferred any theatrical rights to anyone, stating, "the Class A (Broadway) play rights are in me. (Dramatic Publishing Co. has amateur and stock co. rights, much to my disgust.)" (*Id.*)

12.     Dramatic received a notice of termination pursuant to 17 U.S.C. 304(c) dated April 28, 2011 bearing Ms. Lee's signature, with an effective date of termination of April 26, 2016. (Doc. 30-7.)

13.     In 2015, after negotiation with Ms. Lee's literary agent, Andrew Nurnberg, the current representative of her Estate, Tonja Carter, and a lawyer named Tim O'Donnell, Mr. Rudin and his lawyers produced a letter agreement (the "2015 Letter Agreement") for Ms. Lee to sign regarding a new Broadway stage production of *To Kill a Mockingbird.* (Doc. 30-3; Tottis Decl., Ex. 11, ¶ 11.)

14.     Mr. Rudin testified that neither he nor his representatives had direct contact with Ms. Lee. (*Id.*; Tottis Decl., Ex. 12, ¶¶ 4-5.)

15.     According to Mr. Rudin, and his lawyer, neither he, his lawyers nor any of Rudinplay's agents and representatives ever negotiated the 2015 Letter Agreement with anyone in Alabama. (Tottis Decl., Ex. 11, ¶ 11; Ex. 12, ¶¶ 4-5.)

16.     In a complaint Ms. Lee filed against her former literary agent in 2013, Ms. Lee alleged that she suffered a stroke in 2007. (Tottis Decl., Ex. 13, ¶ 17.)

17.     Ms. Lee also suffered from both macular degeneration and profound hearing loss. (*Id.*)

18.     Alice Lee, Ms. Lee's sister and long-time lawyer, commented to an author of a book on Ms. Lee and herself in 2011 that "Poor Nelle can't see and can't hear and will sign anything put before her by anyone in whom she has confidence." (Tottis Decl., Ex. 14.)

19.     The 2015 Letter Agreement specifically identifies the 1969 Agreement as the "Prior Agreement" which is "dated June 26, 1969 between" Ms. Lee and Dramatic. (Doc. 30-3 at ¶2(b).)

20.     The 2015 Letter Agreement explains that the 1969 Agreement granted Dramatic a right to create an adaptation of *To Kill a Mockingbird* and to exploit the amateur acting rights "as defined in the 1969 Agreement." (*Id.*)

21.     The phrase "amateur acting rights" as determined by the Arbitrator and as confirmed by the Northern District of Illinois, constitutes all non-first-class stage rights. (Doc. 30-2, App. A, p. 6, ¶10; Doc. 30-5, p. 3, ¶6(a); *Dramatic Publishing Co. v. Carter*, ---F.Supp.3d ---, 2022 WL 2194586, *5 (N.D. Ill. June 17, 2022).)

22.     The 2015 Letter Agreement says that Ms. Lee "represents that it (sic) has terminated the [1969] Agreement effective April 26, 2016." (Doc. 30-3, ¶ 2(b).)

23.     For its part, Rudinplay acknowledged that "notwithstanding the termination, the [non-first-class rights] to [Dramatic's version of *To Kill a Mockingbird*] can continue to be exploited following such termination under the terms of the [1969 Agreement] on a non-exclusive basis in the United States, and on an exclusive basis elsewhere."[2] (*Id.*)

---

[2] Termination rights under the Copyright Act do not apply outside the United States.

24.     The 2015 Letter Agreement provides that, "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 Agreement], as limited by such termination." (*Id.*)

25.     The terms of the 2015 Letter Agreement were modified in some unspecified way pursuant to a settlement agreement between the Rudinplay Affiliates and the Lee Estate that terminated a litigation filed in 2018. (Doc. 37-4, at p 29 of 96).

26.     A version of the 2018 settlement agreement that was produced in the Arbitration is almost entirely redacted. (Tottis Decl. ¶ 17(d).)

27.     The Arbitrator found that within months of executing the 2015 Letter Agreement, Mr. Rudin began pressuring Ms. Lee's handlers to breach the 1969 Agreement and interfere with Dramatic's licensees.  (Doc. 30-2, App., p. 73.)

28.     In October 2015 Mr. Rudin complained to Andrew Nurnberg about a "professional production" at the Queens Theater in Corona, New York. (Doc. 30-2, App., p. 73; Tottis Decl., Ex. 28.)

29.     Mr. Nurnberg responded to Mr. Rudin, telling him that Tim O'Donnell (Ms. Lee's lawyer) would look into it. (*Id.*)

30.     Mr. Rudin replied, "I am—as you know—very eager that **we** start to enforce your agreement with Sergel." (*Id.*)

31.     Mr. Rudin and his lawyer (the late Loeb and Loeb partner, Seth Gelblum) demanded that Lee's agents stop the Queens Theater production stating, "'We MUST deal with this.'" (Doc. 30-2, App., p.74; Tottis Decl., Ex. 16.)

32.     Mr. Gelblum claimed the professional productions violated "Scott's exclusive rights," and demanded that the production be stopped. (*Id.*)

33.     Mr. O'Donnell had previously told Mr. Rudin that Dramatic had "everything but first class" theater rights. (Doc. 30-2, App. A., pp. 23-24; Tottis Decl., Ex. 17.)

34.     In what the Arbitrator labelled an "appeasement process" (Doc. 30-2, App. A., p. 74), Mr. O'Donnell and Mr. Nurnberg, on behalf of Ms. Lee, agreed to do Mr. Rudin's bidding, as the Arbitrator put it. (*Id.* at 75.)

35.     As found by the Arbitrator, in response to "Rudin's desires to prevent Dramatic from licensing any performances with one or more professional actors," Mr. Nurnberg sent Dramatic an email a few weeks later "to remind Sergel of the newly minted prohibition on professional actors…". (Doc. 30-2, App. A., p. at 74; Tottis Decl., Ex. 18.)

36.     Mr. O'Donnell forwarded the email to Mr. Gelblum, Mr. Rudin's lawyer, with the statement, "'To allay Scott's unease.'" (*Id.*)

37.     Tim O'Donnell proposed writing "a formal opinion letter on my letterhead" opining that Dramatic could not license any professional theater. (Doc. 30-2, App. A., pp. 74-75; Tottis Decl., Ex. 19.)

38.     Mr. O'Donnell also told Mr. Nurnberg that before the Estate publicly announced its deal with Mr. Rudin regarding the Broadway production "'you can give that to [Dramatic] first and tell [Dramatic] that you had sought independent legal advice…'" (*Id.*)

39.     Both Mr. Rudin and his Loeb and Loeb lawyer were involved in the crafting of the O'Donnell "opinion" and continued working as a team with Ms. Lee's agents. (Doc. 30-2, App. A., p. 75; Tottis Decl., Ex. 20.)

40.     On January 27, 2016, Mr. Nurnberg sent an email to Mr. Rudin saying he would send Mr. O'Donnell's opinion letter to Dramatic's president and enclosed a copy of the opinion letter for Rudin. (Doc. 30-2, App. A., p. 75; Tottis Decl., Ex. 20.)

41.     Mr. Rudin responded that he wanted to send it to Seth Gelblum for review first. (*Id.*)

42.     Mr. Nurnberg replied that he is happy to have Mr. Gelblum look at it and the next day Mr. Rudin responded, "SETH THINKS TIM'S LETTER IS EXCELLENT" "SEND AWAY!" (*Id.*)

43.     Mr. Nurnberg forwarded Mr. Rudin's endorsement to Mr. O'Donnell, with the comment "Well, that's a relief. It means you won't have to take up snow-shoveling for a living." (*Id.*)

44.     Mr. O'Donnell later acknowledged the illegitimacy of that opinion, stating to Nurnberg that the opinion would not fool Dramatic's counsel. (Doc. 30-2, App. A., p. 79; Tottis Decl., Ex. 21.)

45.     The arbitrator detailed many of the joint actions of the Rudinplay Affiliates and the Lee Estate which precipitated Dramatic's decision to file its arbitration. (Doc. 30-2, App. A, pp. 76-85.)

46.     In early 2019, the Rudinplay Affiliates' lawyer, Jonathan Zavin, began to encourage the Lee Estate and its new lawyer, Matt Lembke, to, as the Arbitrator found, improperly threaten Dramatic's licensees both in the United Kingdom and the United States. (See *e.g.,* Doc 30-2, App. A, pp. 76-77; Tottis Decl., Group Ex. 22.)

47.     At one point, Mr. Zavin asked for Mr. Lembke's assistance to threaten a planned tour in the U.K. by Jonathan Church, pointing out that the Rudinplay Affiliates and the Lee Estate are "on the same side," and explaining that Rudin's play "is an extremely valuable property for both parties," that will "earn millions of dollars in the U.K." (Doc. 30-2, App. A, p. 77; Tottis Decl., Ex. 23.)

48.     Mr. Zavin said "We can't let Dramatic or their licensees screw this up." (*Id.*)

49.     Mr. Rudin's U.K. law firm sent a cease-and-desist letter to the Jonathan Church lawyers claiming that Rudin is "the exclusive worldwide licensee" for live stage rights of TKAM. (Doc. 30-2, App. A, p. 77; Tottis Decl., Ex. 24.)

50.     The Arbitrator concluded that the two groups acted "in concert" regarding "…the Church tour or any of the many other instances of interfering with Dramatic's full exercise of its rights." (Doc. 30-2, App. A., p. 80.)

51.     Dramatic filed a claim in arbitration against the Lee Estate in March 2019. (Tottis Decl., Ex. 25.)

52.     Initially, Dramatic and the Lee Estate chose three arbitrators who are also seasoned copyright practitioners. (Tottis Decl., Group Exs. 26-27.)

53.     On December 17, 2019, the Lee Estate filed a motion for partial summary judgment claiming that under Section 304(c)(6) of the Copyright Act, an exclusivity term could not survive termination. (Tottis Decl., Ex. 28.)

54.     On January 14, 2020, Dramatic filed its response in opposition to the Lee Estate's motion for partial summary judgment. (Tottis Decl., Ex. 29.)

55.     On February 13, 2020, the panel of three arbitrators denied the Lee Estate's motion for summary judgment. (Tottis Decl., Ex. 30.)

56.     In response to a request from Mr. Zavin, on February 15, 2020, Mr. Lembke supplied him with the parties' summary judgment briefs. Mr. Lembke had also sent Mr. Zavin the Arbitrators' order denying summary judgment. There is no mention of the denial of summary judgment on the issue of exclusivity by the three-arbitrator panel in the Complaint or in the Rudinplay Affiliates' Response. (Tottis Decl., Group Ex. 31.)

57.     Subsequently, the parties to the Arbitration agreed to go forward with a single arbitrator, William T. McGrath. (Tottis Decl., Ex. 32.)

58.     Mr. McGrath has taught courses in copyright law and copyright litigation since 1990 at The John Marshall Law School, where he served as Associate Director of the Center for Intellectual Property Law. (Tottis Decl., Group Ex. 27.)

59.     Mr. McGrath is the author of numerous articles, including more than a dozen articles for the IP Litigator, and has provided feature content for journals including the National Law Journal and Corporate Legal Times (now Inside Counsel). He is also the author of two chapters on copyright law in the treatise Intellectual Property Law (IICLE 2008). (*Id.*)

60.     During discovery in the Arbitration, the Lee Estate objected to producing documents or providing information concerning their communications with Rudinplay based on a common interest agreement. (Tottis Decl., Ex. 33.)

61.     After a 25-day hearing involving almost 5000 pages of testimony by 13 witnesses and over 1000 exhibits (Doc. 30-2, App. A, p. 4), the Arbitrator found "substantial evidence" that the Estate was well aware that Dramatic had not exceeded the scope of its grant, but that the Lee Estate "…yielded to pressure from the Rudin interests to the determent of Dramatic." (Doc. 30-2, p. 5.)

62.     Mr. McGrath found "as shown in substantial evidence" the Lee Estate and its counsel were influenced by the Rudin interests "…rather than by the respective rights of the parties under the 1969 Agreement." (*Id.*)

63.     Mr. McGrath issued an award granting extensive injunctive and declaratory relief, including an express finding that Dramatic's exclusive rights survived Ms. Lee's termination notice and orders barring the Lee Estate from continuing to engage in wrongful conduct with the Rudinplay Affiliates. (Doc. 30-2, App., pp. 5-8.)

64.     In addition to awarding just under $200,000 in damages, the Arbitrator awarded over $2.5 million in attorneys' fees and costs. (Doc. 30-2, p. 18 & App. A, pp 4-5.)

65.     The Arbitrator found that Mr. Rudin "…has been kept aware of the arbitration by Lembke, who has sent pleadings and orders from the arbitration to Rudin." (Doc. 30-2, App. A, p. 87.)

66.     Mr. Lembke provided Mr. Zavin with Dramatic's initial arbitration demand shortly after it was filed and suggested having a conversation. (Tottis Decl., Ex. 34.)

