# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

## DEFERRED JOINT APPENDIX
## VOLUME V of V (JA532-736)

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
*Counsel for Defendant-Appellant*

Wook Hwang
SHEPPARD MULLIN
30 Rockefeller Plaza
New York, NY 10112
(212) 653-8700

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
*Counsel for Plaintiff-Appellee*

*(For Continuation of Appearances See Inside Cover)*

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

Keane Barger
LOEB & LOEB LLP
35 Music Square East, Suite 310
Nashville, TN 37203

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Page

## SPECIAL APPENDIX (SPA1-59)

Opinion and Order, dated April 27, 2023 (ECF No. 65) ................................... SPA-1

Opinion and Order, dated July 24, 2023 (ECF No. 87) ................................... SPA-35

Order, dated July 25, 2023 (ECF No. 88) ........................................................ SPA-46

Judgment, dated August 1, 2023 (ECF No. 92) ................................................ SPA-49

Amended Judgment, dated August 28, 2023 (ECF No. 100) ......................... SPA-51

17 U.S.C. § 304 ................................................................................................ SPA-54

## DEFFERED JOINT APPENDIX VOLUME I of V (JA1-173)

U.S. District Court Southern District of New York,
Civil Docket for Case No. 1:22-cv-10147 ........................................................ JA-1

Complaint, dated November 30, 2022 (ECF No. 1) ......................................... JA-17

Notice of Motion, dated January 23, 2023 (ECF No. 28) ................................. JA-31

Defendant Dramatic Publishing Company's Memorandum
in Support of Its Motion to Dismiss Atticus LLC's Complaint,
dated January 23, 2023 (ECF No. 29) .............................................................. JA-33

Declaration of Kevin Tottis, dated January 23, 2023 (ECF No. 30) ............... JA-63

    Final Award of Arbitrator in American Arbitration Association
    Case No. 01-19-0000-7463, dated January 28, 2022
    (ECF No. 30-2) .............................................................................................. JA-66

## DEFFERED JOINT APPENDIX VOLUME II of V (JA174-233)

    Agreement between Harper Lee and Dramatic Publishing Co.,
    dated June 25, 1969 (ECF No. 30-4) ............................................................ JA-174

    Notice of Termination of Transfer Extended Renewal Term,
    dated April 28, 2011 (ECF No. 30-7) ........................................................... JA-179

Notice of Cross-Motion for Summary Judgment,
dated February 6, 2023 (ECF No. 34) ...........................................JA-186

Plaintiff's Statement of Undisputed Material Facts,
dated February 6, 2003 (ECF No. 35) ...........................................JA1-88

Plaintiff's Memorandum of Law (1) in Opposition to Defendant's
Motion to Dismiss and (2) in Support of Plaintiff's Cross-Motion
for Summary Judgment, dated February 6, 2023 (ECF No. 36) .....................JA-191

Declaration of Jonathan Zavin, dated February 6, 2023 (ECF No. 37)...........JA-222

    Agreement between Harper Lee and Rudinplay, Inc.,
    dated June 29, 2015 (ECF No. 37-3) .........................................JA-225

    Agreement between No Ice, Inc. and Atticus LLC,
    dated December 12, 2018 (ECF No. 37-5) ...............................JA-231

**DEFERRED JOINT APPENDIX VOLUME III of V (JA234-342)**

    Motion to Confirm Arbitration Award and Enter Judgment, Case
    No. 1:21-CV-05541 (N.D. Ill. October 19, 2021) (ECF No. 37-7)...........JA-234

**DEFERRED JOINT APPENDIX VOLUME IV of V (JA343-531)**

    Final Judgment Order, Case No. 1:21-CV-05541 (N.D. Ill. January
    13, 2023) (ECF No. 37-8).........................................................JA-343

    Dramatic Publishing Company's Response to Respondents' Motions to Vacate
    Arbitration Awards, Reply in Support of Motion to Confirm Awards and
    Memorandum in Support of Dramatic's Motion to Vacate, Correct or Modify,
    Case No. 1:21-CV-05541 (N.D. Ill., February 16, 2022) (ECF No. 37-9) JA-354

Dramatic Publishing Company's Reply in Support of Its Motion
to Dismiss Atticus LLC's Complaint, dated February 15, 2023
(ECF No. 47)........................................................................JA-390

Dramatic Publishing Company's Response to Motion for Summary
Judgment, dated February 21, 2023 (ECF No. 50)..........................JA-405

Declaration of Kevin Tottis, dated February 21, 2023 (ECF No. 52) .............JA-433

Dramatic Publishing Company's Response to Plaintiff's Statement of Undisputed Material Facts, dated February 22, 2023 (ECF No. 57)..............JA-443

Declaration of Kevin Tottis, dated February 28, 2023 (ECF No. 60) ............JA-448

Email from Matthew Lembke to Jonathan Zavin, dated March 7, 2019 (ECF No. 60-27).......................................................JA-458

Dramatic Publishing Company's Statement of Additional Facts, dated February 28, 2023 (ECF No. 61) ...........................................................JA-461

Plaintiff's Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment, dated March 3, 2023 (ECF No. 63).........................JA-473

Defendant Dramatic Publishing Company's Answer to Plaintiff Atticus LLC's Complaint, dated May 11, 2023 (ECF No. 72) ......................JA-489

Order, dated May 25, 2023 (ECF No. 75) .......................................................JA-507

Notice of Dramatic Publishing Company's Motion for Summary Judgment, dated June 2, 2023 (ECF No. 76).....................................................JA-509

Memorandum of Law in Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 2, 2023 (ECF No. 77)...............JA-511

## DEFERRED JOINT APPENDIX VOLUME V of V (JA532-736)

Declaration of Kevin Tottis, dated June 2, 2023 (ECF No. 78) ....................JA-532

Email from Scott Rudin to Alvin Deutsch, dated January 23, 2019 (ECF No. 78-1) ............................................................................................JA-535

Arbitration Demand file by Dramatic Publishing Co. against The Estate of Harper Lee, dated March 7, 2019 (ECF No. 78-3) ..............JA-536

Letter from Jonathan Zavin to Matthew Lembke, dated April 24, 2019 (ECF No. 78-6)...........................................................JA-563

Declaration of Christopher Sergel III, dated June 2, 2023 (ECF No. 79) ....................................................................JA-565

Letter from Jonathan Zavin to Dramatic Publishing Co., dated January 9, 2019 (ECF No. 79-1)..................................................................JA-568

Letter from Matthew Lembke to Dramatic Publishing Co., dated January 15, 2019 (ECF No. 79-2)................................................................JA-572

Defendant Dramatic Publishing Company's Statement of Undisputed Material Facts, dated June 2, 2023 (ECF No. 80)............................JA-576

Reply in Further Support of Dramatic Publishing Company's Motion for Summary Judgment, dated June 14, 2023 (ECF No. 83)..........................JA-584

Transcript of Conference held on May 23, 2023 before Judge Denise L. Cote (ECF No. 84)........................................................................JA-599

Joint Status Report, dated June 16, 2023 (ECF No. 86)..................................JA-618

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-2) ...................................................................JA-622

Excerpts of Post-Hearing Brief of The Estate of Harper Lee and Harper Lee LLC, American Arbitration Association Case No. 10-19-0000-7463, dated July 28, 2021, and Excerpts of Respondents' Motion to Vacate Corrected Interim Award of Arbitration and Response in Opposition to Petitioner's Motion to Confirm Corrected Interim Award, Case No. 1:21-CV-05541 (N.D. Ill., January 14, 2022) (ECF No. 86-3) .............................................................JA-631

Email from Jonathan Zavin to Matthew Lembke, dated February 1, 2021 (ECF No. 86-4) ...................................................................JA-648

Wayback Machine captures of February 5, 2021 and March 4, 2021 U.S. Copyright Office webpage (ECF No. 86-5) .............................JA-653

Emails from Jonathan Zavin, dated between March 23, 2019 and July 27, 2021 (ECF No. 86-6) ...................................................................JA-658

Email from Jonathan Zavin to Matthew Lembke, dated September 25, 2020 (ECF No. 86-7) ...........................................................JA-701

Email from Jonathan Zavin to Matthew Lembke, dated April 6, 2021 (ECF No. 86-8) ...................................................................JA-703

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-9) ...................................................................JA-705

Email from Jonathan Zavin to Matthew Lembke, dated April 23, 2021 (ECF No. 86-10) ................................................................JA-708

Email from Jonathan Zavin to Matthew Lembke, dated May 20, 2021 (ECF No. 86-11) ................................................................JA-712

Email from Jonathan Zavin to Matthew Lembke, dated May 26, 2021 (ECF No. 86-12) ................................................................JA-714

Email from Jonathan Zavin to Matthew Lembke, dated June 14, 2021 (ECF No. 86-13) ................................................................JA-717

Email from Jonathan Zavin to Matthew Lembke, dated July 23, 2021 (ECF No. 86-14) ................................................................JA-719

Notice of Appeal, dated August 30, 2023 (ECF No. 102) .............................JA-721

Opinion and Order, dated October 31, 2023 (ECF No. 109) ..........................JA-723

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br><br>*Plaintiff,*<br><br>and<br><br>AARON SORKIN,<br><br>*Involuntary Plaintiff,*<br><br>-against-<br><br>THE DRAMATIC PUBLISHING COMPANY,<br><br>*Defendant.* | No. 1:22-cv-10147-DLC |

**DECLARATION OF KEVIN TOTTIS**

I, Kevin Tottis, declare as follows:

1.      I am an attorney at TottisLaw, which, along with Goodwin Procter LLP and McLaughlin & Stern, LLP, is counsel of record for defendant The Dramatic Publishing Company ("Dramatic"). I make this declaration in support of the motion for summary judgment filed by Dramatic regarding its statute of limitations defense.

2.      Atticus' counsel has stipulated to the authenticity of Exhibits 1, 2, 5, and 6 to this Declaration and Exhibit 1 to the Declaration of Christopher Sergel III being filed at the same time.

3.      Attached as Exhibit 1 is a true and correct copy of a January 23, 2019 email from Scott Rudin to Alvin Deutsch, copying Jonathan Zavin.

4.      Attached as Exhibit 2 s a true and correct copy of a cease-and-desist letter dated February 6, 2019 that Atticus sent to the Grand Theater regarding its plan to present the Christopher Sergel version of *To Kill a Mockingbird.*

5.      Attached as Exhibit 3 is a true and correct copy of the arbitration demand (the "Arbitration Demand") that Dramatic filed on March 7, 2019 against the Estate of Nelle Harper Lee (the "Estate").

6.      Attached as Exhibit 4 is a true and correct copy of relevant pages of the transcript from the May 25, 2023 hearing before the Court.

7.      Attached as Exhibit 5 is a true and correct copy of an April 18, 2019 email with attachments from counsel for the Estate to counsel for Atticus attaching a letter with the subject "Notice of Indemnity Obligation."

8.      Attached as Exhibit 6 is a true and correct copy of an April 24, 2019 letter from counsel for Atticus responding to the Estate's April 18, 2019 letter.

9.      Attached as Exhibit 7 is a true and correct copy of the Arbitrator's January 28, 2022 Final Award of Arbitrator in American Arbitration Association Case Number 01-19-0000-7463, which contains, as Appendix A, the October 21, 2021 Interim Award of Arbitrator (Corrected) (collectively referred to as the "Arbitrator's Award"). Exhibit 7 has been redacted to remove information the Estate requested be kept confidential.

10.     Attached as Exhibit 8 is a true and correct copy of an October 7, 2015 email exchange between Tim O'Donnell, Seth Gelblum, Scott Rudin and Andrew Nurnberg, regarding Dramatic's rights under the 1969 Agreement that was previously filed with the Court, ECF No. 60-10. Atticus' counsel has stipulated to another email exchange containing the relevant portions of Exhibit 8 (bottom of page 3 through page 4), but because that email was labelled "confidential" by the Estate, he could not agree to lift the confidentiality designation. Accordingly, Dramatic has referenced the publicly-filed document over which there is no dispute as to confidentiality.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:     June 2, 2023

_____/s/ Kevin Tottis_____
Kevin Tottis

> -----Original Message-----
> From: Scott Rudin [mailto:sr@scottrudinproductions.com]
> Sent: Wednesday, January 23, 2019 12:30 PM
> To: Alvin Deutsch <ADEUTSCH@mclaughlinstern.com>
> Cc: jzavin@loeb.com
> Subject:
>
> I saw your note to Jonathan Zavin.
>
> Your client sold rights in To Kill a Mockingbird that he does not own or control, rights which belong exclusively to me.
>
> There is nothing more to say about this except that I will move against him with aggression and alacrity if he tries to do it again.  I hope the Harper Lee estate and Jonathan Church are smart enough to go after him.   What he committed is theft.
>
> Now there's nothing to talk about.
>
> Reserving all rights.

**THE ARBITRATION TRIBUNALS OF THE
AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| **In the Matter of the Arbitration between** | ) | |
| | ) | |
| **THE DRAMATIC PUBLISHING COMPANY,** | ) | |
| | ) | |
| **Claimant,** | ) | **Demand** |
| | ) | |
| **v.** | ) | **AAA Case No.** |
| | ) | |
| **THE ESTATE OF NELLE HARPER LEE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

The Dramatic Publishing Company ("Dramatic"), for its arbitration demand, states as follows:

**BACKGROUND**

1.      Dramatic, established in 1885, is a small family-owned company located in Woodstock, Illinois, engaged in the business of licensing stock and amateur rights to stage plays, which it also publishes.

2.      Dramatic acquires its rights from their owners and agents and licenses them to schools, community theaters and stock theaters (including regional theaters, dinner theaters, children's theaters and other non-commercial theaters).  Some of the properties in its catalogue are Reginald Rose's *Twelve Angry Men*, E.B. White's *Charlotte's Web*, Ray Bradbury's *Martian Chronicles*, JRR Tolkien's *The Hobbit*, CS Lewis' *The Lion, The Witch and The Wardrobe* and A.A. Milne's *Winnie-the-Pooh*.

3.      The fees Dramatic charges are remitted to rights' owners, less a percentage which it retains for its licensing services.

## The Harper Lee-Dramatic Contract

4.       In 1969, Dramatic entered into an agreement with Harper Lee (the "Original

Grant," attached as Exhibit A) under which she agreed that Dramatic would create a play based

upon her novel *To Kill a Mockingbird*.  Ms. Lee further agreed that she would license to

Dramatic the right to publish the play as well as exclusive worldwide stock and amateur

performance rights in the play. ¶ 2(a).  She specifically agreed that dramatization created by

Dramatic "is to be the **only one** the amateur acting rights of which [Ms. Lee] will permit to be

leased and/or licensed…". *Id.*  (emphasis added)

5.       Ms. Lee also promised ". . . to do nothing, either by omission or commission, to

prevent or hinder [Dramatic] from the full exercise of all rights granted and/or purported to be

granted herein." ¶ 1(a).  The Original Grant also provided that its terms were binding on the

parties' "…heirs, executors, administrators, successors and assigns." ¶ 4(d).

6.       Under the express terms of the Original Grant, "amateur acting rights" were not

simply limited to high school and community theater productions; rather, Ms. Lee expressly

agreed that "amateur acting rights" would include:

> …all performance rights for little theatres, community theatres
> and/or drama associations, colleges, universities, high school and other
> school groups, churches, clubs and other amateur organizations or groups
> therein or connected therewith, together with **all stock, repertoire,
> lyceum and Chautauqua performances** whether any or all of the
> abovementioned **performances are given by paid and/or unpaid
> actors….**

Exhibit A, ¶ 4(e)(e) (emphasis added).

7.       Although the Original Grant expressly anticipated paid actors performing in the

licensed performances, it exempted two categories of performances, providing that the grant

would not include "…Broadway production rights nor first-class professional road and/or first

2

class touring production rights." *Id.*

8.      Pursuant to the terms of the Original Grant, then-president of Dramatic,

Christopher Sergel (now deceased), wrote an adaptation of *To Kill a Mockingbird* for the stage

(the "Sergel Version"). For nearly 50 years, the Sergel Version has been successfully licensed by

Dramatic for stock and amateur productions worldwide, generating millions of dollars in

royalties.

9.      Indeed, over the past 50 years, multiple top professional stock and repertoire

companies produced the Sergel Version with full knowledge of Ms. Lee and her agents.  They

included the Alabama Shakespeare Festival, Ford's Theatre, the Guthrie Theatre, Hartford Stage

Company and the Stratford (Ontario) Festival.

10.      These and other productions resulted in millions of dollars of royalties paid to and

accepted by Ms. Lee.  In fact, in each case, not only did Ms. Lee receive and accept royalties

from the productions, she and her agents were provided with full accountings, identifying, *inter*

*alia,* the name of each theater and number of performances.  Ms. Lee's ongoing acceptance of

the payments and accountings for nearly 50 years reflected her full and complete understanding

that the words in the Original Grant meant what they said, that she had licensed the rights to

"stock" and "repertoire" theaters and that the work she licensed would be performed by both

"paid and/or unpaid actors."

**The Harper Lee-Rudin Contract**

11.      In 2011, Ms. Lee served notice seeking to terminate certain of Dramatic's rights

effective April 2016 pursuant to 17 U.S.C. § 304(c) during the extended renewal term of her

copyright.  Because the Sergel Version is, however, a derivative work created before the date of

termination, 17 U.S.C.  § 304(c) (6) (A) provides that it "may continue to be utilized under the

terms of the [original] grant" by Dramatic.

12.     Subsequently, Producer Scott Rudin acquired the rights to produce a Broadway

Production of *To Kill a Mockingbird* to be written by Aaron Sorkin (the "Sorkin Version")

pursuant to a contract with Harper Lee dated June 29, 2015 (the "Rudin Agreement").  Dramatic

has been provided with a highly redacted copy of that agreement (a copy of which is attached as

Exhibit B) which on its face acknowledges a limitation on Mr. Rudin's rights to exploit his

project, making it expressly subject to Dramatic's rights under its 1969 Original Grant with Ms.

Lee.  Paragraph 2(b) of the Rudin Agreement provides:

> Producer acknowledges that pursuant to an agreement (the "Prior Agreement") dated June 26, 1969 between Author and The Dramatic Publishing Company ("DPC"), Author granted DPC the right to create a play (the "Prior Adaptation") based on the Novel, and to exploit the amateur acting rights (**as defined in the Prior Agreement**) in the Prior Adaptation.  Author represents that it has terminated the Prior Agreement effective April 26, 2016.  Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere.  **The rights granted hereunder shall be subject to the rights granted under the Prior Agreement**, as limited by such termination.

(emphasis added)

13.     The Rudin agreement does not attempt to change or limit the scope of the term

"amateur acting rights" as defined in the Original Grant between Ms. Lee and Dramatic,

including the express language including stock and repertoire performances whether or not the

actors are paid.

14.     Ms. Lee subsequently died in 2016.

15.     Despite the words in the Original Grant literally stating that stock and repertoire

performances were within its scope whether they are given by "paid and/ or unpaid actors"  and

despite Ms. Lee's nearly 50 years of accepting millions of dollars in royalties from productions

mounted with "paid…actors" and despite the express obligation of the Lee Estate in the Original Grant "… to do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and/or purported to be granted herein," after it appeared the Sorkin Version would be successful on Broadway, the Lee Estate and Mr. Rudin began to ignore the clear and unambiguous words set forth in the Original Grant to Dramatic's significant detriment.

16.     For example, in 2018, Dramatic granted a license to Jonathan Church Productions ("Church") to present a non-first-class tour of the Sergel version, for a period of six months, in the United Kingdom and Ireland.  That same year, Church publicly announced the tour.

17.     Months later, on January 9, 2019–right before the Church United Kingdom and Ireland tour was to commence–Dramatic and Church received a letter from lawyers representing Mr. Rudin and endorsed by the Lee Estate, threatening lawsuits if any presentations of the Sergel version were made in the United Kingdom or Ireland.  The letter claimed that because the tour would be presented in major commercial venues, it would violate both the Original Grant and purported rights under the Rudin Agreement. The statements were materially false.  Not a single one of the purported restrictions appear in the Original Grant.

18.     Dramatic's license to Church was well within the rights granted to it by Ms. Lee under the Original Grant.  The ensuing threats sanctioned by the Lee Estate directly violate its express promise to do nothing to "prevent or hinder Dramatic from the full exercise of its rights under [the Original Grant]."

19.     Dramatic was notified by Church on February 4, 2019 that it had cancelled its tour as a result of those threats of litigation.

**The Estate Continues to Prevent and Hinder the Exercise of Dramatic's Rights**

20.     Sadly, the Lee Estate did not stop with threatening the UK production.

21.     Under the terms of the Original Grant, Dramatic agreed that during the run of a "first class" production in New York or a related touring engagement, Dramatic would not license the Sergel Version for any performance "…within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000." Original Grant Rider, ¶ 2.

22.     Well aware of this restriction, when Dramatic learned the Sorkin Version would be produced on Broadway, in July 2018, Dramatic sought special permission from the Lee Estate's agent for nine amateur theaters to produce the Sergel Version of *To Kill a Mockingbird*.[1] No production was to be presented more than 20 times and theater capacity at each venue ranged from 70 to 600.  With the exception of one production in Staten Island ("While certainly not economically competitive, it would be preferable not to have any competing press distraction here in NYC.") the Estate's agent authorized each of the other eight productions to go forward. A copy of the email chain reflecting such authorization is attached as Exhibit C.

23.     Dramatic took the Estate at its word and in direct reliance on the Lee Estate's representations that such productions could proceed and did not raise concerns to the Estate, Dramatic licensed each of the productions (the "Licensed Productions").

24.     Each of the Licensed Productions made preparations to open productions of the Sergel Version.

25.     Despite Dramatic's and the Licensed Productions' good faith reliance on the Lee

---

[1] The theaters included the Prior Lake Players Community Theater in Prior Lake, Minnesota; the Dayton Playhouse in Dayton, Ohio; the Curtain Call Theatre in Braintree, Massachusetts; The Grand Theatre in Salt Lake City, Utah; Theatre Memphis in Memphis, Tennessee; the Conejo Players Theatre in Thousand Oaks, California; the Kavinoky

Estate's material representation that such productions could proceed unimpeded, on January 31,

2019—as many or most of the Licensed Productions were preparing to open—the Lee Estate

suddenly claimed it was revoking its permission for the Licensed Productions to proceed.

26.     Over the next month, in concert with Mr. Rudin, the Lee Estate proceeded to

threaten a number of the productions with letters containing false statements, including that Mr.

Rudin's production company is the ". . . exclusive worldwide licensee . . . for live stage rights to

the novel "To Kill a Mockingbird" (the "novel") subject to the *limited* rights granted by Owner

[Harper Lee] to Dramatic Publishing Company ("DPC") in 1969 to create a theatrical adaptation

of the novel for *amateur* purposes only" (emphasis added).

27.     The purported description in the threatening letters materially misrepresent the

express written terms of the Original Grant, the Rudin Agreement and the email approval

obtained by Dramatic for each of the Licensed Productions.  On information and belief, these

statements were made with the intention that the small, amateur theaters would rely on the

allegations and, with limited means to respond to a lawsuit, cancel their productions, thereby

diminishing the value of the Original Grant to Dramatic, and, in turn, violating the Lee Estate's

express obligation to "…do nothing, either by **omission or commission**, to prevent or hinder

[Dramatic] from the full exercise of all rights…" granted in the Original Grant.

28.     The letters had their intended effect. According to published reports, the

producers of the Licensed Productions shut down their productions because of fears of reprisal.

29.     Such threatening acts and other misstatements, omissions and commissions by the

Lee Estate constitute further breaches of the Original Grant.

30.     As a direct result of the Lee Estate's multiple breaches of its contract with

---

Theatre at D'youville College in Buffalo, New York;  Spotlight Productions, Inc. in Staten Island, New York; and
the Central Connecticut State University in New Britain, Connecticut.

Dramatic, Dramatic has suffered damages in excess of $500,000.  Left unchecked, the Lee

Estate's continued false and misleading statements coupled with its acts of omission and

commission will further erode the value of Dramatic's significant rights transferred under the

terms of the Original Grant.

31.     Pursuant to Paragraph 4(k) of the Original Grant, "Any controversy arising out of

this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration

Association."  In addition, Dramatic is entitled to indemnity for any losses, including "reasonable

attorney's fees" caused by the Lee Estate's breach. (Original Grant, ¶ 1(b) )

### Relief Requested

WHEREFORE, Dramatic requests relief as follows:

(a)     Damages in excess of $500,000 arising out of the Lee Estate's actions including

multiple breaches of the Original Grant;

(b)     A declaration that Dramatic's exclusive rights to the Sergel Version of the play

include all of the rights granted to Dramatic under paragraph 4(e) of  the Original Grant,

including but not limited to the exclusive right to license stock and repertoire theaters to perform

any stage version of the novel *To Kill a Mockingbird*, whether or not the actors are paid, and that

no other person or entity has such rights in any other stage version of the novel;

(c)     An injunction against the Lee estate and/or anyone acting under authority from or

in concert with the Lee Estate from purporting to own, be authorized to exploit or to exploit any

of the following worldwide rights in any stage version of the novel *To Kill a Mockingbird:*

> All performance rights for little theatres, community theatres and/or drama
> associations, colleges, universities, high school and other school groups, churches,
> clubs and other amateur organizations or groups therein or connected therewith,
> together with all stock, repertoire, lyceum and Chautauqua performances whether
> any or all of the abovementioned performances are given by paid and/or unpaid
> actors, but shall not include Broadway production rights nor first-class

professional road and/or first-class touring production rights.

(d)      Reasonable attorney's fees and costs of arbitration.

(e)      All other relief which the tribunal deems appropriate.

Dated: March 7, 2019

Respectfully submitted,

**THE DRAMATIC PUBLISHING COMPANY**

By: /s/  Kevin Tottis_____
        One of its Attorneys

Kevin Tottis
ktottis@tottislaw.com
Monica L. Thompson
mthompson@tottislaw.com
Tiffany Lopez
tmlopez@tottislaw.com
TottisLaw
One East Wacker Drive
Suite 1205
Chicago, IL 60601
Tel: (312) 527-1400
Fax: (312) 589-7192

Of Counsel:
Alvin Deutsch
adeutsch@mclaughlinstern.com
David Blasband
dblasband@mclaughlinstern.com
McLaughlin & Stern LLP
260 Madison Avenue
New York, NY 10016
Tel: (212) 448-1100
Fax: (212) 448-0066

# Exhibit A

*AGREEMENT* entered into this **25th**                day of **June**

**19 60** , between   **HARPER LEE**————————————

(herein sometimes called "Owner") and **THE DRAMATIC PUBLISHING COMPANY**, an Illinois corporation (herein sometimes called "Publisher")

**Witnesseth, That:**

In consideration of the mutual covenants and conditions herein contained, the parties hereto hereby mutually agree with each other with respect to the property written by **HARPER LEE**————————————

entitled   **TO KILL A MOCKINGBIRD**

(herein sometimes called "Property") and a dramatization (herein sometimes called "Play") to be based upon and/or adapted from the Property, as follows:

1. The Owner hereby represents, warrants and agrees that:

(a) Neither the Property nor the exercise of the rights granted and/or purported to be granted herein will infringe upon or violate any copyright or any other right of any person, firm or corporation, and that the Property contains nothing libelous, slanderous or unlawful, and that he alone has the power and authority to grant the rights herein granted and/or purported to be granted and that there is not now and there will not be during the term of this agreement any valid or outstanding right, title, interest, claim, encumbrance, or agreement in connection with the Property or the rights herein granted which would prevent or hinder the Publisher from the full exercise of all rights granted herein, and that he will do nothing, either by omission or commission, to prevent or hinder the Publisher from the full exercise of all rights granted and/or purported to be granted herein;

(b) He will defend, indemnify and hold harmless the Publisher from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by the Owner; provided, however, that the provisions of this paragraph shall not apply to any material in the Play not also contained in the Property.

2. The Owner hereby grants to the Publisher the complete right throughout the world:

(a) To write or cause to be written a dramatization based upon and/or adapted from the Property, but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;

(b) To lease the amateur acting rights in and to the Property and/or the Play and/or parts thereof;

(c) To publish the Play and/or parts thereof in such form and style as the Publisher may determine;

(d) To publish portions of the Play up to 1,500 words in collections of readings.

3. The Publisher covenants and agrees to:

(a) Cause the Play to be written and published within eighteen (18) months from the date hereof;

(b) Sell copies and license amateur performances of the Play and/or of parts thereof at such prices and on such terms as it determines;

(c) Publish the Play with the following notice of copyright, and to register the claim to copyright in the Copyright Office of the United States of America;

© ~~(Year Play is published)~~           By  **Harper Lee**
~~The Dramatic Publishing Company~~

Based upon the work,

**TO KILL A MOCKINGBIRD**

(Title) © **1960** by **Harper Lee**

**All Rights Reserved**

Printed in the United States of America

(d) Deliver to the Owner a copy of Exhibit A signed by the dramatizer of the Property;

(e) Pay to the Owner twenty-five per cent (25%) of all monies actually collected and retained from the leasing and licensing of the amateur acting rights in and to the Play and/or parts thereof;

(f) Pay to the Owner a royalty of five per cent (5%) of the retail price on every copy of the Play published and sold by it, but not on free copies or on copies destroyed, damaged or returned;

(g) Semi-annually send to the Owner statements of account and pay any sums due.

