# 23-1226-cv

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

ATTICUS LIMITED LIABILITY COMPANY,
*Plaintiff - Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,
*Defendant - Appellant.*

On Appeal from the United States District Court for the
Southern District of New York, No. 1:22-cv-10147-DLC (Cote, J.)

## BRIEF OF DEFENDANT-APPELLANT

William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

May 1, 2024

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Kevin Tottis
TOTTISLAW
401 N Michigan Avenue
Suite 530
Chicago, IL 60611
(312) 527-1400

*Counsel for Defendant-Appellant*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Dramatic Publishing Company states that it has no parent corporation and no public company owns ten percent or more of its stock.

May 1, 2024

*/s/ William M. Jay*
William M. Jay

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ...............................................................5

STATEMENT OF THE ISSUES....................................................................5

STATEMENT OF THE CASE........................................................................6

     A.    Under the terms of the 1969 Agreement, Dramatic's Sergel Play is the exclusive adaptation of *To Kill a Mockingbird* for non-first-class performances. ..............................................................6

     B.    Congress amends the Copyright Act to create a termination right, subject to the Derivative Works Exception. ...............................8

     C.    Lee sends Dramatic a notice of termination, but then purports to grant Rudin and ALLC non-first-class rights before the termination's effective date...............................................................10

     D.    An arbitrator determines Dramatic retains exclusive non-first-class performance rights...................................................................11

     E.    ALLC files this case in New York, seeking to relitigate issues decided in the arbitration....................................................................17

     F.    Directly contradicting the arbitral award, the district court holds Dramatic does not retain exclusive non-first-class rights. ..................18

     G.    The district court denies Dramatic's motion for summary judgment on the statute of limitations and enters judgment against Dramatic.................................................................................21

SUMMARY OF THE ARGUMENT .....................................................24

STANDARD OF REVIEW ...................................................................28

ARGUMENT ........................................................................................29

I.    ALLC's Suit Fails Under The Derivative Works Exception. .......................29

     A.    Under the text of the Exception as construed in *Mills Music*, Dramatic's non-first-class rights survive termination.........................29

B.     The district court's reading of the Exception is contrary to *Mills Music* and violates basic interpretive canons. ......................................33

II.   ALLC's Suit Fails Because Its Grant Was Not "Made After The Effective Date Of Termination." ..................................................................39

       A.     The grant of non-first-class rights in the 2015 Agreement was not valid under the Act's timing provision. ........................................39

       B.     The district court's cursory rejection of the timing argument was error. ...........................................................................................41

       C.     ALLC's arguments for avoiding application of the timing provision fail...............................................................................................42

III.   ALLC's Suit Is Time-Barred. ...........................................................................45

       A.     ALLC's claim is for ownership and therefore accrued in early 2019. .........................................................................................................45

       B.     Dramatic did not forfeit its limitations defense. ................................50

IV.   ALLC's Suit Is Barred By Preclusion. ..........................................................55

CONCLUSION ...........................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ...................................................................28

*Artists Rights Enforcement Corp. v. Est. of King*,
224 F. Supp. 3d 231 (S.D.N.Y. 2016) .........................................40, 41

*Baldwin v. EMI Feist Catalog, Inc.*,
805 F.3d 18 (2d Cir. 2015) ............................................................40, 44

*Benzemann v. Houslanger & Assocs., PLLC*,
924 F.3d 73 (2d Cir. 2019) ...................................................................50

*Borthwick v. First Georgetown Sec., Inc.*,
892 F.2d 178 (2d Cir. 1989) .................................................................50

*Brown v. City of New York*,
862 F.3d 182 (2d Cir. 2017) .................................................................28

*Clean Air Council v. U.S. Steel Corp.*,
4 F.4th 204 (3d Cir. 2021) ....................................................................57

*Coleman v. Tollefson*,
575 U.S. 532 (2015).............................................................................56

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014).................................................................................38

*Davis v. Shah*,
821 F.3d 231 (2d Cir. 2016) .................................................................54

*Dramatic Publ'g Co. v. Carter*,
608 F. Supp. 3d 618 (N.D. Ill. 2022).............................................16, 58

*Dramatic Publ'g Co. v. Est. of Lee ex rel. Carter*,
2022 WL 17986696 (N.D. Ill. Dec. 29, 2022)....................................16

*Elliott v. Cartagena*,
84 F.4th 481 (2d Cir. 2023) ..................................................................51

iii

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998) ...................................................................36

*Henry v. Daytop Vill., Inc.*,
    42 F.3d 89 (2d Cir. 1994) .....................................................................42

*Kwan v. Schlein*,
    634 F.3d 224 (2d Cir. 2011) ................................. 22, 27, 46, 47, 48, 49

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018)..........................................................................35

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153 (1985)..... 3, 9, 14, 19, 24, 25, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39

*Monahan v. N.Y. City Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000) .................................................................56

*Murphy for Nat'l Lab. Rels. Bd. v. Cayuga Med. Ctr. of Ithaca*,
    715 F. App'x 108 (2d Cir. 2018) ..........................................................55

*Narragansett Elec. Co. v. Am. Home Assur. Co.*,
    999 F. Supp. 2d 511 (S.D.N.Y. 2014) ...........................................52, 53

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..............................................................................42

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) ..............................................................57

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..............................................................................34

*Range Rd. Music, Inc. v. Music Sales Corp.*,
    76 F. Supp. 2d 375 (S.D.N.Y. 1999) ...................................................40

*Rose v. AmSouth Bank of Fla.*,
    391 F.3d 63 (2d Cir. 2004) ...................................................................54

*Santos v. Dist. Council of N.Y. City & Vicinity of United Bhd. of
    Carpenters & Joiners of Am.*,
    619 F.2d 963 (2d Cir. 1980) .................................................................52

*Simmons v. Stanberry*,
   810 F.3d 114 (2d Cir. 2016) (per curiam) ..............................................27, 47, 48

*Taylor v. Sturgell*,
   553 U.S. 880 (2008)..................................................................................28, 56, 59

*Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*,
   262 F.3d 559 (6th Cir. 2001) ........................................................................57, 59

*Tourangeau v. Uniroyal, Inc.*,
   101 F.3d 300 (2d Cir. 1996) ................................................................................57

*United States v. All Funds Distributed To, or o/b/o Weiss*,
   345 F.3d 49, 54 (2d Cir. 2003) ...........................................................................28

*United States v. Carter*,
   696 F.3d 229 (2d Cir. 2012) ...............................................................................34

*Warner-Lambert Co. v. Northside Dev. Corp.*,
   86 F.3d 3 (2d Cir. 1996) .....................................................................................55

*Weinstein Co. v. Smokewood Ent. Group, LLC*,
   664 F. Supp. 2d 332 (S.D.N.Y. 2009) ................................................................45

*Woods v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995) .................................................................................36

*Wright v. Ernst & Young LLP*,
   152 F.3d 169 (2d Cir. 1998) ...............................................................................45

**Statutes:**

17 U.S.C. § 101 ........................................................................................................8

17 U.S.C. § 106(2) ...................................................................................................8

17 U.S.C. § 203 ........................................................................................................8

17 U.S.C. § 203(a) ...................................................................................................8

17 U.S.C. § 203(b) ...................................................................................................8

17 U.S.C. § 203(b)(1)...............................................................................................8

17 U.S.C. § 203(b)(4) .................................................................10

17 U.S.C. § 304(c) ...............................................................8, 33

17 U.S.C. § 304(c)(3) ...............................................................9

17 U.S.C. § 304(c)(4)(A) .........................................................9

17 U.S.C. § 304(c)(6) ............................8, 9, 19, 24, 29, 33

17 U.S.C. § 304(c)(6)(A) ................ 2, 8, 9, 24, 29, 31, 33, 34, 35

17 U.S.C. § 304(c)(6)(D) ................ 2, 5, 10, 18, 26, 40, 44

17 U.S.C. § 304(c)(6)(E) .........................................................37

17 U.S.C. § 507(b) ............................................................5, 26, 45

28 U.S.C. § 1291 ........................................................................5

28 U.S.C. § 1331 ........................................................................5

28 U.S.C. § 1338(a) ..................................................................5

**Rules:**

Fed. R. Civ. P. 8(c)(1) ............................................................52

Fed. R. Civ. P. 8(d)(3) ............................................................42

Fed. R. Civ. P. 12(a)(4) ..........................................................21

Fed. R. Civ. P. 12(b) ..........................................................51, 52

Fed. R. Civ. P. 56(b), Advisory Committee's note to 2010 amendment.................51

**Legislative Materials:**

*Further Discussions and Comments on Preliminary Draft for Revised*
   *U.S. Copyright Law*, 88th Cong., 2d Sess., Copyright Law
   Revision, Pt. 4 (H. Judiciary Comm. Print 1964).............................39

H.R. Rep. No. 94-1476 (1976)..............................................8, 31

S. Rep. No. 94-473 (1975) ......................................................44

**Other Authorities:**

*To Kill a Mockingbird*, Encyclopedia Britannica,
   https://www.britannica.com/topic/To-Kill-a-Mockingbird-film-
   1962.......................................................................................................6

*Restatement (Second) of Judgments* § 40 (1980)...............................................56, 58

*Subject to,* Black's Law Dictionary (6th ed. 1990) ..................................................57

**INTRODUCTION**

This is a dispute over exclusive performance rights for stage adaptions of Harper Lee's novel *To Kill a Mockingbird*. In 1969, Lee agreed to grant The Dramatic Publishing Company ("Dramatic") an exclusive license for a theatrical version of the novel. The district court issued a declaratory judgment concluding that Lee could and did revoke Dramatic's exclusivity. That judgment misinterpreted the Copyright Act, improperly relitigated a question Lee's estate had already lost in another forum, and disregarded the statute of limitations for exclusivity disputes. For each of these independent reasons, the declaratory judgment should be reversed.

In 1969, Lee authorized the creation of a stage adaptation of her book by the playwright Christopher Sergel. Lee's agreement with Dramatic, Sergel's company, provided that the Sergel Play would be the only stage adaptation of *To Kill a Mockingbird* (the "Novel") that Lee would permit to be performed in amateur and regional professional productions—so-called "non-first-class" productions. Lee reserved her right to license a stage adaptation of the Novel for performance for "first-class" productions—mainly Broadway and London's West End.

