23-1226; 23-7751(L)
*Atticus Ltd. Liab. Co. v. The Dramatic Publ'g Co.*

# In the
# United States Court of Appeals
## for the Second Circuit

————————————

August Term 2024
Argued: October 21, 2024
Decided: July 29, 2025

————————————

Docket No. 23-1226

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff-Appellee,*

v.

THE DRAMATIC PUBLISHING COMPANY,

*Defendant-Appellant.*

————————————

Docket Nos. 23-7751(L), 23-7850(XAP)

THE DRAMATIC PUBLISHING COMPANY,

*Defendant-Appellant-Cross-Appellee,*

v.

ATTICUS LIMITED LIABILITY COMPANY,

*Plaintiff-Appellee-Cross-Appellant.*

————————————

CERTIFIED COPY ISSUED ON 07/29/2025

Before:         WESLEY, CHIN, and PÉREZ, *Circuit Judges*.

––––––––––––––––––

These appeals concern two derivative works based on the Harper Lee novel, *To Kill a Mockingbird*.  Under a 1969 grant from Lee, The Dramatic Publishing Company ("Dramatic") developed a stage adaptation of *To Kill a Mockingbird*, which Lee agreed would be "the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed."  Joint Merits App'x at 175.  Decades later, Lee terminated that grant and authorized the development of another stage adaptation of *To Kill a Mockingbird*; Atticus Limited Liability Company ("Atticus") holds the rights to present and produce certain performances of that second adaptation.

Atticus brought suit in the United States District Court for the Southern District of New York, seeking a declaration that performances of that second stage adaptation do not infringe any copyright interest that Dramatic held in *To Kill a Mockingbird* under its 1969 grant from Lee.  In response, Dramatic maintained that it continued to hold an exclusive license to stage certain adaptations of *To Kill a Mockingbird*, even after Lee's termination of the 1969 grant, under a provision of the Copyright Act governing the use of derivative works after termination of a license granted to the creator of a derivative work.  Dramatic also contended that Atticus's acquisition of stage rights to its competing adaptation of *To Kill a Mockingbird* was invalid under the timing requirements of the Copyright Act, that Atticus's claim accrued when Dramatic filed an arbitration against Harper Lee's estate in 2019 and therefore was untimely, and that the result of that prior arbitration precluded Atticus's request for declaratory relief.

The district court (Cote, *J.*) rejected Dramatic's arguments, entered a declaratory judgment for Atticus, and subsequently awarded Atticus just over $200,000 in attorney's fees.  Dramatic appeals the district court's judgment on the merits, and Dramatic and Atticus cross-appeal the district court's award of attorney's fees.  We **AFFIRM** the district court's judgment granting declaratory relief to Atticus, **VACATE** the district court's award of attorney's fees, and **REMAND** for the district court to further consider the fee application in light of this opinion.

––––––––––––––––––

2

FOR DEFENDANT-APPELLANT, DEFENDANT-APPELLANT-CROSS-APPELLEE: WILLIAM M. JAY, Goodwin Procter LLP, Washington, D.C. (William E. Evans, Goodwin Procter LLP, Boston, MA; Stefan Mentzer, Goodwin Procter LLP, New York, NY; Kevin Tottis, TottisLaw, Chicago, IL, *on the brief*).

FOR PLAINTIFF-APPELLEE, PLAINTIFF-APPELLEE-CROSS-APPELLANT: WOOK HWANG, Sheppard, Mullin, Richter & Hampton LLP, New York, NY (Jonathan Zavin, Loeb & Loeb LLP, New York, NY; Keane Barger, Loeb & Loeb LLP, Nashville, TN, *on the brief*).

FOR THE UNITED STATES, AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE IN DOCKET NO. 23-1226: JOSHUA DOS SANTOS, Appellate Staff Attorney, Civil Division, United States Department of Justice, Washington, D.C. (Brian M. Boynton, Principal Deputy Assistant Attorney General, Daniel Tenny, Appellate Staff Attorney, Civil Division, United States Department of Justice, Washington, D.C.; Suzanne V. Wilson, General Counsel and Associate Register of Copyrights, Emily L. Chapuis, Deputy General Counsel, United States Copyright Office, Washington, D.C., *on the brief*).

————————————

WESLEY, *Circuit Judge*:

Those familiar with the name may recall Atticus Finch as he is described through the eyes of his precocious daughter, Scout Finch, in Harper Lee's 1960

3

classic novel *To Kill a Mockingbird*.  But they may just as well think first of Gregory Peck's Oscar-winning turn in the 1962 film adaptation of the novel.  Such is the potential of, in copyright parlance, "derivative works":  By adapting a previously copyrighted work to a new medium, the creator of a derivative work can both cast new light on the prior work and generate a work that stands alone in its own right.

These appeals concern two other derivative works based on *To Kill a Mockingbird*.  Under a 1969 grant from Lee, The Dramatic Publishing Company ("Dramatic") developed a stage adaptation of *To Kill a Mockingbird*, which Lee agreed would be "the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed."  Joint Merits App'x at 175.[1]  Decades later, Lee terminated that grant and authorized the development of another stage adaptation of *To Kill a Mockingbird*; Atticus Limited Liability Company ("Atticus") holds the rights to present and produce certain performances of that second adaptation.

---

[1] References to the "Joint Merits App'x" are to the Joint Appendix in Docket No. 23-1226; references to the "Special App'x" are to the Special Appendix in Docket No. 23-1226; and references to the "Joint Fees App'x" are to the Joint Appendix in Docket Nos. 23-7751(L), 23-7850(XAP).

Atticus brought suit in the United States District Court for the Southern District of New York, seeking a declaration that performances of that second stage adaptation do not infringe any copyright interest that Dramatic held in *To Kill a Mockingbird* under its 1969 grant from Lee. In response, Dramatic maintained that it continued to hold an exclusive license to stage certain adaptations of *To Kill a Mockingbird*, even after Lee's termination of the 1969 grant, under a provision of the Copyright Act governing the use of derivative works after termination of a license granted to the creator of a derivative work. Dramatic also contended that Atticus's acquisition of stage rights to its competing adaptation of *To Kill a Mockingbird* was invalid under the timing requirements of the Copyright Act, that Atticus's claim accrued when Dramatic filed an arbitration against Harper Lee's estate (the "Lee estate") in 2019 and therefore was untimely, and that the result of that prior arbitration precluded Atticus's request for declaratory relief.

The district court (Cote, *J.*) rejected Dramatic's arguments, entered a declaratory judgment for Atticus, and subsequently awarded Atticus just over $200,000 in attorney's fees. Dramatic appeals the district court's judgment on the merits, and Dramatic and Atticus cross-appeal the district court's award of

5

attorney's fees.  We affirm the district court's judgment granting declaratory relief to Atticus, vacate the district court's award of attorney's fees, and remand for the district court to further consider the fee application in light of this opinion.

## BACKGROUND

This case involves several actions implicating various provisions of the Copyright Act: Lee's authorization of two derivative works based on *To Kill a Mockingbird*, *see* 17 U.S.C. § 106(2); Lee's grant of a copyright license to Dramatic and her subsequent termination of that grant, *see id.* § 304(c); Dramatic's right to continue to use its adaptation of *To Kill a Mockingbird* after Lee's termination of the grant authorizing its creation, *see id.* § 304(c)(6)(A); and the timing restrictions imposed on Lee's subsequent re-grant of certain rights that were covered by the terminated grant, *see id.* § 304(c)(6)(D).