67.     The following day, Mr. Zavin asked Mr. Lembke to call him. (Tottis Decl., Ex. 35.)

68.     A week later Mr. Lembke asked Mr. Zavin for documents and Mr. Zavin supplied them. (Tottis Decl., Group Ex. 36.)

69.     On May 7, 2019, Mr. Lemke identified the three arbitrators the parties initially selected. (Tottis Decl., Ex. 37.)

70.     On September 26, 2019, Mr. Lembke emailed Mr. Zavin a copy of a document subpoena even before Dramatic served it on Loeb and Loeb. (Tottis Decl., Exs. 38-39.)

71.     On October 14, 2019, Mr. Lembke supplied Mr. Zavin with Dramatic's amended arbitration demand. (Tottis Decl., Group Ex. 40.)

72.     When Mr. Zavin requested information about the parties' experts, on November 2, 2019, Lembke provided it. (Tottis Decl., Group Ex. 41.)

73.     Mr. Lembke kept Mr. Zavin appraised of developments in the Arbitration, providing him with information regarding scheduling and progress of the arbitration proceedings and hearing. (Tottis Decl., Group Ex. 42.)

74.     Dramatic moved to confirm its awards and the Lee Estate moved to vacate a portion of the Award, including the determination that Dramatic's non-first class rights remained exclusive following termination, which Dramatic opposed. (Doc. 37-7; Doc 37-9.)

75.     The motion to vacate was denied in June 2022, although the issue of the definition of "non-first-class rights" was remanded to the Arbitrator for clarification. *Dramatic Publishing Co. v. Carter*, ---F.Supp.3d ---, 2022 WL 2194586, *5 (N.D. Ill. June 17, 2022).

76.     On July 22, 2022, M. Graham Coleman, a lawyer purporting to represent the Lee Estate, provided an unsolicited settlement offer to Dramatic's counsel on behalf of the Lee Estate, the Rudinplay Affiliates and Mr. Sorkin. (Tottis Decl., Ex. 43.)

77.     In September 2022, the Arbitrator issued a detailed definition of "non-first-class rights." (Tottis Decl., Ex. 44.)

78.     On January 13, 2023, the court in the Northern District of Illinois entered a final judgment confirming the entire award, awarding post-award interest under applicable Illinois law and awarding Dramatic its additional attorneys' fees in the district court proceeding. (Doc. 30-5.)

79.     On February 10, 2023, the Lee Estate filed a notice of appeal. (Tottis Decl., Ex. 45.)

80.     The Lee Estate's brief is due March 29, 2023. (Tottis Decl., Ex. 46.)

81.     Under the 7th Circuit Rules, Dramatic's response is due April 28, 2023 and the Lee Estate's reply is due May 9, 2023. (Tottis Decl., ¶ 55.)


Dated:  February 21, 2023                    Respectfully submitted,


                                             TottisLaw

                                             By:     /s/ Kevin Tottis                    

                                                     Kevin Tottis
                                                     Keith Stolte
                                                     Max A. Stein
                                                     401 N. Michigan Avenue
                                                     Suite 530
                                                     Chicago, IL 60611
                                                     Tel: (312) 527-1400
                                                     ktottis@tottislaw.com
                                                     kstolte@tottislaw.com
                                                     mstein@tottislaw.com


                                                     McLaughlin & Stern, LLP

                                                     Steven J. Hyman

David Blasband
Oliver R. Chernin
260 Madison Avenue
New York, New York  10016
Tel: (212) 447-1100
shyman@mclaughlinstern.com
dblasband@mclaughlinstern.com
ochernin@mclaughlinstern.com

*Attorneys for The Dramatic Publishing Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

       *Plaintiff*,

   and

AARON SORKIN,

       *Involuntary Plaintiff*,

   -against-

THE DRAMATIC PUBLISHING COMPANY,

       *Defendant.*

Case No.: 1:22-cv-10147-DLC

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

LOEB & LOEB LLP
Jonathan Zavin
Wook Hwang
Frank D. D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

Keane Barger
35 Music Square East, Suite 310
Nashville, Tennessee 37203
Tel: (615) 749-8300
Fax: (615) 749-8308

*Attorneys for Plaintiff*
*Atticus Limited Liability Company*

23585397

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 1

I.     DPC HAS NO EXCLUSIVE RIGHTS IN THE NOVEL POST-TERMINATION .......... 1

II.    THE ARBITRAL AWARD HAS NO PRECLUSIVE EFFECT ON ATTICUS
       OR SORKIN ................................................................................................................ 3

       A.     Atticus and Sorkin Did Not Agree to Be Bound by the Arbitration ...................... 3

       B.     Atticus and Sorkin Are Not Bound by the Arbitral Award Because its
              Copyright Interest Accrued Prior to DPC's Initiation of the Arbitration ............... 4

       C.     Atticus and Sorkin Are Not Bound by the Arbitral Award Based on
              "Adequate Representation" ................................................................................... 6

       D.     Atticus and Sorkin Are Not Bound by the Arbitral Award Based on
              Control .................................................................................................................. 8

       E.     The Judgment Is Not Final Under Illinois Law ..................................................... 9

III.   DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO
       RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT ...................... 9

IV.    THE DISCOVERY DPC SEEKS IS IRRELEVANT TO THE DISPOSITION OF
       THIS ACTION ........................................................................................................... 10

CONCLUSION .................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agolf, LLC v. Vill. of Arlington Heights*,
   946 N.E.2d 1123 (Ill. App. Ct. 2011) .......................................................................... 7

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ........................................................................................ 6

*People ex rel. Burris v. Progressive Land Developers, Inc.*,
   602 N.E.2d 820 (1992) ................................................................................................ 7

*City of Chicago v. St. John's United Church of Christ*,
   935 N.E.2d 1158 (Ill. App. Ct. 2010) .......................................................................... 7

*Davis v. Blige*,
   505 F.3d 90 (2d. Cir. 2007) ......................................................................................... 5

*Diversified Fin. Sys., Inc. v. Boyd*,
   678 N.E.2d 308 (Ill. App. Ct. 1997) ......................................................................... 5, 7

*Doctor's Assocs. v. Distajo*,
   66 F.3d 438 (2d Cir. 1995) .......................................................................................... 9

*Matter of Emergency Beacon Corp.*,
   665 F.2d 36 (2d Cir. 1981) .......................................................................................... 5

*Esquire Trade & Fin., Inc. v. CBQ, Inc.*,
   562 F.3d 516 (2d Cir. 2009) ........................................................................................ 7

*Giakoumelos v. Coughlin*,
   88 F.3d 56 (2d Cir. 1996) ............................................................................................ 7

*Gilliam v. ABC*,
   538 F.2d 14 (2d Cir. 1976) .......................................................................................... 5

*Holzer v. Motorola Lighting*,
   693 N.E.2d 446 (Ill. App. Ct. 1998) ............................................................................ 4

*IFC Credit Corp. v. Magnetic Techs., Ltd.*,
   859 N.E.2d 76 (Ill. App. Ct. 2006) .............................................................................. 7

*Living Care Alts. of Kirkersville, Inc. v. United States*,
   247 F. App'x 687 (6th Cir. 2007) ................................................................................ 4

*Lutkauskas v. Ricker*,
    28 N.E.3d 727 (Ill. 2015) ......................................................................................... 7

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ..................................................................................... 2

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153 (1985) .................................................................................................. 3

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) ..................................................................................... 4

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
    531 U.S. 497 (2001) .................................................................................................. 6

*Smith v. Estate of Womack*,
    149 N.E.2d 778 (Ill. App. Ct. 1958) ........................................................................ 7

*Sweeting v. Campbell*,
    119 N.E.2d 237 (Ill. 1954) ....................................................................................... 6

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ............................................................................................. 7, 8

*Va. Hosp. Ass'n v. Baliles*,
    830 F.2d 1308 (4th Cir. 1987) ................................................................................. 8

*Waite v. UMG Recordings, Inc.*,
    450 F. Supp. 3d 430 (S.D.N.Y. 2020) ..................................................................... 2

*Wilder v. World of Boxing LLC*,
    310 F. Supp.3d 426 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) ...................... 4

*Woods v. Bourne Co.*,
    60 F.3d 978 (2d Cir. 1995) ....................................................................................... 2

**Statutes And Rules**

17 U.S.C. § 101 .................................................................................................................. 2

17 U.S.C. § 304(c) ......................................................................................................... 2, 3

17 U.S.C. § 505 ................................................................................................................ 10

Copyright Act of 1909 ...................................................................................................... 3

Fed. R. Civ. P. 56(d) ....................................................................................................... 10

**Other Authorities**

47 Am. Jur. 2d Judgments § 569 (2023) ........................................................................... 5

Goldstein on Copyright § 5.4.2.3 (3d ed. 2023) ............................................................ 3

3 Nimmer on Copyright § 11.02[C][1] (2023) ............................................................ 2-3

Restatement (Second) Of Judgments § 43, cmt. a .......................................................... 5

Restatement (Second) Of Judgments § 40, cmt. b .......................................................... 4

Restatement (Second) Of Judgments § 39, cmt. c .......................................................... 8

**PRELIMINARY STATEMENT**

Despite having acknowledged that this case can and should be resolved as a matter of law with its filing of a pre-answer, pre-discovery motion to dismiss (Doc. 28), DPC now backtracks in response to Atticus's cross-motion for summary judgment, arguing it requires broad swaths of discovery to probe the scope of Atticus's stage rights with respect to the Novel.  DPC misses the point entirely.  The sole, case-dispositive issue is whether *DPC* continues to hold exclusive rights to a segment of the dramatic rights in the Novel (the stock and amateur rights) following termination of the 1969 Grant, as necessary for DPC to have standing to sue *anyone* for copyright infringement— whether that be Atticus, Sorkin, any local, school or church theater or anyone else that puts on a performance of the Sorkin Play.  Atticus's rights are irrelevant to this inquiry.  And copyright law is unambiguous that DPC cannot claim exclusive rights, or any other form of copyright ownership, in the Novel in perpetuity notwithstanding the undisputed termination of its prior grant.

Nor are Atticus, Sorkin and the rest of the world bound by the plainly erroneous arbitration decision of a single private practice attorney who resolved a private dispute between DPC and the Estate, pursuant to an arbitration agreement to which *only* DPC and the Estate are bound.  Nothing in that flawed decision binds those *not* in privity with the Estate, including pre-arbitration licensees like Atticus and Sorkin or, indeed, the rest of the world—none of whom were parties to the arbitration, none of whom agreed that the Estate could serve as their representative proxy therein, and none of whom otherwise agreed to be bound by the outcome of their private arbitration.

**ARGUMENT**

**I.     DPC HAS NO EXCLUSIVE RIGHTS IN THE NOVEL POST-TERMINATION**

DPC does not dispute that Harper Lee served a valid notice of copyright termination.  (Doc. 57 at ¶ 4.)  Accordingly, the question before the Court is a purely legal one that requires no discovery: Does the derivative works exception prohibit termination of all exclusive licenses and thereby

eviscerate the statutory termination right?  The answer is obviously no.  Not surprisingly, DPC cannot

cite to a *single* decision, treatise or article in which anyone has opined or suggested that the derivative

works exception—rather than simply permitting the continued "utilization" of a derivative work—

precludes termination of exclusive licenses altogether.

The absurdity of DPC's fundamental premise is underscored by the plain language of the

Copyright Act—which expressly provides that "the **exclusive** . . . grant of a transfer or license of the

renewal copyright or any right under it, executed before January 1, 1978, . . . **is subject to**

**termination**" (17 U.S.C. § 304(c) (emphasis added))—as well as the "unequivocal purpose" of

termination to "provide a mechanism by which artists can reclaim their copyright after the work has

had time to become more valuable."  *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438

(S.D.N.Y. 2020).  The Copyright Act itself defines the "copyright owner" as one who owns "any of

one of the **exclusive** rights comprised in a copyright," and defines "transfer of copyright ownership"

to include an "**exclusive** license, or any other conveyance, alienation, or hypothecation of a copyright

or of any of the **exclusive** rights comprised in a copyright . . . but not including a nonexclusive

license." 17 U.S.C. § 101 (emphasis added).  DPC's position, then, is that such "transfers of copyright

ownership" *cannot be terminated*—contradicting the Copyright Act's plain language and the purpose

of termination, and eviscerating the "inalienable" termination right that the Copyright Act and

controlling authority make clear can be exercised "notwithstanding any agreement to the contrary."

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 282 (2d Cir. 2002) (quoting 17 U.S.C. § 304(c)(5)).

Every court has held otherwise.  *See* Doc. 36 at 10-11 (listing cases).  And no court has ever

read the derivative rights *exception* to the termination right to nullify the termination right altogether,

as DPC insists.[1]  That DPC rails against the Copyright Office's own universally accepted position in

---

[1] *See, e.g., Woods v. Bourne Co.*, 60 F.3d 978, 988-89 (2d Cir. 1995) ("[T]he exception protects only authorized *uses* made by derivative work copyright owners, or their licensees." (emphasis added)); 3 NIMMER ON COPYRIGHT § 11.02[C][1] (2023) ("the grantee's continuing right

this regard underscores how wrong it is.  *See* https://www.copyright.gov/recordation/termination.html ("A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights . . . to prepare new derivative works revert to the authors or their heirs.").