**4. It is further agreed between the parties hereto that:**

(a) Without in any way limiting any of the other provisions of this agreement, the Publisher shall have the absolute and unlimited right, for the purpose of the dramatization to be produced, to make such changes, alterations, adaptations, additions to or eliminations from the Property as in its sole judgment and discretion the Publisher shall deem advisable;

(b) Publisher is hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the said Property and Play and any renewals thereof, or concerning any infringement of or interference with the rights hereby granted, in its own name or in the name of the copyright proprietor, but at the expense of the Publisher and, at its option, the Publisher may join the Owner and/or copyright proprietor as party plaintiff or defendant in any such action or proceeding. Any recovery from the infringement of the copyright in the said Property or Play, in so far as it arises from a violation of the rights hereunto granted to the Publisher, is assigned to and shall be paid to the Publisher;

(c) The Publisher shall have the right to use and permit others to use the Owner's name, photograph and likeness in connection with exploiting and publicizing the Play and the rights herein granted;

(d) This agreement shall be governed by and interpreted in accordance with the laws of the State of Illinois, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. This agreement contains the entire understanding between the parties hereto and shall not be construed as a joint venture or partnership;

(e) The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

(f) The Owner shall renew and/or extend the copyright in the Property during that period when it may be renewed and/or extended, and the term of this agreement unless terminated earlier as provided elsewhere herein, shall be for the term of the original copyright of the Property and the renewals and/or extensions thereof;

(g) One year after publication, if the Publisher finds the Play unprofitable and wishes to terminate this agreement, it may do so. If the Play is allowed to remain out of print more than six months after written demand by the Owner to reprint, the Owner may terminate this agreement. These terminations shall take effect on mailing of notice by registered mail to the last known address of the other party;

(h) If the Publisher shall fail to send the Owner a certified public accountant's statement as to the correctness of all reports sent to the Owner by the Publisher for the preceding year, a Certified Public Accountant appointed by any mutually agreed upon third party shall have the right to examine the books of the Publisher insofar as they relate to the Play and make a report to the Owner as to the correctness of the Publisher's statements. Such examination shall be at the cost of the Owner unless errors shall be found requiring an adjustment in the Owner's favor of five per cent (5%) or more of the total sums theretofore paid the Owner, in which case the cost shall be paid by the Publisher;

(i) The parties hereto shall execute such other and further documents as may be necessary or desirable to effectuate the purposes hereof;

(j) This agreement may not be terminated nor the Publisher held liable because of failure of performance for causes outside the Publisher's control, unless continued unreasonably after abatement of the said cause;

(k) Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association;

(l) All notices hereunder shall be in writing and except for notices of termination, which shall be sent by registered mail, all other notices, statements and payments shall be sent by regular mail to the parties hereto at their last known addresses.

**In Witness Whereof,** the parties hereto have executed this agreement the day and year first above written.
In addition to the foregoing, Paragraphs 5, 6 and 7 on Page Four of this agreement are hereby made a part of this agreement.

_____ (SEAL)
(Owner's signature)

THE DRAMATIC PUBLISHING COMPANY

ATTEST: _____
Secretary or Assistant Secretary

By _____
President or Vice President

RIDER TO CONTRACT DATED JUNE 25, 1960 BY AND BETWEEN HARPER LEE
AS OWNER AND THE DRAMATIC PUBLISHING COMPANY AS PUBLISHER RE.
"TO KILL A MOCKINGBIRD"

1.   The following shall be deemed added to Paragraph 1 (b):

The Publisher will similarly indemnify and hold harmless
the Owner with respect to any new material in the Play not
contained in the Property.

2.   The following shall be deemed added to Paragraph 2:

In the event the Owner shall lease professional acting rights to a third party
for the purpose of producing a first class dramatic play or dramatico-musical
play based on the Property, during the run of the said play in New York or
during a first class touring engagement thereof, the Publisher shall not permit
amateur performances, as provided herein, within a distance of twenty-five (25)
miles of the city limits of any city which had a 1960 U.S. census population in
excess of 150,000.  After the close of the final first class road company, the
Publisher may release amateur rights without restriction.

3.   The following shall be deemed added to Paragraph 4 (c):

Any biographical material, photograph and/or likeness of the Owner used by
the Publisher shall be subject to the Owner's approval.

Page Four

5.    The Publisher agrees to pay to the Owner, promptly upon receipt of a properly executed copy of this agreement, the sum of Two Thousand Five Hundred Dollars ($2,500.00) as a non-returnable advance against royalties to accrue under the terms hereof.  Before any amount due to the Owner under Paragraphs 3 (e) and 3 (f) hereof is paid to the Owner, the Publisher shall take all such amounts as its own property until the sum so taken shall equal the total of the advance herein provided for.

6.    All notices, monies, and statements due to the Owner hereunder shall be sent and/or paid to Annie Laurie Williams, Inc., 18 East 41st Street, New York, New York 10017, as her agent, and the Publisher shall not be required to look to the application of any payments made to Annie Laurie Williams, Inc., but the receipt by Annie Laurie Williams, Inc. shall be a full and complete discharge of the Publisher's obligation to the Owner to the extent of any such payments.

7.    Before publication of the dramatization and before the leasing and/or licensing of the amateur acting rights to the dramatization, the Publisher agrees to submit a copy of the dramatization to the Owner.  The Owner agrees that upon receipt of such copy of the dramatization she will examine the same and within thirty (30) days from the receipt thereof, either give her written objections to the Publisher or submit her written approval thereto.  If within such thirty (30) day period the Owner has not given her written approval or submitted her written objections to the Publisher, the drama- tization shall be deemed to have been approved by the Owner and the Publisher may publish the dramatization as submitted to the Owner, and lease and/or license the amateur acting rights therein as herein elsewhere provided.  If the Owner within the said thirty (30) day period submits written objections to the dramatization, the Publisher agrees to use its reasonably best efforts to have the dramatization revised to meet the said objections, provided however that it is understood and agreed that the Publisher shall not be required to materially alter the basic structure and/or nature of the dramatization or make extensive revisions therein.  The Owner shall also have the right to make such line changes and/or revisions in the said dramatization as the Owner deems necessary and proper.  After the said dramatization has been approved I any of the means hereinabove provided or after written objections have been submitted to the Publisher and the Publisher has used its reasonably best efforts to revise the dramatization to meet the Owner's objections as hereinabove provided, the Publisher shall have the right to publish the dramatization including any changes made therein b the Owner and to lease and/or license the amateur acting rights therein as herein elsewhere provided.

# Exhibit B

Exhibit B

**RUDINPLAY, INC.**
120 West 45th Street, 10th Floor
New York, New York  10036

As of 29 June, 2015

Ms. Harper Lee
c/o Andrew Nurnberg Associates International
20-23 Greville Street, London EC 1N 8SS
United Kingdom;

Re:    "To Kill a Mockingbird" Live Stage Rights

Dear Ms. Lee:

This letter agreement ("**Agreement**") sets forth the material deal terms that have been agreed upon between Rudinplay, Inc. ("**Producer**") and you ("**Author**") in connection with the live stage and ancillary rights in and to the novel entitled "To Kill a Mockingbird" written by you (the "**Novel**").

1.    Agency.



2.    Grant of Rights.

(a)    Upon having obtained the written approval of the Author to the Playwright, Author shall thereby grant to Producer and its licensees and assignees the sole and exclusive option (the "**Option**") to acquire, on an exclusive (subject to Paragraph 2 (b) below), worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights, including without limitation: (i) the right to create, develop, produce and present a live stage play (the "**Play**") based on and using the Work and any and all elements thereof (including without limitation the right to present the Play in first and non-first class touring and sit-down productions), (ii) the right to use the title "To Kill a Mockingbird" in connection with the Play, and (iii) the right to exploit all customary advertising rights in all media, merchandising rights and stock and amateur licensing rights (subject to Paragraph 1(b) below).  It shall be a condition precedent to the approval of the Playwright that the Playwright shall agree in writing that any grant of stock and amateur licensing rights is to be contingent on: (i) an annual professional performance of the Play in Monroeville, AL,  (ii) a prohibition against any license for performance of the Play by or under the auspices of the Monroe County Museum or to any successor or affiliated entity, organization or individual, and (iii) a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL.

(b)    Producer acknowledges that pursuant to an agreement (the "**Prior Agreement**") dated June 26, 1969 between Author and The Dramatic Publishing company ("**DPC**"), Author granted DPC the right to create a play (the "**Prior Adaptation**") based on the Novel, and to exploit the amateur acting rights (as defined in the

NY:1301454.6_076169-10002

**JA-551**

Prior Agreement) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

3.  Option Periods and Payments.



4.  Exercise of Option. The initial commercial first class production of the Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright (the "**Playwright Agreement**") shall be referred to herein as the "**Initial Production**". The Option will be deemed exercised if the first paid public performance of the Initial Production is presented within the Option Period. Producer shall have the right to present a pre-Broadway or pre-West End developmental production, either at a not-for-profit theater or as a commercial engagement.

5.  Royalties.





NYT3010346_0a869-76032

5





Please confirm your agreement to the foregoing by signing your name where indicated below.

Very truly yours,

RUDINPLAY, INC.

By: _____
    An Authorized Officer

ACCEPTED AND AGREED:

By: _____
    HARPER LEE

NY1301454 b_076166-0209?

5

# Exhibit C

**From:** odohmnail@aol.com [mailto:odohmnail@aol.com]
**Sent:** Tuesday, July 10, 2018 10:06 AM
**To:** Carrie Blomquist <CBlomquist@dpcplays.com>
**Cc:** ANurnberg@nurnberg.co.uk; carter@tokillamockingbird.com
**Subject:** Re: Restrictions for TO KILL A MOCKINGBIRD

Dear Carrie,

The only proposed license of concern is for the Spotlight Productions Inc. performances at Staten Island in NYC at the same time as the Broadway previews and premiere.

While certainly not economically competitive, it would be preferable not to have any competing press distraction here in NYC.

Thanks,

Tim


-----Original Message-----
From: Carrie Blomquist <CBlomquist@dpcplays.com>
To: odohmnail <odohmnail@aol.com>
Cc: ANurnberg <ANurnberg@nurnberg.co.uk>; carter <carter@tokillamockingbird.com>
Sent: Mon, Jul 9, 2018 2:50 pm
Subject: RE: Restrictions for TO KILL A MOCKINGBIRD

Dear Tim,

Many thanks for the response and the consideration.

The following organizations that are now in restricted areas were offered licenses prior to the announcement:

Prior Lake Players Community Theatre in Prior Lake, Minnesota is requesting to produce the show four times between Nov. 2-Nov.10, 2018. They have a seating capacity of 250 and an expected attendance per show of 200.

Dayton Playhouse in Dayton, Ohio requested to produce six times between March 8-17, 2019. They have a seating capacity of 164 and an expected attendance per show of 90.

Curtain Call Theatre in Braintree, MA requested to produce six times between May 3-12, 2019. They have a seating capacity of 70 and an expected attendance of 60.

The Grand Theatre in Salt Lake City, UT is requesting to produce fifteen times between March 20-April 6, 2019. Seating capacity of 600 and expected attendance of 200.

Theatre Memphis in Memphis, TN is requesting to produce eleven times between Jan. 18-Feb. 3, 2019. Seating capacity of 400, expected attendance 200.

Conejo Players Theatre in Thousand Oaks, CA is requesting to produce fourteen times between Jan. 18-Feb, 9, 2019. Seating capacity 175, expected attendance 100.

Kavinoky Theatre at D'youville College in Buffalo, NY is requesting to produce the show nineteen times between March 1-March 24, 2019. Seating capacity 259, expected attendance of 120.

Spotlight Productions, Inc in Staten Island, NY is requesting to produce the show five times between Nov. 1-4, 2018 at the Snug Harbor Cultural Center in Staten Island. They have a seating capacity of 400, expected attendance of 300.

Central Connecticut State University in New Britain, CT is requesting to produce the show four times between Nov. 28-Dec. 1, 2018. They have a seating capacity of 110 and an expected attendance of 70.

Please let me know your thoughts on these productions or if there is any additional information I can provide you. Moving forward would you like me to continue to send new requests in the restricted areas to all parties copied on this email?

We thank you for reaching out to us and for your consideration to the theatres that we work with that have such a great love for the title!

All Best,

Carrie

**From:** odohmnail@aol.com [mailto:odohmnail@aol.com]
**Sent:** Monday, July 09, 2018 1:20 PM
**To:** Carrie Blomquist <CBlomquist@dpcplays.com>
**Cc:** ANurnberg@nurnberg.co.uk; carter@tokillamockingbird.com
**Subject:** Re: Restrictions for TO KILL A MOCKINGBIRD

Dear Carrie,

The estate of course does not desire to unreasonably impede your licensing of amateur performances by nonprofessional actors.   So, if you provide details as to the licenses already offered prior to the announcement of the Broadway performances, we shall take the request to proceed with those licenses under advisement.

**JA-558**

And we appreciate and accept your offer to advise us of any new requests for
licenses from the restricted areas so that the estate can consider those requests as
well in its sole discretion.

Best,

Tim O'Donnell

-----Original Message-----
From: Carrie Blomquist <CBlomquist@dpcplays.com>
To: odohmnail <odohmnail@aol.com>
Cc: Andrew Nurnberg <ANurnberg@nurnberg.co.uk>; carter <carter@tokillamockingbird.com>
Sent: Mon, Jul 2, 2018 11:56 am
Subject: RE: Restrictions for TO KILL A MOCKINGBIRD
Dear Mr. O'Donnell,

Good afternoon. I hope all is well. I wanted to follow-up regarding the restrictions in place
surrounding *To Kill a Mockingbird*.

There were several amateur theatres that had been offered licenses to produce the show prior
to the Broadway production dates being announced that are within areas that are now
restricted.

The terms of the contract are not particularly clear in addressing this issue. We do not feel these
productions would harm the success of the Broadway production and we would like to honor
our agreements with these theatres, but we would like to know how you would like us to
proceed.

Also, moving forward, would the estate like us to send any new requests for licensing that are in
restricted cities for consideration? For example, if a high school near Gary, IN applies the estate
could let us know that although Gary is restricted, they do not feel that the production would be
a conflict and they would like us to proceed with licensing.

I look forward to hearing your thoughts.

All Best,

Carrie



**Carrie Blomquist**
Professional Leasing Director
**P:** (800)-448-7469 | **F:** (800)-334-5302
www.DramaticPublishing.com
311 Washington St. Woodstock, IL 60098
FOLLOW US!



**From:** Carrie Blomquist
**Sent:** Friday, June 15, 2018 2:04 PM
**To:** 'odohmnail@aol.com' <odohmnail@aol.com>
**Cc:** Andrew Nurnberg <ANurnberg@nurnberg.co.uk>; 'carter@tokillamockingbird.com'
<carter@tokillamockingbird.com>
**Subject:** RE: Restrictions for TO KILL A MOCKINGBIRD

Dear Mr. O'Donnell,
Thank you for your prompt response. We would, of course, never license a first-class or Broadway production, but would continue to license theatres as defined by the contract: "little theatres, community theatres and/ or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/ or unpaid actors." I apologize for not being clearer in my previous email.
We have put a restriction in our database for all new requests to produce to ensure they are not within 25 miles of the cities listed in the 1960's census with populations greater than 150,000.
All Best,

Carrie



**Carrie Blomquist**
Professional Leasing Director
**P:** (800)-448-7469 | **F:** (800)-334-5302
www.DramaticPublishing.com
311 Washington St. Woodstock, IL 60098
FOLLOW US!



-----Original Message-----
From: odohmnail <odohmnail@aol.com>
To: cblomquist <cblomquist@dpdplays.com>
Cc: anurnberg <anurnberg@nurnberg.co.uk>; carter <carter@tokillamockingbird.com>
Sent: Tue, Jun 12, 2018 3:58 pm
Subject: Restrictions for TO KILL A MOCKINGBIRD

Dear Ms. Blomquist,

I represent the Estate of Nelle Harper Lee and your email regarding the restrictions
on your licensing given the Broadway production has been referred to me.

First of all, let me reiterate, as stated in my letter of September 22, 2016 to Mr. Sergel,
that Ms. Lee reserved all professional acting rights in her agreement with Dramatic
Publishing Company, so you certainly may not license the Sergel adaptation for
any productions using professional actors regardless of location. A copy of my
September 22, 2016 letter is attached.

With respect to productions in schools and community theaters, I am attaching the 1960
Census data indicating the cities with a population then in excess of 150,000.  Your
agreement restricts you from licensing within a 25 mile radius of those cities during
the run and any first class tour of the Broadway production that is now imminent.

Please let me know if you have any questions.

Sincerely,

Tim O'Donnell

Begin forwarded message:

**From:** Carrie Blomquist <CBlomquist@dpcplays.com>
**Subject: Restrictions for To Kill a Mockingbird**
**Date:** June 12, 2018 at 12:35:48 PM CDT
**To:** "carter@tokillamockingbird.com" <carter@tokillamockingbird.com>
**Cc:** "tonjacarter@frontiernet.net" <tonjacarter@frontiernet.net>

Hi Tonja,

Good afternoon. I hope all is well. I wanted to reach out to you now that the dates have been
announced for the Broadway production of **_To Kill a Mockingbird_**  to see if you would like me
to restrict licensing of our adaptation to schools, community theatre and professional theatres
around New York City during the run? We want to make sure we are fulfilling any contractual

obligations Dramatic Publishing might have. Our there any additional cities you would need to have restricted at this time?

I look forward to hearing from you.

Kind Regards,

Carrie Blomquist



**Carrie Blomquist**
Professional Leasing Director
**P:** (800)-448-7469 | **F:** (800)-334-
5302www.DramaticPublishing.com
311 Washington St. Woodstock, IL 60098
FOLLOW US!

  

************************************
Tonja Carter
President/CEO
Harper Lee LLC
44 East Claiborne Street
Post Office Box 278
Monroeville, AL  36461
(251)743-3386
carter@tokillamockingbird.com



JONATHAN ZAVIN
Partner

345 Park Avenue
New York, NY  10154

Direct  212.407.4161
Main   212.407.4000
Fax    212.658.9105
jzavin@loeb.com

Via E-mail (mlembke@bradley.com)
Via U.S. Mail

April 24, 2019

Matthew H. Lembke
Partner
Bradley Arant Boult Cummings LLP
One Federal Place
1819 5th Avenue N
Birmingham, AL  35203

Re:   To Kill A Mockingbird

Dear Matt:

This is in response to your two letters to me of April 18, the first demanding indemnification and defense by Rudininplay, Inc.("Rudinplay"), or its assignee Atticus Limited Liability Company ("Atticus") of the claims brought by Dramatic Publishing Company  ("DPC") against the Estate of Harper Lee ("the Estate") in an arbitration commenced in Chicago, Illinois.  The second letter suggests that even if Atticus declines to indemnify Lee, Atticus should assume the defense of the arbitration.

As you anticipated in this second letter, Atticus will not indemnify the Estate.  First, the claim against the Estate by DPC does not arise "out of or in connection with the development, production or exploitation of the Play...." (Emphasis added).  Rather, the claim arises out of Atticus enforcing its exclusive rights, granted by the Estate, to prevent the production of a different play.  Atticus had the absolute right to take these actions pursuant to the agreement between Lee and Rudinplay, and nothing in such action constituted a breach of the agreement by Atticus.

Additionally, as we've discussed, to the extent that the Estate or its agent or licensee approved either the professional Church production of the Sergel play in the U.K, or any production in the United States of the Sergel play after November 1, 2018 within 25 miles of a city that had a population of more than 150,000 per the 1960 United States census, that constituted a clear breach by the Estate of its representations and warrantees to Rudinplay pursuant to the 2015 agreement between the Harper Lee and Rudinplay.  I note that in this respect, according to the e-mails attached to the Demand for Arbitration between Tim O'Donnell (the attorney for the Estate) and DPC, O'Donnell appears to grant the Estate's approval for some performances of the Sergel play after November 1, 2018 within such 25 mile limit.  Further, both Tonja Carter and Andrew Nurnberg were copied on the O'Donnell e-mails, so they were both aware of this purported approval.  Any grant of such approval was a clear breach of the Estate's agreement with Rudinplay, since the exclusive rights to such performances had been granted to Rudinplay

Los Angeles  New York  Chicago  Nashville  Washington, DC  San Francisco  Beijing  Hong Kong  www.loeb.com

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership.

17669681.1
227691-10003

CONFIDENTIAL                   JA-563                   HL_00005385



Matthew H. Lembke
April 24, 2019
Page 2

by the Estate in the 2015 agreement. As you are aware, this purported approval by the Estate, in violation of its agreement with Rudinplay, has caused actual damages to Atticus.

I also note that in its claim for relief in the Demand for Arbitration, DPC seeks a declaration that it has the "exclusive" worldwide right for all amateur performances of an adaptation of the novel, *To Kill a Mockingbird*. Obviously the Estate granted the non-exclusive rights in the United States to such performances to Rudinplay, represented and warranted that it had the right to grant such rights, and indemnified Rudinplay with respect to any breach of such representations and warranties. If for any reason Atticus, through Sorkin, is unable to exploit such amateur rights, the damages for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate.

In light of the above, in the event that Atticus is damaged in any way by DPC's claims, or by the actions of the Estate in violation of the agreement between Lee and Rudinplay, Atticus reserves the right to seek appropriate damages against the Estate.

Finally, while I understand your suggestion that Atticus assume the defense of the Arbitration, Atticus declines to do so. This is a problem of the Estate's making and one that the Estate must solve at its expense. Further, given the possibility of a conflict between the Estate and Atticus arising from the claims made in the arbitration, it would be inappropriate for Atticus to assume the defense of the Estate. Nonetheless, to the extent that the interests of Atticus and the Estate align in the Estate's defending the claims in the arbitration, it is Atticus's present intent to continue to provide assistance to the Estate, to the extent that it can. As you undoubtedly recall, Scott Rudin reached out to Tonja Carter few months ago to discuss working together regarding the Play, and Ms. Carter never responded.

The foregoing is not intended as a complete statement of the facts or Atticus's claims or defenses in this matter, and nothing in the foregoing is intended to waive any rights or remedies which Atticus may have, all of which are specifically reserved.

Sincerely,

Jonathan Zavin
Partner

17669681.1
227691-10003

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | No. 1:22-cv-10147-DLC |
| *Plaintiff*, | |
| and | |
| AARON SORKIN, | |
| *Involuntary Plaintiff*, | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant*. | |

## DECLARATION OF CHRISTOPHER SERGEL III

I, Christopher Sergel III, declare as follows:

1.     I am President of The Dramatic Publishing Company ("Dramatic") and have held that position since 2012. I make this declaration in support of the motion for summary judgment filed by Dramatic regarding its statute of limitations defense and to provide the Court with true and correct copies of the documents attached.

2.     Dramatic licenses stage adaptations of *To Kill a Mockingbird* under a 1969 Agreement with Harper Lee (the "1969 Agreement"). ECF No. 37-1.

3.     On or about January 9, 2019 Dramatic received a letter from Jonathan Zavin, counsel for Atticus Limited Liability Company ("Atticus"), which I reviewed within days of its receipt. Exhibit 1 is a true and correct copy of Mr. Zavin's January 9, 2019 letter to Dramatic.

4.      I subsequently learned that Atticus had sent cease and desist letters to Jonathan Church and theaters in both the United States and United Kingdom to whom Dramatic had licensed the rights to perform Dramatic's adaptation of *To Kill a Mockingbird*.

5.      Mr. Church subsequently cancelled the U.K. tour and a number of theaters in the U.S. cancelled their productions of Dramatic's adaptation of *To Kill a Mockingbird*.

6.      On or about January 15, 2019, Dramatic received a letter from the Lee Estate regarding Dramatic's licensing of the U.K. and U.S. productions of the Dramatic's versions of *To Kill a Mockingbird*. Exhibit 2 is a true and correct copy of the letter from the Lee Estate to Dramatic.

7.      To resolve any issue about the scope of its rights under the 1969 Agreement with Ms. Lee raised by the multiple threats from Atticus, Atticus' principal Scott Rudin and the Lee Estate, Dramatic filed an arbitration demand with the American Arbitration Association as required by the terms of the 1969 Agreement.

8.      Attached as Exhibit 3 is a true and correct copy of a statement Dramatic posted on its website on February 3, 2022, titled "Dramatic Publishing Wins Its Arbitration Against the Harper Lee Estate Over To Kill a Mockingbird."

9.      Dramatic did not send a cease-and-desist letter or otherwise allege that Atticus was somehow infringing on Dramatic's rights.

10.      Dramatic has never claimed to Atticus that the Aaron Sorkin theatrical production of *To Kill a Mockingbird* copies is substantially similar to or infringes Dramatic's versions of *To Kill a Mockingbird*.

11.      Dramatic has not sent a demand to Atticus seeking to recover damages.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:      June 2, 2023

_____/s/ Christopher Sergel III_____
Christopher Sergel III



**JONATHAN ZAVIN**
Partner

345 Park Avenue
New York, NY  10154

| | |
|---|---|
| **Direct** | 212.407.4161 |
| **Main** | 212.407.4000 |
| **Fax** | 212.658.9105 |

jzavin@loeb.com

Via E-mail (customerservice@dpcplays.com)
Via Federal Express

January 9, 2019

Dramatic Publishing Company
311 Washington St.
Woodstock, IL  60098-3308

Re:   Atticus Limited Liability Company adv. Dramatic Publishing Company: *To Kill A Mockingbird*

Dear Sir/Madam:

We represent Atticus Limited Liability Company ("Atticus"), the exclusive worldwide licensee (via assignment from Rudinplay Inc.) of the Estate of Harper Lee ("Lee") for live stage rights to the novel *To Kill A Mockingbird* ("the Novel"), subject only to the limited rights granted by Lee to Dramatic Publishing Company ("Dramatic Publishing) in 1969 to create a theatrical adaptation of the Novel for amateur performances.

It has come to our attention that there is a planned professional tour of the Dramatic Publishing adaptation in the U.K. and Ireland, commencing in early February, that is booked to perform in major commercial venues.  Such a tour would be a clear violation both of Atticus's exclusive rights, and a violation of the agreement between Lee and Dramatic Publishing.  A description of the proposed tour, and a list of the venues, can be found at
https://openairtheatre.com/production/to-kill-a-mockingbird-uk-tour.

If Dramatic Publishing has licensed this tour we hereby demand that such license immediately be withdrawn and cancelled, and that Dramatic Publishing take all necessary steps to insure that its adaptation of the Novel is not performed on this tour, or at any other performance which violates either the terms of Dramatic Publishing's agreement with Lee, or violates Atticus's exclusive rights.  Please confirm by no later than close of business on Friday, January 11, that any such license has been cancelled.  If you fail to do so, Atticus reserves all remedies it may have against you for infringing its rights.  Of course, if you have not granted a license for this tour, we expect you to inform us of this also.

Further, so there are no issues going forward, please understand that Atticus intends to vigorously enforce its exclusive right to perform a live stage adaptation of the Novel, and that any performance of your theatrical adaptation of the Novel, outside of the very limited rights granted to you by the 1969 agreement will be considered an infringement by Atticus, and Atticus will act accordingly.  In this regard, please note that the rider to your agreement with Lee provides that,

Los Angeles   New York   Chicago   Nashville   Washington, DC   San Francisco   Beijing   Hong Kong   www.loeb.com

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership.
DPC000873 CONFIDENTIAL

17268501.1
227691-10003



"In the event the Owner shall lease professional acting rights to a third party for the purpose of producing a first class dramatic play or dramatico-musical play based on the Property, during the run of the said play in New York or during a first class touring engagement thereof, the Publisher shall not permit amateur performances, as provided herein, with a distance of twenty-five (25) miles of the city limits of any city which had a 1960 census population in excess of 150,000. After the close of the final first-class road company, the Publisher may release amateur rights without restriction."

As you are undoubtedly aware, the Atticus theatrical adaptation of the Novel commenced paid performances in New York on November 1, 2018, is currently running, and is expected to run for years. Further, concurrent with or following such performances in New York, there will undoubtedly be a first class tour of the Atticus adaptation, which is also expected to run for a few years. Therefore, please be advised that during the term of the run in New York, and the first class tour, you may not license even amateur performance of your adaptation of the Novel in violation of this 25 mile restriction.

I look forward to hearing from you by the close of business on Friday. If you or your counsel have any questions about this, please call me immediately. Also, the foregoing is not intended as a complete statement of the facts in this matter, or as a waiver of any rights that Atticus may have, all of which are specifically reserved.