A later amendment to the Copyright Act permitted Lee to terminate her prior licenses, subject to two important limitations. First, the statute preserved Dramatic's rights in the Sergel Play as a "derivative work" Sergel created under the license from Lee: "A derivative work prepared under authority of the grant before its termination

1

may continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 304(c)(6)(A). This is called the Derivative Works Exception. Second, the statute precluded Lee from re-licensing Dramatic's rights to anyone *except* Dramatic until "after the effective date of the termination." *Id.* § 304(c)(6)(D). The district court granted a declaration allowing Lee's new licensee to flout both these requirements.

The effective date of the termination was April 26, 2016. *Before* that date, in 2015, Lee granted producer Scott Rudin the right to create a new stage adaptation, the Sorkin Play, and purported to give Rudin exclusive rights for *all* stage performances of the Novel, subject only to Dramatic's non-exclusive right to mount non-first-class productions. This 2015 Agreement expressly recognized that the grant of exclusive performance rights is "subject to the rights granted under the" 1969 Agreement, "as limited by [Lee's] termination." The rights under the 2015 Agreement are assigned to appellee Atticus LLC ("ALLC"), one of Rudin's companies.

Lee died soon after signing the 2015 Agreement. Rudin and ALLC then began coordinating with Lee's Estate to interfere with Dramatic's performance rights, including threatening to sue productions lawfully licensed by Dramatic. ALLC's interference caused the cancellation of several productions of the Sergel Play, including a major tour in the United Kingdom. Forced to defend its performance

rights, Dramatic filed and won a lengthy arbitration against Lee's Estate. ALLC collaborated with the Estate throughout the arbitration proceeding and even drafted the most salient portion of the Estate's brief addressing the exclusivity issue.

The arbitrator held, among other things, that under the plain terms of the Derivative Works Exception, Dramatic continues to have the right to use the Sergel Play as the exclusive adaptation of the Novel for non-first-class performances, and therefore ALLC has no right to license non-first-class performances of the Sorkin Play. The Northern District of Illinois confirmed the award.

After the Estate lost the arbitration, ALLC filed this action, challenging the same exclusivity finding it had unsuccessfully litigated via the Estate in the arbitration. ALLC sought a declaration that the arbitration award was wrong—that ALLC *does* have the right to license the Sorkin Play for non-first-class productions. The district court agreed and granted the requested declaration. For multiple reasons, this Court should reverse that judgment.

First, the declaration removes a right the Derivative Works Exception secures. Under the Exception, Dramatic retains the right to perform the Sergel Play "under the terms of the grant" from Lee. The Supreme Court has held that language "preserve[s] the total contractual relationship," though only for derivative works completed before the termination, as the Sergel Play was. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 169 (1985). The district court wrongly thought the contractual

3

provision granting Dramatic its limited exclusivity is not among "the terms of the grant" that survive termination.

Second, the district court inexplicably ignored the plain terms of § 304(c)(6)(D), which render the re-grant of non-first-class rights to ALLC invalid. Lee re-granted those rights *before* termination of Dramatic's grant, during a time when the statute limited Lee to making a new deal *with Dramatic*. Thus, regardless of Dramatic's rights, ALLC never received the rights the declaration recognizes.

Third, ALLC admitted it knew by early 2019 that Dramatic claimed continuing exclusive rights in non-first-class productions that would exclude ALLC. The Copyright Act requires that a claim sounding in ownership (including a claim, like ALLC's, challenging Dramatic's possession of exclusive rights to non-first-class productions) be brought within three years after the dispute arises. But ALLC waited more than three years to sue. The district court wrongly refused to apply this Circuit's precedent on accrual of ownership disputes and instead treated ALLC's action as if it were purely an infringement suit.

Finally, even though the 2015 Agreement makes ALLC's rights "subject to" Dramatic's, the district court wrongly concluded ALLC is not bound by a final judgment regarding Dramatic's rights rendered by an arbitrator and confirmed in federal court.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on August 1, 2023. SPA49-50. Dramatic timely appealed on August 30, 2023. JA721-722.

# STATEMENT OF THE ISSUES

Whether the district court's judgment must be reversed for any of the following reasons:

1. Under the Derivative Works Exception and *Mills Music*, Dramatic retains the right to "utilize[]" the Sergel Play as the exclusive adaptation of the Novel for non-first-class productions "under the terms of the" 1969 Agreement.

2. Under 17 U.S.C. § 304(c)(6)(D), the purported grant of non-first-class rights in the 2015 Agreement was invalid, because that grant was made before April 26, 2016, "the effective date of the termination" of the 1969 Agreement.

3. The suit is barred by the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b), because the exclusivity dispute at the heart of the case accrued more than three years before suit.

4. The suit is barred by res judicata, because the 2015 Agreement expressly states the rights in it are "subject to" the rights in the 1969 Agreement, and ALLC therefore agreed to be bound by the arbitrator's determination of those rights.

## STATEMENT OF THE CASE

**A.**     **Under the terms of the 1969 Agreement, Dramatic's Sergel Play is the exclusive adaptation of *To Kill a Mockingbird* for non-first-class performances.**

Harper Lee published *To Kill a Mockingbird* in 1960.  JA20(¶12).  The Novel, which examines race and community in a small Alabama town during the Great Depression, won the Pulitzer Prize in 1961, JA20(¶12), and was adapted the next year into an Oscar-winning film starring Gregory Peck, *see To Kill a Mockingbird*, Encyclopedia Britannica, https://www.britannica.com/topic/To-Kill-a-Mockingbird -film-1962.  Today, *To Kill a Mockingbird* occupies a special place in American culture as an iconic work of modern literature with broad popular appeal. JA20(¶12).

In 1969, with the Novel's reputation and popularity established, Harper Lee decided to authorize a stage adaptation of the Novel, but not on Broadway.  She entrusted the task to Christopher Sergel, a playwright and then-president of Dramatic.  Founded in 1885, Dramatic "is a small family-owned company ... engaged in the business of licensing stock and amateur rights to stage plays, which it also publishes."  JA536(¶1).

The 1969 Agreement memorialized the terms of Lee's grant to Dramatic. Under that contract, Lee "grants to [Dramatic] the complete right throughout the world" "[t]o write or cause to be written a dramatization based upon and/or adapted

from the [Novel], but agrees that said dramatization (herein called the 'Play') is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed." JA175. The agreement defined "[a]mateur acting rights" to encompass non-first-class rights—including "stock" and "repertoire" professional productions, but excluding "Broadway" and comparable "first-class professional" productions. JA176.

In exchange for these exclusive rights, Dramatic contracted to pay Lee certain royalties, including 25% of revenue from licensing its stage adaptation. JA175. Lee retained the right to license Broadway or other first-class productions. Dramatic agreed that if she ever did, during the run of any such production or tour, Dramatic would not license any performance within 25 miles of a set of large U.S. cities. JA177. Finally, the 1969 Agreement specifies "[a]ny controversy arising out of" it would be decided through arbitration. JA176.

Pursuant to the 1969 Agreement, Dramatic adapted the Novel into the Sergel Play. JA87. For the next several decades, Dramatic exercised its exclusive rights under the terms of the grant and licensed the Sergel Play for non-first-class productions across the country, including amateur and student performances, and also productions at leading regional theaters like the Guthrie, Steppenwolf, and the Huntington. JA100-102. Dramatic paid Lee royalties from these non-first class productions for decades. JA101.

**B.    Congress amends the Copyright Act to create a termination right, subject to the Derivative Works Exception.**

In 1976, as part of its comprehensive revision of the copyright law, Congress adopted a provision allowing authors to terminate licenses and assignments of copyrights. The author (or certain successors) may terminate an "exclusive or nonexclusive grant of a transfer or license." 17 U.S.C. § 304(c); *see id.* § 203(a).[1] Termination causes the rights to revert to the author (or successors). Congress thought this provision would "safeguard[] authors against unremunerative transfers," *i.e.*, the risk that authors will license their works too cheaply before the works become successful. H.R. Rep. No. 94-1476, at 124 (1976). But "[i]n all cases the reversion of rights is subject to [c]ertain limitations." 17 U.S.C. § 304(c)(6); *see id.* § 203(b). One of those exceptions is the Derivative Works Exception. *Id.* § 304(c)(6)(A); *see id.* § 203(b)(1).

"A 'derivative work' is a work based upon one or more preexisting works," such as a "dramatization" of a novel or "sound recording" of a musical work. *Id.* § 101. A copyright owner has the exclusive right to authorize *new* derivative works. *See id.* § 106(2). But Congress recognized that reverting the rights in *existing*

---

[1] This case involves § 304(c) rather than § 203 because the Novel was already under copyright when the revised statute took effect in 1978. The primary substantive difference is that § 304(c) applies only to grants of rights under the "renewal copyright," the term of which the 1976 amendments extended (from 28 to 47 years), and its timing provisions are keyed to that extended renewal period.

derivative works to the creator of the original work would be unfair to the playwrights, screenwriters, recording artists, and others who create derivative works under license from the creator of the original work. In that specific category, therefore, the drafters sought to "preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion." *Mills Music*, 469 U.S. at 173 (citation omitted).

Accordingly, under the Derivative Works Exception, "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 304(c)(6)(A). Construing the phrase "under the terms of the grant," the Supreme Court explained that the Exception "preserve[s] the total contractual relationship," so that *all* the terms of the grant governing use of the derivative work survive termination. *Mills Music*, 469 U.S. at 169. The Exception protects only works completed before termination, however: "this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work." 17 U.S.C. § 304(c)(6)(A).

Termination is permitted within a five-year period beginning 56 years after the copyright was secured, and requires at least two years' advance notice plus advance recordation in the Copyright Office. *Id.* § 304(c)(3), (c)(4)(A). The notice period implicates another "limitation[]" on "the reversion of rights." *Id.* § 304(c)(6).

During the notice period, the author cannot re-grant the rights subject to termination *except* to "the original grantee" or its successors; otherwise, "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after *the effective date* of the termination." *Id.* § 304(c)(6)(D) (emphasis added); *see id.* § 203(b)(4) (same).

### C. Lee sends Dramatic a notice of termination, but then purports to grant Rudin and ALLC non-first-class rights before the termination's effective date.

In April 2011, Lee served Dramatic with a notice "terminat[ing] the grant of transfer of copyright(s) made in [the 1969 Agreement]." JA182-183. The notice specified "[t]he effective date of termination shall be April 26, 2016," fifty-six years after Lee secured the copyright for the Novel. JA183.