## I. Statutory Background

The Copyright Act grants an author the "exclusive right[] to do and to authorize" a number of acts with a copyrighted work.  *Id*. § 106.  For example, an author has the exclusive right to "reproduce the copyrighted work in copies" and to "perform" and "display" a literary work in public.  *See id.* § 106(1), (4), (5).  The

6

author also has the exclusive right to prepare, or authorize others to prepare, "derivative works based upon the copyrighted work." *Id.* § 106(2). Derivative works, or "work[s] based upon one or more preexisting works," can include "musical arrangement[s], dramatization[s], fictionalization[s], motion picture version[s]," or "any other form in which a work may be recast, transformed, or adapted." *Id.* § 101. "Paradigmatic examples of derivative works include the translation of a novel into another language, the adaptation of a novel into a movie or a play, or the recasting of a novel as an e-book or an audiobook." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014).

Although a derivative work is "based upon [a] copyrighted work," 17 U.S.C. § 106(2), a derivative work is itself independently copyrightable, *id.* § 103. But "[t]he copyright in a . . . derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *Id.* § 103(b). Put differently, "[t]he aspects of a derivative work added by the derivative author are that author's property, but the element drawn from

the pre-existing work remains on grant from the owner of the pre-existing work."

*Stewart v. Abend*, 495 U.S. 207, 223 (1990).

The Copyright Act also gives an author the ability to terminate a prior grant of a transfer or license. In particular, 17 U.S.C. § 304(c) provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . is subject to termination" under certain conditions.[2]  17 U.S.C. § 304(c).  That termination right is expansive:  "Termination of the grant

---

[2] Prior to the enactment of the Copyright Act of 1976, authors secured an initial 28-year copyright term upon publication of their work, followed by a 28-year renewal term.  *See* Pub. L. No. 60–349, § 23, 35 Stat. 1075, 1080 (1909).  For works created on or after January 1, 1978, the Copyright Act of 1976 replaced that two-term framework with a single term, beginning on the date of the work's creation and spanning the author's life plus fifty years.  *See* Pub. L. No. 94–553, § 302(a), 90 Stat. 2541, 2572 (1976).  For works that already were in their first copyright term on January 1, 1978, the Copyright Act of 1976 retained the prior two-term framework, but extended the renewal term to 47 years.  *See id.* § 304(a), 90 Stat. at 2573–74.

The Copyright Act contains separate provisions for terminating grants, depending on whether the copyrighted work was in its first or renewal term as of January 1, 1978, and the grant was executed before January 1, 1978, *see* 17 U.S.C. § 304(c), or whether the grant was executed by the author on or after January 1, 1978, *see id.* § 203.  Because *To Kill a Mockingbird* received copyright protection in 1960 and the Dramatic grant was executed in 1969, termination was effected under 17 U.S.C. § 304(c).

8

may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *Id.* § 304(c)(5).

This termination right, enacted as part of the Copyright Act of 1976, "was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 (1985). Once a grant is terminated, "all of [the] author's rights under [the Copyright Act] that were covered by the terminated grant revert, upon the effective date of termination, to that author." 17 U.S.C. § 304(c)(6).

That "reversion of rights," however, is "subject to" some "limitations." *Id.* One limitation is the so-called "derivative works exception" of 17 U.S.C. § 304(c)(6)(A). Under that provision, "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination." *Id.* § 304(c)(6)(A). Although the owner of a derivative work may continue to "utilize[]" the derivative work "under the terms of the grant after its termination," that "privilege does not extend to the

9

preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant."  *Id*.  Thus, the derivative works exception "preserves the right of owners of derivative works to continue to exploit their works" under the terms of a grant after the grant's termination, *Woods v. Bourne Co.*, 60 F.3d 978, 986 (2d Cir. 1995), but does not preserve any right by the grantee to prepare new derivative works based on the copyrighted work after a grant is terminated.

Termination of a grant "may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later."  17 U.S.C. § 304(c)(3).[3]  After the effective date of a grant's termination, the author may reach a new agreement to grant the same rights covered by the terminated grant. However, "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of

---

[3] Notice of an impending termination must be served on the grantee (or the grantee's successor in title) "not less than two or more than ten years before" the effective date of termination, which must "fall within the five-year period" mentioned above.  17 U.S.C. § 304(c)(4)(A).

the termination." *Id.* § 304(c)(6)(D). "As an exception, [] an agreement for [] a further grant may be made between the author . . . and the original grantee or such grantee's successor in title, after the notice of termination has been served" but before the effective date of termination. *Id.*

"This existing-grantee exception was included in the [Copyright Act of 1976] to give the grantee 'some advantage over others in obtaining the terminated rights.'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 26 (2d Cir. 2015) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 11.08[A] (2013)). Thus, "[b]etween service of the notice and the date of termination," an author can "reach an agreement for a further grant of the terminated rights with [the original grantee] or its successor in title, but no one else." *Id.* at 22.

11

**II.     Dramatic's and Atticus's Grants and the Ensuing Litigation**

    **A.     The Grants to Dramatic and Rudinplay**

        **1.     Lee's 1969 Grant to Dramatic**

In 1960, Harper Lee published *To Kill a Mockingbird*.[4]  Nine years later, Lee

entered into an agreement with Dramatic, in which Lee authorized Dramatic "[t]o

write or cause to be written a dramatization based upon and/or adapted from [*To*

*Kill a Mockingbird*]."  Joint Merits App'x at 175.  That grant also gave Dramatic "the

complete right throughout the world" to "lease the amateur acting rights in and

to" any play developed under the terms of the agreement.  *Id.*  The grant defined

"amateur acting rights" as "performances by living actors in the immediate

presence of an audience," which covered a range of performances but excluded

"Broadway production rights," "first-class professional road" rights, and

"first[-]class touring production rights."  *Id.* at 176.[5]  (The parties refer to these

---

[4] *To Kill a Mockingbird*, of course, is an American classic, having won the Pulitzer Prize in 1961.  Today, the book "occupies a special place in American culture as an iconic work of modern literature with broad popular appeal."  Dramatic Merits Br. at 6.

[5] More specifically, "amateur acting rights" included "all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and

rights as either "non-first-class" or "amateur" production rights; in keeping with the nomenclature of the arbitration decision described below, we call them "non-first-class" production rights unless quoting another source.)  Under the grant, Lee "reserve[d] all rights not expressly granted to [Dramatic], including but not limited to the professional acting, radio broadcasting, television and motion picture rights."  *Id.* at 175.

Lee "agree[d] that [the] dramatization" developed under the grant "is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed."  *Id.*  The parties agree that this language amounted to the grant of an exclusive license to stage non-first-class productions of adaptations of *To Kill a Mockingbird*.  Dramatic's president, Christopher Sergel, subsequently wrote an adaptation of *To Kill a Mockingbird* (the "Sergel Play"), which Dramatic has continued to license for non-first-class productions.

---

Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors."  Joint Merits App'x at 176.

In April 2011, Lee served on Dramatic a notice of termination of the 1969 grant pursuant to 17 U.S.C. § 304(c).  The notice provided that "[t]he effective date of termination shall be April 26, 2016."  *Id.* at 183.

### 2.    Lee's 2015 Grant to Rudinplay

In June 2015, Lee executed a second grant authorizing another theatrical adaptation of *To Kill a Mockingbird*.  Under that grant, Lee "designate[d] [Rudinplay, Inc. ("Rudinplay")] as her sole and exclusive agent . . . to procure a playwright . . . to create a dramatic adaptation of [*To Kill a Mockingbird*] for presentation as a live stage play."  *Id.* at 226.  Provided Lee approved the choice of playwright, Rudinplay would receive "the sole and exclusive option . . . to acquire[] . . . all live stage rights in and to [*To Kill a Mockingbird*] and all subsidiary and ancillary rights related to such live stage rights."  *Id.*  The option would be deemed exercised upon a timely initial production of *To Kill a Mockingbird* on Broadway or in the West End of London.