DPC's attempt to cherry-pick selectively from *Mills* (*see* Doc. 47 at 1-2, 9-10; Doc. 50 at 20-22) is unavailing.  As DPC admits, "the issue of exclusivity was not addressed in *Mills*[.]"  (*Id.* at 22.) None of DPC's selective quotations supports its position that the derivative rights exception confers *interminable* exclusivity (and, hence, copyright ownership).  To the contrary, the Court explained that the termination "caused the ownership of the copyright to revert to the [authors' heirs]" who were thus the "owner of the copyright."  *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 167 (1985).[2]  Despite this clear language, DPC somehow continues to claim that it maintains exclusivity—and therefore copyright ownership—over the non-first class dramatic rights in the Novel.  DPC's unprecedented interpretation of the derivative works exception is flat wrong and fails as a matter of law.

## II.     THE ARBITRAL AWARD HAS NO PRECLUSIVE EFFECT ON ATTICUS OR SORKIN

### A.     Atticus and Sorkin Did Not Agree to Be Bound by the Arbitration

In arguing that Atticus "agreed to be bound" by the Arbitrator's conclusion that DPC retained exclusive rights, DPC buries in a footnote (Doc. 50 at 10 n.7) the express language of the No Ice

---

to 'utilize' the derivative work after termination *merely permits continued exercise of the right of public performance by exhibition of the [derivative] film*") (emphasis added); GOLDSTEIN ON COPYRIGHT   § 5.4.2.3 (3d ed. 2023) ("Section 304(c)(6)(A) exempts certain continued *uses* of derivative works prepared under authority of a grant that has since been terminated." (emphasis added)).

[2] DPC argues that the Supreme Court's own description of the effect of termination—from the only decision DPC cites on this issue—should be ignored because under the 1909 Copyright Act "an exclusive grant of part of a copyright's rights operated 'merely as a license[.]'" (Doc. 50 at 23 n.17 (citation omitted).)  But in *Mills*, the author "assigned his *entire interest* in all renewals of the copyright." *Id.* at 157 (emphasis added).  More generally, the termination right set forth in Section 304(c) of the Copyright Act deals *exclusively* with pre-1978 grants once governed by the 1909 Act, and expressly provides that such exclusive grants are "subject to termination[.]"  17 U.S.C. § 304(c).

Grant that defeats this argument at the threshold: No Ice agreed only that the Sergel Play "can continue to be exploited following such termination under the terms of the Prior Agreement on a ***non-exclusive basis***[.]"  (Doc. 37-3  at § 2(b)) (emphasis added).  This is the diametric *opposite* of agreeing to be bound by an arbitrator's decision that DPC retained exclusive rights after termination.  No agreement to be bound—whether express or implied—can be found in the face of that plain intent.[3]

After ignoring the plain text of the No Ice Grant, DPC purports to claim that one can "infer" an agreement to be bound, primarily because Atticus and the Estate had a common legal interest in the outcome of the arbitration.  (Doc. 47 at 7; Doc. 50 at 14-15.)  But "no such agreement should be inferred except upon the plainest circumstances."  RESTATEMENT § 40, cmt. b.  As courts have made clear, "entities may have an interest in the same legal issue or in proving or disproving similar facts, but this should not be and is not sufficient to establish privity between them[.]"  *Living Care Alts. of Kirkersville, Inc. v. United States*, 247 F. App'x 687, 699 (6th Cir. 2007).  That is true even when the entities "have common ownership" (*id.*), which is not the case here.  DPC cites *no* case finding an implied agreement to be bound under the circumstances here.  Its argument fails as a matter of law.[4]

## B.   Atticus and Sorkin Are Not Bound by the Arbitral Award Because its Copyright Interest Accrued Prior to DPC's Initiation of the Arbitration

As set forth in Atticus's moving brief, the authority is overwhelming and uniform that a grantee is *not* bound by an adverse judgment against a grantor where the grant was made *before* the

---

[3] DPC claims the No Ice Grant "incorporated" the 1969 Grant's arbitration clause.  But the law is clear that any incorporation must be clear and unequivocal.  *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996).  There is not even an arguable, let alone clear and unequivocal, incorporation of any arbitration agreement in the 1969 Grant into the No Ice Grant.

[4] The cases DPC cites (Doc. 50 at 9 & 14 n.10) are inapposite.  *Wilder* did not involve non-party preclusion, and the actual parties to the litigation expressly agreed that "the [sports organization] shall have complete discretion to rule on culpability."  *Wilder v. World of Boxing LLC*, 310 F. Supp.3d 426, 442 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019).  In *Holzer,* the contract expressly stated that the non-party's royalty would be reduced as the result of any damage award.  *Holzer v. Motorola Lighting*, 693 N.E.2d 446, 455 (Ill. App. Ct. 1998).  None of those facts are present here.

proceeding in question. DPC counters (Doc. 47 at 8) that these cases involved only liability in contract and tort, not property rights. That is simply false, under both federal law *and* Illinois law. Atticus's cited authority includes a multitude of decisions involving the non-preclusive effect of judgments as to property rights conveyed prior to the litigation. *See* Doc. 36 at 18-20. The law is uniform in this regard, across jurisdictions. *See, e.g.,* 47 AM. JUR. 2D JUDGMENTS § 569 (2023) ("[A] person to whom a party to an action has made an assignment or has granted **property or an interest therein** before the commencement of the action is not regarded as in privity with the assignor or grantor so as to be affected by a judgment rendered against the assignor or grantor in the action, unless that person is made a party to the action." (emphasis added)); RESTATEMENT § 43, cmt. a (determination adjudicating title to property "is carried over upon succession"); *Diversified Fin. Sys., Inc. v. Boyd*, 678 N.E.2d 308, 311 (Ill. App. Ct. 1997) ("Where the transferor becomes a party to an **action concerning property**, after it has been transferred, his becoming a party 'does not make him in any sense a representative of his successor in estate.'") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 44, cmt. f, at 12 (1982)) (emphasis added).

Ignoring all of the cited, on-point authority in this regard, DPC relies upon authority having no relevance to the issue of non-party preclusion over previously transferred property interests. Neither *Davis v. Blige*, 505 F.3d 90 (2d. Cir. 2007) nor *Gilliam v. ABC*, 538 F.2d 14 (2d Cir. 1976) (cited without comment at Doc. 50 at 5-6) stands for the proposition that a post-grant judgment against a grantor is binding on a grantee. Indeed, neither of these decisions involved preclusion at all. And in *Matter of Emergency Beacon Corp.*, 665 F.2d 36, 40 (2d Cir. 1981) (cited at Doc. 47 at 8), the court did not even discuss—let alone reject—the uniformly accepted principle that a grantee acquiring its interest prior to the commencement of an action is *not* precluded by the outcome thereof.

Thus, neither Atticus nor Sorkin is bound by the arbitral award by virtue of having acquired their rights *before* DPC commenced its arbitration. More obviously, third-party regional, local and

community theaters and amateur acting groups across the United States—none of whom acquired any rights from Ms. Lee or her Estate—are not bound by the award's erroneous determination that DPC maintains copyright ownership in the Novel following the uncontested termination.[5]  If DPC's argument were to prevail, *all* such third parties would be bound by DPC's claim of exclusivity.

### C.   Atticus and Sorkin Are Not Bound by the Arbitral Award Based on "Adequate Representation"

DPC concedes federal law does not recognize preclusion via "virtual representation" but claims Illinois law does.  (Doc. 47 at 7-8; Doc. 50 at 15-17.)  Applying federal law is appropriate here.  In *Semtek*, the Court reasoned that federal courts sitting in diversity should apply state-law preclusion principles to avoid forum shopping.  *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).  Because the arbitration here involved a federal question, there is no risk of forum shopping given that copyright is a uniform body of federal law.  *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 n.4 (2d Cir. 1998) (applying federal law to arbitration award because "Federal law governs the preclusive effect of a prior federal question judgment").  Moreover, DPC is judicially estopped from claiming that Illinois law applies, after having secured confirmation of the Award in federal court based on the position that the Northern District of Illinois had "subject matter jurisdiction . . . under 28 U.S.C. § 1331 because it involves a federal question arising under . . . the Copyright Act[.]"  (Doc. 37-7 at ¶ 4.)

DPC's "virtual representation" argument fails even under Illinois law as well.  DPC claims Illinois recognizes an ill-defined "virtual representation" theory.  (Doc. 47 at 7; Doc. 50 at 16.)  But under the facts at bar, the Illinois courts have been crystal clear that privity cannot exist.  *See, e.g., Sweeting v. Campbell*, 119 N.E.2d 237, 240 (Ill. 1954) (no preclusion even where both sets of alleged

---

[5] In this regard, DPC attempts to have its cake and eat it too.  If DPC were correct that Atticus and Sorkin acquired *no* stock and amateur rights via the No Ice Grant, DPC cannot simultaneously claim that Atticus or Sorkin maintain privity with the Estate by virtue of that (non-existent) grant.

6

landowners vigorously litigated issue of ownership over same piece of land); *IFC Credit Corp. v. Magnetic Techs., Ltd.*, 859 N.E.2d 76, 80 (Ill. App. Ct. 2006); *Diversified*, 678 N.E.2d at 311; *Smith v. Estate of Womack*, 149 N.E.2d 778, 781 (Ill. App. Ct. 1958).  Critically, *none* of the cases cited by DPC involved a successor who acquired its alleged property interest *before* the action concerning the property was commenced.[6]

Moreover, the decisions DPC cites all predate the Supreme Court of Illinois' decision in *Lutkauskas v. Ricker*, 28 N.E.3d 727 (Ill. 2015).  Relying on *Taylor*, the court noted that "the requirements of [federal] due process prohibit the application of *res judicata* to bar an action by a different plaintiff" where the constitutional prerequisites are not met.  *Id.* at 741.  And binding authority in this Circuit holds that, as a matter of federal due process, privity for preclusion purposes requires (1) "special procedures to protect the nonparties' interests" or (2) or that the "first suit was brought in a representative capacity."  *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, 562 F.3d 516, 521-22 (2d Cir. 2009) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 897 (2008) (reversing application of res judicata); *see also, e.g., Giakoumelos v. Coughlin*, 88 F.3d 56, 61 (2d Cir. 1996) (even if state-law requirements for preclusion are satisfied, "as a matter of federal law a state cannot give preclusive effect in its own courts to a constitutionally infirm judgment").  Here, DPC has not and cannot allege facts to establish either of these factors.[7]  As a matter of law, the Estate did not "virtually represent" Atticus, much less Sorkin.

---

[6] Additionally, the Illinois cases finding virtual representation are limited to claims where one of the parties is a governmental actor.  *See Agolf, LLC v. Vill. of Arlington Heights*, 946 N.E.2d 1123, 1132 (Ill. App. Ct. 2011) (municipal corporation); *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1168 (Ill. App. Ct. 2010) (municipality); *People ex rel. Burris v. Progressive Land Developers, Inc.*, 602 N.E.2d 820 (1992) (attorney general on behalf of State).

[7] Such special protections, the Supreme Court has held, are those that exist for "properly conducted class actions" under Federal Rule of Civil Procedure 23.  *Taylor*, 553 U.S. at 894.  Due process requires a formally defined legal relationship, such as "suits brought by trustees, guardians, and other fiduciaries[.]"  *Id.*

**D.**     **Atticus and Sorkin Are Not Bound by the Arbitral Award Based on Control**

Nor can privity be established by any purported control Atticus or Sorkin exercised over "the Lee Estate and its legal team[.]"  (Doc. 50 at 17-18.)  That Atticus has no "control" over the Estate is clear from the fact that Atticus's predecessor (No Ice f/k/a Rudinplay) and the Estate were litigation *adversaries* as recently as 2018.  *See Rudinplay, Inc. v. Estate of Harper Lee, et al.*, No. 18-cv-03300-AT (S.D.N.Y.); *Tonja Carter v. Rudinplay, Inc.*, No. 18-cv-117 (S.D. Ala.).  Even more implausible is the notion that Sorkin—the copyright owner of the work (the Sorkin Play) that DPC seeks to suppress—could have exercised "control" over the Estate in the arbitration.  DPC implicitly concedes as much by having made *no* claim that it requires any discovery from Sorkin to probe the factual charade that the Estate was controlled by anyone other than its own fiduciaries and attorneys.

DPC's allegations do not suffice to establish any manner of "control."  According to DPC, Atticus (1) made "recommendations," (2) "supplied . . . salient materials in the arbitration," and (3) occasionally "communicat[ed]" with the Estate.  (*Id.* at 3, 17-18.)  But this type of assistance does not come close to establishing the "control" necessary to find privity.  As set forth in the Restatement, "[i]t is not sufficient … that the person merely contributed funds or advice in support of the party, supplied counsel to the party, or appeared as *amicus curiae*."  Restatement § 39, cmt. c.  Rather, the nonparty must have had *actual* control, i.e., "effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action."  *Id.*; *see also, e.g.*, *Taylor*, 553 U.S. at 906 ("A mere whiff of 'tactical maneuvering will not suffice. . . .'"); *Va. Hosp. Ass'n v. Baliles*, 830 F.2d 1308, 1313 (4th Cir. 1987) (rejecting "control" argument, even when non-party "participated in the . . . litigation in a number of ways," including providing to party evidence used at trial and attending district court conferences and depositions, because non-party did not have "any effective choice as to the legal theories and proofs advanced in the prior suit").