Sincerely,

Jonathan Zavin

Jonathan Zavin
Partner

| | |
|---|---|
| **From:** | Jonathan Zavin |
| **To:** | "CSergelIII@dpcplays.com." |
| **Cc:** | Carrie Blomquist |
| **Subject:** | RE: To Kill a Mockingbird/ Dramatic Publishing |
| **Date:** | Saturday, January 12, 2019 8:45:10 AM |
| **Attachments:** | [Untitled].pdf |

Dear Mr. Sergel,

Attached is a copy of a letter I sent your company on Wednesday, January 9, requiring a response by the end of business on Friday, January 11. I received the below e-mail on January 10 from Ms. Blomquist saying the matter had been referred to your legal counsel, and that I should address any further inquiries to you. I have not yet heard from any legal counsel on your behalf. Given the immediacy of the infringing tour, if this matter is not resolved immediately, legal proceedings will be commenced shortly. The cost of these proceedings will be additional damages incurred by my client, and if your company has participated in the infringing activity we will seek to recover those costs from your company. Please have your attorney contact me by no later than Monday, January 14.

I will be in Los Angeles on Monday, but can be reached on my cell phone at 917-324-1206.

Sincerely,

Jonathan Zavin

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
jzavin@loeb.com
212-407-4161
310-282-2227

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

**From:** Carrie Blomquist <CBlomquist@dpcplays.com>
**Sent:** Thursday, January 10, 2019 5:09 PM
**To:** Jonathan Zavin <jzavin@loeb.com>
**Cc:** Chris Sergel III <CSergelIII@dpcplays.com>
**Subject:** To Kill a Mockingbird/ Dramatic Publishing

DPC000875 CONFIDENTIAL

Dear Mr. Zavin,

Good afternoon. I received your letter today in regards to licensing of *To Kill a Mockingbird* and have forwarded to our legal counsel to review. Should you have questions at this time, please feel free to contact the owner of our company, Christopher Sergel III, at CSergelIII@dpcplays.com.

Kind Regards,

Carrie

**Carrie Blomquist**
Professional Leasing Director
Dramatic Publishing Company
P: 800-448-7469
www.dramaticpublishing.com
Facebook | Twitter | Instagram | LinkedIn

DPC000876 CONFIDENTIAL

**Matthew H. Lembke**
mlembke@bradley.com
205.521.8560 direct



January 15, 2019

**Via Email**
Ms. Carrie Blomquist
Dramatic Publishing Company
311 Washington Street
Woodstock, IL 60098

RE:   United Kingdom Production of *To Kill a Mockingbird*

Dear Ms. Blomquist:

My firm represents the Estate of Harper Lee (the "Estate"). The Estate is the successor in interest to Harper Lee's rights under the Agreement between Ms. Lee and The Dramatic Publishing Company ("Dramatic Publishing") dated June 25, 1969 (the "Agreement").

It has recently come to the Estate's attention that Dramatic Publishing has licensed Jonathan Church Productions to present a 15-city touring production of Christopher Sergel's adaptation of *To Kill a Mockingbird* beginning on February 7, 2019. Information concerning this upcoming tour can be found at www.tokillamockingbirdplay.com.

We have received a redacted copy of the license issued by Dramatic Publishing in connection with this tour (the "License"), a copy of which is attached.

In Section 1 of the License, Dramatic Publishing purports to grant rights to "present the Play on the live professional stage in the English language." Under Section 2(a) the Agreement, however, Ms Lee expressly reserved all professional acting rights in *To Kill a Mockingbird*.

It appears that Dramatic Publishing has exceeded its rights under the Agreement in issuing the License. Please let me know by the close of business on Thursday, January 17, 2019, what basis, if any, Dramatic Publishing contends it has under the Agreement to issue the License.

In your response, I also ask that you inform us as to (1) the nature of the company that will present the performances, (2) whether any or all of the actors are members of any trade unions, and (3) the nature of each facility where the production will be presented.

The Estate reserves all of its rights in connection with the issuance of the License.

Very truly yours,

Matthew H. Lembke

CONFIDENTIAL

MEMORANDUM OF AGREEMENT made this Twenty Fourth day of January in the year of Two Thousand and Eighteen

BETWEEN **DRAMATIC PUBLISHING COMPANY** care of Alan Brodie Representation Limited of Paddock Suite, The Courtyard at 55 Charterhouse Street, London EC1M 6HA (the "Licensor") of the one part

AND **JONATHAN CHURCH PRODUCTIONS** care of Noel Coward Theatre, St. Martin's Lane, London WC2N 4AU (the "Licensee") of the second part

WHEREAS the Licensor controls the rights in the text of a play entitled **TO KILL A MOCKINGBIRD** (the "Play") by **CHRISTOPHER SERGEL** (the "Writer") based on the novel of the same name by **HARPER LEE** (the "Author"). The Licensee wishes to license certain rights in the Play and the Licensor is willing to grant a licence of such rights, but not in any music or songs specified therein unless otherwise agreed in writing, according to the terms and conditions contained in this agreement (the "Agreement").

WHEREBY IT IS AGREED AS FOLLOWS:

1) In consideration of the payments referred to in Clauses 2 and 3 below the Licensor hereby grants to the Licensee a non-exclusive licence to produce and present the Play on the live professional stage in the English language, in a production as first staged at Regent's Park Open Air Theatre in 2013, on a single continuous tour anywhere in the territory of the United Kingdom of Great Britain excluding the West End of London (as defined in Schedule 1) and the Republic of Ireland (together, the "Territory") **the first performance to be on or before 31ˢᵗ December 2019 and the last performance to be on or before 30 June 2020** (the "Licence"), in default of which all rights in the Play shall automatically revert to the Licensor with full use but without prejudice to any monies which may be due to the Licensor. For the purposes of this Agreement a "single continuous tour" is one in which performances take place in each week following the first performance of the Play except for mutually agreed periods during which no performances need to be given (hiatuses of up to 3 (three) months are hereby approved). If the Licensee wishes to perform the Play at a London venue (for the avoidance of doubt, other than the venues contained in Schedule 1) such venue shall be subject to the prior written approval of the Licensor. Regent's Park Open Air Theatre is hereby approved as a London venue for the Play.

CONFIDENTIAL

AS WITNESS THE HANDS OF THE PARTIES HERETO THE DAY AND YEAR FIRST
ABOVE WRITTEN

*Micky Reed* 1/24/18.
~~President or~~ Vice President - DRAMATIC PUBLISHING COMPANY
LICENSOR

signed by on behalf of JONATHAN CHURCH PRODUCTIONS
LICENSEE

CONFIDENTIAL

HL_00000189

The definition of "West End of London" in this Agreement shall mean and include the following theatres:

Adelphi
Aldwych
Ambassadors (New Ambassadors)
Apollo
Apollo Victoria
Cambridge
Coliseum
Comedy
Covent Garden
Criterion
Drury Lane
Duchess
Duke of York's
Fortune
Garrick
Gielgud
Haymarket
Her Majesty's
London Palladium
Lyric
Mayfair
Mermaid
New London
Noël Coward
Novello
Palace
Phoenix
Piccadilly
Playhouse
Prince Edward
Prince of Wales
Queen's
St Martin's
Savoy
Shaftesbury
Trafalgar Studio 1
Vaudeville
Victoria Palace
Westminster
Wyndham's

CONFIDENTIAL

HL_00000190

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br><br>*Plaintiff,*<br><br>and<br><br>AARON SORKIN,<br><br>*Involuntary Plaintiff,*<br><br>-against-<br><br>THE DRAMATIC PUBLISHING COMPANY,<br><br>*Defendant.* | No. 1:22-cv-10147-DLC |

**DEFENDANT DRAMATIC PUBLISHING COMPANY'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1, Defendant Dramatic Publishing Company ("Dramatic")

submits the following statement of undisputed material facts in support of Dramatic's motion for

summary judgment.

1.      On January 9, 2019, counsel for Atticus Limited Liability Company ("Atticus") sent a

letter to Dramatic. Declaration of Christopher Sergel III ("Sergel Decl."), ¶ 3 and Ex. 1 (January 9,

2019 letter from Jonathan Zavin to Dramatic Publishing Company).

2.      The January 9, 2019 letter stated that "there is a planned professional tour of the

Dramatic Publishing adaptation [of *To Kill a Mockingbird*] in the U.K. and Ireland, commencing in

early February, that is booked to perform in major commercial venues." Sergel Decl., Ex. 1.

3.      The January 9, 2019 letter stated that Atticus is "the exclusive worldwide licensee (via

assignment from Rudinplay Inc.) of the Estate of Harper Lee ('Lee') for live stage rights to the novel

**JA-576**

*To Kill a Mockingbird* (the 'Novel'), subject only to the limited rights granted by Lee to [Dramatic] in 1969 to create a theatrical adaptation of the Novel for amateur performances." Sergel Decl., Ex. 1.

4.      The January 9, 2019 letter stated that the planned tour of the Dramatic Publishing adaptation of *To Kill a Mockingbird* in the U.K. and Ireland would "be a clear violation" of "Atticus's exclusive rights." Sergel Decl., Ex. 1.

5.      The January 9, 2019 letter stated: "please understand that Atticus intends to vigorously enforce its exclusive rights to perform a live stage adaptation of the Novel . . . ." Sergel Decl., Ex. 1.

6.      The 1969 agreement between Dramatic and Harper Lee defined Dramatic's rights to *To Kill a Mockingbird* in Paragraph 4. ECF 37-1 is a true and correct copy of the 1969 Agreement between Dramatic and Harper Lee.

7.      ECF 37-3 is a true and correct copy of the 2015 Agreement between Harper Lee and Atticus' predecessor, Rudinplay.

8.      Harper Lee's lawyer stated to Rudinplay Inc. during negotiations for the 2015 agreement between Harper Lee and Rudinplay Inc. that Dramatic had "everything but first class rights."  Declaration of Kevin Tottis ("Tottis Decl."), Ex. 8 (October 7, 2015 email from Scott Rudin).

9.      Also in January 2019, Atticus sent cease-and-desist letters to 15 theaters on the U.K. tour of the Christopher Sergel version of *To Kill a Mockingbird* who had licensed rights from Dramatic. Sergel Decl., ¶ 4.

10.     In February 2019, Atticus sent cease-and-desist letters to theaters in the United States that were planning to present the Christopher Sergel version of *To Kill a Mockingbird*. Tottis Decl., Ex. 3 (February 20, 2019 email and letter from Jonathan Zavin to John Fogle); Sergel Decl, ¶ 4.

11.      In its letters to U.S. theaters, Atticus claimed that Harper Lee had given Atticus exclusive worldwide rights for all professional productions. Tottis Decl., Ex. 2.

12.      Atticus' principal, Scott Rudin sent Dramatic's New York counsel an email on January 23, 2019 stating: "Your client sold rights in To Kill a Mockingbird that he does not own or control, rights which belong exclusively to me." He also said "there is nothing more to say about this except that I will move against him with aggression and alacrity if he tries to do it again. I hope the Harper Lee estate and Jonathan Church are smart enough to go after him. What he committed is theft." Mr. Rudin copied his counsel, Jonathan Zavin, on the email. Tottis Decl., Ex. 1 (January 23, 2019 email from Scott Rudin to Alvin Deutsch).

13.      After Atticus sent cease-and-desist letters to Jonathan Church, U.K. theaters, and U.S. theaters, Mr. Church cancelled the U.K. tour, and a number of theaters in the U.S. cancelled their productions of the Christopher Sergel version of *To Kill a Mockingbird*. Sergel Decl., ¶ 5.

14.      On January 15, 2019, the Lee Estate sent a letter to Dramatic regarding Dramatic's licensing of the U.K. and U.S. productions of the Christopher Sergel versions of *To Kill a Mockingbird*. Sergel Decl. ¶ 6 and Ex. 2 (January 15, 2019 letter from Matthew Lembke to Carrie Blomquist).

15.      To resolve any issue about the scope of its rights under the 1969 Agreement with Ms. Lee raised by the multiple threats from Atticus, Mr. Rudin personally and the Lee Estate, Dramatic filed an arbitration demand with the American Arbitration Association as required by the terms of the 1969 Agreement. Sergel Decl., ¶ 7.

16.      Dramatic filed an arbitration demand on March 7, 2019, against the Estate of Nelle Harper Lee (the "Estate"). Tottis Decl., Ex. 3 (March 7, 2019, arbitration demand by Dramatic Publishing Company).

17.     Dramatic's arbitration demand asserted that Dramatic owned exclusive rights to stage non-first-class productions of *To Kill a Mockingbird* by licensing the Christopher Sergel version of the novel. Tottis Decl., Ex. 3.

18.     Specifically, Dramatic's arbitration demand requested:

> A declaration that Dramatic's exclusive rights to the Sergel Version of [*To Kill a Mockingbird*] include all of the rights granted to Dramatic under paragraph 4(e) of [the 1969 Agreement between Harper Lee and Dramatic] including but not limited to the exclusive right to license stock and repertoire theaters to perform any stage version of the novel *To Kill a Mockingbird*, whether or not the actors are paid, and that no other person or entity has such rights in any other stage version of the novel . . . .

Tottis Decl., Ex. 3, p. 8.

19.     Dramatic's arbitration demand asserted that that statements by Atticus in its cease-and-desist letters to United Kingdom theaters were "materially false." Tottis Decl., Ex. 3, ¶ 17.

20.     Dramatic's arbitration demand stated, with respect to Atticus' letter to United Kingdom theaters: "The letter claimed that because the tour would be presented in major commercial venues, it would violate both the Original Grant and the purported rights under the [Atticus] Agreement . . . . Not a single one of the purported restrictions appear in the Original Grant." Tottis Decl., Ex. 3, ¶ 17.

21.     Dramatic's arbitration demand asserted that Atticus' claim to being the "exclusive worldwide licensee," subject only to Dramatic's "limited" rights to create an adaptation of the novel for "amateur" purposes only, was false. Tottis Decl., Ex. 3, ¶ 26.

22.     Atticus learned of Dramatic's arbitration demand on or shortly after Dramatic filed its demand. Tottis Decl., Ex. 4 (Excerpt from May 25, 2023 Hearing Tr. 18:22-25) (counsel for Atticus stating "I will stipulate that I received a copy of the arbitration demand at or about the time that it was filed. I don't know of the exact date.").

4

23.     On April 18, 2019, counsel for the Estate sent to counsel for Atticus a letter with the subject "Notice of Indemnity Obligation." Tottis Decl., Ex. 5 (April 18, 2019 email from Matthew Lembke to Jonathan Zavin, with attachments).

24.     Also on April 18, 2019, counsel for the Estate sent to counsel for Atticus a letter with the subject "Dramatic Publishing Co. Arbitration." Tottis Decl., Ex. 5 (April 18, 2019 email from Matthew Lembke to Jonathan Zavin, with attachments).

25.     On April 24, 2019, counsel for Atticus sent a letter responding to the Estate's April 18, 2019 email and letters. Tottis Decl., Ex. 6 (April 24, 2019 letter from Jonathan Zavin to Matthew Lembke).

26.     The April 24, 2019 letter from counsel for Atticus to counsel for the Estate stated:

> I also note that in its claim for relief in the Demand for Arbitration, [Dramatic] seeks a declaration that it has the 'exclusive' worldwide right for all amateur performances of an adaptation of the novel, *To Kill a Mockingbird*. Obviously the Estate granted the non-exclusive rights in the United States to such performances to Rudinplay, represented and warranted that it had the right to grant such rights, and indemnified Rudinplay with respect to any breach of such representations and warranties. **If for any reason Atticus, through Sorkin, is unable to exploit such amateur rights, the damages for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate.**
>
> In light of the above, in the event that Atticus is damaged in any way by [Dramatic's] claims, or by the actions of the Estate in violation of the agreement between Lee and Rudinplay, Atticus reserves the right to seek appropriate damages from the Estate.

Tottis Decl., Ex. 6 (emphasis added).

27.     The arbitrator in the arbitration between Dramatic and the Estate issued an Interim Award on October 21, 2021. Tottis Decl., Ex. 7 (Interim Award of Arbitrator (Corrected), Appendix A to Final Award of Arbitrator).

28.     The arbitrator in the arbitration between Dramatic and the Estate issued a Final Award on January 28, 2022. Tottis Decl., Ex. 7 (Final Award of Arbitrator).

29.     The arbitrator found that Dramatic "has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* . . . and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights." Tottis Decl., Ex. 7, Appendix A, p. 6.

30.     On February 3, 2022, Dramatic posted a statement on its website titled "Dramatic Publishing Wins Its Arbitration Against the Harper Lee Estate Over To Kill a Mockingbird." Sergel Decl., Ex. 3 (printout from Dramatic Publishing Company webpage).

31.     The statement posted on Dramatic's website announced the findings of the final and interim opinions in the arbitration between Dramatic and the Estate of Harper Lee. Tottis Sergel Decl., Ex. 3..

32.     The statement posted on Dramatic's website did not state that Dramatic would seek to prohibit Atticus from licensing to third parties or presenting the Sorkin production of *To Kill a Mockingbird*. Sergel Decl., Ex. 3.

33.     Dramatic never sent a cease-and-desist letter to Atticus alleging copyright infringement. Sergel Decl., ¶ 9.

34.     Dramatic never has written to, or communicated with, Atticus claiming that the Aaron Sorkin theatrical production of *To Kill a Mockingbird* copies, is substantially similar to, or infringes the Christopher Sergel theatrical production of *To Kill a Mockingbird*. Sergel Decl., ¶ 10.

35.     Dramatic never has sent a demand to Atticus seeking recovery of damages. Sergel Decl., ¶ 11.

36.     Atticus filed its complaint in this action against Dramatic on November 30, 2022. ECF No. 1.

37.     Dramatic filed its answer to the complaint on May 11, 2023. ECF No. 72.

38.     In its answer to the complaint, Dramatic raised a statute of limitations affirmative defense. ECF No. 72, at 16-17.

39.     In its answer to the complaint, Dramatic did not assert a counterclaim for copyright infringement against Atticus. ECF No. 72.

40.     Dramatic has not filed any claim or counterclaim for copyright infringement against Atticus. ECF No. 72.

Respectfully submitted,

Dated: June 2, 2023                         TOTTISLAW

By: /s/ Kevin Tottis
       Kevin Tottis (*pro hac vice*)
       Keith Stolte (*pro hac vice*)
       Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*

7

**JA-582**

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff,*

and

AARON SORKIN,

*Involuntary Plaintiff,*

-against-

THE DRAMATIC PUBLISHING COMPANY,

*Defendant.*

No. 1:22-cv-10147-DLC

## REPLY IN FURTHER SUPPORT OF
## DRAMATIC PUBLISHING COMPANY'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.   Atticus' claim is time-barred...................................................................................................1

    A.   The Case Is about the Ownership of Rights, Not Infringement...........................1

    B.   This Case Is Not About Copying or Substantial Similarity.................................2

II.  Dramatic Did Not Waive Its Affirmative Defenses.........................................................7

III. Atticus' Claim for Fees and Sanctions Has No Merit....................................................9

CONCLUSION.............................................................................................................................10

i

## **TABLE OF AUTHORITIES**

**Cases**

*118 E. 60th Owners, Inc. v. Bonner Properties, Inc.*, 677 F.2d 200, 204 (2d Cir.1982)....................................5

*Am. Council of Blind New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 243-44
     (S.D.N.Y. 2020)........................................................................................................................8

*Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 334 (S.D.N.Y. 2018)............................9

*Books-A-Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 851 (S.D. Ohio 2001) ......8

*Busher v. Barry*, No. 20-cv-3587, 2021 U.S. App. LEXIS 32561, at *8-9 (2d Cir. Nov. 2, 2021) ...........9

*Cabell v. Zorro Prods., Inc.*, No. 15-cv-771, 2018 WL 2183236, *7 (N.D. Cal. 2018)............................ 6, 7

*Caro Cap., LLC v. Koch*, 20-cv-6153-LJL, 2023 U.S. Dist. LEXIS 15508, at *20
     (S.D.N.Y. Jan. 30, 2023) ..........................................................................................................9

*Case v. Eslinger*, 6:06-cv-832 (M.D. Fla.) ...................................................................................8

*Charles v. Seinfeld* , 410 F.Supp.3d 656, 659 (S.D.N.Y. 2019)....................................................4

*Easter Unlimited, Inc. v. Rozier*, No. 18-cv-6637, 2021 WL 4409729, *7-8
     (E.D.N.Y. Sept. 27, 2021)..........................................................................................................4

*Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d. Cir. 2003)............................6

*Fahey v. Breakthrough Films & Television Inc.*, No. 21-cv-3298, 2022 WL 6244313, *22
     (S.D.N.Y. July 7, 2022)..............................................................................................................4

*Ferrarini v. Irgit*, No. 19-cv-96, 2021 WL 638771, *4 (S.D.N.Y. Feb. 17, 2021) .......................4

*Fishoff v. Coty Inc.*, 634 F.3d 647 (2d Cir. 2011)........................................................................10

*Garza v. Everly*, 59 F.4th 876, 884 (6th Cir. 2023)........................................................................6

*Kempner v. Oppenheimer & Co., Inc.*, 662 F. Supp. 1271, 1283 (S.D.N.Y. 1987) ......................10

*Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011)........................................................2, 3, 4, 7, 10

*Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) ......................................... 3, 4

*Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996) ..........................................................................4

*Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995) ........................................................10

*Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 516 (S.D.N.Y. 2014) ....................8

*Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2003) ......................................................................9

*Phillies v. Harrison/Erickson,* 2021 WL 5936523, *24-25 (S.D.N.Y. August, 10, 2021) .......................3, 4

*Phoenix Light SF, Ltd. v. U.S. Bank N.A.*, 14-cv-10116-VSB, 2020 U.S. Dist. LEXIS 144731 (S.D.N.Y. Aug. 12, 2020)............................................................................................................9

*Phoenix Light SF, Ltd. v. U.S. Bank N.A.*, 612 F.Supp.3d 263......................................................9

*Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) ................................ 3, 4

*Santos v. Dist. Council of N.Y.C. & Vic. of Utd. B'hd of Carpenters & Joiners*, 619 F.2d 963, 967 (2d Cir. 1980) ..................................................................................................................... 7, 8, 10

*Schleifer v. Berns*, 17-cv-1649, 2017 WL 3084406 (E.D.N.Y. July 19, 2017)............................10

*See Capitol Records, LLC v. ReDigi Inc.*, 12-cv-95-RJS, 2015 U.S. Dist. LEXIS 113790, at *1-15 (S.D.N.Y. Aug. 27, 2015) ..........................................................................................................9

*Sid Bernstein Presents, LLC v. Apple Corps Limited*, No. 16-cv-7084, 2017 WL 4640149, *5 (S.D.N.Y. July 26, 2017) ...........................................................................................................4

*Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) ............................................................4

*Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992).......................................................... 1, 5

*Toilliver v. McCants,* 2009 WL 1473445, *1 (S.D.N.Y. May 26, 2009) ......................................8

*Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 Fed. App'x 39, 40 (2d Cir. 2014) .....................9

*U.S. v. Boynton*, 2007 WL 737725, *1 n.2 (Feb. 1. 2007) ...........................................................9

*United States v. Drame*, 18-cv-11480 (S.D.N.Y.) ......................................................................8

*United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72 (1956)..............................................6

*Vela*, 276 F.3d 659 5th Cir. 2001 .................................................................................................9

*Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 305-06 (D.R.I. 2007).........................................9

*Walker v. Carter*, 210 F.Supp.3d 487, 507-08 (S.D.N.Y. 2016).................................................4

*Williams v. Univ. Med. Ctr. Of S. Nev.*, 2010 WL 3001707 (D. Nev. July 28, 2010)..................9

**Statutes**

17 U.S.C. § 304 ..............................................................................................................................2

17 U.S.C. § 507 ............................................................................................................................10

**Rules**

Fed.R.Civ.P. 12.......................................................................................................................... 7, 10

Fed.R.Civ.P. 8............................................................................................................................ 7, 10

## I.   ATTICUS' CLAIM IS TIME-BARRED

In its opposition, Atticus conflates a number of concepts about ownership, infringement, declaratory judgment actions, and statutes of limitation. Its brief does not change the following basic and unassailable principles:

> 1.   When the "core" of a dispute involves competing assertions of rights in a copyright—and not the nature, extent, or scope of copying—the statute of limitations accrues only once: when the allegedly aggrieved party learns of the dispute.
> 2.   Under long-settled Second Circuit law, it does not matter whether the dispute arises out of the non-aggrieved party's assertion of its own ownership or repudiation of another's ownership interest.
> 3.   This case was never one of "non-infringement," since Dramatic never sued or even threatened Atticus with an infringement suit; rather, this suit was always about Atticus' affirmative claim that Dramatic did not have exclusive rights. And that is exactly what the Court found. ECF No. 65, at 3, 34.

And importantly, the opposition claims it is Dramatic, rather than Atticus, that is time-barred from disputing ownership because Dramatic knew in January 2019 that Atticus' principal, Scott Rudin, claimed exclusive rights and expressly repudiated Dramatic's rights to license *To Kill a Mockingbird* to professional theaters: "Your client sold rights in To Kill a Mockingbird that he does not own or control, rights which belong exclusively to me." ECF No. 81, at 8-9. But it is well-settled that "[b]ecause a declaratory judgment action is a procedural device used to vindicate substantive rights, it is time-barred only if relief on a direct claim based on such rights would also be barred." *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir. 1992). Applying Atticus' theory, its own claim would be time-barred, and this lawsuit should be dismissed in its entirety.

### A.   The Case Is about the Ownership of Rights, Not Infringement

Atticus repeatedly characterizes this action as one for "non-infringement." ECF No. 81, at 7-8. But this case is not about infringement. Dramatic never threatened Atticus with an infringement action. ECF No. 82, ¶¶ 33-35. Dramatic never sued or counterclaimed against Atticus for

1

infringement. ECF No. 82, ¶¶ 39-40.[1] Rather, Atticus' complaint alleged it was Dramatic's claim of

"worldwide exclusive rights" in a press release that triggered this action. ECF 1, ¶ 5. The thin reed

upon which Atticus based its claim for declaratory judgment jurisdiction was ***not*** an infringement

threat from Dramatic, but rather Dramatic's claim to own exclusive rights and Atticus's repudiation

of that claim:

> An actual and justiciable controversy has arisen . . . regarding whether [Dramatic] owns exclusive ***rights*** to present 'non-first class' productions . . . or, as Atticus contends, that Atticus and Sorkin have sufficient ***rights*** to present such productions of the Sorkin Play . . . .

ECF No. 1, ¶ 42 (emphasis added). And this Court found the "core of this dispute" turns on

"whether, under 17 U.S.C. § 304(c), Dramatic retains exclusive ***rights*** to produce amateur

performances of the Novel." ECF No. 65, at 14 (emphasis added).[2] The Court ultimately ruled that

"Dramatic does not currently possess exclusive rights . . . ." *Id.* at 34.

In short, this case has always been about one thing: Atticus' and Dramatic's competing

assertions about who owns the rights granted to Dramatic in the 1969 Agreement. Either Dramatic's

exclusive rights survived termination, or they did not and ownership and the ability to license those

rights to Atticus reverted to Ms. Lee.

### B.    This Case Is Not About Copying or Substantial Similarity

To maintain an action for copyright infringement, a plaintiff must establish (1) ownership of

a valid copyright and (2) copying of constituent original elements of the work. *Kwan v. Schlein*, 634

F.3d 224, 229 (2d Cir. 2011) (citations omitted). In many cases the first element is not in dispute. *Id.*

---

[1] Nor would it be necessary for Dramatic to bring legal action against Atticus. Both Dramatic and Atticus obtained their rights from Harper Lee. Both pay royalties to the Harper Lee Estate. When Atticus threatened Dramatic, Dramatic initiated arbitration against the Lee Estate, its licensor, and obtained a binding and final judgment resolving the issue of who owns what rights. *See* ECF No. 79, ¶ 7. That is because the Lee Estate owes Dramatic multiple obligations (ECF No. 37-1; ECF No. 82, ¶ 6), as confirmed by the arbitration award (ECF No. 37-6).

[2] *See also* ECF No. 1, ¶ 43 ("a declaration is necessary and appropriate because a substantial controversy exists between the parties having adverse legal interests as to their respective ***rights*** to derivative stage adaptations of the Novel . . . ."); ¶ 44 ("Declaratory judgment in this action would serve a useful purpose in clarifying and settling the respective ***rights*** and obligations of the parties.") (emphasis added).

When infringement arises out of copying, each act triggers the statute. But where, as here, the rights under the first element are contested, the statute of limitations begins to run when the party challenging those rights first learns they are in dispute. That is why in *Kwan,* when the plaintiff sued for "infringement" claiming she was the sole author of a work, the Second Circuit rejected her claim, explaining that an "ownership claim accrues only once" when a plaintiff learns of defendant's "express assertion of sole ownership." *Kwan*, 634 F.3d at 228. As explained in *Roberts*, a claim for copyright infringement is an "ownership claim, when it 'does not involve the nature, extent or scope of copying,' but instead focuses on ***competing assertions of . . . rights in the work at issue***." *Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) (citing *Kwan*, 634 F.3d at 229) (emphasis added).

      Atticus' opposition ignores Dramatic's citation to *Roberts*. With good reason. The statute of limitations for infringement claims involving "competing assertions of . . . rights in the work at issue" accrues only once. *See*, *e.g.*, *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (notice sufficient to trigger the statute occurs "once there has been an 'express repudiation' or an "***express assertion of sole authorship or ownership***," at which point the claim begins to accrue) (emphasis added). Likewise, in *Phillies v. Harrison/Erickson,* 2021 WL 5936523, *24-25 (S.D.N.Y. August, 10, 2021), the Phillies tried to claim co-authorship in its mascot even though the defendant had filed a copyright registration which listed defendant as sole author and repeatedly signed agreements listing defendant as author. Citing *Kwan,* the court explained these assertions of sole ownership by the defendant trigger the statute of limitations.