On June 29, 2015—nearly a year *before* termination became effective—Lee signed a new agreement with Rudinplay, a company controlled by Scott Rudin, the prominent film and stage producer. Under the 2015 Agreement, Rudinplay was allowed "to procure a playwright" to make a new stage adaptation of the Novel. JA226. The 2015 Agreement also purported to grant Rudinplay an option to exercise "on an exclusive ... worldwide basis, all live stage rights in and to the Novel and all subsidiary and ancillary rights related to such live stage rights." JA226.

That grant of exclusive rights has an important caveat. The 2015 Agreement "acknowledges" the grant to Dramatic in the 1969 Agreement, as well as Lee's

purported termination of the grant. After this acknowledgement, the 2015 Agreement provides "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 Agreement], as limited by such termination." JA226-227.

Rudinplay[2] next engaged Aaron Sorkin, the playwright and screenwriter, to create the Sorkin Play. JA23(¶23). Sorkin granted Rudinplay exclusive rights to produce and present the Sorkin Play. JA23-24(¶¶24-27). Finally, in December 2018, Rudinplay assigned all its relevant rights—including under the 2015 Agreement—to ALLC, another entity controlled by Rudin. JA24(¶28); SPA5-6. That same month, the Sorkin Play premiered on Broadway. JA25(¶29).

### D. An arbitrator determines Dramatic retains exclusive non-first-class performance rights.

1. Lee died in February 2016. JA87. Rudin began pushing Lee's representatives to "prevent[] or hinder[] Dramatic's full exercise of its stock and amateur rights." JA157 (arbitrator's findings). Lee's Estate caved to the pressure. JA157-158. Over the next several years, the Estate "repeatedly cooperated" with Rudin to try to "narrow Dramatic's [performance] rights to purely amateur rights"— in other words, to prevent Dramatic from licensing the Sergel Play to regional professional theaters, an important part of the non-first-class rights the 1969 Agreement had granted Dramatic. JA165.

---

[2] Rudinplay's name subsequently changed to No Ice, Inc. For simplicity, this brief refers to this entity throughout as "Rudinplay."

11

The issue came to a head in January 2019, when counsel for ALLC and the Estate wrote Dramatic regarding "a planned professional tour" of the Sergel Play "in the U.K. and Ireland." JA568; JA572. ALLC claimed it was "the exclusive worldwide licensee ... for live stage rights to the" Novel and threatened to sue for infringement. JA568-570. The Estate insisted Dramatic had no right to license the Sergel Play to *any* professional theaters, even non-first-class ones. JA572. In his own missives, Rudin accused Dramatic of committing "theft" and selling rights "which belong exclusively to me" and threatened to "move against [Dramatic] with aggression and alacrity." JA535. Around the same time, the Estate revoked exemptions it had already granted for performances of the Sergel Play that fell within the 1969 Agreement's geographic limitations, which kicked in once the Sorkin Play premiered on Broadway. *See* JA541-542(¶¶22-25); p. 7, *supra*.

In addition to threatening Dramatic, Rudin "issued a flurry of cease and desist letters" to various licensees of the Sergel Play. JA167-168. As a direct consequence, several planned performances of the Sergel Play were cancelled. JA166-168. "While Rudin took the lead" in issuing the cease and desist letters, "the Estate facilitated and enabled" these threats. JA168.

Dramatic responded by filing an arbitration demand against the Estate, alleging the Estate improperly coordinated with Rudin to limit the exercise of Dramatic's performance rights, in violation of the 1969 Agreement. JA86-87;

JA536-543(¶¶1-31). Dramatic sought, among other things, a declaration that it continues to have "the exclusive right to license" non-first-class performances "and that no other person or entity has such rights in any other stage version of the novel." JA543. ALLC admits it learned of the arbitration demand when Dramatic filed it in March 2019. JA616(18:15-25).

During the arbitration, ALLC and its counsel worked directly with the Lee Estate, drafting substantial portions of the Estate's post-hearing brief on the § 304 termination issue. *See* JA623-627, JA636-638. Its counsel also contacted the general counsel of the Copyright Office regarding the case, after which the Office changed its website discussion of § 304. *See* JA649-652, JA654-657. Both the Estate and ALLC cited the altered website in all their subsequent submissions to the arbitrator and courts in Illinois and New York. *Compare* JA632-647, *with* JA22(¶19), JA207, and JA479-480.

2.     After an evidentiary hearing spanning 25 days with more than 1,000 exhibits, the arbitrator entered an award for Dramatic. JA89.

First, the arbitrator determined the 1969 Agreement grants Dramatic exclusive rights to "non-first-class" productions—meaning *both* amateur *and* professional productions in regional and community theaters, but not Broadway, the West End, or certain other major professional productions. JA94-114. Next, the arbitrator held that, "by virtue of" the Derivative Works Exception, "Dramatic continues to hold

after termination of the original grant" its exclusive non-first-class rights. JA146. The arbitrator explained (JA148) this was required by the text of the statute, which makes "*all cases*" of termination "subject to" the "limitation" of the Exception. Because the Exception provides "a derivative work prepared under the original grant (as Sergel's play was) 'may continue to be utilized under *the terms of the grant* after its termination,'" and the terms of the 1969 Agreement include exclusive non-first-class rights for the Sergel Play, it follows that those rights survive termination under the Exception. JA148-149.

The Supreme Court's reading of the statute in *Mills Music* provided further support for the arbitrator's decision. JA149-152. The Court there stressed the Exception "preserve[s] the total contractual relationship" governing use of the derivative work. 469 U.S. at 169. And the "boundaries" of the contractual relationship are "defined by reference to the scope of the privilege … under the terminated grant." *Id.* at 164. The general right to recapture copyright through termination must yield to this express carve-out: "the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Id.* at 164.

The arbitrator also addressed the consequences of this holding for Lee's grant to Rudin. Because the rights in the 2015 Agreement "are expressly made subject to the rights Ms. Lee granted to Dramatic in the 1969 Agreement," and given the

arbitrator determined "Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of" the Novel. JA156-157.

Finally, the arbitrator determined the Estate breached the 1969 Agreement by attempting to hinder Dramatic from exercising its non-first-class rights. The arbitrator surveyed voluminous evidence showing the Estate had engaged in a years-long "appeasement process and coordination with" Rudin "to help him engage in a campaign against Dramatic's licenses," which had "caused considerable havoc" for Dramatic. JA157, 159, 166.

The arbitrator declared that "[t]he terms of the original grant in the 1969 Agreement survive termination," and under those terms "Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* … and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first class theater or stage rights." JA91. The arbitrator entered an injunction forbidding the Estate from assisting Rudin in mounting any non-first-class performance of the Sorkin Play, and further ordered the Estate to pay Dramatic any royalties from non-first-class performances of the Sorkin Play and to indemnify Dramatic for legal expenses in any dispute with Rudin or his affiliates over Dramatic's rights. JA91-92.

3.      Dramatic moved to confirm the arbitration award in the Northern District of Illinois, and the Estate moved to vacate it.  The court denied the Estate's motion and, as relevant here, rejected the Estate's argument that the arbitrator's decision "violat[ed] the rights of third parties, particularly Aaron Sorkin and [ALLC]."  *Dramatic Publ'g Co. v. Carter*, 608 F. Supp. 3d 618, 623-24 (N.D. Ill. 2022).  As the court explained, the 2015 Agreement provided "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 Agreement], as limited by such termination."  *Id.* at 624 (emphasis removed).  Because the "clause says that the rights granted to Rudinplay [and ALLC as its licensee] are subject to those previously granted to Dramatic," it follows that "if Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then Rudinplay [and ALLC] did not acquire that right."  *Id*.  "This is exactly what transpired":  the arbitrator determined Dramatic's non-first-class rights survived termination, and so Rudinplay and ALLC never acquired those rights in the first place. *Id.* at 624-25.

The court remanded to the arbitrator for clarification of his construction of Dramatic's "non-first-class" rights.   After the arbitrator issued the required clarification and a modified award, Dramatic renewed its motion to confirm, which the court granted.  *Dramatic Publ'g Co. v. Est. of Lee ex rel. Carter*, 2022 WL 17986696, at *3 (N.D. Ill. Dec. 29, 2022).  The Estate has appealed to the Seventh

16

Circuit, where briefing is currently stayed.  *See* Order, ECF No. 14, *Dramatic Publ'g Co. v. Est. of Lee ex rel. Carter*, No. 23-1309 (7th Cir. May 25, 2023).

### E.    ALLC files this case in New York, seeking to relitigate issues decided in the arbitration.

After the Illinois court rejected the Estate's attempts to vacate the arbitration award, ALLC filed this action on November 30, 2022—nearly four years after the dispute over Dramatic's performance rights commenced.  *See* pp. 11-13, *supra*.

The Complaint described at length "the exclusive stage rights" granted to ALLC through the 2015 Agreement, limited only by Dramatic's purportedly "nonexclusive" post-termination rights.  JA20-22(¶¶12-19).  The Complaint then attacked the arbitrator's "purported" decision "adjudicat[ing] the rights of" ALLC as "directly at odds with the" 2015 Agreement and "contrary" to the Copyright Act. JA27(¶¶34-36).  And the Complaint alleged Dramatic's "claim[] that it holds the 'exclusive' rights to present all 'non-first-class' productions derived from the Novel, pursuant to the arbitral award," was a direct threat to ALLC's rights.  JA28(¶41).

The Complaint accordingly "request[ed] declaratory judgment that":  (1) ALLC has "the right, in relation to [Dramatic], to present" non-first-class performances "of the Sorkin Play in the United States; and (2) any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to the Novel."  JA29(¶45).

**F.   Directly contradicting the arbitral award, the district court holds Dramatic does not retain exclusive non-first-class rights.**

1.   Dramatic moved to dismiss the Complaint.  First, the motion argued ALLC's claim fails as a matter of law because Dramatic retains exclusive rights for non-first-class productions under the Derivative Works Exception.  Second, Dramatic contended the "further grant" of Dramatic's non-first-class rights to Rudinplay in the 2015 Agreement was not valid because it was not "made after the effective date of the termination," as the statute required for a "further grant" to anyone other than Dramatic.  17 U.S.C. § 304(c)(6)(D); *see* JA49-50, 56-61.  Third, the motion asserted the action was barred by claim preclusion.  Among other bases for preclusion, Dramatic argued that, because the 2015 Agreement expressly "subordinate[s] the[] rights [in that contract] to those of Dramatic," ALLC agreed to be bound by the arbitrator's decision about the scope of Dramatic's rights.  JA50-51.