Although this option was granted "on an exclusive . . . , worldwide basis," Rudinplay also "acknowledge[d] that pursuant to an agreement . . . dated June 26, 1969[,] between [Lee] and [Dramatic], [Lee] granted [Dramatic] the right to create

14

a play . . . based on [*To Kill a Mockingbird*], and to exploit the amateur acting rights" in that play. *Id.* at 226–27. Lee "represent[ed] that [she] ha[d] terminated the [1969 grant] effective April 26, 2016"; Rudinplay "acknowledge[d] that, notwithstanding such termination, the amateur acting rights to the [Sergel Play] can continue to be exploited following such termination under the terms of the [1969 grant] on a non-exclusive basis in the United States, and on an exclusive basis elsewhere." *Id.* at 227. The 2015 grant provided that "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 grant]" from Lee to Dramatic, "as limited by [Lee's] termination." *Id.*

Rudinplay—at this point called No Ice, Inc. ("No Ice")—then engaged Aaron Sorkin to develop a stage adaptation of *To Kill a Mockingbird* (the "Sorkin Play"). Under the terms of their agreement, Sorkin and No Ice agreed that Sorkin would be the "sole and exclusive Author, owner and [] copyright proprietor of the [Sorkin] Play" and that No Ice would receive the exclusive right to produce and present first-class, off-Broadway, and second-class performances of the Sorkin Play. *Id.* at 23–24 (second alteration in original). No Ice subsequently assigned its rights under its agreements with Lee and Sorkin to Atticus. It is Atticus's right to

15

present non-first-class performances of the Sorkin Play that the parties contest here.

The Sorkin Play opened on Broadway in December 2018, then in London's West End in March 2022. Under the terms of the 2015 grant, the option was deemed exercised in December 2018.

## B.    The Arbitration

In January 2019, Atticus sent Dramatic a letter claiming that Dramatic's licensing of the Sergel Play for "a planned professional tour . . . in the U.K. and Ireland" was a "clear violation both of Atticus's exclusive rights[] and a violation of the agreement between Lee and Dramatic." *Id.* at 568. In that letter, Atticus maintained that it was "the exclusive worldwide licensee . . . for live stage rights to the novel *To Kill a Mockingbird* . . . , subject only to the limited rights granted by Lee to Dramatic . . . in 1969 to create a theatrical adaptation of [*To Kill a Mockingbird*] for amateur performances." *Id.*

In response, Dramatic filed an arbitration demand against the Lee estate.[6] Dramatic sought, among other relief, "[a] declaration that Dramatic's exclusive

---

[6] Lee died in 2016.

rights to the [Sergel Play]" included "the exclusive right to license stock and repertoire theaters to perform any stage version of the novel *To Kill a Mockingbird*, whether or not the actors are paid, and that no other person or entity has such rights in any other stage version of the novel." *Id.* at 543.

After a 25-day hearing, the arbitrator entered an award for Dramatic. The arbitrator concluded that, "by virtue of the [derivative works exception], Dramatic continues to hold after termination of the original grant all the exclusive rights granted to it in the 1969 Agreement." *Id.* at 146. The arbitrator found that, notwithstanding Lee's termination of the 1969 grant, Dramatic maintained "worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* . . . and has all rights under the [1969] Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights." *Id.* at 91. The arbitrator awarded Dramatic damages, enjoined the Lee estate from assisting in the "wrongful licensing" of the Sorkin Play "for any non-first-class production throughout the world," and ordered the Lee estate to indemnify Dramatic in any litigation brought by Atticus challenging Dramatic's "exclusive worldwide rights." *Id.* at 89–92.

17

After prevailing in the arbitration, Dramatic filed a petition to confirm the arbitration award in the United States District Court for the Northern District of Illinois.  The Lee estate then moved to vacate the arbitration award, arguing that the arbitrator's decision would force the Lee estate to violate the rights of third parties who did not consent to the arbitration (including Atticus).

The district court rejected the Lee estate's motion to vacate, concluding that Atticus's rights could not have been violated by the arbitrator's decision because "Rudinplay did not acquire the right to license its version of the play in non-first-class" productions in the first place.  *Dramatic Publ'g Co. v. Carter*, 608 F. Supp. 3d 618, 625 (N.D. Ill. 2022).  After remanding for the arbitrator to clarify the exact scope of the non-first-class production rights Dramatic retained after Lee's termination of the 1969 grant, the district court entered judgment for Dramatic on January 13, 2023.  The Lee estate appealed; that appeal is pending before the United States Court of Appeals for the Seventh Circuit.[7]

---

[7] In an amicus curiae brief, the United States—represented by the United States Copyright Office and the Civil Division of the United States Department of Justice—argued to the Seventh Circuit that an author's termination causes the right to make or perform new derivative works to revert to the author.  *See* Brief for the United States as Amicus Curiae in Support of Neither Party, *Dramatic Publ'g Co. v. Carter*, Docket No. 23-1309 (7th Cir. Apr. 15, 2025).  The United States filed a substantially similar amicus curiae brief in this

## C.    This Litigation

After the arbitrator entered the award in favor of Dramatic, Atticus initiated this case in the Southern District of New York.  In its complaint, Atticus alleged that the arbitrator's ruling—"that authors such as Harper Lee have *no* right to terminate grants of exclusive rights under the Copyright Act"—was "contrary to the plain and unambiguous language of the Copyright Act's termination provisions."  Joint Merits App'x at 27.  Atticus sought a declaration that "Atticus and Sorkin have the right, in relation to [Dramatic], to present any and all Second-Class, Stock, Amateur and Ancillary Performances . . . of the Sorkin Play in the United States; and [that] any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to [*To Kill a Mockingbird*]."  *Id.* at 29–30.

Dramatic moved to dismiss, arguing that its exclusive right to stage non-first-class productions of adaptations of *To Kill a Mockingbird* survived Lee's termination of the 1969 grant under the derivative works exception.  Dramatic also

---

case almost a year prior.  *See* Brief for the United States of America as Amicus Curiae in Support of Appellee, *Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*, Docket No. 23-1226 (2d Cir. Mar. 22, 2024).

maintained that, to the extent it granted non-first-class production rights, Lee's 2015 grant to Rudinplay was invalid under 17 U.S.C. § 304(c)(6)(D) because it preceded the effective date of termination of the 1969 grant from Lee to Dramatic, and that Atticus's requested declaratory relief was barred by res judicata because of the Northern District of Illinois judgment.[8]  Atticus opposed Dramatic's motion to dismiss and cross-moved for summary judgment, countering that Dramatic's exclusive right to stage non-first-class productions of adaptations of *To Kill a Mockingbird* ended with Lee's termination of the 1969 grant, that the purported invalidity of Lee's grant to Rudinplay was irrelevant for purposes of the case, and that res judicata could not apply because Atticus was not a party to, or in privity with a party to, the arbitration and subsequent Northern District of Illinois proceeding.  The parties briefed their respective motions; in its response to Atticus's motion for summary judgment, Dramatic contended that summary judgment was inappropriate because, among other things, it "ha[d] not had an

---

[8] On appeal, Dramatic refers to its preclusion argument as both res judicata and claim preclusion; in its briefing below, Dramatic invoked both issue and claim preclusion.  We therefore generally refer to Dramatic's argument as one of res judicata.  *See Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'").

opportunity to raise affirmative defenses" and it was entitled to seek discovery on its res judicata arguments.  *See id.* at 411 & n.1.