Accordingly, even assuming the full truth of DPC's factual suppositions, the premise of DPC's contention that both Atticus *and* Sorkin "controlled" the Estate, its fiduciaries and its counsel so as to establish privity fails as a matter of law.

### E.    The Judgment Is Not Final Under Illinois Law

Even if DPC were correct that Illinois law applies, preclusion cannot apply because the judgment is not final.  DPC claims Illinois law on this issue is unsettled.  (Doc. 47 at 8-9; Doc. 50 at 18-19.)  The Second Circuit disagrees. "[A]n Illinois judgment is not final, and thus not entitled to preclusive effect, until the time for appeal has expired."  *Doctor's Assocs. v. Distajo*, 66 F.3d 438, 449 (2d Cir. 1995) (citing *Ballweg v. City of Springfield*, 499 N.E.2d 1373 (Ill. 1986)).

## III.   DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT

DPC argues that if Atticus "does not have the rights on which [it] base[s] the lawsuit, [it] ha[s] no lawsuit."  (Doc. 47 at 10.)  But Atticus's lawsuit is not "based on," and does not require, that Atticus has *any* stage rights to the Novel.[8]  In view of DPC's public proclamations that it owns exclusive stock and amateur rights, and the concomitant threat of litigation, Atticus seeks only a declaration that DPC has no exclusive rights in the Novel as necessary to bring a claim for infringement.  That inquiry turns *solely* on the scope of DPC's copyright interest in the Novel, and *not* on the scope or even the existence of any such rights held by Atticus or Sorkin.  Acknowledging as much, DPC itself explains that this case turns on "the limited issue before this Court regarding exclusivity."  (Doc. 50 at 2 n.1).

DPC's contention that the "actual words" in the Complaint seek a declaration that Atticus has rights in the Novel (Doc. 47 at 4) is simply false.  Two declarations are sought by this action: (1) that "Atticus and Sorkin have the right, ***in relation to DPC***, to present" performances of the Sorkin Play

---

[8] For the reasons set forth in Atticus's moving brief (Doc. 36 at 22-23), DPC's position that Atticus and Sorkin have no such rights is wrong in any event.

as to which DPC claims exclusive rights, and (2) that any such productions "have not infringed and could not infringe any purported copyright interest **DPC claims to hold** to the Novel."  (Doc. 1 ¶ 45 (emphasis added.)  These declarations require a determination that DPC, in relation to Atticus and Sorkin, have no exclusive rights in the Novel *only* and thus lack standing to sue either of them for infringement.

IV.     **THE DISCOVERY DPC SEEKS IS IRRELEVANT TO THE DISPOSITION OF THIS ACTION**

The discovery DPC seeks under Fed. R. Civ. P. 56(d) (*see* Doc. 50 at 3-5) is limited almost entirely to a fishing expedition purportedly to probe the scope of Atticus's rights in the Novel.  For the reasons explained above, that inquiry, and the demanded discovery, is irrelevant.

DPC also seeks discovery on the communications between Atticus and the Estate concerning the arbitration.  But, as discussed herein, DPC's contentions that Atticus made "recommendations," provided "materials" and "communicat[ed]" with the Estate, even if proven, do not come close to establishing the "control" necessary to deem Atticus to be in privity with the Estate.  Moreover, any such "control" by Atticus would do nothing to establish that *Sorkin* had any involvement, much less "control," over the Estate and its representatives who actually controlled the course of its arbitration with DPC.

<u>**CONCLUSION**</u>

Accordingly, Atticus respectfully requests that the Court (1) grant summary judgment in its favor, and the declaratory relief requested by this action, and (2) award Atticus its costs and reasonable attorneys' fees incurred in this suit.  *See* 17 U.S.C. § 505.

Dated: March 3, 2023
New York, New York

LOEB & LOEB LLP

By: ____/s/ Jonathan Zavin_____
Jonathan Zavin
Wook Hwang
Frank D. D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

Keane Barger
35 Music Square East, Suite 310
Nashville, Tennessee 37203
Tel: (615) 749-8300
Fax: (615) 749-8308

*Attorneys for Plaintiff Atticus Limited Liability Company*

23585397

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | No. 1:22-cv-10147-DLC |
| *Plaintiff*, | |
| and | |
| AARON SORKIN, | |
| *Involuntary Plaintiff*, | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant*. | |

## DEFENDANT DRAMATIC PUBLISHING COMPANY'S ANSWER TO PLAINTIFF ATTICUS LLC'S COMPLAINT

Defendant The Dramatic Publishing Company ("Dramatic"), by its undersigned counsel, answers the Complaint filed by Plaintiff Atticus Limited Liability Company ("Atticus") as follows:

### NATURE OF THE ACTION

1.      Dramatic is without knowledge or information sufficient to form a belief as to whether Atticus is the production company responsible for the Broadway adaptation of *To Kill a Mockingbird*, but admits the remaining allegations in the first sentence of paragraph 1. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 1.

2.      Dramatic admits the first sentence of paragraph 2. Dramatic admits that Nelle Harper Lee, through her counsel, served a termination notice pursuant to 17 U.S.C. § 304(c) and that the termination purported to take effect as of April 2016, but Dramatic denies the remaining

allegations in the second sentence. Dramatic admits that a 2015 document bearing what appears to be Ms. Lee's signature purported to grant Atticus's alleged predecessor-in-interest certain performance rights, but Dramatic is without knowledge or information sufficient to form a belief as to whether Ms. Lee knowingly granted such rights. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 3.

3.      Dramatic admits that consistent with the final judgment entered by the United States District Court for the Northern District of Illinois in Case No. 1:21-cv-05541 (the "Final Judgment"), Dramatic retains exclusive non-first-class production rights in the United States (the "Non-First-Class" rights) as set forth in the Final Judgment. Dramatic further admits that it retains exclusive Non-First-Class rights outside the United States, rights that were not affected by the termination and have not been challenged in any proceeding, including this one. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 3.

4.      Dramatic denies the allegations in paragraph 4.

5.      Dramatic denies the allegations in paragraph 5.

## THE PARTIES

6.      Dramatic admits the allegations in paragraph 6.

7.      Dramatic admits the allegations in paragraph 7.

8.      Dramatic admits that Aaron Sorkin is a natural person, but Dramatic is without knowledge or information sufficient to form a belief as to the remaining allegations in the first sentence of paragraph 8. Dramatic is without knowledge or information sufficient to form a belief as to whether "due request" was made to Mr. Sorkin that he join this action as a plaintiff. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 8.

## JURISDICTION AND VENUE

9.      Dramatic denies the allegations in paragraph 9.

10.     Dramatic does not contest personal jurisdiction in this action, but denies the allegations in paragraph 10 as to the alleged basis for such jurisdiction over Dramatic. Dramatic is without knowledge or information sufficient to form a belief as to whether this Court has personal jurisdiction over Mr. Sorkin. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 10.

11.     Dramatic denies the allegations in paragraph 11.

## FACTUAL ALLEGATIONS

### THE TERMINATION OF DPC'S EXCLUSIVE LICENSE PURSUANT TO THE COPYRIGHT ACT'S PLAIN TERMS

12.     Dramatic admits the allegations in paragraph 12.

13.     Dramatic admits the allegations in paragraph 13.

14.     Dramatic admits the allegations in paragraph 14.

15.     Dramatic admits the allegations in paragraph 15.

16.     Dramatic admits the first sentence in paragraph 16. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 16.

17.     Dramatic denies the allegations in paragraph 17.

18.     Dramatic admits that the Sergel Play is subject to the so-called "derivative works exception" of 17 U.S.C. § 304(c)(6)(A). Dramatic admits that it owns all rights as set forth in the arbitrator's ruling confirmed by the Final Judgment, including worldwide exclusive rights to all Non-First-Class theater and stage rights in *To Kill a Mockingbird*. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 18.

19.     Dramatic denies the allegations in paragraph 19.

**ATTICUS'S AND SORKIN'S RIGHTS TO THE SORKIN PLAY**

20.      Dramatic admits that a letter agreement dated June 29, 2015 (prior to the effective

date of the purported termination of the 1969 Agreement between Dramatic and Ms. Lee), which

bears what purports to be Ms. Lee's signature, purportedly transferred certain rights in the Novel

for the purposes of creating a new derivative stage adaptation "subject to the terms of the [1969

Agreement between Dramatic and Ms. Lee], as limited by such termination." Dramatic is

without knowledge or information sufficient to form a belief as to whether Ms. Lee knowingly

transferred any rights to No Ice, Inc. (f/k/a Rudinplay, Inc.). Except as expressly admitted,

Dramatic denies the remaining allegations in paragraph 20.

21.      Dramatic admits that it owns all rights as set forth in the arbitrator's ruling

confirmed by the Final Judgment, including worldwide exclusive rights to all Non-First-Class

theater and stage rights in *To Kill a Mockingbird*. Except as expressly admitted, Dramatic denies

the remaining allegations in paragraph 21.

22.      Dramatic denies the allegations in paragraph 22.

23.      Dramatic is without knowledge or information sufficient to form a belief as to No

Ice's purported engagement of Mr. Sorkin. Dramatic admits that Mr. Sorkin has been

acknowledged as the author of a derivative stage adaptation of *To Kill a Mockingbird*. Dramatic

admits the remaining allegations in paragraph 23.

24.      Dramatic is without knowledge or information sufficient to form a belief as to the

details of any agreement between No Ice and Mr. Sorkin, but admits it has been provided with

heavily redacted documents which, *inter alia*, state that Mr. Sorkin's agreement is subject to the

terms of the June 29, 2015 purported agreement between Rudinplay and Nelle Harper Lee,

which, in turn, is subject to Dramatic's 1969 Agreement with Ms. Lee. Except as expressly

admitted, Dramatic denies the remaining allegations in paragraph 24.

25.     Dramatic admits that the quoted words appear in documents provided to Dramatic. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 25.

26.     Dramatic admits that the quoted words appear in documents provided to Dramatic. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 26.

27.     Dramatic is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.     Dramatic is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.     Dramatic admits the allegations in the first sentence of paragraph 29. Dramatic is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 29.

30.     Dramatic is without knowledge or information sufficient to form a belief as to whether "[t]he Sorkin Play received near-universal acclaim following its premiere." Dramatic admits the remaining allegations in paragraph 30.

31.     Dramatic admits that a West End production and a U.S. tour of the Sorkin Play, both of which were First Class productions, have occurred. Dramatic is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 31.

**DPC'S RELIANCE ON AN ARBITRAL AWARD TO
WRONGLY CLAIM *EXCLUSIVE* RIGHTS TO PRESENT
NON-FIRST CLASS STAGE PRODUCTIONS OF THE NOVEL**

32.     Dramatic admits that it posted a statement on its website containing the quoted language, but denies that it was a press release. Dramatic admits the remaining allegations in paragraph 32.

33.     Dramatic denies the characterization in paragraph 33 of "Harper Lee's termination of the DPC Grant." Dramatic admits the remaining allegations in paragraph 33.

34.     Dramatic denies the characterization in paragraph 34 that the Interim Award "purported to rule . . . ." Dramatic admits that Dramatic owns all rights as set forth in the arbitrator's ruling confirmed by the Final Judgment, including worldwide exclusive rights to all Non-First-Class theater and stage rights in *To Kill a Mockingbird*. Dramatic denies that the Interim Award ruled that "authors such as Harper Lee have *no* right to terminate grants of exclusive rights under the Copyright Act . . . ."  Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 34.

35.     Dramatic admits that "Atticus, its predecessor-in-interest No Ice, and No Ice's President Scott Rudin (collectively referred to as 'Rudin')" were not named parties in the arbitration. Dramatic admits that the Interim Award held that Ms. Lee did not own Non-First-Class stage rights in *To Kill a Mockingbird*, and that, because Ms. Lee could not transfer rights she did not own, the Interim Award held that "Rudin has no stock and amateur rights for live theatrical productions" of *To Kill a Mockingbird*. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 35.

36.     Dramatic admits that portions of the No Ice Grant were inconsistent with the rights Ms. Lee owned. Except as expressly admitted, Dramatic denies the remaining allegations in paragraph 36.

37.     Dramatic denies the allegations in paragraph 37.

38.     Dramatic is without knowledge or information sufficient to form a belief as to the allegations in paragraph 38.

## FIRST CLAIM
### (Declaratory Judgment)

39.     Dramatic incorporates by reference each of its responses set forth above.

40.     Dramatic denies the allegations in paragraph 40.

41.     Dramatic admits that Atticus and Sorkin were not named parties in the arbitration.
Dramatic admits that it claims to hold all rights as set forth in the arbitrator's ruling confirmed by
the Final Judgment, including worldwide exclusive rights to all Non-First-Class theater and stage
rights in *To Kill a Mockingbird*. Except as expressly admitted, Dramatic denies the remaining
allegations in paragraph 41.