      To avoid accrual of its ownership claim, Atticus tries to create a distinction, claiming that because Atticus has not asserted its ***own*** "claim seeking declaratory judgment of ownership for infringement predicated on any such ownership" (ECF No. 81, at 7), the single-accrual rule of *Kwan* does not apply. That ignores what this dispute is about. As both *Mahan* and the *Phillies* case show,

the assertion or repudiation of ownership starts the statute of limitations to run. Knowledge of the "injury upon which [ownership] claims are premised" triggers the statute. *Phillies*, 2021 WL 5936523, at \*17. In fact, *Charles* rejected Atticus' conceit:

> Plaintiff argues that *Kwan* and *Simmons* involved disputes over the plaintiff's status as an owner but not defendant's status. This is not a material distinction, **because *a non-owner defendant* can prevail in an infringement suit so long as the plaintiff is also not the owner.**

*Charles v. Seinfeld*, 410 F.Supp.3d 656, 659 (S.D.N.Y. 2019) (emphasis added). Likewise, in *Easter Unlimited, Inc. v. Rozier*, No. 18-cv-6637, 2021 WL 4409729, \*7-8 (E.D.N.Y. Sept. 27, 2021), when defendant was sued for infringement, he challenged the ownership and authorship of plaintiff's copyright. Just like Atticus, the defendant did not claim ownership, but rather pointed to a third party and submitted the third party's declaration claiming ownership. Even though the defendant's *own* ownership was not at issue, the court rejected the use of the declaration, finding that using the alleged owner's declaration was time-barred under the single-accrual rule because the alleged third-party owner had known about plaintiff's assertion of ownership for more than three years. *Id.*

Time and again, as summarized below, courts apply the single-accrual rule regardless of whether a party, like Dramatic, asserts sole rights, repudiates another's claim of rights, or both:

- **Assertion of sole rights**. *Kwan*, 634 F.3d at 228-29; *Phillies,* 2021 WL 5936523 at \*25; *Roberts*, 518 F. Supp. 3d at 731; *Ferrarini v. Irgit*, No. 19-cv-96, 2021 WL 638771, \*4 (S.D.N.Y. Feb. 17, 2021); *Sid Bernstein Presents, LLC v. Apple Corps Limited*, No. 16-cv-7084, 2017 WL 4640149, \*5 (S.D.N.Y. July 26, 2017).
- **Repudiation of sole rights**. *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016); *Seinfeld*, 410 F. Supp. 3d at 660; *Walker v. Carter*, 210 F.Supp.3d 487, 507-08 (S.D.N.Y. 2016).
- **Both assertion and repudiation**. *Fahey v. Breakthrough Films & Television Inc.*, No. 21-cv-3298, 2022 WL 6244313, \*22 (S.D.N.Y. July 7, 2022).
- **Party asserts or repudiates co-ownership.** *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996); *Mahan*, 634 F. App'x at 331.

**C.      Atticus' Affirmative Claim Remains Subject to the Statute of Limitations**

Atticus' attempt to position this case as one of declaratory judgment for "non-infringement" (ECF No. 81, at 7-8) does not change the outcome. As noted, this is not a defensive action by Atticus for "non-infringement." Atticus does not dispute that Dramatic never threatened it with an infringement. ECF No. 82, ¶¶ 33-35, 39-40. The issue has always been about whether Dramatic could claim it held exclusive rights. Atticus sought affirmative relief challenging Dramatic's claim of exclusive rights, and the Court agreed. ECF No. 65, at 34.

Atticus made the decision to sue Dramatic, not the other way around. That is significant. "When a party is 'attacked,' he can rely on the statute of limitations as a shield, but when a party is the 'aggressor,' equity precludes the use of the time bar as a sword." *118 E. 60th Owners, Inc. v. Bonner Properties, Inc.*, 677 F.2d 200, 204 (2d Cir.1982). Dramatic never threatened Atticus with an infringement action; Dramatic merely declared its rights in March 2019, and Dramatic sought relief against the *Lee Estate*—not Atticus—after Atticus sent cease-and-desist letters to Dramatic and third parties threatening legal action. ECF No. 79, ¶¶ 3-7, Exs. 1-2; ECF No. 82, ¶¶ 9-13. Atticus cannot now avoid the time bar:

> Here plaintiff seeks to extend the intrinsically defensive doctrine beyond its confines. ***Plaintiff is certainly more of an aggressor than defendants***. Defendants have done nothing concrete to change the basic relations between the parties as they have existed for over ten years. ***It is the plaintiff that has haled the defendants into court and disturbed the equilibrium between the parties***.

*118 E. 60th Owners*, 677 F.2d at 204 (emphasis added).

Keeping with its aggressive approach, Atticus claims Dramatic is time-barred from asserting a statute of limitations defense (ECF No. 81, at 8-9), claiming that Dramatic—which promptly filed, and ultimately prevailed in, an arbitration against the Lee Estate—is time-barred. But as noted above, when a direct claim based on such rights would be time-barred, so is the corresponding declaratory judgment action. *Stone*, 970 F.2d at 1048 (2d Cir. 1992). Under Atticus' own formulation,

its complaint should be dismissed.[3]

Atticus cites the unpublished, out-of-circuit *Cabell* decision to claim it is free to file a declaratory judgment action without being subject to the single-accrual rule. ECF No. 81, at 8. *Cabell* provides this Court with no basis to stray from the express teachings of *Kwan, Simmons*, and other controlling Second Circuit authority. Crucially, in *Cabell*, only **infringement** by copying was contested—not ownership. *Cabell v. Zorro Prods., Inc.*, No. 15-cv-771, 2018 WL 2183236, *7 (N.D. Cal. 2018). The single accrual rule was not even at issue. When ZPI repeatedly threatened an infringement action arising out of the **similarity** of the works, Cabell filed a declaratory judgment action claiming non-infringement. Unlike Atticus' claim, Cabell's claim was not about ownership. Noting that the statute of limitations "does not bar affirmative defenses" in defensive declaratory judgment actions, the Court found the action was not time-barred. *Id.* at *16. So *Cabell* arose out of two bases not present here: (1) the "core" issue was copying, not rights in the work; and (2) plaintiff claimed non-infringement defensively against the aggressor ZPI.

Copying is not at issue here. In January 2019, Atticus asserted it owned exclusive rights in professional productions of *TKAM* and repudiated Dramatic's rights. ECF No. 82, ¶¶ 1-5. Less than two months later, Dramatic filed a claim in arbitration, asserting its exclusive rights in *TKAM* and repudiating Atticus' rights. ECF No. 82, ¶¶ 16-21. As Atticus admits, at that point, Atticus learned of Dramatic's "express assertion of sole ownership." ECF No. 82, ¶ 22; *see Kwan*, 634 F.3d at 228-

---

[3] *Garza v. Everly*, 59 F.4th 876, 884 (6th Cir. 2023) (cited in ECF No. 81, at 9) does not support Atticus' position. Atticus cites *Garza* for the proposition that the statute of limitations bars Dramatic's assertion of exclusive rights as a defense in this case. There, the defendant repackaged as an affirmative defense a previously dismissed counterclaim. Finding the repackaged defense sought the same affirmative relief as the counterclaim, the court held it time-barred. That is not the situation here. Nor is it the law in the circuit. In *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, the court held that "[a] defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." 342 F.3d 149, 163 (2d. Cir. 2003) (citing *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation.")).

229.[4] The declaratory judgment action filed by Atticus nearly four years later was hardly defensive. Unlike ZPI, Dramatic never threatened Atticus. ECF No. 82, ¶¶ 33-35, 39-40. Moreover, Atticus affirmatively sought and obtained a ruling on Dramatic's exclusive rights, the same rights it asserted in March 2019. Atticus' action is time-barred, and nothing in *Cabell* changes that analysis.

## II.    DRAMATIC DID NOT WAIVE ITS AFFIRMATIVE DEFENSES

Atticus treats Dramatic's statute of limitations defense as if it were any other argument raised in opposition to a summary judgment motion. *See* ECF No. 81, at 3-6. It is not. The statute of limitations is an affirmative defense Dramatic properly raised in its answer. *See* Fed.R.Civ.P. 8(c)(1) (listing affirmative defenses to be included in a defendant's answer, including statute of limitations); Fed.R.Civ.P. 12(h)(2)(A) ("[f]ailure to state a claim upon which relief can be granted…or to state a legal defense. . . may be raised . . . in any pleading . . . ."). Dramatic timely filed its answer under Rule 12(a)(4), and in that answer properly raised its limitations defense. Seeking to avoid the plain language of the Federal Rules, Atticus states the unremarkable proposition that Rule 56 permits pre-answer motions for summary judgment. ECF No. 81, at 5. Nothing in Rule 56 and nothing Atticus has offered says that an early summary judgment motion suspends the pleadings rules and precludes a non-movant from asserting an affirmative defense like those in this case.

The Second Circuit made clear decades ago that even after pre-answer motion practice, a defendant does not waive the right to assert the statute of limitations affirmative defense in its answer. *Santos v. Dist. Council of N.Y.C. & Vic. of Utd. B'hd of Carpenters & Joiners*, 619 F.2d 963, 967 (2d Cir. 1980). Dramatic cited this controlling authority in its opening brief (ECF No. 77, at 13), but Atticus offers no cogent basis for this Court to ignore the Second Circuit's teachings. Atticus relegates its discussion to a footnote toward the end of its waiver argument (ECF No. 81, at 5 n.2),

---

[4] The language from *Kwan* handily dispenses with footnote 3 of Atticus' brief. ECF 81, at 7. The law requires only knowledge of Dramatic's repudiation, not a direct or public proclamation.

claiming *Santos* does not apply because the *Santos* defendant failed to raise the defense in its **own** pre-answer motion as opposed to **responding** to a pre-answer motion. That is a distinction without a difference. The Second Circuit made that clear: "under Fed.R.Civ.P. 8(c), the statute of limitations constitutes an affirmative defense, to be asserted in a responsive pleading" as opposed to a pre-answer brief. *Santos*, 619 F.2d at 967. Neither Rule 8 nor the Second Circuit distinguish between whether the party asserting an affirmative defense is a movant or non-movant in a pre-answer motion.

Indeed, on similar facts to this case, another court in this district refused to bar a statute of limitations defense not raised in response to a pre-answer summary judgment motion. "Justice requires consideration of Defendant's statute of limitations defense." *See Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 516 (S.D.N.Y. 2014).[5] Other courts have reached similar conclusions in post-answer summary judgment cases.[6]

Atticus cites over a dozen cases to support its waiver argument. Not one of them involves a pre-answer summary judgment motion. Attius leads off with *Drame* and *Case* (ECF No. 81, at 3). In both, the defendants were given the opportunity to answer and raise the affirmative defenses, and **then** failed to argue those affirmative defenses on summary judgment.[7]

The other cases listed in Atticus' page-long list of cases (ECF No. 81, at 3-4) involve entirely different procedural postures or stand for basic principles of law that have no application here. In

---

[5] Under Atticus' argument, filing a pre-answer summary judgment motion somehow triggers a duty for the defendant to plead (and prove) **every** affirmative defense in its response to a pre-answer summary judgment motion, even though, as the *Narragansett* court found, no rule even hints at such a duty. Moreover, imposing such a burden on the defendant relieves the movant of its duty to address and challenge any affirmative defenses in its initial moving papers. *Toilliver v. McCants,* 2009 WL 1473445, *1 (S.D.N.Y. May 26, 2009) ( "district court may not enter summary judgment against a non-movant defendant on its affirmative defenses if those defenses were not challenged in the **plaintiff's** motion" (citing *Books-A-Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 851 (S.D. Ohio 2001)).

[6] *See, e.g., Am. Council of Blind New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 243-44 (S.D.N.Y. 2020) (statute of limitations affirmative defense raised in answer sufficiently preserved for trial even when not raised in opposition to plaintiff's post-answer summary judgment motion.

[7] *See United States v. Drame*, 18-cv-11480 (S.D.N.Y.), ECF No. 12 (defendant's answer), ECF No. 28 (plaintiff's summary judgment motion); *Case v. Eslinger*, 6:06-cv-832 (M.D. Fla.), ECF Nos. 27, 38, 39 (defendants' answers to second amended complaint); ECF Nos. 54, 58, 60 (defendants' motions for summary judgment).

*Phoenix Light SF, Ltd. v. U.S. Bank N.A.*, 14-cv-10116-VSB, 2020 U.S. Dist. LEXIS 144731

(S.D.N.Y. Aug. 12, 2020), the court denied plaintiffs' motion seeking reconsideration and to set

aside a judgment entered after extensive motion to dismiss briefing and discovery. *See Phoenix Light*

*SF, Ltd. v. U.S. Bank N.A.*, 612 F.Supp.3d 263, 267-273 (summarizing the motions to dismiss,

amended complaints, and facts developed during discovery). In *Caro Capital*, defendants had an

opportunity to answer and raise both affirmative defenses and counterclaims, but then raised in their

motion for summary judgment "without citation to evidence, a new theory of liability" for their

counterclaim. *Caro Cap., LLC v. Koch*, 20-cv-6153-LJL, 2023 U.S. Dist. LEXIS 15508, at *20

(S.D.N.Y. Jan. 30, 2023). In *Blue Citi*, the defendant also was permitted to file an answer and

affirmative defenses, but then failed to raise an argument regarding one of those defenses in

opposition to a summary judgment motion before raising it for the first time in a cross-motion. *Blue*

*Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 334 (S.D.N.Y. 2018). *Capitol Records* precluded two

individual defendants, the principals of defendant ReDigi, from raising affirmative defenses that

ReDigi had waived or abandoned ***after answering*** because the individual defendants were in privity

with ReDigi. *See Capitol Records, LLC v. ReDigi Inc.*, 12-cv-95-RJS, 2015 U.S. Dist. LEXIS 113790, at

*1-15 (S.D.N.Y. Aug. 27, 2015).[8]

## III.   ATTICUS' CLAIM FOR FEES AND SANCTIONS HAS NO MERIT

The Court should reject Atticus' extraordinary request for fees and sanctions. For sanctions,

"[t]he operative question is whether the argument is frivolous, *i.e.*, the legal position has 'no chance

---

[8] *Busher*, *Triodetic*, and *Palmieri* (ECF No. 81, at 3-4) involved waiver ***on appeal*** by litigants who failed to raise arguments before the district court. *See Busher v. Barry*, No. 20-cv-3587, 2021 U.S. App. LEXIS 32561, at *8-9 (2d Cir. Nov. 2, 2021); *Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 Fed. App'x 39, 40 (2d Cir. 2014); *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2003). This obviously is not an appeal, indeed, the Court has not yet even entered a final judgment. None of the out-of-circuit cases Atticus cites (ECF No. 81, at 4 nn.1-2) has any bearing on the waiver issue presented here either. *See Vela*, 276 F.3d 659 5th Cir. 2001 (arguments not raised before the district court waived on appeal); *Williams v. Univ. Med. Ctr. Of S. Nev.*, 2010 WL 3001707 (D. Nev. July 28, 2010) (defendant's affirmative defense raised in answer filed before summary judgment briefing found to be waived); *Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 305-06 (D.R.I. 2007) (granting plaintiff's motion for summary judgment on defendant's statute of limitation defense where defendant's only response was to reassert the defense); *U.S. v. Boynton*, 2007 WL 737725, *1 n.2 (Feb. 1. 2007) (statute of limitations defense included in defendant's answer filed before summary judgment briefing found to be waived).

of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fishoff v. Coty Inc.*, 634 F.3d 647 (2d Cir. 2011) (quoting *Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)). Atticus has not come close to any such showing; the opposite is true. Dramatic is seeking to defend itself against Atticus' summary judgment motion by arguing an affirmative defense authorized by the Copyright Act (17 U.S.C. § 507) and permitted under the Federal Rules (Fed.R. Civ.P. 8(c)(1), 12(h)(2)(A)). In doing so, Dramatic has asserted, among other meritorious arguments, an affirmative defense recognized by the Second Circuit as valid (*Kwan*) and not waived (*Santos*).

Dramatic never threatened Atticus with legal action, ECF No. 82, 33-35, 39-40. Nevertheless, Atticus sued Dramatic and moved for summary judgment before Dramatic answered. Now, having answered and having outlined the basis for the current motion by letter to the Court, ECF No. 73, and after discussing it with Atticus' counsel and the Court at the May 25, 2023 hearing, Dramatic brings this motion in its defense and in compliance with the Court's order, ECF No. 75.

The cases Atticus cites, *Kemper* and *Schleifer*, bear no relationship to the meritorious arguments advanced here by Dramatic. In *Kemper*, the court characterized the conduct by both parties as "vituperative hyperbole which has resulted in inordinate delay in the adjudication of this dispute" and yet still did not award sanctions. *Kempner v. Oppenheimer & Co., Inc.*, 662 F. Supp. 1271, 1283 (S.D.N.Y. 1987). Meanwhile, in *Schleifer v. Berns*, 17-cv-1649, 2017 WL 3084406 (E.D.N.Y. July 19, 2017) the court imposed sanctions on a plaintiff that advanced objectively baseless arguments and failed to support those arguments with any legal authority. *Id.* at *5. The court determined the plaintiff had submitted "false allegations and far-fetched legal arguments, including arguing for statutory damages in the absence of a copyright registration at the time of the alleged copyright infringement, a statutory prerequisite. No such circumstances exist here.

## CONCLUSION

Dramatic respectfully requests that the Court grant its motion for summary judgment.

Respectfully submitted,

Dated:  June 14, 2023                    TOTTISLAW

By: /s/ Kevin Tottis
     Kevin Tottis (*pro hac vice*)
     Keith Stolte (*pro hac vice*)
     Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*

N5P4ATTC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   ATTICUS LIMITED LIABILITY
3  COMPANY,

4              Plaintiff,              22 Civ. 10147(DLC)
        and
5  AARON SORKIN,                       Conference

6              Involuntary Plaintiff,
          v.
7
   THE DRAMATIC PUBLISHING
8  COMPANY,

9
             Defendant.
10 ------------------------------x
                                  New York, N.Y.
11                                May 25, 2023
                                  11:00 a.m.
12 Before:

13                 HON. DENISE L. COTE,

14                                District Judge

15                    APPEARANCES

16 LOEB & LOEB LLP
        Attorneys for Plaintiff
17 BY:  JONATHAN ZAVIN
        WOOK HWANG
18
   FRANKFURT KURNIT KLEIN & SELZ PC
19      Attorneys for Involuntary Plaintiff
   BY:  MAURA J. WOGAN
20      NICOLE BERGSTROM

21 TOTTISLAW
        Attorneys for Defendant
22 BY:  KEVIN TOTTIS

23 GOODWIN PROCTER LLP
        Attorneys for Defendant
24 BY: STEFAN M. MENTZER

25

N5P4ATTC

1        (Case called)

2            MR. ZAVIN:  Jonathan Zavin, Loeb & Loeb.

3            MR. ZAVIN:  Your Honor, Wook Hwang, Loeb & Loeb for

4    Atticus.

5            THE DEPUTY CLERK:  For Involuntary Plaintiff Sorkin.

6            MS. WOGAN:  Mora Wogan from Frankfurt Kurnit.

7            MS. BERGSTROM:  Nicole Burgstrom, from Frankfurt

8    Kurnit.

9            THE DEPUTY CLERK:  For Dramatic Publishing.

10           MR. TOTTIS:  Kevin Tottis, your Honor.

11           MR. MENTZER:  Stefan Mentzer from Goodwin Procter.

12           THE COURT:  Thank you so much.

13       I issued an opinion towards the end of April and

14   roughly a month away and this is a conference to determine next

15   steps.  I believe the only issue is what discovery, if any,

16   needs to be undertaken with respect to the privity argument.

17   Counsel have submitted letters to me, the defendant of May 22,

18   and the plaintiff of May 24 in preparation for this conference.

19   There is obviously a problem for the parties given what I found

20   was the error in the arbitrator's decision in Illinois, and

21   that's working its way through the court system in Illinois,

22   the federal court system.  And I was pleased to learn that

23   there are settlement discussions ongoing in the Seventh

24   Circuit.  It didn't appear that there are three-way

25   conversations, and I don't know that that would be appropriate.

1    It's certainly available to parties always in this district,

2    and we can talk about that.

3           One of the issues I want to raise with you is whether

4    I should refer you again to Magistrate Judge Aaron.

5           We have a proposal from the plaintiff to share their

6    attorneys' communications with the party with the Lee estate in

7    connection with the arbitration.  I don't have the defendant's

8    position with respect to that or any particular request for

9    discovery other than that.  So we'll resolve these issues today

10   and set a schedule.  But I assume there will be a summary

11   judgment motion judgment on the privity issue and then I'll

12   enter judgment because I think I already ruled on the

13   declaratory judgment request.  And so that's over so I think

14   the only remaining legal issue is the issue of privity.

15          So, Mr. Zavin, why don't I give you a chance to be

16   heard and of course I'll hear from Mr. Tottis.

17          MR. ZAVIN:  Thank you, your Honor.

18          Under your Honor's ruling the question was should

19   there be any discovery on the issue of control.  We don't think

20   it's necessary, but because there's been no showing of any

21   control by Atticus over the estate in connection with the

22   arbitration as indeed there wasn't any.  While we don't think

23   any discovery is necessary, no showing has been made.  Just to

24   lay the issue to rest, we are willing to turn over our -- in

25   effect, my emails with Mr. Lembke, who was in the law firm that

1   represents the estate in the arbitration.  There are actually

2   no communications between me and the attorney who handled the

3   arbitration.  Until I reviewed my emails, I frankly didn't

4   remember his name.  Mr. Lembke was at the firm and was a

5   witness in the arbitration.  So he was frequently not allowed

6   to know what was going on in the arbitration, because he was

7   going to be a witness, but I did have communications with him.

8   It's fewer than 100 emails on my part over the course of three

9   years.  Many of them just asking what was the schedule of the

10  arbitration.  We are perfectly happy to share those with the

11  defendant.

12          I can't without a court order or consent of

13  Mr. Lembke's share his communications with the defendant,

14  because he is claiming common interest privilege.  I am willing

15  to submit those emails to the Court *in camera*, if you would

16  like.  Again, we're not trying to hide anything.  It's

17  abundantly clear from the emails that there was absolutely no

18  control.  As a matter of fact, the estate and Atticus had far

19  more often been adversaries.  This arbitration arose very soon

20  after there was a major lawsuit between the estate and Atticus.

21  So if that would clear it up and accelerate it, we will share

22  the emails.

23          THE COURT:  Thank you so much.

24          Mr. Tottis.

25          MR. TOTTIS:  Thank you, your Honor.

1          I want to clarify one point about the communications

2     with Mr. Lembke.  Mr. Lembke was in fact the estate's lead

3     counsel.  And he was actually involved in the case until the

4     arbitration at which point -- I mean, until the arbitration

5     hearing.  So throughout discovery Mr. Lembke was involved.  He

6     was counsel of record.  He was the first lawyer I dealt with

7     until his partner, Mr. Hymer became involved.  I can find the

8     hearing transcript for you, I believe, your Honor.

9          But at some point, and I think it was at the beginning

10    of the arbitration, Mr. Hymer said, we got an opinion from the

11    Alabama bar or the Alabama Supreme Court that says Mr. Lembke

12    can participate in the case, but he cannot participate in the

13    arbitration hearing because we are calling him as a witness in

14    the arbitration hearing.  So he was involved in much of the

15    preliminary discussions.  Mr. Lembke was actively involved when

16    the issue of exclusivity was first addressed and a motion for

17    partial summary judgment.  This was a motion brought before a

18    three-arbitrator panel by Mr. Lembke.  Mr. Hymer argued the

19    motion, and the motion was denied.  That was about a year and a

20    half or two years before the arbitration hearing itself.

21         So those communications with Mr. Lembke could have a

22    very direct impact on the issue of control.  With respect to

23    the issue of control, in light of your ruling, your Honor, we

24    looked at additional cases involving control including the

25    *Montana v U.S*. case, where the Supreme Court talked about

1    various factors that go into control.  And in that particular

2    case, the Supreme Court did point out -- it listed facts that

3    led the Supreme Court to conclude that the U.S. government did

4    have control over the proceedings in the earlier state court

5    case.  This was a dispute about whether a Montana tax was

6    constitutional.  And that's where the Court said that control

7    includes one who assists in the prosecution or defense of an

8    action in aid of some interest of his own.

9          And so the point is simply that control is a

10   fact-driven analysis.  And what we have been seeking is the

11   universe of communications between the estate and Atticus

12   regarding the arbitration, regarding the issue of exclusivity

13   in the arbitration.  Mr. Zavin has offered to give counsel's

14   communications but only half of them.  Because --

15         THE COURT:  Well, there's not going to be any control

16   unless they are apparent from that half.

17         MR. TOTTIS:  OK.

18         THE COURT:  Right.  If the emails are asking what's

19   the schedule, it could be hard to infer control from that.

20         MR. TOTTIS:  That's true.  But if Mr. Lembke's email

21   says we're letting you decide this issue, if it's the issue of

22   exclusivity or related to exclusivity, that's something we're

23   entitled to see.  If the estate wants to assert the common

24   interest privilege it can do so.  But we should be able to see

25   the answer or the estate's position with respect to the issue

1    of control.  For instance, if the estate writes and says, at

2    your request, we hired David Hymer to argue the issue of

3    exclusivity in our partial summary judgment motion, that would

4    have a direct bearing on the issue of control.  The few emails

5    that we have that were largely transmittal emails, some of them

6    refer to as we discussed, as we discussed.  So there are

7    telephone conversations between Mr. Lembke and Mr. Zavin,

8    largely Mr. Zavin that wouldn't be reflected in that

9    production.  Again, if there was a privilege, the privilege

10   definitely should be asserted.  But at that point we also

11   should be entitled to a privilege log of what is being

12   withheld.

13            In addition, your Honor, and I'm not sure I don't know

14   whether this is intentional or not, when Atticus says we are

15   providing communications solely between Atticus counsel and the

16   estate's counsel, if there were other communications, by the

17   clients relating to this issue I think we're entitled to see

18   those as well.  If, for instance, a representative of Atticus

19   writes to Ms. Carter, who is the estate's representative and

20   says, if you don't agree to X, we are going to sue you.  I

21   instructed my lawyers to take the following action.  I'm

22   speculating.  I have no idea what's in there.  But if there are

23   communications along those lines, we're entitled to see that.

24   I also think we should be able to see any agreements, any

25   common interest agreement that would have been executed by the

1  parties.  And there might be an issue and, again, we don't

2  know, but there might be an interest regarding insurance

3  coverage.  So to the extent that Atticus --

4              THE COURT:  You mean an agreement regarding insurance?

5  What do you mean an interest regarding insurance coverage?

6  What do you mean interest regarding --

7              MR. TOTTIS:  I'm sorry.  I misspoke.

8              THE COURT:  OK.

9              MR. TOTTIS:  To the extent Atticus made a claim with

10  its insurer regarding the proceedings in the arbitration, I

11  think we're entitled to see that.  And this may not exist.  I

12  don't know that it does.  But if there was a claim that says a

13  claim has been asserted against our licensor regarding

14  exclusivity, you should pay or you should pay for that defense.

15              THE COURT:  I'm sorry.  Atticus's insurer is paying

16  for the defense of the Lee estate?

17              MR. TOTTIS:  Yes.  I have no idea whether that

18  occurred or not.  I'm just saying to limit it solely to the

19  lawyer's communications could leave out potentially relevant

20  documents relating to that point.  And judging by the look on

21  your face you think that is a stretch.

22              THE COURT:  Well, actually, I'm not hearing much that

23  makes a lot of sense.  The issue here is not to allow a fishing

24  expedition or theories that are implausible on their face but

25  to identify if there's any targeted discovery that could

1    actually resolve the issue of control.  So in the past month, I

2    would hope that would have been a focus.  I didn't see in the

3    letter much that was responsive to the definition of control

4    contained in the opinion.  So I didn't see much to support a

5    position that you thought discovery would be useful here.  So,

6    you know, I want to save the party's time and expense and get

7    to the core of the issues which I think were already addressed

8    in my opinion of about a month ago.  But if you could identify

9    any useful discovery or any discovery that's likely to be

10   useful on the issue of control, you know, I'm happy to hear

11   from you today.

12        MR. TOTTIS:  OK.  I brought with me documents that

13   previously had been labeled confidential in the arbitration.  I

14   got approval from the estate to bring these documents that were

15   exchanged with Mr. Zavin and between Mr. Zavin and Mr. Lembke

16   when the arbitration demand was first made in those letters,

17   and I'm happy to pass them up to you if you want.  I have

18   copies for everyone --

19        THE COURT:  Well, they should go to Mr. Zavin first

20   before they go to me.

21        MR. TOTTIS:  I told Mr. Zavin I was going to be using

22   these today.