ALLC opposed dismissal and, even though Dramatic had not yet answered, cross-moved for summary judgment.  Dramatic responded to ALLC's arguments on the merits, but also argued twice that summary judgment for ALLC would be premature, both because Dramatic was entitled to further discovery on facts going to its preclusion arguments, and because Dramatic "ha[d] not had an opportunity to raise affirmative defenses."  JA411 n.1; JA433.

2.     The district court denied Dramatic's motion (which it converted to one for summary judgment, SPA12-13) and granted partial summary judgment to ALLC on a number of issues.  Starting with the "core" dispute over exclusive rights, the court determined "as a matter of law that Dramatic's rights are no longer exclusive." SPA3, 14.

The court held the grant of exclusive non-first-class rights to Dramatic in the 1969 Agreement did *not* survive termination under the Derivative Works Exception. The court reasoned that because the statute says an "exclusive" license (like a "nonexclusive" one) "is subject to termination," Dramatic cannot possibly retain any exclusive rights.  SPA16, 18.  Although the Derivative Works Exception is a "limitation[]" applicable  to "all cases" of termination, 17 U.S.C. § 304(c)(6), the court thought the Exception does not extend to exclusive rights.  Focusing solely on the Exception's use of the verb "utilize" without applying the adjacent prepositional phrase "under the terms of the grant," the court concluded the Exception merely allows non-exclusive use of a derivative work after termination, *even if* exclusivity was one of "the terms of the grant."  SPA16-17.  The court reasoned that this accorded with the termination provision's overall purpose to allow authors to recapture their copyrights, SPA16-17, but the court did not address the "countervailing" purpose of the Exception to "'preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion,'" *Mills Music*, 469 U.S.

at 173-74 (quoting legislative history).  The court also brushed aside the Supreme

Court's construction of "utilized under the terms of the grant" in *Mills Music* as

distinguishable because the contractual term in that case involved royalties, not

exclusivity.  SPA18-19.

The court did not meaningfully engage with Dramatic's § 304(c)(6)(D)

argument.  Without citing the statute, the court alluded to the issue in a footnote, but

rejected it because Dramatic advanced *other* arguments "recogniz[ing] the validity

of the 2015 Agreement."  SPA24 n.7; *see also* SPA27 n.9 (similar).

The court largely rejected Dramatic's claim-preclusion arguments.  SPA19-

34.  Among other things, the court disagreed that the 2015 Agreement bound ALLC

to the arbitrator's decision on the rights issue.  The court recognized that, under the

2015 Agreement, "Rudinplay's rights were 'subject to' the rights Lee had granted to

[Dramatic] in the 1969 Agreement."  SPA25.  And the court acknowledged fact

disputes over the degree of control Rudin and his affiliates exercised over the Estate

in the arbitration.  SPA32-34.  But since the 2015 Agreement did not show that

ALLC joined the 1969 Agreement or specifically consented to the arbitration clause,

the court decided there could be no agreement to be bound by anything decided in

the arbitration.  SPA24-25.

Although it decided a number of issues in favor of ALLC, the court awarded

ALLC summary judgment only "in part."  SPA34.  It kept the case open and

scheduled a conference with the parties so that, among other things, Dramatic could be given the opportunity to seek discovery into whether ALLC exercised control over the Estate's conduct of the arbitration and thus was in privity with the Estate. SPA34; *see* SPA30-34.

### G. The district court denies Dramatic's motion for summary judgment on the statute of limitations and enters judgment against Dramatic.

1.  All this took place before the time for Dramatic to answer the Complaint. *See* Fed. R. Civ. P. 12(a)(4). After the court denied its motion to dismiss, Dramatic timely filed its answer, raising a number of affirmative defenses, JA504-505, as it had said it would in its opposition to ALLC's motion for summary judgment, p. 18, *supra*. Relevant here, Dramatic averred that the action was time-barred because the exclusivity dispute between the parties accrued more than three years before ALLC filed suit. JA504-505.

The district court then held the promised status conference, where the parties agreed to limited discovery regarding ALLC's involvement in the arbitration, as relevant to preclusion. JA610-612(12:21-14:23). Dramatic also announced it intended to move for summary judgment on its statute of limitations defense. JA614(16:4-11). While expressing doubts that the defense was properly preserved, the district court set a schedule for Dramatic's motion. JA614-617(16:12-19:8).

2.     Dramatic's motion explained that ALLC's suit turns entirely on an issue of ownership—a dispute over exclusive rights—not infringement.  ALLC had stipulated (JA616(18:14-25)) it was aware of Dramatic's claim to exclusive non-first-class rights in the arbitration when it was first made, in March 2019.  Under Second Circuit precedent, an ownership claim accrued at that time.  *See Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011).  The three-year statute of limitations therefore barred ALLC's suit, which was filed in November 2022.  Dramatic also explained that the answer was the proper place to raise its limitations defense and that Dramatic argued against granting summary judgment before the answer deadline precisely for that reason.

The district court denied Dramatic's motion, reasoning that because the claims in the arbitration focused on *Dramatic's* claim for exclusive rights, a claim involving ALLC's rights could not have accrued then, despite ALLC's assertion of its purported exclusive rights at the time.  SPA41.  The court also concluded the ownership accrual rule set out in cases like *Kwan* was irrelevant because ALLC's "ownership interest in the Sorkin Play" was not at issue.  SPA43.  The court also stated that applying the statute of limitations would be unfair because ALLC "could not have known in March of 2019 that the arbitrator would issue an award premised on a fundamental error of copyright law."  SPA44.  After rejecting the limitations defense on the merits, the district court tersely held Dramatic had also forfeited the

defense when it "failed to raise this affirmative defense in its opposition to" ALLC's pre-answer "motion for summary judgment." SPA45.

3.     Contemporaneously, the parties wrote to address the limited discovery ALLC provided to Dramatic regarding ALLC's involvement in the arbitration. Dramatic explained the documents showed ALLC worked in lockstep with the Estate to defend against Dramatic's claims. For example, ALLC drafted the most salient portions of the Estate's briefing on the exclusivity issue in the arbitration and helped choose arbitrators and experts. *See* JA623-630; JA659-700. ALLC also asked the Copyright Office to intervene on the Estate's behalf, and appeared to convince the Office to change language on its website concerning the Derivative Works Exception, *see* JA649-652, JA654-657—language the Estate then relied on in the arbitration and ALLC relied on in the district court, *see* p. 13, *supra*. Dramatic requested additional discovery to further flesh out the extent to which ALLC worked with or directed the Estate on the exclusivity issue. JA619.

The district court refused to allow additional discovery. In a brief opinion, it dismissed Dramatic's preclusion argument as "unsubstantiated speculation" and granted ALLC full summary judgment. SPA47-48 (citation omitted). Soon after, the court entered final judgment, granting essentially the declaration ALLC sought in its complaint: that ALLC has "the right, in relation to Dramatic, to present any and all performances of the Sorkin Play in the United States," and that "[a]ny such

productions of the Sorkin Play have not infringed and do not infringe any copyright interest Dramatic holds in and to the Novel."  SPA52-53.

## SUMMARY OF THE ARGUMENT

The district court's judgment should be reversed for any of four independently sufficient reasons.

**I.**     Under the Derivative Works Exception, Dramatic retains the right to license the Sergel Play as the exclusive stage adaptation of the Novel for non-first class productions.

**A.**     "In all cases the reversion of rights" to the author through termination "is subject to" certain "limitations," including the Exception. 17 U.S.C. § 304(c)(6). It provides that "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."  *Id*. § 304(c)(6)(A).  In *Mills Music*, the Supreme Court held the Exception is a specific limitation on the more general termination right, so the ordinary "consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception."  469 U.S. at 164.  By its terms, the Exception "preserve[s] the total contractual relationship" governing use of the derivative work.  *Id.* at 169.  The "boundaries" of that contractual relationship are "defined by reference to the scope of the privilege … under the terminated grant." *Id.* at 164.  Thus, "the terms of the grant that were applicable to the use of derivative

24

works at the time of termination should remain in effect." *Id.* at 177. Under the Exception, then, a derivative work prepared before termination may continue to be used under *all* the terms of grant.

Applying this reading of the Exception to this case yields a straightforward result. No one disputes the Sergel Play is a derivative work prepared pursuant to the grant before termination. Nor does anyone dispute that exclusive non-first-class performance rights for the Sergel Play were among the "terms of the grant." It follows that, notwithstanding termination, Dramatic "may continue to ... utilize[]" the Sergel Play with exclusive non-first-class rights "under the terms of the grant."

**B.** The district court's reading of the Derivative Works Exception flouted the rules of construction and binding precedent. The court held the general termination provision trumped the more specific Exception that expressly "limit[s]" it, and dismissed the Supreme Court's construction based on an irrelevant factual distinction. The court also believed applying the ordinary meaning (or the Supreme Court's construction) of the Exception here would be contrary to Congress's purpose, but as the text itself reflects and as the Supreme Court recognized in *Mills Music*, part of Congress's purpose was to exempt use of already-completed derivative works specifically from the ordinary consequences of termination. Lee's Estate still retains the lion's share of copyright privileges under this reading, including the power to terminate licenses to her own works and to block the creation

of new derivative works.  None of the district court's reasons for resisting the text of the statute and the holding of *Mills Music* is valid.

**II.**     Regardless of Dramatic's rights after termination, ALLC never received the non-first-class rights recognized in the declaration.     Under § 304(c)(6)(D), "[a] further grant, or agreement to make a further grant," to a new grantee "of any right covered by a terminated grant is valid only if it is made after the effective date of the termination."  The effective date of termination for Dramatic's grant was April 26, 2016, but Lee purported to grant Rudinplay some of Dramatic's rights well before then.  The grant of non-first-class rights under that contract is therefore not "valid."

The district court relegated this issue to a cursory footnote with virtually no reasoning.  To the extent the court considered the issue at all, it appears to have rejected the argument for application of § 304(c)(6)(D) because it supposedly was in tension with other arguments Dramatic advanced based on the validity of the 2015 Agreement.  That is factually inaccurate and legally wrong.  Dramatic pleaded alternative arguments that were not inconsistent; and regardless, it did not *prevail* on one argument, so it cannot be estopped from even *asserting* the other.