The district court converted Dramatic's motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d), denied that motion, and granted Atticus's cross-motion for summary judgment in part.  In particular, the district court rejected Dramatic's interpretation of the derivative works exception, reasoning that its reading "would thwart the plain language of the Copyright Act, rendering any exclusive license interminable."  Special App'x at 18.  The district court also largely rejected Dramatic's preclusion arguments, concluding that Atticus did not agree to be bound by any arbitration between the Lee estate and Dramatic, Atticus could not be bound by any preexisting legal relationship Atticus had with the Lee estate, and Atticus was not adequately represented by the Lee estate in the arbitration.  However, the district court left open the possibility that Dramatic could establish, through discovery, that preclusion might apply on the theory that Atticus sufficiently controlled the Lee estate in the arbitration.  Finally, the district court did not separately analyze Dramatic's argument that the 2015 grant of non-first-class production rights was

invalid under 17 U.S.C. § 304(c)(6)(D), instead noting that "for purposes of its claim preclusion argument Dramatic recognizes the validity of the 2015 Agreement." *Id.* at 24 n.7. Later in its opinion, however, the district court reasoned that "it is unnecessary to resolve through this lawsuit the extent to which the Lee Estate granted Atticus rights through the 2015 Agreement" because "[t]hat [] issue is irrelevant to Dramatic: . . . if Dramatic's rights are not exclusive, then it has no power to bar anyone from performing derivative works based on [*To Kill a Mockingbird*], other than . . . the Sergel Play." *Id.* at 32.

Dramatic then answered the complaint. In its answer, Dramatic raised various affirmative defenses—including, for the first time, a statute of limitations defense. Dramatic maintained that Atticus's claim was untimely under the Copyright Act's three-year statute of limitations because that claim accrued no later than March 2019, when Dramatic filed its arbitration demand against the Lee estate and thereby asserted its claim to exclusive rights to stage non-first-class productions of adaptations of *To Kill a Mockingbird*. Dramatic moved for summary judgment on its statute of limitations defense.

22

The district court denied Dramatic's motion, concluding that Atticus's declaratory judgment claim was timely because it was not governed by the one-time accrual rule for claims of copyright ownership. The court further found that Dramatic had forfeited its timeliness argument by not raising it in its opposition to Atticus's motion for summary judgment.[9]

In the meantime, Dramatic, consistent with the district court's earlier decision, sought discovery from Atticus regarding the extent of Atticus's control over the Lee estate in the arbitration. Atticus's counsel agreed to disclose emails between Atticus's counsel and the Lee estate's counsel during the arbitration. After those emails were disclosed, Dramatic "request[ed] the Court consider allowing additional, targeted discovery of Atticus' control over the Lee Estate's briefing on the limited issue of exclusive ownership" over non-first-class production rights in stage adaptations of *To Kill a Mockingbird*. Joint Merits App'x at 618. Dramatic qualified that ask, however, and "request[ed] no further

---

[9] Although the district court framed its analysis in terms of waiver, we refer to the issue here as forfeiture, as nothing suggests Dramatic intentionally abandoned its statute of limitations defense. *See Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) ("[F]orfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." (alteration adopted) (internal quotation marks and citation omitted)).

discovery" should the district court "not view full disclosure of Atticus' role in preparing and advising on the [Lee estate's] exclusivity briefing sufficient to constitute 'control' as a matter of law." *Id.* at 619.

The day after it denied Dramatic's motion for summary judgment on its statute of limitations defense, the district court issued an order rejecting Dramatic's preclusion defense in full and denying its request for additional discovery. Having disposed of Dramatic's remaining arguments, the court entered the declaratory judgment for Atticus on August 1, 2023, and entered an amended judgment on August 28, 2023.

That ended the parties' dispute over the merits of Atticus's declaratory judgment claim. The case lingered on, however, after Atticus moved to recover its attorney's fees under the fee-shifting provision of the Copyright Act. The district court subsequently granted Atticus's motion in part and awarded Atticus its fees incurred litigating the case after April 27, 2023—that is, after the district court's first decision granting Atticus's motion for summary judgment in part. Ultimately, the district court entered an order awarding Atticus $201,171.25 in attorney's fees.

## DISCUSSION

### I.     The Merits Appeal

Dramatic raises four challenges to the district court's grant of partial summary judgment in favor of Atticus and its denial of Dramatic's motions for summary judgment: first, that it maintained *exclusive* rights to stage non-first-class productions of adaptations of *To Kill a Mockingbird* after Lee's termination of the 1969 grant; second, that Atticus itself lacks the right to stage non-first-class productions because Lee's 2015 grant of those rights to Rudinplay was invalid; third, that Atticus's claim is time barred; and finally, that Atticus is bound by the result of the arbitration and the follow-on proceeding.  "We review a district court's grant or denial of summary judgment de novo."  *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 135 (2d Cir. 2022).

### A.     Termination of the 1969 Grant and the Derivative Works Exception

First, Dramatic maintains that its "exclusive right to live, non-first-class stage performances of [*To Kill a Mockingbird*]" survived Lee's termination of the 1969 grant under the derivative works exception.  Dramatic Merits Br. at 35.  As stated above, the derivative works exception provides that "[a] derivative work

25

prepared under authority of [a] grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." 17 U.S.C. § 304(c)(6)(A).

In other words, Dramatic claims that Lee's promise that the Sergel Play "is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed," Joint Merits App'x at 175—or, stated differently, Lee's grant to Dramatic of an exclusive license to produce non-first-class stage adaptations of *To Kill a Mockingbird*—is a "term[] of the grant" protected from termination by the derivative works exception. *See* 17 U.S.C. § 304(c)(6)(A). Under that reading of the derivative works exception, the Sergel Play can "continue to be utilized" as the *exclusive* stage adaptation of *To Kill a Mockingbird* for non-first-class productions. *See id.*

That reading conflates Dramatic's rights in the Sergel Play with Lee's rights in *To Kill a Mockingbird* itself. Lee's termination of the 1969 grant to Dramatic caused "all of [Lee's] rights under [the Copyright Act] that were covered by the

26

terminated grant [to] revert, upon the effective date of termination, to [Lee]." *Id.*

§ 304(c)(6). That includes the right to create derivative works based on *To Kill a*

*Mockingbird* and the right to authorize others to prepare such derivative works.

*See id.* § 106(2). Thus, prior to the termination of the 1969 grant, Dramatic

maintained an exclusive license to stage non-first-class productions of adaptations

of *To Kill a Mockingbird* as part of the rights conveyed under the grant. But when

Lee terminated the 1969 grant—and thereby terminated "the exclusive or

nonexclusive grant of a transfer or license of the renewal copyright or any right

under it," *id.* § 304(c)—she regained her right to authorize new non-first-class

productions of adaptations of *To Kill a Mockingbird*, because that right was part and

parcel of her copyright in *To Kill a Mockingbird*.

The derivative works exception does not point in a different direction. The

derivative works exception preserves Dramatic's right to "continue to [] utilize[]"

the Sergel Play "under the terms of the [1969] grant after its termination." *Id.*

§ 304(c)(6)(A). However, Lee's promise that the Sergel Play was "to be the only

one the amateur acting rights of which [she would] permit to be leased and/or

licensed," Joint Merits App'x at 175, is not a term governing how the Sergel Play

is "utilized."  Dramatic assiduously attempts to frame its asserted right as the right to "use the Sergel Play as the exclusive stage adaptation of [*To Kill a Mockingbird*] for non-first-class productions."  Dramatic Merits Br. at 32.  But it is more accurately understood as the right to authorize new stage adaptations of *To Kill a Mockingbird* for non-first-class productions (or, conversely, to prevent such authorization).  In other words, the right to prevent further stage adaptations of *To Kill a Mockingbird* for non-first-class productions—the upshot of Dramatic's claimed exclusive license here—is part of the copyright in *To Kill a Mockingbird* itself.  Under 17 U.S.C. § 304(c), that right reverted to Lee upon termination of the 1969 grant.