42.     Dramatic denies the allegations in paragraph 42.

43.     Dramatic denies the allegations in paragraph 43.

44.     Dramatic denies the allegations in paragraph 44.

45.     Dramatic admits Atticus requests the relief set forth in paragraph 45, but denies
that Atticus is entitled to such relief. Except as expressly admitted, Dramatic denies the
remaining allegations in paragraph 45.

46.     Dramatic denies any allegations set forth in the headings of the Complaint.

## PRAYER FOR RELIEF

Dramatic denies that Atticus is entitled to the relief requested in the Prayer for Relief.

## FIRST AFFIRMATIVE DEFENSE
### (Lack of Subject Matter Jurisdiction)

1.     Pursuant to and as required by the terms of the 1969 Agreement between
Dramatic and Ms. Lee, an arbitrator determined the rights between Dramatic and Ms. Lee,
including the Estate of Harper Lee and Harper Lee, LLC, as successors (collectively, the "Lee
Parties"). The Arbitrator concluded, *inter alia*, that "amateur rights" as used in that Agreement
means all Non-First-Class stage rights.

2.      The United States District Court for the Northern District of Illinois confirmed the Arbitrator's finding and entered a final judgment specifically defining the Non-First-Class stage rights (the "Non-First-Class" rights). *See* Final Judgment Order, attached as Exhibit A (the "Final Judgment").

3.      The Final Judgment determined and defines the rights between Ms. Lee and Dramatic.

4.      Pursuant to 9 U.S.C. § 13, the Final Judgment "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered."

5.      Under the terms of the Final Judgment, Dramatic has exclusive Non-First-Class stage rights in *To Kill a Mockingbird*, both inside and outside the United States.

6.      As alleged in paragraphs 20 and 21 of its Complaint, on June 29, 2015, Atticus alleges that its predecessor-in-interest No Ice, Inc. received the "exclusive stage rights to the Novel for purposes of creating a new derivative stage adaption" and received non-exclusive "rights to Stock and Amateur Productions" from Ms. Lee. Atticus alleges that No Inc, Inc. subsequently assigned those rights to Atticus.

7.      Pursuant to the allegations of the Complaint, including in paragraphs 2 and 15, and the language Atticus quotes from the June 29, 2015 Agreement in paragraph 21, Atticus alleges that the effective date of termination of Dramatic's original grant was April 26, 2016.

8.      Under 17 U.S.C. § 304(c)(6)(D), "a further grant, or agreement to make a further grant, of any right covered by a terminated grant ***is valid only if*** it is made ***after*** the effective date of the termination" (emphasis added).

9.      Accordingly, as a matter of law, no valid transfer of whatever Non-First-Class rights Ms. Lee and her successors might have after the termination of the 1969 Agreement to anyone other than Dramatic could occur until after April 26, 2016. The Lee Parties were, though, free to transfer First Class rights prior to the April 26, 2016 effective date of the termination of the 1969 Agreement.

10.     Under the terms of the purported paragraph 2(b) June 29, 2015 Agreement, "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 Agreement with Dramatic] as limited by such termination."

11.     Under the terms of the June 29, 2015 Agreement, Ms. Lee represented and warranted that she had not licensed or assigned any rights or entered into any agreements "that would derogate from or conflict with the rights" she was granting, subject to the restrictions and disclosures set forth in 2(b).

12.     Under paragraph 2(a) of the June 29, 2015 Agreement, the rights of Atticus's predecessors-in-interest were expressly subject to the 1969 Agreement between Dramatic and Ms. Lee.

13.     On information and belief, Atticus's alleged predecessors-in-interest drafted the June 29, 2015 Agreement.

14.     Atticus's alleged predecessors-in-interest had a full and complete opportunity to review the terms of the 1969 Agreement when they drafted the June 29, 2015 Agreement.

15.     Accordingly, under the express language of Paragraphs 2(a), 2(b), and 11(e) of the June 29, 2015 Agreement, any rights Atticus acquired were subject to all of the terms of the 1969 Agreement.

16.     The United States District Court for the Northern District of Illinois has finally adjudicated Dramatic's rights under the 1969 Agreement to be exclusive as set forth in the Final Judgment.

17.     The June 29, 2015 Agreement purported to give Atticus non-exclusive rights to stage Non-First-Class productions of its proposed version of *To Kill a Mockingbird.*

18.     Nothing in the 2015 Agreement gave Atticus the right to act on behalf of Ms. Lee or her Estate with regard to Non-First-Class productions of *To Kill a Mockingbird.*

19.     As a non-exclusive licensee, Atticus has no legal right to take any action on behalf of the Lee Parties with regard to Non-First-Class productions of *To Kill a Mockingbird*.

20.     Nothing in the 2015 Agreement gave Atticus the right to seek adjudication of the rights between Dramatic and Ms. Lee or her Estate.

21.     As a non-exclusive licensee, Atticus has no legal right to seek adjudication of the rights between Dramatic and Ms. Lee or her Estate.

22.     Atticus is not a third-party beneficiary to the 1969 Agreement between Dramatic and Ms. Lee.

23.     To the extent that the prayer for relief requesting a declaration seeking the right to present Non-First-Class performances and the right to immunize Atticus from infringement actions is construed to require a determination of the rights between the Lee Parties and Dramatic under the terms of the 1969 Agreement, Atticus is resting its claim for relief on the legal rights or interest of the Lee Parties.

24.     Consequently, Atticus has no standing to assert such a claim and, accordingly, has failed to provide this Court with a sufficient basis for subject matter jurisdiction to render such an adjudication.

25.     To the extent Atticus seeks a determination or reformation of any of Dramatic's

licensing rights which Dramatic received from Ms. Lee in *To Kill a Mockingbird*, as a purported

non-exclusive licensee in all Non-First-Class stage rights, Atticus has no standing to do so and

has failed to provide this Court with a sufficient basis for subject matter jurisdiction to render

such an adjudication.

26.     As a purported non-exclusive licensee in Non-First-Class rights, Atticus has no

standing to reform, shape, or expand Ms. Lee's rights under the terms of her agreement with

Dramatic and has failed to provide this Court a sufficient basis to assert subject matter

jurisdiction to render such an adjudication.

WHEREFORE, this Court should issue an order dismissing, with prejudice, this action

for lack of subject matter jurisdiction and entering judgment in favor of Dramatic.

### SECOND AFFIRMATIVE DEFENSE
**(Real Party in Interest)**

27.     Dramatic incorporates and restates the allegations in paragraphs 1-26 as if fully

set forth herein.

28.     Atticus seeks a remedy under the Copyright Act, 17 U.S.C. § 101, *et seq.* in

connection with Dramatic's assertion of its exclusive Non-First-Class rights pursuant to the 1969

Agreement.

29.     Atticus claims non-exclusive rights to Non-First-Class stage rights in *To Kill a*

*Mockingbird.*

30.     Accordingly, Atticus cannot claim an ownership interest in Non-First-Class rights

in *To Kill a Mockingbird.*

31.     As a non-exclusive licensee and a non-owner, Atticus cannot bring an action under the Copyright Act against Dramatic on behalf of the owner of the copyright in *To Kill a Mockingbird.*

32.     On information and belief, Harper Lee, LLC is the current legal owner of the copyright in *To Kill a Mockingbird.*

33.     The Estate of Harper Lee LLC retains a beneficial interest in the copyright of *To Kill a Mockingbird* because, *inter alia*, it continues to collect royalties from Dramatic.

34.     Pursuant to Federal Rule of Civil Procedure 17(a), as the owner of the rights in *To Kill a Mockingbird*, the Estate of Harper Lee and Harper Lee, LLC are the real parties in interest and should be given an opportunity to ratify, join or be substituted in the current action.

WHEREFORE, this Court should issue an order dismissing with prejudice Atticus from this action and giving the Estate of Harper Lee and Harper Lee, LLC the opportunity to ratify, join, or be substituted into this action.

## THIRD AFFIRMATIVE DEFENSE
### (Failure to Join a Required Party)

35.     Dramatic restates paragraphs 1-34 as if fully set forth herein.

36.     On information and belief, Harper Lee, LLC is the current legal owner of the copyright in *To Kill a Mockingbird.* The Estate of Harper Lee LLC retains a beneficial interest in the copyright of *To Kill a Mockingbird* because, *inter alia*, it continues to collect royalties from Dramatic.

37.     Harper Lee, LLC and the Estate of Harper Lee LLC are required parties under Federal Rule of Civil Procedure 19(a). This is because of their respective legal and beneficial ownership interests in *To Kill a Mockingbird*, and because the Lee Parties claim an interest relating to the subject matter of the action and are so situated that disposing of the action in their

absence may leave an existing party, Dramatic, subject to a substantial risk of incurring inconsistent obligations because of the interest.

38.     This has already happened as this Court's April 27, 2023 Opinion and Order (ECF No. 65) is inconsistent with the Final Judgment of the U.S. District Court for the Northern District of Illinois confirming the arbitrator's decision.

39.     Furthermore, joinder of the Lee Parties is not feasible under Rule 19(b). This dispute between the Lee Parties and Dramatic is required to be decided – and indeed already was decided – in arbitration. The U.S. District Court for the Northern District of Illinois confirmed the arbitrator's decision in its Final Judgment.

40.     This action should not proceed among the existing parties, but rather should be dismissed because, *inter alia*, the judgment rendered in the Lee Parties' absence will prejudice Dramatic and Atticus has an adequate remedy against the Lee Parties.

WHEREFORE, Dramatic respectfully requests that this Court issue an order finding that, pursuant to Rule 19, Atticus failed to join a required party, joinder is not feasible, and this action should be dismissed; dismissing this action with prejudice; and entering judgment in favor of Dramatic.

### FOURTH AFFIRMATIVE DEFENSE
**(Claim Preclusion and Issue Preclusion)**

41.     Dramatic restates paragraph 1-40 as if fully set forth herein.

42.     Pursuant to the June 29, 2015 Agreement, Atticus claims to have obtained a license from the Estate of Harper Lee to produce Non-First-Class productions on a non-exclusive basis. Such a license would be in addition to the license Atticus obtained to produce First-Class productions on an exclusive basis.

43.     As a result of the June 29, 2015 Agreement and, upon information and belief, their subsequent dealings including after the commencement of the arbitration, the Lee Parties and Atticus and its predecessor-in-interest had a close preexisting legal relationship concerning Non-First-Class stage rights in *To Kill a Mockingbird*.

44.     As a matter of law, a non-exclusive licensee may not assert a claim on behalf of the copyright owner.

45.     To the extent Atticus is permitted to assert the Lee Parties' rights relating to Non-First-Class rights in this action, those rights have been fully resolved and reduced to the Final Judgment. The Final Judgment is a final adjudication on the merits.

46.     That resolution includes both the identical issue – whether Dramatic's exclusive rights survive the purported termination – and the identical claims – the Lee Parties' claim that Dramatic was not entitled to continue to assert its exclusive rights under the Copyright Act. Atticus is not permitted to raise the same issues and to assert the same claims here as asserted by the Lee Parties in the arbitration.

47.     Atticus is in privity with the Lee Parties, for several reasons.  As one basis for privity, on information and belief, Atticus, its owners, and its predecessors-in-interest worked in concert with and controlled the conduct of the Lee Parties and their counsel in the arbitration.

48.     On information and belief, Atticus, its owners, and its predecessors-in-interest were consistently kept informed by the Lee Parties of the proceedings in the arbitration and the Illinois District Court action between Dramatic and the Lee Parties (including receiving written submissions). On information and belief, Atticus, its owners, and its predecessors-in-interest provided input on and had effective choice over the legal theories and proofs to be advanced those actions.

49.     The interests of Atticus and the Lee Parties with respect to Non-First-Class rights are identical.

50.     In post-hearing briefing during the arbitration, the Lee Parties recognized that "Atticus LLC is the entity (as assignee of Rudinplay) that holds all stage rights in the Novel except those still held by Dramatic following Ms. Lee's termination of the Grant."

51.     The arbitrator relied on this acknowledgment when he stated in the Interim Final Order that, "[i]n essence, Rudinplay was granted any stage rights not already owned by Dramatic."

52.     The Lee Parties retained the right to collect royalties from Atticus, they remained a beneficial owner in the copyright, and they acted as Atticus's proxy with respect to Atticus's stage rights.

53.     In the arbitration, the Lee Parties claimed that Dramatic's exclusive rights did not survive termination.

54.     On information and belief, Atticus and its owners threatened to sue the Lee Parties in the event the arbitration adversely affected Atticus's rights.

55.     Thus, the Lee Parties had every incentive to challenge Dramatic's claim that its Non-First-Class rights survived termination during the arbitration and the Illinois District Court action. On information and belief, the Lee Parties understood themselves to be acting in a representative capacity of Atticus, to which the Lee Parties had purportedly granted rights. On information and belief, Atticus knew about the arbitration at the time it was proceeding.