23        THE COURT:  OK.  Great.

24        MR. ZAVIN:  I have no objection, your Honor.

25        THE COURT:  Thank you.

1    MR. TOTTIS:  And in these letters there are requests

2  from Mr. Lembke for indemnification and defense.  And one thing

3  is odd, first --

4    THE COURT:  I'm sorry, Mr. Lembke is asking for

5  indemnification and defense?

6    MR. TOTTIS:  Yes.

7    THE COURT:  So the estate is asking Atticus to

8  indemnify it and defend it?

9    MR. TOTTIS:  Yes.

10    THE COURT:  OK.  To pay its attorneys bills and any

11  damages that are awarded.  Is that it?

12    MR. TOTTIS:  The email says, per our discussion last

13  week -- we don't know what happened during the discussion --

14  attached is the draft indemnity demand letter that I will be

15  sending along with the second draft letter urging cooperation

16  in the event that Scott does not agree to provide the requested

17  indemnity.  And it's puzzling why Mr. Lembke is sending the

18  draft to Mr. Zavin, but he sends drafts of these letters based

19  on this email and then subsequently sends the same two letters

20  in final form where he demands -- the estate hereby demands

21  that it be indemnified and held harmless by Rudinplay, Inc. and

22  Atticus Limited Liability Company for all claims,

23  liabilities -- he goes onto list everything with respect to the

24  indemnity.  Please let us know whether Atticus will provide the

25  indemnity and assume the defense.

1    THE COURT:  Excuse me.  Mr. Tottis, did you discuss

2  with Mr. Zavin in advance of this conference what discovery you

3  want in particular?

4    MR. TOTTIS:  I invited Mr. Zavin to have that

5  discussion and he declined.  He said that they would be filing

6  their letter and we could resolve the issue in court today.

7    MR. ZAVIN:  If I may, your Honor?

8    THE COURT:  Yes.

9    MR. ZAVIN:  Since the only universe is the emails

10  between me and Mr. Lembke, I mean, I think I can cut through

11  this.  To the best of my knowledge, there was no communications

12  between the parties with respect to the arbitration.  To be

13  perfectly blunt, Atticus and the estate don't like each other.

14  So as far as I know, there was no communication.  I'm perfectly

15  willing to check again.  To the best of my knowledge, there was

16  no insurance claim made by Atticus.  The indemnity that

17  Mr. Tottis is talking about was declined.  And what Mr. Tottis

18  hasn't said yet, although I'm sure he would make full

19  disclosure, there was a response from me saying not only are we

20  not indemnifying, we reserve our rights to sue you in

21  connection with any results from the arbitration.

22    Basically, what I offered Mr. Tottis here in that

23  letter is the entire universe of correspondence to the best of

24  my knowledge, and my understanding something Mr. Sorkin and

25  Mr. Sorkin's counsel had no communications at all with the

1    estate regarding the arbitration.

2           MS. WOGAN:  Yes, your Honor.  I could represent to the

3    Court there were no communications between Aaron Sorkin and the

4    estate, also a difficult relationship.  I went back and looked

5    at all of my communications with Mr. Lembke or anybody

6    representing the estate, and all of those emails -- there

7    aren't many -- but all of them are dated after the award in the

8    arbitration so no communication.

9           THE COURT:  I have no basis to believe there was

10   anything close to control by Atticus over the estate's

11   litigation positions in the arbitration.  I have an offer here

12   for counsel for Atticus to share his communications with

13   counsel for the estate during the period of the arbitration.  I

14   take it you would like to receive those communications?  Am I

15   right, Mr. Tottis?

16          MR. TOTTIS:  Yes, your Honor.

17          THE COURT:  OK.  Is there anything else you seek based

18   on the record so far today?

19          MR. TOTTIS:  No, not with respect to this issue.

20   Thank you, your Honor.

21          THE COURT:  So with respect to the issue of privity

22   and specifically the issue of control that might theoretically

23   establish privity, let's talk about a schedule for turning over

24   those communications.  Mr. Zavin, when can you make those

25   available to Mr. Tottis?

1      MR. ZAVIN:  We could certainly make them available by

2   the end of next week if not before.

3           THE COURT:  Great.

4           MR. ZAVIN:  One issue, your Honor, let me anticipate

5   it.  In reviewing the emails, as I said, it wasn't hard, there

6   aren't that many.  One category that some of the emails fall

7   into, which we will mark as privileged even mine is, as

8   Mr. Tottis is aware, there was a settlement discussion among

9   the estate, DPC and Atticus.  This was prior to the final

10  judgment in the arbitration.

11          THE COURT:  The estate and who?

12          MR. ZAVIN:  DPC.

13          THE COURT:  Oh, Dramatic.

14          MR. ZAVIN:  I'm sorry, your Honor, Dramatic.

15          THE COURT:  I thought you said "TPC" and I thought OK.

16  I don't know who that is.

17          MR. ZAVIN:  Well, there is another party here your,

18  Honor we haven't disclosed -- no.

19          There were some settlement discussions.  This was

20  during the arbitration but before the final award, I believe.

21  And I would mark a few emails between myself and the estate

22  with regards to the settlement discovery discussions as

23  privileged.  Other than that, we can turn -- and I will put

24  them on a privilege log, I'm happy to do that.

25          THE COURT:  So with respect to the estate's responsive

1    emails, Mr. Tottis, there's been an offer here to provide them

2    to me *ex parte* since the estate is claiming a privilege.  If it

3    is your request, I will look at them *ex parte*.  Otherwise, we

4    will just assume if your review of the communications between

5    Mr. Zavin and Mr. Lembke don't suggest control than it's

6    unnecessary for me to look at the other half of the

7    communications.  Does that make sense?

8            MR. TOTTIS:  Sure, your Honor.  I actually was going

9    to propose we look at what Mr. Zavin sends us first before we

10   ask the Court to look at 100 emails.

11           THE COURT:  Thank you.  I really appreciate that.

12           So let's say that and just rough out a schedule here.

13   So you'll get the emails, the one half of the email

14   correspondence by June 2nd.  And then by June 9, can you be in

15   touch with Mr. Zavin and discuss whether or not you think you

16   need me to look at any portion of the other half of the

17   communications?  And you two can talk about that first.  And

18   then write me on the 12th if there's agreement or not.

19           MR. TOTTIS:  Your Honor, would it be OK if I could

20   have until the 14th and then write to you on the 16th?

21           THE COURT:  Is this to accommodate some travel plans?

22           MR. TOTTIS:  I'm going to be at the Copyright Society

23   conference.  I could do it on the road.

24           THE COURT:  Great.  Travel was sufficient.  Good.  So

25   I'll expect some kind of letter on the 16th telling me I have

1    some more work to do or the parties are in agreement.

2         It sounds to me like we don't need further motion

3    practice unless this email exchange supports some theory of

4    control.  So I'm just going to suggest if they turn out to

5    be -- much as Mr. Zavin has described and represented on the

6    record, so that they wouldn't yield anything supportive of

7    control -- that the parties include that in their June 16

8    letter.  And then that would mean that the plaintiff would

9    hopefully submit shortly thereafter a proposed judgment for me

10   to conclude this litigation, or, alternatively, if the

11   defendant believes there is enough from those emails for motion

12   practice, I'm going to want to do it very quickly.  Brief it,

13   you know, three days, three days, two days.  This isn't

14   complicated.  It's very narrow.  It shouldn't burden the

15   parties.

16        And, of course, Mr. Tottis, if you have new law you

17   want me to consider in addition to that, you presented on the

18   underlying motion I ruled on, feel free to include it including

19   that Supreme Court decision.

20        MR. TOTTIS:  It is in our letter.

21        THE COURT:  Well, it isn't in the motion that I ruled

22   upon.

23        MR. TOTTIS:  Oh, I understand.

24        THE COURT:  OK.  So I just want to make clear that if

25   we do have additional motion practice you are not restricted to

1   the authorities you cited already.

2          MR. TOTTIS:  Thank you, your Honor.

3          THE COURT:  Good.

4          MR. TOTTIS:  There is another issue.

5          THE COURT:  Sure.

6          MR. TOTTIS:  We did file an answer that contained

7   affirmative defenses including the statute of limitations

8   affirmative defense.  We filed our answer within 14 days of the

9   denial of the motion to dismiss as required by rule.  We

10  believe we have the basis for a motion for summary judgment on

11  the issue of statute of limitations and we --

12         THE COURT:  Why isn't that waived?

13         MR. TOTTIS:  It isn't waived for a number of reasons.

14  First, we hadn't filed an answer in affirmative defense.

15         THE COURT:  No, but there was a summary judgment

16  motion.  I converted as described in the opinion the motion

17  practice before me into a summary judgment motion, and you had

18  an opportunity to oppose that.  So if you thought there was any

19  legitimate argument for me not entering summary judgment in the

20  plaintiff's favor that was your opportunity to raise it.

21         MR. TOTTIS:  Well, your Honor, in our response and in

22  my declaration I did point out that we did not have an

23  opportunity to raise all affirmative defenses.  It was not --

24  we state in both papers, we state we didn't have an opportunity

25  to answer, and we haven't had an opportunity to answer or file

1    counterclaims or affirmative defense.

2         We also responded to a summary judgment motion that

3    was before us.  We didn't file a cross motion on summary

4    judgment.  Although, the Court converted our motion to dismiss,

5    when we filed our motion to dismiss, we took great pains and

6    perhaps the Court thought we were wrong, but we took great

7    pains to limit any documents we refer to those that were

8    integral to the complaint.  The contracts at issue, the

9    underlying arbitration decision, and we specifically identified

10   that and the basis for using those.  Motions to dismiss

11   typically are not the appropriate vehicle for raising a statute

12   of limitation defense.  There was no requirement that we in our

13   motion to dismiss raise every single potential claim we would

14   make at trial.  And when we received a countermotion, the cross

15   motion for summary judgment, we addressed just those issues in

16   that cross motion.  We didn't file an additional motion for

17   summary judgment at that time.  We addressed the specific

18   issues that had been raised in that motion.  There also wasn't

19   a final judgment entered in this case.  We had an

20   opportunity --

21         THE COURT:  Well, no.  That's because there was the

22   open issue of privity.  You responded to the summary judgment

23   motion with a defense on the ground of privity and in essence

24   claim preclusion.

25         MR. TOTTIS:  Yes.  But it was not our understanding

1   that we needed in response to a summary judgment motion before

2   an answer or affirmative defenses had been filed that we needed

3   to list every single affirmative defense we might ultimately

4   raise.  And affirmative defense has been characterized as a

5   failure to state a claim.  And we are entitled to make those

6   arguments at any point during the litigation.

7           THE COURT:  So I'm not sure that given the procedural

8   posture here that your defenses haven't been waived.  But for

9   purposes of our discussion, the one defense you want to pursue

10  is statute of limitations.  Am I right?

11          MR. TOTTIS:  That's correct.

12          THE COURT:  So let's set a schedule for that right

13  now.  So can you file that next Friday?

14          MR. TOTTIS:  Yes, your Honor.

15          There was just one point that we would need, and I

16  don't think it's going to be a problem.  There's a transmittal

17  letter from Mr. Lembke to Mr. Zavin saying attached is the

18  demand.  Obviously, we don't have -- if Mr. Zavin will

19  stipulate that he received a copy of the arbitration demand on

20  March 7, 2019, there is no need to get that from discovery for

21  something.  I don't think it's going to be disputed.

22          MR. ZAVIN:  Your Honor, it is not disputed.  I will

23  stipulate that I received a copy of the arbitration demand at

24  or about the time that it was filed.  I don't know of the exact

25  date.

1          THE COURT:  Thank you.

2          And so June 9 for opposition.  And June 14 for reply.

3          And I'm not ruling in setting this motion schedule on

4     the waiver theory.  If the plaintiff wants to argue waiver,

5     that's just fine with me.  I'm just trying to give the parties

6     the litigation piece here and put you in a position to settle

7     things universally hopefully or take it up to the next level to

8     give you some finality.

9          MR. ZAVIN:  I appreciate that, your Honor.

10          THE COURT:  Yes.

11          So, Mr. Tottis, is there anything else?  Anything

12     other open issue before I talk about process for settlement?

13          MR. TOTTIS:  No, your Honor.  I would just add to

14     maybe move the settlement discussion forward.  I confirmed

15     jointly with Mr. Zavin on the email, I confirmed with Judge

16     Aaron, that the referral is still open.  We did have email

17     exchanges.  So at least from his viewpoint, the referral is

18     still open and we can go to him should we have the need.

19          THE COURT:  Thank you.

20          So I take is it there is no other issue, Mr. Tottis,

21     we need to address?

22          MR. TOTTIS:  No.  Thank you, your Honor.

23          THE COURT:  Thank you.  So we are going to go off the

24     record.

25          (Adjourned)

June 16, 2023

Hon. Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

**Re:** *Atticus LLC v. The Dramatic Publishing Company*, **No. 1:22-cv-10147-DLC (S.D.N.Y.)**

Defendant Dramatic Publishing Company ("Dramatic") and Plaintiff Atticus LLC ("Atticus") respectfully submit this joint letter regarding the status of fact discovery on the issue of privity through control, in accordance with the Court's May 25, 2023, Order (ECF No. 75). Counsel conferred on June 12, 2023, and resolved some issues. An email confirmation is attached as Ex. A.

**<u>Dramatic's submission</u>**

Dramatic respectfully requests the Court consider allowing additional, targeted discovery of Atticus' control over the Lee Estate's briefing on the limited issue of exclusive ownership. The word "control" for purposes of issue and claim preclusion does not require absolute dominance over decision-making. "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or *who assists in the prosecution or defense of an action in aid of some interest of his own* . . . is as much bound . . . as he would be if he had been a party to the record." *Montana v. United States*, 440 U.S. 147, 154 (1979) (emphasis added).[1] Citing *Montana,* the Supreme Court explained in *Taylor,* "[b]ecause such a person has had 'the opportunity to present proofs and argument,' he has already 'had his day in court' even though he was not a formal party to the litigation." *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); *see also Marine Power & Equip. Co., Inc. v. United States*, 594 F. Supp. 997, 1003 (D.D.C. 1984) (furnishing affidavits, conducting legal research, suggesting argument, consulting on discovery among indicia of "control").

Here, the issue is whether an exclusivity term survives termination under § 304(a) of the Copyright Act. Despite a lengthy evidentiary arbitration hearing, the **exclusivity issue was decided solely on the papers**. Atticus' recent production shows Atticus not only commented on the Estate's post-hearing submission on the issue, but also drafted roughly a third of the final brief's exclusivity section (as confirmed by counsel in Ex. A) and appears to have approved the balance of the Estate's draft. *Compare* Ex. B (email with portion of brief drafted by Atticus), *with* Ex. C (relevant excerpts of final, filed version highlighted to show portions drafted by Atticus).[2] In addition, Atticus' counsel sought intervention in the arbitration from the U.S. Copyright Office. *See* Ex. D (requesting "a short statement/brief . . . explaining to the arbitrators that termination terminates exclusivity in the grant to the original work . . . ."). Shortly after Atticus' counsel's email, the Copyright Office changed its

---

[1] Despite financing the litigation, notably, the Government did not try or argue the underlying case.
[2] Atticus' counsel also prepared a five-page internal legal memorandum for the Estate on post-termination issues. It is unclear the extent to which the memorandum applies directly to the exclusivity issue, but Atticus has agreed to produce it to the Court for *in camera* review. Atticus's production demonstrates it also had a hand in other matters, including the selection of potential arbitrators and experts as reflected in the attached. Ex. F.

website to address derivative works following termination. *See* Ex. E ("Wayback Machine" captures of Feb. 5 and Mar. 4, 2021 Copyright Office webpage). The Estate quoted the changed language in its briefs in the arbitration and the district court confirmation proceedings (Ex. C (excerpts from briefs)) long before Atticus quoted it before this Court three times. *See* ECF No. 1, ¶ 19; ECF No. 36, at 10; ECF No. 63, at 2-3. Atticus has had its "day in court" on the issue of exclusivity.

Atticus' production shows the exclusivity issue was decided in the arbitration on papers submitted in which Atticus took the "laboring oar." Atticus's submission below disputes this, arguing the merits of the control issue, but it does so on the basis of an incomplete record, one that Atticus selectively produced. If the Court believes Dramatic's analysis would benefit from further targeted discovery, Dramatic requests the opportunity to obtain the communications directly related to the exclusivity issue—specifically, (1) unredacted versions of the emails regarding exclusivity as produced by Atticus, and (2) all communications between Atticus and the Estate relating to exclusive ownership during the post-arbitration proceedings before the N.D. Ill. (not produced by Atticus). Dramatic, however, is not interested in prolonging the litigation unnecessarily. If the Court does not view full disclosure of Atticus' role in preparing and advising on the exclusivity briefing sufficient to constitute "control" as a matter of law, Dramatic requests no further discovery.

## Atticus' submission

Atticus respectfully submits that no further discovery is necessary to establish that Atticus did not "control" the Estate in its arbitration against Dramatic for purposes of the preclusion analysis.

As directed by the Court, Atticus has produced to Dramatic the entire collection of emails sent by Atticus to the Estate's representative Matthew Lembke relating to the arbitration, excluding only a handful of emails pertaining to potential settlement (all of which have been identified on a log).  In the **two-and-a-half-year period** from March 7, 2019 through October 19, 2021—respectively, the dates when the arbitration was commenced to when Atticus's counsel learned of the arbitrator's post-hearing award—Atticus's counsel sent the Estate a total of **53 emails**.[3]  As Your Honor observed at the May 25 conference, "there's not going to be any control unless they are apparent from" these emails.  (May 25, 2023 Conference Tr. at 6:15-16).

In addition to their low number, the contents of these emails eliminate any doubt that Atticus did not "control" the Estate.  Indeed, Atticus had no involvement in any of the most fundamental and critical aspects of defending an arbitration, including as follows: (i) Atticus had no input into the Estate's selection of counsel to represent it in the arbitration; (ii) Atticus did not select the arbitrator(s), or the number of arbitrators; (iii) during most of the arbitration, the Estate refused to keep Atticus informed on the grounds that it was a confidential arbitration; (iv) Atticus did not see

---

[3] Atticus has also produced an additional seven emails sent between June 17, 2022 through September 27, 2022, during which period the proceeding had been remanded to the arbitrator for clarification on the scope of Dramatic's stage rights under its purportedly interminable license.  An additional 14 emails were located relating to the confirmation proceeding itself.  This latter set of emails has not been produced because they reflect the Estate's work product and, in any event, cannot establish control for privity purposes since they do not relate to the underlying arbitration. As we have advised Dramatic, however, Atticus can provide these to the Court for *in camera* review.

the summary judgment briefing that addressed the terminability of exclusive licenses, that is, until after a decision was rendered; (v) Atticus did not have any contact with the lawyer actually conducting the arbitration for the Estate and its sole contact was with a witness, Mr. Lembke; (vi) Atticus had no involvement in the arbitration hearing *at all*. Atticus's near complete lack of involvement—or even knowledge—is reflected in the emails. *See* Exs. 1-7 (emails from 9/25/20 to 6/14/21 in which Atticus's counsel asks, "What is the current status/schedule of the arbitration?"; "What is the status of the arbitration. Have you testified yet, so that you can talk to me about it?"; "How many days has it [the hearing] gone so far?"; "I look forward to you telling me about this when it's over."; "What is the status of the arbitration?"; "Any word on whether you can talk to me. Both my client and I are, to say the least, curious as to what's going on."; "What is the status of the arbitration? Any end in sight?").

Dramatic thus focuses on the trivial bits of help Atticus did, or tried to, provide over the arbitration's two-year-plus span. The totality of Atticus's "assistance" emphasized by Dramatic is as follows: (i) Atticus requested that the Copyright Office appear as amicus in the arbitration, (ii) Atticus provided a few suggested paragraphs to a single brief; and (iii) Atticus provided an "internal legal memorandum for the Estate on post-termination issues" (*see* fn 1 *supra*). Addressing each of these in turn, the Copyright Office *declined* to appear in the arbitration and, even had it done so—or even if Atticus itself had appeared as amicus—it would not support Dramatic's position. *See Nat'l Fuel Gas Distribution Corp. v. TGX Corp.*, 950 F.2d 829, 839 (2d Cir. 1991 ("TGX's mere participation as an amicus curiae … does not establish that it significantly controlled NFG's conduct of that litigation."). The single brief on which Atticus provided suggestions was a post-hearing brief spanning scores of pages, submitted after the conclusion of the arbitral hearing and more than two years of pre-hearing proceedings, in which Atticus's counsel suggested only a few short paragraphs with additional legal cites and a cover email noting, "**Obviously you will adopt or not adopt this as you will**." *See* Ex. 8 (July 23, 2021 email). This of course is the opposite of control. Finally, the "internal memorandum" on "post-termination issues" that Atticus's counsel provided was an internal email memo on a legal theory that the Estate chose *not* to advance in the arbitration. Indeed, other than the aforementioned status requests, the bulk of the emails Atticus's counsel sent were suggestions on potential options for expert witnesses—given at the Estate's request, and none of whom the Estate chose to retain.

These isolated incidents, none of which relate to any of the core work in litigating the arbitration, do not come close to establishing that Atticus could somehow be bound to an arbitral award issued after a lengthy hearing in which it did not even *participate*, much less control. Recognizing as much, Dramatic once again misstates the standard itself, relying on an out-of-context snippet from *Montana v. United States*, 440 U.S. 147 (1979), to contend that mere "assistance" suffices. It does not. As this Court has already held, "[a] nonparty is not bound by a judgment because it has influenced another's litigation strategy. Privity exists if the nonparty 'assumed control over the litigation in which that judgment was rendered.'" April 27, 2023 Opinion and Order (DE 65) at 31 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008)). This Court's conclusion is supported by *Montana*, in which the court did *not* hold that the United States was subject to preclusion due to mere "assistance" but where the government had stipulated to facts establishing that it "directed and financed" the prior litigation, *id.* at 151—facts entirely absent here. Following *Montana* (both before and after the 2008

decision in *Taylor*), courts have repeatedly held that far more is required to establish "control" for purposes of the preclusion analysis than anything that existed here.[4]

Under the actual governing standards, there is no amount of further discovery that could establish that Atticus exercised any semblance of "control" over the Estate in the arbitration.  Moreover, and independently, Dramatic does not even attempt to claim that Sorkin—the copyright owner of the Sorkin Play—had any such control, because he also did not.  As Dramatic seems to have accepted, Sorkin thus cannot be bound by the arbitral award.

Accordingly, Dramatic's "control" argument is a doomed endeavor under all circumstances, and no further discovery is warranted.  Notwithstanding, should the Court direct, Atticus is happy to provide any further materials the Court deems appropriate for *in camera* review.

Respectfully submitted,


/s/ Kevin Tottis                          /s/ Wook Hwang
Kevin Tottis

*Counsel for Dramatic Publishing Company*          *Counsel for Atticus LLC*


cc:      Counsel of record

---

[4] *See, e.g., Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Phillippe S.E. Schreiber*, 327 F.3d 173, 185 (2d Cir. 2003) ("In those cases where we have applied the doctrine of privity …, we have found that that person nonetheless exercised some degree of *actual control* over the presentation of a party's case at the previous proceeding.") (emphasis added); *Omni Food Sales v. Boan*, 2007 U.S. Dist. LEXIS 62844, at *10 (S.D.N.Y. Aug. 24, 2007) ("Even if this defense agreement existed, however, it would prove only a litigation alliance; it alone would not create privity.  There is simply no evidence that Boan either 'controlled or substantially participated in the control' of Cargill's presentation in the arbitration.").

# EXHIBIT B

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **CC:** | Wook Hwang |
| **Sent:** | 7/23/2021 2:55:19 PM |
| **Subject:** | Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX |
| **Attachments:** | Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX |

Matt,

Here are some comments on the excerpt of the brief regarding the exclusivity argument. The basic change is we found more legal support for the argument. Obviously you will adopt or not adopt this as you will. I've been somewhat out of pocket this week, so my partner Wook Hwang, has taken the lead on this. If you or Bob Clarida have any questions about anything in our version, you should address them to both of us.

Regards,

Jonathan

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

# Redacted

> **Formatted:** Font: Italic

Dramatic is wrong.  Section 304(c) of the Copyright Act provides that "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it .... is subject to termination."  17 U.S.C. § 304(c).  This provision—applicable by its plain terms to exclusive licenses—"gives authors the right to terminate the grant of any transfer or license made prior to 1978, *allowing them to recapture the copyright for an extended term." Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 235 (S.D.N.Y. 2016) (internal citations omitted; emphasis added); *see also, e.g., Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020) ("unequivocal purpose" of Copyright Act's termination provisions is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable"); *Siegel v. Warner Bros. Entm't*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded ... by the 1976 Act.").

---

[1] The Lee parties do not contest that rights granted to Dramatic in the Agreement, whatever they may be, continue to be exclusive outside the United States even post-termination.

21035984.1
227691-10003

The termination right "is both absolute, and inalienable." *Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 235 (S.D.N.Y. 2016) (citations omitted).  By the Copyright Act's plain terms, "[t]ermination may be effected *notwithstanding any agreement to the contrary*." 17 U.S.C. § 304(c)(5) (emphasis added).  As courts have thus explained, "the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).  In other words, "the 1976 Act gave artists and their heirs the ability to *terminate* any prior grants of the rights to their creations that were executed before January 1, 1978, **regardless of the terms contained in [the grant]**, *e.g.*, **a contractual provision that all the rights (the initial and renewal) belonged exclusively to the [grantee]**." *Siegel v. Warner Bros. Entm't, Inc.*, 542 F. Supp. 2d 1098, 1007, 1113-14 (C.D. Cal. 2008) (bold emphasis added) (holding that heirs to author of *Superman* comics recaptured rights following termination of 1938 grant that had conveyed to comic book publisher "all ... **exclusive** right[s]' to Superman 'to have and hold forever'").

> **Commented [WH1]:** Note that this case was reversed sub nom on other grounds (post-termination settlement held by 9th Cir. to be enforceable).

Indeed, Dramatic's absurd insistence that *all* "terms" of any copyright grant remain in force post-termination would mean that an assignment—with "terms" transferring copyright ownership to the grantee[2]—would be *in*terminable for purposes of recapturing the originally granted rights. This is not only at odds with the fundamental purpose of the Copyright Act's termination provisions, but all relevant authority.[3]

---

[2] Indeed, pursuant to the Copyright Act, both assignments *and* exclusive licenses are deemed to constitute a "transfer of copyright ownership" with respect to the rights conveyed.  17 U.S.C. § 101.  Under Dramatic's reading, any such transfer of ownership, whether by assignment or exclusive license, could never be recaptured "under the terms" of the grant.  That is not what the Copyright Act provides.  *See* 17 U.S.C. § 304(c) (providing that both "the exclusive or nonexclusive grant of a transfer or license" are terminable).

[3] *See, e.g., Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015) (holding that heirs recaptured rights to song following termination of grant conveying "all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works], . . . and all United States reversionary and termination interests in copyright now in existence or expectant, including all rights reverted, reverting or to revert to Grantor[,] his heirs, executors, administrators or next of kin by

21035984.1
227691-10003

# Redacted

reason of the termination of any transfers or licenses covering any extended renewal term of copyright pursuant to Section 304 of the Copyright Act of 1976...."); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 929 (6th Cir. 2016) (same, with respect to grants "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" and "all rights to obtain renewals or copyrights in the future upon Works written or composed by [the author]").