**III.**     ALLC's suit is time-barred under the Copyright Act's three-year statute of limitations, 17 U.S.C. § 507(b).  When the "backbone" of the dispute turns on ownership (of which exclusivity is one aspect), the claim accrues when the dispute

ripens, even if the plaintiff later seeks to style the suit as an infringement action. *Kwan*, 634 F.3d at 229; *see Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) (per curiam). Applying that rule here, ALLC's action is untimely on its face. This case turns on ALLC's claims to share in rights that Dramatic owns exclusively, not a dispute over whether ALLC's productions infringe. By its own representations, ALLC knew Dramatic's position nearly four years before ALLC filed suit.

The district court's rejection of the limitations defense rested on a series of non sequiturs—most notably, the remarkable proposition that ALLC had no obligation to sue once it was aware of the exclusivity dispute because it could not have predicted the arbitrator would rule against the Estate. The district court also was wrong to hold Dramatic waived the issue by not raising it in opposition to ALLC's pre-answer motion for summary judgment. In its summary judgment response, Dramatic argued ALLC's motion was premature precisely because Dramatic had not yet had a chance to raise its affirmative defenses. Dramatic then timely raised the limitations defense in its answer and moved for summary judgment on it. That was everything necessary to assert the defense.

IV. ALLC's suit is barred by preclusion. As the district court recognized, the same rights dispute at issue here was determined in a final judgment against the Estate, confirmed by a federal court. But the district court held ALLC was not in privity with the Estate. That was wrong. A non-party can make an agreement that

binds it to a judgment. *Taylor v. Sturgell*, 553 U.S. 880, 893-94 (2008). All circumstances here confirm ALLC agreed to be bound by an authoritative construction of the 1969 Agreement. The 2015 Agreement states the rights granted in it are "subject to" to the rights in the 1969 Agreement, and disputes over the rights in that earlier contract were expressly directed to arbitration. Moreover, ALLC's actions showed it understood the consequences of losing the arbitration—it worked in lockstep with the Estate during those proceedings, going so far as to re-write the Estate's briefing on the exclusivity issue and to lobby the Copyright Office to come to the Estate's aid.

## STANDARD OF REVIEW

Review of the district court's decision on summary judgment is *de novo*. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 36 (2d Cir. 2021). The district court's determination that Dramatic forfeited its statute of limitations defense is reviewed for abuse of discretion, *Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017), but the legal errors in that forfeiture ruling are reviewed *de novo*, *United States v. All Funds Distributed To, or o/b/o Weiss*, 345 F.3d 49, 54 (2d Cir. 2003).

**ARGUMENT**

## I.   ALLC's Suit Fails Under The Derivative Works Exception.

The termination statute provides: "In all cases the reversion of rights" to the author after a termination "is subject to" enumerated "limitations." 17 U.S.C. § 304(c)(6). The very first limitation is the Derivative Works Exception. It states: "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." *Id.* § 304(c)(6)(A). As the Supreme Court explained in *Mills Music*, "under the terms of the grant" means what it says—the owner of a derivative work prepared before termination may continue to use it after termination under *all* the terms of the grant, from royalty rate to exclusivity. The statute does not permit continuing some terms but eliminating others. That means Dramatic may continue to use the Sergel Play with exclusive non-first-class rights, and the declaration to the contrary was error.

### A.   Under the text of the Exception as construed in *Mills Music*, Dramatic's non-first-class rights survive termination.

In *Mills Music*, the Supreme Court read the plain text of the Exception to "preserve the total contractual relationship" governing use of a derivative work prepared before termination. 469 U.S. at 169. That reading is dispositive.

1. *Mills Music* concerned an agreement between Snyder, a composer, and Mills Music, a publisher. 469 U.S. at 154-55. Snyder assigned the renewal copyright in a song to Mills in exchange for, among other things, "50 percent of all net royalties that Mills received for mechanical reproductions." *Id.* at 157. Mills issued licenses for mechanical reproductions of the song, each a derivative work, and paid half the royalties from these works to Snyder. *Id.* at 158. Eventually, Snyder's heirs terminated Mills's interest in the song copyright pursuant to § 304(c), then demanded a right to *all* royalties from the derivative works too. *Id.* at 162.

A panel of this Court sided with Snyder's heirs, relying on general observations about Congressional intent. *Id.* at 163. The Supreme Court granted certiorari and reversed, holding the Exception preserved Mills's right to license its derivative works under the 50-50 royalty-sharing arrangement, because it was one of the "terms of the grant" from Snyder to Mills.

2. The Court "start[ed] with an examination of the statutory text." *Mills Music*, 469 U.S. at 164. By its plain terms, the Exception was just that—"an *exception* from the reversion of rights that takes place when an author exercises his rights to termination." *Id*. (emphasis added). That means "the consequences of a termination … simply do not apply to derivative works that are protected by the Exception." *Id.* And by providing that derivative works completed before the termination "may continue to be utilized under the terms of the grant," 17 U.S.C.

30

§ 304(c)(6)(A), the statute directs that "[t]he boundaries of th[e] Exception are defined by reference to the scope of the privilege that had been authorized under the terminated grant and by reference to the time the derivative works were prepared." 469 U.S. at 164. The result is that the Exception "preserve[s] the total contractual relationship" that existed prior to termination. *Id.* at 169.

The Court rejected broad appeals to statutory purpose. The "general purpose" of the termination provision was indeed "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Id.* at 172-73. "The Exception in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—even if they were manifestly unfair to the author—from that broad objective." *Id.* at 173. The statute therefore "produce[s] an accommodation and a balancing among various interests." *Id.* at 174 n.41; *see also* H.R. Rep. No. 94-1476, at 127 (1976).

Equally unpersuasive was the argument that the statute was meant only to allow continued *use* of the derivative work, shorn of the other terms of the grant. That position was contrary to the text, and it would also allow authors undue leverage to renegotiate terms with the original grantee. *Id.* at 176-77.

With the statutory phrase "under the terms of the grant" construed, the case's outcome was straightforward. The mechanical reproductions licensed by Mills were

derivative works authorized under the terms of Snyder's grant. One of the terms of the grant was for Snyder to receive 50% of royalties from mechanical reproductions, not 100%. Accordingly, "[u]nder the terms of the grant in effect at the time of termination, Mills [wa]s entitled to a share of the royalty income in dispute." *Mills Music*, 469 U.S. at 178.

3.     Application of that reading of the Exception to this case is also straightforward.

All agree the Sergel Play is a derivative work prepared under the terms of the 1969 Agreement before termination. So "the consequences of [Lee's] termination that § 304 authorize[d] simply do not apply to" the Sergel Play. *Mills Music*, 469 U.S. at 164. And the Exception "preserve[s] the total contractual relationship" in the 1969 Agreement, so continued use of the Sergel Play is "defined by reference to the scope of the privilege … under" that contract. *Id.* at 164, 169. As part of the overall bargain, the 1969 Agreement states the Sergel Play "is to be the only" stage adaptation of the Novel "permit[ted] to be leased and/or licensed" for non-first-class productions. JA175. "Under the terms of the grant in effect at the time of termination," then, Dramatic "is entitled to" use the Sergel Play as the exclusive stage adaptation of the Novel for non-first-class productions. *Mills Music*, 469 U.S. at 178. This case should end there.

**B.** **The district court's reading of the Exception is contrary to *Mills Music* and violates basic interpretive canons.**

The district court arrived at the opposite conclusion by reading fragments of the statute out of context, elevating speculation about Congressional intent over the statute's plain terms, and unjustifiably brushing aside the Supreme Court's statutory interpretation in *Mills Music*.

1. The district court seized on language that an "exclusive" grant of copyright "is subject to termination," 17 U.S.C. § 304(c), and concluded this made the statute "unambiguous"—but it failed to construe the express *exception* to that language. SPA16. The court leaped to the conclusion that the Exception merely "permits a grantee to continue to 'utilize' derivative works created during the term of the license without the threat of litigation," and that it does not allow the grantee to "retain the right to prevent the author from licensing others to create new derivative works." SPA16-17. That conclusion disregards both the statute's structure (a general rule subject to exceptions) and the text of the key exception.

To begin, the district court concluded the statute unambiguously answers the question here by providing that an exclusive license, as well as a nonexclusive one, "is subject to termination." SPA16 (quoting 17 U.S.C. § 304(c)(6)). That is the starting point, not the end, because "[i]n all cases the reversion of rights is subject to the following limitations," 17 U.S.C. § 304(c)(6), the first of which is the Derivative Works Exception, *id.* § 304(c)(6)(A). The plain meaning of this text is that "the

*general*" termination "provision[]" must "give way to [the] *specific* … provision[]" in the Exception. *E.g.*, *United States v. Carter*, 696 F.3d 229, 232 (2d Cir. 2012). After all, it is a "commonplace of statutory construction that the specific governs the general," a canon with particular force when "a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). This is why *Mills Music* explained the Exception is "an exception from the reversion of rights that takes place when an author exercises his right to termination," and that "the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." 469 U.S. at 164.

The district court insisted that applying the Exception would "render[] any exclusive license interminable" and thus "eviscerate" the statute, SPA18, but that is plainly incorrect. All transfers, including licenses, may indeed be terminated, reverting the rights in the original work to the author (or her successor), including the right to create new derivative works. *See* 17 U.S.C. § 304(c)(6)(A). But "all" such reversions upon termination are "subject to" the Exception's specific protection for any *existing* derivative works; "[t]he critical point ... is whether [a derivative work] was 'prepared' before the termination." *Mills Music*, 469 U.S. at 173. Preserving the right to use such pre-termination derivative works—if any—under existing terms does not make the original license or transfer "interminable."

Thus, here, all Dramatic retains through the Exception is one narrow form of exclusivity for its own theatrical adaptation: the exclusive right to live, non-first-class stage performances of the Novel. None of the Estate's many other rights as owner of the copyright in the Novel is affected. The exclusive grant of rights from Lee to ALLC remains effective for first-class productions. The Estate retains rights over copying, adaptation, distribution, and performance in a range of other media. The Estate also retains the power to authorize the preparation of new derivative works based on the Novel.