To put a finer point on it:  Suppose Lee agreed in the 1969 grant that the future Sergel Play would be the only derivative work that could be created based on *To Kill a Mockingbird*.  *See* United States Amicus Curiae Br. at 16–17 (raising this hypothetical).[10]  Under Dramatic's reading of the derivative works exception,

---

[10] In its amicus curiae brief, the United States—represented by the United States Copyright Office and the Civil Division of the United States Department of Justice—sides with Atticus and argues that an author's termination causes the right to make or perform new derivative works to revert to the author.  *See* Brief for the United States of America as Amicus Curiae in Support of Appellee, *Atticus Ltd. Liab. Co. v. Dramatic Publ'g Co.*, Docket No. 23-1226 (2d Cir. Mar. 22, 2024).

Dramatic would have the right to prevent the development of any future derivative works based on *To Kill a Mockingbird*—even after the termination of the 1969 grant—because Dramatic maintained the right to "utilize" the Sergel Play as the exclusive derivative work based on *To Kill a Mockingbird*. That interpretation, however, would be plainly inconsistent with the termination right of 17 U.S.C. § 304(c), as it would prevent the reversion of "all of [Lee's] rights under [the Copyright Act]," including the right to authorize the preparation of new derivative works, *see* 17 U.S.C. § 106(2). Moreover, under that theory, because the derivative works exception does not allow a grantee to prepare new derivative works after a grant's termination, no one, including either Dramatic or Lee, could create or authorize the creation of a new derivative work based on *To Kill a Mockingbird* after the grant's termination. The absurdity of that sort of dead-hand interpretation of the derivative works exception betrays the error of Dramatic's position.

*Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985), the case on which Dramatic principally relies, does not support its interpretation here. In *Mills Music*, the Supreme Court resolved a dispute over the rightful recipient of royalty payments

for the song "Who's Sorry Now."  That dispute arose out of multiple grants of rights in the song: first from Ted Snyder, one of the song's authors, to Mills Music, Inc. ("Mills"), a music publisher; and then from Mills to various record companies, which created recordings of the song (that is, separate derivative works based on "Who's Sorry Now").  *See id.* at 156–59.  Under the terms of the respective agreements, "the record companies were contractually obligated to pay royalties to Mills, and Mills, in turn, was contractually obligated to pay 50 percent of those royalties to Snyder."  *Id.* at 158.  After Snyder's heirs delivered a written termination notice to Mills pursuant to 17 U.S.C. § 304(c), the Snyders demanded all royalties on the derivative works, bypassing Mills altogether.  *Id.* at 162.

The Supreme Court held that, under the derivative works exception, Mills could continue to recoup its share of the royalty payments.  The Court concluded that the derivative works exception applied to successive grants, and that the "terms of the grant" covered by the derivative works exception included the royalty-sharing arrangement between Snyder and Mills.  *See id.* at 166–69.  At bottom, the Supreme Court reasoned, the derivative works exception ensures that "the terms of the grant that were applicable to the use of derivative works at the

time of termination should remain in effect," and therefore protected Mills's "entitle[ment] to a share of the royalty income in dispute." *Id.* at 177–78.

The *Mills Music* Court did not, however, hold that the derivative works exception protects a grantee's right in the original copyrighted work, separate from the terms of the grant that bear on how the derivative work itself is "utilized." In fact, the Supreme Court said the opposite: The Court recognized that although the derivative works exception preserved the contractual terms governing the use of the previously authorized derivative works, "termination has caused the ownership of the copyright to revert to the Snyders." *Id.* at 167.

*Mills Music* therefore simply reiterated what the statutory text makes clear. The derivative works exception preserves the terms of a grant applicable to the use of a derivative work after the termination of a grant, but termination causes any copyright interest in the original work to revert to the author. *See* 17 U.S.C. § 304(c)(6), (c)(6)(A); *see also Mills Music*, 469 U.S. at 178 (White, *J.*, dissenting) ("[I]t is merely an obvious rephrasing of the statutory language to say that users of these derivative works may continue to utilize them under the specific terms of the licenses issued by Mills."). *Mills Music* therefore does not suggest that Dramatic

31

maintained the exclusive right to stage non-first-class productions of adaptations of *To Kill a Mockingbird* after Lee's termination of the 1969 grant.

Lacking support in the statutory text or the caselaw, Dramatic falls back on a basic appeal to fairness:  Dramatic complains that it "would not have agreed to the[] terms [of the 1969 grant] without receiving exclusive non-first-class rights." Dramatic Merits Br. at 37.  Those protests, however, are better addressed to Congress, which enacted 17 U.S.C. § 304(c) and thereby ensured that "all of a particular author's rights under [the Copyright Act] that were covered by the terminated grant" revert upon termination, even as the derivative work can "continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 304(c)(6), (c)(6)(A).  Because the derivative works exception does not preserve Dramatic's exclusive license to stage non-first-class productions of adaptations of *To Kill a Mockingbird*, the district court correctly rejected Dramatic's argument about the effect of Lee's termination of the 1969 grant.

## B.    Invalidity of the 2015 Grant Under 17 U.S.C. § 304(c)(6)(D)

Next, Dramatic contends that Atticus lacks non-first-class production rights in the Sorkin Play because Lee's grant of those rights to Rudinplay (and, by

32

extension, Atticus) was invalid. As mentioned above, the Copyright Act provides that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." *Id.* § 304(c)(6)(D). Dramatic maintains that because Lee's 2015 grant of non-first-class production rights to Rudinplay preceded the 2016 effective date of termination of Lee's grant of those rights to Dramatic, Lee's grant to Rudinplay was barred by 17 U.S.C. § 304(c)(6)(D). Therefore, Dramatic argues, Atticus—which now holds Rudinplay's rights under the 2015 grant—cannot itself claim non-first-class production rights in the Sorkin Play.

Dramatic's challenge to Atticus's rights under the 2015 grant is a red herring. This case turns not on the rights that *Rudinplay* acquired from Lee, but instead on the scope of *Dramatic's* rights under the terminated 1969 grant. Indeed, the final amended judgment in this case declared that "Atticus and Aaron Sorkin have the right, in relation to Dramatic, to present any and all performances of the Sorkin Play in the United States," and "[a]ny such productions of the Sorkin Play in the United States have not infringed and do not infringe any copyright interest Dramatic holds in [*To Kill a Mockingbird*]." Special App'x at 52–53. Dramatic offers

33

no argument as to why this judgment must be set aside based on a conflict between the 2015 grant and the timing provision of 17 U.S.C. § 304(c)(6)(D).

Because Dramatic no longer holds exclusive rights to stage non-first-class productions of adaptations of *To Kill a Mockingbird*—and instead holds a non-exclusive license for such productions—it cannot bar Atticus from licensing the Sorkin Play in competing productions, notwithstanding any purported invalidity in the 2015 grant from Lee to Rudinplay. *See, e.g.*, *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (distinguishing between exclusive and non-exclusive licensees for purposes of who may bring an infringement action under 17 U.S.C. § 501(b)). As the district court recognized, charting the scope of Atticus's rights under the 2015 grant is "unnecessary to resolve [in] this lawsuit." Special App'x at 32.

## C. Statute of Limitations

Dramatic also argues that Atticus's claim is untimely. Under the Copyright Act, "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).

34

Determining when a claim accrues under the Copyright Act depends on the nature of the claim asserted. "An ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011) (internal quotation marks and citation omitted). A claim of infringement, meanwhile, can accrue multiple times, as "each infringing act starts a new limitations period." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). Although ownership and infringement claims can travel in tandem, when an "ownership claim is time-barred, and ownership is the dispositive issue, any attendant infringement claims must fail." *Kwan*, 634 F.3d at 230.