56.     Consequently, the Lee Parties adequately represented Atticus's interests in the Arbitration and the Illinois District Court action. In addition, the Lee Parties virtually represented the interests of Atticus as its proxies.

57.     On information and belief, both Atticus and the Lee Parties made demands on one another for either indemnification, control of the arbitration, and cooperation.

58.     The Lee Parties asserted a common interest privilege in the arbitration as a basis for withholding evidence of communications between the Lee Parties and Atticus regarding the foregoing.

59.     The Lee Parties never produced a common interest agreement or privilege log regarding any of their communications with Atticus.

60.     Only after discovery will Dramatic understand the full extent of the cooperation and control by Atticus and the Lee Parties which, on information and belief, will disclose additional bases for privity, estoppel, and other bases for issue and claim preclusion.

WHEREFORE, Dramatic respectfully requests that this Court issue an order finding that Atticus's action is barred under the doctrine of claim preclusion, finding that Atticus's claim for declaratory judgment on whether it owns non-exclusive rights is barred under the doctrine of issue preclusion, dismissing this action with prejudice, and entering judgment in favor of Dramatic.

## FIFTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

61.     Dramatic restates paragraphs 1-60 as if fully set forth herein.

62.     Dramatic filed its claim in arbitration on March 7, 2019 in which it asserted its exclusive rights to Non-First-Class stage productions.

63.     On April 8, 2019, the Estate of Harper Lee responded and specifically claimed that Dramatic did not have exclusive rights.

64.     Atticus and its predecessors were aware of the arbitration on March 7, 2019 or shortly afterwards.

65.     In this action, Atticus claims that, "[a]n actual and justiciable controversy has arisen and now exists between Atticus and Sorkin, on the one hand, and [Dramatic], on the other hand, regarding whether [Dramatic] owns *exclusive* rights to present 'non-first class' productions of *any* derivative work based on the Novel . . . ." Compl. ¶ 42. Atticus alleges that "this case arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the declaratory relief sought herein requires an interpretation of the Copyright Act." Compl. ¶ 9.

66.     Under 17 U.S.C. § 507(b), "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."

67.     Atticus's claim accrued more than three years before Atticus filed this action. Atticus knew that Dramatic claimed exclusive rights to present "non-first class" productions more than three years before it filed the current action on November 30, 2022.

WHEREFORE, Dramatic respectfully requests that this Court issue an order finding that Atticus's action is time-barred, dismissing this action with prejudice, and entering judgment in favor of Dramatic.

Respectfully submitted,

Dated:  May 11, 2023                      TOTTISLAW

By: /s/ Kevin Tottis
    Kevin Tottis (*Admitted pro hac vice*)
    Keith Stolte (*Admitted pro hac vice*)
    Max A Stein (*Admitted pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building

620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*

```
-----------------------------------X
                                   :
ATTICUS LIMITED LIABILITY COMPANY, :        22cv10147 (DLC)
                                   :
                       Plaintiff,  :            ORDER
        and                        :
                                   :
AARON SORKIN,                      :
                                   :
            Involuntary Plaintiff, :
                                   :
            -v-                    :
                                   :
THE DRAMATIC PUBLISHING COMPANY,   :
                                   :
                       Defendant.  :
                                   :
-----------------------------------X
```

DENISE COTE, District Judge:

     As set forth at the conference held on May 25, 2023,

it is hereby

     ORDERED that any motion for summary judgment by the

defendant asserting a statute of limitations defense shall be

served by the dates indicated below:

-    Motion served by June 2, 2023.
-    Opposition served by June 9, 2023.
-    Reply served by June 14, 2023.

At the time any reply is filed, the moving party shall supply

Chambers with two (2) courtesy copies of all motion papers by

mailing or delivering them to the United States Courthouse, 500

Pearl Street, New York, New York.

IT IS FURTHER ORDERED that, by June 16, 2023, the parties shall submit a letter to the Court regarding the status of fact discovery on the issue of privity through control exercised by Atticus over the Lee Estate in connection with the Estate's arbitration with Dramatic.

Dated:    New York, New York
          May 25, 2023

_____
          DENISE COTE
United States District Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | No. 1:22-cv-10147-DLC |
| *Plaintiff,* | |
| and | |
| AARON SORKIN, | |
| *Involuntary Plaintiff,* | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant.* | |

## NOTICE OF DRAMATIC PUBLISHING COMPANY'S
## MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, upon the accompanying (1) memorandum of law; (2) Declaration of Kevin Tottis and the exhibits to the declaration; (3) Declaration of Christopher Sergel III and the exhibits to the declaration; and (4) statement of undisputed material facts, and upon all the pleadings filed in this action, Defendant The Dramatic Publishing Company ("Dramatic"), by its counsel TottisLaw and Goodwin Procter LLP, will move this Court, before the Honorable Denise Cote, United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007, for an Order pursuant to Federal Rule of Civil Procedure 56(a) granting summary judgment in favor or Dramatic regarding Dramatic's statute of limitations defense; dismissing, with prejudice, the complaint in this action (ECF No. 1); and awarding to Dramatic its costs and reasonable attorney's fees pursuant to 17 U.S.C. § 505.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Court's May 25, 2023 Order

(ECF No. 75), opposition papers, if any, shall be served by June 9, 2023 and reply papers by June 14,

2023.

Respectfully submitted,

Dated:  June 2, 2023                                   TOTTISLAW

By: /s/ Kevin Tottis
      Kevin Tottis (*pro hac vice*)
      Keith Stolte (*pro hac vice*)
      Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATTICUS LIMITED LIABILITY COMPANY,

                       *Plaintiff*,

    and

AARON SORKIN,

                    *Involuntary Plaintiff*,

    -against-

THE DRAMATIC PUBLISHING COMPANY,

                  *Defendant*.

No. 1:22-cv-10147-DLC

---

**MEMORANDUM OF LAW IN SUPPORT OF
DRAMATIC PUBLISHING COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

FACTUAL SUMMARY ............................................................................................. 2

   A. Atticus threatens to sue Dramatic and its licensees. ....................................... 2

   B. Dramatic files its arbitration demand against the Estate on March 7, 2019, asserting it continued to own exclusive rights. ................................................................. 3

   C. Atticus learns of Dramatic's claim of exclusive rights on the same day. ....................... 4

PROCEDURAL BACKGROUND ........................................................................... 5

   A. Atticus files its declaratory judgment complaint more than three years after learning of Dramatic's claim to exclusivity. .................................................................. 5

   B. Dramatic moves to dismiss Atticus' declaratory judgment complaint. ............................ 6

   C. Dramatic did not move for summary judgment. ...................................................... 7

   D. Atticus responds to Dramatic's motion to dismiss and cross-moves for summary judgment. ............................................................................................................ 7

   E. Dramatic opposes Atticus' cross-motion and cautions against granting summary judgment prematurely. ................................................................................... 8

   F. The Court issues its Opinion and Order. ............................................................. 9

   G. Dramatic files its answer and affirmative defenses. ............................................ 9

LEGAL STANDARD ............................................................................................. 10

ARGUMENT ......................................................................................................... 10

   A. Atticus' claim is time-barred. .......................................................................... 10

   B. Dramatic did not waive its statute of limitations affirmative defense. ...................... 13

CONCLUSION ...................................................................................................... 17

# Table of Authorities

**Cases**

*Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) ................................10

*Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) ...................................................................17

*Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021) ....................................................................10

*Frederick v. Capital One Bank (USA), NA*, 2015 WL 5521769 (S.D.N.Y. Sept. 17, 2015) .....................15

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F.Supp.3d 173, 189 (S.D.N.Y. 2014) ..........................15

*Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, * 10 (S.D.N.Y. Dec. 10, 2018) ...............................15

*Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, *10 (S.D.N.Y. Dec. 10, 2018) .................................11

*Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d. Cir. 2021) ...............................................................................10

*Kwan v. Schlein*, 634 F.3d 224, 228-229 (2d Cir. 2011) .............................................................1, 2, 11, 13

*Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997)...............................11

*Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) ....................................................1

*Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) .....................................................................17

*Saks v. Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003) ...................................................................17

*Santos v. District Council of New York City*, 619 F.2d 963, 967 (2d Cir. 1980).........................................14

*Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) ......................................................................1, 12

*Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992) ........................................................................13, 14

*Walker v. Carter*, 210 F.Supp.3d 487, 505 (S.D.N.Y. 2016) ......................................................................13

*Waters v. Experian Info. Solutions, Inc.*, 2012 WL 1965333, at *4 n.2 (S.D. Cal. May 31, 2012) ..............15

**Statutes**

17 U.S.C. § 304 ..................................................................................................................................1, 7, 9

17 U.S.C. § 507 ..............................................................................................................................................1

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................................9, 13, 15

Fed. R. Civ. P. 56 ..................................................................................................................8, 10, 14

Fed. R. Civ. P. 8 ........................................................................................................................................13

The Dramatic Publishing Company ("Dramatic") filed its arbitration demand against the Estate of Harper Lee (the "Lee Estate") on March 7, 2019. In its demand, Dramatic claimed to own exclusive stage rights in its adaptation of *To Kill a Mockingbird* and that the grant to Dramatic of those exclusive rights survived Ms. Lee's purported termination under the Copyright Act. Atticus learned of Dramatic's arbitration demand the day Dramatic filed it. Nevertheless, Atticus waited nearly four years to bring this declaratory judgment action challenging Dramatic's exclusive ownership claim.

The Copyright Act is clear: a civil action filed more than three years after a claim accrues is time-barred. 17 U.S.C. § 507(b). Under the well-settled law of this Circuit, Atticus' claim accrued on March 7, 2019, the day Atticus learned of Dramatic's assertion of exclusive ownership rights. An ownership claim accrues *only once*, when a plaintiff learns of defendant's "express assertion of sole ownership." *Kwan v. Schlein*, 634 F.3d 224, 228-229 (2d Cir. 2011) (emphasis added). This is true whether the dispute involves ownership or an exclusive license. *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) (*per curiam*) (no material difference between "ownership" or "exclusive license" dispute for purposes of statute of limitations). "A copyright infringement is an 'ownership claim' when it 'does not involve the nature, extent or scope of copying,' but instead focuses on competing assertions of ownership or rights in the work at issue." *Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) (citing *Kwan*, 634 F.3d at 229).

Atticus may wish to characterize its claim as one for "non-infringement," not of ownership, but that is at odds with the factual record, the pleadings, and the law. This case has never been about the "nature, extent or scope" (*Kwan*, 634 F.3d at 229) of the *copying* of Dramatic's adaptation of *To Kill a Mockingbird*. Indeed, Dramatic has not brought an infringement action against or otherwise alleged infringement by Atticus. As this Court held, the "core of this dispute" turns on "whether, under 17 U.S.C. § 304(c), Dramatic retains *exclusive rights* to produce amateur performances of the Novel." ECF No. 65, at 14 (emphasis added). Atticus agrees. As it told this Court: "…Atticus

1

seeks only a declaration that [Dramatic] has no exclusive rights in the Novel as necessary to bring a claim for infringement. That inquiry **turns solely on the scope of [Dramatic's] copyright interest in the Novel**, and not on the scope or even the existence of any such rights held by Atticus or Sorkin." ECF No. 63, at 9 (emphasis added).

Atticus' claim is and always has been about Dramatic's assertion that it owns exclusive rights in its adaptation of *To Kill a Mockingbird*. The undisputed facts demonstrate that Atticus learned of that assertion the day Dramatic sought clarification of its rights in its arbitration demand. Nevertheless, Atticus waited more than three years to sue, choosing instead to let the Lee Estate litigate the issue and allowing the arbitration to run its course. While Atticus would prefer a different result, its claim is now time-barred.

### FACTUAL SUMMARY

**A.      Atticus threatens to sue Dramatic and its licensees.**

In January 2019, Atticus' counsel sent a cease-and-desist letter to Dramatic over "a planned professional tour of the Dramatic Publishing adaptation [of *To Kill a Mockingbird*] in the U.K. and Ireland." Declaration of Christopher Sergel III ("Sergel Decl."), Ex. 1. In the letter, Atticus claimed it was "the **exclusive licensee** . . . of the Estate of Harper Lee . . . for live stage rights to the novel *To Kill a Mockingbird*, subject only to the limited rights granted by Lee to [Dramatic] in 1969 to create a theatrical adaptation of the Novel for amateur performances." *Id.* (emphasis added).

Even though the 1969 Agreement under which Dramatic obtained the rights it owns defined "amateur" to include "stock" and "repertoire" theater, and even though Harper Lee's lawyer told Atticus' representatives that Dramatic had "everything but first class rights" during negotiations for the Lee/Atticus 2015 Agreement, Declaration of Kevin Tottis ("Tottis Decl."), Ex. 8, Atticus not only took the position in its letter threatening Dramatic that Dramatic was prohibited from licensing any production with professional actors, but also that Harper Lee had granted Atticus **exclusive**

2

worldwide rights to any theatrical productions that used them, Sergel Decl., Ex. 1. Atticus' Scott

Rudin also sent an email to Dramatic's counsel in January 2019 accusing Dramatic of selling rights in

To Kill a Mockingbird that it did not own and that belonged exclusively to Atticus, claiming, "Your

client sold rights in To Kill a Mockingbird that he does not own or control, rights which belong

exclusively to me." He threatened to move against Dramatic "with aggression and alacrity if

[Dramatic's president] tries to do it again. I hope the Harper Lee estate and Jonathan Church are

smart enough to go after him. What he committed is theft." Tottis Decl., Ex. 1.