21035984.1
227691-10003

**Redacted**

Accordingly, while Dramatic is correct that the Original Grant's terms continue to govern *Dramatic's* exploitation of the *derivative work* (i.e., the Sergel Play), nothing in the Original Grant can be read to deprive *the Lee parties* of their post-termination rights to exploit the reclaimed amateur acting rights in the *original work* (i.e. the Novel)..  **Redacted**

**Redacted**

21035984.1
227691-10003

ATTICUS_0000090

# Redacted

21035984.1
227691-10003

CONFIDENTIAL

ATTICUS_0000091

# Redacted

21035984.1
227691-10003

CONFIDENTIAL

ATTICUS_0000092

# Redacted

21035984.1
227691-10003

CONFIDENTIAL
ATTICUS_0000093

# EXHIBIT C

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **THE DRAMATIC PUBLISHING COMPANY,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| v. | ) | **AAA Case No. 10-19-0000-7463** |
| | ) | |
| **THE ESTATE OF NELLE HARPER LEE; HARPER LEE LLC** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>POST-HEARING BRIEF OF</u><br><u>THE ESTATE OF HARPER LEE AND HARPER LEE LLC</u>

July 28, 2021

Robert W. Clarida
rclarida@reitlerlaw.com
Reitler Kailas & Rosenblatt LLP
885 Third Avenue, 20th Floor
New York, NY  10022
(212) 209-3044
(212) 371-5500 (fax)

David G. Hymer
dhymer@bradley.com
Dylan C. Black
dblack@bradley.com
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue N.
Birmingham, AL 35203
(205) 521-8000
(205) 521-8800 (fax)

*Counsel for The Estate of Nelle Harper Lee and Harper Lee LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 2

    I.     The applicable legal and equitable doctrines support the Estate's and
           LLC's positions.................................................................................... 2

           A.    Waiver ............................................................................................. 2

           B.    Estoppel.......................................................................................... 3

           C.    Ratification...................................................................................... 4

           D.    Acquiescence .................................................................................. 4

           E.    Unclean hands................................................................................ 4

    II.    Judgment should be entered in the Estate's and LLC's favor on their
           claims. .................................................................................................. 4

           A.    Dramatic breached the Grant and infringed the copyright in the
                Novel by licensing multiple versions of the Sergel Play. .......... 4

           B.    Dramatic breached the Grant by licensing various U.K.
                productions................................................................................... 12

                1.    Dramatic breached the Grant by licensing commercial
                      productions........................................................................... 12

                2.    Dramatic breached the Grant by licensing first-class
                      productions........................................................................... 14

                  3.    Dramatic breached the Grant by licensing second-class
                      tours..................................................................................... 15

                4.    The Lee parties did not waive, and are not estopped from
                      asserting, their claims for Dramatic's breach due to the
                      licensing of the U.K. productions. ..................................... 16

           C.    Dramatic infringed the copyright in the novel by licensing
                 productions in violation of the 25-mile limit. ............................ 19

           D.    Dramatic breached the Grant and infringed the copyright by
                 licensing productions with professional actors. ........................ 21

                1.    The unambiguous language of the Grant controls. ............. 21

                2.    Even if the Arbitrator deems the Grant ambiguous,
                      extrinsic evidence shows that Ms. Lee never granted
                      professional acting rights to Dramatic. ............................... 23

                        a.    The parties' negotiations..................................... 24

                        b.    Course of performance...................................... 24

|  |  | c. | Prior course of dealings | 26 |
|  |  | d. | Trade usage in the theater industry | 26 |
|  | 3. |  | Dramatic's president concedes that its position on the meaning of "stock" is not correct | 29 |
|  | 4. |  | Dramatic infringed the copyright in the Novel by licensing productions with professional actors. | 30 |
| E. |  |  | The Estate and LLC should be awarded damages. | 30 |
| F. |  |  | The Lee Parties did not waive their claims for breach. | 32 |

III. Judgment should be entered in the Estate and LLC's favor on Dramatic's claims. ............ 32

| A. | Harper Lee's termination of the Grant means that Dramatic no longer has any exclusive rights in the United States. | 32 |
|  | 1. Section 304 plainly allows termination of exclusive rights. | 32 |
|  | 2. Dramatic's argument about the date of the grant to Rudinplay is wrong and irrelevant. | 39 |
| B. | Dramatic failed to prove its claims against LLC for breach of contract or tortious interference. | 40 |
| C. | Dramatic's prior material breaches bar its claims against the Estate. | 41 |
| D. | Dramatic failed to name a necessary party. | 42 |
| E. | Dramatic's claim related to the cancellation of the 2019 U.K. production fails. | 44 |
| F. | Dramatic's claim related to the cancellation of various U.S. productions fails. | 46 |
| G. | Dramatic cannot obtain its requested injunction. | 47 |
| H. | Dramatic cannot obtain an order directing the Estate and LLC to pay potential future indemnity claims. | 49 |

CONCLUSION ............................................................................................ 50

(this amount avoids double-counting professional performances of the revised version).  (*Id.*)

The Estate and LLC also claim as damages their costs and attorney's fees, as set forth in their Prayer for Relief in the Counterclaim, if the Arbitrator determines they are the prevailing parties.

**F.      The Lee Parties did not waive their claims for breach.**

As discussed above, Dramatic relies heavily on meritless arguments about alleged waiver by Ms. Lee or the Estate.  But even if Dramatic had established any waiver by the Lee parties (and it did not), the Estate plainly revoked any and all such waivers by demanding strict compliance with the contract by letters dated January 31, February 5, and February 6, 2019.  (R147; R151; R152)  Under Illinois law, that revocation was effective.  *See supra* at p. 3.  Thus, Dramatic indisputably must comply with the strict letter of the contract going forward.

**III.    Judgment should be entered in the Estate and LLC's favor on Dramatic's claims.**

Judgment should be entered in favor of the Estate and LLC on Dramatic's claims for breach of contract, and for injunctive and declaratory relief, and in favor of LLC on Dramatic's claim for tortious interference.

**A.      Harper Lee's termination of the Grant means that Dramatic no longer has any exclusive rights in the United States.**

**1.   Section 304 plainly allows termination of exclusive rights.**

Ms. Lee terminated the rights she granted to Dramatic by executing a Notice of Termination, effective April 26, 2016.  (J043)  Dramatic does not dispute the validity of this termination.  It nevertheless claims that its right to exploit the "amateur acting rights" conveyed by the Grant remains *exclusive* to Dramatic in the U.S.*, in perpetuity*, under § 304(c)(6)(A) (the "Derivative Works Exception") – a reading that would prevent Ms. Lee or her successors from *ever* recapturing or exploiting *any* of the "amateur acting rights" conveyed by the Grant.

Dramatic is wrong.  Section 304(c) provides that "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it .... is subject to termination."  17 U.S.C. § 304(c).  This provision – applicable by its plain terms to exclusive licenses and to grants of derivative work rights – "gives authors the right to terminate the grant of any transfer or license made prior to 1978, *allowing them to recapture the copyright for an extended term*."  *Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 235 (S.D.N.Y. 2016) (emphasis added); *see also, e.g., Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020) ("unequivocal purpose" of Copyright Act's termination provisions is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable"); *Siegel v. Warner Bros. Entm't*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded ... by the 1976 Act").

The termination right "is both absolute, and inalienable."  *Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 235 (S.D.N.Y. 2016) (citations omitted).  By the Copyright Act's plain terms, "[t]ermination may be effected *notwithstanding any agreement to the contrary*."  17 U.S.C. § 304(c)(5) (emphasis added).  As courts have thus explained, "the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract."  *Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).  In other words, "the 1976 Act gave artists and their heirs the ability to **terminate** any prior grants of the rights to their creations that were executed before January 1, 1978, **regardless of the terms contained in [the grant], e.g., a contractual provision that all the rights (the initial and renewal) belonged <u>exclusively</u> to the [grantee]**."  *Siegel v. Warner Bros. Entm't, Inc.*, 542 F. Supp. 2d 1098, 1007, 1113-14 (C.D. Cal.

2008) (bold and underline emphasis added)[11] (holding that heirs to author of *Superman* comics recaptured rights following termination of 1938 grant that had conveyed to comic book publisher "all ... **exclusive** right[s]' to Superman 'to have and hold forever'").

Dramatic's absurd insistence that *all* "terms" of any grant of derivative work rights remain in force post-termination would mean that an outright assignment of the underlying work – with "terms" transferring copyright ownership to the grantee[12] – would be *in*terminable for purposes of recapturing the originally granted right to prepare derivative works. This is not only at odds with the fundamental purpose of the Act's termination provisions, but all relevant authority.[13]

Accordingly, while Dramatic is correct that the Grant's terms continue to govern Dramatic's exploitation of the *derivative work* it created (i.e., the Sergel Play), nothing in the Grant can be read to deprive *the Lee parties* of their post-termination rights to exploit the reclaimed

---

[11]    Reversed on other grounds sub nom *Larson v. Warner Bros. Entm't, Inc.*, 504 Fed. Appx 586 (9th Cir. 2013).

[12]    Indeed, pursuant to the Copyright Act, both assignments *and* exclusive licenses are deemed to constitute a "transfer of copyright ownership" with respect to the rights conveyed. 17 U.S.C. § 101. Under Dramatic's reading, any such transfer of ownership of derivative work rights, whether by assignment or exclusive license, could never be recaptured "under the terms" of the grant. That is not what the Copyright Act provides. *See* 17 U.S.C. § 304(c) (providing that both "the exclusive or nonexclusive grant of a transfer or license" are terminable).

[13]    *See, e.g., Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015) (holding that heirs recaptured rights to song following termination of grant conveying "all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works], ... and all United States reversionary and termination interests in copyright now in existence or expectant, including all rights reverted, reverting or to revert to Grantor[,] his heirs, executors, administrators or next of kin by reason of the termination of any transfers or licenses covering any extended renewal term of copyright pursuant to Section 304 of the Copyright Act of 1976...."); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 929 (6th Cir. 2016) (same, with respect to grants "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" and "all rights to obtain renewals or copyrights in the future upon Works written or composed by [the author]").

amateur acting rights in the *original work* (i.e., the Novel).

The Copyright Office itself has made it crystal clear that termination under Section 304 does not leave exclusive derivative work rights with the original grantee: "[T]he post-termination rights . . . to prepare new derivative works revert to the authors or their heirs." https://www.copyright.gov/recordation/termination.html (last accessed July 27, 2021). Under Dramatic's view, the termination provision would be meaningless with regard to any exclusive or non-exclusive grant of derivative work rights. If the underlying grant provided exclusivity, then that exclusivity, according to Dramatic, continues after termination. If the underlying grant was non-exclusive, the termination of that grant would also have no effect, because the original grantor already had non-exclusive rights to exploit the work in competition with the underlying grant even prior to termination. Congress did not craft such a meticulous statutory structure in order to yield such a pointless result. For the statutory termination provision to have any meaning or effect at all, it must terminate the exclusivity of the grantee's right to create and exploit derivative works.

Dramatic's novel argument to the contrary is inconsistent with the purpose of the Derivative Works Exception itself. As noted in Virginia E. Lohmann, "The Errant Evolution of Termination of Transfer Rights and the Derivative Works Exception," 48 OHIO ST. UNIV. L.J. 897 (1987) (hereafter "Lohmann") at 910, the purpose of the Exception is to protect the original grantee's investment in making the pre-termination derivative work, by allowing it to keep exploiting that work. This issue was of great concern to the motion picture industry at the time of the 1976 Act's drafting, and the final Act reflects and preserves the expectations of original grantees at the time of their grants.

Before passage of the 1976 Copyright Act, grantees acquiring exclusive derivative work rights under the 1909 Act would have expected the underlying work to go into the public domain

after 56 years from the date of the original copyright and for their derivative work rights to become non-exclusive at that time.  In giving authors the ability to terminate grants of their copyrights and extending the term of copyright protection to the work beyond 56 years, Congress crafted a statutory scheme that also preserved for grantees of derivative work rights exactly what they would have had prior to passage of the 1976 Act, but nothing more.

> Congress determined that the grantee of rights from the original author, the derivative work proprietor, had already received everything it ever had any right to expect, since it had the same fifty-six years as it originally expected under the 1909 Act to recover its investment.

*Id.*

The derivative work proprietor under the 1909 Act also expected, however, that it could keep exploiting its own work indefinitely – after year 56 it might face competition from new derivative versions, but it could at least keep its own derivative works on the market.  The Derivative Works Exception preserves this expectation. After passage of the 1976 Act, derivative work grantees continued to have exclusive rights to exploit their derivative works for 56 years from the date of the original copyright just as they would have had before passage of the 1976 Act. And, they continued to have non-exclusive rights to exploit their derivative works in perpetuity after 56 years had elapsed from the date of the original copyright just as they would have before passage of the 1976 Act.

Former Register of Copyrights Barbara Ringer, who drafted the termination provisions of the 1976 Act, *see* Lohmann at 908 n. 112, recognized in her 1985 Senate Hearing testimony[14] that "the purpose of the [derivative works] exception was to keep the derivative work in circulation

---

[14]     *Civil and Criminal Enforcement of the Copyright Laws: Hearing Before the Subcomm. on Patents, Copyrights and Trademarks of the Senate Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985) (hereafter "Hearings").

and not to deprive the owner of the derivative work from the *use of its own property*."  Hearings at 87 (emphasis added).  Dramatic, however, is not content with continued use of its own property, but instead proposes a tortured reading of the Exception that ignores the intent of Register Ringer and the enacting Congress.

Dramatic's untenable position is that the 1976 Act, intended to give authors more rights by extending the term of copyright protection and providing for the ability to terminate grants, actually gave authors nothing, but instead gave derivative work grantees even more rights than they had prior to the passage of the Act.  Dramatic says that instead of having non-exclusive rights after 56 years from the date of the original copyright as would have been the case prior to the passage of the 1976 Act, it has now acquired by virtue of the Act exclusive rights for the full term of protection enjoyed by Ms. Lee and her Estate, currently the life of the author plus 70 years. That is absurd.

Allowing Dramatic to prohibit amateur performances of the Sorkin Play would not serve the public interest, or benefit the author's heirs, or comport with Dramatic's original expectation *circa* 1969.  It would merely be a windfall to Dramatic. The very purpose of the termination right under Section 304(c), however, was to provide authors and their heirs with a mechanism to ensure that the windfall of the extended copyright term would go to them, not to their original grantees. *See, e.g.*, Lydia Pallas Loren, "Renegotiating the Copyright Deal In the Shadow of the 'Inalienable' Right to Terminate," 62 FLA. L. REV. 1329, 1333-34 ("Congress determined that the author of the work should have an opportunity to benefit from the windfall that the lengthened duration created." (citing H.R. Rep. 94-1476, at 140 (1976)); Marshall A. Leaffer, *Understanding Copyright Law*, § 6.12[A] (§ 304(c) ensures "that any windfall resulting from extension should go first to authors").

Dramatic has argued that termination of its exclusivity post-termination would "punish"

creators of pre-termination derivative works or deprive them of their own exclusive rights in their creations. The argument has no merit. The Sergel Play is subject to its own registered copyright, presumably subsisting for many more years, which protects Dramatic's exclusive rights in *Sergel's own contributions* to that work.  It still has those exclusive rights post-termination, just as it would have expected when signing the contract with Ms. Lee in 1969.  It is not "punishment" that Dramatic is denied the windfall of an additional period of exclusivity with respect to all amateur performances of *other* adaptations of *To Kill A Mockingbird*.

Dramatic's lone cited authority for reaching a different result, *Mills Music Inc., v. Snyder*, 469 U.S. 153 (1985) could not be less apposite. *Mills Music* does not address post-termination exclusivity at all, but merely concerns the flow of post-termination payments for the original grantee's continuing *non*-exclusive exploitation.  Specifically, the question in *Mills Music* is whether the grantee should continue to get paid by its sub-licensees for their uses of the terminated works, or whether the sub-licensees should tender payment directly to the original grantor. *Id.* at 155-56.  Translated to the facts of the present case, *Mills* would hold only that a theater that licensed the Sergel Play from Dramatic would continue to pay its license fees to Dramatic after termination, and not pay them directly to the Estate.  Respondents do not dispute that conclusion.

*Mills Music* did not hold that Mills – which owned the *entire* renewal copyright interest – could prevent Snyder from authorizing new derivative works post-termination, yet that is exactly what Dramatic, with its much narrower interest, argues it should be permitted to do here. Dramatic argues that *Mills* required preservation of the "contractual status quo" after termination, but that overstates the holding. *Mills* only preserved the status quo as between Mills and its own licensees – they would keep paying Mills – it did not maintain Mills' contractual exclusivity vis-à-vis Snyder.  *Mills Music* is a red herring.

To summarize, post- termination, Dramatic can continue to license amateur performances of the Sergel Play in the U.S., subject to the Grant's territorial and other limitations. Dramatic's statutory privilege to continue to exploit amateur acting rights in the United States is no longer exclusive, however – other authorized dramatizations of the Novel can also be licensed for amateur productions.  Dramatic's exclusive rights to continue to license performances of the Sergel Play *outside* the U.S. are still authorized and controlled by the Grant to the extent that Dramatic has not been foreclosed from receiving the benefits of the Grant because of a material breach.

### 2. Dramatic's argument about the date of the grant to Rudinplay is wrong and irrelevant.

In June 2015, Ms. Lee entered into a contract with Rudinplay, Inc. (the "Rudin Grant") granting an option to create and produce a play based on the Novel.  (R058)  Dramatic asserts that this grant to Rudinplay is invalid under Section 304(c)(6)(D), because it was executed before the effective date of the termination.  *See* Claimant's Pre-Hearing Brief at 11.  Dramatic is wrong. Section 304(c)(6)(D) provides in relevant part that, "[a] further grant, or agreement to make a further grant, *of any right covered by a terminated grant* is valid only if it is made after the effective date of the termination" (emphasis added).  The rights conveyed under the Rudin Grant are not "covered by" the terminated grant from Ms. Lee to Dramatic.

On its face, the Rudin Grant acknowledges the existence of the Grant to Dramatic in 1969, acknowledges that such agreement ("Prior Agreement") was terminated, with termination to become effective April 26, 2016, and acknowledges that "the rights granted hereunder [in the Rudin Grant] shall be subject to the rights granted under the Prior Agreement, as limited by such termination."  (R058 ¶ 2(b)).  Accordingly, there is no overlap between the two agreements. By definition, there are no rights in the Rudin Grant that are "covered by" the Grant to Dramatic, and vice versa. Section 304(c)(6)(D) is inapplicable by its terms.

GE KIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) | |
| | ) | |
| *Petitioner/Cross-Respondent*, | ) | Case No.: 1:21-CV-05541-MFK |
| | ) | |
| v. | ) | Hon. Matthew F. Kennelly |
| | ) | |
| TONJA CARTER, *et al*., | ) | |
| | ) | |
| *Respondents/Cross-Movants*. | ) | |

**RESPONDENTS' MOTION TO VACATE CORRECTED INTERIM AWARD OF
ARBITRATION AND RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO
CONFIRM CORRECTED INTERIM AWARD**

J. Timothy Eaton
teaton@taftlaw.com
Andrew S. Murphy
amuprhy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

David G. Hymer
dhymer@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Ave. North
Birmingham, AL 35203
(205) 521-8289

*Attorneys for Respondents The Estate of Nelle Harper Lee and Harper Lee, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND................................................................................................ 2

APPLICABLE LEGAL STANDARD ................................................................................. 4

ARGUMENT........................................................................................................................ 5

I.   The Arbitrator exceeded his powers in declaring the Estate to have certain indemnification obligations to Dramatic.......................................................................................................... 5

    A.   The Arbitrator exceeded his powers by declaring the Estate to have indemnification obligations that cannot possibly arise from the 1969 Agreement. .......................................... 6

    B.   The Arbitrator exceeded his powers by making indemnification determinations unrelated to any controversy between the Estate and Dramatic that arises out of the 1969 Agreement. ................................................................................................................................ 8

II.   The declaratory and injunctive relief pertaining to "non-first-class" rights and productions is too indefinite and ambiguous to be enforceable.................................................. 9

III.   The Arbitrator exceeded his powers in ordering declaratory and injunctive relief based on an erroneous interpretation of 17 U.S.C. § 304(c) that will cause the Estate to violate the legal rights of third parties who have not agreed to arbitrate. .................................................. 11

    A.   The Arbitrator disregarded applicable copyright law by negating the effect of Ms. Lee's termination. .......................................................................................................................... 13

        1.   The statute plainly allows the termination of an exclusive license. ........................... 14

        2.   The Arbitrator misreads *Mills Music*, his principal cited authority............................ 19

        3.   The Arbitrator ignores the purpose of Section 304(c). ............................................... 21

    B.   The Arbitrator's disregard of settled copyright law violates the rights of third parties. 24

        1.   Rights of Atticus and Sorkin ..................................................................................... 24

        2.   Rights of members of the general public.................................................................... 26

IV.   Dramatic's motion to confirm the Award should be denied. ......................................... 27

CONCLUSION.................................................................................................................... 29

2

the 1969 Agreement pursuant to the Copyright Act to the detriment of third parties, which means that the arbitrator's ruling requiring the Estate to ignore that effect cannot stand.[4]  As a result, the Court should vacate the Award.

The Arbitrator's ruling also requires the Estate and LLC to injure the rights of other third parties who did not agree to arbitrate—members of the general public who would be involved in performing or attending productions of the Sorkin Play in non-first-class theaters in the United States.  This too requires vacatur of the Award.

### A.  The Arbitrator disregarded applicable copyright law by negating the effect of Ms. Lee's termination.

The infringement on the rights of third parties stems from the Arbitrator's erroneous interpretation of Section 304(c) of the Copyright Act.  The Arbitrator's flawed legal analysis can be found at pages 60-72 of the Award.  The Arbitrator held that Dramatic's right to exploit the "amateur acting rights" conveyed by the Grant remains *exclusive* to Dramatic in the U.S., *in perpetuity*, under § 304(c)(6)(A) (the "Derivative Works Exception")—a reading that would prevent Ms. Lee or her successors from *ever* recapturing or exploiting *any* of the "amateur acting rights" conveyed by the Grant.

In the course of his discussion of Section 304(c), the Arbitrator does not cite a single case in which a court reached the same conclusion.  That is because there is no such case.  Even though the termination provision in Section 304(c) has been the law for 45 years, no party in the position of Dramatic whose rights have been terminated has ever obtained a ruling that its derivative-work rights remain exclusive after termination.

---

[4]  All parties agree that the termination right permitted by Section 304(c) does not apply outside the United States.

13

**JA-645**

Nor does the Arbitrator mention the U.S. Copyright Office's view on the meaning of Section 304(c), which directly undercuts his conclusion that Dramatic's derivative-work rights remain exclusive.  The Copyright Office has made clear that termination under Section 304 does not leave exclusive derivative-work rights with the original grantee after termination: "[T]he post-termination rights … to prepare *new* derivative works revert to the authors or their heirs." Notices of Termination, https://www.copyright.gov/recordation/termination.html (last accessed January 13, 2022) (emphasis added).

### 1.   The statute plainly allows the termination of an exclusive license.

Section 304(c) permits the termination of "the ***exclusive*** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it."  17 U.S.C. § 304(c) (emphasis added). This provision—applicable by its plain terms to exclusive licenses and to grants of derivative-work rights—"gives authors the right to terminate the grant of ***any*** transfer or license made prior to 1978, ***allowing them to recapture the copyright for an extended term***."  *Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 235 (S.D.N.Y. 2016) (emphasis added); *see also, e.g., Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020) (concluding that "unequivocal purpose" of Copyright Act's termination provisions is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable"); *Siegel v. Warner Bros. Entm't*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (reasoning that purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded ... by the 1976 Act").

Even after the termination, Dramatic maintains some ability to continue licensing the Sergel Play in the United States pursuant to the Derivative Works Exception.  (the Sergel Play is

14

**JA-646**

## CONCLUSION

For the foregoing reasons, this Court should vacate the Award and remand the matter to the Arbitrator with instructions to address the deficiencies in the Award discussed above. The Court should also deny Dramatic's motion to confirm the Award (Doc. 10).

Respectfully submitted,

DATED: January 14, 2022

THE ESTATE OF NELLE HARPER LEE
AND HARPER LEE, LLC

By: /s/ *J. Timothy Eaton*

J. Timothy Eaton
teaton@taftlaw.com
Andrew S. Murphy
amuprhy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
(312) 527-4000

David G. Hymer
dhymer@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Ave. North
Birmingham, AL 35203
(205) 521-8289

*Attorneys for Respondents The Estate of Nelle Harper Lee and Harper Lee, LLC*

29

# EXHIBIT D

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **CC:** | Matt Lembke |
| **Sent:** | 2/1/2021 10:58:55 AM |
| **Subject:** | Fwd: Harper Lee Estate v. Dramatic Publishing Company (Exclusive Rights After Termination) |
| **Attachments:** | ~WRD000.jpg |

Bob,

First, I hope you and yours are well.  Second, with Matt's (and I understand your consent), I contact Regan Smith at the Copyright Office about getting the Office's help in the DPC arbitration.  Regan used to be an associate in our Chicago office, although I only worked with her a little then, but I've gotten to know her better while she's been at the Copyright Office.

Below is my e-mail chain with Regan.  You'll see she has offered to have a call with us.  I think we should do this, although as she has foreshadowed, it may be hard to convince the Office to intervene in a private arbitration. We can but try, however, since I think it would be a simple solution to the arbitrators' confusion.

If you agree, let me know when you would be available.  I'm generally available today, and for much of the week.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

Begin forwarded message:

**From:** "Smith, Regan" <regans@copyright.gov>
**Date:** February 1, 2021 at 10:46:18 AM EST
**To:** Jonathan Zavin <jzavin@loeb.com>
**Cc:** "Sloan, Jason" <jslo@copyright.gov>
**Subject:RE: Harper Lee Estate v. Dramatic Publishing Company (Exclusive Rights After Termination)**



I haven't heard from Bob yet – thanks for offering to coordinate.

Regan

**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Monday, February 1, 2021 10:43 AM

**To:** Smith, Regan <regans@copyright.gov>
**Cc:** Sloan, Jason <jslo@copyright.gov>
**Subject:** Re: Harper Lee Estate v. Dramatic Publishing Company (Exclusive Rights After Termination)

Regan,

Thanks for getting back to me so quickly on this.  Has Bob responded to your offer of a call?  If not, I can get in touch with him and help set something up for all of us.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad


On Feb 1, 2021, at 10:40 AM, Smith, Regan <regans@copyright.gov> wrote:



Hi Jonathan,

I hope you are well, too.  At least the snow makes it feel like we might choose to hunker down even if life were back to normal.  We appreciate the background, including your noting that an arbitration presents a different posture for consideration of the Office's role than federal litigation.  As I mentioned to Bob, we would be happy to set up a call if you would like.

Best,

Regan


**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Monday, February 1, 2021 10:17 AM
**To:** Smith, Regan <regans@copyright.gov>
**Subject:** Harper Lee Estate v. Dramatic Publishing Company (Exclusive Rights After Termination)


Regan,

First, I hope you're well and that you and your loved ones have been healthy through the current insanity.   May we all get vaccinated soon.

Second, I wanted to join in soliciting the Copyright Office's help in the current arbitration between Dramatic Publishing Company (DPC) and the Harper Lee Estate (the Estate) I know that Bob Clarida has reached out to

you on behalf of the Estate, but

I want to join in the Estate's request.  I represent Scott Rudin and Atticus Productions (Atticus) the producer of the Aaron Sorkin written play To Kill A Mockingbird," (the Sorkin Play) based on the Harper Lee novel of the same name (the Novel).  By a grant from the Estate, Atticus has the exclusive right to produce professional productions of the Sorkin Play, and the non-exclusive rights in the U.S. to perform stock and amateur productions of the Sorkin Play.

As you are aware from Bob's communication with you, the Estate had previously granted Christopher Sergel and DPC the right to create a play (the Sergel Play) based on the Novel, and the exclusive right to perform stock and amateur productions of the play so created.  This grant, however, was properly terminated by the Estate in 2016, so that DPC's rights in the stock and amateur markets became non-exclusive as of the effective date of termination.

DPC has commenced an arbitration against the Estate in which, among other things, it claims that despite the termination it continues to have the exclusive right to perform a play based on the Novel in the stock and amateur markets.  As I understand it's argument, it claims that it is allowed to continue to exploit the work (the Sergel Play) under the terms of the original grant, and since the original grant was for exclusive rights, DPC continues to have such exclusivity over the right to exploit the Novel in the stock and amateur theatrical markets.

As a matter of law, this is of course nonsense.  While following termination DPC enjoys exclusive use of it's own work, the Sergel Play, the very purpose of termination is to allow the author of the underlying work (in this case, the Novel), to terminate the exclusivity of the grant to the underlying work, so that the author can enjoy the benefit of creating new works based on the original work.  Under DPC's theory, termination is completely meaningless, since the Estate could never license any new theatrical works (including the Sorkin Play) in the stock and amateur markets.  Thus, the Estate would not enjoy the benefit of the extended period of copyright, and millions of people would not get to see the Sorkin Play.

While I have successfully asked for and obtained Copyright Office aid in litigation where fundamental copyright issues were at stake, most recently in the Spanski Enterprises, Inc. V. Televisual Polska, S.A., D.C. Circuit 2018, I understand that this was at the circuit court level, and not in a private arbitration.  However, based on the arbitrators declining to grant summary judgment to the Estate on this issue, it appears that they are confused, and it is possible that they will do something foolish and find that if the original grant is exclusive, termination does not terminate such exclusivity, which is, of course, the very purpose of termination.  If they did so, the issue would undoubtedly end up in federal court, which should overturn any such decision.  However, such a procedural posture would add the additional issue as to the court's deference to the arbitrators.  While there should be no such deference on a matter of federal law, as we both know, funny things sometimes happen in courts, and judges do odd things.  I think it would be in everyone's interest (including, admittedly, my client's), to nip this in the bud at the arbitration.  Further, I suspect it is fairly easy to do.  I think a short statement/brief from the Copyright Office explaining to the arbitrators that termination terminates exclusivity in the grant to the original work would do it.  This way no one has to worry about a court later going off the rails, there would not be a years' long delay in the Estate benefiting from the proper termination, and audiences would get to see the Sorkin Play.  I understand that the arbitration has now been postponed until March 18, 2021, so there is plenty of time for such a submission.

If you'd like to talk about this, I'd be happy to do so.  I'm sitting in our house on the North Fork of Long Island in the middle of blizzard, and can't go anywhere, even if there were not a pandemic, so I have plenty of time.  If you want to talk, I can be reached on my cell phone (917-324-1206), or you can send me an e-mail to schedule a time.