2.     The reason why a derivative work may retain exclusivity following a termination is the language in the Exception that the district court completely failed to analyze: "utilized *under the terms of the grant*." 17 U.S.C. § 304(c)(6)(A) (emphasis added). Exclusivity survives only when it is one of the "terms of the grant." If the district court were right that a derivative work may still be utilized after termination, but only without regard to the terms of the grant, the prepositional phrase would be superfluous. This "statutory construction must be rejected, for it reads" language "out of the statute." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1755 (2018). Indeed, this use-only construction of the Exception was specifically argued for and rejected in *Mills Music*, which held instead that "the terms of the grant that were applicable to the use of derivative works at the time of termination should remain in effect." 469 U.S. at 176-77.

The district court attempted to distinguish *Mills Music* because it involved a royalty term and, thus, "did not address the question of whether an exclusive license remains exclusive following a valid termination." SPA19. But the fact that the case involved a different *type* of "term[] of the grant" (one about royalties rather than exclusivity) is irrelevant, because nothing specific to royalty terms was material to the Court's analysis. Rather, the Court held broadly that "the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)," and that the Exception "preserve[s] the total contractual relationship" that existed prior to termination. 469 U.S. at 164, 169. This Court has recognized the categorical nature of that holding and has repeatedly emphasized the Exception "preserve[s] during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works by derivative work owners or their licensees." *Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995); *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 23 (2d Cir. 1998) (same). There was no basis for the district court's refusal to follow on-point precedent.

Nor would it be possible to pick apart the parties' bargain to undo some terms but retain others. As with any contract, the "terms of the grant" are part of an integrated whole. In exchange for the right to use the Sergel Play with exclusive non-first-class rights, Dramatic agreed to precise economic terms, including paying

Lee royalties amounting to 25% of license revenue. JA175. Under the district court's selective elimination of the exclusivity term, Dramatic must pay the same rate for non-exclusive rights in the United States as it does for foreign markets, where all agree Dramatic's rights remain exclusive.[3] Similarly, Dramatic agreed that if Lee licensed an adaptation for first-class productions (as she ultimately did in the 2015 Agreement), the Sergel Play would not be performed "within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000" as long as any first-class production is running. JA177. This provision bars Dramatic from, say, licensing a high school production in Seattle, as long as an ALLC first-class production is mounted on Broadway. Under the district court's reading, even though Dramatic is barred from licensing productions in 80 markets while an ALLC first-class production is running, ALLC is free to simultaneously license as many non-first-class productions as it wishes in markets to which Dramatic is denied access under the terms of the original grant.

Dramatic would not have agreed to these terms without receiving exclusive non-first-class rights, and deleting the exclusivity term makes a hash of the others. Why, for example, should Dramatic continue paying a 25% royalty—a royalty premised on exclusive rights for non-first-class productions—if Dramatic no longer

---

[3] Termination does not affect any rights arising under foreign laws, 17 U.S.C. § 304(c)(6)(E), as the 2015 Agreement itself confirmed, JA227.

has exclusivity?  Why would Dramatic agree to eliminate its ability to license non-first-class-productions in major markets, but open the door for ALLC to license in those same markets without restriction?  The district court addressed none of these problems.

Applying the Exception's plain text, and the Supreme Court's construction of it, avoids any such issues.  Leaving *all* "the terms of the grant" in place where the Exception applies prevents the bargain between the parties from becoming incoherent and unfair.

3.     The district court also appealed to a general purpose indicated by the statute's legislative history—allowing authors who may have undervalued their works to recapture copyright.  SPA16.[4]  But "no legislation pursues its purposes at all costs," *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014), and the termination provision and its exceptions reflect a "balancing" between "countervailing purposes."  *Mills Music*, 469 U.S. at 174 & n.41.  As the Supreme Court explained, "[t]he Exception in § 304(c)(6)(A) was designed ... to exclude a specific category of grants—even if they were manifestly unfair to the author—from th[e] broad

---

[4] Lee, of course, had had more than "a fair opportunity to appreciate the true value of [her] work product," *Mills Music*, 469 U.S. at 172-73: she signed the 1969 Agreement only after the Novel spent 98 weeks on the bestseller list, won the Pulitzer Prize, and was adapted into an Oscar-winning movie that made millions at the box office.

objective" of the provision. *Id.* at 173. As to *those* grants, the statutory purpose "was to 'preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion.'" *Id.* (quoting *Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law*, 88th Cong., 2d Sess., Copyright Law Revision, Pt. 4, at 39 (H. Judiciary Comm. Print 1964)).

Applying the Exception as written fully honors the purpose of the Congress that wrote it. Preserving "the terms of the grant" means Dramatic retains the same rights in the Sergel Play it had before the termination. The district court wrongly reached the opposite result.

## II. ALLC's Suit Fails Because Its Grant Was Not "Made After The Effective Date Of Termination."

ALLC's suit fails under another provision of the Copyright Act as well. ALLC sought and won a declaration that it now holds non-first-class performance rights, but § 304(c)(6)(D) makes clear that Lee never validly transferred those rights because she did not comply with the Act's restrictions on timing. The district court's decision never even mentioned § 304(c)(6)(D) and relegated the timing issue to an unreasoned footnote.

### A. The grant of non-first-class rights in the 2015 Agreement was not valid under the Act's timing provision.

Under § 304(c)(6)(D), timing determines whether a re-grant of rights is "valid":

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of termination. As an exception, however, an agreement for such a further grant may be made between the author or [her successors] and the original grantee or [its successor], after the notice of termination has been served….

17 U.S.C. § 304(c)(6)(D). As this Court has recognized, the meaning of the provision is plain: "Between service of the [termination] notice and the date of termination, [an author] c[an] reach an agreement for a further grant of the terminated rights with [the original grantee] or its successor in title, *but no one else*." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015) (emphasis added).

The effect of the provision in this case is plain as well. April 26, 2016, is the effective date for termination of Lee's grant to Dramatic. JA183. The 2015 Agreement, from which ALLC purports to derive its rights, was made nearly ten months *before* termination of the grant to Dramatic became effective. The grant of non-first-class rights to ALLC "contravenes the terms of the Copyright Act and is thus invalid on its face." *Artists Rights Enforcement Corp. v. Est. of King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) (citation and quotation marks omitted) ("promise of future rights" predating effective dates of termination violated plain terms of § 304(c)(6)(D)); *Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F. Supp. 2d 375, 381 (S.D.N.Y. 1999) (similar). Accordingly, ALLC never properly obtained the

right to license the Sorkin Play for non-first-class productions, and its request for a declaration to the contrary "must fail as a matter of law." *Artists Rights Enforcement Corp.*, 224 F. Supp. 3d at 236 (refusing to issue declaration recognizing a grant that was ineffective under plain terms of § 304(c)(6)(D)).

## B. The district court's cursory rejection of the timing argument was error.

Dramatic briefed the issue of timing under § 304(c)(6)(D) in its motion to dismiss. *See* JA44-45. Yet the district court effectively ignored it. In a two-sentence footnote, the court briefly acknowledged the argument that the 2015 Agreement "preceded the effective date of the termination," but limited its analysis to observing that "for purposes of its claim preclusion argument Dramatic recognizes the validity of the 2015 Agreement." SPA24(n.7). To the extent the district court meaningfully addressed the § 304(c)(6)(D) argument *at all*, then, it appears to have rejected it based entirely on a belief that it was in tension with another argument (one the court also rejected). For two reasons, that was error.

First, the two arguments are not inconsistent. The § 304(c)(6)(D) argument concedes the general validity of the 2015 Agreement, but contends that one portion of its larger grant of exclusive performance rights for all productions—the portion covering non-first-class rights—was not valid under the statute. That in no way contradicts the claim-preclusion argument, which contends that because any rights

granted in the 2015 Agreement are "subject to" to those in the 1969 Agreement, the arbitrator's definitive reading of the earlier contract binds ALLC.

Second, and more fundamentally, the district court's perception of an inconsistency between Dramatic's *arguments* for dismissal does not justify the conclusory rejection of the § 304(c)(6)(D) argument. Through alternative pleading, a party may "state as many separate claims or defenses as it has, regardless of consistency." Fed R. Civ. P. 8(d)(3). Accordingly, a court "may not construe [a party's] first claim [or defense] as an admission against another alternative or inconsistent claim [or defense]" in a dispositive motion. *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) (interpreting similar provisions from predecessor version of Rule 8). Rather, only once a party has *prevailed* on an argument does judicial estoppel preclude that party from also prevailing on an inconsistent argument. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The district court had no basis for rejecting one dismissal argument as inconsistent with another one that the district court *also* rejected.

### C. ALLC's arguments for avoiding application of the timing provision fail.

Although the district court did not rely on them, ALLC advanced a number of other arguments for avoiding the issue of invalidity under § 304(c)(6)(D). They are unconvincing and provide no support for the district court's decision.

1.    ALLC asserted that, because the Complaint seeks a declaration of non-infringement, its performance rights are not at issue in the case.  JA219.  That is incorrect.  The Complaint contends that the arbitrator's decision "purport[ing] to adjudicate the rights of" ALLC was wrong, and that there is therefore a live controversy regarding the parties' "respective rights to derivative stage adaptations of the novels."  JA27(¶¶35-36), 29(¶43).  It asks for a declaration that ALLC does "have the right, in relation to [Dramatic], to present any and all" non-first-class performances "of the Sorkin Play in the United States," and that those performances therefore do not infringe any of Dramatic's rights.  JA29(¶45).  The district court granted that exact relief.  SPA52-53.

ALLC's pleadings put its asserted non-first-class rights at center stage.  Recognition of those rights is part of the relief ALLC requested and obtained, and the rights are the predicate for the blanket declaration of non-infringement.  Application of § 304(c)(6)(D) shows that the rights recognized by the declaration were not validly conferred and that the predicate for the declaration of non-infringement is faulty.

2.    As another threshold objection, also incorrect, ALLC argued Dramatic lacks "standing" to invoke § 304(c)(6)(D).  JA220.  Dramatic, the defendant, is arguing that § 304(c)(6)(D) shows ALLC, the plaintiff, failed to state a claim for relief because its grant was not valid.  Dramatic does not need statutory "standing"

to raise that argument. Dramatic merely argues ALLC's claim fails because, as this Court has explained, until termination is effective, an author may make "an agreement for a further grant of the terminated rights with [the original grantee] or its successor in title, but no one else." *Baldwin*, 805 F.3d at 22.