Dramatic maintains that Atticus's claim turns on ownership—and that therefore the one-time accrual rule applies—because Atticus "frames the case as a dispute concerning Dramatic's assertion of exclusive non-first-class rights" to stage adaptations of *To Kill a Mockingbird*. Dramatic Merits Br. at 47. Dramatic further contends that this claim accrued no later than March 2019, when Dramatic filed the arbitration demand and thereby asserted its ownership over the exclusive right to stage non-first-class productions of adaptations of *To Kill a Mockingbird*.

35

Because Atticus's suit was filed more than three years later, Dramatic argues it is time barred.

The premise underlying Dramatic's argument—that both Atticus and Dramatic are claiming "ownership" over the same copyright interest—is wrong. As Dramatic notes, we have previously applied the one-time accrual rule for claims alleging ownership of a copyright. *See, e.g.*, *Kwan*, 634 F.3d at 228–30; *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) (per curiam). In those cases, however, the plaintiff was the party asserting ownership over the contested copyright interest. *See Kwan*, 634 F.3d at 226–27 (plaintiff claimed to be co-author of "a book on the use of the internet"); *Simmons*, 810 F.3d at 116 (plaintiff claimed to be exclusive licensee of copyright interest in a beat and thus the "effective[] . . . owner[] over the rights licensed").

Here, by contrast, Atticus does not claim ownership over Dramatic's asserted copyright interest—the exclusive right to stage non-first-class productions of adaptations of *To Kill a Mockingbird*. Instead, Atticus seeks a declaration that the Sorkin Play does not infringe on any copyright interest Dramatic may have in *To Kill a Mockingbird*. That claim turns not on ownership,

36

but infringement. Accordingly, the district court correctly rejected Dramatic's statute of limitations argument.[11]

**D.    Res Judicata**

Finally, Dramatic maintains that Atticus is precluded from challenging the result of the arbitration between Dramatic and the Lee estate, even though Atticus was not a party to the arbitration and the subsequent Northern District of Illinois proceeding.[12] The doctrine of res judicata, or claim and issue preclusion, bars both "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit" and "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor*, 553 U.S. at 892 (internal quotation marks and citation omitted).

---

[11] Because we reject Dramatic's statute of limitations argument on the merits, we need not consider, at this point, whether the district court correctly concluded that this argument had been forfeited. However, because the district court's fee award relied, at least in part, on its finding that Dramatic had forfeited the argument, we address that issue below.

[12] In the district court, the parties briefed whether the preclusive effect of the Northern District of Illinois judgment should be evaluated under federal or Illinois law. The district court applied federal law, and Dramatic does not argue otherwise on appeal. We therefore apply federal law in evaluating Dramatic's preclusion defense. *See, e.g., Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000).

"A person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Id.* (internal quotation marks omitted). "The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Id.* at 892–93 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)). That general rule, however, admits some exceptions. In particular, a party that "agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of [its] agreement." *Id.* at 893; *see also id.* at 894–95 (listing five other exceptions to the rule against nonparty preclusion).[13]

Dramatic contends that nonparty preclusion applies here because, as part of its 2015 grant from Lee, Rudinplay "agreed to be bound by [the arbitrator's] determination [of Dramatic's] rights." Dramatic Merits Br. at 57. But the 2015 grant does not specifically mention Dramatic's arbitration against the Lee estate.

---

[13] As noted above, Dramatic relied on several other exceptions to the general rule against nonparty preclusion below. In its briefing in the merits appeal, however, Dramatic contends only that nonparty preclusion applies because Atticus agreed to be bound by the arbitration.

38

Nor could it, considering the arbitration began some three-and-a-half years after the grant's execution. Dramatic nevertheless maintains that Rudinplay (and thus Atticus) agreed to be bound by the arbitration when it acknowledged that "[t]he rights granted" under the 2015 grant "shall be subject to the rights granted under the [1969 grant], as limited by [Lee's] termination." Joint Merits App'x at 227.

That provision cannot bear the weight Dramatic asks of it. The 2015 grant does not mention the arbitration between Dramatic and Lee. Instead, the relevant portion of the 2015 grant merely recounts the existence of the 1969 grant; Lee's termination of that grant; Rudinplay's "acknowledge[ment] that, notwithstanding such termination, the amateur acting rights to the [Sergel Play] can continue to be exploited following such termination under the terms of the [1969 grant] on a non-exclusive basis in the United States, and on an exclusive basis elsewhere"; and the bottom-line principle that "[t]he rights granted [under the 2015 grant] shall be subject to the rights granted under the [1969 grant], as limited by such termination." *Id.* at 226–27.

The 2015 grant thus simply reiterates the position that Atticus has advanced all along in this case: that Dramatic can continue to license the Sergel Play on a

non-exclusive basis in the United States. We decline to read that provision as somehow also implicitly binding Atticus to an arbitration that the 2015 grant does not reference and to which Atticus was not a party. *Cf. Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 709 (7th Cir. 2024) ("As a general matter, courts are reluctant to find implied consent to nonparty issue preclusion, given the due process guarantees at stake.").

Unsurprisingly, the cases on which Dramatic relies involved far more explicit agreements to be bound by another party's litigation. In *Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300 (2d Cir. 1996), we concluded that a nonparty company could be bound by a settlement agreement entered into by a party company when the nonparty's predecessor "expressly authorized [the party] to defend and settle litigation which implicated liabilities [the predecessor] had assumed and for which [the predecessor] had agreed to indemnify [the party]." *Id.* at 307; *see also id.* (noting that the nonparty "had actual notice of [the] litigation"). Meanwhile, in *Tennessee Association of Health Maintenance Organizations, Inc. v. Grier*, 262 F.3d 559 (6th Cir. 2001), the Sixth Circuit concluded that a group of managed care contractors was "bound by [] additional appeal process and grievance guidelines

contained in [a] Revised Consent Decree" to which the state was a party, when the organizations' contracts with the state provided that the state could "develop additional grievance process guidelines or rules" and "develop additional appeal process guidelines or rules," which "shall be followed by the [contractor]." *Id.* at 562, 565.

*Tourangeau* and *Tennessee Association of Health Maintenance Organizations* therefore both involved clear manifestations from the nonparty to be bound by the party.  That is consistent with how the Supreme Court described this exception in *Taylor*.  *See Taylor*, 553 U.S. at 893 (nonparty preclusion can apply when "separate actions involving the same transaction are brought by different plaintiffs against the same defendant" and "all the parties to all the actions [] agree that the question of the defendant's liability will be definitely determined, one way or the other, in a 'test case'").  The 2015 grant, by contrast, contains no similar explicit agreement to be bound.[14]  Thus, the district court correctly rejected Dramatic's preclusion arguments.

---

[14] Although Dramatic argues only that res judicata applies here because Atticus agreed to be bound by the arbitration and follow-on proceeding, it also marshals some of the evidence it relied on below to argue that Atticus controlled the Lee estate in the arbitration.  Much like that evidence does not demonstrate that Atticus controlled the Lee

41

\*　　\*　　\*

For those reasons, we reject Dramatic's arguments in its merits appeal and therefore affirm the district court's judgment granting declaratory relief to Atticus.

## II.　The Fees Appeals

Dramatic and Atticus take cross-appeals from the district court's order granting in part and denying in part Atticus's motion for attorney's fees. We review an award of attorney's fees under the fee-shifting provision of the Copyright Act for abuse of discretion. *Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 121 (2d Cir. 2001).

The Copyright Act provides that "the court may [] award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. Although "[t]here is no precise rule or formula" for awarding attorney's fees, the Supreme Court has identified "several nonexclusive factors" that "guide" a court's discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to

---

estate for purposes of the arbitration, it likewise does not demonstrate that Atticus agreed to be bound by that arbitration. *See infra* at 52 n.19.

42

advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994). The objective reasonableness of a party's arguments "carries significant weight," but "courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals"—namely, to "enrich[] the general public through access to creative works" by "encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204, 209 (2016).