     Atticus also made these threats in cease-and-desist letters to Jonathan Church, the producer

of the professional U.K. tour, and to the 15 theaters on the tour who had licensed rights from

Dramatic. Sergel Decl., ¶ 4.[1] Atticus also threatened theaters in the United States and repeated its

claims that Harper Lee had given Atticus exclusive rights for all professional productions. *Id.*, Tottis

Decl., Ex. 2. As a result of the threats by Atticus and its lawyers in the United Kingdom, Jonathan

Church cancelled the U.K. tour and a number of theaters in the United States cancelled their

productions. Sergel Decl., ¶ 5.

### B.    Dramatic files its arbitration demand against the Estate on March 7, 2019, asserting it continued to own exclusive rights.

     While Atticus was sending threatening letters to Dramatic and its licensees, the Lee Estate

sent a letter of its own to Dramatic that made clear the Estate was cooperating with Atticus to

threaten theaters in both the United Kingdom and the United States in violation of the 1969

Agreement. Sergel Decl., ¶ 6 and Ex. 2. After receiving threats from Atticus, Mr. Rudin personally

and the Lee Estate regarding the scope of its rights under its1969 Agreement with Ms. Lee,

---

[1] Atticus now acknowledges that Dramatic's rights outside the United States remain exclusive, regardless of the termination notice. ECF No. 74, at 3. Moreover, Atticus no longer disputes that Dramtic's rights—which, by definition, expressly included "stock and repertoire" rights—are not limited to productions with only amateur actors. ECF No. 1, ¶21.  The Lee Estate's about-face on Dramatic's rights and its complicity with Atticus' post-negotiation threats to Dramatic formed the basis for the arbitrator's breach of contract and tortious interference findings. Tottis Decl. Ex. 7.

Dramatic had no choice but to seek to protect its rights and proceed against the party that had

granted those rights to all parties, the Lee Estate. Sergel Decl. ¶ 7. On March 7, 2019, Dramatic filed

a demand in arbitration with the American Arbitration Association against the Estate as required by

the agreement with Ms. Lee. Tottis Decl., Ex. 3. The demand sought, among other relief, a

declaration of Dramatic's exclusive rights:

> A declaration that Dramatic's exclusive rights to the Sergel Version
> of [*To Kill a Mockingbird*] include **all of the rights granted to**
> **Dramatic under paragraph 4(e)** of [the 1969 Agreement] including
> but not limited to the **exclusive right** to license stock and repertoire
> theaters to perform any stage version of the novel *To Kill a*
> Mockingbird, whether or not the actors are paid, **and that no other**
> **person or entity has such rights in any other stage version of the**
> **novel** . . . .

*Id.*, Ex. 3, p. 8(emphasis added). The demand alleged that statements by Atticus in its cease-and-

desist letters to the United Kingdom theaters were "materially false." *Id.*, Ex. 3, at p. 5, ¶17 ("The

letter claimed that because the tour would be presented in major commercial venues, it would violate

both the Original Grant [the 1969 Agreement] and the purported rights under the [2015 Letter]

Agreement . . . . Not a single one of the purported restrictions appear in the Original Grant."). The

demand also asserted that Atticus' claim to be the "exclusive licensee," subject only to Dramatic's

"limited" rights to create an adaptation of the novel for "amateur" purposes only, was false. *Id.*, Ex.

3, p. 7, ¶26.

### C.    Atticus learns of Dramatic's claim of exclusive rights on the same day.

Atticus learned of Dramatic's arbitration demand, and of Dramatic's claim of exclusive

rights, on March 7, 2019, or shortly afterwards. *Id.*, Ex. 4 (excerpt from hearing transcript containing

stipulation by counsel for Atticus).

On April 24, 2019, Atticus' counsel wrote to the Lee Estate's counsel confirming Atticus'

understanding that Dramatic claimed to own exclusive rights:

> I also note that in its claim for relief in the Demand for Arbitration, *[Dramatic] seeks a declaration that it has the exclusive worldwide right* for all amateur performances of an adaptation of the *To Kill a Mockingbird*. Obviously the Estate granted the non-exclusive rights in the United States to such performances to Rudinplay, represented and warranted that it had the right to grant such rights, and indemnified Rudinplay with respect to any breach of such representations and warranties. *If for any reason Atticus, through Sorkin, is unable to exploit such amateur rights, the damages for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate.*
>
> *In light of the above, in the event that Atticus is damaged in any way by [Dramatic's] claims*, or by the actions of the Estate in violation of the agreement between Lee and Rudinplay, Atticus reserves the right to seek appropriate damages from the Estate.

Tottis Decl., Ex. 6, p. 2 (emphasis added).

## PROCEDURAL BACKGROUND

**A.   Atticus files its declaratory judgment complaint more than three years after learning of Dramatic's claim to exclusivity.**

Atticus filed this declaratory judgment action against Dramatic on November 30, 2022, more than three years after learning of Dramatic's claim to exclusive rights. ECF No. 1. In its complaint, Atticus alleged:

> In April 2011, Ms. Lee, through her counsel, served a notice pursuant to the Copyright Act's termination provision (17 U.S.C. § 304(c)), *unequivocally terminating [Dramatic's] exclusive rights* to stage such productions as of April 2016, *subject to [Dramatic's] continuing nonexclusive rights* to stage and license the Sergel Play.

*Id.* ¶ 2 (emphasis added).

Atticus then alleged that Dramatic, after it prevailed in the arbitration with the Lee Estate, had issued a press release claiming Dramatic "has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird*" and asserting that statement as the basis for its claim against Dramatic. *Id.* ¶ 32. Atticus omitted from its complaint the fact that Dramatic had made a virtually identical statement in its arbitration demand, of which Atticus learned in March 2019.

Atticus' sole claimed basis for the declaratory judgment action was Dramatic's claim to "worldwide exclusive rights" in its 2022 statement. *Id.* That statement mirrored Dramatic's statement in its March 7, 2019, demand. Tottis Decl., Ex. 3, p. 8. It also was almost word-for-word identical to Atticus' counsel's characterization of Dramatic's position in his April 24, 2019 letter. ("[Dramatic] seeks a declaration that it has the exclusive worldwide right . . . ."). Tottis Decl., Ex. 6.

In its claim for declaratory judgment, Atticus framed this case as a dispute about whether Dramatic holds exclusive rights:

> 40.    Pursuant to the Sorkin Agreement, Atticus and/or Sorkin hold the *exclusive right* to present Second-Class, Stock, Amateur and Ancillary Performances (as those terms are defined in the Sorkin Agreement) of the Sorkin Play derived from the Novel.

> 41.    [Dramatic] claims that it holds the *"exclusive" rights* to present all "non-first-class" productions derived from the Novel, pursuant to the arbitral award issued in a proceeding to which neither Atticus nor Sorkin were party.

> 42.    An actual and justiciable controversy has arisen and now exists between Atticus and Sorkin, on the one hand, and [Dramatic], on the other hand, regarding *whether [Dramatic] owns exclusive rights* to present "non-first class" productions of any derivative work based on the Novel *or, as Atticus contends, that Atticus and Sorkin have sufficient rights to present such productions of the Sorkin Play*, for which Atticus has no adequate remedy at law.

ECF No. 1, ¶¶ 40-42 (emphasis added).

Dramatic's position on exclusivity as alleged in Atticus' November 30, 2022 complaint is the same position Dramatic took in its arbitration demand of March 7, 2019, nearly four years earlier. Indeed, all that had changed was that the arbitration vindicated Dramatic's position.

**B.    Dramatic moves to dismiss Atticus' declaratory judgment complaint.**

Dramatic moved to dismiss the complaint on January 23, 2023. ECF Nos. 28 & 29. Dramatic's motion argued that, as a matter of law: (1) any transfer of rights by Harper Lee in the 2015 Agreement that overlapped with Dramatic's were void under 17 U.S.C. § 304(c)(6)(D); (2) the

only rights Harper Lee had to transfer were those rights the arbitrator found she owned in 2015 as

the Illinois district court had concluded; (3) the doctrines of claim and issue preclusion barred the

current action; and (4) Dramatic's exclusive rights survived the purported termination under the

derivative rights exception to 17 U.S.C. § 304(c)(6)(A). In its motion, Dramatic acknowledged that to

the extent the facts set forth in the Complaint were insufficient for the Court to make a *res judicata*

determination, it would seek discovery on the issue. ECF No. 29, at 19 n. 21.

> C.       **Dramatic did not move for summary judgment.**

Dramatic submitted documents with its motion to dismiss. They included: (1) the complaint

(as required by Rule); (2) the arbitrator's Award repeatedly referenced throughout the complaint and

one exhibit referenced in that Award; (3) the 2015 Agreement between Atticus and Harper Lee

referenced in Atticus' complaint; (4) the 1969 Agreement between Dramatic and Harper Lee

referenced in Atticus' complaint; (5) the Final Judgment from the Northern District of Illinois; and

(6) the Lee Estate's Notice of Termination. In its supporting memorandum, Dramatic expressly

identified the basis for the Court's consideration of the documents, without the need to convert the

motion to one for summary judgment: the documents were integral to the complaint or were

materials of which the Court could take judicial notice. ECF No. 29, at 4-5, nn. 6-7. Although the

Court ultimately converted Dramatic's motion to a motion for summary judgment (ECF No. 65, at

13), Dramatic never requested such conversion as an alternate basis for considering the documents it

submitted, and it did not understand that its motion would be treated as such until the receipt of the

Court's Opinion and Order.

> D.       **Atticus responds to Dramatic's motion to dismiss and cross-moves for
>          summary judgment.**

On February 7, 2023, Atticus filed its opposition to Dramatic's motion to dismiss and

brought its own cross-motion for summary judgment. ECF No. 34. In opposing Dramatic's motion,

Atticus did not argue that consideration of the documents attached to Dramatic's motion required

7

conversion of the motion to one for summary judgment; instead, it argued that the motion should

be denied. ECF No. 36, 3-4, 8 n.3. Atticus' summary judgment motion did not raise any issues

beyond those set forth in Dramatic's motion to dismiss. Neither the parties nor the Court suggested

that both motions be treated as cross-motions for summary judgment. In fact, in a stipulation filed

by the parties on February 14, 2023, the parties agreed that Dramatic would file a reply in further

support of its motion to dismiss on February 15, 2023 and that Atticus could file its reply in further

support of its summary judgment motion on March 3, 2023. ECF No. 44. The Court so-ordered the

stipulation on February 15, 2023. ECF No. 45. Dramatic did not request additional time to file its

separate response to the motion for summary judgment, which it filed on February 22, 2023. ECF

No. 50.

### E.   Dramatic opposes Atticus' cross-motion and cautions against granting summary judgment prematurely.

Because Dramatic had not filed its answer and affirmative defenses to the complaint,

Dramatic did *not* cross-move for summary judgment. Rather, Dramatic's opposition to the cross-

motion responded to the issues raised by Atticus to the extent it could without additional discovery.

Where it could not "present facts essential to justify its opposition" pursuant to Federal Rule 56(d),

it provided reasons in a declaration.[2]

In its opposition, Dramatic raised concerns about entry of summary judgment before having

the opportunity to answer the complaint. ECF No. 50, at 2 ("These numerous issues require

discovery and certainly *make entertaining summary judgment inappropriate* until that discovery

---

[2] Rule 56 no longer addresses the timing of an answer. Before 2010, filing an answer after a summary judgment motion would not be an issue because Rule 56 specifically addressed timing. As the Advisory Committee Notes acknowledge, "Although the rule allows a motion for summary judgment to be filed at the commencement of an action, *in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had*. Scheduling orders or other pretrial orders can regulate timing to fit the needs of the case." Fed. R. Civ. P 56 (emphasis added). No scheduling order was entered before issuance of the Court's Opinion and Order.

can be completed, *let alone before Dramatic has even answered*." )(emphasis added). Dramatic cautioned that summary judgment was premature because Dramatic had not yet had an opportunity to raise affirmative defense or counterclaims:

> Not only has there been no opportunity for discovery, **Dramatic has not had an opportunity to raise affirmative defenses or assert any counterclaims**, be they voluntary or compulsory counterclaims. This last point could mean that entry of summary judgment at this early juncture would give the Rudinplay Affiliates the opportunity to claim Dramatic is bound by a judgment far beyond the limited issue before this Court regarding exclusivity.

*Id.* at 2 n. 1. The Declaration of Kevin Tottis, ECF No. 52, raised a similar concern: "At this point in the litigation, Dramatic has not answered the Complaint, nor has it had the opportunity to raise any affirmative defenses or bring any counterclaims or third-party claims it may have." *Id.* at ¶ 12.