As I said in the beginning, I hope you are well.  Best regards,

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


**Sent from my iPad**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000125

# EXHIBIT E



Home / Document Recordation / Notices of Termination

# Notices of Termination



Cover Sheet (Form TCS)

The Copyright Act permits authors or their heirs, under certain circumstances, to terminate the exclusive or nonexclusive grant of a transfer or license of an author's copyright in a work or of any right under a copyright. These termination provisions are set forth in 17 U.S.C. §§ 203, 304(c), and 304(d), with the applicable provision depending on a number of factors, including when the grant was made, who executed it, and when copyright was originally secured for the work. These provisions are intended to protect authors and their heirs against unremunerative agreements by giving them an opportunity to share in the later economic success of their works by allowing authors or their heirs, during particular periods of time long after the original grant, to regain the previously granted copyright or copyright rights. Note that grants made via a will or involving a work made for hire may not be terminated under these provisions (for more information about works made for hire, refer to Circular 30).

To terminate a grant, a written, signed notice of termination must be served on the relevant grantee (i.e., the individual or entity that received the grant that is being terminated) or the grantee's successor-ininterest and a copy of the as-served notice must be properly recorded with the Copyright Office. For more information about notices of termination, including their required form and content, see 17 U.S.C. §§ 203, 304(c), or 304(d), as applicable, 37 C.F.R. § 201.10, and the Compendium of U.S. Copyright Office Practices (Chapter 2300: Recordation).

## Eligibility to Terminate

To terminate a grant, one must be eligible under one of the termination provisions of title 17, section 203, 304(c), or 304(d). Determining which provision applies depends on a number of factors, including when the grant was made, who executed it, and when copyright was originally secured for the work.

- Section 203 applies to grants executed by the author on or after January 1, 1978, regardless of whether the copyright in the author's work was secured before or after that date.
- Section 304(c) applies to grants executed by the author or the author's heirs before January 1, 1978, and only if the copyright in the work was secured before January 1, 1978.
- Section 304(d) applies to grants executed by the author or the author's heirs before January 1, 1979, and only if the copyright in the work was secured between January 1, 1923 and October 26, 1939.
- Additionally, the grant may be a "gap grant". These occur where an author made a grant before January 1, 1978 involving a work created on or after that date. The Office has concluded that gap grants may be terminated under section 203 because, as a matter of copyright law, a transfer that predates the existence of the copyright work connot be effective (and therefore cannot be executed) until the work of authorship (and the copyright) come into existence. In the case of gap grants, the Office may record a notice of termination under section 203 if the notice states that the date of execution for the grant is the date that the work was created.

## Who May Terminate

Identifying the person or persons who may terminate a grant depends on a number of factors, including whether the author or the author's heirs made the grant, whether there are multiple authors, and which termination provision applies. Generally a living author can terminate a grant he or she made. If a grant was made by more than one author on or after January 1, 1978, it can be terminated by a majority of such authors. But if a grant by more than one author was made prior to that date, then any one of those authors can terminate the grant to the extent of his or her own share. Where an author is deceased, a grant executed by the author can generally be terminated by a majority interest of the author's heirs, and if there are no heirs, then by the author's executor, adminstrator, personal representative, or trustee. Where a grant was executed by one or more of the author's heirs, the grant can be terminated by the surviving person(s) who executed the grant.

## When To Terminate

Grants may only be terminated during a specific statutory window of time and must specify the date that the termination goes into effect. The effective date must fall within a five-year "termination period", which is based on factors set forth in sections 203, 304(c), or 304(d), as applicable. The notice must be served no less than two years and no more than ten years before the effective date and must be recorded with the Office before the effective date. The Office has developed a series of tables that may be usefule in identifying the correct termination period, selecting an effective date of termination, and for calculating deadlines for service and recording a notice of termination:

Grants Executed by the Author on or After January 1, 1978 (17 U.S.C. § 203):

- Grant Did Not Convey Right of Publication
- Grant Conveyed Right of Publication (Calculation Based on Date of Publication)
- Grant Conveyed Right of Publication (Calculation Based on Date of Execution)

Grants Executed by the Author or the Author's Heirs Before January 1, 1979(17 U.S.C. § 304(c)):

- Involving Works Originally Registered or Published with Notice between 1923 and 1977

**NOTE:** The last day to have served a notice of termination on a grantee or successor under section 304(d) was October 26, 2017. Each such notice must still, however, be recorded with the Copyright Office prior its effective date of termination.

## How to Record a Notice of Termination with the Copyright Office

Any notice of termination submitted to the Office for recordation must comply with the Copyright Act's statutory requirements (17 U.S.C. §§ 203, 304(c), 304(d)) and the Office's regulations (37 C.F.R. § 201.10(f)) and instructions, including the following:

- The submitted notice must be a true, correct, complete, and legible copy of the signed notice of termination as served on the grantee or successor-in-title. 37 C.F.R. § 201.10(f)(1)(i)(A).
- The submitted notice must be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice itself. 37 C.F.R. § 201.10(f)(1)(i)(B).
- The submitted notice must have been timely served and must have an effective date of termination that is later than the date of recordation. 37 C.F.R. § 201.10(f)(1)(ii).
- The submitted notice must be accompanied by the correct filing fee as specified by 37 C.F.R. § 201.3(c).

Additionally, all notices submitted for recordation must be accompanied by the Office's Notice of Termination Cover Sheet (Form TCS). Completing Form TCS helps remitters ensure that they are providing all necessary information and assists Office staff in processing the submission. Form TCS and instructions for completing it can be found here.

**About**
Overview
Leadership
History and Education
Modernization
Annual Reports
Strategic Plans
IT Reports

**News**
Federal Register Notices
NewsNet
Events
Press/Media Information

**Opportunities**
Academic Partnerships
Internships
Kaminstein Program
Ringer Fellowship

**Help**
Frequently Asked
Questions
Online Registration Help
Tutorials
Password Help
Preguntas Frecuentes

**Contact**
Contact Form
Visitor Information
Mailing Addresses

Sitemap

**Copyright.gov**

**U.S. Copyright Office**
101 Independence Ave. S.E.
Washington, D.C.
20559-6000
(202) 707-3000 or
1 (877) 476-0778 (toll-free)

**Blog | Take Our Survey**

Library of Congress  |  Congress.gov  |  USA.gov  |  FOIA  |  Legal  |  Privacy Policy



Home / Document Recordation / Notices of Termination

# Notices of Termination



Cover Sheet (Form FCS)

The Copyright Act permits authors or their heirs, under certain circumstances, to terminate the exclusive or nonexclusive grant of a transfer or license of an author's copyright in a work or of any right under a copyright. These termination provisions are set forth in 17 USC §§ 203, 304(c), and 304(d), with the applicable provision depending on a number of factors, including when the grant was made, who executed it, and when copyright was originally secured for the work. These provisions are intended to protect authors and their heirs against unremunerative agreements by giving them an opportunity to share in the later economic success of their works by allowing authors or their heirs, during particular periods of time long after the original grant, to regain the previously granted copyright or copyright rights. Note that grants made via a will or involving a work made for hire may not be terminated under these provisions (for more information about works made for hire, refer to Circular 30). Additionally, there is a limitation on termination where derivative works are concerned. A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights to authorize new uses of the derivative work that are not covered by the grant and to prepare new derivative works revert to the authors or their heirs.

To terminate a grant, a written, signed notice of termination must be served on the relevant grantee (i.e., the individual or entity that received the grant that is being terminated) or the grantee's successor in interest, and a copy of the as-served notice must be properly recorded with the Copyright Office. For more information about notices of termination, including their required form and content, see 17 USC §§ 203, 304(c), or 304(d), as applicable; 37 CFR § 201.10; and the *Compendium of U.S. Copyright Office Practices* (Chapter 2300: Recordation).

## Eligibility to Terminate

To terminate a grant, one must be eligible under one of the termination provisions of Title 17, section 203, 304(c), or 304(d). Determining which provision applies depends on a number of factors, including when the grant was made, who executed it, and when copyright was originally secured for the work.

- Section 203 applies to grants executed by the author on or after January 1, 1978, regardless of whether the copyright in the author's work was secured before or after that date.
- Section 304(c) applies to grants executed by the author or the author's heirs before January 1, 1978, and only if the copyright in the work was secured before January 1, 1978.
- Section 304(d) applies to grants executed by the author or the author's heirs before January 1, 1979, and only if the copyright in the work was secured between January 1, 1923, and October 26, 1939.
- Additionally, the grant may be a "gap grant." These occur where an author made a grant before January 1, 1978, involving a work created on or after that date. The Office has concluded that gap grants may be terminated under section 203 because, as a matter of copyright law, a transfer that predates the existence of the copyrighted work cannot be effective (and therefore cannot be executed) until the work of authorship (and the copyright) come into existence. In the case of gap grants, the Office may record a notice of termination under section 203 if the notice states that the date of execution for the grant is the date that the work was created.

## Who May Terminate

Identifying the person or persons who may terminate a grant depends on a number of factors, including whether the author or the author's heirs made the grant, whether there are multiple authors, and which termination provision applies. Generally, a living author can terminate a grant he or she made. If a grant was made by more than one author on or after January 1, 1978, it can be terminated by a majority of such authors. But if a grant by more than one author was made prior to that date, then any one of those authors can terminate the grant to the extent of his or her own share. Where an author is deceased, a grant executed by the author can generally be terminated by a majority interest of the author's heirs, and if there are no heirs, by the author's executor, administrator, personal representative, or trustee. Where a grant was executed by one or more of the author's heirs, the grant can be terminated by the surviving person(s) who executed the grant.

## When to Terminate

Grants may only be terminated during a specific statutory window of time and must specify the date that the termination goes into effect. The effective date must fall within a five-year "termination period," which is based on factors set forth in sections 203, 304(c), or 304(d), as applicable. The notice must be served no less than two years and no more than ten years before the effective date and must be recorded with the Office before the effective date. The Office has developed a series of tables that may be useful in identifying the correct termination period, selecting an effective date of termination, calculating deadlines for service, and recording a notice of termination:

Grants Executed by the Author on or after January 1, 1978 (17 USC § 203):

- Grant Did Not Convey Right of Publication
- Grant Conveyed Right of Publication (Calculation Based on Date of Publication)
- Grant Conveyed Right of Publication (Calculation Based on Date of Execution)

Grants Executed by the Author or the Author's Heirs before January 1, 1979 (17 USC § 304(c)):
- Involving Works Originally Registered or Published with Notice between 1923 and 1977

**NOTE:** The last day to have served a notice of termination on a grantee or successor under section 304(d) was October 26, 2017. Each such notice must still, however, be recorded with the Copyright Office prior its effective date of termination.

## How to Record a Notice of Termination with the Copyright Office

Any notice of termination submitted to the Office for recordation must comply with the Copyright Act's statutory requirements (17 USC §§ 203, 304(c), 304(d)) and the Office's regulations (37 CFR § 201.10(f)) and instructions, including the following:

- The submitted notice must be a true, correct, complete, and legible copy of the signed notice of termination as served on the grantee or successor in title. 37 CFR § 201.10(f)(1)(i)(A).
- The submitted notice must be accompanied by a statement setting forth the date on which the notice was served and the manner of service, unless such information is contained in the notice itself. 37 CFR § 201.10(f)(1)(i)(B).
- The submitted notice must have been timely served and must have an effective date of termination that is later than the date of recordation. 37 CFR § 201.10(f)(1)(ii).
- The submitted notice must be accompanied by the correct filing fee as specified by 37 CFR § 201.3(c).

Additionally, all notices submitted for recordation must be accompanied by the Office's notice of termination cover sheet (Form TCS). Completing Form TCS helps remitters ensure that they are providing all necessary information and assists Office staff in processing the submission. Form TCS and instructions for completing it can be found here.

**About**
Overview
Leadership
History and Education
Modernization
Annual Reports
Strategic Plans
IT Reports

**News**
Federal Register Notices
NewsNet
Events
Press/Media Information

**Opportunities**
Academic Partnerships
Internships
Kaminstein Program
Ringer Fellowship

**Help**
Frequently Asked
Questions
Online Registration Help
Tutorials
Password Help
Preguntas Frecuentes

**Contact**
Contact Form
Visitor Information
Mailing Addresses

**Sitemap**

**Copyright**.gov

**U.S. Copyright Office**
101 Independence Ave. S.E.
Washington, D.C.
20559-6000
(202) 707-3000 or
1 (877) 476-0778 (toll-free)

**Blog | Take Our Survey**

Library of Congress | Congress.gov | USA.gov | FOIA | Legal | Privacy Policy

# EXHIBIT F

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 3/23/2019 5:40:05 AM |
| **Subject:** | Fwd: To Kill A Mockingbird |

Matt,

Please see the e-mails below between me and two of my theater partners regarding recommendations for an expert(s) for the DPC arbitration.  I also have some recommendations from Scott which I'm following up on.

While I hope that the Estate's and Rudin's interests in this matter are aligned, and remain that way, please understand that nothing in our communications regarding this matter is a waiver of any rights that Rudinplay or Atticus may have against the Estate, for anything that the Estate has done in the past or may do in the future with respect to the DPC agreement or the Estate's dealings with DPC, and on behalf of my clients I specifically reserve all rights and remedies that they may have.

Best regards,

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

Begin forwarded message:

**From:** Carol Kaplan <ckaplan@loeb.com>
**Date:** March 22, 2019 at 10:21:51 PM GMT+1
**To:** Stefan Schick <sschick@loeb.com>, Jonathan Zavin <jzavin@loeb.com>
**Subject: RE: To Kill A Mockingbird**

# Redacted

CONFIDENTIAL

ATTICUS_0000001

# Redacted

**Carol Kaplan**
*Partner*



345 Park Avenue | New York, NY 10154
**Direct Dial:** 212.407.4142 | **Fax:** 646.417.7307 | **E-mail:** ckaplan@loeb.com
**Los Angeles | New York | Chicago | Nashville | Washington, DC | San Francisco | Beijing | Hong Kong |** www.loeb.com

**From:** Stefan Schick <sschick@loeb.com>
**Sent:** Friday, March 22, 2019 4:49 PM
**To:** Jonathan Zavin <jzavin@loeb.com>; Carol Kaplan <ckaplan@loeb.com>
**Subject:** RE: To Kill A Mockingbird

# Redacted

**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Friday, March 22, 2019 4:55 AM
**To:** Stefan Schick <sschick@loeb.com>; Carol Kaplan <ckaplan@loeb.com>

ATTICUS_0000002

**Subject:** To Kill A Mockingbird

# Redacted

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
jzavin@loeb.com
212-407-4161
310-282-2227

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 3/25/2019 2:43:22 AM |
| **Subject:** | TKAM - Arbitration w/ DPC |

Matt,

Here are some more potential experts, with brief descriptions of who they are:

Paul Libin. Octogenarian, produced all sorts of things. Retired from Jujamcyn (one of the two major theater owners in New York) but continues to run Circle in the Square Theater. Would know what the norm was in 1969. 917-716-9213.

MIchael David, runs the Dodgers, a major theater producer. In His seventies and has been active in the theater all his life.

Nell Nugent, also in her 70's. Still a producer.

These next four are or were heads of larger competing play licensing services. They might be reluctant to limit stock and repertoire, but if they were willing to testify favorably, they could be compelling witnesses.

Bruce Lazarus at Samuel French
Peter Hagen, Current head of Dramatist Play Service
Steve Sultan, Used to be head of Dramatist Play Service
Steve Spiegel, head of TRW, new entrant, but he was at other licensing service for decades.

I don't have contact information for most of these, but they should be easily findable on the internet. If you reach out to any of these, you can say they were suggested by Joey Parnes.

Again, the same reservations as in my last e-mail on this subject.

Best regards,

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY

ATTICUS_0000004

PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000005

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | 'Lembke, Matt' |
| Sent: | 3/28/2019 5:33:13 AM |
| Subject: | RE: Arbitrator Resumes Attached - The Dramatic Publishing Company v. The Estate of Nelle Harper Lee - Case Number: 01 19 0000 7463 |

Matt,

I sent the list of proposed arbitrators to my Chicago partners to see if they had any thoughts on them.  I'll call you when I have anything, probably later today.  Coincidentally I know one of the arbitrators – Sol Rosenthal, of counsel to Arnold and Porter.  I'm surprised Sol is on the list, since he is an LA lawyer, although I notice that at least of few of the arbitrators are LA based.  He was co-counsel with me in which I represented MGM and he represented Blake Edwards in a large litigation involving the Pink Panther franchise.  This was probably about 10 years ago, and Sol is now in his mid-eighties.  Smart guy, and nice guy, and very knowledgeable in the entertainment industry, although I don't know whether he has dealt in theater as much as film, television, etc. Also, while he was completely competent in his mid-seventies, I haven't dealt with him since then.  I will try to see if my LA partners know any of the LA based arbitrators.

In yet another coincidence, Laverne Berry was a summer associate at my prior firm, Richards & O'Neil, in 1995. I don't remember her, and I suspect she didn't get a permanent offer.  Finally Stephen Strick says he was at a predecessor firm of Loeb & Loeb, but that was way before I joined Loeb.

One of my Chicago partners was former partners with James Gardner,  I'm sure my partner would be happy to talk to you about him if you'd like.

Jonathan

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
jzavin@loeb.com
212-407-4161
310-282-2227

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

**From:** Lembke, Matt <mlembke@bradley.com>
**Sent:** Tuesday, March 26, 2019 6:57 PM
**To:** Jonathan Zavin <jzavin@loeb.com>
**Subject:** FW: Arbitrator Resumes Attached - The Dramatic Publishing Company v. The Estate of Nelle Harper Lee - Case Number: 01 19 0000 7463

Jonathan:

ATTICUS_0000006

# Redacted

Matt

**Matthew H. Lembke**
Partner | Bradley
mlembke@bradley.com
205.521.8560

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | Matt Lembke |
| Sent: | 3/29/2019 2:21:46 PM |
| Subject: | DPC Arbitration |
| Attachments: | Arbitrators.DOCX; ATT00001.txt |

Matt,

I sent an e-mail to my Chicago partners, and to the LA litigation partners asking if they knew anyone on the AAA arbitrators list, and had any thoughts on them for this case, which I briefly described. Attached is a chart showing their comments. You are free to talk to any of them directly. Let me know and I'll give them a heads up, although I already told some of them you might be calling. For obvious reasons, these opinions/comments should be treated as confidential. Again, the same reservation of Atticus's rights as in my prior e-mails on this subject.

Best regards,

Jonathan

P.S. Congratulations on Virginia's win.

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000008

| Name | Phone # & E-Mail | Recommended Arbitrators | Comments |
|------|------------------|-------------------------|----------|
| **Redacted** | | James Ferguson | Very bright and an intellectual. Will be stimulated and do a fine job.  Without knowing the facts, Jim more likely to try and rule the right way. |
| | | Hon. James Montana | Very nice guy but more inclined to be the nice guy who wants to give each side something.  Not as smart as Ferguson |
| | | James Montana | Know very well – workable – wife is a good friend |
| | | James Ferguson | Know very well - workable - Former Assistant US Attorney, wife is a former assistance |
| | | William McGrath | Knows him personally |
| | | James Munson | Knows him personally |
| | | James Gardner | Former Partner, now retired (for > 20 years), thinks highly of him |
| | | William McGrath | Knows him |

17584458.1
227691-10003

| | | |
|---|---|---|
| **Redacted** | Jack Freedman Roy Rifkin | Both are great |
| | Hon. Marc Marmaro | Very good |
| | Hon. Marc Marmaro | Was a partner at Jeffer Mangels before taking the bench.  He is very smart and good, don't know how much entertainment experience he has. |
| | Hon. Marc Marmaro | He is smart, was a very good judge and will have good experience in entertainment matters. |
| | Jack Freedman | He is good. He really cares about getting things right. |
| | Jack Freedman | Good arbitrator who usually handles film finance disputes for IFTA. Used him twice. |
| | Hon. Marc Marmaro | One of the best trial lawyers in LA, handles business and entertainment disputes. Big firm background. |
| | Roy Rifkin | Solid business litigation and IFTA arbitrator. |

CONFIDENTIAL

ATTICUS_0000010

| Redacted | Sol Rosenthal | My be very old now. Billy Crystal's long time lawyer.  Long time IFTA and AAA arbitrator. |
|----------|---------------|------------|

CONFIDENTIAL

ATTICUS_0000011

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| --- | --- |
| To: | Lembke, Matt (mlembke@bradley.com) |
| Sent: | 5/24/2019 9:56:53 AM |
| Subject: | DPC v. Estate of Harper Lee |

Confidential and Privilege
Joint Defense Privilege
Common Interest Privilege

Matt,

Slightly belatedly, below is the memo I discussed with you regarding the possibility that each new stage production of the Sergel play is a new derivative work, and therefore can no longer be licensed by Sergel following termination.  This idea is worth exploring with Bob Clarida.  At a minimum, it gives Sergel a real downside in the arbitration, and gives the arbitrators an opportunity to "split the baby" (which in my experience arbitrators love to do), by rejecting both Sergel's theory of exclusivity, and our theory of a complete loss of rights.  Frankly, while the below theory has issues, I think it is a hell of lot better than their theory of exclusivity.  As we discussed, this e-mail is without prejudice to any rights that my client may have against the Estate, for breach of contract or otherwise.  If you or Bob want to discuss this theory further with me, either of you should feel free to call.

Jonathan

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
jzavin@loeb.com
212-407-4161
310-282-2227

Jonathan,

# Redacted

# Redacted

# Redacted

CONFIDENTIAL
ATTICUS_0000014

# Redacted

CONFIDENTIAL
ATTICUS_0000015

# Redacted

Nathalie Russell | Associate
**LOEB & LOEB LLP** | nrussell@loeb.com
345 Park Avenue | New York, NY 10154
Direct 212.407.4182 | Fax 646.514.2938

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

ATTICUS_0000016

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| To: | Matt Lembke |
| Sent: | 8/13/2019 9:36:31 AM |
| Subject: | Fwd: TKAM - Arbitration w/ DPC |

Matt,

I got your voice-mail message regarding potential expert witnesses.  Sorry it has taken me so long to respond.  Below is the e-mail I sent you some months ago with suggestions.  Did you talk to these people and reject them, or were some unwilling to be retained?  I need to know before I circle back with people asking for more names.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

Begin forwarded message:

**From:** <jzavin@loeb.com>
**Date:** March 25, 2019 at 2:43:21 AM EDT
**To:** Matt Lembke <mlembke@bradley.com>
**Subject: TKAM - Arbitration w/ DPC**

Matt,

Here are some more potential experts, with brief descriptions of who they are:

Paul Libin.  Octogenarian, produced all sorts of things.  Retired from Jujamcyn (one of the two major theater owners in New York) but continues to run Circle in the Square Theater.  Would know what the norm was in 1969.  917-716-9213.

MIchael David, runs the Dodgers, a major theater producer.  In His seventies and has been active in the theater

all his life.

Nell Nugent, also in her 70's.  Still a producer.

These next four are or were heads of larger competing play licensing services.  They might be reluctant to limit stock and repertoire, but if they were willing to testify favorably, they could be compelling witnesses.

Bruce Lazarus at Samuel French
Peter Hagen, Current head of Dramatist Play Service
Steve Sultan, Used to be head of Dramatist Play Service
Steve Spiegel, head of TRW, new entrant, but he was at other licensing service for decades.

I don't have contact information for most of these, but they should be easily findable on the internet.  If you reach out to any of these, you can say they were suggested by Joey Parnes.

Again, the same reservations as in my last e-mail on this subject.

Best regards,

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

ATTICUS_0000018

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 8/28/2019 7:54:23 PM |
| **Subject:** | TKAM |

Matt,

I got your voicemail re the British theater expert. I'd asked Scott's people about this and I reminded them again today. They promise to get back to me tomorrow.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

ATTICUS_0000019

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt (mlembke@bradley.com) |
| **Sent:** | 9/26/2019 3:58:35 PM |
| **Subject:** | TKAM Arbitration - Possible Expert Witnesses |

Matt,

Here are the names of two possible experts who were suggested by the British co-producer of TKAM. Scott thinks both would be ok.  I'm trying to get more contact info for them, I only have an e-mail for Harrison.  However, I assume that Monk could be reached through the Ambassador Theatre Group. Let me know whether either of these work.  If they don't, I'll try to get more.

Jonathan

-
**NICKY MONK**

Venue Bookings Manager at The Ambassador Theatre Group (Venues) Limited

**MICHAEL HARRISON**

Michael Harrison's West End musicals include *The Bodyguard* at the Adelphi and Dominion Theatres, *Gypsy* at the Savoy, *Mrs Henderson Presents* at the Noel Coward, *Annie* at the Piccadilly, Mel Brooks' *Young Frankenstein* at the Garrick Theatre, *Fiddler on the Roof* at The Playhouse and *Joseph and the Amazing Technicolor Dreamcoat* at the London Palladium.  He is managing director of Qdos Entertainment and has created over 100 pantomimes for the company. He also created *Cinderella, Dick Whittington* and *Snow White* at the iconic London Palladium. In 2018 *Dick Whittington* won the Laurence Olivier Award for Best Entertainment and Family.  *Gypsy* won four Laurence Olivier Awards including Best Musical Revival and was filmed for transmission on television both in the UK and the USA.
michael@michaelharrisonentertainment.co.uk

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
jzavin@loeb.com
212-407-4161
310-282-2227

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | ktottis@tottislaw.com |
| **CC:** | Matt Lembke |
| **Sent:** | 10/1/2019 12:55:42 PM |
| **Subject:** | Sergel v. The Estate of Harper Lee |

Kevin,

We have received the document subpoena in this arbitration. I understand from Matt Lembke that there is a confidentiality agreement in place between the parties. Matt has agreed on behalf of the Estate that any documents we produce would be subject to this confidentiality agreement. Would you agree to the same, on behalf of Sergel. Assuming we can agree on the confidentiality of these documents pursuant to that confidentiality agreement, we hope to produce the documents within the 10 days requested. I will let you know if we're running behind that schedule.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

ATTICUS_0000023

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | Kevin Tottis |
| CC: | Matt Lembke |
| BCC: | nrussell@loeb.com |
| Sent: | 10/1/2019 1:06:01 PM |
| Subject: | Re: Sergel v. The Estate of Harper Lee |

Kevin,

Thanks.  I take this exchange of e-mails as binding on the parties, and don't think we need anything further.  You or Matt should let me know immediately if either of you thinks we need anything further.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On Oct 1, 2019, at 1:01 PM, Kevin Tottis <ktottis@tottislaw.com> wrote:



Yes we'll agree.  Let us know if you hit any snags with production.
Kevin



Sent from my T-Mobile 4G LTE Device



-------- Original message --------
From: Jonathan Zavin <jzavin@loeb.com>
Date: 10/1/19 12:55 PM (GMT-05:00)
To: Kevin Tottis <ktottis@tottislaw.com>
Cc: Matt Lembke <mlembke@bradley.com>
Subject: Sergel v. The Estate of Harper Lee

Kevin,

We have received the document subpoena in this arbitration.  I understand from Matt Lembke that there is a confidentiality agreement in place between the parties.  Matt has agreed on behalf of the Estate that any documents we produce would be subject to this confidentiality agreement.  Would you agree to the same, on behalf of Sergel.  Assuming we can agree on the confidentiality of these documents pursuant to that confidentiality agreement, we hope to produce the documents within the 10 days requested.  I will let you know if we're running behind that schedule.

CONFIDENTIAL

ATTICUS_0000024

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.
To comply with U.S. Treasury Regulations: This communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the tax laws of the United States, or promoting, marketing or recommending to another party any transaction or matter addressed in this communication (and any attachment).

Confidentiality Statement:

This message (including any attachments) is intended only for the individual or entity to which it is addressed. It may contain privileged or confidential information that is exempt from disclosure under applicable laws. If you are not the intended recipient, please note that you are strictly prohibited from disseminating or distributing this information (other than to the intended recipient) or copying this information. If you have received this communication in error, please notify us immediately by e-mail or by telephone at 312-527-1400.

CONFIDENTIAL

ATTICUS_0000025

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | Lembke, Matt |
| Sent: | 10/14/2019 2:40:57 PM |
| Subject: | Re: Arbitration filed 3/7/19 |

Thanks.


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

On Oct 14, 2019, at 2:40 PM, Lembke, Matt <mlembke@bradley.com> wrote:




Bradley Arant Boult Cummings LLP
Matthew H. Lembke
Partner
e: mlembke@bradley.com w: bradley.com
d: 205-521-8560 f: 205-488-6560
1819 Fifth Avenue North
Birmingham, Alabama 35203

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 10/21/2019 8:02:57 AM |
| **Subject:** | TKAM |

Matt,

Did Michael Harrison ever get back to you? I both e-mailed him and called him to explain the situation. If he hasn't, I'll suggest to Scott that he call him, or try to come up with other names.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 10/22/2019 8:57:50 AM |
| **Subject:** | Re: TKAM |

Did the call happen?  Is a a suitable witness and will he do it?