3. ALLC also argued that, because the 2015 Agreement's option for performance rights was not exercised until 2018, the grant to ALLC was not made until then. JA213. Even accepting the factual premise, the legal conclusion does not follow. By its express terms, § 304(c)(6)(D) forbids both "[a] further grant" *and* an "agreement to make a further grant" until termination (except to the original grantee). Assuming the contractual option in the 2015 Agreement was not the first (a present grant), it was certainly the second (a binding, enforceable promise of a future grant). Either way, the transfer is invalid under the statute. Congress prohibited granting contingent future interests because it sought "to avoid the situation that ha[d] arisen" under the prior statute: "third parties ha[d] bought up contingent future interests as a form of speculation." S. Rep. No. 94-473, at 111 (1975).

4. Finally, to avoid the statute's plain terms, ALLC took elaborate efforts to recharacterize the nature of its rights. In its motion papers, ALLC argued that, if it does not have an *express* and *exclusive* license covering non-first-class

performances, it has, "at minimum," an *implied* and *non-exclusive* license for non-first-class performances. JA220. This argument also fails.

As an initial matter, the theory in the Complaint has nothing to do with an implied non-exclusive license. The Complaint alleged ALLC has an express and exclusive grant of performance rights from the 2015 Agreement. JA22-23(¶¶ 20-22), 28(¶40). ALLC "is not entitled to amend its complaint through statements made in motion papers" to avoid a legal defect in the theory on which it actually sued. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

Moreover, courts in this Circuit have refused to give litigants a "nonexclusive license ... as a sort of consolation prize for [their] failure to successfully secure an exclusive license." *Weinstein Co. v. Smokewood Ent. Group, LLC*, 664 F. Supp. 2d 332, 345 n.9 (S.D.N.Y. 2009). The Court should do the same here.

## III. ALLC's Suit Is Time-Barred.

ALLC's suit is untimely. ALLC seeks to litigate a dispute that accrued in early 2019, when Dramatic asserted that its rights were exclusive. Because ALLC waited to sue until November 2022, outside the three-year limitations window, the suit is time-barred on its face.

### A. ALLC's claim is for ownership and therefore accrued in early 2019.

1. The Copyright Act requires claims to be brought "within three years after the claim has accrued." 17 U.S.C. §507(b). There are two relevant accrual

rules: one for ownership claims, the other for infringement claims. "An ownership claim accrues only once": "when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Kwan*, 634 F.3d at 228 (citation and quotation marks omitted). "By contrast, an infringement action may be commenced within three years of any infringing act, regardless of any prior acts of infringement," so that "the three-year limitations period [will] bar only recovery for infringing acts occurring outside the three-year period." *Id*.

Litigants may not substitute the more lenient accrual rule by styling a complaint as one for infringement. Substance governs, not form. If deciding ownership is dispositive of the claim, then the one-time rule for ownership applies, regardless how the claim is pleaded.

This Court's decision in *Kwan* illustrates the principle. The plaintiff, Kwan, was hired by the defendants to help edit a book. 810 F.3d at 226. Before the book was published, Kwan told the defendants she should be listed as a co-author, entitling her to an interest in the copyright. *Id.* at 227. The defendants ignored the demand and published the book listing Kwan only as an editor. *Id*. About six years after this, Kwan brought a suit styled as one for infringement. *Id*.

This Court held Kwan's claim untimely. 810 F.3d at 228-30. "[T]here [was] no question that Kwan was aware of the dispute regarding her rights to [the book] by" the time she had asserted co-authorship and the defendants went ahead and

published the book without giving her credit. *Id.* at 229. That was a repudiation of her asserted interest in the copyright, and the claim accrued then. *Id.* at 229. Kwan argued some of her infringement claims must be timely, because new editions had been published within three years of suit, but this Court disagreed. *Id.* Kwan's claim did "not involve the nature, extent or scope, of copying, and therefore, ownership forms the backbone of the 'infringement' claim." *Id.* Since "the ownership claim [wa]s time-barred, and ownership [wa]s the dispositive issue, any attendant infringement claims must fail" as well. *Id.* at 230.

2. This logic requires holding ALLC's suit untimely. Again, ALLC's Complaint frames the case as a dispute concerning Dramatic's assertion of exclusive non-first-class rights. JA27-29(¶¶34-44). ALLC contests that assertion, and claims it has the right to present non-first-class performances as well. ALLC accordingly seeks a declaration that it has the right to present non-first-class performances of the Sorkin Play, and that those performances do not infringe Dramatic's rights. JA29(¶45); *see also* p. 17, *supra*.

The dispute therefore turns on ownership, not copying. A dispute over exclusivity is a dispute about copyright ownership, because "an exclusive license is effectively a transfer of ownership over the rights licensed." *Simmons*, 810 F.3d at 116 (applying ownership accrual rule to infringement claim from exclusive licensee). And "the dispute" here "does not involve the nature, extent or scope, of

copying." *Kwan*, 634 F.3d at 229. ALLC's arguments do not rely on the infringement factors (substantial similarity, fair use, *etc.*). Its claim is more fundamental—ALLC says Dramatic lacks exclusive non-first-class rights and that ALLC has valid rights to non-first-class performances of the Sorkin Play, and so those performances cannot infringe as a matter of law. Accordingly, "*Kwan* controls this case," and under *Kwan*, ALLC's ownership claim accrued only once. *Simmons*, 810 F.3d at 116.

ALLC's suit is untimely under this rule. "On the facts of this case, there is no question that [ALLC] was aware of the dispute regarding" exclusivity more than three years before ALLC filed suit. *Kwan*, 810 F.3d at 229. By early 2019, ALLC had sent correspondence to Dramatic, backed up by letters from the Estate, claiming to be the "exclusive worldwide licensee ... for live stage rights to the novel" and threatening litigation. JA568. Dramatic's response was to file for arbitration against the Estate claiming it had "the exclusive right" to stage non-first-class performances, thus repudiating ALLC's countervailing claim. JA542-543; pp. 11-13, *supra*. ALLC concedes it knew of that claim when it was filed, in March 2019. *See* p. 13, *supra*.

As a matter of law, Dramatic's "express assertion of sole ... ownership" of non-first-class rights was enough for "a reasonably diligent plaintiff [to have been] put on inquiry as to the existence" of the ownership dispute and "trigger the accrual

of an ownership claim." *Kwan*, 810 F.3d at 228 (brackets, citation, and quotation marks omitted). ALLC waited more than three years, until November 2022, to assert that claim. Since that "ownership claim is time-barred, and ownership is the dispositive issue," the requested declaration, including the "attendant" request for a declaration of non-infringement, "must fail." *Kwan*, 634 F.3d at 230.

3. The reasons given by the district court for rejecting the statute of limitations defense on the merits are incorrect.

The court thought that because "[t]he 'right' which Dramatic sought to resolve in the arbitration with the Lee Estate was not [ALLC's] right to perform the Sorkin Play," filing of the arbitration demand could not have triggered accrual of ALLC's claim. SPA41. That is a non sequitur. If filing a suit expressly targeting the plaintiff's rights were required to start the clock, the limitations period would be beside the point; the plaintiff would always already be in court. The question is when ALLC was first "aware" of actions that effectively "rejected" its "express assertion of" rights. *Kwan*, 634 F.3d at 228-29. The answer here is March 2019. By then, ALLC had asserted rights to non-first-class performances, and it knew Dramatic had filed a claim for exclusive rights to those same performances necessarily rejecting ALLC's assertion.

Equally illogical is the district court's statement that an ownership claim could not have accrued because "Dramatic never claimed and does not now claim any

49

ownership interest *in the Sorkin Play*." SPA43 (emphasis added). No one has ever suggested any such interest is in dispute. This case concerns exclusive rights to license performances of the adaptations, not ownership of the adaptations themselves.

Most remarkably, the district court refused to apply the statute of limitations because ALLC "could not have known in March of 2019 that the arbitrator would issue an award premised on a fundamental error of copyright law." SPA44. Setting aside the district court's incorrect view of the merits, the court did not dispute that ALLC knew the position Dramatic was asserting in the arbitration. The statute of limitations is not tolled by a plaintiff's confidence that an ownership claim being made in another case *will not succeed*. After all, "the statute of limitations would be effectively subverted" if a plaintiff could "wait to see how" how things "pan out" before asserting a claim. *Cf. Borthwick v. First Georgetown Sec., Inc.*, 892 F.2d 178, 180 (2d Cir. 1989); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 80-81 (2d Cir. 2019) (rejecting accrual rule that "incents strategic delay").

## B. Dramatic did not forfeit its limitations defense.

The district court also held that Dramatic could not assert the statute of limitations as a defense because it did not brief the defense in opposition to ALLC's pre-answer motion for summary judgment. That was an abuse of discretion.

50

1. The procedural context matters. Rule 12(b), entitled "How to Present Defenses," specifies that defenses are "asserted in the responsive pleading"—here, the answer. Fed. R. Civ. P. 12(b). But ALLC filed its motion for summary judgment while Dramatic's motion to dismiss was pending, making an answer premature. Dramatic opposed the summary judgment motion; it trained its arguments on the issues the parties had briefed, which did not include the statute of limitations. But Dramatic also argued granting full summary judgment to ALLC would be premature in any event, because further discovery was necessary, and because "Dramatic has not had an opportunity to raise affirmative defenses." JA411-JA414 & n.1; JA433-442; p. 18, *supra*. As the Civil Rules advisory committee has noted, "in many cases [an early summary judgment] motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had." Fed. R. Civ. P. 56(b), Advisory Committee's note to 2010 amendment; *see also Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (reversing summary judgment for defendants and noting that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.") (citation omitted).[5]

---

[5] At the time, ALLC had not yet admitted when it knew of Dramatic's assertion of exclusivity, the event that started the limitations clock running.

The district court's decision on the pre-answer motions implicitly recognized these principles, at least in part. While the court decided a number of issues in favor of ALLC, it granted summary judgment only "in part" and did not enter final judgment, leaving the case open for limited discovery and further proceedings. SPA34. Dramatic then timely answered the Complaint and raised its affirmative defenses, including the statute of limitations, JA504-505, exactly as the Rules provide, *see* Fed. R. Civ. P. 8(c)(1), 12(b). Next, Dramatic promptly identified the statute of limitations as a potentially case-dispositive defense on which it wished to move for summary judgment, which the district court permitted. JA614(16:6-11). The parties then engaged in a full round of briefing focused exclusively on the limitations issue.