## A.     Dramatic's Appeal

Dramatic appeals from the district court's order awarding Atticus its fees incurred after April 27, 2023—that is, the time Atticus spent litigating Dramatic's statute of limitations defense and one of its res judicata arguments.[15] We conclude that the district court did not abuse its discretion in determining that a fee award was warranted because Dramatic's statute of limitations and preclusion arguments were objectively unreasonable and because Atticus's suit would

---

[15] Although Atticus attacks the objective reasonableness of Dramatic's remaining res judicata arguments, the district court did not award fees for the period in which these arguments were litigated.

promote the public interest and therefore the purposes of the Copyright Act. However, the district court erred to the extent that it concluded a fee award was warranted because Dramatic had unreasonably prolonged the litigation by raising a forfeited statute of limitations argument and by pursuing discovery.[16]

### 1.    Statute of Limitations

The district court concluded that a fee award was warranted because Dramatic's statute of limitations argument was objectively unreasonable and was not timely asserted. We see no abuse of discretion in the district court's first conclusion but find that the district court erred in the second.

As discussed above, Dramatic's attempt to characterize this dispute as one centered around an "ownership claim" obscures the fact that the parties do not claim "ownership" over the same thing. In light of that, the district court concluded that Dramatic's statute of limitations argument "was nearly

---

[16] The district court also reasoned that a fee award was warranted because "Dramatic felt little restraint in" pursuing its defenses "since it is indemnified for the costs it incurred defending this litigation." Joint Fees App'x at 247. That conclusion largely rested on the district court's determination that Dramatic advanced objectively unreasonable positions that unnecessarily prolonged the litigation, and we therefore focus on those considerations.

44

unintelligible and invited serious error."[17]  Joint Fees App'x at 248 (alteration adopted) (internal quotation marks and citation omitted).  We are confident that the district court did not mistake a "reasonable defense[] that ultimately fail[ed]" with "the objectively unreasonable variety."  *Kirtsaeng*, 579 U.S. at 208; *see also id.* at 207 ("A district court that has ruled on the merits of a copyright case can easily assess whether the losing party advanced an unreasonable claim or defense.").  We therefore see no abuse of discretion in the district court's determination that fees were warranted because of the objective unreasonableness of Dramatic's statute of limitations defense.  *See Matthew Bender & Co.*, 240 F.3d at 121 ("Abuse of discretion is one of the most deferential standards of review . . . ." (internal quotation marks and citation omitted)).

The district court also reasoned that a fee award was warranted because "Dramatic's untimely assertion of [its] statute of limitation defense unreasonably

---

[17] Dramatic maintains that its statute of limitations argument was not objectively unreasonable because it was "novel."  Dramatic Fees Br. at 2.  As Atticus argues, however, accepting Dramatic's statute of limitations argument would plausibly allow anyone to assert a frivolous claim of copyright ownership and later invoke the statute of limitations against the true author.  Dramatic does not explain why this would not be a natural consequence of its position.  Thus, even if Dramatic's statute of limitations argument was "novel," that does not make it objectively reasonable.

created additional motion practice and delayed entry of judgment." Joint Fees App'x at 248. That is, the district court concluded that fees were appropriate because Dramatic "needlessly and unreasonably prolonged this litigation" by raising its statute of limitations defense after not raising it in opposition to Atticus's pre-answer motion for summary judgment. *Id.* at 247.

The Federal Rules of Civil Procedure provide that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required." Fed. R. Civ. P. 12(b); *see also* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including[] . . . statute of limitations."). "Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto." *Day v. McDonough*, 547 U.S. 198, 202 (2006) (citing Fed. R. Civ. P. 8(c), 12(b), 15(a)).

Here, however, Dramatic *did* raise its statute of limitations defense in its answer. The district court nevertheless concluded that Dramatic necessarily forfeited that defense by not raising it in response to Atticus's pre-answer motion

46

for summary judgment. Such a per se forfeiture rule, however, is not commanded by our caselaw or the Federal Rules.

To be sure, a party that does not raise an argument prior to the grant of summary judgment generally cannot later complain that the court failed to consider that argument. *See, e.g.*, *Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004). But that general principle does not bear on the specific scenario here, where Atticus's pre-answer motion for summary judgment was not granted in full and Dramatic subsequently asserted its statute of limitations defense in its answer. The Federal Rules and the cases on which Atticus relies do not suggest that a defendant forfeits a statute of limitations defense by raising it when the Federal Rules so require—in the answer. *See* Fed. R. Civ. P. 8(c); *Litton Indus., Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 967 F.2d 742, 751–52 (2d Cir. 1992) ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint."). In fact, the Advisory Committee's notes to the Federal Rules caution that a pre-answer motion for summary judgment may be "premature" precisely because "the nonmovant" has not "had time to file a

responsive pleading." *See* Fed. R. Civ. P. 56(b) advisory committee's notes to 2010 amendment. Dramatic argued as much in its opposition to Atticus's motion.[18]

Moreover, it is not hard to imagine the possible mischief that such an automatic forfeiture rule might encourage. A plaintiff, seeking to limit the scope of possible defenses, might move for summary judgment before an answer is filed; if that motion is denied and the case proceeds to discovery, the plaintiff could argue that any defense not raised by the defendant in response to the pre-answer motion for summary judgment but borne out by later discovery had been forfeited and that the defendant could not amend its answer to assert that defense. Besides incentivizing procedural gamesmanship, that result would be inconsistent with the principle that leave to amend should be "freely given." *See, e.g., Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 109 (2d Cir. 2014); *see also* Fed. R. Civ. P. 15(a). Thus, to the extent the district court reasoned that an award of attorney's fees was warranted because Dramatic forfeited its statute of limitations defense,

---

[18] The district court cited *Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016), in finding that Dramatic forfeited its statute of limitations defense. If anything, though, that case suggests the opposite. *See id.* at 246 ("find[ing] it appropriate to exercise our discretion to resolve the Commissioner's objection on the merits" when that argument had not been raised in opposition to the plaintiffs' motion for summary judgment below).

48

that conclusion was "based on an erroneous determination of law." *Matthew Bender & Co.*, 240 F.3d at 121.

Because the district court's fee award cited both the objective unreasonableness and timeliness of Dramatic's statute of limitations defense, we vacate the award and remand for further consideration. On remand, the district court may again exercise its discretion to determine what fee award is warranted in light of the objective unreasonableness of Dramatic's statute of limitations defense. For example, although Dramatic did not forfeit that defense because it raised it in its answer, the district court may nevertheless conclude that fees are warranted because Dramatic raised an objectively unreasonable defense only after both parties had filed dispositive motions, and pursued that objectively unreasonable defense through a second, standalone dispositive motion.

### 2.    Res Judicata

Next, the district court concluded that a fee award was warranted because Dramatic's preclusion argument—more specifically, its argument that Atticus controlled the Lee estate in the arbitration—was "far-fetched, untethered to any reliable evidence, and based on repeated misstatements of the legal definition of

49

control." Joint Fees App'x at 248. The district court also faulted Dramatic for its pursuit of discovery to support this defense. *See id.* at 248–49.

We conclude that this second rationale cannot support the district court's award of fees. Recall how Dramatic's res judicata argument unfolded. Dramatic raised this argument in the initial stages of the case (in its motion to dismiss and in its opposition to Atticus's pre-answer motion for summary judgment). The district court rejected this argument in large part in its April 27, 2023 decision, while recognizing that discovery might be necessary to resolve the extent of Atticus's control over the Lee estate. Atticus then offered to produce its communications with the Lee estate during the arbitration, which Dramatic accepted. Dramatic subsequently sought further discovery with the caveat that it would rest on the produced discovery if the district court thought additional discovery would not change the result.