## F.     The Court issues its Opinion and Order.

On April 27, 2023, the Court entered an Opinion and Order and converted Dramatic's motion to dismiss to a motion for summary judgment. ECF No. 65 at 13. The Court then denied Dramatic's motion, finding that under § 304(a) of the Copyright Act, Dramatic does not currently possess exclusive rights, and granted Atticus' summary judgment motion "in part for the same reason." *Id.* at 34. The Court set a conference to discuss "whether Dramatic is entitled to discovery on the issue of whether Atticus controlled the Lee Estate in its arbitration with Dramatic." *Id.* The Court did not enter final judgment.

## G.     Dramatic files its answer and affirmative defenses.

Pursuant to Rule 12(a)(4), Dramatic timely filed its answer fourteen days after denial of the motion to dismiss, on May 11, 2023. ECF No. 72. The answer set forth Dramatic's affirmative defenses, including an affirmative defense that Atticus' claims are time-barred by the Copyright Act's statute of limitations. *Id.* at 16-17.

Dramatic did not counterclaim against Atticus for copyright infringement. ECF No. 72.

9

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact results where the record contains contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party. *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d. Cir. 2021). A material fact is one that might affect the outcome of the case under the applicable law. *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021).

Although courts often hold that summary judgment is inappropriate where there has not been discovery and should be granted in "[o]nly the rarest of cases," *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018); *see also Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, *10 (S.D.N.Y. Dec. 10, 2018), Dramatic is bringing this motion regarding its statute of limitations defense now per the Court's order. ECF No. 75. To the extent Atticus raises issues that require discovery, Dramatic will address those issues and any need for discovery in its Reply.

**ARGUMENT**

**A.      Atticus' claim is time-barred.**

This Court found the "core" issue in this case is whether Dramatic retained exclusive stage rights in *To Kill a Mockingbird*. ECF No. 65, at 14. This is not a dispute about copying. This is not a dispute about substantial similarity or infringement. This case is about competing claims of exclusive rights in *To Kill a Mockingbird*. Dramatic says its rights are exclusive. Atticus says they are not.

Second Circuit law holds that for the purposes of the statute of limitations, where the "core" issue is ownership and not infringement, the statute of limitations begins to run when the plaintiff first knew defendant disputed ownership. *See Kwan*, 634 F.3d at 228 ("any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership'") (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y.

1997). In *Kwan,* the publisher of a book about searching on the internet hired plaintiff Kwan in 1998 (at defendant author Schlein's request) to perform 100 hours of editing. *Id.* at 227. At defendant Schlein's request, Kwan provided further editorial assistance beyond the 100 hours. Later that year, claiming she had "ghostwritten" the book, Kwan demanded co-authorship credit from the publisher and her lawyer sent the publisher a letter demanding she be given credit as co-author. *Id.*  In 2005 Kwan sued Schlein for copyright infringement. *Id.* Finding that the "core" issue was ownership and not infringement and that the plaintiff's claim accrued when she learned of the dispute regarding her rights, the district court granted summary judgment on statute of limitations grounds. *Id.* at 228. The Second Circuit affirmed.

The Court of Appeals explained that to maintain an action for copyright infringement, a plaintiff must show: (1) ownership of a valid copyright and (2) "copying of constituent elements of the work that are original." *Id.* at 229 (citations omitted). Although in many cases ownership is not in dispute, where the dispute "does not involve the nature, extent or scope of copying, and therefore, ownership forms the backbone of the infringement claim," for the purposes of the statute of limitations, a claim is time-barred three years after the plaintiff becomes aware of the dispute. Indeed, even when "ownership is the dispositive issue, any attendant infringement claims must fail." *Id.* Copying of any part of anyone's work is not at issue in this case. The issue is whether Dramatic retained exclusive ownership rights in the rights granted to it by Ms. Lee under § 4(e) of the 1969 Agreement. Atticus has stipulated was of Dramatic's position in March 2019 when it received Dramatic's arbitration demand from the Lee Estate. Atticus made the conscious decision not to take action against Dramatic at the time, and it waited more than three years to file its lawsuit. Atticus' claim is now time-barred.

The fact that Dramatic claimed "exclusive rights" as opposed to "ownership" does not change the analysis. In a *per curiam* opinion, the Second Circuit made short work of that argument in

*Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016). There, the plaintiff tried to distinguish his case from *Kwan*, because the dispute was over an exclusive license rather than ownership. The Court of Appeals was clear: "*Kwan* controls this case." *Id.*

Likewise, *Kwan* controls this case. Atticus' knowledge of the demand is not in dispute. Tottis Decl., Ex. 4. Atticus' full knowledge and understanding of Dramatic's position is also reflected in its counsel's April 24, 2019, letter to the Lee Estate's counsel in which Atticus' counsel wrote, "I also note that in its claim for relief in the Demand for Arbitration, [Dramatic] seeks a declaration it has the 'exclusive' worldwide right for all amateur performances of an adaption of the novel, *To Kill a Mockingbird.*" Tottis Decl., Ex. 6. Atticus' counsel then wrote that if "Atticus, through Sorkin" is prohibited from asserting such rights, damages "for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate." *Id.* As Atticus' counsel made clear, Atticus viewed Dramatic's position as creating the risk of serious injury to Atticus. *Id.*

The facts here are straightforward. Atticus knew no later than March 7, 2019 that Dramatic was asserting exclusive rights over everything Ms. Lee granted Dramatic in 1969. At that point, the only question is whether "'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'" *Kwan,* 634 F.3d at 228 (citing *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992)). Atticus would be hard-pressed to argue that receipt of an arbitration demand that followed Atticus' own threatening communications and that Atticus' own counsel admitted at the time "will" cause millions of dollars to Atticus failed to put it on inquiry notice. To the extent there is any question, *Kwan* resolves it, instructing: "any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" *Id.* (citations omitted).

Atticus' attempt to frame the issue as one for "non-infringement" is unavailing. This is a case about the extent of Dramatic's ownership rights. The substance of a claim governs, not how a

plaintiff packages a cause of action. *Walker v. Carter*, 210 F.Supp.3d 487, 505 (S.D.N.Y. 2016) (collecting cases). Indeed, where, as here, a plaintiff has made ownership the subject of a summary judgment motion, the issue is resolved or  "Plaintiff is hoisted by his own petard: he cannot plausibly maintain that this is a pure infringement action while simultaneously asking this Court to rule on the question of copyright ownership." *Id.* at 506

Finally, any claim by Atticus that it could await an arbitration decision baseless. The Second Circuit made clear decades ago that "[T]the legal rights that stem from certain facts or circumstances need not be known, only the facts or circumstances themselves." *Stone,* 970 F.2d 1049.

### B.      Dramatic did not waive its statute of limitations affirmative defense.

The Federal Rules allow a party to raise, in any pleading, a defense of failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(h)(2)(A). Fed. R. Civ. P. 8 also provides the right to file and answer and affirmative defenses. The statute of limitations is precisely such an affirmative defense. Dramatic timely raised the statute of limitations defense in its answer. ECF No. 72, at 16-17. Dramatic did not waive it.

Atticus filed a summary judgment motion before Dramatic had an opportunity to answer or assert affirmative defenses or counterclaims. Although the 2010 amendments to Rule 56 permit parties to move for summary judgment in a case's nascent stages, nothing in the rule suggests that such a filing divests a defendant of its right to assert affirmative defenses or defenses of failure to state a claim.  The authority is clear: a party does not waive a statute of limitations of defense by failing to raise it in pre-answer motion papers. *See Santos v. District Council of New York City*, 619 F.2d 963, 967 (2d Cir. 1980) ("assertion of the limitations defense in the defendant union's answer, rather than in its prior motion for dismissal and summary judgment, was both timely and sufficient as a matter of pleading").

13

This is not surprising. Courts in this district have noted that motions for summary judgment made before the filing of an answer often are premature. *See, e.g., Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F.Supp.3d 173, 189 (S.D.N.Y. 2014) (quoting *Waters v. Experian Info. Solutions, Inc.*, 2012 WL 1965333, at *4 n.2 (S.D. Cal. May 31, 2012) ("This court typically finds pre-answer summary judgments premature and unhelpful" and collecting cases denying motions for summary judgment filed before a defendant has answered). This is especially true where the answer is likely to include affirmative defenses, since "[w]ithout those defenses before it, the Court cannot possibly entertain whether they could be meritorious," meaning that where "there has been no discovery and the non-movant has not yet filed a responsive pleading, summary judgment is inappropriate." *Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, * 10 (S.D.N.Y. Dec. 10, 2018) (denying plaintiff's cross-motion for partial summary judgment in copyright infringement litigation); *see also Frederick v. Capital One Bank (USA), NA*, 2015 WL 5521769 (S.D.N.Y. Sept. 17, 2015) (denying plaintiff's pre-answer cross-motion for summary judgment as premature). There is no authority suggesting a plaintiff's early summary judgment filing precludes a defendant from asserting a failure to state a claim defense or somehow requires a defendant to argue and prove all its defenses in opposition to such a summary judgment motion.

While Dramatic did respond separately to Atticus' premature summary judgment motion, it limited its response to the facts and arguments raised in that motion. Dramatic did not file a cross-motion for summary judgment. In addition to noting the need to raise affirmative defenses, Dramatic also filed a declaration pursuant to Rule 56(d) and identified facts it needed to discover to

respond to Atticus' motion. In its Opinion and Order, the Court permitted limited discovery of those facts.[3]

Moreover, nothing in Dramatic's motion to dismiss suggested it was seeking to convert its motion to summary judgment or was raising all affirmative relief it would seek in the action before this Court. Nor did Atticus argue that such a conversion was necessary. As a result, the parties fully briefed Dramatic's motion applying the standards for Rule 12 (b)(6) motions and using only the facts alleged in Atticus's complaint and the documents it relied upon in framing those allegations. *See, e.g.,* ECF No. 29, at 4 & n.6 (discussing standards for Rule 12(b)(6) motions and noting that documents of which the plaintiff has actual notice and relied upon in framing the complaint can be considered); ECF No. 36, at 3-4, 8 n.3, 24 (Atticus' requests that the court deny Dramatic's motion to dismiss). Dramatic was unaware the Court would treat the motion as a summary judgment motion. The first notice either party had that Dramatic's motion would be converted to a motion for summary judgment (resulting in the application of wholly different standards and allowing for the consideration of different material) was when the Court issued its ruling. As a result, Dramatic (and Atticus) did not have "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (reversing district court's conversion of motion to dismiss pursuant to Rule 12(d) where no notice was provided to the parties). Although the *Sahu* case involved notice to a non-movant, Rule 12(d) requires notice to "all parties" and that they be given an "opportunity to present all material that is pertinent to the motion."

---

[3] Atticus has indicated it will produce documents relevant to *res judicata* discovery on June 2, 2023. This motion was prepared without the benefit of such discovery, and to the extent Atticus produces documents relevant to the statute of limitations, Dramatic may include such documents in its reply.

Even had Dramatic been given such notice, the material "pertinent" to the motion would not necessarily have included material relevant to the statute of limitations. That is because, by definition, an affirmative defense is a "defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003) (citations omitted). Dramatic took no action to suggest it would not seek to raise all its defenses in a subsequent pleading; indeed, Dramatic expressly indicated it would.

In accordance with the Federal Rules, after the Court denied Dramatic's motion to dismiss, Dramatic timely filed its answer and affirmative defenses. It is unclear how Dramatic's strict compliance with the rules could constitute waiver of the right to file an answer and affirmative defenses. Even if the defenses were somehow construed to have been waived, the Second Circuit has long recognized that a party should be permitted to amend its pleadings "in the absence of a showing of prejudice or bad faith." *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993). In *Block*, the Court of Appeals affirmed the district court's decision to permit the defendants to raise a statute of limitations defense *four years* after the case was filed. As the court explained, mere delay does not constitute prejudice. To show prejudice, the court considered whether assertion of the new claim would (1) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent the plaintiff from bringing a timely action in another jurisdiction. *Id.* Those circumstances are entirely absent here. Finally, as the *Block* court noted the plaintiffs' claim was untimely the day that case was filed. The same is true here. Nothing has happened since November 30, 2022 that would change resolution of any of the statute of limitations issues.

Dramatic did not waive its statute of limitations affirmative defense. Dramatic identified the need to file affirmative defenses in opposition to Atticus' summary judgment motion, and Dramatic timely asserted its affirmative defenses in its answer in accordance with the Federal Rules.

## **CONCLUSION**

Dramatic requests that the Court issue an order (1) finding Atticus' claim time-barred under the Copyright Act's statute of limitations; (2) granting summary judgment to Dramatic; (3) dismissing the complaint with prejudice; and (4) awarding to Dramatic its costs, attorney's fees, and all other relief the Court deems appropriate.

Respectfully submitted,

Dated:  June 2, 2023

TOTTISLAW

By: /s/ Kevin Tottis
    Kevin Tottis (*pro hac vice*)
    Keith Stolte (*pro hac vice*)
    Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

17

*Attorneys for Defendant*
*The Dramatic Publishing Company*

18