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On Oct 21, 2019, at 2:14 PM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

Matt


Matthew H. Lembke
Partner | Bradley
205.521.8560

-----Original Message-----
From: Jonathan Zavin [mailto:jzavin@loeb.com]
Sent: Monday, October 21, 2019 7:03 AM
To: Lembke, Matt <mlembke@bradley.com>
Subject: TKAM

[External Email]

Matt,

Did Michael Harrison ever get back to you? I both e-mailed him and called him to explain the situation. If he hasn't, I'll suggest to Scott that he call him, or try to come up with other names.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue

ATTICUS_0000028

New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

_____

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | Matt Lembke |
| Sent: | 12/2/2019 8:50:37 AM |
| Subject: | TKAM |

Matt,

Here is a suggestion for who might call for a witness on the London theater:

 Jonathan Hull/Jonathan Hull Associated - 44-20-3755-3319 and jonathan@jonathanhullassociates.com.

He was recommended by Jonathan Lonner, one of Scott's theater lawyers in NY.  Lonner says that he is a very knowledgeable theater lawyer in London, who could possibly either testify himself, or would know producers who could testify.  The other name that Lonner gave me was a lawyer at Harbottle and Lewis, but since they represented Jonathan Church, I think it would be inappropriate to call him.  By the way, have you noticed how many "Jonathan's" are involved in this e-mail?  And I thought I was unique.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000031

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| --- | --- |
| To: | Lembke, Matt |
| Sent: | 12/2/2019 7:40:30 PM |
| Subject: | Re: TKAM |

Great.  Who did you find?


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

On Dec 2, 2019, at 3:58 PM, Lembke, Matt <mlembke@bradley.com> wrote:



Jonathan:

# Redacted

Matt

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560



**From:** Jonathan Zavin [mailto:jzavin@loeb.com]
**Sent:** Monday, December 02, 2019 7:51 AM
**To:** Lembke, Matt <mlembke@bradley.com>
**Subject:** TKAM

**[External Email]**

Matt,

Here is a suggestion for who might call for a witness on the London theater:

 Jonathan Hull/Jonathan Hull Associated - 44-20-3755-3319 and jonathan@jonathanhullassociates.com.

He was recommended by Jonathan Lonner, one of Scott's theater lawyers in NY.  Lonner says that he is a very
knowledgeable theater lawyer in London, who could possibly either testify himself, or would know producers

ATTICUS_0000032

who could testify.  The other name that Lonner gave me was a lawyer at Harbottle and Lewis, but since they represented Jonathan Church, I think it would be inappropriate to call him.  By the way, have you noticed how many "Jonathan's" are involved in this e-mail?  And I thought I was unique.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

ATTICUS_0000033

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 12/9/2019 9:02:52 AM |
| **Subject:** | TKAM |

Matt,

Could you tell me the name of the London theater witness you're using. Scott is going to want to know. Thanks.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000034

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| --- | --- |
| To: | Lembke, Matt |
| Sent: | 1/22/2020 3:59:35 PM |
| Subject: | Re: London production and U.S. Tour of TKAM |

Matt,

Rehearsals in London are currently scheduled to start on April 6, 2020, and rehearsals for the first national tour are currently scheduled to start on July 6, 2020.

Did you get the opposition brief on the motion for partial summary judgment. How is it? Is it possible to share the briefs with me?

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

On Jan 22, 2020, at 12:47 PM, Lembke, Matt <mlembke@bradley.com> wrote:


Jonathan:

Redacted

Matt



**Matthew H. Lembke**
Partner
e:mlembke@bradley.com w:bradley.com

ATTICUS_0000035

d: 205.521.8560f: 205.488.6560
Bradley Arant Boult Cummings LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119

LinkedIn | Facebook | Twitter | Instagram | Blogs | My Bio

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

CONFIDENTIAL

ATTICUS_0000036

| From: | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| To: | Matt Lembke |
| Sent: | 11/2/2020 4:50:19 PM |
| Subject: | DPC |

Matt,

Not to bug you, but please do send me the CVs of the experts. Thanks.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000043

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 11/2/2020 5:03:06 PM |
| **Subject:** | Re: DPC |

Understood.  Thanks.


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad


On Nov 2, 2020, at 4:54 PM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

Matthew H. Lembke
Partner | Bradley
205.521.8560


-----Original Message-----
From: Jonathan Zavin <jzavin@loeb.com>
Sent: Monday, November 2, 2020 3:50 PM
To: Lembke, Matt <mlembke@bradley.com>
Subject: DPC


[External Email]


Matt,


Not to bug you, but please do send me the CVs of the experts. Thanks.


Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

CONFIDENTIAL
ATTICUS_0000044

212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

ATTICUS_0000045

Why the postponement?  Scott will want to know.  Also, any luck with the copyright office?  The postponement should give them more time.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

On Jan 25, 2021, at 5:57 PM, Lembke, Matt <mlembke@bradley.com> wrote:


Jonathan:

**Redacted**

Matt


| <image001.jpg> | **Matthew H. Lembke**
Partner
e:mlembke@bradley.com w:bradley.com
d: 205.521.8560 f: 205.488.6560
Bradley Arant Boult Cummings LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119

LinkedIn | Facebook | Twitter | Instagram | Blogs | My Bio |

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

CONFIDENTIAL

ATTICUS_0000053

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 3/10/2021 5:23:09 PM |
| **Subject:** | DPC Arbitration |

Matt,

I think the arbitration is coming up soon (March 18?). Did the Arbitrators decide on the motion to dismiss DPC's new claims? Also, if you are going to submit additional briefing on the exclusivity issue, if it is no problem for you, I'd like to see the brief on this point before it is submitted. I may have some thoughts on it, hopefully constructive.

Best,

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000061

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 7/15/2021 3:21:33 PM |
| **Subject:** | Re: Post-termination exclusivity brief insert |

Thanks.  Will do.

Sent from my iPhone

---

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

---

On Jul 15, 2021, at 3:09 PM, Lembke, Matt <mlembke@bradley.com> wrote:

CONFIDENTIAL --  SUBJECT TO COMMON INTEREST PRIVILEGE

Jonathan:

# Redacted

Matt

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.
<Post-termination exclusivity brief insert 4833-1563-0066 v.1.docx>

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 7/16/2021 9:13:35 PM |
| **Subject:** | DPC Arbitration |

Matt,

I know you sent me the summary judgement briefs on the exclusivity issue before, but I can't find them. Could you send them to me again. Thanks.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

ATTICUS_0000083

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 7/17/2021 4:27:27 PM |
| **Subject:** | Re: arbitration briefs |

Thanks

Sent from my iPhone

> On Jul 17, 2021, at 4:17 PM, Lembke, Matt <mlembke@bradley.com> wrote:
>
> This email originated from outside of Loeb's Network. Here you go. Matthew H. Lembke Partner | Bradley 205.521.8560
-----Original Message----- From: Lembke, Matt Sent: Saturday, February 15, 2020 4:27 PM To: Jonathan Zavin <jzavin@loeb.com>

# Redacted

>
> Matthew H. Lembke
> Partner | Bradley
> 205.521.8560
>
> -----Original Message-----
> From: Lembke, Matt
> Sent: Saturday, February 15, 2020 4:27 PM
> To: Jonathan Zavin <jzavin@loeb.com>
> Subject: arbitration briefs
>
> Jonathan:

# Redacted

> Matt
>
>
> Matthew H. Lembke
> Partner | Bradley
> 205.521.8560
>
> _____
>
> Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb &

ATTICUS_0000084

| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
|---|---|
| **To:** | 'Lembke, Matt' |
| **Sent:** | 7/27/2021 9:58:57 AM |
| **Subject:** | RE: Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX |

Matt,

Could you send me a copy of this portion of the brief as submitted?  Thanks.

Jonathan

**From:** Lembke, Matt <mlembke@bradley.com>
**Sent:** Friday, July 23, 2021 6:47 PM
**To:** Jonathan Zavin <jzavin@loeb.com>
**Subject:** RE: Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX

# Redacted

**Matthew H. Lembke**
Partner | Bradley
mlembke@bradley.com
205.521.8560

**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Friday, July 23, 2021 1:55 PM
**To:** Lembke, Matt <mlembke@bradley.com>
**Cc:** Wook Hwang <whwang@loeb.com>
**Subject:** Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX



Matt,

Here are some comments on the excerpt of the brief regarding the exclusivity argument.  The basic change is we found more legal support for the argument.  Obviously you will adopt or not adopt this as you will.  I've been somewhat out of pocket this week, so my partner Wook Hwang, has taken the lead on this.  If you or Bob Clarida have any questions about anything in our version, you should address them to both of us.

Regards,

Jonathan

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL
ATTICUS_0000094

# EXHIBIT 1

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 9/25/2020 12:55:27 PM |
| **Subject:** | TKAM |

Matt,

What is the current status/schedule of the arbitration?

Best regards,

Jonathan

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

CONFIDENTIAL

ATTICUS_0000041

# EXHIBIT 2

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 4/6/2021 5:54:32 PM |
| **Subject:** | DPC Arbitration |

Matt,

What is the status of the arbitration. Have you testified yet, so that you can talk to me about it?

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

# EXHIBIT 3

**From:**         Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com>
**To:**            Lembke, Matt
**Sent:**          4/23/2021 4:17:59 PM
**Subject:**      Re: Dramatic Arbitration

Unbelievable.  How many days has it gone so far?


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On Apr 23, 2021, at 4:10 PM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560



**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Friday, April 23, 2021 3:06 PM
**To:** Lembke, Matt <mlembke@bradley.com>
**Subject:** Re: Dramatic Arbitration

**[External Email]**

---

No objection.  What is the schedule for completion of the arbitration?

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

---

CONFIDENTIAL                                                    ATTICUS_0000069

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

On Apr 23, 2021, at 3:49 PM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

Matt

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

<18cv3300 Settlement Term Sheet.pdf>

ATTICUS_0000070

# EXHIBIT 4

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 4/23/2021 4:21:56 PM |
| **Subject:** | Re: Dramatic Arbitration |

It is hard to imagine that much testimony being needed, or relevant, but I look forward to you telling me about this when it's over.

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On Apr 23, 2021, at 4:20 PM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560

**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Friday, April 23, 2021 3:18 PM
**To:** Lembke, Matt <mlembke@bradley.com>
**Subject:** Re: Dramatic Arbitration

**[External Email]**

Unbelievable.  How many days has it gone so far?

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On Apr 23, 2021, at 4:10 PM, Lembke, Matt <mlembke@bradley.com> wrote:

ATTICUS_0000071

# Redacted

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560

**From:** Jonathan Zavin <jzavin@loeb.com>
**Sent:** Friday, April 23, 2021 3:06 PM
**To:** Lembke, Matt <mlembke@bradley.com>
**Subject:** Re: Dramatic Arbitration

**[External Email]**

No objection.  What is the schedule for completion of the arbitration?

Jonathan

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

On Apr 23, 2021, at 3:49 PM, Lembke, Matt <mlembke@bradley.com> wrote:



Matt

**Matthew H. Lembke**
Partner |Bradley
mlembke@bradley.com
205.521.8560

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

CONFIDENTIAL

ATTICUS_0000072

<18cv3300 Settlement Term Sheet.pdf>

CONFIDENTIAL

ATTICUS_0000073

# EXHIBIT 5

**From:**      Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com>
**To:**        Matt Lembke
**Sent:**      5/20/2021 10:02:27 AM
**Subject:**   DPC Arbitration

Matt,

What is the status of the arbitration? Have you testified yet, and can you talk to me about it?

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

# EXHIBIT 6

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Lembke, Matt |
| **Sent:** | 5/26/2021 11:30:45 AM |
| **Subject:** | Re: DPC Arbitration |

Matt,

Any word on whether you can talk to me.  Both my client and I are, to say the least, curious as to what's going on.

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

On May 25, 2021, at 11:28 AM, Lembke, Matt <mlembke@bradley.com> wrote:

# Redacted

Matt


Matthew H. Lembke
Partner | Bradley
205.521.8560

-----Original Message-----
From: Jonathan Zavin <jzavin@loeb.com>
Sent: Thursday, May 20, 2021 9:02 AM
To: Lembke, Matt <mlembke@bradley.com>
Subject: DPC Arbitration

[External Email]

Matt,

CONFIDENTIAL

ATTICUS_0000077

What is the status of the arbitration? Have you testified yet, and can you talk to me about it?

Jonathan


Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227


Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

_____


Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

# EXHIBIT 7

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **Sent:** | 6/14/2021 8:12:57 AM |
| **Subject:** | DPC Arbitration |

Matt,

What is the status of the arbitration? Any end in sight?

Jonathan

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

ATTICUS_0000079

# EXHIBIT 8

| | |
|---|---|
| **From:** | Jonathan Zavin <jzavin@loeb.com> on behalf of Jonathan Zavin <jzavin@loeb.com> |
| **To:** | Matt Lembke |
| **CC:** | Wook Hwang |
| **Sent:** | 7/23/2021 2:55:19 PM |
| **Subject:** | Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX |
| **Attachments:** | Mockingbird Excerpt re Termination (Post-Hearing Brief).DOCX |

Matt,

Here are some comments on the excerpt of the brief regarding the exclusivity argument.  The basic change is we found more legal support for the argument.  Obviously you will adopt or not adopt this as you will.  I've been somewhat out of pocket this week, so my partner Wook Hwang, has taken the lead on this.  If you or Bob Clarida have any questions about anything in our version, you should address them to both of us.

Regards,

Jonathan

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
212-407-4161
310-282-2227

Sent from my iPad

CONFIDENTIAL

ATTICUS_0000086

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | No. 1:22-cv-10147-DLC |
| *Plaintiff*, | |
| and | |
| AARON SORKIN, | |
| *Involuntary Plaintiff*, | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant*. | |

## <u>NOTICE OF APPEAL</u>

Please take notice that Defendant The Dramatic Publishing Company appeals to the

United States Court of Appeals for the Second Circuit from the final judgment entered by the

Court on August 1, 2023 (ECF No. 92) as amended August 28, 2023 (ECF No. 100), as well as

the Court's orders and opinions, including, but not limited to, the orders and opinions entered

on April 27, 2023 (ECF Nos. 65, 66), July 24, 2023 (ECF No. 87), and July 25, 2023 (ECF No.

88).

Dated:  August 30, 2023

Respectfully submitted,

TOTTISLAW

By: /s/ Kevin Tottis
    Kevin Tottis (*Admitted pro hac vice*)
    Keith Stolte (*Admitted pro hac vice*)
    Max A Stein (*Admitted pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com

**JA-721**

kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. +1 212 813 8800
smentzer@goodwinlaw.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :
ATTICUS LIMITED LIABILITY COMPANY,   :      22cv10147 (DLC)
                                     :
                      Plaintiff,     :      OPINION AND ORDER
     and                             :
                                     :
AARON SORKIN,                        :
                                     :
           Involuntary Plaintiff,    :
                                     :
                -v-                  :
                                     :
THE DRAMATIC PUBLISHING COMPANY,     :
                                     :
                      Defendant.     :
                                     :
-------------------------------------X
```

APPEARANCES:

For plaintiff Atticus Limited Liability Company:
Jonathan Zavin
Wook J Hwang
Frank David D'Angelo
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

Keane A. Barger
Loeb & Loeb, LLP
35 Music Square East
Suite 310
Nashville, TN 37203

For defendant The Dramatic Publishing Company:
Kevin Tottis
Keith Stolte
Max A. Stein
TottisLaw
401 N. Michigan Avenue
Suite 530
Chicago, IL 60611

David Blasband

McLaughlin & Stern, LLP
260 Madison Avenue
New York, New York 10016

Stefan M Mentzer
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

DENISE COTE, District Judge:

On August 1, 2023, judgment was entered for the plaintiff, Atticus Limited Liability Company ("Atticus"), in this copyright action.  This Court found as a matter of law that the defendant, The Dramatic Publishing Company ("Dramatic"), does not have exclusive rights to amateur productions of a play derived from Harper Lee's novel To Kill a Mockingbird.  On August 15, Atticus moved for attorney's fees pursuant to § 505 of the Copyright Act.  For the following reasons, Atticus is awarded a portion of the costs it seeks.

## Background

Familiarity with the Opinions issued in this litigation is presumed.  See Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co., 22cv10147 (DLC), 2023 WL 3135745 (S.D.N.Y. Apr. 27, 2023); Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co., 22cv10147 (DLC), 2023 WL 4706770 (S.D.N.Y. July 24, 2023).  Only those facts relevant to Atticus' motion for attorney's fees are summarized below.

2

This lawsuit concerns rights to perform amateur productions of a play derived from Harper Lee's 1960 novel <u>To Kill a Mockingbird</u> (the "Novel").  In 1969, Lee granted Dramatic exclusive rights to license amateur acting rights to dramatizations of her novel (the "1969 Agreement").  Pursuant to the 1969 Agreement, Dramatic's then-President, Christopher Sergel, wrote a stage adaptation of the Novel (the "Sergel Play").  In 2011, Lee terminated the 1969 Agreement pursuant to § 304(c) of the Copyright Act, and subsequently entered into an agreement with Rudinplay, Inc.[1] to create a new dramatic adaption of the Novel, the "Sorkin Play."

On March 7, 2019, following a dispute over planned productions of the Sergel Play, Dramatic filed an arbitration demand against the Lee Estate.  In its demand, Dramatic asserted that the Lee Estate had breached the 1969 Agreement by hindering the full exercise of Dramatic's rights and interfering with its related licensing contracts.  Dramatic sought, <u>inter alia</u>, a declaration that it maintained exclusive amateur stage rights for any adaptation of <u>To Kill a Mockingbird</u>.  The arbitrator entered an interim award on October 21, 2021, and a final award on January 28, 2022 (collectively, the "Arbitration Award").

---

[1] Rudinplay and Atticus are entities owned, controlled, or operated by Scott Rudin.

3

The Arbitration Award found that Dramatic's exclusive rights
survived Lee's 2011 termination letter.  Additionally, as
relevant to this motion, the Arbitration Award requires the Lee
Estate to indemnify Dramatic against lawsuits brought by
Atticus, Rudinplay, and other similar third parties.  The
Arbitration Award is currently on appeal to the U.S. Court of
Appeals for the Seventh Circuit.

Atticus filed this federal lawsuit on November 30, 2022,
seeking a declaration that (1) "Atticus and Sorkin have the
right, in relation to [Dramatic], to present any and all Second-
Class, Stock, Amateur and Ancillary Performances [] of the
Sorkin Play in the United States;" and (2) "any such productions
of the Sorkin Play have not infringed and could not infringe any
purported copyright interest [Dramatic] claims to hold to the
Novel."  Dramatic moved to dismiss the complaint on January 23,
2023.  On February 6, Atticus cross-moved for summary judgment.

The Court denied Dramatic's motion to dismiss and granted
in part Atticus' cross-motion in its April 27 Opinion.  See
Atticus, 2023 WL 3135745.  The Court held that as a matter of
copyright law, specifically § 304(c) of the Copyright Act,
Dramatic does not currently possess exclusive rights to perform
in the U.S. amateur theatrical productions of works derived from
the Novel.  Id. at *5.  The Opinion, however, left open the

4

**JA-726**

question of whether Atticus' right to assert as much was limited
by the doctrine of claim preclusion based on the ruling in the
Arbitration Award.  Id. at *13.

On May 11, Dramatic filed its answer, raising for the first
time a statute of limitations defense.  In a conference held on
May 25, Dramatic informed the Court that it planned to move for
summary judgment on the ground that the statute of limitations
bars this action.  Also in the conference, the Court addressed
whether Dramatic was entitled to discovery and the scope of any
such discovery with respect to the remaining defense of claim
preclusion.  The Court accepted Atticus' offer to produce its
own counsel's communications with counsel for the Lee Estate
during the period of the arbitration.  An Order of May 25 set a
briefing schedule for Dramatic's anticipated motion and set a
deadline of June 16 for the parties to submit a status letter
regarding fact discovery.

On June 2, Dramatic filed a motion for summary judgment
asserting its statute of limitations defense.  On June 16, the
parties submitted a letter regarding the status of fact
discovery on the issue of claim preclusion.  In an Opinion of
July 24, the Court denied Dramatic's motion for summary judgment
on its statute of limitations defense both "on the merits and as
untimely."  Atticus, 2023 WL 4706770, at *1.  The Court noted

5

that Atticus' "ownership interest in the Sorkin Play is not
being litigated here and therefore the three-year statute of
limitations under the Copyright Act for claims about its
ownership interest has not been triggered, much less run." Id.
at *3.  In an Order of July 25, the Court denied Dramatic's
motion for summary judgment due to claim preclusion.  The Order
stated that "Dramatic has failed to put forth any evidence
suggesting that Atticus controlled the Lee Estate's conduct in
the arbitration."[2]  Judgment was entered for the plaintiffs on
August 1.[3]

On August 15, Atticus moved for attorney's fees pursuant to
Rule 54(d) of the Federal Rules of Civil Procedure and 17 U.S.C.
§ 505.  The motion became fully submitted on September 22.
Atticus seeks to recover over $400,000 in attorney's fees.

On August 30, Dramatic filed a notice of appeal.  The
appeal is currently pending in the U.S. Court of Appeals for the
Second Circuit.

---

[2] The July 25 Order gave Dramatic an opportunity to show cause
why judgment should not be entered for Atticus following the
July 25 denial of its summary judgment motion.  Dramatic did not
seek to further litigate its theory of claim preclusion.

[3] On consent, an amended judgment was entered on August 28 to
clarify the geographic scope of the judgment.

## Discussion

Under the Copyright Act, a court may "in its discretion" award a reasonable attorney's fee to the prevailing party.  17 U.S.C. § 505.  A court may not, however, award "attorney's fees as a matter of course; rather, a court must make a more particularized, case-by-case assessment."  Kirtsaeng v. John Wiley & Sons, Inc., 579 U.S. 197, 202 (2016) (citation omitted).  In making that assessment, a court may consider "several nonexclusive factors," including "frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence."  Id. (citation omitted).  "[S]ignificant weight" should be given to the objective reasonableness or unreasonableness of the losing party's litigating position.  Id. at 209.  Yet despite its significance, objective reasonableness "can be only an important factor in assessing fee applications -- not the controlling one," and courts must take caution to avoid giving it "dispositive weight."  Id. at 208-09 (citation omitted).  Courts must instead "view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals."  Id. at 209.

Those goals are "well settled."  Id. at 204.  The Act "serves the purpose of enriching the general public through

7

access to creative works." Id. (citing Fogerty v. Fantasy,
Inc., 510 U.S. 517, 527 (1994)).  It does so "by striking a
balance between . . . encouraging and rewarding authors'
creations while also enabling others to build on that work."
Id.

Atticus principally argues that its motion for attorney's
fees should be granted because the defendant's litigation
positions were objectively unreasonable.  It describes
Dramatic's contention that exclusive licenses are interminable
as "nonsensical," unreasonable, frivolous, and contrary to an
unambiguous provision in the Copyright Act.  It accuses Dramatic
of pressing for needless discovery in pursuit of its unfounded
speculation that Atticus controlled the Lee Estate in the
Estate's arbitration with Dramatic.  Finally, Atticus argues
that Dramatic's resort to a statute of limitations bar was
"unfounded."

Atticus also argues that Dramatic's conduct throughout the
litigation, including its repeated requests for discovery and
its untimely assertion of a statute of limitations defense,
unnecessarily prolonged the litigation.  Lastly, Atticus argues
that a fee award is necessary to further the purposes of the
Copyright Act because (1) Atticus has vindicated "the ability of
amateur performers and their audiences across the United States

8

to enjoy both the Sorkin Play and Dramatic's version" and (2)
Dramatic has incurred no costs in this litigation due to the
indemnification relief granted in the Arbitration Award, and
accordingly there is a need for deterrence.

As explained in the July 24 Opinion, the arbitrator erred
in his construction of § 304(c) of the Copyright Act.  See
2023 WL 4706770, at *3.  But, Dramatic having prevailed in the
arbitration, this Court cannot find that Dramatic was
unreasonable in relying on that same interpretation of § 304(c)
when sued by Atticus.  To take any other position while Dramatic
was defending the Arbitration Award before the Court of Appeals
for the Seventh Circuit would have been unusual.  Therefore,
Dramatic premised much of its defense in this litigation on the
legal arguments presented to and adopted by the arbitrator in
Dramatic's proceedings against the Lee Estate.

It should be noted, however, that Dramatic appears to have
finally accepted that its § 304(c) argument is legally
untenable.  For this reason, in opposing this motion for
attorney's fees, it has mischaracterized the arguments it has
presented to this Court.  In its brief in opposition to the
motion for attorney's fees, Dramatic states that "Dramatic never
-- not once -- claimed that the termination provision can never
apply to an exclusive license."  Dramatic also added that it is

9

a "gross mischaracterization" for Atticus to suggest that
"Dramatic advanced the nonsensical position that exclusive
licenses are interminable."  But, from the beginning of this
litigation, that is the very position that Dramatic advanced.
Dramatic consistently asserted that "the words in the [Copyright
Act's derivate works] exception say that all of the terms of an
exclusive grant survive termination."[4]  Repeatedly, in this
litigation, Dramatic insisted that it continued to hold
exclusive rights following the termination of its license.
Despite this troubling attempt to reframe its litigation
positions, the Court declines to impose § 505 sanctions for
asserting as a defense a legal argument upon which it prevailed
in the arbitration.[5]

Atticus is correct, however, that Dramatic needlessly and
unreasonably prolonged this litigation following the issuance of
the Court's April 27 Opinion.  Dramatic felt little restraint in
doing so since it is indemnified for the costs it incurred
defending this litigation.  It had no financial incentive to
restrain its litigation conduct and was not sufficiently mindful

---

[4] See Brief for Dramatic at 21, Atticus Ltd. Liab. Co. v.
Dramatic Publ'g Co., 22cv10147 (DLC), (S.D.N.Y. Jan. 23, 2023)
(ECF No. 29).

[5] Atticus points out that no court has held that an award in a
private arbitration carries any persuasive value in a subsequent
action against distinct parties.

of its obligations to act in good faith and advance arguments
reasonably supported by the facts and the law.

Dramatic's untimely assertion of a statute of limitations
defense unreasonably created additional motion practice and
delayed entry of judgment.  Dramatic's briefing on the issue was
nearly unintelligible and "invite[d] serious error."  <u>Atticus</u>,
2023 WL 4706770, at *3.  Likewise, Dramatic's preclusion
argument, based on Atticus' purported "control" of the Estate's
conduct in the arbitration, was far-fetched, untethered to any
reliable evidence, and based on repeated misstatements of the
legal definition of control.  <u>See</u> <u>Atticus</u>, 2023 WL 3135745, at
*11.

Dramatic gives scant attention in its brief to the request
for attorney's fees premised on these two unreasonable
litigation positions.  Dramatic does argue, however, that it
"exercised restraint" in its discovery requests because Dramatic
did not serve any document requests or interrogatories on the
issue of Atticus' purported control of the Lee Estate in the
arbitration, and because Atticus volunteered to produce its
counsel's emails exchanged with the Lee Estate during the
arbitration.  It also argues that this discovery was crucial in
"indicating the extent of Atticus' involvement in the underlying
arbitration."  Dramatic again mischaracterizes the record.  In

its Rule 56(d) statement, Dramatic "request[ed] discovery on a
variety of topics."  Atticus only volunteered the email
discovery "in the interest of putting this issue to rest" given
Dramatic's continued conjecture on the issue of control.  The
Court also notified the parties that it would control the scope
of discovery to save the parties' "time and expense" and to
prevent "a fishing expedition" on "theories that are implausible
on their face."  Even after Atticus produced counsel's emails,
Dramatic continued to rely on unsubstantiated speculation and
requested "additional, targeted discovery."  Moreover,
Dramatic's discovery requests were premised on repeated
misstatements of the law, law which the Court had set out in its
April 27 Opinion.  See 2023 WL 3135745, at *11-12.

Dramatic next argues that its statute of limitations
defense was reasonable because "it viewed Atticus' declaratory
judgment claim as one involving competing claims of ownership
and not copying," and because Dramatic cited cases to support
that contention.  This attempt to relitigate the merits of its
defense fails.  As the Court stated in its July 24 Opinion,
Dramatic's arguments in support of its statute of limitations
assertion "invite[d] serious error" and made "little sense."
2023 WL 4706770, at *3.

12

Finally, Dramatic argues that a fee award would not advance the public interest.  Not so.  Dramatic is in the business of licensing stock and amateur rights to its derivative work, the Sergel Play.  Through this lawsuit, amateur performers and their audiences will now have access as well to the Sorkin Play.  This public access to the two copyrighted works derived from the Novel is very much in the public interest.  Dramatic's assertion that it had the exclusive right to perform in amateur productions a derivative work from Harper Lee's masterpiece does not vindicate the public interest.

Dramatic does not contest that the amount of the requested attorney's fees is reasonable.  Accordingly, in an exercise of this Court's discretion, and after consideration of the goals of the Copyright Act, <u>Kirtsaeng</u>, and its progeny, Atticus' motion for attorney's fees is granted in part.  Atticus is entitled to recover the reasonable fees that it has incurred litigating this action since the Court issued its April 27, 2023 Opinion.

<u>Conclusion</u>

Atticus' August 15, 2023 motion for attorney's fees is granted in part.  Atticus is awarded attorney's fees associated with litigating the case since April 27, 2023.  A scheduling

13

order addressing the calculation of the fee award accompanies

this Opinion.

Dated:     New York, New York
           October 31, 2023

                                    _____
                                        DENISE COTE
                              United States District Judge