Dramatic did not forfeit its limitations defense. "The statute of limitations defense need not be raised in a pre-answer motion. Rather, ... the statute of limitations constitutes an affirmative defense, to be asserted in a responsive pleading." *Santos v. Dist. Council of N.Y. City & Vicinity of United Bhd. of Carpenters & Joiners of Am.,* 619 F.2d 963, 967 (2d Cir. 1980) (footnote omitted); *see id.* at 967 n.4 (explaining the rules protecting against waiver of such a defense). Dramatic did just that.

Another district court opinion in this Circuit, *Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511 (S.D.N.Y. 2014), is directly on point. There

too, the court had granted the plaintiff partial summary judgment before the defendant was required to answer, and after the case remained open, the defendant raised the statute of limitations in its answer and filed for summary judgment. *Id.* at 516. The court concluded "it would be unfair not to consider" the defense. *Id.* In particular, the court noted "[t]here is no case law or rule mandating that the Defendant raise its affirmative defenses in response to Plaintiff's motion." *Id.* The defendant therefore had "raised [the] statute of limitations defense in its Answer," which was "as soon as required under the Federal Rules of Civil Procedure." *Id.* As here, there was no sign the Defendant "ha[d] been purposefully dilatory in asserting its defense," and no prejudice to the plaintiff. *Id.* The court therefore rejected the waiver argument.

2.      The district court should have applied similar reasoning here. But it did not, apparently because the court believed that "fail[ure] to raise [an] affirmative defense in [an] opposition to [a] motion for summary judgment" *automatically* results in forfeiture. SPA45.

That was wrong. No such bright-line rule exists, certainly not in responding to a summary judgment motion before the deadline to answer. *See Narragansett*, 999 F. Supp. 2d at 516 ("There is no case law or rule" imposing such a requirement). Indeed, this Court has held that even "failure to *plead* an affirmative defense" *in* the answer as Rule 8(c) requires "does not necessarily result in waiver" where there is

an "absence" of the prudential factors: "undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Rose v. AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004) (emphasis added). Here, the defense *was* pleaded at the proper time, and *none* of the usual factors supports forfeiture. The defense is meritorious, it was not at issue in ALLC's summary judgment motion, Dramatic moved on the defense promptly after raising it in the answer, and ALLC was given ample opportunity to contest its merits.

It is therefore unsurprising that neither the district court nor ALLC could cite a single case supporting forfeiture based on a defendant's failure to raise an affirmative defense in opposition to a plaintiff's pre-answer summary judgment motion. The only case the district court *did* cite, *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016), contradicts the district court's decision. This Court held in *Davis* that it was appropriate to consider, *on appeal*, an argument the defendant had raised in its answer but then failed to argue in opposition to a motion for summary judgment (a motion that, unlike the one here, led directly to final judgment). *Id.* at 246. The argument had been raised in the answer and in earlier motion practice, and the "plaintiffs' extensive briefing on th[e] issue" confirmed "that plaintiffs suffered no unfair surprise or prejudice." *Id.* The same considerations argue even more strongly against waiver here.

Adopting the district court's reasoning would put defendants in an impossible situation. Whenever a plaintiff files a pre-answer motion for summary judgment, the defendant would have to raise and prove *all* its affirmative defenses—before the time to answer, without discovery, and regardless of the substance of the plaintiff's arguments for summary judgment. That makes no sense, and it would only encourage plaintiffs to use pre-answer summary judgment motions to railroad defendants. This Court should not endorse that perverse logic.

In short, by misunderstanding the waiver standard and misreading this Court's case law, the district court abused its discretion. *Cf. Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996) ("abuse of discretion" when "district court applied an erroneous legal standard"); *Murphy for Nat'l Lab. Rels. Bd. v. Cayuga Med. Ctr. of Ithaca*, 715 F. App'x 108, 111 (2d Cir. 2018) (district court "abused its discretion" when it "misapplied" this Court's "precedent"). Dramatic properly preserved the limitations defense, and this Court should reach it on the merits.

## IV. ALLC's Suit Is Barred By Preclusion.

Finally, the district court was wrong to reject application of claim preclusion based on the arbitral award. This is another independent basis for reversing the judgment.

"[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (citation omitted). [6]   There are three elements:   "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Id.* at 285.

The district court, applying federal common law, determined that the first and third elements were present.  The Northern District of Illinois had adjudicated on the merits the same issue that is case-dispositive here—which rights Dramatic retains, and thus which rights were properly granted ALLC.  SPA21-22.  That was undisputed and correct.  But the district court held ALLC was not in privity with the Estate during the arbitration.  SPA22-34.  That was error.

1.     Under the rules of preclusion, "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor*, 553 U.S. at 893 (quoting *Restatement (Second) of Judgments* § 40, at 390 (1980) ("Restatement")).  For example, when a company agrees to assume another's "obligations" and "liabilities," it can be bound by a

---

[6] The "preclusive effect" of a district court's final judgment "is generally immediate, notwithstanding any appeal."  *Coleman v. Tollefson*, 575 U.S. 532, 539 (2015).

judgment affecting those obligations and liabilities. *Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 306-07 (2d Cir. 1996). Or if a company agrees that another's "appeal process [and grievance] guidelines or rules … *shall be* followed," and the scope of those guidelines or rules is determined by a court order, the order binds the company. *Tennessee Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001). Stepping back, an agreement to be bound by another's rights or obligations is also an agreement to be bound by a determination of those rights or obligations.

That principle controls here. The 2015 Agreement is explicit: "The rights granted hereunder *shall be subject* to the rights granted under the [1969] Agreement, as limited by [Lee's] termination." JA227 (emphasis added). That means the rights in the later contract are "governed or affected by" those in the earlier one. *See Subject to*, Black's Law Dictionary (6th ed. 1990); *see also Clean Air Council v. U.S. Steel Corp.*, 4 F.4th 204, 209 (3d Cir. 2021) (applying this meaning of "subject to"); *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1028 (9th Cir. 2007) (same). By agreeing to be bound to the rights in Dramatic's contract, ALLC also agreed to be bound by a determination of those rights.

That determination has been made. The 1969 Agreement gave the arbitrator the power to decide "[a]ny controversy arising out of" it. JA176. And after an exhaustive hearing, the arbitrator decided "Dramatic continues to hold" exclusive non-first-class rights. JA146. The arbitrator also spelled out the consequences of

that holding: "Because Rudin's rights are subject to Dramatic's rights under the terms of the 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of" the Novel. JA156-157. The rights in the 1969 Agreement have been authoritatively construed, and so have ALLC's rights that are "subject to" it. The Northern District of Illinois summarized this logic well. By agreeing that its rights would be "subject to" Dramatic's, ALLC agreed "that if Dramatic is properly found to have retained the [exclusive] right to produce the [Sergel P]lay in non-first-class theatres, then Rudinplay [and ALLC] did not acquire that right." *Dramatic Publ'g Co.*, 608 F. Supp. 3d at 624-25. "This is exactly what transpired." *Id.* at 624.

Other considerations reinforce what ALLC's contract makes plain. An agreement to be bound can "be implied from conduct and manifestations of intention." Restatement § 40. The question is ultimately "a matter of inference from all the circumstances," including "the closeness or interests of the persons involved" and "whether they were represented by the same or collaborating counsel." *Id*. Those circumstances also support finding agreement to be bound here. Discovery showed that ALLC drafted substantial portions of the Estate's briefing in the arbitration, and it lobbied the Copyright Office to come to the Estate's aid. *See* JA623-627; JA649-652. *See* pp. 13, 23, *supra*. ALLC worked in lockstep with the

Estate for a reason: it knew the arbitrator's judgment concerning Dramatic's rights under the 1969 Agreement would also be a judgment regarding its rights under the 2015 Agreement.

2. In refusing to recognize ALLC's agreement to be bound in the arbitration, the district court misunderstood the privity standard.

The court reasoned ALLC did not agree to be bound because it was not "a party to the terminated 1969 Agreement." SPA24-25. That is not the right test. The relevant question is whether ALLC agreed to be bound "by virtue of [the] contractual obligations" *in the 2015 Agreement*. *Tennessee Ass'n of Health Maint. Organizations, Inc.*, 262 F.3d at 565. For the reasons already given, the answer is yes. ALLC agreed to be subject to Dramatic's rights, and those rights have been declared in a final judgment. ALLC should be "bound in accordance with the terms of [its] agreement." *Taylor*, 553 U.S. at 893.

The district court also incorrectly believed that the only "situations in which [ALLC] allegedly worked in concert with the Lee Estate do not include the arbitration itself." SPA25-26. As already discussed, Dramatic submitted discovery materials demonstrating ALLC worked with the Estate throughout the arbitration, even going so far as to write the Estate's legal arguments on the issue of exclusivity and to lobby the Copyright Office. *See* pp. 13, 23, *supra*. ALLC also had a hand in evaluating arbitrator candidates and vetting the Estate's experts. JA659-692. The

district court should not have dismissed this out of hand as "unsubstantiated speculation." SPA47 (citation omitted). Documentary evidence is the *opposite* of unsubstantiated speculation. To the extent ALLC's own contractual commitment is not enough, its conduct should remove any doubt: ALLC knew the arbitration would decide the scope of its rights. This Court should hold ALLC to that understanding.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

May 1, 2024                              Respectfully submitted,


                                         /s/ William M. Jay
William E. Evans                         William M. Jay
GOODWIN PROCTER LLP                      GOODWIN PROCTER LLP
100 Northern Avenue                      1900 N Street, NW
Boston, MA 02210                         Washington, DC 20036
(617) 570-1000                           (202) 346-4000

Stefan Mentzer                           Kevin Tottis
GOODWIN PROCTER LLP                      TOTTISLAW
The New York Times Building              401 N. Michigan Avenue
620 Eighth Avenue                        Suite 530
New York, NY 10018                       Chicago, IL 60611
(212) 813-8800                           (312) 527-1400

                                         *Counsel for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Local Rule 32.1(a)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 13,894 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Version 2008 in 14-point Times New Roman, a proportionally spaced typeface.


 May 1, 2024                          */s/ William M. Jay*
                                      William M. Jay

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system. I certify that all counsel of record are registered as ECF filers and will be served by the CM/ECF system.

May 1, 2024                               */s/ William M. Jay*
                                          William M. Jay