The Supreme Court has "acknowledge[d] that direct evidence justifying nonparty preclusion is often in the hands of plaintiffs rather than defendants," and, for that reason, "targeted interrogatories or deposition questions can reduce the information disparity." *Taylor*, 553 U.S. at 907. Given that, it is understandable

50

that Dramatic sought the discovery that was contemplated by the district court's April 27, 2023 decision, even if that discovery ultimately proved fruitless. To the extent the district court's fee award rested on its perception that Dramatic unreasonably prolonged the litigation by requesting discovery consistent with the court's order—discovery that Dramatic could not have known the contents of until it received it—we conclude that this was in error. *See Fogerty v. MGM Grp. Holdings Corp.*, 379 F.3d 348, 358 (6th Cir. 2004) ("[I]t was not until *after* the completion of discovery that the district court could have reached the conclusion that plaintiffs failed to provide evidence of access. Prior to that, . . . plaintiffs had several concerns that reasonably prompted them to continue discovery." (citation omitted)) (reversing fees awarded under 17 U.S.C. § 505).

That said, the district court did not abuse its discretion in determining that a fee award was warranted based on Dramatic's continued assertion of its preclusion defense after receiving that discovery. After Atticus produced its emails with the Lee estate, Dramatic maintained that the communications demonstrated the sort of control necessary for preclusion, and that its additional requested discovery would only further corroborate that argument. As the district

51

court concluded, however, Dramatic's theory of preclusion was "untethered" to the produced discovery and insufficient to satisfy its burden under relevant caselaw: Far from demonstrating that Atticus "exercised some degree of *actual control* over the [Lee estate's] presentation," *see Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 185 (2d Cir. 2003) (emphasis added), these communications show a far more hands-off posture.[19] We therefore see no abuse of discretion in the district court's conclusion that the objective unreasonableness of Dramatic's continued assertion of its preclusion argument weighed in favor of a fee award.

### 3. Remaining Factors

Finally, the district court concluded that a fee award was warranted because it would advance the public interest. We do not see any error in that finding: Atticus's litigation would "encourag[e] and reward[] authors' creations while also

---

[19] *See, e.g.*, Joint Merits App'x at 623 (email from Atticus's counsel attaching suggestions on draft brief: "Obviously you will adopt or not adopt [these suggestions] as you will."); *id.* at 704 (email from Atticus's counsel: "What is the status of the arbitration. Have you testified yet, so that you can talk to me about it?"); *id.* at 709 (email from Atticus's counsel: "It is hard to imagine that much testimony being needed, or relevant, but I look forward to you telling me about this when it's over."); *id.* at 715 (email from Atticus's counsel: "Any word on whether you can talk to me. Both my client and I are, to say the least, curious as to what's going on.").

enabling others to build on that work," *Kirtsaeng*, 579 U.S. at 204, given that both the Sergel Play and the Sorkin Play would be available for non-first-class productions. Accordingly, the district court did not abuse its discretion in determining that these broader purposes of the Copyright Act supported a fee award.

### B. Atticus's Appeal

As noted above, the district court awarded Atticus its attorney's fees incurred after April 27, 2023—that is, for the period after the district court issued its decision rejecting Dramatic's argument regarding the derivative works exception. Atticus argues that it should have been awarded the fees it incurred *before* that date, or for its time spent litigating Dramatic's position on the derivative works exception. We see no abuse of discretion in the district court's decision to deny those fees.

Atticus primarily asserts that the district court abused its discretion by "afford[ing] precedential value to a single arbitrator's objectively unreasonable, non-precedential," and "legally untenable construction of the Copyright Act's termination provisions." Atticus Fees Br. at 25 (internal quotation marks and

citation omitted).  In other words, Atticus maintains that while it may have been subjectively reasonable for Dramatic to advance the same position that prevailed in the arbitration, that position was nevertheless objectively unreasonable and therefore warranted a fee award.

True enough, an arbitration award lacks general precedential effect.  *See, e.g.*, *Int'l Brotherhood of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 597 (7th Cir. 2014).  That does not mean, however, that a party or a court must ignore an arbitrator's decision altogether.  Nor did the district court supplant the objective reasonableness standard with a subjective one when it determined that it was objectively reasonable for Dramatic to advance the same argument about the derivative works exception that the arbitrator accepted. Granted, it might be difficult to imagine a scenario in which another defendant might be able to rely on the arbitrator's reasoning; much of Dramatic's argument in this case turns on the specific language of the 1969 grant.  Still, any other defendant facing claims similar to the claim Atticus brought here would, presumably, adopt the same reading of the derivative works exception that an

arbitrator accepted after a 25-day hearing and memorialized in an 88-page decision.[20]

Although we reject Dramatic's reading of the derivative works exception for the reasons stated above, the district court did not abuse its discretion in concluding that a full fee award was not warranted. *Cf. Matthew Bender & Co.*, 240 F.3d at 122–23 (objectively reasonable to rely on positions that "provoked vigorous dissenting opinions agreeing with [those] positions" and where another circuit "ha[d] ruled in [the defendant's] favor on a substantially similar . . . issue"). Because Atticus provides no other basis to set aside the district court's denial of the fees Atticus incurred prior to April 27, 2023, we affirm the district court's partial denial of fees.

\*     \*     \*

In sum, we conclude that the district court did not abuse its discretion in determining that an award of fees was warranted due to the objective

---

[20] Moreover, a federal district court in the Northern District of Illinois denied the Lee estate's motion to vacate that arbitral award. *See Carter*, 608 F. Supp. 3d at 623–25. Having won both victories by employing the same theory, Dramatic understandably would have advanced that same theory here.

unreasonableness of Dramatic's statute of limitations and res judicata arguments. The district court erred, however, to the extent that it based its fee award in part on its findings that Dramatic had forfeited its statute of limitations defense and that Dramatic's discovery unnecessarily prolonged the litigation. We further conclude that the district court did not abuse its discretion in declining to award Atticus's fees incurred prior to April 27, 2023. We therefore vacate the fee award and remand for the district court to further consider the fee application in light of this decision. *See, e.g.*, *Kirtsaeng*, 579 U.S. at 209–10; *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 799 F. App'x 43, 47 (2d Cir. 2020) (summary order). On remand, the district court may set forth its reasoning as to how the objective unreasonableness of Dramatic's statute of limitations and res judicata defenses, along with any other permissible consideration, may support an award of fees.

Finally, Atticus requests, in passing, an award of attorney's fees for this appeal, in an amount to be determined by the district court on remand. We exercise our discretion to deny this request. Although we conclude that the district court did not abuse its discretion in determining that a fee award was warranted because Dramatic's statute of limitations argument was objectively unreasonable,

that was only one of four arguments advanced in the single merits appeal—one of which, as mentioned above, the district court permissibly found to be objectively reasonable so as to not warrant the imposition of fees. *Cf. Kirtsaeng*, 579 U.S. at 208–09 ("[I]n any given case a court may award fees even though the losing party offered reasonable arguments (or, conversely, deny fees even though the losing party made unreasonable ones)."). Accordingly, and heeding the Supreme Court's "oft-stated concern that an application for attorney's fees should not result in a second major litigation," *id.* at 207 (internal quotation marks and citation omitted), we decline to award Atticus its fees on appeal. *See, e.g., Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1383 (2d Cir. 1993) ("In the circumstances of this case, we [] decline to award appellate fees under [17 U.S.C. § 505]. . . . [A] very substantial fee (even if ultimately reduced somewhat . . . ) was awarded at the trial level, and the lawyers in this appeal were familiar with the issues because they made similar arguments in the District Court.").

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment granting declaratory relief to Atticus, **VACATE** the district court's award of attorney's fees, and **REMAND** for the district court to further consider the fee application in light of this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit